Scott A. Edelman (SE-5247)
Daniel M. Perry (DP-9966)
MILBANK, TWEED, HADLEY & McCLOY, LLP
1 Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel for Compass Financial Partners LLC and
Compass USA SPE LLC*

<div align="center">

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

</div>

| | |
|---|---|
| CCM PATHFINDER GRAMERCY, LLC | ) ) ) | Case No: 08 Civ. 5298 (JSR) |

CCM PATHFINDER GRAMERCY, LLC      )    Case No: 08 Civ. 5298 (JSR)

          Plaintiff,    )

     -against-    )   **DECLARATION OF GABRIEL WEAVER
                )   IN SUPPORT OF OPPOSITION TO**
COMPASS FINANCIAL PARTNERS )   **PLAINTIFFS' MOTION FOR REMAND**
LLC and COMPASS USA SPE LLC, )

          Defendants.   )

I, Gabriel Weaver, declare as follows:

1.     I am duly licensed to practice law in the States of New York and California, and in the United States District Court, Southern District of New York. I am an associate with the law firm of Milbank, Tweed, Hadley & McCloy LLP, ("Milbank"), counsel for Compass USA SPE LLC, and its servicer, Compass Financial Partners LLC (together, "Compass"). I submit this declaration in support of Compass's Opposition to Plaintiffs' Motion to Remand. I have personal knowledge of the facts stated in this declaration and, if called upon to do so, would testify competently thereto at trial.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the list of Direct Lenders from whom CCM Pathfinder Bay Pompano, LLC and CCM Pathfinder Gramercy (collectively "Pathfinder" or "Plaintiffs") acquired their interests.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Accounting filed by the Nevada Plaintiff LLCs in the Nevada District Court on November 15, 2007 in connection with Case No. 2:07-cv-00892-RCJ-GWF., listing the roster of LLC Members for each loan.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Statement of the Law Offices of Alan R. Smith Pursuant to Bankruptcy Rule 2019, filed in the Nevada Bankruptcy court on December 6, 2006, Case No. BK-S-06-10725, listing the members of the Lenders Protection Group.

5.      On July 13, 2008 we cross referenced Exhibit 1 with Exhibit 2 and Exhibit 3.  By comparing Exhibit 1 with Exhibit 2, we were able to determine that four of the Direct Lenders from whom Pathfinder acquired its assignments of interest were members of one of the LLCs involved in the Nevada Litigation.  By comparing Exhibit 1 with Exhibit 3, we were able to determine that six of the Direct Lenders from whom Pathfinder acquired its assignments of interest were member of the Lenders Protection Group.  On Exhibit 1, we marked "LLC" next to the name of each LLC member, and "LPG" next to the name of each LPG member.

6.      Attached hereto as Exhibit 4 is a true and correct copy of the Disclosure Statement accompanying Debtors' Bankruptcy Plan, filed on November 15, 2006, in Case No. BK-S-06-10725, available as Docket Number 1798

7.      Attached hereto as Exhibit 5 is a true and correct copy of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization, filed on November 15, 2006 in Case No. BK-S-06-10725, which is available as Docket Number 1799.

8.      Attached hereto as Exhibit 6 is a true and correct copy of the Order Confirming the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization," as Modified Herein, signed by the Honorable Linda B. Riegle on January 8, 2007 in Case No. BK-S-06-10725 (LBR), which is available as Docket Number 2376.

9.      Attached hereto as Exhibit 7 is a true and correct copy of the Complaint entitled *3685 San Fernando Lenders LLC, et al. v. Compass USA SPE LLC, et al.,* in Case No. 3:07-CV-241 which is available as Docket Number 1.

10.      Attached hereto as Exhibit 8 is a true and correct copy of the Order of the Nevada Bankruptcy Court on Emergency Motion to Enforce Confirmation and For Sanctions and Order on Subject Matter Jurisdiction entered by the Honorable Linda B. Riegle on August July 2, 2007 at Docket Number 4109 in Case No. 06-10725 LBR.

11.      Attached hereto as Exhibit 9 is a true and correct copy of the Supplemental Order Re: Emergency Motion of Compass Financial Partners LLC For Order Pursuant to 11 U.S.C. §§ 105 and 1141 Enforcing Confirmation Order and for Civil Contempt Sanctions entered by the Honorable Linda B. Riegle on August 1, 2007 at Docket Number 4402 in Case No. 06-10725 LBR.

12.      Attached hereto as Exhibit 10 is a true and correct excerpt of the Transcript of Proceedings before the Honorable Robert C. Jones on August 6, 2007.

13.      Attached hereto as Exhibit 11 is a true and correct copy of the Preliminary Injunction and Order Pursuant to 11 U.S.C. §§ 105 and 1141 and Fed. R. Civ. P. 65 Enforcing Confirmation Order entered by the Honorable Robert C. Jones on November 6, 2007 at Docket Number 199 in Case No. 2:07-cv-00892-RCJ-GWF.

14.      Attached hereto as Exhibit 12 is a true and correct excerpt of the Affidavit of Mailing of the Preliminary Injunction and Order Pursuant to 11 U.S.C. §§ 105 and 1141 and Fed. R. Civ. P. 65 Enforcing Confirmation Order entered by the Honorable Robert C. Jones on November 6, 2007 at Docket Number 199 in Case No. 2:07-cv-00892-RCJ-GWF.

15.      Attached hereto as Exhibit 13 is a true and correct copy of a sample Loan Servicing Agreement utilized by USA Commercial Mortgage Company.

16.      Attached hereto as Exhibit 14 is a true and correct copy of the Findings of Fact and Conclusions of Law in Support of the "Order Confirming the "Debtors' Third Amended

Joint Chapter 11 Plan of Reorganization, as Modified Herein"" signed by the Honorable Linda Riegle on January 8, 2007, at Docket Number 2377, in Case No. BK-S-06-10725.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of July, 2008 in Los Angeles, California.

Gabriel Weaver

| LoanID | Loan Name | AccountID | Legal Vesting | Service Fee Rate | Original Inv Per Pathfinder |
|---|---|---|---|---|---|
| | 299 Palm Harbor One | | Liberty Resource Management Corp., a Pennsylvania company | 1.00% | 200,000.00 |
| | 299 Palm Harbor One | | KTylerGO Investments, LTD, a Texas company | 3.00% | 2,000,000.00 |
| | 299 Palm Harbor One | | Helms Homes, LLC, a Nevada limited liability company | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Walter Kixmey & Gail Kixmey, husband & wife | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | AGI Limited, a Nevada Limited Partnership | 1.00% | 100,000.00 |
| | 299 Palm Harbor One | | Clifford D. Hagseng & Claire F. Hagseng, husband & wife, as joint tenants with right of survivorship | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Davis Investments, a Nevada partnership | 1.00% | 300,000.00 |
| | 299 Palm Harbor One | | Area 2 LLC, a Nevada limited liability company | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Sidney M. Collins Trustee as her sole & separate property under the Collins Family Trust dated 1/26/90 | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Theda Nicholas Rouble Trustee of the Theda Rouble Family Trust dated 7/24/90 | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Norman Martineau & Kathryn J. Martineau, husband & wife, as joint tenants with right of survivorship | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Elizabeth Skytta Bhaur, a single woman | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | First Savings Bank Custodian For Gary O. Sharp IRA | 1.00% | 60,000.00 |
| | 299 Palm Harbor One | | Arthur E. Kabbe & Thelma M. Kabbe Trustees of the Arthur E. Kabbe & Thelma M. Kabbe Family Trust dated 6/16/96 | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Jerry Wodzinsky, a married man dealing with his sole & separate property | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Gregory D. Yuval Trustee of the Gregory D. Yuval Family Trust | 1.00% | 75,000.00 |
| | 299 Palm Harbor One | | Daniel R. Hsieuh & Sandra K Hsieuh Trustees of the Hsieuh Family Trust restated 4/21/00 | 1.00% | 100,000.00 |
| | 299 Palm Harbor One | | Norman Khosn, a married man dealing with his sole & separate property | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Mary Jean Jellison, a married woman dealing with her sole & separate property | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Guenter A. Kohler & Elfriede Kohler Trustees of the 1989 Kohler Living Trust dated 6/13/89 | 1.00% | 75,000.00 |
| | 299 Palm Harbor One | | David S. Cadwalader & Alyce E. Cadwalader Trustees of the Cadwalader 2001 Trust | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Christian Gasner & Hildegard Gasner, husband & wife, as joint tenants with right of survivorship | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Darley Ventures, LP a Nevada limited partnership | 1.00% | 100,000.00 |
| | 299 Palm Harbor One | | Adam J. Jakszorovz Trustee of the Albert J. Jakszorovz Living Trust dated 11/4/97 | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Larry L. Rieger & Patsy R. Rieger Trustees of the Larry L. Rieger & Patsy R. Rieger Revocable Trust dated 8/14/91 | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | First Savings Bank Custodian For Gary Holder IRA | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Marc Tysseling & Sharon Vry-Tysseling, husband & wife, as joint tenants with right of survivorship | 1.00% | 100,000.00 |
| | 299 Palm Harbor One | | Ronald Kryvko & Linda Kryvko, husband & wife, as tenants in common | 1.00% | 80,000.00 |
| | 299 Palm Harbor One | | Simotec, Inc., a Nevada corporation | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Ron Lifton & Leonore Lifton Trustees of the Lifton Trust dated 2/9/99 | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Marietta Virglis, a married woman dealing with her sole & separate property | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Donald T. Flood & Betty R. Flood Trustees of the Flood Family Trust dated 12/24/85 | 1.25% | 80,000.00 |
| | 299 Palm Harbor One | | Linda F. Carsion, an unmarried woman | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Renki L. Threfall, a married woman dealing with her sole & separate property | 1.00% | 100,000.00 |
| | 299 Palm Harbor One | | Carolina M. Gerwin Trustee of the Carolina Gerwin Family Trust dated 11/2/93 | 3.00% | 330,000.00 |
| | 299 Palm Harbor One | | Donald A. Herrmann & Nancy E. Herrmann, husband & wife, as joint tenants with right of survivorship | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | David M. Olds & Sally W. Olds, husband & wife, as joint tenants with right of survivorship | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Robert H. Schultz & Sharon L. Schultz Trustees of the Robert H. Schultz & Sharon L. Schultz Living Trust dated 2/25/97 | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Richard H. Dahlke, a married man dealing with his sole & separate property | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Stanley Hellhar a married man dealing with his sole & separate property | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | First Savings Bank Custodian For Kenneth O. Shelley IRA | 1.00% | 75,000.00 |
| | 299 Palm Harbor One | | Linda Patrocco Doerr Trustee of the Doerr Family Trust dated 9/12/02 | 1.00% | 65,000.00 |
| | 299 Palm Harbor One | | Andrew Shler & Perl Chkinsteng, husband & wife, as joint tenants with right of survivorship | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Laverne F. Rafferty Trustee of the Harry J. Rafferty & Laverne F. Rafferty Trust dated 2/16/90 | 3.00% | 50,000.00 |
| | 299 Palm Harbor One | | Walter F. Henningsen Trustee of the Walter F. Henningsen Revocable Trust dated 2/19/03 | 3.00% | 100,000.00 |
| | 299 Palm Harbor One | | State Farm Ltd Partnership | 3.00% | 60,000.00 |
| | 299 Palm Harbor One | | First Savings Bank Custodian For Mary Jelfson IRA | 1.00% | 50,000.00 |
| | 299 Palm Harbor One | | Saul Collin, a married man dealing with his sole & separate property | | |

| | | | |
|---|---|---|---|
| 299 Palm Harbor One | Robert M. Lampert Trustee of the Pulmonary Associates Profit Sharing Plan #002 for the Benefit of Robert M. Lampert dated 01/01/03 | 3.00% | 60,000.00 |
| 299 Palm Harbor One | Diane A. Odham, a married woman dealing with her sole & separate property | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Hans J. Prakel, an unmarried man | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Hans - Uwe Sattler, a married man dealing with his sole and separate property | 1.00% | 50,000.00 |
| 299 Palm Harbor One | Paul L. Kwiatkowski and Celia Jo Kwiatkowski, Trustees of the Kwiatkowski Revocable Trust, dated 12/17/04 | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Sheila E. Rothberg, a married woman dealing with her sole & separate property | 1.00% | 150,000.00 |
| 299 Palm Harbor One | Dr. Dena D. Kahn, DDS a married man dealing with his sole and separate property | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Bernard Cohen and Elaine Cohen, Trustees of the Bernard Cohen Trust dated 3/24/98 | 2.00% | 50,000.00 |
| 299 Palm Harbor One | Ella L. Elgart and Shta V. Elgart, Trustees of the Ella L. Elgart Revocable Living Trust dated 7/8/02 | 1.00% | 50,000.00 |
| 299 Palm Harbor One | Erin Bella Zanor, Trustee of the Erin Bella Zanor 1994 Trust dated 4/13/94 | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Glenn Greenberg and Denise M. Greenberg, husband and wife, as joint tenants with the right of survivorship | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Coke Acosta, an unmarried man | 1.00% | 50,000.00 |
| 299 Palm Harbor One | Patrick Ferguson Trustee of the Ferguson Living Trust dated 6/28/00 | 3.00% | 50,000.00 |
| 299 Palm Harbor One | PLB Enterprises, LLC | 3.00% | 66,000.00 |
| 299 Palm Harbor One | Charles R. Brice and Jaynned L. Brice, husband and wife, as joint tenants with the right of survivorship | 3.00% | 100,000.00 |
| 299 Palm Harbor One | Susan F. Geotambach, Trustee of the Susan F. Stein Trust Dated 2/12/00 | 3.00% | 100,000.00 |
| 299 Palm Harbor One | Richard V. Houston & William H. Houston Trustees of the William H. Houston and Susan N. Houston Revocable Family Trust dated 12/29/83 | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Susan N. Houston & William H. Houston Trustees of the William H. Houston and Susan N. Houston Revocable Family Trust dated 12/29/83 | 1.00% | 100,000.00 |
| 299 Palm Harbor One | George S. Wilkat and Lorraine Wilkat, husband and wife, as joint tenants with right of survivorship | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Brian J. Miller and Penny Miller, husband and wife, as joint tenants with right of survivorship | 1.00% | 100,000.00 |
| 299 Palm Harbor One | Stephanie Trager & Lawrence B. Trager, a husband & wife as joint tenants with rights of survivorship | 3.00% | 53,000.00 |
| 299 Palm Harbor One | William L. Ghldssel, an unmarried man | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Ronald C. Shackleford, Trustee of the Shackleford Family Trust dated 9/21/04 | 1.00% | 50,000.00 |
| 299 Palm Harbor One | Richard M. Reiter, Trustee of the Richard M. Reiter Living Trust dated 3/18/98 | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Jack L. Jones, a married man dealing with his sole and separate property | 3.00% | 70,000.00 |
| 299 Palm Harbor One | Doris Mae Campbell, Trustee of the Doris Mae Campbell Revocable Trust of 1999 dated 3/30/99 | 1.00% | 50,000.00 |
| 299 Palm Harbor One | Charles A. Spencer, a single man | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Julia A. Vigo, an unmarried woman | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Richard M. Heinen, a married man as his sole & separate property | 3.00% | 50,000.00 |
| 299 Palm Harbor One | Maury R. Romvonpati, an unmarried woman | 3.00% | 100,000.00 |
| 299 Palm Harbor One | Karen L. Pigeon Trustee of the Karen L. Pigeon 2006 Living Trust dated 2/27/2006 | 3.00% | 65,000.00 |
| 299 Palm Harbor One | William L. Graham and Willa L. Graham, husband and wife as Joint Tenants with Rights Of Survivorship | 3.00% | 100,000.00 |
| 299 Palm Harbor One | David B. Burlingame | 1.00% | 50,000.00 |
| | | | 70,000.00 |
| **Palm Harbor One Total** | | **2.0340841%** | **7,775,900.00** |

| lanID | Loan Name | AccountID | Legal Vesting | Service Fee Rate | Current Investment |
|---|---|---|---|---|---|
| 174 | Gramercy Court Condos | | William C. Campbell & Luis M. Campbell Trustees of the 2001 Campbell Family Trust dated 10/03/01 | 1.00% | $100,000.00 |
| 174 | Gramercy Court Condos | | Ila G. Corley Trustee of the Ila G. Corley Trust, dated 8/19/94 | 1.00% | $75,000.00 |
| 174 | Gramercy Court Condos | | First Savings Bank Custodian For L. Ronald Trapp IRA | 3.50% | $50,000.00 |
| 174 | Gramercy Court Condos | | KTaylorGO Investments, LTD., a Texas company | 1.00% | $100,000.00 |
| 174 | Gramercy Court Condos | | Gordon N. Stimpson & Marjorie E. Stimpson Co-Trustees of The Stimpson Family Trust Dated 3/9/90 | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | L. Ronald Trapp & Jacqueline P. Trapp Trustees of the L. Ronald Trapp & Jacqueline P. Trapp Family Trust | 1.00% | $100,000.00 |
| 174 | Gramercy Court Condos | | Alan Simon & Carol Simon Trustees of the Simon Family Trust 2000 | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | David R. Fuller & Marina Fuller Trustees of the David R. Fuller & Marina Fuller Trust | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | David Sallet & Jean Sallet, husband & wife, as joint tenants with right of survivorship | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | George Miner & Virginia Miner Trustees for the benefit of The Virginia & George Miner Living Trust | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Arnold Alvso & Agnes Alvso Trustees of the Alvso Family Trust dated 10/27/89 | 1.00% | $30,000.00 |
| 174 | Gramercy Court Condos | | Marilyn Mullen & Matthew Mullen, husband & wife, as joint tenants with right of survivorship | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Kenneth B. Schott & Mary Kay Bryan-Schott, husband & wife, as joint tenants with right of survivorship | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Gary L. Miller & Barbara L. Miller Trustees of the Gary L. & Barbara L. Miller Trust dated 09/13/87 | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Susan Pontius, an unmarried woman | 1.00% | $85,000.00 |
| 174 | Gramercy Court Condos | | | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Cassandra J. Robbins, an unmarried woman | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Larry Antram & Luann Antram, husband & wife, as joint tenants with right of survivorship | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Heidi R. Olson, Trustee Margaret Patterson Living Trust Dated 11/9/04 | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Jorg U. Lueck, a married man dealing with his sole & separate property | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Eddie Shaw Trustee of the Eddie Shaw 2000 Trust dated 12/1/2000 | 1.00% | $75,000.00 |
| 174 | Gramercy Court Condos | | | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Rebecca A. Rogers Trustee of the Rebecca A. Rogers Trust dated 9/19/06 | 3.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Houghton Dental Corp Profit Sharing Plan for benefit of Geraldine Houghton | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | James C. Bill, a married man dealing with his sole & separate property | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Noemi M. Deuf, an unmarried woman | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Mark M. Leef, an unmarried man | 1.00% | $80,000.00 |
| 174 | Gramercy Court Condos | 3141 | Jeremy L. Black & Channa N. Black, husband & wife, as joint tenants with right of survivorship | 1.00% | $50 |
| 174 | Gramercy Court Condos | | Gary B. Anderson & Barbara L. Anderson Trustees of the Anderson Family Trust dated 7/21/92 | 1.00% | $125,...00 |
| 174 | Gramercy Court Condos | | Vier Shah & Bina Shah, husband & wife, as joint tenants with right of survivorship | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Gail R. Hedden Trustee of the Gail Hedden Living Trust dated 8/9/03 | 3.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | William J. Orca, Jr. Trustee of the Orca Associates, Inc. Defined Pension Plan | 1.00% | $75,000.00 |
| 174 | Gramercy Court Condos | | Eugene W. Cady & Sandra L. Cady Trustees of the Eugene W. Cady & Sandra L. Cady Trust dated 9/24/85 | 1.00% | $275,000.00 |
| 174 | Gramercy Court Condos | | Rakesh G. Hospi & Virginia M. Hospi Trustees of the Hospi Trust dated 1/20/92 | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Evelyn Matanovich Trustee of the Matanovich Family Trust dated 9/16/73 (RVM/31/5290) | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Evelyn Matanovich Trustee of the Matanovich Marital Trust UAD 1/25/77 | 1.00% | $370,000.00 |
| 174 | Gramercy Court Condos | 3517 | Robert M. Taylor & Lolita Ludelle Taylor, husband & wife, as joint tenants with right of survivorship | 1.00% | $100,000.00 |
| 174 | Gramercy Court Condos | 3524 | Ronald W. Ezra Trustee of The Ronald W. Ezra Living Trust | 1.00% | $75,000.00 |
| 174 | Gramercy Court Condos | 3536 | | 1.00% | $100,000.00 |
| 174 | Gramercy Court Condos | | Rose Q. Hocker, a single woman & Anita Rosenfield, a single woman, as joint tenants with right of survivorship | 1.00% | $100,000.00 |
| 174 | Gramercy Court Condos | 4090 | Gale Gladstone-Katz Trustee of the Gale Gladstone-Katz Revocable Living Trust dated 12/1/00 | 1.00% | $100,000.00 |
| 174 | Gramercy Court Condos | 4144 | Don P. Marshall Trustee of the Don P. Marshall Trust dated 7/16/95 | 1.00% | $50,000.00 |
| 174 | Gramercy Court Condos | | Farrah M. Habba Trustee of the Farrah M. Habba Revocable Trust dated 3/12/04 | 1.00% | $55,000.00 |

| Property | Name | % | Amount |
|---|---|---|---|
| 174 Gramercy Court Condos | Benedict E. Urban & Roselyn N. Urban Trustees of The Benedict E. Urban & Roselyn N. Urban Family Trust dated 2/3/04 | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | Mark L. Earnes & Beverly K. Earnes, husband & wife, as joint tenants with right of survivorship | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | Marvin W. Glissman & Toby E. Glissman, husband & wife, as joint tenants with right of survivorship | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | Carol Sue Duran, a married woman dealing with her sole & separate property | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | Sierra Health Services, Inc., a Nevada corporation | 3.00% | $1,000,000.00 |
| 174 Gramercy Court Condos | Robert Levy & Renee Levy Trustees of the R&R Living Trust dated 10/1/04 | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | James R. Battaglia & Donna M. Battaglia General Partners of the Battaglia Investments Limited Partnership | 2.00% | $100,000.00 |
| 174 Gramercy Court Condos | Dwayne O'Hanna & Nancy O'Hanna Trustees of the Dwayne & Nancy O'Hanna Revocable Trust dated 4/2/03 | 3.00% | $50,000.00 |
| 174 Gramercy Court Condos | Verona Mahler Trustee of The Verona Mahler Family Trust dated 1/13/05 | 1.00% | $175,000.00 |
| 174 Gramercy Court Condos | First Savings Bank Custodian For Michael J. McLenn IRA | 3.00% | $255,000.00 |
| 174 Gramercy Court Condos | Gayle D. Holt, a married woman dealing with her sole and corporate property | 3.00% | $50,000.00 |
| 174 Gramercy Court Condos | Allen Thompson and Doreen Thompson, Trustees of the Thompson Family Trust, dtd 6/20/04 | 1.00% | $200,000.00 |
| 174 Gramercy Court Condos | Barry C. Vosatura, an unmarried woman | 3.00% | $50,000.00 |
| 174 Gramercy Court Condos | Amanda T. Bath, a divorced woman | 3.00% | $50,000.00 |
| 174 Gramercy Court Condos | First Savings Bank Custodian For Elia L. Sigel IRA | 3.00% | $50,000.00 |
| 174 Gramercy Court Condos | First Savings Bank Custodian For Gary Delahite IRA | 3.00% | $50,000.00 |
| 174 Gramercy Court Condos | Joseph F. Sparks and Marcia A. Sparks, Trustees of The Joseph F. and Marcia A. Sparks Revocable Family Trust dated 12-11-03 | 1.00% | $48,000.00 |
| 174 Gramercy Court Condos | First Savings Bank Custodian For Howard Wallick IRA | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | Thomas E. Clarke, Transfer on Death to Michael T. Clarke | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | Remy K. Landin, Transfer on Death to Christian K. Landin | 3.00% | $80,000.00 |
| 174 Gramercy Court Condos | William Kostoroho, Trustee of The William Kostoroho Revocable Trust dated October 31, 2005 | 3.00% | $1,000,000.00 |
| 174 Gramercy Court Condos | Salomon Capdevil & Mary Capdevil, husband and wife as joint tenants with the right of survivorship | 3.00% | $1,100,000.00 |
| 174 Gramercy Court Condos | Wanda C. Wright, Trustee of The Wanda Wright Revocable Living Trust | 1.00% | $50,000.00 |
| 174 Gramercy Court Condos | Billy D. Danny and Donna R. Danny, Trustees of the Billy D. Danny and Donna R. Danny 2000 Revocable Trust dated 1/29/00 | 1.00% | $70,000.00 |
| 174 Gramercy Court Condos | California National Bank, Custodian for benefit of David E. Gackenbach IRA | 3.00% | $200,000.00 |
| 174 Gramercy Court Condos | Yankee Holdings, LLC, a Arizona corporation | 1.00% | $150,000.00 |
| 174 Gramercy Court Condos | Diane J. Weller, an unmarried woman | 3.00% | $50,000.00 |
| Gramercy Court Condos Total | | 1.827793477% | $8,173,000.00 |

| LoanID | Loan Name | AccountID | Legal Vesting | Service Fee Rate | Original Inv Per Participant |
|---|---|---|---|---|---|
| 260 | Bay Pompano Beach | | Taylor Samuels Trustee of the Samuels 1999 Trust | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | | Waxa LP, a Pennsylvania limited partnership | 1.0000000% | 280,000.00 |
| 260 | Bay Pompano Beach | 943 | | 3.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 636 | | 3.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 660 | Barbara J. Vivero Trustee of the Barbara J. Vivero Revocable Trust | 1.0000000% | 90,000.00 |
| 260 | Bay Pompano Beach | 664 | | 1.0000000% | 80,000.00 |
| 260 | Bay Pompano Beach | 671 | Lewis H. Fine & Arlene J. Fine, husband & wife | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | | Josephine Caseboll Trustee of the Caseboll Revocable Trust dated 2/30/94 | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | | | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | | Christopher Dickinson & Patricia Dickinson, husband & wife, as joint tenants with right of survivorship | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | | | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | | Richard G. Vrbancic, a single man | 2.0000000% | 90,000.00 |
| 260 | Bay Pompano Beach | | Nona Harding & Eda Harding, joint tenants with right of survivorship | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 2624 | | 1.0000000% | 150,000.00 |
| 260 | Bay Pompano Beach | 2531 | Edward J. Quinn & Darlene A. Quinn, husband & wife, as joint tenants with right of survivorship | 1.0000000% | 90,000.00 |
| 260 | Bay Pompano Beach | 2501 | | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 2360 | Anthony Di Meo & Shannon Smith Di Meo Trustees of the Di Meo Family Trust dated 8/15/00 | 1.0000000% | 90,000.00 |
| 260 | Bay Pompano Beach | 2372 | | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 2480 | | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 2541 | | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | | Barbara Reiss Miller Trustee of the Barbara Reiss Miller Revocable Living Trust dated 2/4/03 | 1.0000000% | 60,000.00 |
| 260 | Bay Pompano Beach | 2990 | Dorothy J. Shoop, a married woman dealing with her sole and separate property | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 3005 | Larry D. Sargent & Maryann Sargent, husband & wife, as joint tenants with right of survivorship | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 3177 | C. Donald Ayers, a single man | 1.0000000% | 90,000.00 |
| 260 | Bay Pompano Beach | 3194 | Richmond Dean II & Joan Dean Trustees of the Dean Family Trust dated 12/26/94 | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 3320 | | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 5972 | First Savings Bank Custodian For Karen Taylor IRA | 1.0000000% | 85,000.00 |
| 260 | Bay Pompano Beach | 3990 | John D. Eichhorn & Jill A. Eichhorn, husband & wife, as joint tenants with right of survivorship | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 3537 | Joseph Sterling & Theresa Sterling Trustees of the Sterling Family Trust dated 8/14/02 | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 2651 | Augustine Tuffenaelli Trustee of the Augustine Tuffenaelli Family Trust dated 7/25/04 | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 3814 | Leon E. Singer & Suzy Singer Trustees of the Leon E. Singer & Suzy Singer Revocable Trust dated 9/30/98 | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 3992 | Raymond E. Harshman & Margaret E. Harshman Trustees of the Raymond E. & Margaret Elsa Harshman Family Trust dated 3/4/97 | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 3424 | | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 3461 | Sierra West, Inc., a Nevada corporation | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 3895 | Teri L. Melvin, a single woman | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 3926 | Anna Flannery, an unmarried woman | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 3979 | William R. Godfrey & Cynthia Godfrey, husband & wife as Joint Tenants with Right of Survivorship | 1.0000000% | 100,000.00 |
| 260 | Bay Pompano Beach | 3997 | Joseph Davis & Marion Sharp Co-Trustees of the Davis Family Trust | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 4043 | Melvin Lamph Trustee of the Melvin Lamph Trust dated 2/19/97 | 1.0000000% | 370,000.00 |
| 260 | Bay Pompano Beach | 4150 | Peter A. Bohno & Fabiola A. Bohno Trustees of the Bohno Family Revocable Trust dated 3/6/95 | 1.0000000% | 75,000.00 |
| 260 | Bay Pompano Beach | 4144 | | 1.0000000% | 150,000.00 |
| 260 | Bay Pompano Beach | 4965 | Bruce R. LeMer, an unmarried man | 3.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 4997 | Barbara A. Cecil, a married woman dealing with her sole & separate property | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 5113 | Terry Mertvett Trustee of the Terry Mertvett Profit Sharing Plan & Trust | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 5276 | Richard N. Dielke, a married man dealing with his sole & separate property | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 5286 | E. C. Yeppe a married man dealing with his sole & separate property | 1.0000000% | 50,000.00 |
| 260 | Bay Pompano Beach | 5298 | | | |

| Property | Acct | Owner | Percent | Amount |
|---|---|---|---|---|
| 260 Bay Pompano Beach | | Guy Archer, a married man dealing with his sole & separate property | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Linda M. Herdman Trustee for the Linda M. Herdman Family Trust dated 12/11/03 | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Raymond J. Zurfluh, Jr. & Shirley J. Zurfluh, husband & wife, as joint tenants with right of survivorship | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Jack Goldenthal & Sylvia Goldenthal, husband & wife, as joint tenants with right of survivorship | 3.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | Josten, LP, a Nevada limited partnership | 3.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | Priscilla M. Gugelzli, an unmarried woman | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Carey B. Sigmen & Lisa K. Sigmen Trustees of The Carey B. Sigmen & Lisa K. Sigmen Trust dated 3/3/97 | 3.000000% | 200,000.00 |
| 260 Bay Pompano Beach | | S & P David Limited Partnership, a Texas Partnership | 3.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | Janice A. Allegrini, an unmarried woman & Phillip W. Dickinson an unmarried man, joint tenants with the right of survivorship | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Brian H. Busse & Dawn Busse, husband & wife, as joint tenants with right of survivorship | 1.000000% | 75,000.00 |
| 260 Bay Pompano Beach | | Irvin Schwaiber & Ursula Schnaiber, husband & wife, as joint tenants with right of survivorship | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Charles T. Hamm and Sandra L. Hamm, Trustees of the Hamm Trust dated 3/17/05 | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | First Savings Bank Custodian For Janice A. Lucas, IRA | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Paul G. Chelew, an unmarried man | 1.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | David C. Wehl, a married man dealing with his sole and separate property | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Gina M. Goehner, an unmarried woman | 3.000000% | 54,000.00 |
| 260 Bay Pompano Beach | | First Savings Bank Custodian For Tana Stiple IRA | 1.000000% | 60,000.00 |
| 260 Bay Pompano Beach | | Ronald M. Addy & Priscilla K. Addy, husband & wife, as joint tenants with right of survivorship | 1.000000% | 65,000.00 |
| 260 Bay Pompano Beach | | Anthony M. Barbetta and Rose M. Barbetta, Trustees of the Barbetta Family Trust dated 5/29/00 | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Robert R. Wade Trustee of the Robert R. Wade Revocable Trust dated 5/22/01 | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Daniel Jenkins and Lori J. Jenkins, husband and wife, as joint tenants with right of survivorship | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | | 3.000000% | 75,000.00 |
| 260 Bay Pompano Beach | | Richard A. Breeting, Sr. and Helen R. Breeting Trustees of the Richard A. Breeting, Sr. and Helen R. Breeting Revocable Trust dated 7/17/97 | 3.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | James R. Bordiglio & Donna M. Bordiglio General Partners of the Broadveils Investments Limited Partnership | 3.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | Carol C. Eyre & Edward E. Eyre, Jr. Co-Trustees of the Trust A of the 1983 Living Trust Agreement dated 6/11/83 | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Daniel R. Jenkins Trustee of the Evelyn W. Jenkins Trust | 1.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Mary G. Christl, an unmarried woman | 3.000000% | 200,000.00 |
| 260 Bay Pompano Beach | | Ronald Goldman & Barbara Goldman, Trustees of the Goldman Family Trust dated 10/29/93 | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Johanna B. Koracz, an unmarried woman | 3.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | Joyce A. Hayward Trustee of the 1985 Hayward Living Trust dated 7/05/1985 | 1.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | Lori Dietzman and William Dietzman, wife and husband as joint tenants with right of survivorship | 1.000000% | 100,000.00 |
| 260 Bay Pompano Beach | | Deborah H. Nogam, an unmarried woman | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Shahriar Zarrabi, an unmarried man | 3.000000% | 50,000.00 |
| 260 Bay Pompano Beach | | Peter Labadie and Beverly Labadie, husband and wife as joint tenants with the right of survivorship | 3.000000% | 50,000.00 |
| **Bay Pompano Beach Total** | | | 1.47597% | 6,555,000.00 |

WALTER A. HERRING, ESQ.
Texas State Bar No. 09535300
*Admitted Pro Hac Vice*
NORLYNN B. PRICE, ESQ.
Texas State Bar No. 02499050
*Admitted Pro Hac Vice*
MICHAEL W. ANGLIN
Texas State Bar No. 01260800
*Admitted Pro Hac Vice*
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200
Email:  wherring@fulbright.com
        nprice@fulbright.com
        manglin@fulbright.com

STANLEY W. PARRY, ESQ.
Nevada Bar No. 1417
Ballard Spahr Andrews & Ingersoll, LLP
300 South Fourth Street, Suite 1201
Las Vegas, Nevada  89101
Telephone: (702) 471-7000
Facsimile: (702) 471-7070
Email: ParryS@ballardspahr.com

Attorneys for all Plaintiff LLCs [with the
exception of Hesperia Lenders, LLC]

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>              Debtor. | Case No.  2:07-cv-00892-RCJ-GWF<br><br>Bankruptcy Case No. 06-10725-LBR<br>[Chapter 11]<br><br>**NOTICE OF FILING OF SUBMISSION OF ACCOUNTING REQUIRED BY SECTION 10 OF THE PRELIMINARY INJUNCTION  AND ORDER** |

70092077.1

- 1 -

1      On November 15, 2007, Plaintiff LLCs filed their Accounting as Required by Section 10

2  of the *Preliminary Injunction and Order Pursuant to 11 U.S.C. §§ 105 and 1141 and Fed. R. Civ.*

3  *P. 65 Enforcing Confirmation Order* (Doc. No. 199). *See* Schedule 1 attached hereto.

4  DATED this 15th day of November, 2007.      FULBRIGHT & JAWORSKI L.L.P.

5

6

7                                          By: _____
                                                WALTER A. HERRING, ESQ.

8
                                            Attorney for all LLCs [with the exception of
                                            Hesperia Lenders, LLC]
9

10                                         BALLARD SPAHR ANDREWS &
                                           INGERSOLL, LLP
11
                                           STANLEY W. PARRY
12
                                           Attorney for all LLCs [with the exception of
13                                         Hesperia Lenders, LLC]

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

70092077.1                              - 2 -

1

## CERTIFICATE OF SERVICE

2      This certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure, on the 15th
3 day of November 2007, a true and correct copy of the foregoing *Plaintiffs' Notice of Submission
   *of Accounting Required by Section 10 of the Preliminary Injunction and Order* was served on all
   counsel of record via the Court's CM/ECF System, as indicated on the electronic service lists
4 attached hereto, and to the following attorneys of record by U.S. mail:

5 Erin E. Jones
   Diamond McCarthy Taylor Finley & Lee, LP
6 909 Fannin, Suite 500
   Houston, TX 77010
7 Tel: 713.333.5100
   Email: ejones@diamondmccarthy.com
8

   Christine M. Pajak
9 Stutman Treister & Glatt
   1901 Avenue of the Stars, 12th Floor
10 Los Angeles, CA 90067
   Email: cpajak@stutman.com
11

   Cynthia J. Larsen
12 Orrick, Herrington & Sutcliffe, LLP
   400 Capitol Mall, Suite 300
13 Sacramento, CA 95814
   Email: clarsen@orrick.com
14

15                                             By: _____
16                                                   Walter A. Herring

17

18

19

20

21

22

23

24

25

26

27

28
   70092077.1                                    - 3 -

Case 1:08-cv-05298-JSR    Document 20-3    Filed 07/14/2008    Page 4 of 18

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Bar-USA | $20,000 | Ralph E. Worthing & Maryanne H. Worthing |
| Bar-USA | $15,000 | Wu Family Trust dated 06/19/91 c/o James C. Wu & Jeanne K. Wu, trustees |
| Bar-USA | $200,000 | X-Factor, Inc., a Nevada corporation |
| Bar-USA | $50,000 | Gregory D. Yonai Family Trust C/O Gregory D. Yonai, trustee |
| Bar-USA | $270,000 | Anthony J. Zerbo, an unmarried man |
| Bar-USA | $60,000 | Evo E & Billie D Zepponi Family Trust Under Agreement dated 2/9/1993, C/O Evo Zepponi And Billie Zepponi, trustees |
| Bay Pompano | $50,000 | Arthur V. Adams Trust dated 9/1/297 c/o Arthur V. Adams, trustee |
| Bay Pompano | $100,000 | Addes Trust c/o Kenneth Addes & Victoria Addes Co-trustees |
| Bay Pompano | $300,000 | Al-Awar Living Trust dated 04/05/01 c/o Adib M Al-Awar & Ellen A Al-Awar, Co-trustees |
| Bay Pompano | $100,000 | David J. Albid |
| Bay Pompano | $50,000 | Marcia C. Albid & Henry Albid, husband & wife, as JTWROS |
| Bay Pompano | $100,000 | Altman Living Trust dated 11/4/04 c/o Daniel C. Altman & Barbara A. Altman, trustees |
| Bay Pompano | $50,000 | Lynda Gay Anderson Trust dated 7/7/04 c/o Lynda Gay Anderson, trustee |
| Bay Pompano | $93,000 | Aimee E Kearns Ttee of the B A B S, Inc Trust |
| Bay Pompano | $50,000 | Daniel C. Barcia |
| Bay Pompano | $200,000 | Richard D. Barzan & Leila J. Barzan, husband & wife, As JTWROS |
| Bay Pompano | $50,000 | Basko Revocable Trust dated 7/2/93 c/o Joseph Basko, trustee |
| Bay Pompano | $50,000 | Joseph C. Bellan & Verna J. Bellan Revocable Living Trust, dated 3/4/00 c/o Joseph C. Bellan & Verna J. Bellan, trustees |
| Bay Pompano | $50,000 | Bellas 1996 Family Trust c/o Peter Bellas & Joyce Bellas, trustees |
| Bay Pompano | $50,000 | Bender Family Trust-By-Pass Trust Date c/o Harriet Bender, trustee |
| Bay Pompano | $250,000 | Robert B Bender & Paula S. Bender, husband & wife JTWROS |
| Bay Pompano | $100,000 | Joseph J. Benoualid & Helen L. Benoualid |
| Bay Pompano | $50,000 | David P. Betteridge, a single man |
| Bay Pompano | $50,000 | Gerald L. Bittner-Sr. Dds Inc Profit Sharing Plan |
| Bay Pompano | $100,000 | Michael S. Blau & Shamiran Blau, husband & wife As JTWROS |
| Bay Pompano | $50,000 | Michael S. Braida IRA |
| Bay Pompano | $50,000 | Glen J. Brecht Trust dated 1/24/86 c/o Glen J. Brecht & Janine K. Brecht, trustees |
| Bay Pompano | $200,000 | Bridges Family Trust c/o Michael T. Bridges, trustee |
| Bay Pompano | $50,000 | Brock Family Trust dated 5/25/95 c/o Penny L. Brock, trustee |
| Bay Pompano | $50,000 | Donna J. Brooks, a single woman |
| Bay Pompano | $50,000 | Robert E. Brooks, a married man dealing with his sole & separate property |
| Bay Pompano | $100,000 | Larry M. Brown & Marie S. Brown, husband & wife, As JTWROS |
| Bay Pompano | $50,000 | Richard L. Cadieux & Clara M. Cadieux, husband & wife, As JTWROS |
| Bay Pompano | $50,000 | Peter W. Capone & Deldra D. Capone, husband & wife, As JTWROS |
| Bay Pompano | $50,000 | Carrier Family Trust dated 8/9/91 c/o Don F. Carrier & Sara L. Carrier, trustees |
| Bay Pompano | $50,000 | Carson Family Trust dated 11/19/04, Doyna J. Carson & Elsie L. Carson, trustees |
| Bay Pompano | $50,000 | Ronald R. Carter & Leslie A. Carter Revocable Trust dated 10/24/91 c/o Ronald R. Carter & Leslie A. Carter, trustees |
| Bay Pompano | $50,000 | M & J Cauchois Family Trust dated 2/25/93 c/o Maurice A. Cauchois & Jacqueline M. Cauchois, trustees |
| Bay Pompano | $50,000 | A William Ceglia |
| Bay Pompano | $100,000 | Donald P. Clark Family Trust dated 10/25/84 c/o Donald P. Clark, trustee |
| Bay Pompano | $50,000 | Jack R. Clark & Linda C. Reid husband & wife As JTWROS |

Prepared 11/14/2007

Page 18

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Bay Pompano | $53,000 | First Savings Bank, Custodian for Mary Coleman IRA |
| Bay Pompano | $75,000 | Collins Family Trust dated 1/29/93 c/o Shirley M. Collins, trustee |
| Bay Pompano | $100,000 | April Corley Trust dated 4/25/05, April M. Corley, trustee |
| Bay Pompano | $100,000 | Iris G. Corley Trust dated 9/19/84, Iris G. Corley, trustee |
| Bay Pompano | $70,000 | Robert J. Cowen Trust dated 11/7/97, Robert J. Cowen, trustee |
| Bay Pompano | $50,000 | Craner Family Trust Under Agreement dated 2/23/89 c/o Gareth A. R. Craner, trustee |
| Bay Pompano | $50,000 | The Gareth A. R. Craner Trust dated 6/01/02 c/o Gareth A. R. Craner, trustee |
| Bay Pompano | $100,000 | Daniel Living Trust As Amended dated 1/9/98 c/o Mark A. Daniel & Cathy A. Daniel |
| Bay Pompano | $50,000 | Davis Revocable Living Trust UA 7/06/88 c/o Glenn B. Davis & Bernie S. Davis, trustees |
| Bay Pompano | $75,000 | Nancy R. Davis Defined Benefit Plan c/o Nancy R. Davis, trustee |
| Bay Pompano | $70,000 | Pensco Trust Company Custodian for Gary Dieppe-IRA |
| Bay Pompano | $75,000 | James D. Dery & Ann R. Dery, husband & wife as JTWROS |
| Bay Pompano | $100,000 | Dennis A Devito, a married man |
| Bay Pompano | $50,000 | John H. Duberg |
| Bay Pompano | $50,000 | William Dupin & Penny Dupin, husband & wife as JTWROS |
| Bay Pompano | $50,000 | Robert D. Earp IRA |
| Bay Pompano | $60,000 | Marie L. Ehlers |
| Bay Pompano | $50,000 | Emery Living Trust dated 6/04/91 c/o John R. Emery & Sandra Kipp Emery, trustees |
| Bay Pompano | $50,000 | Byrne E. Falke Living Trust dated 6/3/03 c/o Byrne E. Falke Jr., trustee |
| Bay Pompano | $50,000 | Brenda Falvai |
| Bay Pompano | $50,000 | Farrah Family Trust dated 9/18/03 c/o Joseph A. Farrah & Emily T. Farrah, trustees |
| Bay Pompano | $50,000 | Richard T Fiory Revocable Trust dated 05/30/01 c/o Richard T Fiory, trustee |
| Bay Pompano | $100,000 | Sharon R. Fitzgerald |
| Bay Pompano | $50,000 | Freedom Properties, Inc. |
| Bay Pompano | $50,000 | Alan B. Friedman |
| Bay Pompano | $50,000 | George Gage Trust dated 10/8/99 c/o George J. Gage & Miriam B. Gage, co-trustees |
| Bay Pompano | $50,000 | The Gambello Trust c/o Anthony V. Gambello & Elizabeth Gambello, trustees |
| Bay Pompano | $50,000 | Catherine Garland |
| Bay Pompano | $50,000 | Elmer Eugene Gilbert, Jr., a married man dealing with his sole & separate property |
| Bay Pompano | $150,000 | Graham Family Trust dated 10/26/78 c/o Robin B. Graham & Celia Allen-Graham, trustees |
| Bay Pompano | $50,000 | Barbara L. Gunther, a married woman dealing with her sole & separate property |
| Bay Pompano | $50,000 | T. Claire Harper Family Trust dated 2/28/84 c/o Charles Harper, trustee |
| Bay Pompano | $50,000 | Jocelyne Helzer, an unmarried woman |
| Bay Pompano | $50,000 | Marilyn Hilborn, trustee of the Marilyn Hilborn Trust dated 11/18/93 |
| Bay Pompano | $50,000 | Gail M. Hock, a married woman dealing with her sole & separate property |
| Bay Pompano | $110,000 | George W. Hubbard Roth IRA |
| Bay Pompano | $50,000 | Janice Janis & Christine Brager, tenants in common |
| Bay Pompano | $50,000 | Jayem Family LP, a Nevada limited partnership |
| Bay Pompano | $100,000 | Royce G. Jenkins, an unmarried man |
| Bay Pompano | $50,000 | Richard A. Johnson, a married man dealing with his sole & separate property |
| Bay Pompano | $118,000 | Joy Investment, Inc., a Nevada corporation c/o Tony Chaudhry |

Case 1:08-cv-05298-JSR    Document 20-3    Filed 07/14/2008    Page 6 of 18

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Bay Pompano | $50,000 | JWB Trust Agreement dated 8/1/97 c/o James W. Barnes, trustee |
| Bay Pompano | $50,000 | Clas G. Karlberg & Ulla G. Karlberg, JTWROS |
| Bay Pompano | $50,000 | Kiwi-Nevada LP |
| Bay Pompano | $75,000 | Bernard Kloenne Living Trust dated 10/10/1986, Bernard A. Kloenne, trustee |
| Bay Pompano | $100,000 | Dorothea K Kraft, an unmarried woman |
| Bay Pompano | $50,000 | Leslie S. Lanes, a married woman dealing with her sole & separate property |
| Bay Pompano | $80,000 | Gery Larson & Dolores Larson husband & wife As JTWROS |
| Bay Pompano | $50,000 | Sharon S. Lazar |
| Bay Pompano | $85,000 | Joan M. Leblanc, a married woman dealing with her sole & separate property |
| Bay Pompano | $50,000 | Richard C. L Lee & Estella W. Y. Lee, JTWROS |
| Bay Pompano | $50,000 | Lehtmann Family Trust dated 4/19/96 c/o Larry D. Lehtmann & Kathleen F. Lehtmann, trustees |
| Bay Pompano | $50,000 | James Allen Linthicum & Carol Diane Linthicum, trustees of the Linthicum Revocable Trust dated 1/14/80 |
| Bay Pompano | $50,000 | Ben Lofgren & Dana Lofgren as JTWROS |
| Bay Pompano | $50,000 | Pompeo J. Lombardi, an unmarried man, & Sarah A. Grant, a married woman, as JTWROS |
| Bay Pompano | $50,000 | William Lukasawage & Joanne Lukasawage, husband & wife, JTWROS |
| Bay Pompano | $50,000 | Philip & Dora Lyons Trust UA 8/9/99 c/o Philip Lyons & Dora Lyons, trustees |
| Bay Pompano | $75,000 | Scott Mechock & Heidi Mechock, husband & wife, JTWROS |
| Bay Pompano | $50,000 | Rita K. Malkin Trust dated 7/26/2002 c/o Rita K Malkin, trustee |
| Bay Pompano | $50,000 | The J V Marrone Revocable Trust dated 12/12/95 c/o J V Marrone, trustee |
| Bay Pompano | $50,000 | Pamela Jean Merton, an unmarried woman, transfer on death to James Dickinson |
| Bay Pompano | $100,000 | Morris Messry, a married man dealing with his sole & separate property |
| Bay Pompano | $58,000 | First Savings Bank Custodian for Todd C Maurer IRA |
| Bay Pompano | $50,000 | Mayo Family Trust c/o Monroe Mayo & Louise Mayo, trustees |
| Bay Pompano | $50,000 | Eddie Mayo, an unmarried man, & Jocelyne Hézer, an unmarried woman, as JTWROS |
| Bay Pompano | $50,000 | Revocable Living Trust Agreement of Barbara McClaflin c/o Barbara McClaflin, trustee |
| Bay Pompano | $50,000 | McMullan Living Trust dated 8/19/94 c/o Dale J. McMullan |
| Bay Pompano | $50,000 | Phillip E. McMullin & Rosemarie L. McMullin, trustees And/Or Their Successors Under The Phillip E. McMullin & Rosemarie L. McMullin Trust 4/4/80 As |
| Bay Pompano | $50,000 | McShaffrey Living Trust dated 3/27/81 c/o Harvey J. McShaffrey & Christina F. McShaffrey |
| Bay Pompano | $200,000 | First Savings Bank Custodian for Jack Mentris IRA |
| Bay Pompano | $50,000 | Robert D. Mierau & Sandra J. Mierau, trustees of the Mierau Living Trust dated 9/14/98 |
| Bay Pompano | $50,000 | R.G.T. Millar Trust dated 6/28/1988 |
| Bay Pompano | $50,000 | Minter Family 1994 Trust c/o Douglas Minter & Elizabeth F. Minter |
| Bay Pompano | $50,000 | Sandra M. Mogg, trustee of the Sandra M. Mogg Revocable Living Trust 4/9/04 |
| Bay Pompano | $60,000 | Arthur B. Moore, an unmarried man |
| Bay Pompano | $100,000 | William Richard Moreno, a married man dealing with his sole & separate property |
| Bay Pompano | $100,000 | Jerry Moreo, an unmarried man |
| Bay Pompano | $50,000 | Moretto Family Living Trust dated 9/1/99 c/o Robert J. Moretto & Josephine Moretto, trustees |
| Bay Pompano | $50,000 | Rosalie Allen Morgan Trust dated 1/31/03 c/o Rosalie Allen Morgan, trustee |
| Bay Pompano | $100,000 | John & Janet Mrasz Trust dated 12/2/04 c/o John T. Mrasz & Janet Mrasz, trustees |
| Bay Pompano | $50,000 | Freda Newman, trustee of the Freda Newman Trust dated 7/26/94 |
| Bay Pompano | $50,000 | Allen M. Nirenstein & Dorothy H. Nirenstein, trustees of the Allen M. Nirenstein & Dorothy H. Nirenstein 1992 Revocable Trust dated 3/4/92 |

Prepared 11/14/2007

Page 20

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Bay Pompano | $50,000 | John Nix & Lisa Nix, JTWROS |
| Bay Pompano | $50,000 | Novak Living Trust dated 10/21/97 c/o Frank T. Novak & Patricia A. Novak, trustee |
| Bay Pompano | $50,000 | The Stanley M Novara Family Trust dated 11/12/04 c/o Stanley M. Novara, trustee |
| Bay Pompano | $50,000 | O'Connor Revocable Trust Utd 9/17/97 c/o Robert H. O'Connor & Cathleen B. O'Connor, trustees |
| Bay Pompano | $50,000 | Omaye 1990 Trust c/o Annie Omaye & Stanley Omaye, trustees |
| Bay Pompano | $150,000 | Adrian J.R. Oosthuizen, a married man dealing with his sole & separate property |
| Bay Pompano | $50,000 | Osherow Trust dated 9/1/89 c/o Aaron I. Osherow, trustee |
| Bay Pompano | $100,000 | Anthony Pasqualotto & Alicia Pasqualotto, trustees of the Anthony Pasqualotto & Alicia pasqualotto 1997 Trust |
| Bay Pompano | $50,000 | Andrew Peterson & Sharon Peterson, trustees of the Andrew R. Peterson & Sharon Peterson 1991 Living Trust dated 11/22/91 |
| Bay Pompano | $100,000 | Sharon Peterson For Benefit Peterson Family Trust |
| Bay Pompano | $50,000 | Michael Pezzano & Lisa Pezzano husband & wife As JTWROS |
| Bay Pompano | $50,000 | Betty J. Phenix, a married woman dealing with her sole & separate property |
| Bay Pompano | $50,000 | A. Stephen Phillips & Frances E. Phillips, trustees Phillips Family Trust dated 10/24/89 |
| Bay Pompano | $75,000 | First Savings Bank Custodian for Cesari Piazza IRA |
| Bay Pompano | $100,000 | Holly J. Pickerel a single woman |
| Bay Pompano | $100,000 | Donald H. Pinsker, an unmarried man |
| Bay Pompano | $400,000 | Preswick Corp, A Nevada Corporation |
| Bay Pompano | $50,000 | Michael H. Ricci, a married man dealing with his sole & separate property |
| Bay Pompano | $50,000 | Roberts Family Trust dated 4/28/04 c/o Sarah R. Roberts, trustee |
| Bay Pompano | $100,000 | Alan Robinson & Gail Robinson husband & wife As JTWROS |
| Bay Pompano | $50,000 | David Rosner, trustee of the David Rosner Revocable Trust dated 01/05/2005 |
| Bay Pompano | $50,000 | Thalia Routsis Family Trust dated 7/24/9 c/o Thalia Nicholas Routsis, trustee |
| Bay Pompano | $200,000 | Philip M. Rulon & Shirley S. Rulon, husband & wife, JTWROS |
| Bay Pompano | $75,000 | Burton M. Sack, a married man dealing with his sole & separate property |
| Bay Pompano | $100,000 | Scott A. Sack Irrevocable Trust Edated 3/18/94, Burton Sack, trustee |
| Bay Pompano | $50,000 | Schnadt Trust dated 6/18/93 c/o William E. Schnadt &Janet E. Schnadt |
| Bay Pompano | $60,000 | The Schoonover Family Trust dated 2/23/00 c/o Edward L & Susan A. Schoonover |
| Bay Pompano | $50,000 | Althea F. Shef Living Trust dated 5/1/03, Althea F. Shef, trustee |
| Bay Pompano | $100,000 | Donald E. Shoup & Sharon K. Shoup, husband & wife, As JTWROS |
| Bay Pompano | $50,000 | Alen R. Simmons & Judith B. Simmons, husband & wife, As JTWROS |
| Bay Pompano | $50,000 | Dennis Sipiorski & Donna Sipiorski, husband & wife As JTWROS |
| Bay Pompano | $100,000 | Raymond M. Smith & Margaret M. Smith Grantors of the Raymond M. Smith Revocable Trust dated 3/12/79 |
| Bay Pompano | $50,000 | Sovereign Capital Advisors, LLC Stanley Tera, a Nevada limited liability company |
| Bay Pompano | $125,000 | Robert Speckert IRA |
| Bay Pompano | $50,000 | Stark Family Trust dated 4/2/84 c/o Rosalind L. Stark, trustee |
| Bay Pompano | $50,000 | 2001 Steinmetz Family Trust c/o Nicholas A. Steinmetz & Cynthia M. Steinmetz, trustees |
| Bay Pompano | $100,000 | Tony Suarez, an unmarried man |
| Bay Pompano | $50,000 | James Supple, an unmarried man |
| Bay Pompano | $160,000 | Alvin M. Swanson & Grace E. Swanson Family Trust dated 9/14/94 c/o Leland K. Swanson & Lena M. Swanson, trustees |
| Bay Pompano | $50,000 | David J. Tammadge, an unmarried man |
| Bay Pompano | $75,000 | Jeanette D. Tarantino, a married woman dealing with her sole & separate property |

Case 1:08-cv-05298-JSR    Document 20-3    Filed 07/14/2008    Page 8 of 18

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Bay Pompano | $61,000 | First Savings Bank Custodian for Louise Teeter IRA Rollover |
| Bay Pompano | $50,000 | Norman Teeter, a single man |
| Bay Pompano | $50,000 | Michel Tessel |
| Bay Pompano | $100,000 | Neil Tobias, a married man |
| Bay Pompano | $100,000 | Warren W. Tripp |
| Bay Pompano | $200,000 | 1994 Turner Family Trust dated 9/23/94 c/o Robert H. Turner & Nancy A. Turner, trustees |
| Bay Pompano | $74,000 | Universal Management, Inc. c/o Tony Chaudhry |
| Bay Pompano | $50,000 | Lloyd F. Van Sickle, trustee of the Van Sickle Family Trust dated 5/20/99 |
| Bay Pompano | $50,000 | Bunny C. Vreeland, an unmarried woman |
| Bay Pompano | $100,000 | John L. Wade Trust dated 5/8/01 c/o John L. Wade, trustee |
| Bay Pompano | $125,000 | Frank S. Wasko Revocable Trust dated 5/2/102 |
| Bay Pompano | $50,000 | Welble 1981 Trust dated 6/30/81 c/o Ardis Welble & Dean F. Welble Co-trustees |
| Bay Pompano | $50,000 | Gerald R. Weiland & Diana F. Weiland Trust c/o Diana Weiland, trustee |
| Bay Pompano | $50,000 | Heather Winchester & William Winchester, husband & wife, JTWROS |
| Bay Pompano | $50,000 | Windisch 1998 Living Trust c/o Frederick P. Windisch, trustee |
| Bay Pompano | $50,000 | First Savings Bank Custodian for Phyllis P. Wyatt IRA |
| Bay Pompano | $75,000 | Robert J. Yoder Defined Benefit Plan c/o Robert J. Yoder, trustee |
| Bay Pompano | $50,000 | Shahriar Zavosh |
| Bay Pompano | $100,000 | Franz J. Zimmer, trustee of the Franz J. Zimmer Revocable Trust dated 02/05/97 |
| Bay Pompano | $50,000 | Terry Zimmerman, trustee of the Terry Audbrey Zimmerman Revocable Living Trust dated 9/4/90 |
| Bay Pompano | $50,000 | Charles Henry Small Revocable Living Trust c/o Charles H Small, trustee |
| Bay Pompano | $50,000 | Mary Ann Rees IRA |
| Bay Pompano | $50,000 | Suzanne L. Arbogast |
| Bay Pompano | $50,000 | Luther E. Tate, an unmarried man |
| Bay Pompano | $50,000 | Jay E. Herman Retirement Plan |
| Bay Pompano | $50,000 | Richard D. Luthi Trust dated 5/20/93 |
| Bay Pompano | $50,000 | Milton P Kaplan Profit Sharing Plan dated c/o Milton P Kaplan, Md, Ttee |
| Bay Pompano | $70,000 | Stephen F Sobesky, an Unmarried man |
| Bay Pompano | $100,000 | The Donald S. Tomlin & Dorothy R. Tomlin Revocable Trust dated 10/24/79, c/o Donald S. Tomlin, Dorothy R. Tomlin, & David Wayne Mounier, Co-trustees |
| Bay Pompano | $50,000 | Sierra Liquidity Fund, LLC |
| Bay Pompano | $60,000 | D. Nathan Meehan, a married man dealing with his sole & separate property |
| Binford | $50,000 | Sidney R. Adams & Lisa Adams Investment Acct |
| Binford | $50,000 | Kenneth Addes & Victoria Addes Co-trustees of the Addes Trust |
| Binford | $100,000 | First Savings Bank Custodian for Willard Arledge IRA |
| Binford | $50,000 | Jerry L. Blackman, Sr. & Carolyn N. Blackman Living Trust dated 11/26/01 |
| Binford | $50,000 | Gregory E. Borgel, a married man dealing with his sole and separate property |
| Binford | $75,000 | Raymond Brahy & Rita Brahy, husband & wife As JTWROS |
| Binford | $50,000 | Maurice A. Cauchois & Jacqueline M. Cauchois, trustees of the M & J Cauchois Family Trust 2/25/93 |
| Binford | $100,000 | Paul G Chelew, an unmarried man |
| Binford | $130,000 | Alta Bates Summit Foundation, trustee of the Paul G. Chelew Charitable Remainder Unitrust III |
| Binford | $125,000 | Jack R. Clark & Linda C. Reid husband & wife As JTWROS |

Prepared 11/14/2007

Page 50

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Fox Hills | $100,000 | John A. Unland & Jane E. Unland, husband & wife, as JTWROS |
| Fox Hills | $50,000 | George W. Urda, a married man dealing with his sole and separate property |
| Fox Hills | $50,000 | Jennifer A. Wade, an unmarried woman |
| Fox Hills | $50,000 | David C. Wahl & Margaret A. Wahl, husband & wife, as JTWROS |
| Fox Hills | $200,000 | Joseph P. Walls & Ellen Walls, trustees of the Walls Family Trust dated 12/10/97 |
| Fox Hills | $50,000 | Carl M. Warfield & Laura W. Warfield, husband & wife, as JTWROS |
| Fox Hills | $50,000 | Patricia Ann Webber, trustee of the Webber Family Trust dated 10/31/89 |
| Fox Hills | $50,000 | Ardis Weible & Dean F. Weible Co-trustees of the Weible 1981 Trust dated 6/30/81 |
| Fox Hills | $50,000 | Gregory E. Weir, an unmarried woman |
| Fox Hills | $50,000 | H. Daniel Whitman, trustee of the Whitman Trust dated 12/1/04 |
| Fox Hills | $50,000 | Wild Water Limited Partnership, A Nevada Partnership |
| Fox Hills | $50,000 | John L. Willis Jr., an unmarried man |
| Fox Hills | $100,000 | Heather Winchester & William Winchester, husband & wife, as JTWROS |
| Fox Hills | $50,000 | Doris E. Winter, trustee of the The Doris E. Winter Trust |
| Fox Hills | $50,000 | Lisa M Holifield |
| Fox Hills | $100,000 | Joseph L Melz & Sandra L Melz |
| Grammercy | $90,000 | August J. Amaral, Inc., A Nevada Corporation |
| Grammercy | $100,000 | Darlene Ashdown & Vincent N. Greene, husband & wife As JTWROS |
| Grammercy | $100,000 | Dr. Henry C. Ayoub, a single man |
| Grammercy | $200,000 | Richard D. Barzan & Lelia J. Barzan, husband & wife, As JTWROS |
| Grammercy | $450,000 | Jack J. Beaulieu, trustee of the Jack J. Beaulieu Revocable Living Trust dated 9/1/94 |
| Grammercy | $50,000 | Joseph C. Bellan & Verna J. Bellan, trustees of the Joseph C. Bellan & Verna J. Bellan Revocable Living Trust, dated 2/4/00 |
| Grammercy | $50,000 | Thomas E. Bishofberger & Betty T. Bishofberger, trustees of the Bishofberger Restated Family Trust U/A 9/6/95 |
| Grammercy | $50,000 | Valon R. Bishop, trustee of the Valon R. Bishop Trust dated 5/7/03 |
| Grammercy | $67,000 | Daryl L. Blanck & Yvonne M. Blanck, trustees of the Daryl Blanck & Yvonne Blanck Trust dated 3/23/94 |
| Grammercy | $100,000 | Michael S. Blau & Shamiran Blau, husband & wife As JTWROS |
| Grammercy | $50,000 | Marshall J. Brecht & Janet L. Brecht, trustees of the Marshall J. Brecht Trust dated 2/5/86 |
| Grammercy | $75,000 | June F. Brehn, an unmarried woman |
| Grammercy | $50,000 | Michael R. Brines & Cindy G. Brines, trustees of the Michael R.Brines & Cindy G. Brines Revocable Family Trust U/A dated 11/5/94 |
| Grammercy | $50,000 | Donald E. Briney, trustee of the Briney Family Exemption Trust dated 1/15/82 |
| Grammercy | $100,000 | Larry M. Brown & Marie S. Brown, husband & wife, As JTWROS |
| Grammercy | $100,000 | First Savings Bank Custodian For Edward Burgess IRA |
| Grammercy | $50,000 | Richard L Cadieux & Clara M. Cadieux, husband & wife, As JTWROS |
| Grammercy | $50,000 | Ronald R. Carter & Leslie A. Carter, trustees of the Ronald R. Carter & Leslie A. Carter Revocable Trust dated 10/24/91 |
| Grammercy | $50,000 | Richard F. Casey, III & Kathryn A. Casey, trustees of the Casey Family Trust |
| Grammercy | $50,000 | Constantin Chailission, an unmarried man |
| Grammercy | $110,000 | Robert T. Chylak & Barbara M Chylak, trustees of the Robert T Chylak & Barbara M Chylak Family Trust dated 10/30/90 |
| Grammercy | $200,000 | Classic Plumbing, A Nevada Company |
| Grammercy | $50,000 | Clawiter Associates, LLC, A California Limited Liability Company |
| Grammercy | $100,000 | Shirley M. Collins, trustee As her sole & separate property Under The Collins Family Trust dated 1/29/93 |
| Grammercy | $100,000 | Donald W. Cook, trustee of the Donald W. Cook Trust |

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Grammercy | $100,000 | Sam Costanza, trustee of the Costanza 1987 Decedent's Trust |
| Grammercy | $50,000 | Sam Costanza, trustee of the Costanza 1987 Survivor's Trust dated 3/12/87 |
| Grammercy | $50,000 | Kevon Cottrell & Karen Cottrell, husband & wife, As JTWROS |
| Grammercy | $50,000 | Leslie Shane Daniel & Denise M. Daniel husband & wife As JTWROS |
| Grammercy | $100,000 | Mark A. Daniel & Cathy A. Daniel, trustees of the Daniel Living Trust As Amended dated 1/9/98 |
| Grammercy | $50,000 | Frank Davenport, a single man |
| Grammercy | $150,000 | Tracy A. Deberry, an unmarried man |
| Grammercy | $75,000 | Pensco Trust Company Custodian for Gary Deppe-IRA |
| Grammercy | $60,000 | Dwayne H. Deutscher & Michelle T. Deutscher, husband & wife, As JTWROS |
| Grammercy | $800,000 | Duane U. Deverill, trustee of the Nevada Freedom Corp. PSP dated 10/1/90 Amended 9/1/95 FBO Duane U. Deverill |
| Grammercy | $350,000 | Duane U. Deverill, trustee of the Nevada Freedom Corp. PSP dated 10/1/90 Amended 9/1/95 FBO Debra L. Deverill |
| Grammercy | $50,000 | Robert Dibkiss & Louise G. Sherk, trustees of the Louise G. Sherk, M.D., a Medical Corporation, Employee Benefit Plan Trust |
| Grammercy | $50,000 | Eric C. Disbrow, trustee of the Eric C. Disbrow M.D., Inc. Profit Sharing Plan |
| Grammercy | $50,000 | Elizabeth P. Dokken-Baxter, trustee of the Elizabeth P. Dokken Trust dated 1/27/93 |
| Grammercy | $50,000 | Michael Donahue, a married man, as his sole & separate property |
| Grammercy | $50,000 | Glenn M. Donahue & Carrie Donahue, trustees of the Glenn & Carrie Donahue Living Trust dated 4/20/94 |
| Grammercy | $50,000 | D. Joseph Doucet & Louise M. Doucet, trustees of the D. Joseph & Louise M. Doucet 1989 Trust dated 3/30/89 |
| Grammercy | $150,000 | Daniel Drubin & Laura Drubin husband & wife As JTWROS |
| Grammercy | $50,000 | Charles B. Dunn, IV, trustee of the Charles B. Dunn, IV Trust dated 8/12/05 |
| Grammercy | $100,000 | Ellen V. Dustman & Oliver Henry, husband & wife As JTWROS |
| Grammercy | $50,000 | Wayne A. Dutt & Cynthia Deann Dutt, trustees of the Wayne A. Dutt Trust |
| Grammercy | $50,000 | First Savings Bank Custodian for Robert D. Earp IRA |
| Grammercy | $50,000 | Allan R. Eisenbach & Jayne M. Eisenbach, husband & wife, As JTWROS |
| Grammercy | $100,000 | First Savings Bank Custodian For Lamberto Eugenio IRA |
| Grammercy | $90,000 | John P. Everett, a married man dealing with his sole & separate property |
| Grammercy | $100,000 | Denise F. Fager, trustee of the Denise F. Fager Revocable Trust Under Agreement dated 2/28/03 |
| Grammercy | $100,000 | Patrick F. Fenton & Angela B. Fenton, husband & wife, As JTWROS |
| Grammercy | $100,000 | Bernard I. Finley & Jacklyn Finley, husband & wife As JTWROS |
| Grammercy | $50,000 | Richard T. Fiory, trustee of the Richard T. Fiory Revocable Trust dated 5/30/01 |
| Grammercy | $50,000 | Edwin L. Foreman & Dianne E. Foreman, trustees of the Edwin & Dianne Foreman Trust |
| Grammercy | $50,000 | James W. Forsythe & Earlene M. Forsythe, husband & wife, As JTWROS |
| Grammercy | $200,000 | Susan F. Geckenbach, trustee of the Susan F. Stein Trust dated 2/12/00 |
| Grammercy | $100,000 | Gale Gladstone-Katz, trustee of the Gale Gladstone-Katz Revocable Living Trust dated 12/10/03 |
| Grammercy | $50,000 | Sylvia M. Good, trustee of the Sylvia M. Good Survivor's Trust Established Under The Sam Good Family Trust dated 6/25/86 As Amended & Restated |
| Grammercy | $50,000 | Michael John Goodwin, an unmarried man |
| Grammercy | $50,000 | Kelly L. Hadland & Karen J. Hadland, husband & wife, As JTWROS |
| Grammercy | $100,000 | T. Claire Harper, trustee of the T. Claire Harper Family Trust dated 2/28/84 c/o Charles Harper, executor |
| Grammercy | $50,000 | Earl Hausserman & Bette Hausserman, husband & wife As JTWROS |
| Grammercy | $50,000 | Edwin L. Hausler, Jr., trustee of the Edwin Lowell Hausler, Jr., Living Trust dated 1/3/92 |
| Grammercy | $50,000 | Donald A. Hermann & Nancy E. Hermann, husband & wife As JTWROS |
| Grammercy | $100,000 | Christopher Hine & Nancy D. Hine, trustees of the Hine Family Trust |

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Grammercy | $60,000 | First Savings Bank Custodian For Jay P. Hingst IRA |
| Grammercy | $75,000 | Earl Howsley, Jr., a married man dealing with his sole & separate property |
| Grammercy | $50,000 | John A. Ippolito & Patricia M. Ippolito, trustees of the Ippolito Family Trust dated 8/31/89 |
| Grammercy | $50,000 | Stephen C. Irwin, an unmarried man |
| Grammercy | $50,000 | Richard J. Kane & Dianne M. Kane, husband & wife, As JTWROS |
| Grammercy | $122,000 | Aimee E. Kearns, trustee of the KM Trust aka Aimee E. Kearns, trustee of the A. E. Trust |
| Grammercy | $50,000 | First Savings Bank Custodian For Lindsey H. Kasler Jr. IRA |
| Grammercy | $50,000 | Frederick W. Kewall II, trustee of the Barbara J. Kewall Trust dated 7/16/89 |
| Grammercy | $50,000 | Evelyn Kitt, a single woman |
| Grammercy | $50,000 | Gregor Kloenne & Otilla M. Kloenne, trustees of the Kloenne Living Trust dated 3/11/87 |
| Grammercy | $50,000 | G. Robert Knoles & Christina G. Knoles husband & wife As JTWROS |
| Grammercy | $50,000 | Harvey A. Kornhaber, a single man |
| Grammercy | $50,000 | Dina Ladd, a single woman |
| Grammercy | $50,000 | Leslie S. Lanes, a married woman As Her Sole & Separate Property |
| Grammercy | $75,000 | Andrew J. Lembersky, an unmarried man |
| Grammercy | $50,000 | Robert Levy & Renee Levy, trustees of the RNR Living Trust dated 10/1/04 |
| Grammercy | $50,000 | First Savings Bank Custodian For Henri L. Lovrigny IRA |
| Grammercy | $50,000 | Thomas D. Lynch President of the Thomas D. Lynch Family Foundation |
| Grammercy | $50,000 | John Manter, an unmarried man |
| Grammercy | $50,000 | Gilbert Manuel, trustee of the Gilbert Manuel Living Trust 1/9/92 |
| Grammercy | $50,000 | Joseph F. McMullin & Pearl A. McMullin, husband & wife, as JTWROS |
| Grammercy | $50,000 | Christiane Menchin-Baker, trustee of the Christiane Menchin-Baker Revocable Trust |
| Grammercy | $100,000 | Jack R. Mennis & Susan A. Mennis, husband & wife, As JTWROS |
| Grammercy | $50,000 | Albert Montero, trustee of the Albert Montero Family Trust U/A dated 11/3/94 |
| Grammercy | $50,000 | Rudolph W. Moreno & Beatriz Moreno, husband & wife As JTWROS |
| Grammercy | $50,000 | Anne Marie Mueller, trustee of the Anne Marie Mueller Trust |
| Grammercy | $50,000 | Jean H. Murray, trustee of the Jean H. Murray Separate Property Trust dated 9/1/2/02 |
| Grammercy | $100,000 | Dominique Naylon, an unmarried woman |
| Grammercy | $50,000 | Ronald Douglas Neal, a married man dealing with his sole & separate property |
| Grammercy | $50,000 | James S. Nidson, a married man dealing with his sole & separate property |
| Grammercy | $50,000 | Freda Newman, trustee of the Freda Newman Trust dated 7/26/64 |
| Grammercy | $75,000 | Daniel D. Newman, trustee of the Daniel D. Newman Trust dated 11/1/92 |
| Grammercy | $50,000 | First Savings Bank Custodian For Frank T. Novak IRA |
| Grammercy | $50,000 | Olga O'Buch, trustee of the Olga O'Buch Trust dated 5/28/98 |
| Grammercy | $50,000 | Robert H. O'Connor & Cathleen B. O'Connor, trustees of the O'Connor Revocable Trust Utd 9/17/97 |
| Grammercy | $150,000 | Robert L. Ogren, trustee for the benefit of the Robert L. Ogren Trust dated 6/30/92 |
| Grammercy | $150,000 | Adrian J.R. Oosthuizen, a married man dealing with his sole & separate property |
| Grammercy | $50,000 | David A. Palmer, trustee UA 2/13/90 for the benefit of the Palmer Family Trust |
| Grammercy | $50,000 | Young Jin Park, a married woman & Sejin Park, a married man As JTWROS |
| Grammercy | $100,000 | Olynnda Palmer, trustee of the Olynnda Long Living Trust dated 11/18/80 |
| Grammercy | $50,000 | Shirley Payne, an unmarried woman |

Prepared 11/14/2007

Page 53

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Grammercy | $50,000 | Robert H. Perlman & Lynn R. Perlman, trustees of the Robert H. Perlman & Lynn R. Perlman Trust dated 9/17/92 |
| Grammercy | $100,000 | Michael E. Pile, a single man |
| Grammercy | $50,000 | Clair W. Potter, trustee of the Clair W. Potter Trust |
| Grammercy | $50,000 | First Savings Bank Custodian For James C. Presswood IRA |
| Grammercy | $100,000 | Justin D. Rafferty & Patricia L. Lewis, trustees of the The Lewis/Rafferty Family Trust dated 6/25/97 |
| Grammercy | $100,000 | Dennis Raggi, a married man dealing with his sole & separate property |
| Grammercy | $50,000 | Moshe Ram & Barbara Ram, trustees for the benefit of the Ram Family Trust dated 6/22/01 |
| Grammercy | $50,000 | Jack L. Rankin, a married man dealing with his sole & separate property |
| Grammercy | $50,000 | Lawrence Rausch, a married man As his sole & separate property |
| Grammercy | $60,000 | Donald E. Redmon & JayMe Redmon, trustees of the Donald E. Redmon & JayMe Redmon Family Trust dated 10/31/95 |
| Grammercy | $63,000 | First Savings Bank Custodian for Noel E. Rees IRA |
| Grammercy | $50,000 | Harvey Andrew Rineer III, trustee For The Harvey Andrew Rineer III Trust UTA dated 11/15/02 |
| Grammercy | $50,000 | Lee Rotchy, trustee of the Lee Rotchy Trust dated 12/5/00 |
| Grammercy | $50,000 | Ingrid A. Rutherford, trustee of the Ingrid A. Rutherford Family Trust dated 7/8/99 |
| Grammercy | $250,000 | Burton M. Sack, a married man dealing with his sole & separate property |
| Grammercy | $50,000 | William E. Schradt & Janet E. Schradt, trustees of the Schradt Trust dated 6/18/93 |
| Grammercy | $50,000 | David W. Saxton & Pamela K. Saxton, husband & wife, As JTWROS |
| Grammercy | $60,000 | Carey B. Sigmen & Lisa K. Sigmen, trustees of the Carey B. Sigmen & Lisa K. Sigmen Trust dated 3/3/97 |
| Grammercy | $50,000 | Alan R. Simmons & Judith B. Simmons, husband & wife, As JTWROS |
| Grammercy | $50,000 | Richard Small & Jacqueline Small, trustees of the Small Family Trust |
| Grammercy | $50,000 | Herbert Sonnenklar & Norma R. Sonnenklar, husband & wife, As JTWROS |
| Grammercy | $105,000 | Robert S. Speckert, trustee of the Robert S. Speckert Revocable Living Trust dated 6/11/92 |
| Grammercy | $100,000 | Floyd M. Spindle, an unmarried man Transfer On Death To Floyd Spindle Jr. |
| Grammercy | $50,000 | Donald Swezey & Beverly W. Swezey, trustee of the Donald Swezey & Beverly W. Swezey Trust dated 2/20/01 |
| Grammercy | $250,000 | Preswick Corp, A Nevada Corporation |
| Grammercy | $54,000 | First Savings Bank Custodian for Louise Teeter IRA Rollover |
| Grammercy | $50,000 | Lawrence H. Tengan & Lorraine K. Tengan, trustees of the Lawrence H. Tengan & Lorraine K. Tengan Revocable Trust |
| Grammercy | $55,000 | TGBA Properties |
| Grammercy | $50,000 | David M. Thatcher, a single man |
| Grammercy | $350,000 | Donald S. Tomlin & Dorothy R. Tomlin, trustees of the Donald S. Tomlin & Dorothy R. Tomlin Revocable Trust dated 10/24/79, (c/o David Wayne Mournier, |
| Grammercy | $100,000 | Robert W. Ulm, trustee of the Robert W. Ulm Living Trust dated 4/11/05 |
| Grammercy | $75,000 | Lloyd F. Van Sickle, trustee of the Van Sickle Family Trust dated 5/20/99 |
| Grammercy | $50,000 | Marietta Voglis, a married woman dealing with her sole & separate property |
| Grammercy | $50,000 | Joseph P. Walls & Ellen Walls, trustees of the Walls Family Trust dated 12/10/97 |
| Grammercy | $50,000 | Delbert Watkins & Mary Ann Watkins, trustees of the Watkins Family Trust dated 7/24/92 |
| Grammercy | $50,000 | Diana F. Weiland, trustee for the benefit of Gerald R. Weiland & Diana F. Weiland Trust |
| Grammercy | $50,000 | LK Wolfe Family, Lp, A Nevada Limited Partnership |
| Grammercy | $50,000 | James C. Wu & Jeanne K. Wu, trustees of the Wu Family Trust dated 06/19/91 |
| Grammercy | $100,000 | Kenneth H. Wyatt & Phyllis P. Wyatt, trustees of the Kenneth H. & Phyllis P. Wyatt Family Trust |
| Grammercy | $200,000 | Zawacki, A California LLC |
| Grammercy | $100,000 | Evo Zapponi & Billie Zapponi, trustees of the Evo E. Zapponi & Billie D. Zapponi Family Trust Under Agreement dated 2/9/93 |

Case 1:08-cv-05298-JSR     Document 20-3     Filed 07/14/2008     Page 13 of 18

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Grammercy | $125,000 | Anthony J. Zerbo, an unmarried man |
| Grammercy | $50,000 | Marshall R. Zerbo, a single man |
| Grammercy | $100,000 | Franz J. Zimmer, trustee of the Franz J. Zimmer Revocable Trust dated 02/05/97 |
| Harbor Gtown | $50,000 | Al-Awar Living Trust dated 04/05/01 c/o Adib M Al-Awar & Ellen A Al-Awar, Co-trustees |
| Harbor Gtown | $100,000 | R. L. Allgeier Family Trust dated 10/4/97 c/o Robert L. Allgeier & Donna L. Allgeier, trustees |
| Harbor Gtown | $50,000 | David Barker & Lisa Barker |
| Harbor Gtown | $50,000 | Bishofberger Restated Family Trust U/A 9/8/95 c/o Thomas E. Bishofberger & Betty T. Bishofberger, trustees |
| Harbor Gtown | $50,000 | Botton Living Trust dated 11/17/00 c/o William D. Botton, trustee |
| Harbor Gtown | $50,000 | Glen J. Brecht Trust dated 1/24/86 c/o Glen J. Brecht & Janine K. Brecht, trustees |
| Harbor Gtown | $50,000 | Marshall J. Brecht Trust dated 2/5/86 c/o Marshall J. Brecht & Janet L. Brecht, trustees |
| Harbor Gtown | $50,000 | June F. Brehm, an unmarried woman |
| Harbor Gtown | $50,000 | Michael R.Brines & Cindy G. Brines Revocable Family Trust U/A dated 11/5/94 c/o Michael R. Brines & Cindy G. Brines, trustees |
| Harbor Gtown | $50,000 | John S. Broders, an unmarried man |
| Harbor Gtown | $50,000 | Peter W. Capone & Deidre D. Capone, husband & wife, As JTWROS |
| Harbor Gtown | $50,000 | Tracy A. Deberry, an unmarried man |
| Harbor Gtown | $150,000 | First Savings Bank Custodian For James N. Daglandon IRA |
| Harbor Gtown | $50,000 | Humberto D'Elia |
| Harbor Gtown | $100,000 | Doerr Family Trust dated 9/12/02 c/o Linda Patrucco Doerr, trustee |
| Harbor Gtown | $100,000 | First Savings Bank Custodian For Mary H. Earp IRA |
| Harbor Gtown | $50,000 | Jonathan M. Eller & Carol A. Eller |
| Harbor Gtown | $100,000 | Denise F. Fager Revocable Trust Under Agreement dated 2/28/03 c/o Denise F. Fager, trustee |
| Harbor Gtown | $100,000 | Marguerite Falkenborg 2000 Trust dated 6/20/00 c/o Marguerite Falkenborg, trustee |
| Harbor Gtown | $50,000 | James W. Forsythe & Earlene M. Forsythe, husband & wife, As JTWROS |
| Harbor Gtown | $75,000 | Gale Gladstone-Katz Revocable Living Trust dated 12/10/03 c/o Gale Gladstone-Katz, trustee |
| Harbor Gtown | $200,000 | Graham Family Trust dated 10/26/78 c/o Robin B. Graham & Celia Allen-Graham, trustees |
| Harbor Gtown | $50,000 | Susan C. Grush a single woman |
| Harbor Gtown | $50,000 | Hansen Family Trust dated 6/6/89 c/o Kenneth L. Hansen & Donna J. Hansen |
| Harbor Gtown | $75,000 | Hine Family Trust c/o Christopher Hine & Nancy D. Hine Tru |
| Harbor Gtown | $100,000 | Richard Ianni, an unmarried man |
| Harbor Gtown | $50,000 | Janice Janis, trustee of the Janice Janis Living Trust dated 2/3/99 |
| Harbor Gtown | $250,000 | Leif A. Johansen & Roberta K. Johansen, trustees of the Johansen Family Trust dated 10/23/87, As Amended 6/11/04 |
| Harbor Gtown | $60,000 | Kaneda Living Trust dated 5/30/02 c/o K. Ken Kaneda & Brigitte Arendt-Kaneda |
| Harbor Gtown | $50,000 | Evelyn Kitt a single woman |
| Harbor Gtown | $75,000 | Richard Kleinbaum & Jennifer Kleinbaum |
| Harbor Gtown | $50,000 | Bernard Kloenne Living Trust dated 10/10/1995, Bernard A. Kloenne, trustee |
| Harbor Gtown | $100,000 | Gery Larson & Dolores Larson husband & wife As JTWROS |
| Harbor Gtown | $50,000 | Lehmann Family Trust dated 4/19/96 c/o Larry D. Lehmann & Kathleen F. Lehr |
| Harbor Gtown | $50,000 | Steve Lindquist Charitable Remainder Unitrust dated 09/09/96 c/o Steve Lindquist, trustee |
| Harbor Gtown | $50,000 | Mallin Family Trust dated 7/1/299 c/o John Robert Mallin, Jr. & Marie Theresa Mallin, trustees |
| Harbor Gtown | $50,000 | D. Nathan Meehan, a married man dealing with his sole & separate property |
| Harbor Gtown | $100,000 | Teri L. Melvin |

Prepared 11/14/2007

Page 83

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Ocean Atlantic 9.425 | $50,000 | Patricia Ann Webber, trustee of the Webber Family Trust dated 10/3/89 |
| Ocean Atlantic 9.425 | $50,000 | The Welcher Family Trust dated 7/13/99 c/o Andrew A. Welcher & Rosanne Welcher, trustees |
| Ocean Atlantic 9.425 | $50,000 | John L. Wilks Jr., an unmarried man |
| Ocean Atlantic 9.425 | $50,000 | Zawacki, A California LLC |
| Ocean Atlantic 9.425 | $50,000 | Lisa M Hollifield |
| Ocean Atlantic 2.7 | $25,000 | Darlene Ashdown & Vincent N. Greene, husband & wife As JTWROS |
| Ocean Atlantic 2.7 | $250,000 | Robert B Bender & Paula S. Bender, husband & wife JTWROS |
| Ocean Atlantic 2.7 | $50,000 | The Chiappetta Trust dated 4/1/03 |
| Ocean Atlantic 2.7 | $600,000 | Citizen Printing Company Inc. Citizen Investment Account |
| Ocean Atlantic 2.7 | $50,000 | Panagiotis Dovanidis, a single man & Dimitra Dovanidou, a married woman dealing with her sole & separate property, As JTWROS |
| Ocean Atlantic 2.7 | $150,000 | Raymond J. Eberlin & Karen Eberlin |
| Ocean Atlantic 2.7 | $150,000 | Sagrario T. Evers Living Trust dated 5/1/01 c/o Sagrario T. Evers, trustee |
| Ocean Atlantic 2.7 | $25,000 | Dionisio A. Fernandes, Md & Fida Fernandes |
| Ocean Atlantic 2.7 | $75,000 | Foxcroft Living Trust dated 1/10/02 c/o Fred J. Foxcroft & Roberta Foxcroft, trustees |
| Ocean Atlantic 2.7 | $40,000 | Gold Rush Lounge- Inc. |
| Ocean Atlantic 2.7 | $25,000 | The James F. Lawrence & Arla Lawrence Reovcable Trust dated 1-19-04 |
| Ocean Atlantic 2.7 | $50,000 | Lily Markham, a married woman dealing with her sole & separate property, & Irene Anne Markham-Tatoya, , a married woman dealing with her sole & |
| Ocean Atlantic 2.7 | $100,000 | Rosalie Allen Morgan Trust dated 1/31/03 |
| Ocean Atlantic 2.7 | $150,000 | John & Janet Mrasz Trust dated 12/2/04 John & Janet Mrasz Trust c/o John T. Mrasz & Janet |
| Ocean Atlantic 2.7 | $100,000 | O'Connor Revocable Trust Utd 9/17/87 c/o Robert H. O'Connor & Cathleen B. O'Connor, trustees |
| Ocean Atlantic 2.7 | $25,000 | Carol J. Pruner, trustee of the Carol J Pruner Trust dated 11/24/99 |
| Ocean Atlantic 2.7 | $45,000 | Phillip M. Rukon & Shirley S. Rukon |
| Ocean Atlantic 2.7 | $25,000 | Sanchez Living Trust dated 10/13/03 c/o Randy M. Sanchez & Sharon Sanchez, trustees |
| Ocean Atlantic 2.7 | $25,000 | Alan R. Simmons & Judith B. Simmons, husband & wife, As JTWROS |
| Ocean Atlantic 2.7 | $60,000 | Carmine Spinelli & Anna Spinelli, husband & wife as JTWROS |
| Ocean Atlantic 2.7 | $95,000 | Maria Spinelli, a single woman |
| Ocean Atlantic 2.7 | $90,000 | Michael Spinelli, a single man |
| Ocean Atlantic 2.7 | $25,000 | Sterling Tom, trustee of the Tom Trust |
| Ocean Atlantic 2.7 | $25,000 | Whitman Trust dated 12/1/04 c/o H. Daniel Whitman, trustee |
| Ocean Atlantic 2.7 | $25,000 | Gregory D. Yonai Family Trust C/O Gregory D. Yonai, trustee |
| Ocean Atlantic 2.7 | $30,000 | First Trus Co. of Onaga Custodia For Janice Mills, IRA |
| Ocean Atlantic 2.7 | $50,000 | Kathy John & Tine Eden As Joint Tenants |
| Ocean Atlantic 2.7 | $40,000 | Giovanni Spinelli Trust c/o Michele Spinelli, trustee |
| Palm Harbor I | $50,000 | Gloria Weiner Adams Revocable Trust Date 6-8-2005 |
| Palm Harbor I | $50,000 | First Savings Bank Custodian For Kenneth Addes IRA |
| Palm Harbor I | $50,000 | Michel F. Aiello & Patricia A. Aiello Trust Date 10/4/94 c/o Michel F. Aiello & Patricia A. Aie |
| Palm Harbor I | $100,000 | Steven C. Altman |
| Palm Harbor I | $100,000 | August J. Amaral, Inc. A Nevada Corporation |
| Palm Harbor I | $70,000 | Pensco Trust Company Custodian for Robert S. Angel IRA |
| Palm Harbor I | $100,000 | John F. Aquino & Lisa Aquino |
| Palm Harbor I | $250,000 | Arbogast Family Trust c/o Rodney J. Arbogast & Donna Arbogast |

Prepared 11/14/2007

Page 84

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Palm Harbor I | $50,000 | Darlene Ashdown & Vincent N. Greene, husband & wife As JTWROS |
| Palm Harbor I | $50,000 | 1994 Robert Asselin & Mary Asselin Family Trust c/o Robert J. Asselin & Mary E. Asselin |
| Palm Harbor I | $75,000 | Dr. Henry C. Ayoub, a single man |
| Palm Harbor I | $50,000 | Backes Family Trust dated 8/6/86 c/o Paul P. Backes & Loretta D. Backes Co-trustees |
| Palm Harbor I | $50,000 | Don L. Barnes & Miriam M. Tucker-Barnes, husband and wife as JTWROS |
| Palm Harbor I | $50,000 | Gary R. Barton & Mavis J. Barton husband & wife As JTWROS |
| Palm Harbor I | $100,000 | David P. Betteridge, a single man |
| Palm Harbor I | $50,000 | Jerry L. Blackman-Sr. & Carolyn N. Blackman Living Trust dated 11/26/01 |
| Palm Harbor I | $50,000 | Donald W. Brehm |
| Palm Harbor I | $50,000 | June F. Brehm, an unmarried woman |
| Palm Harbor I | $65,000 | Briney Family Exemption Trust dated 11/5/82 c/o Donald E. Briney, trustee |
| Palm Harbor I | $50,000 | First Savings Bank Custodian For Edward Burgess IRA |
| Palm Harbor I | $100,000 | Richard L. Cadieux & Clara M. Cadieux, husband & wife, As JTWROS |
| Palm Harbor I | $50,000 | A William Ceglia |
| Palm Harbor I | $50,000 | Robert J. Centanni-Sr. & Susan R. Centanni |
| Palm Harbor I | $50,000 | Eunice O. Chapman |
| Palm Harbor I | $100,000 | Jack R. Clark & Linda C. Reid husband & wife As JTWROS |
| Palm Harbor I | $100,000 | George S. Cohan & Natalie H. Cohan Family Trust dated 4/1/03 c/o George S. Cohan, trustee |
| Palm Harbor I | $50,000 | Cohen Living Trust dated 3/6/90 c/o Irwin Cohen & Marilyn T. Cohen, trustees |
| Palm Harbor I | $50,000 | Thomas Raymond Conway & Victoria C. E. Conway husband & wife As JTWROS |
| Palm Harbor I | $50,000 | April Corley Trust dated 4/25/05, April M. Corley, trustee |
| Palm Harbor I | $50,000 | Billy James Corley Revocable Living Trust c/o Billy James Corley, trustee |
| Palm Harbor I | $50,000 | Iris G. Corley Trust dated 9/19/84, Iris G. Corley, trustee |
| Palm Harbor I | $100,000 | Costanza 1987 Survivor's Trust dated 3/12/87 c/o Sam Costanza, trustee |
| Palm Harbor I | $50,000 | Craner Family Trust Under Agreement dated 2/23/89 c/o Gareth A. R. Craner, trustee |
| Palm Harbor I | $80,000 | Charles D. Cunningham & Susan M. Cunningham |
| Palm Harbor I | $50,000 | Dakota Trust dated 9/16/96 c/o Jerry L. Gage & Darlene C. Gage, trustees |
| Palm Harbor I | $50,000 | Deborah A. Daniel |
| Palm Harbor I | $50,000 | Leslie Shane Daniel & Denise M. Daniel husband & wife As JTWROS |
| Palm Harbor I | $150,000 | Andrew Dauscher & Ellen Dauscher husband & wife As JTWROS |
| Palm Harbor I | $100,000 | Marrice L. Davis & Nanci E. Davis, husband & wife |
| Palm Harbor I | $50,000 | Gary Deppe a single man |
| Palm Harbor I | $50,000 | Dwayne H. Deutscher & Michelle T. Deutscher, husband & wife, As JTWROS |
| Palm Harbor I | $100,000 | Dennis A Devito, a married man |
| Palm Harbor I | $50,000 | Thomas Di Jorio & Antonette Di Jorio, husband & wife |
| Palm Harbor I | $50,000 | Helmul R. Dobeck & Eloise A. Dobeck |
| Palm Harbor I | $50,000 | Mark A. Dolginoff Separate Property Trust |
| Palm Harbor I | $25,000 | Daniel T. Drubin IRA |
| Palm Harbor I | $40,000 | Daniel T. Drubin Sep IRA |
| Palm Harbor I | $100,000 | Daniel T. Drubin & Laura Drubin husband & wife As JTWROS |
| Palm Harbor I | $300,000 | Dunbar Revocable Living Trust dated 11/21/98, c/o Donald C. Dunbar & Wanda Dunbar, trustees |

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Palm Harbor I | $150,000 | Wayne A. Dutt Trust c/o Wayne A. Dutt & Cynthia Deann Dutt, trustees |
| Palm Harbor I | $75,000 | Mary H. Earp IRA |
| Palm Harbor I | $57,000 | Schwartz & Earp Joint Venture |
| Palm Harbor I | $115,000 | Raymond J. Eberlin & Karen Eberlin, husband & wife as JTWROS |
| Palm Harbor I | $100,000 | Marguerite Falkenborg 2000 Trust dated 6/20/00 c/o Marguerite Falkenborg, trustee |
| Palm Harbor I | $50,000 | Allen K. Forbes |
| Palm Harbor I | $50,000 | RGF Revocable Trust c/o Robert G. Fuller, trustee |
| Palm Harbor I | $100,000 | Fuller Family Trust dated 5/29/97 c/o Theodore J. Fuller & Joan L. Fuller, trustees |
| Palm Harbor I | $50,000 | Frederick D. Garth & Blair F. Garth |
| Palm Harbor I | $50,000 | Thornton Garth & Sharon R. Garth |
| Palm Harbor I | $50,000 | Nancy R. Gilmour IRA |
| Palm Harbor I | $50,000 | Gorsira Foundation, LLC |
| Palm Harbor I | $50,000 | William Harrison Goulding & Elizabeth R. Goulding |
| Palm Harbor I | $50,000 | Larry E. Hanan Revocable Trust dated 5/2 c/o Larry E. Hanan |
| Palm Harbor I | $300,000 | T. Claire Harper Family Trust dated 2/28/84 c/o Charles Harper, trustee |
| Palm Harbor I | $50,000 | Kevin J. Haselhorst |
| Palm Harbor I | $100,000 | Brooke Ann Hawley & Stephen Hawley |
| Palm Harbor I | $100,000 | Heffner Family Trust dated 9/10/02 c/o Michael T. Heffner & Barbara C. Heffner, trustees |
| Palm Harbor I | $100,000 | Herndon Family Trust dated 05/29/1997 c/o Brian K. Herndon & Sharon L. Herndon |
| Palm Harbor I | $50,000 | Edward O. High, an unmarried man |
| Palm Harbor I | $60,000 | The Ruby M. Hill Family Trust dated Dece |
| Palm Harbor I | $75,000 | Holder Revocable Trust dated 10/21/91 c/o Ralph C. Holder & Naomi S. Holder Tr |
| Palm Harbor I | $100,000 | Horizon Investment Management-Llc |
| Palm Harbor I | $90,000 | Earl Howsley Jr. |
| Palm Harbor I | $100,000 | Hubbard Trust dated 7/29/1998 c/o George W. Hubbard & Carol N. Hubba |
| Palm Harbor I | $50,000 | Suzanne L. Hudson, a single woman, & Carolyn J. Chrzastek, a single woman, as JTWROS |
| Palm Harbor I | $50,000 | Richard Ianni, an unmarried man |
| Palm Harbor I | $50,000 | Johnston Trust dated 9/7/85 c/o Rodney L. Johnston & Diane E. John |
| Palm Harbor I | $50,000 | Kaneda Living Trust dated 5/3/02 c/o K. Ken Kaneda & Brigitte Arend-Kaneda |
| Palm Harbor I | $100,000 | Kay Living Trust dated 7/11/90 c/o Othmar Klay & Christine Klay, Trus |
| Palm Harbor I | $75,000 | Bernard Kloenne Living Trust dated 10/10/1986, Bernard A. Kloenne, trustee |
| Palm Harbor I | $50,000 | G. Robert Knoles & Christina G. Knoles husband & wife As JTWROS |
| Palm Harbor I | $50,000 | Stephen V. Kowalski & Maria T. Sutherland husband & wife As JTWROS |
| Palm Harbor I | $50,000 | Donald H. Kwiatkowski & Sandra L. Kwiatk |
| Palm Harbor I | $50,000 | Dina Ladd, a single woman |
| Palm Harbor I | $50,000 | Stephen Lincoln & Patricia Lincoln, trustees of the Stephen & Patricia Lincoln Trust dated 8/21/03 |
| Palm Harbor I | $50,000 | Douglas Littrell & Joan Littrell, husband & wife, As JTWROS |
| Palm Harbor I | $70,000 | Ivan Loebs |
| Palm Harbor I | $50,000 | Erika G. Lynn |
| Palm Harbor I | $50,000 | Christopher A. Marando & Noreen E. Marando |
| Palm Harbor I | $50,000 | Pamela Jean Merton |

Prepared 11/14/2007

Page 86

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Palm Harbor I | $50,000 | Gerald Marts & Linda R. Marts |
| Palm Harbor I | $100,000 | Morris Massay |
| Palm Harbor I | $50,000 | Mayo Family Trust c/o Monroe Mayo & Louise Mayo, trustees |
| Palm Harbor I | $50,000 | Alicia McBride & Marion McBride |
| Palm Harbor I | $50,000 | McMullan Living Trust dated 8/19/94 c/o Dale J. McMullan |
| Palm Harbor I | $50,000 | Joseph J. Melz & Linda M. Melz |
| Palm Harbor I | $50,000 | Albert J. Mineconzo Living Trust dated 11/4/97 c/o Albert J. Mineconzo, trustee |
| Palm Harbor I | $50,000 | Minter Family 1994 Trust c/o Douglas Minter & Elizabeth F. Minter |
| Palm Harbor I | $50,000 | William H. & Donna R. Morgan Living Trust c/o William H. Morgan & Donna R. Morgan, trustees |
| Palm Harbor I | $50,000 | Frank J. Murphy & Margaret F. Murphy |
| Palm Harbor I | $75,000 | The Murphy Family Trust c/o Dr. James & Tracy Murphy, trustees |
| Palm Harbor I | $50,000 | Musso Living Trust dated 11/30/92 c/o Walter Musso & Barbara Musso, trustees |
| Palm Harbor I | $50,000 | Newman Family Trust dated 9/30/97 c/o Larry J. Newman & Elsie D. Newman, trustees |
| Palm Harbor I | $50,000 | Irene R. O'Hare Trust dated 7/28/88 |
| Palm Harbor I | $75,000 | Marvin Nicola-IRA |
| Palm Harbor I | $50,000 | Novak Living Trust dated 10/21/97 c/o Frank T. Novak & Patricia A. Novak, trustees |
| Palm Harbor I | $50,000 | Henry & Mengia Obermuller Trust dated 9/14/90 c/o Henry J. Obermuller & Mengia K. Obermuller, trustees |
| Palm Harbor I | $60,000 | Robert L. Ogren, trustee for the benefit of the Robert L. Ogren Trust dated 6/30/92 |
| Palm Harbor I | $50,000 | John E. O'Riordan & Sonhild A. O'Riordan, JTWROS |
| Palm Harbor I | $100,000 | Ott Family Revocable Trust dated 4-29-98 c/o Franklin D. Ott & Kathryn R. Ott, |
| Palm Harbor I | $50,000 | Shirley Payne, an unmarried woman |
| Palm Harbor I | $50,000 | Leland T. Pearce & Isabelle J. Pearce |
| Palm Harbor I | $50,000 | Robert L. Pech & Judith G. Pech, trustees of the Robert L. Pech & Judith G. Pech Family Trust dated 9/5/96 |
| Palm Harbor I | $50,000 | Jean G. Richards Trust dated 9/30/1999 c/o Jean G. Richards, trustee |
| Palm Harbor I | $50,000 | Ronald C Phelps Trust dated 10/19/01, c/o Ronald C Phelps, trustee |
| Palm Harbor I | $50,000 | Betty J. Phenix |
| Palm Harbor I | $50,000 | Michael E. Pile, a single man |
| Palm Harbor I | $50,000 | Martha W Potter Revocable Trust c/o Martha W Potter, trustee |
| Palm Harbor I | $60,000 | Jean G. Richards Trust dated 9/30/1999 c/o Jean G. Richards, trustee |
| Palm Harbor I | $50,000 | Brooks H. & Dee Dee Robinson |
| Palm Harbor I | $50,000 | Robert R. Rodriguez, an unmarried man |
| Palm Harbor I | $150,000 | Robert Roeder & Patricia Roeder, husband & wife as JTWROS |
| Palm Harbor I | $50,000 | Michele L. Marson-Ruiz & Phillip J. Ruiz, husband & wife as JTWROS |
| Palm Harbor I | $50,000 | Ingrid A. Rutherford, trustee of the Ingrid A. Rutherford Family Trust dated 7/8/99 |
| Palm Harbor I | $50,000 | Ronald F. Ryan & Mary A. Ryan, husband & wife, as JTWROS |
| Palm Harbor I | $200,000 | Mark A. Sauceda, an unmarried man |
| Palm Harbor I | $100,000 | Abraham Serouya |
| Palm Harbor I | $100,000 | Donald E. Shoup & Sharon K. Shoup, husband & wife, As JTWROS |
| Palm Harbor I | $50,000 | Alan R. Simmons & Judith B. Simmons, husband & wife, As JTWROS |
| Palm Harbor I | $50,000 | Oliver F. Smith Incorporated Profit Sharing Plan |
| Palm Harbor I | $50,000 | Sovereign Capital Advisors, LLC Stanley Tara, a Nevada limited liability company |
| Palm Harbor I | $100,000 | Robert S. Speckert, trustee of the Robert S. Speckert Revocable Living Trust dated 6/11/92 |

Prepared 11/14/2007

Page 87

| Loan Name | Dollars Invested | Vesting Name |
|---|---|---|
| Palm Harbor I | $60,000 | Peter E. Sprock 2001 Trust c/o Peter E. Sprock, trustee |
| Palm Harbor I | $200,000 | Jay S. Stein Charitable Remainder Unitrust |
| Palm Harbor I | $100,000 | Stewart Family Trust dated 1/15/98 c/o Michael D. Stewart & Mary Jude Stewart, trustees |
| Palm Harbor I | $50,000 | Lesley Stricker, a widow |
| Palm Harbor I | $100,000 | Sunrise Mini-Storage |
| Palm Harbor I | $50,000 | T-2 Enterprises LLC c/o Manager Warren W Tripp |
| Palm Harbor I | $50,000 | T-3 Enterprises LLC c/o Manager Warren W Tripp |
| Palm Harbor I | $50,000 | Taylor Living Trust dated 2/27/98 c/o Kerry S. Taylor & Joyce L. Taylor, trustees |
| Palm Harbor I | $50,000 | Gregory R. Thompson |
| Palm Harbor I | $50,000 | Lynnette S. Thurman & John H. Thurman |
| Palm Harbor I | $85,000 | Tomczak Family Trust dated 4/25/83 c/o Sigmund L. Tomczak & Diane Tomczak, trustees |
| Palm Harbor I | $100,000 | Robert C. Toombes & Patsy G. Toombes, husband and wife as JTWROS |
| Palm Harbor I | $50,000 | Gary E. Tucker & Linda L. Tucker, husband & wife As JTWROS |
| Palm Harbor I | $95,000 | Peggy Ann Valley IRA |
| Palm Harbor I | $50,000 | Weible 1981 Trust dated 6/30/81 c/o Ardis Weible & Dean F. Weible Co-trustees |
| Palm Harbor I | $100,000 | Gerald R. Welland & Diana F. Welland Trust |
| Palm Harbor I | $75,000 | Windisch 1998 Living Trust c/o Frederick P. Windisch, trustee |
| Palm Harbor I | $50,000 | Terry Thomas Young |
| Palm Harbor I | $65,000 | First Savings Bank custodian for Craig Zager Sep IRA |
| Palm Harbor I | $400,000 | Sierra Liquidity Fund, LLC |
| Placer Vineyards I | $50,000 | Arthur V. Adams Trust dated 9/12/97 c/o Arthur V. Adams, trustee |
| Placer Vineyards I | $100,000 | Addes Trust c/o Kenneth Addes & Victoria Addes Co-trustees |
| Placer Vineyards I | $300,000 | Al-Awar Living Trust dated 04/05/01 c/o Adib M Al-Awar & Ellen A Al-Awar, Co-trustees |
| Placer Vineyards I | $100,000 | Stanley Alexander Trust , Dr. Stanley Alexander, trustee |
| Placer Vineyards I | $50,000 | R. L. Allgeier Family Trust dated 10/4/97 c/o Robert L. Allgeier & Donna L. Allgeier, trustees |
| Placer Vineyards I | $50,000 | August J. Amaral, Inc. A Nevada Corporation |
| Placer Vineyards I | $50,000 | Guy Archer |
| Placer Vineyards I | $50,000 | William P. Austin & Mary Lee Austin |
| Placer Vineyards I | $200,000 | B & W Precast Construction, Inc |
| Placer Vineyards I | $50,000 | Robert Bennett & Michele Bennett husband & wife As JTWROS |
| Placer Vineyards I | $50,000 | Albert Blumenthal IRA |
| Placer Vineyards I | $50,000 | Charles E. Borom & Lanna G. Borom, husband & wife, As JTWROS |
| Placer Vineyards I | $75,000 | Glen J. Brecht Trust dated 1/24/86 c/o Glen J. Brecht & Janine K. Brecht, trustees |
| Placer Vineyards I | $100,000 | Marshall J. Brecht Trust dated 2/5/86 c/o Marshall J. Brecht & Janet L. Brecht, trustees |
| Placer Vineyards I | $100,000 | Hannah Brehmer & Billy Gates, JTWROS |
| Placer Vineyards I | $50,000 | Broadwalk Investments Limited Partnership, c/o James R. Bonfiglio & Donna M. Bonfiglio, General Partners |
| Placer Vineyards I | $100,000 | Larry M. Brown & Marie S. Brown, husband & wife, As JTWROS |
| Placer Vineyards I | $50,000 | Buckwald Revocable Trust dated 2/11/92 c/o Neil G. Buckwald Trust |
| Placer Vineyards I | $50,000 | Dr. Joselito Tan Burgos |
| Placer Vineyards I | $50,000 | Evelyn A. Calhoun, an unmarried woman transferable on death to Dale E. Calhoun |
| Placer Vineyards I | $100,000 | Cal-Mark Beverage Company Defined Benefit c/o Nevada Trust Company Custodian |

ALAN R. SMITH, ESQ.
Nevada Bar No. 1449
KEVIN A. DARBY, ESQ.
Nevada Bar No. 7670
Law Offices of Alan R. Smith
505 Ridge Street
Reno, Nevada 89501
Telephone (775) 786-4579
Facsimile (775) 786-3066
*Email: mail@asmithlaw.com*

Attorney for Lenders Protection Group

*ELECTRONICALLY FILED -12/6/06*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

—ooOoo—

| | |
|---|---|
| In Re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>         Debtor.<br>_____/ | Case Nos.:<br>BK-S-06-10725-LBR<br>BK-S-06-10726-LBR<br>BK-S-06-10727-LBR<br>BK-S-06-10728-LBR<br>BK-S-06-10729-LBR |
| In Re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>         Debtor.<br>_____/ | JOINTLY ADMINISTERED<br>Chapter 11 |
| In Re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br>         Debtor.<br>_____/ | **STATEMENT OF THE LAW OFFICES OF ALAN R. SMITH PURSUANT TO BANKRUPTCY RULE 2019** |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>         Debtor.<br>_____/ | **(AFFECTS ALL DEBTORS)**<br><br>No Hearing Required |
| In re:<br>USA SECURITIES, LLC,<br>         Debtor.<br>_____/ | |

Affects:
☒ All Debtors
☐ USA Commercial Mortgage Company
☐ USA Capital Realty Advisors, LLC
☐ USA Capital Diversified Trust Deed Fund, LLC
☐ USA Capital First Trust Deed Fund, LLC
☐ USA Securities, LLC
_____/

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\2019 Statement 120606-plt.wpd

I, ALAN R. SMITH, ESQ., hereby declare under penalty of perjury that the following assertions are true:

1.    I am an attorney licensed to practice law in the State of Nevada and am doing business as the Law Offices of Alan R. Smith.  I have personal knowledge of the facts herein stated, and if called as a witness could and would competently testify as to those facts.

2.    Kevin A. Darby, Esq., and myself are the attorneys primarily responsible for representing a group of lenders (most of whom are direct lenders) with regard to certain loans which were originated and serviced by the Debtors.  The group is known as the "Lenders Protection Group", whose members are comprised of the following:

| | |
|---|---|
| D. Joseph & Louise Doucet Trust<br>3301 Skyline Drive<br>Reno, Nevada 89509 | Dr. Kip E. Virts<br>Dr. Brent E. Virts<br>Mark Virts<br>4381 West Hidden Valley Drive<br>Reno, Nevada 89502 |
| Sandra Masters<br>18124 Wedge Pkwy #550<br>Reno, NV 89511 | James Feeney, Trustee<br>E & M Profit Sharing Plan<br>P.O. Box 19122<br>Reno, NV 89511 |
| Jack R. Clark and Linda C. Reid<br>9900 Wilbur May Pkwy, Apt. 4701<br>Reno, Nevada 89521-8039 | Eddie Mayo and Jocelyne Helzer<br>115 So. Deer Run Road<br>Carson City, NV 89701 |
| John M. Luongo<br>965 Leah Circle<br>Reno, NV 89511 | Donald and Beverly Swezey<br>3666 Cherokee Drive<br>Carson City, NV 89705 |
| Thomas B. Harrison, Trustee<br>Marguerite F. Harrison, Trustee<br>Harrison Family Trust<br>930 Dorcey Drive<br>Incline Village, NV 89451 | John Weaver<br>9225 Cordoba Blvd.<br>Sparks, NV 89441 |
| John P. Everett<br>6120 N. Mayfair, 2nd Floor<br>Spokane, WA 99208 | The Klay Living Trust<br>Othmar & Christine Klay, Trustees<br>5530 Lausanne Drive<br>Reno, NV 8951 |

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\2019 Statement 120606-plt.wpd

- 2 -

| | |
|---|---|
| Donald E. and Patricia Virts Trust<br>4381 W. Hidden Valley Drive<br>Reno, NV | Audrey M. Whightsil<br>12754 Joleane Avenue<br>Yuma, AZ 85367 |
| Pat Tiede<br>5225 Pooks Hill Road, Apt. 1520N<br>Bethesda, MD 20814-6765 | Karen Allison<br>2656 Seashore Drive<br>Las Vegas, NV 89128 |
| V. and Franklyn O'Brien<br>2805 Castle Bar N<br>Las Vegas, NV 89134 | Joyce and Bob Patterson-Rogers<br>Patterson-Rogers 2001 Family Trust<br>P.O. Box 60175<br>Las Vegas, NV 89160 |
| Alan and Carol Simon<br>The Simon Family Trust of 2000<br>1800 Waldman Avenue<br>Las Vegas, NV 89102-2347 | Charles H. Small<br>12754 Joleane Avenue<br>Yuma, AZ 85367 |
| Anthony J. Zerbo<br>780 Saratoga Avenue Apt. S-107<br>San Jose, CA 95129 | Richard Krupp<br>2321 Sky Valley Street<br>Henderson, NV 89052 |
| Robert L. Ogren<br>3768 Rick Stratton Drive<br>Las Vegas, NV 89120 | Joseph A. Farrah, Trustee<br>Farrah Family Trust<br>1410 Murchison Drive<br>Millbrae, CA 94030 |
| Joseph A. Farrah, Trust<br>Julia Farrah Trust<br>1410 Murchison Drive<br>Millbrae, CA 94030 | James W. Rogers<br>22 Lopez Avenue<br>San Francisco, CA 94116 |
| James W. Rogers, Trustee<br>Eleanor L. Rogers 1991 Living Trust<br>22 Lopez Avenue<br>San Francisco, CA 94116 | Donna Cangelosi<br>5860 Lausanne Drive<br>Reno, NV 89511 |
| Carol Mortensen Kesler<br>4847 Damon Circle<br>Salt Lake City, UT 84117 | Billing D. Denny<br>8209 Sunbonnet Drive<br>Fair Oaks, CA 95628 |
| Michael R. Brines<br>Cindy G. Brines<br>4935 El Sereno Avenue<br>La Crescenta, CA 91214 | Jonathan M. Eller<br>P.O. Box 1614<br>Mammoth Lakes, CA 93546 |
| William Dupin<br>545 Cole Circle<br>Incline Village, NV 89451 | Robert Essaff<br>Cindy H. Essaff<br>2860 Heybourne Road<br>Minden, NV 89423 |
| Rose Moore<br>Raymond Moore<br>902 University Ridge Drive<br>Reno, NV 89512 | Adib M. Al-Awar<br>Ellen A. Al-Awar<br>1330 Burro Court<br>Gardnerville, NV 89410 |

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

| Jean H. Murray, Trustee of the Jean H. Murray separate property trust dated 9/12/02<br>865 Coloma Drive<br>Carson City, NV 89705 | Patricia Ann Webber<br>9157 Shadow Glen Way<br>Fort Myers, FL 33913 |
|---|---|
| John L. Willis Jr.<br>9157 Shadow Glenn Way<br>Fort Myers, FL 33913 | Peter W. Capone<br>Deidre' D. Capone JTWROS<br>P.O. Box 1470<br>Gardnerville, NV 89410 |
| Larry & Diane Higgins<br>571 Alden<br>Incline Village, NV 89451 | David A. And Elizabeth M. Souza<br>542 Socorro Ct.<br>Reno, NV 89511 |
| Richard and Lelia Barzan<br>7231 Langworth Road<br>Oakdale, CA 95361 | Anne E. Abrams<br>10490 Wilshire Blvd. #703<br>Los Angeles, CA 90024 |
| Gale Ebert<br>336 S. Spalding Drive, #201<br>Beverly Hills, CA 90212 | Shirley M. Collins<br>1975 Snowberry Ct.<br>Carlsbad, CA 92009 |
| J.V. Marrone Trust<br>(formerly Marlon & Alicia McBride)<br>55 Colonial Drive<br>Rancho Mirage, CA 92270 | Tom Gloy<br>P.O. Box 4497<br>Incline Village, NV 89450 |
| Denise F. Faber<br>5 Salvatore<br>Ladera Ranch, CA 92694 | William E. Buck<br>P.O. Box 5127<br>Reno, NV 89513 |
| Darlene Turner<br>2028 ½ I Street<br>Sparks, NV 89431 | Ernest J. Moore<br>2028 I Street<br>Sparks, NV 89431 |
| Lawrence A. Kirkham<br>2350 High Terrace Drive<br>Reno, NV 89509 | Larry Newman<br>1775 Autumn Valley Way<br>Reno, NV 89523 |
| Thalia Routsis<br>P.O. Box 4311<br>Incline Village, NV 89450 | Otto D. Minter<br>5389 Conte Drive<br>Carson City, NV 89701 |
| Julian J. Wells<br>Annette M. Wells<br>P.O. Box 6129<br>Incline Village, NV 89450 | John R. Mallin<br>Marie T. Mallin<br>9809 Pinnacle Pass Drive<br>Las Vegas, NV 89117-5997 |
| Evelyn Fisher<br>12051 S. Cherokee Lane<br>Tucson, AZ 85736 | Dick & Jackie Small<br>4801 N. Calle Santa Cruz<br>Prescott Valley, AZ 86314 |
| Jed Barish<br>2011 Oak Street<br>San Francisco, CA 94117 | Sam Costanza<br>9809 Cantebury Rose Lane<br>Las Vegas, NV |

| | |
|---|---|
| Laguna Paloma, Inc.<br>Virginia Swilley, President<br>2714 N. Peach Hollow Circle<br>Pearland, TX 77584 | John E. And Souhild A. O'Riordan<br>2745 Hartwick Pines Drive<br>Henderson, NV 89052 |
| Paul Garcell<br>2013 Grouse Street<br>Las Vegas, NV 89134 | Ardis Weible, Co-Trustee<br>Dean Weible of Weible 1981 Trust<br>6314 Tara Avenue<br>Las Vegas, NV 89146 |
| Raymond F. Brant<br>P.O. Box 728<br>Diablo, CA 94528 | The David A. Gean Trust<br>Marsha Van Jul, Trustee<br>6615 E. Pacific Coast Hwy #260<br>Long Beach, CA 90803 |
| Suze Harrington<br>2131 Connor Park Cove<br>Salt Lake City, UT 84109 | Donald E. Redmon<br>51 Sanlo Lane<br>Mountain Home, AR 72653 |
| Jaylyle Redmon<br>51 Sanlo Lane<br>Mountain Home, AR 72653 | Patricia R. Lietz<br>3676 Woodhurst Drive<br>Covina, CA 91724 |
| DavidC. Wahl<br>P.O. Box 8012<br>Mammoth Lakes, CA 93546 | Arthur F. Di Salvo for Anne F. Di Salvo<br>P.O. Box 18220<br>Reno, NV 89511-0220 |
| Jennefer C. Peele<br>2581 Rampart Terrace<br>Reno, NV 89519 | Whitney H. Lauren<br>2581 Rampart Ter<br>Reno, NV 89519 |
| Maurice Davis<br>P.O. Box 7290<br>Tahoe City, CA 96145 | Henry J. Obermuller<br>Mengia K. Obermuller<br>P.O. Box 1161<br>Tahoe City, CA 96145 |
| Linda Patrucco Doerr<br>690 West Riverview Circle<br>Reno, NV 89509 | Richard W. Murphy<br>255 Stags Leap Circle<br>Sparks, NV 89441 |
| Gary E. Tucker<br>1932 Windward Pt.<br>Discovery Bay, CA 94514 | Mary Jane and Henry H. Gill<br>1904 Scenic Sunrise Drive<br>Las Vegas, NV 89117-7236 |
| Jo M. Gledhill<br>10500 Valley Drive<br>Plymouth, CA 95669 | Richard L. Bowman<br>10500 Valley Drive<br>Plymouth, CA 95669 |
| James G. Ton<br>10405 Trenton Place<br>Las Vegas, NV 89134 | Rebecca A. Rogers, Trustee<br>2309 Sierra Heights Drive<br>Las Vegas, NV 89134 |
| Bernard & Margaret W. Benz<br>Benz Family Trust<br>1265 Old Foothill Road<br>Gardnerville, NV 89460 | George A. DiGioia<br>1843 Bougainvillea Drive<br>Minden, NV 89423 |

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\2019 Statement 120606-plt.wpd

- 5 -

| | |
|---|---|
| Adrian Oosthuizen<br>5860 Lausanne Drive<br>Reno, NV 89511 | Brandon A. Cangelosi and<br>Donna M. Cangelosi<br>5860 Lausanne Drive<br>Reno, NV 89511 |
| Margaret M. Cangelosi<br>614 Hillside Crossing<br>Pompton Plains, NJ 07444 | Warren W. Tripp<br>President and Trustee<br>Tripp Plastics<br>250 Greg Street<br>Sparks, NV 89431 |
| Arline L. Cronk<br>Edward Davies<br>1631 Picetti Way<br>Fernley, NV 89408 | Gunter Volpel<br>Volpel Trust of 2-2-96<br>90876 Libby Lane<br>Coos Bay, OR 97420 |
| Alan R. Simmons & Judith B. Simmons<br>P.O. Box 13296<br>South Lake Tahoe, CA 96151 | Edward O. High, DUM<br>1413 Pelican Bay Trail<br>Winter Park, FL 32792 |
| Lawrence H. & Lorraine K. Tengan,<br>Trustee/Lawrence H. & Lorraine K.<br>Tengan Revocable Trust<br>504 Edgefield Ridge Place<br>Henderson, NV 89012 | Kelley M. Hains<br>5349 Mira Loma Drive<br>Reno, NV 89502 |
| Ingrid A. Rutherford<br>In Der Neckarhelle 127<br>69118 Heidelberg Germany | Marilyn & Ronald Johnson<br>1010 La Rue Avenue<br>Reno, NV 89509 |
| Marilyn Johnson Trust<br>1010 La Rue Avenue<br>Reno, NV 89509 | Gilbert Manuel<br>4617 Constitution Ave. NE<br>Albuguerque, NM 87110 |
| Dennis Raggi<br>P.O. Box 10475<br>Zephyr Cove, NV 89449 | Suzanne L. Arbogast<br>1005 W. Buffington<br>Upland, CA 91784 |
| Greg R. Thompson<br>1005 W. Buffington Street<br>Upland, CA 91784 | Wilma Jean Thomas<br>12 Brewster Way<br>Redlands, CA 92373-6102 |
| Walter and Barbara Musso<br>P.O. Box 2566<br>Avila Beach, CA 93424 | Alfred Olsen<br>931 Pigeon Forge Avenue<br>Henderson, NV 89015 |
| Dannie R. Murphy<br>5620 Rustic View Ct.<br>Las Vegas, NV 89131 | Donald L. Hess<br>914 Shore Crest Road<br>Carlsbad, CA 92011 |
| Donald C. Dunbar<br>18121 Wedge Pkwy #153<br>Reno, NV 89511 | |

1    3.    The total of the loans made by the above-referenced individuals and entities

2          is unknown at this time, due to incomplete records received from the Debtors.

3          Undersigned is in the process of gathering as much information as possible

4          concerning the loans made by the members of the group, and will supplement

5          this disclosure when such additional information is obtained.  This disclosure

6          is made at this time without complete information, as required by Bankruptcy

7          Rule 2019, in order to apprise the Court and the parties of the members of the

8          Lenders Protection Group prior to the hearing to be conducted on December

9          7, 2006.

10   4.    The majority of the loans made by the Lenders Protection Group were made

11         more than a year prior to the filing of the petitions by the Debtors.

12   5.    This Statement will be supplemented from time to time upon the retention of

13         additional lenders.

14   **DATED** this 6th day of December, 2006.

15                          LAW OFFICES OF ALAN R. SMITH

16                                */s/ Alan R. Smith*

17                          By_____
                               ALAN R. SMITH, ESQ.
18                             Attorney for Lenders Protection Group

19

20

21

22

23

24

25

26

27

28

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders (Cangelosi)\2019 Statement 120606-plt.wpd          - 7 -

1    Annette W. Jarvis, Utah Bar No. 1649            **E-FILED ON November 15, 2006**
     Steven C. Strong, Utah Bar No. 6340
2    RAY QUINNEY & NEBEKER P.C.
3    36 South State Street, Suite 1400
     P.O. Box 45385
4    Salt Lake City, Utah 84145-0385
     Telephone: (801) 532-1500
5    Facsimile: (801) 532-7543
     Email: ajarvis@rqn.com
6
7    Lenard E. Schwartzer, Nevada Bar No. 0399
     Jeanette E. McPherson, Nevada Bar No. 5423
8    SCHWARTZER & MCPHERSON LAW FIRM
     2850 South Jones Boulevard, Suite 1
9    Las Vegas, Nevada  89146-5308
     Telephone:  (702) 228-7590
10   Facsimile:  (702) 892-0122
11   E-Mail:  bkfilings@s-mlaw.com
     Attorneys for Debtors and Debtors-in-Possession
12

13                    **UNITED STATES BANKRUPTCY COURT**

14                           **DISTRICT OF NEVADA**

15   In re:                                          Case No. BK-S-06-10725 LBR
16   USA COMMERCIAL MORTGAGE COMPANY,                Case No. BK-S-06-10726 LBR
                                      Debtor.        Case No. BK-S-06-10727 LBR
17   In re:                                          Case No. BK-S-06-10728 LBR
     USA CAPITAL REALTY ADVISORS, LLC,               Case No. BK-S-06-10729 LBR
18                                    Debtor.
                                                     Chapter 11
19   In re:
     USA CAPITAL DIVERSIFIED TRUST DEED FUND,        Jointly Administered Under
20   LLC,                                            Case No. BK-S-06-10725 LBR
                                      Debtor.
21   In re:                                          **DEBTORS' FIRST AMENDED**
     USA CAPITAL FIRST TRUST DEED FUND, LLC,         **DISCLOSURE STATEMENT FOR**
22                                    Debtor.        **DEBTORS' THIRD AMENDED JOINT**
                                                     **PLAN OF REORGANIZATION**
23   In re:                                          **(AFFECTS ALL DEBTORS)**
     USA SECURITIES, LLC,
24                                    Debtor.        Disclosure Statement Hearing
     Affects:                                        Date:  November 13, 2006
25      ☒ All Debtors                                Time:  9:30 a.m.
        ☐ USA Commercial Mortgage Company
26      ☐ USA Securities, LLC                        Confirmation Hearing
        ☐ USA Capital Realty Advisors, LLC           Date:  December 19, 2006
27      ☐ USA Capital Diversified Trust Deed Fund, LLC   Time:   10:00 a.m.
        ☐ USA Capital First Trust Deed Fund, LLC
28

                                           1

**TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................1
        A.      Where to Find a Discussion of the Treatment of Your Claim Within This
                Disclosure Statement ..................................................................................3
        B.      Summary of the Treatment of Each Claim and Interest .............................4
        C.      Hypothetical Situations Illustrating Certain Compromises
                Involving Direct Lenders. .........................................................................11
        1.Hypothetical No. 1. ...............................................................................................11
        2.Hypothetical No. 2. ...............................................................................................12

II.     VOTING ...............................................................................................................14
        A.      Deadline for Receipt of Ballots, and Admonition to Vote If Eligible ......14
        B.      Entities Entitled to Vote ............................................................................14
        C.      Voting Instructions ....................................................................................16
                1.      The Voting Record Date ................................................................16
                2.      The Voting Deadline ......................................................................16
        D.      Results of Balloting Determined by Class .................................................17
        E.      Confirmation Based Upon Acceptance of Plan by All Impaired Classes ...18
        F.      Confirmation Over the Objections of One or More Impaired Classes .......18

III.    DEADLINE FOR FILING APPLICATIONS OR OTHER REQUESTS FOR
        PAYMENT OF ADMINISTRATIVE EXPENSES .................................................19

IV.     DEADLINE FOR FILING PROOFS OF CLAIM ARISING FROM REJECTION
        OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS ...........................20
        A.      Deadline for Filing Proofs of Claims ........................................................20
        B.      USACM's Unexpired Non-Residential Real Property Leases ...................21

V.      DATE AND TIME OF HEARING ON CONFIRMATION OF THE PLAN ...........21

VI.     DESCRIPTION OF THE DEBTORS AND THEIR BUSINESSES .........................22
        A.      USA Commercial Mortgage Company .......................................................22
        B.      USA Capital Diversified Trust Deed Fund, LLC ......................................23
        C.      USA Capital First Trust Deed Fund, LLC .................................................24
        D.      USA Securities, LLC .................................................................................26
        E.      USA Capital Realty Advisors LLC ............................................................26
        F.      Other Related Entities ...............................................................................26
        G.      Factors Precipitating Debtors' Bankruptcy Filings ....................................26

VII.    POST-PETITION DEVELOPMENTS .....................................................................27
        A.      Investigating and Restating Debtors' Loan Records ..................................27
        B.      Significant Post-petition Motions and Other Court Filings .......................28

VIII.   DESCRIPTION OF POST-PETITION OPERATIONS .............................................33

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

IX. SUMMARY OF THE PLAN........................................................................36
    A. General Plan Summary .....................................................................36
    B. Classification and Treatment of Claims and Interests ...........................38
        1. Unclassified Claims. ...............................................................38
            a. Administrative Expenses for Each Debtor............................38
                (i). General ..................................................................38
            b. Bar Date For Administrative Claims .................................39
                (i). General Provisions ..................................................39
                (ii). Professionals .........................................................39
                (iii). Ordinary Course Liabilities......................................40
            c. Priority Tax Claims.......................................................40
        2. Classified Claims and Equity Interests .....................................40
            a. USACM – (Classes A-1 through A-7)..............................41
                (i). Class A-1: Secured Tax Claims ..............................41
                (ii). Class A-2: Other Secured Claims ...........................41
                (iii). Class A-3: Priority Unsecured Claims......................41
                (iv). Class A-4: General Unsecured Claims ......................42
                (v). Class A-5: Direct Lender Compromise Claims ..........42
                (vii). Class A-7: Subordinated Claims ..............................44
                (viii). Class A-8: Equity Interests ....................................44
            b. FTDF – (Classes B-1 through B-5)..................................44
                (i). Class B-1: Secured Tax Claims ..............................44
                (ii). Class B-2: Other Secured Claims ...........................45
                (iii). Class B-3: Priority Unsecured Claims......................45
                (iv). Class B-4: General Unsecured Claims ......................45
                (v). Class B-5: Equity Interests ....................................46
            c. DTDF – (Classes C-1 through C-5)..................................46
                (i). Class C-1: Secured Tax Claims ..............................46
                (ii). Class C-2: Other Secured Claims ...........................47
                (iii). Class C-3: Priority Unsecured Claims......................47
                (iv). Class C-4: General Unsecured Claims ......................47
                (v). Class C-5: Equity Interests ....................................48
            d. USA Realty – (Classes D-1 through D-5)...........................48
                (i). Class D-1: Secured Tax Claims ..............................48
                (ii). Class D-2: Other Secured Claims ...........................48
                (iii). Class D-3: Priority Unsecured Claims......................49
                (iv). Class D-4: General Unsecured Claims ......................49
                (v). Class D-5: Equity Interests ....................................50
            e. USA Securities – (Classes E-1 through E-5) .......................50
                (i). Class E-1: Secured Tax Claims ..............................50
                (ii). Class E-2: Other Secured Claims............................50
                (iii). Class E-3: Priority Unsecured Claims ......................51
                (iv). Class E-4: General Unsecured Claims ......................51
                (v). Class E-5: Equity Interests ....................................52
    C. No Substantive Consolidation. ........................................................52
    D. Sale of USACM Assets and FTDF Assets..........................................53
        1. FTDF Price..........................................................................53
        2. USACM Price. .....................................................................54

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3.     Auction..................................................................................55

4.     Transfer of the Loan Servicing Agreements.............................55

     a.     Summary of Silver Point's Loan Servicing Capability....................56

5.     The Sale of the FTDF Assets is in the Best Interests of the FTDF Estate.........................................................................57

6.     The Sale of the USACM Assets is in the Best Interests of the USACM Estate and Direct Lenders............................................57

E.     Intercompany Compromises. ...............................................................59

1.     Settlement Between USACM and Direct Lenders...........................59

     a.     Prepaid Interest ....................................................................59

     b.     Surcharge ...............................................................................61

     c.     Recharacterization and Substantive Consolidation.......................62

     d.     Accrued and Unpaid Loan Servicing Fees........................62

     e.     Compromise and Settlement ................................................62

2.     Settlement Between FTDF and USACM..........................................63

     a.     Fees and Expenses Incurred by USACM as FTDF's Loan Servicer ...............................................................63

     b.     Management Fee .....................................................................65

     c.     Debtors' Professional Fees and Expenses.........................65

     d.     Claims Asserted By and Between USACM and FTDF .............66

     e.     Allocation of the Overbid, Break-Up Fee, and Expense Reimbursement ..............................................................67

     f.     January 31, 2007 as the Termination Date of the FTDF/USACM Compromise.....................................................67

3.     Settlement Between FTDF and DTDF .............................................68

     a.     FTDF Payment to DTDF and Terms of Repayment.........69

     b.     Transfer of FTDF Assets and Claims to DTDF ..............70

     c.     FTDF General Unsecured Claim Subordination..............70

4.     USA Realty/FTDF Settlement ..........................................................71

5.     USA Realty/DTDF Settlement .........................................................71

6.     Remaining Disputes Between USACM and DTDF. .......................71

F.     Release and Limitations of Liability.................................................72

G.     Post-Effective Date Entities ..............................................................73

1.     FTDF, USA Realty, and USA Securities After the Effective Date ...........73

2.     The USACM Trust.............................................................................73

3.     The Post-Effective Date DTDF .......................................................73

4.     The Litigation Against Non-Debtor Insiders ..................................74

5.     Post-Effective Date Administrators and Advisory Committees. ........75

H.     USACM's Pension Plan......................................................................75

I.     Binding Nature of the Plan and Injunction Included in Plan .................76

X.     ALTERNATIVES TO THE PLAN AND LIQUIDATION ANALYSIS ........77

A.     Alternatives to the Plan......................................................................77

B.     Liquidation Analysis and Best Interest of Creditors Test......................78

C.     General Assumptions for the Liquidation Analysis................................79

D.     Notes to the Liquidation Analysis........................................................79

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

XI.     PLAN FEASIBILITY ................................................................................................80

XII.    POTENTIAL MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF
        THE PLAN ............................................................................................................81
        A.      General Tax Administration and Reporting...............................................82
                1.      Allocation of Reportable Tax Items.................................................83
                2.      Valuations. ......................................................................................83
        B.      Consequences to the Debtors ....................................................................84
                1.      Sale of Acquired Assets ..................................................................84
                2.      Partial Satisfaction of Indebtedness ...............................................84
                3.      Cancellation of Indebtedness Income .............................................85
                4.      Effects of Filing by Partnerships.....................................................85
        C.      Tax Consequences to Creditors .................................................................86
        D.      Tax Consequences to USACM Stockholders and Members of the Debtors ...........87

XIII.   CONCLUSION........................................................................................................89

899884v9

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    INTRODUCTION

This Disclosure Statement provides information about the Debtors' Third Amended Joint Plan of Reorganization Dated (the "Plan"). The "Debtors" are the five related entities that filed petitions for relief under Chapter 11 of the United States Bankruptcy Code on April 13, 2006 (the "Petition Date") in the U.S. Bankruptcy Court for the District of Nevada (the "Court"), namely: USA Commercial Mortgage Company ("USACM"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF"), USA Capital First Trust Deed Fund, LLC ("FTDF" and together with DTDF, the "Funds"), and USA Securities, LLC ("USA Securities"). The Debtors jointly prepared this Disclosure Statement to help creditors (including direct lenders who may be creditors) as well as equity interest holders who are entitled to vote (i.e., the members of the Funds) to evaluate the Plan and to encourage them to vote to accept the Plan.

Current management of the Debtors was appointed as of the Petition Date and has expended great efforts to carefully reconstruct the records of the Debtors to enable the Debtors to present information contained in this Disclosure Statement that is as accurate as is reasonably possible. Nonetheless, because current management has no historical connection with the Debtors, current management cannot verify that the information contained herein that is outside of its personal knowledge is accurate or correct.

The Court's approval of this Disclosure Statement constitutes neither a certification that the factual information contained in this Disclosure Statement is accurate, nor an endorsement of the Plan. Certain materials in this Disclosure Statement are taken from other readily available documents or are digests of such documents. Although efforts have been made to convey accurately the contents of such documents, you are urged to examine the documents themselves and to use the descriptions of documents contained in this Disclosure Statement only after having conducted such an examination.

The purpose of this Disclosure Statement is to assist those who vote on the Plan to make an informed decision whether to vote to accept or reject the Plan. This Disclosure Statement is not the Plan. The Plan is summarized in this Disclosure Statement, but the summary is qualified by

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   the terms of the Plan itself.  If there are any inconsistencies between the Plan and the summary of

2   the Plan contained in this Disclosure Statement, the Plan controls.  The Plan should be read in its

3   entirety in conjunction with this Disclosure Statement.  No representations are made concerning

4   the Debtors, their business operations, the value of their property, or the value of benefits offered

5   to creditors or other parties in interest in connection with the Plan other than as set forth in this

6   Disclosure Statement.  You should not rely on any representations or inducements made to obtain

7   your acceptance or rejection of the Plan that are contrary to the information contained in this

8   Disclosure Statement.

9          The Debtors believe that the Plan provides a comprehensive, workable solution to the

10  many complex issues that resulted from the pre-petition irregularities that occurred in the Debtors'

11  businesses – a solution that is in the best interests of the Debtors' creditors, members of the Funds

12  (the "Fund Members"), direct lenders (excluding FTDF and DTDF) on the loans serviced by

13  USACM (the "Direct Lenders"), and other parties in interest.  The Plan effectuates a sale of

14  substantially all of the assets of FTDF and the loan servicing assets and business of USACM, puts

15  in place a mechanism for maximizing the recovery on other assets and claims held by the Debtors,

16  including the funding and pursuit of litigation against non-Debtor insiders and pre-petition

17  professionals, provides for the ongoing servicing and collection of the loans of the Direct Lenders

18  by a reputable and experienced loan servicer, provides for the recovery of the "Prepaid Interest"

19  (as defined in the Plan) as property of the estate, and provides for an equitable distribution of the

20  proceeds of the Debtors' assets to creditors and Fund Members.  The four official committees

21  appointed by the United States Trustee in the Debtors' cases (the "Committees") also support the

22  Plan and encourage you to vote in favor of the Plan.

23      **A.      Where to Find a Discussion of the Treatment of Your Claim Within This**
            **Disclosure Statement**
24

25          If you are a Direct Lender, treatment of your claims are discussed on pages [5-6; 43-45;

26  and 60-64] of this Disclosure Statement.  If you are a creditor of USACM, other than a Direct

27  Lender, treatment of your claim can be found on pages [5; 42-43; and 64-70] of this Disclosure

28  Statement.

3

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

If you are a Fund Member having a membership interest in DTDF, treatment of your interest is discussed on pages [8 and 49] of this Disclosure Statement. If you are a creditor of DTDF, treatment of your claim is discussed on pages [7-8; 47-49; and 70-74] of this Disclosure Statement.

If you are a Fund Member having a membership interest in FTDF, treatment of your interest is discussed on pages [7 and 47] of this Disclosure Statement. If you are a creditor of FTDF, treatment of your claim is discussed on pages [6-7; 45-47; and 70-72] of this Disclosure Statement.

If you are a creditor of USA Realty, treatment of your claim is discussed on pages [8-9 and 49-51] of this Disclosure Statement.

If you are a creditor of USA Securities, treatment of your claim is discussed on pages [9-10 and 51-53] of this Disclosure Statement.

## B.    Summary of the Treatment of Each Claim and Interest

The following chart summarizes the classification and treatment of unclassified claims and classified claims and interests as to each of the Debtors:

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| **USACM Claims and Equity Interests** | | |
| **Unclassified Claims** | | |
| **Administrative Expense Claims** | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Priority Tax Claims** | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Classified Claims** | | |
| **A-1: Secured Tax Claims** | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |

4

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| **A-2: Other Secured Claims** | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USACM:<br>**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or<br>**Option B:** USACM shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USACM shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | 100% |
| **A-3: Priority Unsecured Claims** | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **A-4: General Unsecured Claims** | Holders of Allowed General Unsecured Claims, including the Unremitted Principal Claims, Allowed FTDF Unsecured Claims, the Allowed Direct Lender Unsecured Claims and the Allowed DTDF Unsecured Claim, shall receive a beneficial interest in the USACM Trust, and on account of their Allowed Claim may receive a Pro Rata Share of the assets of the USACM Trust after satisfaction of all Allowed unclassified Claims, Allowed Class A-1, A-2 and A-3 Claims, and all post-Effective Date fees, costs, and expenses of implementation of the USACM Plan and USACM Trust. Allowed Penalty Claims shall be subordinated in payment to the payment of the full amount of all Allowed General Unsecured Claims. | 8-33% |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| **A-5: Direct Lender Compromise Claims** | The Direct Lenders will be released by USACM, FTDF, USA Realty and USA Securities from all Claims, including but not limited to surcharge, recharacterization of Direct Lender Loans, and the collection of pre-petition accrued as of the Effective Date but unpaid annual loan servicing fees due under Loan Servicing Agreements, but excluding causes of action to recover Prepaid Interest. In exchange (and as a compromise), Direct Lenders acknowledge and agree that the Prepaid Interest constitutes an asset of the USACM Estate or transfer their ownership rights, if any, in Prepaid Interest to the USACM estate, that USACM retains the maximum amount for servicing fees allowed and that $605,000 of the 2% Holdback can and will be used to reimburse USACM for the Allowed Professional fees and costs of the Direct Lender Committee. If the Plan is confirmed, Direct Lenders will be bound to the Class A-5 treatment regardless of whether they vote to accept or reject the Plan or whether the Class accepts or rejects the Plan; any objection to this treatment must be made by objection to confirmation of the Plan. | N/A |
| **A-6: Penalty Claims** | All Penalty Claims shall receive no distribution under the Plan. | 0% |
| **A-7: Subordinated Claims** | All Subordinated Claims shall receive no distribution under the Plan. | 0% |
| **A-8: Equity Interests** | All Equity Interests in USACM, regardless of form, shall be cancelled and the holders of Equity Interests in USACM shall receive no distribution under the Plan. | 0% |
| colspan | **FTDF Claims and Interests** | |
| colspan | **Unclassified Claims** | |
| **Administrative Expense Claims** | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Priority Tax Claims** | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| colspan | **Classified Claims** | |
| **B-1: Secured Tax Claims** | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| **B-2: Other Secured Claims** | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of FTDF:<br>**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or<br>**Option B:** FTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, FTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | 100% |
| **B-3: Priority Unsecured Claims** | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **B-4: General Unsecured Claims** | Holders of Allowed General Unsecured Claims shall be paid in full on the Effective Date out of assets of the Estate, plus Postpetition Interest. | 100% |
| **B-5: Equity Interests** | After the FTDF Payment has been made, holders of Allowed Equity Interests shall retain all distributions received after the Petition Date and receive the remaining Allocated Net Sale Proceeds after satisfaction of all Allowed unclassified Claims, Allowed Class B-1, B-2, B-3 and B-4 Claims, and post-Effective Date fees, costs, and expenses of implementation of the Plan for FTDF. Allowed Equity Interests shall receive a Pro Rata Share of the USACM Trust recoveries on account of the Allowed FTDF Unsecured Claim. | 67-70%[1] |

---

[1] The estimated distribution to equity interest holders in FTDF assumes that FTDF does not receive any overbid on the sale of its assets and is net of all costs of sale and the administration of FTDF's chapter 11 case.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| | **DTDF Claims and Interests** | |
| | **Unclassified Claims** | |
| **Administrative Expense Claims** | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Priority Tax Claims** | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| | **Classified Claims** | |
| **C-1: Secured Tax Claims** | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |
| **C-2: Other Secured Claims** | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of Post-Effective Date DTDF: **Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or **Option B:** Post-Effective Date DTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, Post-Effective Date DTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | 100% |
| **C-3: Priority Unsecured Claims** | Holders of Allowed Priority Unsecured Claims paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **C-4: General Unsecured** | Holders of Allowed General Unsecured Claims shall be paid in full on the Effective Date out of the assets of the Estate, plus Postpetition Interest. | 100% |

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| Claims | | |
| C-5: Equity Interests | Holders of Allowed Equity Interests shall retain their Equity Interests in DTDF and distributions received from the Petition Date, and after satisfaction of all Allowed unclassified Claims, Allowed Class C-1, C-2, C-3 and C-4 Claims, and all post-Effective Date fees, costs and expenses of implementation of Plan for DTDF, shall receive shall receive a Pro Rata Share of the assets of Post-Effective Date DTDF and the USACM Trust recoveries on account of the Allowed DTDF Unsecured Claim. | 25-46%[2] |
| **USA Realty Claims and Interests** | | |
| **Unclassified Claims** | | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Classified Claims** | | |
| D-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |
| D-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USA Realty: | 100% |

[2] The estimated range of distributions to equity interest holders in DTDF is based on several major assumptions, including but not limited to the recovery on the 10-90, Inc. loan, which is secured by the LLC member interests of USAIP in certain limited liability companies that own real estate projects. The recovery on this loan, which is by far the largest loan in the DTDF portfolio, could be significantly different than the amount projected. Another major assumption is the recovery on DTDF's claims against USACM. The amount of this claim has not yet been determined and the recoveries in the USACM estate are also uncertain, thus making projections on the recovery on this claim uncertain as well. It is known that the claim will exceed $18.9 million, the amount scheduled for "Unremitted Principal" (as defined below in this Disclosure Statement), and it is possible that the ultimate allowed claim will be equivalent or will greatly exceed this amount. Another major assumption is that there will be no allowance of the $20 million claim filed by Prospect High Income Fund against DTDF, which is the only significant claim the Debtors are aware of at present that has been asserted against DTDF. That claim was disallowed in full by an order of the Bankruptcy Court entered October 26, 2006, but the order is now on appeal. ACTUAL RESULTS MAY DIFFER FROM FORECAST AND THESE DIFFERENCES MAY BE SIGNIFICANT. AS SUCH, THE ACTUAL DISTRIBUTION TO EQUITY INTEREST HOLDERS IN DTDF COULD BE MUCH LESS, OR GREATER, THAN THE 25-46% ESTIMATED RANGE GIVEN ABOVE.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| | **Option A:** Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or<br><br>**Option B:** USA Realty shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA Realty shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | |
| **D-3: Priority Unsecured Claims** | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **D-4: General Unsecured Claims** | Holders of Allowed General Unsecured Claims shall be paid a Pro Rata Share of assets of the Estate available after payment in full of Allowed unclassified Claims and Allowed Class D-1, D-2 and D-3 Claims. | 0.40 to 1% |
| **D-5: Equity Interests** | All Equity Interests in USA Realty, regardless of form, shall be cancelled and the holders of Equity Interests in USA Realty shall receive no distribution under the Plan. | 0% |
| **USA Securities Claims and Interests** | | |
| **Unclassified Claims** | | |
| **Administrative Expense Claims** | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Priority Tax Claims** | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **Classified Claims** | | |
| **E-1: Secured Tax Claims** | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. | 100% |

SCHWARTZER & McPHERSON LAW FIRM<br>2850 South Jones Boulevard, Suite 1<br>Las Vegas, Nevada 89146-5308<br>Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims Name | Description and Treatment | Estimated Distribution Percentages |
|---|---|---|
| **E-2: Other Secured Claims** | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USA Securities: <br> **Option A:** Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or <br> **Option B:** USA Securities shall surrender the property securing the Allowed Other USA Securities Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA Securities shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. | 100% |
| **E-3: Priority Unsecured Claims** | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. | 100% |
| **E-4: General Unsecured Claims** | Holders of Allowed General Unsecured Claims shall be paid a Pro Rata Share of assets of the Estate available after payment in full of Allowed unclassified Claims and Allowed Class E-1, E-2 and E-3 Claims. | Less than 1% |
| **E-5: Equity Interests** | All Equity Interests in USA Securities, regardless of form, shall be cancelled and the holders of Equity Interests in USA Securities shall receive no distribution under the Plan. | 0% |

C.     **Hypothetical Situations Illustrating Certain Compromises Involving Direct Lenders.**

The following are two hypothetical situations involving Direct Lenders that illustrate how pre-paid interest and accrued servicing fees might be treated under the Plan. These hypothetical situations are included for demonstrative purposes only and may or may not represent actual results for any particular party.

11

### 1. Hypothetical No. 1.

Investor A invested $50,000 in Loan X and $100,000 in Loan Y. Prior to the bankruptcy filing, USACM, as the servicer on Loan X and Loan Y, collected $2,500 of interest from the borrower on Loan X (a performing loan), but nothing in interest from the borrower on Loan Y (a non-performing loan). Prior to the bankruptcy filing, USACM paid Investor A the $2,500 it collected in interest on Loan X. In addition, despite USACM's failure to collect interest on Loan Y, prior to the bankruptcy filing, USACM nevertheless paid Investor A $5,000 in interest on Loan Y. As a result, USACM asserts a right to recover the $5,000 it "prepaid" the investor. As a consequence, USACM asserts it has a current right to sue for the repayment of the $5,000 in "prepaid interest."

After the bankruptcy filing, USACM collected $2,000 of the "prepaid interest" from the borrower on Loan Y. That money is now held in the collections account by USACM. After the bankruptcy filing and pursuant to the Court's order allowing netting, USACM collected $1,000 from the borrower on Loan X and held back the $1,000, claiming the right to keep this amount as partial repayment for the remaining "prepaid interest" owed by Investor A. Upon plan confirmation (and the plan becoming effective), USACM will keep the $2,000 collected from the borrower on Loan Y and the $1,000 netted from collections on Loan X, which shall become the property of USACM, and will reduce the amount owed by Investor A to $2,000 for repayment of the original claim of $5,000 for "prepaid interest." If the plan is confirmed and becomes effective, no action will be taken against Investor A for two years. In the intervening two years, if Silver Point (or the prevailing bidder) either collects the remaining $2,000 owed from the borrower on Loan Y for the "prepaid interest," or Silver Point (or the prevailing bidder), through the continuing netting process, holds back and pays over to USACM an additional $2,000 from collections on

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

12

1  Loan X (or any combination of the two that results in the return of the remaining $2,000 to

2  USACM), then the "prepaid interest" claim against Investor A will be considered fully satisfied

3  under the plan and no litigation will ever be brought by USACM against Investor A.  This

4  hypothetical does not preclude either a Direct Lender or USACM from filing other claims it may

5  have.

6  

7  **2.    Hypothetical No. 2.**

8  Investor B invested $200,000 in Loan X, $200,000 in Loan Y, and $200,000 in Loan Z.

9  Investor B signed a Loan Servicing Agreement with a 1% service fee provision.

10  Prior to the bankruptcy filing, USACM, as servicer, collected all interest due on Loan X (a

11  performing loan) and paid that amount over to Investor B, but failed to charge or collect the

12  servicing fee owed USACM on the interest collected in the annual amount of $2,000 ($200,000

13  times 1%).

14  After the bankruptcy filing, USACM continued to collect interest on Loan X, and deducted

15  its servicing fee of $1,000 for the period after the bankruptcy filing (the full amount owed for the

16  servicing fee for the post-bankruptcy period) before paying the remaining collected interest on

17  Loan X to Investor B.  However, USACM did not collect the $2,000 owed for servicing fees prior

18  to the bankruptcy from interest collected after the bankruptcy filing on Loan X, and, as of the date

19  the plan became effective, the $2,000 in servicing fees for the pre-bankruptcy period remained

20  owing from Investor B to USACM.  If the plan is confirmed and becomes effective, the $2,000

21  remaining owing from Investor B to USACM for the pre-bankruptcy period on Loan X will be

22  waived and released and will not be paid, deducted or collected in any way from Investor B.

23  Prior to the bankruptcy filing, USACM, as servicer, failed to collect any interest on Loan

24  Y (a non-performing loan) and did not collect servicing fees owed in the amount of $2,000 on

25  Loan Y for the pre-bankruptcy period.  After the bankruptcy filing but before the plan was

26  confirmed and became effective, USACM partially collected past due interest on Loan Y, and

27  

28  

13

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    from the interest collected, deducted $1,000 of the $2,000 owed for servicing fees from the pre-

2    bankruptcy period, and $1,000 for servicing fees for the post-bankruptcy period (the full amount

3    owed for the servicing fee for the post-bankruptcy period) before paying the remaining collected

4    interest on Loan Y to Investor B.  Thus, as of the date the plan became effective, Investor B still

5    owed USACM $1,000 in servicing fees on Loan Y for the pre-bankruptcy period. If the plan is

6    confirmed and becomes effective, the $1,000 in servicing fees remaining owing from Investor B to

7    USACM for the pre-bankruptcy period on Loan Y will be waived and released and will not be

8    paid, deducted or collected in any way from Investor B, and USACM will retain the amount

9    collected postpetition.

10          Prior to the bankruptcy filing, USACM, as servicer, failed to collect any interest on Loan Z

11   (a non-performing loan) and did not collect servicing fees owed in the amount of $2,000 on Loan

12   Z.  For the period after the bankruptcy was filed but before the plan was confirmed and became

13   effective, USACM did not collect any interest on Loan Z.  During this post-bankruptcy period,

14   $1,000 of servicing fees became due for the post-bankruptcy period, which was not collected

15   because there was no money collected from the borrower post-bankruptcy.  Thus, as of the date

16   the plan became effective, Investor B owed USACM $1,000 in servicing fees on Loan Z for the

17   post-bankruptcy period and $2,000 in servicing fees for the pre-bankruptcy period.  If the plan is

18   confirmed and becomes effective, the $2,000 in servicing fees owing from Investor B to USACM

19   for the pre-bankruptcy period on Loan Z will be waived and released and will not be

20   paid, deducted or collected in any way from Investor B.  However, the $1,000 in servicing fees

21   owing from Investor B to USACM for the post-bankruptcy period on Loan Z will be deducted or

22   paid after the date the plan becomes effective by Silver Point (or the prevailing bidder) when it

23   collects Loan Z and will then be paid over to the USACM trust for distribution to creditors in the

24   USACM estate.

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

14

## II. VOTING

### A. Deadline for Receipt of Ballots, and Admonition to Vote If Eligible

ALL BALLOTS MUST BE RECEIVED BY **December 11, 2006**, OR THEY WILL NOT BE COUNTED. As delays in the delivery of mail can occur, the Debtors urge you to mail, fax or deliver your ballots well in advance of the voting deadline.

IT IS IMPORTANT THAT YOU VOTE. VOTING ON THE PLAN WILL AFFECT YOUR RIGHTS. DETERMINING THE OUTCOME OF BALLOTING ON THE PLAN REQUIRES A CALCULATION THAT CONSIDERS THE VOTES OF THOSE CREDITORS AND EQUITY INTEREST HOLDERS (IF ENTITLED TO VOTE) WHO ACTUALLY VOTED ON THE PLAN. FURTHER, IF THE PLAN IS CONFIRMED, IT IS BINDING ON ALL CREDITORS AND EQUITY INTEREST HOLDERS, WHETHER OR NOT YOU VOTED OR WHETHER OR NOT YOU VOTED FOR OR AGAINST THE PLAN. THUS, YOUR RIGHTS MAY BE AFFECTED EVEN IF YOU DO NOT VOTE ON THE PLAN. YOUR OPPORTUNITY TO HAVE THE OUTCOME YOU DESIRE WILL LIKELY BE ENHANCED IF YOU VOTE. THE DEBTORS REQUEST, THEREFORE, THAT YOU VOTE IF YOU ARE ENTITLED TO DO SO AND THAT YOU TAKE STEPS TO ENSURE THAT YOUR BALLOT IS RECEIVED IN TIME TO BE COUNTED.

### B. Entities Entitled to Vote

Only creditors and equity interest holders whose claims or interests have been allowed for purposes of voting and are "impaired" by the Plan are entitled to vote on the Plan. For a claim to be allowed for voting purposes, the claim must be listed in the Debtors' Schedules of Assets and Liabilities ("Schedules"), or you must have filed a proof of claim describing the claim by the "Voting Record Date" (defined below), or the claim must be a "Direct Lender Compromise Claim" (defined below) in Class A-5 under the Plan. A scheduled claim is allowed for voting purposes if it is listed on the Schedules but is not listed as "disputed," "contingent" or "unliquidated." If a claim in the Schedules is listed as "disputed," "contingent" or "unliquidated," the holder of the claim will not be entitled to vote absent the timely filing of a proof of claim.

If a claim is not listed in the Schedules, or is listed as "disputed," "contingent" or

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

15

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  "unliquidated," the holder of the claim is not entitled to vote unless the holder files a proof of

2  claim on or before the "Voting Record Date" set by the Court, which is November 6, 2006, or

3  unless the claim is a "Direct Lender Compromise Claim," which is a type of claim that all Direct

4  Lenders are deemed to hold in order to allow them to vote in Class A-5 under the Plan. Moreover,

5  no holder of a claim will be entitled to vote if any party in interest objects to that claim by the

6  voting deadline, unless the Court enters an order allowing the claim for voting purposes

7  notwithstanding the objection.

8      For an equity interest to be allowed, the equity interest holder's asserted interest must

9  appear on the lists of Fund Members in DTDF and FTDF maintained by the Debtors that were

10  deemed to be filed with the Court pursuant to the Stipulated Order entered September 15, 2006

11  (docket no. 1293) and from which an individual notice was mailed to each Fund Member

12  specifying the amount of the Fund Member's interest per the Debtors' records, or the holder of the

13  equity interest must have filed a proof of interest before the Voting Record Date, which is

14  November 6, 2006. In addition, no entity claiming to hold an equity interest may vote if any party

15  in interest has objected to the allowance of the asserted interest before balloting on the Plan (or

16  any amended Plan) occurs, unless the Court enters an order allowing the interest for voting

17  purposes notwithstanding the objection.

18      In addition to the foregoing criteria for voting eligibility, only classes in which the claims

19  or interests of creditors and equity interest holders are "impaired" by the Plan (i.e., those whose

20  claims or interests are altered or who will not receive the full allowed amount of their claims in

21  cash pursuant to the original terms of their agreements) are entitled to vote to accept or reject the

22  Plan. Holders of claims that are not "impaired" are deemed to have accepted the Plan as a matter

23  of law. The Plan designates which classes are "impaired" under, and thus entitled to vote on, the

24  Plan.

25      If the claim or interest you hold has been classified in one of the impaired classes of claims

26  or interests created by the Plan (and that class is not deemed to have rejected the Plan), it is

27  important that you vote. The classes of claims impaired under the Plan and entitled to vote to

28  accept or reject the Plan are Classes A-4, A-5, D-4, and E-4. The classes of interests that are

impaired, but that are not deemed to have rejected the Plan, are Classes B-5 and C-5.  In addition,

if you hold more than one claim or interest classified as "impaired" and entitled to vote under the

Plan, it is important that you vote with respect to each such claim or interest.

Allowance or disallowance of a claim or interest for voting purposes will not be

determinative of the allowable amount, if any, of such claim or interest for purposes of distribution

under the Plan.

### C. Voting Instructions

#### 1. The Voting Record Date

The Court has approved November 6, 2006, as the record date for purposes of determining

which creditors and equity interest holders are entitled to vote on the Plan (the "Voting Record

Date").

#### 2. The Voting Deadline

**The Court has approved December 11, 2006 at 4:00 p.m. prevailing Pacific Time as

the voting deadline (the "Voting Deadline").**  To be counted as votes to accept or reject the Plan,

all ballots must be properly executed, completed and delivered by (a) first class mail; (b) overnight

courier; (c) by facsimile, or (d) personal delivery, **so that they are actually received**, in any case,

by the Debtors' solicitation agent, BMC Group, Inc. (the "Solicitation Agent"), at the appropriate

address below, no later than the Voting Deadline:

If by first class mail:

BMC Group
Attn: USACM Solicitation Agent
P. O. Box 911
El Segundo, CA 90245-0911
BMC Group

If by overnight courier or personal delivery:

BMC Group
Attn: USACM Solicitation Agent
1330 East Franklin Avenue
El Segundo, CA 90245

If by facsimile:

17

1   BMC Group
    Attn: USACM Solicitation Agent
2   866-904-4778

3

4   AS MAIL DELAYS AND OTHER DELIVERY DELAYS MAY OCCUR, IT IS IMPORTANT

5   THAT THE BALLOT OR BALLOTS BE MAILED, FAXED OR DELIVERED WELL IN

6   ADVANCE OF THE DEADLINE SPECIFIED ABOVE.  BALLOTS RECEIVED AFTER THE

7   VOTING DEADLINE WILL NOT BE COUNTED.

8           Each creditor or equity interest holder entitled to vote should receive a ballot for each

9   separately classified, impaired claim or interest held.  If you do not receive the required number of

10  ballots with your copy of the Court-approved Disclosure Statement, immediately notify the

11  Solicitation Agent for the Debtors by contacting BMC Group by telephone, toll-free at 888-909-

12  0100.

13          **D.      Results of Balloting Determined by Class**

14          Claimants and interest holders vote by class.  In general, a class of claimants accepts the

15  Plan if those creditors who vote to accept it hold at least two-thirds (2/3) in dollar amount and

16  more than one-half (1/2) in number of the allowed claims in the class that actually vote on the

17  Plan.  In general, a class of equity interest holders accepts the Plan if it is accepted by those who

18  hold at least two-thirds (2/3) in amount of the allowed interests in the class that actually voted on

19  the Plan.  A class that is not "impaired" under the Plan is "conclusively presumed" to have

20  accepted the Plan under section 1126(f) of the Bankruptcy Code.  This means that each holder of a

21  claim or interest in a class that is not impaired is presumed to have accepted the Plan.  Conversely,

22  a class in which the holders of a claim or interest will not receive or retain any property under the

23  Plan on account of their claim or interest is deemed to have rejected the Plan under section

24  1126(g) of the Bankruptcy Code.

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

18

**E.   Confirmation Based Upon Acceptance of Plan by All Impaired Classes**

One of the statutory requirements that must be met for the Plan to be confirmed is that under section 1129 of the Bankruptcy Code each of the impaired classes of claims or interests must have accepted the Plan.  Alternatively, if all impaired classes do not accept the Plan, and certain additional requirements are met including that at least one impaired class of claims as to each of the Debtors accepts the Plan, then section 1129 of the Bankruptcy Code allows the Debtors to seek to confirm the Plan over the negative vote of one or more classes of claims or interests.  Further, because the Plan consists of a plan of reorganization for each of the five separate Debtors, the Debtors reserve the right to request confirmation of the Plan for one or more but less than all the Debtors under section 1129(b) of the Bankruptcy Code.

**F.   Confirmation Over the Objections of One or More Impaired Classes**

If an impaired class rejects the Plan but at least one other impaired class of each of the Debtors has accepted it, the Plan may still be confirmed by the Court at the request of the Debtors.  To grant such a request, the Court must find, among other things, that the Plan does not "discriminate unfairly" and that it is "fair and equitable" with respect to each impaired class that rejected the Plan.

The phrases "discriminate unfairly" and "fair and equitable" are defined in section 1129(b) of the Bankruptcy Code and by the case law interpreting that statute.  In other words, those phrases are "terms of art" and denote specific criteria for confirmation that the Plan must satisfy to be confirmed by the Court if any impaired class rejects the Plan.

The Debtors believe the Plan satisfies the statutory criteria required by section 1129(b) of the Code, and they intend to request confirmation of the Plan in the event it is rejected by any impaired class.  Further, in accordance with section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code for one or more of the Debtors.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

III.    **DEADLINE FOR FILING APPLICATIONS OR OTHER REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSES**

The Plan establishes deadlines for the filing of applications or other requests for payment of administrative expenses.  Generally, administrative expenses are certain types of claims that arise only after the Petition Date and do not include claims that existed as of the Petition Date.  If you have a claim for the payment of administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code, you must file with the Court an application or request for payment of such administrative expense on or before the applicable bar date.  For professionals employed by the Debtors or the Committees, this bar date is 45 days after the Plan become effective (the "Effective Date").  For all other claims for administrative expenses, the bar date is 30 days after the Effective Date.   If you do not timely file an application or request for payment of an administrative expense claim before the applicable deadline, your administrative expense claim will not receive any distribution under the Plan and will be forever barred.

Consequently, if you have a claim for payment of an administrative expense, review the provisions of the Plan and this Disclosure Statement and timely file an application or request for payment of such administrative expense to which you may be entitled with the Clerk of the Court at the following address, or your claim will be forever barred:

> U.S. Bankruptcy Court
> Foley Federal Building
> 300 Las Vegas Boulevard South
> Las Vegas, NV 89101

In addition, send a copy of the application or request to attorneys for the Debtors at the following address:

> Annette W. Jarvis
> Steven C. Strong
> RAY QUINNEY & NEBEKER P.C.
> 36 South State Street, Suite 1400
> P.O. Box 45385
> Salt Lake City, Utah 84145-0385

IV.     **DEADLINE FOR FILING PROOFS OF CLAIM ARISING FROM REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS**

A.      **Deadline for Filing Proofs of Claims**

As soon as practicable after the Court approves this Disclosure Statement but in no event later than twenty (20) days prior to the commencement of the Confirmation Hearing (defined below), the Debtors will file a schedule with the Court setting forth all unexpired leases or executory contracts, if any, that they intend to assume. At this time, the Debtors do not anticipate assuming any unexpired leases or executory contracts but reserve their right to do so. The Plan provides that all remaining unexpired leases or executory contracts not previously rejected that are not listed on the schedule are rejected, as permitted by sections 365 and 1123 of the Bankruptcy Code. The Debtors do not consider the various loan servicing agreements USACM entered into with Direct Lenders to service loans ("Loan Servicing Agreements") to be executory contracts. Claims relating to USACM's services under the Loan Servicing Agreements are not deemed to be executory contract related claims but are treated as Class A-4 claims, as described below.

If you have an unexpired lease or an executory contract with any of the Debtors that has been or will be thus rejected, you have until thirty days after the date that the order confirming the Plan ("Confirmation Order") is entered ("Confirmation Date") to file with the Court a claim for damages arising from the rejection of the unexpired lease or executory contract. If you do not timely file a claim within this time period, you will not receive any distribution on your claim under the Plan, and your claim will be forever barred. Any claim arising out of the rejection of an unexpired lease or executory contract will be treated as a general unsecured claim.

If you have an unexpired lease or executory contract with one of the Debtors that has been or will be rejected, review the provisions of the Plan and this Disclosure Statement and timely file a proof of any claim to which you may be entitled or your claim will be forever barred. File your proof of claim with the Clerk of the Court at the following address:

U.S. Bankruptcy Court
Foley Federal Building
300 Las Vegas Boulevard South
Las Vegas, NV 89101

In addition, send a copy of the proof of claim to attorneys for the Debtors at the following address:

> Annette W. Jarvis
> Steven C. Strong
> RAY QUINNEY & NEBEKER P.C.
> 36 South State Street, Suite 1400
> P.O. Box 45385
> Salt Lake City, Utah 84145-0385

**B.     USACM's Unexpired Non-Residential Real Property Leases**

As of the Petition Date, USACM was the lessee under unexpired, non-residential real property leases with the following lessors (collectively, the "Leases"):

| Lessor | Premises |
|---|---|
| 1) Pecos Professional Park Limited Partnership ("Pecos Lease") | 4484 South Pecos Road, Las Vegas, Nevada  89121 |
| 2) P&P Enterprises LLC ("P&P" Lease) | 940 Southwood Boulevard, Incline Village, Nevada known as Timber Ridge Plaza, Suite 103 |
| 3) S&J Enterprise Investments, Inc. ("S&J" Lease") | 488 Reno Corporate Drive, Suite 100, Reno, Nevada 89511 |
| 4)  Haspinov, LLC ("Haspinov Lease") | 4480 South Pecos Road, Las Vegas, Nevada  89121 |

Other than USACM, none of the other Debtors were or are parties to any non-residential real property leases.

USACM has rejected the P&P Lease, and the order approving the rejection of this lease was entered on May 22, 2006.  USACM has also rejected the S&J Lease, and the order approving the rejection of this lease was entered on August 1, 2006.  The P&P Lease and the S&J Lease were rejected because USACM was no longer operating out of these leased premises.

USACM has entered into a stipulation and order to extend the time for it to assume or reject the Pecos Lease and the Haspinov Lease until November 11, 2006.  USACM is working towards obtaining another stipulation and order to further extend the time for it to assume or reject the Pecos Lease and the Haspinov Lease.   USACM is currently operating out of the Pecos Lease and Haspinov Lease premises, but has not yet determined whether to assume and assign, or to

reject those leases.

**V.     DATE AND TIME OF HEARING ON CONFIRMATION OF THE PLAN**

A copy of the Plan is attached as *Exhibit 1* to this Disclosure Statement.  The Court has scheduled a hearing to consider confirmation of the Plan on December 19, 2006, at 10:00 a.m. PST in the courtroom of the Honorable Linda Riegle ("Confirmation Hearing").  The Court has ordered that objections, if any, to confirmation of the Plan must be filed on or before December 11, 2006, and served on the attorneys for the Debtors at the following address:

> Annette W. Jarvis
> Steven C. Strong
> RAY QUINNEY & NEBEKER P.C.
> 36 South State Street, Suite 1400
> P.O. Box 45385
> Salt Lake City, Utah 84145-0385

If you object to the confirmation of the Plan you must file a timely objection to confirmation, whether or not you vote to accept or reject the Plan.  You may vote to accept or reject the Plan (if you are entitled to vote) whether or not you file an objection to confirmation of the Plan.  The date of the Confirmation Hearing may be continued to such later time(s) as the Court may announce during the Confirmation Hearing without further written notice.

**VI.     DESCRIPTION OF THE DEBTORS AND THEIR BUSINESSES**

**A.     USA Commercial Mortgage Company**

USACM, which sometimes did business under the trade name "USA Capital," is a Nevada corporation with its sole remaining offices located in Las Vegas at the Pecos Road addresses given above.  Public records of the Nevada Secretary of State indicate that USACM was organized as of February 28, 1989.  Prior to the Petition Date, USACM was in the business of underwriting, originating, brokering, funding and servicing commercial loans primarily secured by residential and commercial developments, both on behalf of investors and for its own account.  USACM has been licensed as a mortgage broker by the State of Nevada since January 11, 1990, although its license was limited by the Mortgage Lending Division of the State of Nevada after the Petition Date to exclude raising investment funds from individual investors.

The primary shareholders of USACM are Thomas A. Hantges, Joseph D. Milanowski and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Paul S. Hamilton (either in their own names or through trusts they control) who also managed

2    USACM as officers and directors prior to the Petition Date.  As of the Petition Date, they

3    relinquished management authority to Thomas J. Allison of Mesirow Financial Interim

4    Management, LLC ("MFIM"), who became the President and Chief Restructuring Officer of

5    USACM on that date.  Mr. Allison continues to serve in those capacities to the present.  Other

6    management employees of USACM appointed after the Petition Date were Mark L. Olson, Vice

7    President and Chief Operating Officer and Robert A. Hilson, Treasurer and Chief Financial

8    Officer.  A. Faisal Siddiqui was appointed as the Vice President and Chief Technology Officer of

9    USACM after the Petition Date.  Mr. Hilson's employment was terminated in September 2006.

10          As of the Petition Date, the loan portfolio that USACM was servicing consisted of

11   approximately 115 loans having a combined outstanding balance of approximately $960 million.

12   Since the Petition Date, USACM's new management has aggressively engaged in efforts to collect

13   outstanding loan amounts.  As of September 30, 2006, the total outstanding balance of the

14   serviced loans was approximately $791 million.  A loan summary spreadsheet created by MFIM

15   providing information as of September 30, 2006, concerning each of the serviced loans is attached

16   hereto as *Exhibit 2*.  Similar loan summaries created by MFIM as of earlier dates, including April

17   26, 2006, May 26, 2006, June 30, 2006, July 31, 2006, and August 31, 2006, are available for

18   review on USACM's website at usacapitalcorp.com.

19          Prior to the Petition Date, USACM's business included soliciting individual investors to

20   purchase fractional interest in loans, as well as originating and servicing the loans.  As of the

21   Petition Date, there were approximately 3,600 investors whose names appear as a "Lender" in the

22   documents for one or more of the serviced loans.  In the Debtors' bankruptcy cases and in this

23   Disclosure Statement, the loan investors have been referred to as "Direct Lenders."  Many of the

24   Direct Lenders invested in more than one of the serviced loans, with the average being

25   approximately 3 to 4 loans for each Direct Lender.  Along with being the servicer, USACM is

26   itself a Direct Lender having an aggregate investment of approximately $2 million as of June 30,

27   2006, in the serviced loans.  Two of the other Debtors, DTDF and FTDF, are also Direct Lenders

28   having interests in certain of the serviced loans, as explained below.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

### B.    USA Capital Diversified Trust Deed Fund, LLC

DTDF is a Nevada limited liability company organized as of February 3, 2000.  A copy of DTDF's Operating Agreement is on file with the Court at Docket # 1590.  It appears that the purpose of DTDF was to allow USACM to offer investors (in Nevada only) the opportunity to invest in loans that USACM originated by purchasing membership interests in a fund (i.e., DTDF) that then invested in various loans, rather than (or in addition to) the investor investing directly in the loans.  Because DTDF was not a fund registered with the U.S. Securities and Exchange Commission ("SEC"), it could not solicit investors beyond the State of Nevada.  DTDF's stated purpose was to make or purchase entire or fractional interests in acquisition, development, construction, bridge or interim loans that were secured by first deeds of trust on, among other things, undeveloped land and residential and commercial developments located primarily in the United States.  There was a continuous offering of membership interests (known as "units") in DTDF from May 2000 to July 2004.  In July 2004, DTDF stopped offering the sale of membership units, and on September 27, 2005, the investors were notified that DTDF would be liquidating.  DTDF had approximately 1,350 members as of the Petition Date.  The aggregate outstanding balance owed to DTDF on its loan investments as of July 31, 2006, was $117,742,343, consisting of 21 loans (excluding the former Epic and Sheraton loans) in which DTDF invested as a Direct Lender.  The loans were all originated by USACM.  As explained in further detail below, although DTDF loans were supposed to be secured by first deeds of trust and have other protections for DTDF investors, those protections were not generally provided by USACM.

Prior to the Petition Date, the nominal manager of DTDF was USA Realty (described below), and another of the Debtors, USACM, acted as the loan servicer.  The management duties included investing funds, hiring and paying professionals, preparing tax returns, and other duties.  Pursuant to an order of the Court entered shortly after the Petition Date, Mr. Allison is serving as the chief restructuring officer of DTDF as well as the four other Debtors.

### C.    USA Capital First Trust Deed Fund, LLC

FTDF is a Nevada limited liability company organized as of February 16, 2001.  A copy of the FTDF Operating Agreement is on file with the Court at Docket # 1591.  It appears that the

25

1    purpose of FTDF was to allow USACM to offer investors throughout the United States (not just in

2    Nevada, as was the case with DTDF) the opportunity to invest in loans that USACM originated by

3    purchasing membership interests in a fund (FTDF) that invested in various loans, rather than (or in

4    addition to) the investor investing directly in the loans.  Prior to the Petition Date, FTDF filed

5    reports and disclosures with the SEC.  FTDF's stated purpose was to make or purchase entire or

6    fractional interests in acquisition, development, construction, bridge or interim loans that were

7    secured by first deeds of trust on, among other things, undeveloped land and residential and

8    commercial developments located primarily in the United States.  FTDF had approximately 950

9    members as of the Petition Date.  The aggregate outstanding balance owed to FTDF on its loan

10   investments as of July 31, 2006, was $62,653,825, consisting of 47 loans in which FTDF invested

11   as a Direct Lender.  The loans were all originated by USACM.

12       FTDF offered four classes of membership, Class A, B, C and D.  Class A members agreed

13   to commit their capital contributions for a period of twelve (12) months and were to receive the

14   "Class A Preferred Return" defined as "nine percent (9%) per annum, or such other percentage

15   determined by the manager from time to time, in its sole and absolute discretion, without

16   reinvesting."  See Second Amended and Restated Operating Agreement of FTDF, dated as of June

17   1, 2003, ("FTDF Operating Agreement") ¶¶ 1.13, 1.14, & 1.15.  Class B members agreed to

18   commit their capital contributions for a period of twenty-four (24) months and were to receive the

19   "Class B Preferred Return" defined as "ten percent (10%) per annum, or such other percentage

20   determined by the manager from time to time, in its sole and absolute discretion, without

21   reinvesting."  See FTDF Operating Agreement ¶¶ 1.16, 1.17, & 1.18.  Class C members agreed to

22   commit their capital contributions for a period of thirty-six (36) months and were to receive the

23   "Class C Preferred Return" defined as "eleven percent (11%) per annum, or such other percentage

24   determined by the manager from time to time, in its sole and absolute discretion, without

25   reinvesting."  See FTDF Operating Agreement ¶¶ 1.19, 1.20, & 1.21.  The Class D member of

26   FTDF is USA Securities (see below), and does not receive the returns described above for Class A

27   members, Class B members, or Class C members.

28       Prior to the Petition Date, the nominal manager of FTDF was USA Realty (described

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

26

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

below), and another of the Debtors, USACM, acted as the loan servicer.  The management duties included investing funds, hiring and paying professionals, preparing tax returns, and other duties. Pursuant to an order of the Court entered shortly after the Petition Date, Mr. Allison is serving as the chief restructuring officer of FTDF as well as the four other Debtors.

### D.    USA Securities, LLC

USA Securities is a Nevada limited liability company organized as of March 3, 1999.  The Company is a registered broker-dealer under SEC Rule 15c3-1(a)(2)(vi) and was a member of the National Association of Securities Dealers (NASD).  It appears that the primary business of USA Securities was to sell membership interests in FDTF.  USA Securities is dormant and has conducted no business on or after the Petition Date.

Prior to the Petition Date, the sole members and co-managers of USA Securities were Joseph Milanowski and Paul Hamilton.  On and after the Petition Date, and pursuant to resolutions filed with USA Securities' bankruptcy petition, Thomas J. Allison of MFIM became the sole manager of USA Securities.  Pursuant to an order of the Court, Mr. Allison is also serving as the chief restructuring officer of USA Securities as well as the four other Debtors.

### E.    USA Capital Realty Advisors LLC

USA Realty is a Nevada limited liability company organized as of January 18, 2001.  It is the manager of FTDF and DTDF.  USA Realty is owned by USA Investment Partners LLC ("USAIP"), and prior to the Petition Date USA Realty's sole managing member was Joseph Milanowski.  Based on records in possession of the Debtors, USAIP is owned by Thomas Hantges, Joseph Milanowski, and Paul Hamilton, either directly or through trusts controlled by these individuals.

On and after the Petition Date, and pursuant to resolutions filed with USA Realty's bankruptcy petition, Thomas J. Allison of MFIM became the sole manager of USA Realty. Pursuant to an order of the Court, Mr. Allison is also serving as the chief restructuring officer of USA Realty as well as the four other Debtors.

### F.    Other Related Entities

Attached hereto as *Exhibit 3* is a chart showing relationships among the five Debtors, the

27

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  non-debtor entity USAIP, and certain related non-debtor entities.

2       **G.    Factors Precipitating Debtors' Bankruptcy Filings**

3       Prior to April 2006, it appears that USACM regularly made monthly interest payments to

4  Direct Lenders regardless of whether the borrowers of the particular loans in which the Direct

5  Lenders had an interest were paying USACM.  For example, during the first three months of 2006,

6  USACM collected on average approximately $5.3 million per month in interest payments on the

7  serviced loans from the borrowers but paid out on average approximately $9.7 million per month

8  to the Direct Lenders, using, among other sources, principal paid on loans from other borrowers to

9  make these interest payments.  MFIM has determined that as of the Petition Date, USACM made

10  approximately $39.5 million in such advance payments of principal or interest to Direct Lenders

11  (defined in the Plan as "Prepaid Interest").  USACM did not have sufficient funds to make

12  monthly interest payments to all Direct Lenders in April 2006, and therefore did not make any

13  March 2006 payments (which were due in April) to any of the Direct Lenders.  USACM's

14  inability to continue making monthly payments to all Direct Lenders was a significant contributing

15  factor to the Debtors' decision to file for bankruptcy protection.

16       Another significant contributing factor was an investigation by the SEC.  Prior to the

17  Petition Date, USACM and FTDF received notice from the SEC that they were the subject of a

18  regulatory investigation.  FTDF and USACM believe that reorganization under Chapter 11 of the

19  Bankruptcy Code would result in a greater return to creditors of their estates, FTDF investors and

20  to Direct Lenders than would a potential receivership by the SEC.

21  **VII.    POST-PETITION DEVELOPMENTS**

22       **A.    Investigating and Restating Debtors' Loan Records**

23       On April 13, 2006, the Debtors filed for bankruptcy protection.  Thomas J. Allison of

24  MFIM was appointed by the Board of Directors as the President, Chief Executive Officer, and

25  Chief Restructuring Officer of USACM, and as the Manager and Chief Restructuring Officer of

26  the other four Debtors (which are limited liability companies).  Mr. Allison's first action was to

27  terminate the employment of Joseph Milanowski and Thomas Hantges as the principal officers

28  and management of USACM.  Mr. Allison and MFIM next began an intensive review and

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  investigation of the books and records of USACM and the four other related Debtors.  USACM

2  was the loan servicer for the portfolios of the Direct Lenders, including FTDF and DTDF.  To

3  date, the post-petition investigation of the Debtors, which is ongoing, indicates that USACM made

4  monthly payments to the Direct Lenders, DTDF, and FTDF regardless of whether the borrower

5  had paid the interest due.  Further, full principal repayments by at least four borrowers were

6  collected by USACM but not disbursed to the appropriate Direct Lenders (referred to in the Plan

7  as "Unremitted Principal").  Evidence of other irregularities includes a lack of any attempt to

8  obtain collateral to secure at least four loans, loans without properly perfected security interests,

9  loans secured by second liens, and other potential violations of the Nevada mortgage lending

10  statutes.  In addition, many of the loans appear to have been extended to borrowers who were

11  affiliated or otherwise related to USACM's pre-petition management, such that the borrower

12  entities were partially owned by the owners and officers of USACM through one or more of their

13  various entities (including USAIP).  Many of these loans were non-performing loans in that the

14  underlying borrower had not paid the interest due.  Further investigation and analysis has

15  continued.  To date, the history of fundings, assignments of fractional interests in an out of loans,

16  interest paid and received, and principal payments has been reconstructed for 110 of the 115 loans

17  in the USACM portfolio.  Five loans are still under investigation due to lack of records,

18  foreclosure, litigation, or other special situations.  This reconstruction identified over 25 loans

19  which were seriously delinquent (meaning they were over 6 months past due).  Collection efforts

20  have focused on these 25 loans and other past due loans.

21      **B.**    **Significant Post-petition Motions and Other Court Filings**

22      Many significant motions and other papers have been filed with and ruled on by the Court

23  in the Debtors' jointly administered bankruptcy cases.  As of November 3, 2006, the Court's

24  docket in the jointly administered case (Bankruptcy Case No. 06-10725) contains 1,725 entries.

25  The full docket and copies of all of the significant filings and orders in the Debtors' bankruptcy

26  cases are publicly available free of charge through the Debtors' website, usacapitalcorp.com (click

27  on "Filings").  Several of the most significant Court rulings to date are detailed below.

28          1.    Orders Approving Debtors' Use of Cash.  If the Debtors were not able to

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   use the cash in the Debtors' bankruptcy estates, the Debtors would be unable to collect amounts

2   owed from borrowers on outstanding loans and unable to continue other business operations

3   essential in attempting to maximize the return to creditors, Direct Lenders, and Fund Members in

4   these bankruptcy cases.  In response to periodic motions made by the Debtors requesting

5   permission to continue using cash for the essential operations and administrative expenses of the

6   Debtors, the Court entered orders on April 19 [docket no. 32], May 9, May 22 [docket no. 315],

7   July 25 [docket no. 974], and September 14, 2006 [docket no. 1282], allowing Debtors to continue

8   using cash in the bankruptcy estates pursuant to proposed cash budgets prepared by MFIM.  On

9   October 5, 2006, Debtors filed a Motion for Order Approving Continued Use of Cash Through

10   January 31, 2007 Pursuant to Fourth Revised Budget [docket no. 1451].  This Motion was

11   approved by the Court at the October 30, 2006 hearing, although a written order has not yet been

12   entered by the Court.

13           2.    <u>Orders Approving Debtors' Employment of Professionals</u>.  The Debtors

14   filed applications requesting authority to retain Thomas J. Allison as chief restructuring officer,

15   MFIM as restructuring and financial advisors [docket no. 6], Ray Quinney & Nebeker P.C. as

16   general bankruptcy counsel [docket no. 23], and Schwartzer-McPherson Law Firm as local

17   Nevada bankruptcy counsel [docket no. 21].  On April 19, 2006, the Court entered an order

18   granting interim approval through July 27, 2006, for the Debtors to employ Mr. Allison and

19   MFIM [docket no. 26].  On June 5, 2006, the Court entered an order granting interim approval

20   through July 27, 2006, for the Debtors to employ the two law firms mentioned above as legal

21   counsel [docket nos. 474 and 475].  On August 11, 2006, the Court entered its order extending the

22   approval for the Debtors to continue employing the above-named professionals through October 2,

23   2006 [docket no. 1137].  On October 31, 2006, the Court entered a further order granting approval

24   for the continued retention of all these professionals through December 15, 2006 [docket no.

25   1708].

26           3.    <u>Four Official Committees and Their Professionals</u>.  On May 10, 2006, the

27   U.S. Trustee's office filed notices indicating that four committees had been formed in the Debtors'

28   cases: (a) the Official Committee of Unsecured Creditors of USA Commercial Mortgage

1  Company [docket no. 201]; (b) the Official Committee of Holders of Executory Contract Rights

2  Through USA Commercial Mortgage Company [docket no. 202]; (c) the Official Committee of

3  Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC [docket no. 203]; and

4  (d) the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund,

5  LLC [docket no. 204]. Shortly thereafter, the Court approved applications by each of the

6  committees to employ legal counsel and the applications of three of the four committees to employ

7  financial advisors (the Executory Contract Rights Committee has not employed a financial

8  advisor). Each of the committees has established a website containing further information that is

9  available through a link on the usacapitalcorp.com website.

10          4.          Approval of Motion to Hold Funds. On May 8, 2006, USACM filed a

11  motion requesting permission to temporarily hold funds pending a determination of the proper

12  recipients and proper holdback amounts [docket no. 173]. USACM filed this motion, as directed

13  by the Court, to obtain permission from the Court to continue holding funds in USACM's loan

14  servicing collection account until USACM could complete its review and restatement of the

15  Debtors' loan servicing records. After considering all of the responses and oppositions to the

16  motion, the Court granted USACM's motion in an order entered July 6, 2006 [docket no. 836].

17  Although the Court approved USACM's request to continue to hold the funds temporarily, the

18  Court did not make any final rulings respecting the rights of any party to the funds that were being

19  held.

20          5.          Debtors' Bankruptcy Statements and Schedules. On June 15, 2006, each of

21  the Debtors filed its Statement of Financial Affairs ("Statements") and its Schedules, as required

22  by the Bankruptcy Code [docket nos. 673-682], and on June 23, 2006, certain amendments to the

23  Statements and Schedules were filed [docket no. 784]. Given the pre-petition loan servicing

24  irregularities and problems with the Debtors' accounting records, the preparation and filing of the

25  Statements and Schedules represented a major effort by the Debtors' new management and MFIM.

26          6.          Investor Statements Mailed to All Direct Lenders and Fund Members.

27  Although not filed with the Court, investor statements as of the Petition Date were prepared and

28  mailed to all Direct Lenders and Fund Members on July 10, 2006, which was another major

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

milestone in the Debtors' cases. After completing the accounting investigations and restatements necessary to produce and file the Statements and Schedules, the Debtors were then able to prepare and mail these investor statements to each Direct Lender indicating what their position was with respect to each loan that they had an interest in as of the Petition Date. Investor statements were also prepared and mailed to the Fund Members indicating what their respective interests were in DTDF and FTDF. Shortly thereafter, the Debtors were able to update the loan accounting records for each Direct Lender through June 30, 2006, and an updated investor statement was mailed to each Direct Lender on July 27, 2006. Additional investor statements were mailed out to Direct Lenders on August 25, 2006, and October 20, 2006.

       7.   <u>$64 Million Distribution Approved by Court and Mailed to Investors</u>. One of the primary goals of Debtors' new, post-petition management was to distribute to investors, as promptly as possible after the initial accounting work and reconstruction of the loan records was completed, a significant portion of the funds USACM had collected and was holding. The Debtors accomplished this goal through their Motion to Distribute Funds [docket no. 847], which elicited numerous responses and oppositions but which the Court approved at a hearing held on August 4, 2006. The Court's order granting the motion was entered on August 24, 2006 [docket no. 1184], and the distributions, totaling approximately $64.3 million and representing approved distributions on loan collections through June 2006 (after Court-approved holdbacks), were mailed to Direct Lenders on August 25, 2006. Shortly thereafter, FTDF distributed the approved portion of the payments it received (after an appropriate reserve for claims) to its Fund Members.

       8.   <u>Order Granting Proposed Procedures for Distributions on a Monthly Basis</u>. On August 29, 2006, Debtors filed their Modification to Motion to Distribute Funds and Proposed Procedures for Ongoing Distributions [docket no. 1203] in which they sought to extend and modify the relief requested in the Motion to Distribute Funds and to propose specific procedures by which future interim distributions could be made to direct lenders and fund members on a monthly basis. On October 2, 2006, the Court entered a Modified Order Authorizing Interim Distributions and Holdbacks [docket no. 1424] setting forth the procedures for future monthly distributions less certain holdbacks. Pursuant to this order, a second interim distribution of approximately $61.3 million from the USACM collection account was mailed to Direct Lenders

32

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

on or about October 20, 2006, representing approved distributions on loan collections during July and August 2006.  Shortly thereafter, FTDF distributed the approved portion of the payments it received (after an appropriate reserve for claims) to its Fund Members.  A distribution on account of loan collections received during September 2006 is expected to be made in November 2006.  A distribution for October 2006 collections should be made in late November 2006.

9.  <u>Order Scheduling Auction and Establishing Bid Procedures</u>.  Over the course of the last few months, a primary focus of the Debtors has been to negotiate the terms of the Asset Purchase Agreement with SPCP Group, LLC ("Silver Point") to establish a lead bid for the purchase of certain assets of FTDF and USACM which bid would then be subjected to an auction process to determine if the assets could be sold for a higher and better offer.  Accordingly, on September 22, 2006, after extensive discussions with counsel for the Committees and Silver Point, Debtors filed a Motion for Order Scheduling an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC, as Lead Bidder, and Approving Bid Procedures and Protections (the "Bid Procedures Motion") [docket no. 1352].  On October 26, 2006, the Bid Procedures Motion was approved by the Court subject to some minor modifications, and the order was entered on November 8, 2006 [docket no. 1761].

10.  <u>Approval of Motion for Retention of Employees</u>.  On October 3, 2006, a Motion for Order Approving Retention Plan of Debtors' Remaining Employees (the "Retention Motion") [docket no. 1429] was filed.  Since the Petition Date, most of the Debtors' pre-petition employees were terminated by Debtors' current management or left voluntarily for other work.  The Retention Motion was filed to request approval of certain incentives to encourage the remaining eleven employees to stay until confirmation of the Plan.  The Debtors believed that the cost of the incentives would be less expensive that if the Debtors had to replace those employees with professional consultants or temporary employees.  The Court approved the Retention Motion at the October 30, 2006 hearing, and entry of the written order is pending.

11.  <u>Order Denying Motion to Convert Case to a Chapter 7</u>.  On October 24, 2006 the United States Trustee ("UST") filed a Motion to Convert Case to Chapter 7 (the "Conversion Motion") [docket no. 1661].   The UST argued that the requirements were met for the case to be converted under 11 U.S.C. § 1112(b).  The Conversion Motion was strongly opposed by the Debtors and all four of the Committees appointed by the UST who argued that conversion to a

liquidating Chapter 7 at this point would be disastrous and not in the best interest of creditors and the estates. At a hearing on October 30, 2006, the Court denied the Conversion Motion, and the written order denying the motion was entered November 1, 2006 [docket no. 1711].

12. <u>Fixing of Claims Bar Date</u>. The Court set November 13, 2006, as the deadline (the "Bar Date") for all creditors and equity interest holders to file proofs of claim and proofs of interest. The Court recently extended the Bar Date, but <u>only</u> as to the filing of claims by Direct Lenders, to January 13, 2007. The Court also extended indefinitely the Bar Date for the filing of intercompany claims between the Debtors. These claims are not expected to be filed in these cases as they are described in this Disclosure Statement and are being settled or determined in accordance with the provisions of the Plan.

## VIII.    DESCRIPTION OF POST-PETITION OPERATIONS

Thomas J. Allison and the MFIM staff investigated the allegations of improper accounting for the loans USACM serviced ("Serviced Loans") to reconstruct the books and records of the USACM loan portfolio in order to properly account for the payments and disbursements made with respect to each loan in the portfolio. The reconstruction effort focused on accounting for each loan on a separate basis. This effort necessarily included an analysis of the position of each Direct Lender in each specific loan. Under Mr. Allison's direction, USACM prepared a loan summary as of the Petition Date containing various data respecting the 115 loans that constitute the Serviced Loans. To obtain the information necessary for the loan summary, as well as for the Debtors' Schedules and Statements and the investor statements prepared as of the Petition Date, it was first necessary to obtain, analyze and reconstruct the loan data. This process began with analyzing the existing USACM database containing data from 2004-2006.

MFIM determined, as of the Petition Date, that USACM's loan servicing database contained substantial errors, including but not limited to the following: (a) some borrower payments were not entered into the system; (b) most interest payments from borrowers were not posted in a timely manner; (c) payments were not applied according to the governing loan documents, which required that that payments be applied first to outstanding interest and then principal; (d) the amount of interest owed by borrowers was not calculated with the correct number of days outstanding or correct amount of principal owing; (e) check numbers used were not in sequence or were used multiple times; and (f) servicing fees were not charged, or were

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

calculated incorrectly using an interest rate "spread" rather than the loan service fee allowed pursuant to the loan servicing agreements. The research of USACM's books and records also revealed that the historical data prior to 2004 was kept in Access or Excel electronic files that were overwritten as they were updated, leaving no historical data or audit trail. In addition, there was no reliable system for tracking the numerous assignments in and out of various loans. Thus, in order to reconstruct the accounting for each loan, it was necessary to review and analyze the source documentation of Direct Lenders' deposits of investment funds, fundings to the borrowers, and assignments of Direct Lenders in or out of a loan. Bank deposits, deposit or clear dates from bank statements, and assignments were reviewed and documented. A loan general ledger was prepared for each of the Serviced Loans by using the source data and applying the correct interest rate and days outstanding; applying payments first to outstanding interest then to principal; correcting to use actual dates for the receipt of interest payments; calculating the amount of unpaid interest owed to Direct Lenders as the promissory note interest rate less the loan servicing fee allowed under the servicing agreements; tracking assignments in and out of various loans; and recharacterizing payments made to Direct Lenders on a particular loan after the borrower had repaid the loan as principal repayments, not interest payments (because interest was no longer due from the borrower).

USACM, as directed by Mr. Allison, has also focused its efforts on collecting the loans in its portfolio. USACM determined that there were loans that had matured as well as loans with uncollected interest. A team consisting of USACM staff and MFIM staff has worked diligently to collect the monies due to the Direct Lenders, including DTDF and FTDF. As of October 30, 2006, the team has collected approximately $185 million, consisting of $38 million in interest and $146 million in principal. In addition, MFIM estimates that 10 loans should be collected in the next 90 days including at least 3 with substantial amounts of past due interest.

The total USACM has collected from borrowers after the Petition Date through September 30, 2006, on the serviced loans is $184,528.383.89, which includes the amounts collected on the following loans that were repaid substantially or in full:

/ / /

/ / /

35

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Loan | Date | Principal | Interest |
|---|---|---|---|
| 5252 Orange LLC | 6/9/2006 | $ 3,800,000.00 | $ 62,965.56 |
| Ashby Financial Company LLC | 9/1/2006 | $ 7,200,000.00 | $ 2,010,137.25 |
| Boise Gowan 93 LLC | 8/29/2006 | $ 2,425,000.00 | $ 48,984.97 |
| Copper Sage Commerce Center LLC | 6/22/2006 | $ 179,105.65 | $ 14,508.78 |
| Del Valle Isleton | 5/23/2006 | $ 6,420,000.00 | $ 123,604.23 |
| Fiesta Beaumont | 7/21/2006 | $ 2,400,000.00 | $ 17,499.93 |
| Glendale Tower Partners, LP | 8/31/2006 | $ 6,500,000.00 | $ 288,580.07 |
| Golden State Investments LP | 6/5/2006 | $ 2,850,000.00 | $ 173,041.84 |
| HFA- North Yonkers | 5/26/2006 | $24,000,000.00 | $ 4,168,402.75 |
| HFA-Riviera | 5/26/2006 | $ 5,000,000.0 | $ 767,361.09 |
| HFA- Riviera 2nd | 5/26/2006 | $ 8,000,000.00 | $ 2,698,080.00 |
| J. Jireh Corporation | 8/31/2006 | $ 8,825,000.00 | $ 198,037.00 |
| LCG Gilroy LLC | 6/30/2006 | $ 4,950,000.00 | $ 444,747,79 |
| Midvale Marketplace  LLC | 7/14/2006 | $ 4,075,000.00 | $ 366,232.33 |
| Opaque Land Development LLC | 4/28/2006 | $ 4,827,970.00 | $ 856,614.77 |
| Preserve at Galleria, LLC | 9/27/2006 | $ 3,591,750.00 | $ 88,938.12 |
| Roam Development Group | 8/2/2006 | $ 25,042,250.00 | $ 7.637.26 |
| Urban Housing Alliance LLC | 8/21/2006 | $ 8,150,000.00 | $ 261,473.25 |
| **Total** | | **$128,236,075.65** | **$ 12,594,747.09** |

## IX.    SUMMARY OF THE PLAN

This part of the Disclosure Statement summarizes the provisions of the Plan. The Plan, after it has been confirmed, will constitute a contract between the Debtors and their creditors, equity interest holders, and Direct Lenders. If confirmed, the Plan will be binding on all parties in interest in the case including all creditors, equity interest holders, and Direct Lenders, whether or not they voted for the Plan. This summary is a broad outline of the Plan and is qualified in its entirety by reference to the Plan. It is therefore advisable that you review the Plan carefully for the full details of the treatment of creditors and equity interest holders and seek the assistance of your own counsel and other professionals as you may deem appropriate to ensure you adequately understand the Plan and its consequences.

### A.    General Plan Summary

The Plan contemplates the liquidation of each Debtor's estate and the distribution of the liquidation proceeds to each such Debtor's creditors and equity interest holders, as applicable. The Plan will be implemented, in part, through a proposed asset sale transaction, in which substantially all of the assets of FTDF (primarily its interests in a portfolio of loans) and certain assets of USACM (primarily those used to conduct its loan servicing business) will be transferred to a third party purchaser. The Plan will also be implemented through the settlement of several disputes among the various parties in interest in these cases.

Specifically, the Plan will be implemented through the following transactions:

- the sale of substantially all of the assets of FTDF and certain assets of USACM, and disbursement of related proceeds and certain other cash of the estates in accordance with the Plan;

- the transfer of most Loan Servicing Agreements to the purchaser of the FTDF and USACM sale assets, which will be or be affiliated with a qualified third-party servicing agent;

- the treatment of Prepaid Interest as property of the USACM estate to fund distributions to holders of allowed administrative priority claims and other priority or secured claims

37

according to the priorities provided for in the Bankruptcy Code;

- the transfer of the remaining USACM assets, principally including (a) remaining Prepaid Interest; (b) USACM's share of the the $58 million secured note payable by USAIP; (c) USACM's interests in certain notes; (d) USACM's right to collect origination, extension, or other success fees and default interest premiums; and (e) lawsuits to be brought against Hantges, Milanowski, USAIP and other non-Debtor insiders, aiders and abetters of wrongdoing that led to the bankruptcy case, to a USACM Trust in which all unsecured creditors will share as beneficiaries;

- the retention by DTDF after the effective date of the Plan of its assets, principally including (a) DTDF's interests in over 20 loans, including the largest loan in the USACM portfolio, which loan is owned solely by DTDF, the 10-90, Inc. secured note payable by USAIP; (b) lawsuits against the same wrongdoers; (c) its interest in the $58 million secured note payable by USAIP; and (d) its claims against USACM;

- the transfer of certain assets of FTDF to DTDF as part of its settlement of all claims and disputes between FTDF and DTDF, which will be used to pay DTDF's administrative expense and creditor claims, and begin funding its litigation;

- the liquidation of the DTDF assets and USACM Trust assets, including through coordinated litigation against the wrongdoers;

- distribution of the net proceeds of the DTDF assets to holders of allowed equity interests in DTDF (and any remaining creditor claims), and distribution of the net proceeds of USACM Trust assets to the USACM unsecured creditors as Trust beneficiaries, in accordance with the Plan, followed by the dissolution of those entities;

- the distribution of FTDF's share of the proceeds from the sale of its assets to equity interest holders in FTDF after satisfaction of all allowed claims against FTDF, followed by the dissolution of FTDF;

- the liquidation of any assets of the USA Realty estate and the USA Securities estate,

38

distribution of cash to holders of allowed claims against USA Realty and USA Securities, respectively, in accordance with the Plan, and the dissolution of USA Realty and USA Securities; and

- the preservation of certain claims, causes of action, defenses and counterclaims, which shall be pursued as set forth in the Plan.

**B.    Classification and Treatment of Claims and Interests**

While this Disclosure Statement provides a brief description of the types of potential Claims to receive treatment under the Plan, NOTHING IN THIS DISCLOSURE STATEMENT OR IN THE PLAN IS INTENDED TO, NOR DOES IT, CONSTITUTE AN ADMISSION THAT ANY CLAIM OR EQUITY INTEREST IS OR SHOULD BE ALLOWED.  THE DEBTORS RESERVE ALL RIGHTS TO OBJECT TO ANY AND ALL CLAIMS OF ANY CREDITOR OR EQUITY INTEREST HOLDER UNDER THE PLAN.

**1.    Unclassified Claims.**

The Plan addresses certain unclassified claims for which treatment is mandated under the Bankruptcy Code.  These include administrative expense claims under sections 503(b) and 507(a)(1), and priority tax claims under section 507(a)(8) of the Bankruptcy Code.  These unclassified claims are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors have <u>not</u> placed the following claims in a class.  The respective treatments for these claims are provided below.

**a.    Administrative Expenses for Each Debtor**

**(i).    General**

Administrative expenses are claims for costs or expenses of administering the Debtors' Chapter 11 Cases which are allowed under Bankruptcy Code section 503(b), and referred to in Bankruptcy Code section 507(a)(1).  These claims include, without limitation, (i) any actual and necessary postpetition expenses of preserving the estates, (ii) any actual and necessary postpetition expenses of operating the businesses of the debtors, (iii) all compensation or reimbursement of expenses to the extent allowed by the Court under Bankruptcy Code sections 330, 331, or 503, and (iv) any fees or charges assessed against the estates under 1930 of title 28 of the United States

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Code.

Each holder of an allowed administrative expense in a particular estate will be paid in full in cash out of such estate. Payment will be made on the later of, or as soon as practicable thereafter: (a) the Effective Date, or (b) the date the expense becomes an allowed administrative expense except to the extent that the holder of an allowed administrative expense agrees to a different treatment. The Direct Lender Committee professional fees and costs are an administrative expense of USACM, a portion of which shall be reimbursed pursuant to the compromise set forth in the Plan.

### b.      Bar Date For Administrative Claims

### (i).      General Provisions

Except as provided below for professionals or entities requesting compensation providing services on behalf of the Debtors' estates, requests for payment of Administrative Expenses must be filed no later than thirty (30) days after the Effective Date.

The Plan establishes a bar date of forty-five (45) days after the Effective Date by which all final fee applications, to the extent not previously filed, for the compensation of professionals for services rendered and for reimbursement of expenses incurred on or before the Effective Date pursuant to Bankruptcy Code sections 327, 328, 503(b), 1103, and/or 1106 and all other requests for payment of administrative expenses incurred before the Effective Date under Bankruptcy Code sections 507(a)(1) or 507(b) must be filed with the Court or be forever barred.

The holders of administrative expenses (including without limitation, professionals requesting compensation or reimbursement of expenses and any governmental units asserting claims for federal, state or local taxes) who are required to file a request for payment of such claims but that do not do so by the applicable bar date will be forever barred from asserting their claims for administrative expenses against the Debtors, the estates, the USACM Trust, DTDF any other person or entity, or any of their respective property.

### (ii).      Professionals

All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional or any other entity for making a substantial contribution in the Chapter 11 Cases) will need to file and serve on

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

the U.S. Trustee, the Debtors, the USACM Trust, and Post-Effective Date DTDF an application for final allowance of compensation and reimbursement of expenses. This application must be filed no later than forty-five (45) days after the Effective Date. Any objection to such applications must be timely filed and served in accordance with Nevada District Court Local Rule 9014.

### (iii). Ordinary Course Liabilities

The holders of claims for administrative expenses based on liabilities incurred in the ordinary course of the Debtors' businesses prior to the Effective Date (other than professionals or other entities described in subparagraph (2), above, governmental units that hold claims for taxes or claims and/or penalties related to such taxes, and claims otherwise described in the Plan) are not required to file any request for payment of these claims. Each administrative expense shall be assumed and paid by the obligated estate under the terms and conditions of the particular transaction giving rise to that administrative expense, without any further action by the holder of such administrative expense.

### c. Priority Tax Claims

A priority tax claim is that portion of any general unsecured claim for unpaid taxes which is entitled to priority under section 507(a)(8) of the Bankruptcy Code. Each holder of an allowed priority tax claim in a particular estate will be paid in full, in cash from such estate. This payment will be made on the later of, or as soon as practicable thereafter, the: (a) Effective Date, or (b) the date such priority tax claim becomes an allowed priority tax claim, except to the extent that the holder of an allowed priority tax claim agrees to a different treatment.

### 2. Classified Claims and Equity Interests

The following describes the Plan's classification of claims against and equity interests in the Debtors and the treatment that holders of allowed claims and allowed equity interests will receive under the Plan. The Plan provides that holders of such allowed claims can agree to accept less favorable treatment by settlement or otherwise.

If the Plan is confirmed by the Court, each holder of a claim in a particular class will receive the same treatment as the other holders in the same class of claims or equity interests whether or not such holder voted to accept the Plan. Moreover, upon confirmation, the Plan will be binding on all creditors and interest holders of the Debtors and the Direct Lenders, regardless of

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

whether such creditors, interest holders or Direct Lenders voted to accept the Plan. Such treatment will be in full satisfaction, release and discharge of such holder's respective claims against and equity interests in the Debtors, except as otherwise provided in the Plan.

### a. USACM – (Classes A-1 through A-7)

### (i). Class A-1: Secured Tax Claims

Class A-1 consists of all allowed secured tax claims against USACM. A secured tax claim in Class A-1 is a claim of a governmental unit against USACM to the extent of the value of any interest in property of USACM's estate securing such claim. USACM estimates that allowed Class A-1 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full. Payment on these claims will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (ii). Class A-2: Other Secured Claims

Class A-2 consists of all other allowed secured claims against USACM. These are claims against USACM to the extent of the value of any interest in property of USACM's estate securing such claim, other than a secured tax claim. USACM estimates that allowed Class A-2 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will either have their claim paid in full or USACM will surrender the property securing the claim in full satisfaction of the claim. USACM has the discretion to choose either option. If USACM elects to pay the claim in full, payment will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. If USACM elects to surrender the property, it shall do so by making the property reasonably available to the holder before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. In the event that the property securing the claim has been lost or destroyed, USACM will provide notice to the holder of this fact. The delivery of this notice will constitute a "surrender" of the property. This class is unimpaired so the holders of

42

claims in this class are presumed to vote in favor of the Plan.

### (iii). Class A-3: Priority Unsecured Claims

Class A-3 consists of all allowed claims against USACM entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses. These claims are primarily for employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts. USACM estimated that allowed Class A-3 claims will aggregate approximately $178,200, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full on the Effective Date unless USACM and the creditor agree to different treatment. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (iv). Class A-4: General Unsecured Claims

Class A-4 consists of all allowed general unsecured claims against USACM. This class includes allowed unsecured claims, including claims of trade creditors, claims for loan payments received by USACM but not paid over to applicable lenders prior to the Petition Date ("Unremitted Principal Claims"), all unsecured claims (whether under contract, tort, or other legal theory) of Direct Lenders against USACM, and the unsecured claims of FTDF and DTDF against USACM. USACM estimates that allowed Class A-4 claims will aggregate approximately $138 million to $488 million, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will receive a pro-rata share of the assets that are recovered by the USACM Trust (see section below). This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan. The Debtors and Committees expect that objections will be filed to unsecured claims against USACM asserting losses on account of a deficit between the amount of a Direct Lender's or fund investor's loan or investment, and the amount received from the Debtors pre-petition and postpetition. The Debtors and Committees anticipate that only holders of unsecured claims that prove breach of the Loan Servicing Agreements or prove damages proximately caused by some act or failure to act by USACM in violation of a contractual or statutory duty or fraud will be allowed. In order to reduce the expense and delay of formal objections to Claims in accordance with the Bankruptcy Code and

43

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Rules, the Unsecured Committee and the Direct Lenders Committee will propose an alternative

2    dispute resolution mechanism under the Plan not less than 20 days before the first day scheduled

3    for the Confirmation Hearing.

4    **(v).    Class A-5: Direct Lender Compromise Claims**

5    Class A-5 consists of all Direct Lenders of USACM.  In exchange (and as a compromise)

6    for a release by USACM, FTDF, USA Realty, and USA Securities for all claims and causes of

7    actions against the Direct Lenders (except as described below regarding Prepaid Interest),

8    including claims relating to surcharge, recharacterization of Direct Lender loans, fraudulent

9    conveyance, and the collection from Direct Lenders of prepetition accrued as of the Effective Date

10   but unpaid annual loan servicing fees, success fees and other fees and default interest due under

11   the Loan Servicing Agreements, the Direct Lenders acknowledge that the Prepaid Interest

12   constitutes an asset of the USACM estate, or will otherwise transfer their ownership rights, if any,

13   in Prepaid Interest to the USACM estate.  As part of the overall settlement, and release of claims

14   for surcharge, and for allocation of a portion of the Debtors' professional fees and costs along with

15   professional fees and costs of counsel for the Direct Lenders Committee, the Direct Lenders

16   further agree that up to $605,000 of the 2% Holdback (as defined in the Plan) will be used to

17   reimburse USACM for the allowed professional fees and costs of the Direct Lender Committee.

18   That amount will be allocated among the Holdbacks from Direct Lenders pro rata based on the

19   unpaid principal loan balance of those Direct Lenders with funds in the 2% Holdbacks.  USACM

20   will retain the maximum amount for its contractual servicing fee due under the respective Loan

21   Servicing Agreements (whether 1% or more), and the balance of the 2% Holdback will be

22   refunded to the applicable Direct Lender.  Those Direct Lenders with loan servicing fees of in

23   excess of 1% will not be charged for both a portion of the $605,000 and the maximum contractual

24   loan servicing fee.  Instead, their share of the $605,000 will be recovered from the loan servicing

25   fees paid to USACM.  It is anticipated that as of the Effective Date of the Plan, most of the

26   Prepaid Interest will have been recovered from borrowers or retained by the USACM estate

27   through netting of holdbacks during the bankruptcy case.  It is further anticipated that the

28   remainder should be recovered either (a) after transfer of servicing rights under the sale to Silver

     Point or approved overbidder through netting of additional holdbacks or (b) through setoff against

     Claims before allowance.  The statute of limitations for recovery of the Prepaid Interest will be

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

tolled for two years, to enable recovery by holdbacks and netting, but in the unlikely event that Prepaid Interest has not been recovered after two years, thereafter such Direct Lenders may be sued for any unrecovered Prepaid Interest. This class is impaired and the holders of these claims will have the opportunity to vote to accept or reject the Plan.

Please note that if anyone, including a Direct Lender, objects to the proposed compromises set forth above, the objecting party must file, serve and pursue an objection to confirmation of the Plan in compliance with the Court's Local Rule 9014 in order to preserve the objection. Voting to reject the Plan will not be sufficient to preserve an objection.

### (vi)     Class A-6: Penalty Claims

Class A-6 consists of penalty claims against USACM, such as claims by governmental entities for non-pecuniary losses and or for punitive damages or default-rate interest, are sought and allowed, they are subordinated and not paid until and unless there is full payment of the full amount of all Allowed General Unsecured Claims. Under the Plan, Penalty Claims receive nothing.

### (vii).   Class A-7: Subordinated Claims

Class A-7 consists of all claims against USACM asserted by a non-debtor insider. Such claims are subordinated to claims of unsecured creditors, including Allowed Penalty Claims, and as a result, will receive no distribution under the Plan. This class is impaired and since no payment will be made on these claims the holders of these claims are deemed to have rejected the Plan.

### (viii).  Class A-8: Equity Interests

Class A-8 consists of all equity interests in USACM. These equity interests, in every form, will be cancelled and no payment will be made on their account. This class is impaired and since no payment will be made on these interests the holders of these interests are deemed to have rejected the Plan.

### b.      FTDF – (Classes B-1 through B-5)

### (i).     Class B-1: Secured Tax Claims

Class B-1 consists of all allowed secured tax claims against FTDF. A secured tax claim in Class B-1 is a claim of a governmental unit against FTDF to the extent of the value of any interest in property of FTDF's estate securing such claim. FTDF estimates that allowed Class B-1 claims

45

will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full. Payment on these claims will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

**(ii).    Class B-2: Other Secured Claims**

Class B-2 consists of all other allowed secured claims against FTDF. Claims in Class B-2 are claims against FTDF to the extent of the value of any interest in property of FTDF's estate securing such claim, other than a secured tax claim. FTDF estimates that allowed Class B-2 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will either have their claim paid in full or FTDF will surrender the property securing the claim in full satisfaction of the claim. FTDF has the discretion to choose either option. If FTDF elects to pay the claim in full, payment will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. If FTDF elects to surrender the property, it shall do so by making the property reasonably available to the holder before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. In the event that the property securing the claim has been lost or destroyed, FTDF will provide notice to the holder of this fact. The delivery of this notice will constitute a "surrender" of the property. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

**(iii).    Class B-3: Priority Unsecured Claims**

Class B-3 consists of all allowed claims against FTDF entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses. Generally, these claims include employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts. FTDF estimates that allowed Class B-3 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

46

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

These claims will be paid in full on the Effective Date unless FTDF and the creditor agree to different treatment. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (iv).    Class B-4: General Unsecured Claims

Class B-4 consists of all allowed general unsecured claims against FTDF. This class includes unsecured claims, including claims of trade creditors or professionals who rendered services to FTDF prior to the Petition Date. FTDF estimates that the ultimate amount of allowed general unsecured claims included Class B-4 will aggregate approximately $77,300, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed. These claims will be paid in full on the Effective Date. The holders of these claims will also receive post-petition interest on their claims as provided for in the Plan. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (v).    Class B-5: Equity Interests

Class B-5 consists of all allowed equity interests in FTDF. The holders of these equity interests will retain their pro-rata share of all distributions that were received after the Petition Date. They will also receive their pro rate share of the net sale proceeds from the sale of the FTDF assets to Silver Point, after the satisfaction of all classified and unclassified claims of FTDF, compromises provided under the Plan, the costs of the administering the Chapter 11 cases and implementing the Plan for FTDF, as well as their pro rata share of and beneficial interest in all assets recovered by the USACM Trust (subject to the compromise with DTDF as set forth below). This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.

### c.    DTDF – (Classes C-1 through C-5)

### (i).    Class C-1: Secured Tax Claims

Class C-1 consists of all allowed secured tax claims against DTDF. A secured tax claim in Class C-1 is a claim of a governmental unit against DTDF to the extent of the value of any interest in property of DTDF's estate securing such claim. DTDF estimates that allowed Class C-1 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full. Payment on these claims will be made on or before the

later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (ii). Class C-2: Other Secured Claims

Class C-2 consists of all other allowed secured claims against DTDF. Claims in Class A-2 are claims against USACM to the extent of the value of any interest in property of USACM's estate securing such claim, other than a Secured Tax Claim. DTDF estimates that allowed Class C-2 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will either have their claim paid in full or DTDF will surrender the property securing the claim in full satisfaction of the claim. DTDF has the discretion to choose either option. If DTDF elects to pay the claim in full, payment will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. If DTDF elects to surrender the property, it shall do so by making the property reasonably available to the holder before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. In the event that the property securing the claim has been lost or destroyed, DTDF will provide notice to the holder of this fact. The delivery of this notice will constitute a "surrender" of the property. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (iii). Class C-3: Priority Unsecured Claims

Class C-3 consists of all allowed claims against DTDF entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses. Generally, these claims include employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts. DTDF estimates that allowed Class C-3 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full on the Effective Date unless DTDF and the creditor agree to different treatment. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

48

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0022

**(iv).    Class C-4: General Unsecured Claims**

Class C-4 consists of all allowed general unsecured claims against DTDF.  This class includes unsecured claims, including claims of trade creditors or professionals who rendered services to DTDF prior to the Petition Date.  DTDF estimated that the ultimate amount of allowed general unsecured claims included Class C-4 will be nominal, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.  These claims will be paid in full on the Effective Date.  The holders of these claims will also receive post-petition interest on their claims as provided in the Plan.  One unsecured claim filed by Prospect High Income Fund and other related creditors, seeking a claim amount of some $20 million, was disallowed in full by the Bankruptcy Court at a hearing held on October 19, 2006.  However, the decision disallowing the claim is on appeal.  If such appeal is decided against DTDF, and if the Bankruptcy Court thereafter allows the claim, such claim will have to be paid in full with interest.  This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

**(v).    Class C-5: Equity Interests**

Class C-5 consists of all allowed equity interests in DTDF.  The holders of these interests will retain their interest in DTDF and all distributions, if any, that were received after the Petition Date.  They will also receive their pro rata beneficial interests in each share of the assets recovered by DTDF, including the assets received by the Post-Effective Date DTDF, and the assets recovered by the USACM Trust.  They will also share in the monies received from FTDF pursuant to the compromise with FTDF discussed below.  This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.

**d.    USA Realty – (Classes D-1 through D-5)**

**(i).    Class D-1: Secured Tax Claims**

Class D-1 consists of all allowed secured tax claims against USA Realty.  A secured tax claim in Class D-1 is a claim of a governmental unit against USA Realty to the extent of the value of any interest in property of USA Realty's estate securing such claim.  USA Realty estimates that allowed Class D-1 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full.  Payment on these claims will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date

the claim becomes an allowed claim. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (ii). Class D-2: Other Secured Claims

Class D-2 consists of all other allowed secured claims against USA Realty. Claims in Class D-2 are claims against USA Realty to the extent of the value of any interest in property of USA Realty's estate securing such claim, other than a secured tax claim. USA Realty estimates that allowed Class D-2 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will either have their claim paid in full or USA Realty will surrender the property securing the claim in full satisfaction of the claim. USA Realty has the discretion to choose either option. If USA Realty elects to pay the claim in full, payment will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. If USA Realty elects to surrender the property, it shall do so by making the property reasonably available to the holder before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. In the event that the property securing the claim has been lost or destroyed, USA Realty will provide notice to the holder of this fact. The delivery of this notice will constitute a "surrender" of the property. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (iii). Class D-3: Priority Unsecured Claims

Class D-3 consists of all allowed claims against USA Realty entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses. Generally, these claims include employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts. USA Realty estimates that allowed Class D-3 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full on the Effective Date unless USA Realty and the creditor agree to different treatment. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (iv). Class D-4: General Unsecured Claims

50

Class D-4 consists of all allowed general unsecured claims against USA Realty. This class includes unsecured claims, including claims of trade creditors or professionals who rendered services to USA Realty prior to the Petition Date. USA Realty estimated that the ultimate amount of allowed general unsecured claims included Class D-4 will aggregate approximately $50,050,000, including approximately $50,000 in scheduled claims and claims that will exceed $50 million held by DTDF and FTDF for mismanagement, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will receive a pro rata share of the remaining USA Realty assets after the payment in full of all USA Realty unclassified claims and the claims in Classes D-1 to D-3, unless the creditor and USA Realty agree to different treatment. As part of the intercompany compromises contained in the Plan, FTDF will subordinate its general unsecured claim against USA Realty to the payment of other claims in this case, and DTDF will subordinate any claim it has against USA Realty in excess of $50 million to the payment of other claims in this class. This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.

### (v). Class D-5: Equity Interests

Class D-5 consists of all equity interests in USA Realty. These equity interests, in every form, will be cancelled and no payment will be made on their account. This class is impaired and since no payment will be made on these interests the holders of these interests are deemed to have rejected the Plan.

### e. USA Securities – (Classes E-1 through E-5)

### (i). Class E-1: Secured Tax Claims

Class E-1 consists of all allowed secured tax claims against USA Securities. A secured tax claim in Class E-1 is a claim of a governmental unit against USA Securities to the extent of the value of any interest in property of USA Securities' estate securing such claim. USA Securities estimates that allowed Class E-1 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full. Payment on these claims will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. This class is unimpaired so the holders of claims in this

51

class are presumed to vote in favor of the Plan.

### (ii). Class E-2: Other Secured Claims

Class E-2 consists of all other allowed secured claims against USA Securities. Claims in Class E-2 are claims against USA Securities to the extent of the value of any interest in property of USA Securities' estate securing such claim, other than a secured tax claim. USA Securities estimates that allowed Class E-2 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will either have their claim paid in full or USA Securities will surrender the property securing the claim in full satisfaction of the claim. USA Securities has the discretion to choose either option. If USA Securities elects to pay the claim in full, payment will be made on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. If USA Securities elects to surrender the property, it shall do so by making the property reasonably available to the holder before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) business days after the date the claim becomes an allowed claim. In the event that the property securing the claim has been lost or destroyed, USA Securities will provide notice to the holder of this fact. The delivery of this notice will constitute a "surrender" of the property. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (iii). Class E-3: Priority Unsecured Claims

Class E-3 consists of all allowed claims against USA Securities entitled to priority in right of payment under Bankruptcy Code section 507(a) except priority tax claims and claims for administrative expenses. Generally, these claims include employee wages, vacation pay, severance pay, contributions to benefit plans and other similar amounts. USA Securities estimates that allowed Class E-3 claims will be negligible, if any, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

These claims will be paid in full on the Effective Date unless USA Realty and the creditor agree to different treatment. This class is unimpaired so the holders of claims in this class are presumed to vote in favor of the Plan.

### (iv). Class E-4: General Unsecured Claims

Class E-4 consists of all allowed general unsecured claims against USA Securities. This

52

class includes unsecured claims, including claims of trade creditors or professionals who rendered services to USA Securities prior to the Petition Date. USA Securities estimates that the ultimate amount of allowed general unsecured claims included Class E-4 will aggregate approximately $13,000, but this estimate is preliminary only and is subject to change because the Bar Date has not yet passed.

The holders of these claims will receive a pro rata share of the remaining USA Securities assets after the payment in full of all USA Securities unclassified claims and the claims in Classes E-1 to E-3, unless the creditor and USA Securities agree to different treatment. This class is impaired and the holders of claims in this class will have the opportunity to vote to accept or reject the Plan.

### (v). Class E-5: Equity Interests

Class D-5 consists of all equity interests in USA Securities. These equity interests, in every form, will be cancelled and no payment will be made on their account. This class is impaired and since no payment will be made on these interests the holders of these interests are deemed to have rejected the Plan.

### C. No Substantive Consolidation

On the Effective Date, all of the assets of each Debtor shall be sold, transferred, distributed or retained by each of such Debtor's respective estate, or the Post-Effective Date Entities created for each such Debtor and its estate under the Plan, with all proceeds of sold, transferred, or liquidated assets of each Debtor being retained by the respective Debtor's estate, or the Post-Effective Date Entities created for each such Debtor and its estate under the Plan. All claims against and equity interests in the Debtors and their respective estates shall be retained by the holders of allowed claims and allowed equity interests against and in the respective estates, except as otherwise provided for under the Plan. The allowance, voting, treatment and distributions on account of allowed claims and allowed equity interests shall be as set forth in the Plan on an individual estate basis. Notwithstanding any inference to the contrary in this section, equity interests in USACM, USA Realty and USA Securities shall be retained only until the Effective Date, at which date, those equity interests shall be cancelled on an individual estate basis under the Plan.

Notwithstanding any provision of this Plan, nothing in this Plan shall constitute or effect a recharacterization of any loan or any interest in a loan as giving rise to a claim against or equity interest in any of the Debtors.  If any entity believes that all or a portion of the loans should be so recharacterized, it must expressly raise this issue by filing an objection to the confirmation of the Plan on this basis.  Any entity who fails to file such an objection to confirmation of the Plan shall be forever barred and estopped from arguing, asserting or claiming in any way that its loan or its interest in a loan should be recharacterized as an allowed claim against or allowed equity interest in a Debtor.

### D.    Sale of USACM Assets and FTDF Assets

On the Effective Date, USACM will sell its loan servicing assets and FTDF will sell substantially all of its assets, free and clear of liens and interests through an auction process.  Although another bidder may submit a higher bid, currently the highest bid for the assets to be sold of USACM and FTDF is that of a company called SPCP Group, LLC (aka "Silver Point").3 Silver Point is a U.S.-based investment fund that is unaffiliated with any of the Debtors.  The Debtors and the Committees have negotiated an agreement that will dictate the terms of sale to Silver Point (the "Asset Purchase Agreement"), and that will be used as a model for potentially higher and better offers.  Silver Point's loan servicing capabilities are described below.

Pursuant to the Asset Purchase Agreement, USACM and FTDF are selling the following assets:

- FTDF's proportional interest in 44 different loans[4] (the "FTDF Assets") for cash consideration of $46 million, subject to certain adjustments (the "FTDF Price"); and

- USACM's post-closing rights to service loans pursuant to the Loan Servicing Agreements for the USACM portfolio and related personal property (the "USACM

---

3   The Debtors are aware that certain sensitive personally identifiable information is being transferred to Silver Point in connection with the sale.  The Debtors have taken and will continue to take reasonable efforts to protect such personally identifiable information.  The appointment of a "consumer privacy ombudsman," as contemplated under the October 2005 amendments to the Bankruptcy Code, is not required, however, because as of the Petition Date, the Debtors did not have any formal policy regarding the privacy of personally identifiable information about individuals. 11 U.S.C. §363(b)(1)

4   The Asset Purchase Agreement lists 46 loans, but two of the loans were repaid after the July 31, 2006 "Cut Off Date," which will result in a price adjustment as explained further below.

54

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Assets") for cash consideration based on the future (i) collection of servicing fees, (ii) collection of default rate interest and (iii) other payments and obligations set forth in the Asset Purchase Agreement (the "USACM Price").

## 1.  FTDF Price

The Asset Purchase Agreement provides for a purchase price for the FTDF Assets of $46 million, subject to certain adjustments.  Based on the current aggregate principal balance of $63,539,756 for the FTDF Assets, the base FTDF Price will yield a 72.4% return to the FTDF.  Of course, actual distributions to the FTDF Fund Members will be reduced by allowed administrative expenses, allowed claims, and settlements.

The Asset Purchase Agreement contemplates different price adjustments with respect to the FTDF Price.  First, the Asset Purchase Agreement has built-in price adjustments that enhance the recovery to the FTDF to the extent that principal payments on FTDF loans are received after July 31, 2006, (the "Cut Off Date") and before the closing of the Asset Purchase Agreement. These adjustments provide for a partial reduction in the purchase price (ranging from 65% to 95% of the principal collected based on the loan at issue) for each dollar of principal collected prior to the close of the sale.  As the FTDF Price will be reduced by less than the amount of the principal actually received by FTDF, the net effect of any principal pay downs on the FTDF Assets after the Cut Off Date will be an increase on the overall return to FTDF.[5]

Second, the Asset Purchase Agreement has another price adjustment mechanism in the event the reported principal balance of the FTDF Assets as of the Cut Off Date proves to be inaccurate.[6]  These adjustments will not be made on a dollar-for-dollar basis, but rather, will be made according to the same adjustment percentages that are used to account for post-Cut Off Date

---

5  For example, assume that, between the Cut-Off Date and the close of the sale, the FTDF's proportionate share of the principal collected is a hypothetical $5 million and all such collections relate to loans falling within the 85% adjustment level contained in the Asset Purchase Agreement.  Instead of reducing the purchase price by the full $5 million of principal collected, the purchase price would be reduced by only $4,250,000 (i.e., 85% of $5 million).  The FTDF would retain the $5 million collected, thereby increasing the recovery by $750,000.

6  All parties recognize that Debtors' new management has done all that it could in reconstructing the Debtors' records, but, in the end, Debtors' new management, like a chapter 7 trustee, cannot guarantee any of the records they have used in re-creating the Debtors' records.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

principal payments (i.e., ranging from 65% to 95%), and subject to various "netting" criteria set forth in detail in the Asset Purchase Agreement.[7]

Finally, all parties agree that there are certain title issues regarding one of the FTDF loans that require further development and analysis. To the extent that the Debtors are able to resolve these issues by delivering an appropriate title policy endorsement, the FTDF Price will be increased by $250,000.

### 2. USACM Price.

In consideration of the USACM Price, Silver Point will pay USACM approximately $550,000 over time for USACM's servicing business and related assets, including the right to service the loans in the USACM portfolio as described in more detail below. Silver Point will pay USACM out of the proceeds that Silver Point will receive from servicing these loans. Specifically, Silver Point will pay USACM 50% of the first $1,000,000 (such amount subject to reduction based upon a ratio of the principal balance of serviced loans being excluded from transfer to the principal balance of serviced loans being transferred) it collects in annual servicing fees, net of its collecting and servicing expenses. Silver Point will also pay $50,000 out of the first $100,000 it collects on default rate interest payments on FTDF assets.

Importantly, USACM elected to retain all pre-close accrued servicing fees and related fees. Thus, after the closing of the Asset Purchase Agreement ("Closing"), subject to agreed upon "waterfall" provisions, Silver Point will collect and pay over to USACM certain amounts, including (a) all servicing fees accrued but unpaid as of the Closing and (b) all late charges and default interest due, but unpaid, from borrowers as of the Closing, with the exception of the proportionate default interest in respect of the FTDF Assets. In addition, Silver Point will also perform certain services on behalf of USACM's estate to assist USACM in the collection of its other assets, which it has elected to retain, including exit fees, extension fees, deferred origination fees, and netted Prepaid Interest, among others.

### 3. Auction.

The sale of the USACM Assets and FTDF Assets to Silver Point is subject to an auction process. The auction process allows other qualified bidders to make higher and better offers for the USACM Assets and FTDF Assets. Thus, the price paid for the USACM Assets and FTDF

---

[7]    The "netting" process is set forth in detail in Section 3.6 of the Asset Purchase Agreement.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Assets may increase even more to the extent that overbidders participate in the auction process and decide to pay more for these assets. It is anticipated that the auction for these assets will take place on December 7, 2006.

### 4. Transfer of the Loan Servicing Agreements

As stated above, included among the USACM Assets are the Loan Servicing Agreements. Pursuant to sections 363 and 1123(a)(5) of the Bankruptcy Code, these Loan Servicing Agreements are not modified, and will be transferred to Silver Point (or the successful overbidder), at the Court-supervised auction, free and clear of liens, claims, and interests including any alleged claims under § 503(b) of the Bankruptcy Code. The Debtors and Committees believe that the transfer of these Loan Servicing Agreements to the asset purchaser is not an assumption and assignment of the agreements because they are not executory contracts and thus no assumption or assignment is required to transfer them as assets of the USACM estate.

### a. Summary of Silver Point's Loan Servicing Capability

Silver Point is a private investment firm specializing in credit-related investments, with approximately $6 billion of capital under management. Silver Point's middle market investment group is well-qualified to manage and service portfolios of troubled loans. Silver Point's middle market troubled loan investment model is focused on the acquisition, management and resolution of sub-performing and non-performing loan assets, emphasizing current income potential, with near- to long-term capital appreciation. Silver Point, working in conjunction with its third-party loan servicing provider, Laureate Capital, LLC ("Laureate"), monitors collections through mid-month and month-end delinquency reports, and trail balance reporting emphasizing delinquent credits.

Laureate has been working as a loan services for Silver Point since May 2004. Laureate has serviced approximately 150 loans for Silver Point, totaling approximately $300 million of outstanding debt. Laureate has been servicing loans since 1994. Today, Laureate services approximately 2,170 loans, totaling approximately $9 billion dollars of outstanding debt, for approximately 60 lenders. Standard & Poors recently gave Laureate a very favorable rating and stated that Laureate is effectively positioned "as a highly capable commercial primary loan servicer" in its service evaluation dated July 20, 2006. In addition, Laureate is audited annually by the audit department of its parent BB&T Corp., a financial holding company with almost $100

billion in assets. The audit staff has documented Laureate's compliance with the minimum servicing standards identified by the Mortgage Bankers' Association Uniform Single Attestation Program for Mortgage Bankers.

Laureate handles all administrative and financial aspects of managing performing, sub-performing and non-performing loans within Silver Point's portfolio. Specifically, Laureate issues billing notices, collects the payments from Borrowers, remits collections directly to lenders (or, where applicable, investors), and issues reports on payments to Silver Point. In addition, Laureate also is responsible for tracing UCC expirations, real estate tax delinquencies, and insurance coverage for each improved collateral property. As mentioned above, Silver Point actively monitors collections through mid-month and month-end delinquency reports, as well as trial-balance reporting emphasizing delinquent credits, produced by Laureate.

The Debtors and Committees expect that any successful bidder, if other than Silver Point, will have similar loan servicing capabilities, and overbidders will provide evidence of their capabilities and experience in conjunction with sale procedures.

**5.**      **The Sale of the FTDF Assets is in the Best Interests of the FTDF Estate**

FTDF believes that the proposed sale of the FTDF Assets and USACM Assets, subject to an auction process, is in the best interests of the FTDF estate and provides for the best mechanism to maximize the recovery to the FTDF investors. In order to gain comfort as to the purchase price of the FTDF Assets, the professionals of FTDF and the FTDF Committee spent considerable time and effort evaluating the ultimate recovery on the FTDF assets on a standalone basis, the timing and cost of such recovery and the myriad of risks and uncertainties inherent in achieving such recovery. After evaluating the potential range of recovery values to FTDF relative to the risks, costs and uncertainties associated with such potential recovery values, FTDF supported the FTDF Price agreed to by the Debtors for several reasons. First, the sale process eliminates the timing and collection risk inherent in the continued workout of the FTDF loans. Second, the sale process removes the dilution of recoveries to investors from the continued administrative burden associated with administering these Chapter 11 Cases and the costs of collection and work out of the FTDF loan portfolio. Third, the auction process and purchase price adjustments for principal

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    collections prior to the close of the sale is likely to provide a higher recovery than that contained in

2    the Asset Purchase Agreement. Accordingly, FTDF believes that the proposed Asset Sale

3    Transaction, subject to the auction process, provides the best means to maximize the value to the

4    FTDF investors.

5

6              **6.**      **The Sale of the USACM Assets is in the Best Interests of the USACM Estate and Direct Lenders**

7        USACM is transferring its servicing rights in 80 specifically identified loans, including

8    rights to collect servicing fees and other fees, as well as limited personal property related to loan

9    servicing.  The proposed purchase price is $500,000 out of the first $1,000,000 it collects in

10    servicing fees, after reimbursement of Silver Point's expenses.  Silver Point will also pay $50,000

11    out of the first $100,000 it collects on default rate interest payments on FTDF Assets.

     Importantly, USACM elected to retain all pre-close accrued servicing fees and related fees.

12    Thus, after the closing of the Asset Purchase Agreement ("Closing"), Silver Point will collect

13    and pay over to USACM certain amounts, including (a) all servicing fees accrued but unpaid as

14    of the Closing and (b) all late charges and default interest due, but unpaid, from borrowers as of

15    the Closing, with the exception of the proportionate default interest in respect of the FTDF

16    Assets.  In addition, Silver Point will also perform certain services on behalf of USACM's estate

17    to assist USACM in the collection of its other assets, which it has elected to retain, including exit

18    fees, extension fees, and deferred origination fees, and including collecting and remitting Prepaid

19    Interest to the USACM Trust, among others.

20        This transaction creates a mechanism for collection and servicing of Loans by an

21    experienced, well-capitalized loan servicer.  The new servicer will allow Direct Lenders a means

22    for collection of their Loans.  The new servicer will collect post-Closing servicing fees in

23    consideration of those efforts.

24        The sale of the servicing assets was linked to the sale of the FTDF Assets for two

25    reasons.  First, given that the servicing portfolio is comprised of a substantial number of non-

26    performing loans it became apparent that substitute loan servicers were not willing to service the

27    portfolio without modification of the existing loan service agreements or Lenders paying (out of

     pocket) collection costs including foreclosure and attorney fees and costs.  Linking the sale of

28

servicing rights to the sale of the FTDF Assets expanded the market for available loan servicers to include parties (like Silver Point) who are willing to perform loan servicing as a condition of purchasing the FTDF Assets at a discount to its face value. Second, buyers wanted a known, substantial amount of loans to be included in the servicing portfolio. Without that critical mass, a servicer would not know what Loans might be available for servicing after the Closing. This synergy caused the FTDF Committee to agree to an allocation of the potential Overbid that recognizes the value contributed for the servicing assets that is not reflected in the present allocation of the purchase price.

The practical alternative to the sale from the perspective of the USACM creditors was to create a servicing entity, which would require staff, facilities, and capitalization. One issue for creditors is whether such a new servicing entity would be profitable. An even more difficult issue is how the funds to operate such an entity would be obtained.

Balancing the alternatives, USACM's current management decided that a sale of the servicing assets was in the best interests of creditors, and the Unsecured Creditors Committee concurred.

### E. Intercompany Compromises.

#### 1. Settlement Between USACM and Direct Lenders

As discussed below, USACM, FTDF, USA Securities, USA Realty and the Direct Lenders Committee have reached a resolution of certain disputes between them. In order to avoid the time and costs involved in litigation of the disputes, as well as to provide more certainty to the Direct Lenders, the Direct Lenders Committee believes that it is in the best interest of the Direct Lenders to approve the compromise as incorporated in the Plan. Please note that if you object to the proposed compromise in the Plan regarding Prepaid Interest, as discussed below, you must file and pursue an objection to confirmation of the Plan to preserve your objection. Voting to reject the Plan will not be sufficient to preserve your objection.

##### a. Prepaid Interest

Prior to the Petition Date, USACM's former management made regularly made monthly payments to certain Direct Lenders regardless of whether those Direct Lenders' respective loans

60

were performing.  In the case of nonperforming loans (where borrowers failed to make timely payments), USACM used other funds in its collection account to advance payments to certain of the Direct Lenders, resulting in "Prepaid Interest" (as defined in the Plan).  The Debtors believe that the accumulated funds in its collection account came from multiple sources, including, but not limited to, the diversion of principal payments from borrowers ("Unremitted Principal"); deferred loan fees payable to USACM that were collected as part of the payments made by borrowers on certain loans; and transfers from DTDF.  Therefore, since approximately January 2003, there were a variety of funds commingled in the collection account that were used to make advance payments to certain Direct Lenders on nonperforming loans being serviced by USACM, as well as to pay interest on direct loans to USACM or to insiders.

Since the Petition Date, USACM through MFIM has continued to service loans and collect interest and principal payments from borrowers.  Some previously non-performing loans have become performing.  As a result, USACM is now receiving payments on these loans after having already advanced funds to Direct Lenders resulting in Prepaid Interest.  The Direct Lenders that previously received the advance payments are not entitled to receive their loan interest twice, which would result if interest payments on now-performing loans were passed on to those Direct Lenders.  As of September 30, 2006, USACM has collected approximately $14 million from borrowers in recovered Prepaid Interest.  As additional interest payments are collected, the amount of recovered Prepaid Interest held by USACM should continue to rise.

As part of its post-petition operations, USACM has continued to collect interest and principal payments on loans held by certain Direct Lenders.  Unrelated to such loans, individual Direct Lenders, prior to bankruptcy, received advance payments of interest (and sometimes principal) on account of non-performing loans.  Pursuant to Court orders, USACM has retained funds on account of such advance payments from the otherwise performing loans (this process has sometimes been referred to as "Netting").  As of September 30, 2006, USACM has retained approximately $18 million in Prepaid Interest on account of the Court-approved Netting process.

Debtors contend, and the Plan provides, that the Prepaid Interest constitutes property of USACM's bankruptcy estate under Section 541(a) of the Bankruptcy Code.  First, by making advance payments to Direct Lenders without receiving the underlying payments from the

61

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  borrower, the borrower became indebted to USACM for the amount USACM advanced. The

2  payments collected later from such borrowers on account of such advanced funds constitute

3  payment of that debt, and thus, are property of the estate under sections 541(a)(1) and (a)(7) of

4  the Bankruptcy Code. Likewise, the payments collected from borrowers on other loans and

5  withheld from the applicable Direct Lenders through the Court-approved Netting process are

6  estate property because they constitute a valid recoupment and/or setoff and recovery from

7  Direct Lenders who received improper payment advances from USACM's prior management.

8  Thus, the Prepaid Interest collected (and to be collected in the future) from the Netting process is

9  also property of the estate, under sections 541(a)(3) and (a)(7) of the Bankruptcy Code.

10       The Unsecured Creditors Committee has also asserted that the advance payment transfers

11  from accounts in the name of USACM resulting in Prepaid Interest may be recovered from

12  Direct Lender transferees as fraudulent conveyances, and has requested authorization to pursue

13  such litigation. This claim is supported by the fact that such transfers were made from accounts

14  in the name of USACM, and in which USACM held an interest, to Direct Lenders that were not

15  entitled to such funds (since corresponding payments had not been obtained from the respective

16  borrowers on their loans).

17       On the other hand, certain Direct Lenders have argued that recovered Prepaid Interest is

18  not property of the USACM bankruptcy estate. Rather, certain Direct Lenders have taken the

19  position (among other theories) that recovered Prepaid Interest should be held in a constructive

20  or other equitable trust for the Direct Lenders whose payments were diverted as Unremitted

21  Principal.

22       In response to this argument, the Debtors believe that individual Direct Lenders cannot

23  trace their Unremitted Principal to any Prepaid Interest amounts, as would be required under

24  applicable bankruptcy and non-bankruptcy law. First, the Unremitted Principal funds in the

25  collection account were used, not only to make advance payments to other Direct Lenders, but

26  also to make interest payments on other loans, including for USACM or USACM insiders.

27  Second, the Unremitted Principal was commingled in the collection account with other funds of

28  USACM and DTDF. Because money is fungible, Debtors believe that it is impossible for

individual Direct Lenders to trace their Unremitted Principal to any particular advance payment

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

made by USACM to a Direct Lender and, therefore, that Direct Lenders are unable to impose a trust upon any Prepaid Interest and that all Prepaid Interest constitutes USACM estate property.

### b. Surcharge

USACM has alleged that it is entitled to surcharge the Direct Lenders for payment of a portion of its professional fees, including fees of its financial advisor, MFIM, as well as its counsel, Ray, Quinney & Nebeker and Schwartzer & McPherson, for services specifically related to the Direct Lenders. Additionally, USACM has alleged that it is entitled to surcharge the Direct Lenders for payment of the fees and costs of counsel for the Direct Lenders Committee, Gordon & Silver, Ltd. under Bankruptcy Code provisions and case law holding that committee professionals should be paid from amounts distributed to their constituents. This surcharge is alleged to be in addition to any servicing fees or collection costs charged under the Loan Servicing Agreement. Throughout USACM's bankruptcy case, the Direct Lenders Committee has vigorously asserted that the Direct Lenders' loans do not constitute property of USACM's bankruptcy estate. As such, the Direct Lenders Committee has taken the position that USACM has no authority to seek reimbursement of or surcharge the Direct Lenders' loans for any of its professionals' fees and costs that are not otherwise authorized under the Loan Servicing Agreements.

### c. Recharacterization and Substantive Consolidation

Certain parties have threatened litigation seeking recharacterization of the Direct Lenders' Claims as equity investments in USACM, or to substantively consolidate them with the USACM, DTDF or FTDF estates and/or seeking substantive consolidation of the Debtors' estates.

### d. Accrued and Unpaid Loan Servicing Fees

USACM asserts that it is entitled to collect loan servicing fees that were accrued and unpaid as of the Petition Date from Direct Lenders, even those servicing fees that were deductible out of amounts that were collected on loans prior to the Petition Date.

### e. Compromise and Settlement

As a settlement and compromise of these and other disputes, the Plan provides that Direct

63

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Lenders will be released by USACM, FTDF, USA Realty and USA Securities from all Claims (except as to Prepaid Interest), including but not limited to surcharge, recharacterization of Direct Lender Loans, and the collection of pre-petition accrued annual loan servicing fees due under Loan Servicing Agreements but unpaid as of the Effective Date directly from Direct Lenders.  In exchange for this release, Direct Lenders will acknowledge and agree that the Prepaid Interest constitutes an asset of the USACM Estate or, to the extent necessary, will transfer their ownership rights, if any, in recovered Prepaid Interest to the USACM estate.  The Netting process to recover Prepaid Interest from loan collections will be continued by any subsequent loan servicer.  Any Direct Lender who does not consent to being bound by this acknowledgement and agreement must object to confirmation of the Plan.  USACM believes that such objection would necessarily require the objecting party to present sufficient evidence to trace any of its Unremitted Principal to assets of the USACM estate.

All of the Debtors and their respective Estates agree under the settlement not to surcharge the Direct Lenders for the administrative fees and costs of their professionals.  USACM further agrees to limit the amount of reimbursement it seeks for payment of the counsel for the Direct Lenders Committee solely from the 2% Holdback to a maximum amount of $605,000.  All fees and costs of counsel for the Direct Lenders Committee incurred above the $605,000 amount shall be paid by the estate of USACM and not the Direct Lenders.  The $605,000 shall be allocated among the Holdbacks from Direct Lenders on a pro-rata basis based upon the unpaid principal balance of their loans as of the Petition Date.

The compromise further provides that USACM retains the maximum amount of servicing fees provided for in Loan Service Agreements. Lenders with "up to" x% in annual loan servicing fees will be charged that x% amount, but the reimbursement of the Allowed Professional fees and costs of the Direct Lender Committee comes out of those fees.  Direct Lenders with 1% or less annual servicing fees will share in the reimbursement of the Allowed Professional fees and costs of the Direct Lender Committee and the balance of their 2% Holdback will be returned.  In addition, USACM agrees that the Direct Lenders are not responsible for annual loan servicing accrued as of the Petition Date but unpaid as of the Effective Date.

**2.      Settlement Between FTDF and USACM**

64

As described below, FTDF and USACM have reached a global settlement on the numerous disputes between them. While each of these compromises is described separately, no one compromise can be consummated without the other. In order to avoid the time and costs of protracted litigation on one or more of these disputes, FTDF and USACM believe that it is in the best interests of their respective estates for the Plan, which contemplates the settlements described below, to be approved.

           **a.**       **Fees and Expenses Incurred by USACM as FTDF's Loan Servicer**

USACM currently acts as FTDF's loan servicer under the terms of the FTDF Loan Servicing Agreement, executed by and between USACM and FTDF. In exchange for USACM servicing FTDF's loan portfolio, FTDF has the following obligations: (i) payment of a servicing fee up to 3% per annum of the maximum principal amount of each of FTDF's Loans and (ii) reimbursement for FTDF's proportionate share of USACM's out-of-pocket expenses incurred in connection with foreclosure proceedings, including attorney's fees, trustee's fees and foreclosure costs (collectively, the "Sevicer Advances"). Under the terms of the loans serviced by USACM, it is standard practice for the borrower to be responsible for all costs of foreclosure and for USACM to seek reimbursement of Servicer Advances from such borrowers, which could then be remitted to FTDF and other Direct Lenders.

Prior to the Petition Date, USACM, however, never collected more than a 1% servicing fee from FTDF. From the Petition Date through June 2006, USACM continued to collect a 1% servicing fee from FTDF. Thereafter, pursuant to the Modified Order Authorizing Interim Distributions and Holdbacks [docket no. 1424], USACM has collected a 3% servicing fee from FTDF. FTDF and USACM dispute the amount of the servicing fee that should be collected from FTDF.

In connection with the Servicer Advances, while USACM did not seek the reimbursement from FTDF of any such advances it incurred prior to the Petition Date, it has since sought reimbursement from FTDF for certain Servicer Advances incurred after the Petition Date. Most recently, FTDF has been charged with its proportionate share of real estate appraisals related to the FTDF loan portfolio. In addition, USACM has put FTDF on notice that it intends to seek

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

65

reimbursement of other Servicer Advances associated with foreclosure proceedings, including the fees and expenses incurred by certain professionals USACM has hired to handle such foreclosures. As described below, FTDF questions whether it should be responsible for reimbursing Servicer Advances when it is already paying its share of the Debtors' professional fees and expenses in accordance with the FTDF Debtors' Professionals' Fee/Cost Allocation (see below).

As part of the parties' overall settlement, FTDF and USACM have reached an agreement on the amount of FTDF's servicing fee and FTDF's obligation to reimburse Servicer Advances. In connection with the servicing fee, FTDF shall be charged a 1% servicing fee for the period of the Petition Date through June 30, 2006. Thereafter, commencing on July 1, 2006 and ending on the earlier of January 31, 2007, or the Effective Date, FTDF shall be charged a 2.5% loan servicing fee. Finally, to the extent any prepetition servicing fees remain outstanding, such fees shall be waived in full by USACM.

Second, with respect to Servicer Advances, FTDF shall pay its proportionate share of all Servicer Advances incurred by USACM prior to the close of the Asset Sale Transaction; provided, however, that, if FTDF pays its Debtors' Professionals' Fee/Cost Allocation (described below), FTDF shall not then be responsible for reimbursing Servicer Advances incurred by the Debtors' professionals, except solely for Servicer Advances for those professionals who actually perform foreclosure work, excluding USACM's bankruptcy professionals. Furthermore, should USACM receive payment from any source for Servicer Advances that have been previously paid by FTDF, then USACM shall reimburse FTDF for such Servicer Advances paid by FTDF. Both USACM and FTDF believe that the compromise on FTDF's payment of the servicing fee and Servicer Advances far outweigh the risks and costs of litigating these disputes.

### b. Management Fee

As described above, USA Realty was the nominal manager of FTDF under the terms of the FTDF Operating Agreement and another of the Debtors, USACM, acted as the loan servicer. The management duties included investing funds, hiring and paying professionals, preparing tax returns, and other duties. Pursuant to the FTDF Operating Agreement, USA Realty is entitled to collect the FTDF Management Fee equal to 1.5% per annum of FTDF's assets under management.

1  Since the Petition Date, FTDF has incurred approximately $78,000 per month for the FTDF

2  Management Fee. As FTDF asserts that it realizes little benefit from the FTDF Management Fee

3  and is already being allocated its share of the Debtors' professional fees and expenses, FTDF

4  believes that it should not be responsible for paying the FTDF Management Fee.

5       In consideration of the fees and expenses already charged to the FTDF estate, the parties

6  have agreed that the FTDF Management Fee shall be waived in full for both prepetition and

7  postpetition periods, through the earlier of January 31, 2007, or the Effective Date. Any

8  management fees paid by FTDF to USACM since the Petition Date shall be applied to reduce the

9  obligations of FTDF to USACM under the Plan, and any remaining management fees shall be

10 repaid by USACM to FTDF. Management fees from July 2006 until the Effective Date shall be

11 deposited in the USA Realty account and transferred to FTDF on the Effective Date. As part of

12 this compromise, FTDF agrees to subordinate its claim in USA Realty to the claims of other

13 unsecured creditors.

14             c.       **Debtors' Professional Fees and Expenses**

15      FTDF, as one of the Debtors, shares responsibility for the administrative costs of these

16 Chapter 11 Cases. Since the Petition Date, the Debtors' professionals have allocated their fees and

17 expenses among the five Debtors' estates. In September 2006, the Unsecured Creditors'

18 Committee objected to the allocation of the Debtors' professional fees and expenses through July

19 31, 2006, arguing that FTDF and DTDF should bear more of the burden. To resolve this dispute,

20 the parties have agreed that FTDF shall be responsible for a flat amount on a monthly basis for its

21 share of these fees and expenses. FTDF's Debtors' Professionals' Fee/Cost Allocation shall be

22 $125,000 per month commencing on the Petition Date and ending on the earlier of January 31,

23 2007, or the Effective Date. Such agreement will not affect the ultimate allowance of fees and

24 costs of Debtors' professionals, but only the allocation of payment of such fees and costs between

25 FTDF and USACM.

26             d.       **Claims Asserted By and Between USACM and FTDF**

27      Like other Direct Lenders, FTDF was also a victim of USACM's pre-petition management

28 practices. First, USACM failed to remit $347,775 from principal collected on FTDF's loans to

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

FTDF, resulting in a FTDF Unremitted Principal Claim in the amount of $347,775. Second, USACM paid to FTDF certain amounts that it had never collected from FTDF loan borrowers. In fact, prior to the Petition Date, FTDF had received $2,557,307 in "pre-paid interest" (the "FTDF Prepaid Interest"). USACM has subsequently netted this pre-paid interest against amounts collected post-petition in connection with the FTDF loan portfolio. The FTDF Prepaid Interest is now being held in the USACM Collection Account. Third, FTDF asserts a general unsecured claim against USACM for its failure to fulfill its fiduciary duties, among others, under its Loan Servicing Agreement and FTDF Operating Agreement, which is referred to as the FTDF Unsecured Claim.

As part of the global settlement between USACM and FTDF to avoid the costs and risks associated with litigating these issues, the parties have agreed to recognize each of the above claims, which will receive the following treatment under the Plan. The FTDF Unremitted Principal Claim will be allowed as a USACM Unsecured Claim in the amount of $347,775, which FTDF will transfer to DTDF as part of its compromise with DTDF (see below). With respect to the FTDF Prepaid Interest being held in the USACM Collection Account, USACM, on the Effective Date of the Plan, shall be permitted to retain the FTDF Prepaid Interest as an unencumbered asset of the USACM estate. Finally, the amount of FTDF's general unsecured claim against USACM (the "FTDF Unsecured Claim") shall be allowed in either (i) the amount as agreed to by FTDF and USACM on or before the Confirmation Hearing, or (ii) if no agreement is reached by such date, the amount determined by the Court after an evidentiary hearing. If such a compromise is reached, the details of the compromise will be posted on the USACM website at usacapitalcorp.com. The Debtors will request that the Court approve such compromise at the confirmation hearing.

e. **Allocation of the Overbid, Break-Up Fee, and Expense Reimbursement**

In order to maximize the value of their respective estates, USACM and FTDF agreed to jointly sell their assets, subject to an auction process, as described above. The Court has entered an order approving certain protections for Silver Point, who agreed to become the lead bidder, and establishing certain guidelines for the auction. The Court order provides that, under specified

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

circumstances, the Silver Point will be entitled to the break-up fee of $1,500,000 (less the amount of any expense reimbursement already paid) or an expense reimbursement of up to $500,000.

The parties have agreed that only the estates of USACM and FTDF shall be liable for the break-up fee or expense reimbursement. Furthermore, USACM and FTDF have agreed that their estates shall share in any overbid in the same proportion or in the same manner as they share in the liability for the break-up fee or the expense reimbursement. The allocation shall be 85% to FTDF and 15% to USACM for any overbid consideration, and any incurred break-up fee or expense reimbursement obligation (as those terms are used in the Asset Purchase Agreement) shall be allocated in the same percentages, except as otherwise provided in the Stipulation memorializing the agreement between USACM and FTDF on the overbid allocation filed by the USACM Committee and the FTDF Committee with the Court, under seal, and served on the Debtors as confidential information, no later than ten (10) days prior to the Auction.

> **f.** **January 31, 2007 as the Termination Date of the FTDF/USACM Compromise**

USACM and FTDF both recognize that their overall compromise is very time sensitive and have agreed on an outside date by which their settlement agreement must be implemented. By entering into this settlement, the parties are not foregoing any of their respect rights in connection with the compromises reached on FTDF's payment of servicing fees, Servicer Advances, the FTDF Management Fee, or the FTDF's Debtors' Professionals Fee/Cost Allocation should the Effective Date of the Plan not occur by January 31, 2007. In that event, the parties' settlement regarding FTDF's payment of servicing fees, Servicer Advances, the FTDF Management Fee, and the FTDF's Debtors' Professionals Fee/Cost Allocation shall no longer be enforceable as of February 1, 2007, and USACM and FTDF shall have reserved all of their rights with respect thereto for all periods after January 31, 2007, including the right of USACM seek a Court order to compel FTDF's payments of such fees for all time periods after January 31, 2007.

> **g.** **FTDF Litigation Claims**

To the extent there exist any FTDF Litigation Claims, such claims (except for non-assignable FTDF Litigation Claims which are to be transferred to DTDF) shall be transferred to the USACM Trust. FTDF does not believe that any such Litigation Claims exist, other than

69

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

potential claims against non-Debtor insiders which would be similarly held by USACM and transferred to the USACM Trust, in which FTDF will share recoveries due to the FTDF Unsecured Claim.  However, in the event that distinct FTDF Litigation Claims are later determined to exist, FTDF will share in any proceeds of the FTDF Litigation Claims, pro rata, through the FTDF Unsecured Claim against USACM.

### 3.    Settlement Between FTDF and DTDF

As described below, FTDF and DTDF, through their respective committees, have reached a settlement regarding DTDF's threatened litigation to seek the re-characterization of all loans serviced by USACM, including the FTDF loan portfolio, as property of the Debtors' estates and the substantive consolidation of the Debtors' estates.[8]

Under the re-characterization argument, DTDF seeks to pool all loans together into one collective pot, from which all Direct Lenders, including the FTDF, would share, pro rata, based on the amount of their respective original investment.  In this scenario, FTDF, rather than looking solely to the FTDF loan portfolio for recovery, would be just one of many Direct Lenders asserting a claim against the common pool of loans.  Thus, while FTDF would be able to seek recovery from a larger asset pool, the number of claims against that asset pool would also be significantly greater.  On the other hand, if only the Debtors' estates were substantively consolidated together, all assets and liabilities would become part of the same estate, resulting in all of the Debtors' constituencies (excluding Direct Lenders) seeking recovery from a much smaller, single pot of assets.  As the Bankruptcy Code dictates that general unsecured claims must be paid before equity interests, substantive consolidation would delay and potentially reduce recovery to holders of FTDF equity interests.

In analyzing the ramifications of re-characterization with respect to FTDF's anticipated recovery, the FTDF Committee believes that re-characterization, in and of itself, would only have a minor negative impact on the expected recovery for holders of FTDF equity interests.  While the effect of substantive consolidation of only the Debtors' estates on the FTDF recovery is much more meaningful, the FTDF Committee believes the Court is not likely to grant this relief.

---

8    DTDF first asserted its claims for re-characterization and substantive consolidation in opposing USACM's Motion for Interim Distributions.  In approving the Motion for Interim Distributions, the Court did so without

70

Litigation, however, is not without its own costs. Litigation is very expensive and would increase the administrative burden of these Chapter 11 Cases. Moreover, any litigation with respect to claims for re-characterization or substantive consolidation would necessarily delay recovery to holders of FTDF equity interests. Distributions could not be made to any of the Debtors' constituencies, let alone holders of FTDF equity interests, until the litigation had been resolved. After taking into account the cost and delay of DTDF litigating its claims for re-characterization and substantive consolidation, FTDF, with the support of the FTDF Committee, believes it is in the best interests of the FTDF estate to settle this threatened litigation. The terms of this settlement are described below. Like the FTDF/USACM compromise, the parties negotiated this settlement as a whole, and no one compromise can be consummated without the other.

### a.     FTDF Payment to DTDF and Terms of Repayment

On the Effective Date, FTDF shall pay to DTDF $500,000. In addition, FTDF shall also pay an additional sum of up to $500,000 from 50% of any overbid increment actually paid and allocated to FTDF, after taking into consideration any break-up fee (including any expense reimbursement) paid by FTDF (together with the $500,000 payment, the "FTDF Payment"). In other words, the minimum amount of the FTDF Payment is $500,000, which can only be increased to the extent that FTDF actually receives additional consideration from the sale of the FTDF Assets. FTDF will evenly split this potential "upside" with DTDF until DTDF receives an additional $500,000.

DTDF shall have no obligation to repay the FTDF Payment until holders of DTDF equity interests have received the same recovery as holders of FTDF Equity Interests, which is defined as the FTDF Base Recovery Percentage in the Plan. Upon achieving the FTDF Base Recovery Percentage (not as adjusted below), DTDF shall repay $500,000 of the FTDF Payment. The repayment of the remaining amount of the FTDF Payment shall be based on the adjusted FTDF Base Recovery Percentage, which means the percent recovery that DTDF or post-Effective Date DTDF must reach after the adjustment for an annual increase, made on each anniversary of the Effective Date, of an additional $5 million to DTDF's investment in order to achieve the FTDF Base Recovery Percentage (the "Adjusted FTDF Base Recovery Percentage"). Upon achieving

prejudice to the rights of any party in interest. As a result, DTDF has reserved all of its rights with respect to

71

the Adjusted FTDF Base Recovery Percentage, DTDF shall repay the balance of the FTDF Payment.

### b. Transfer of FTDF Assets and Claims to DTDF

As further consideration of the parties' settlement, FTDF will transfer to DTDF its interest in the Bysynergy Loan, the FTDF Unremitted Principal Claim, and the proceeds of certain non-assignable actions, which include FTDF's right to pursue certain tort actions against USA Realty, USA Securities and USACM (the "FTDF Transferred Assets"). DTDF, not FTDF, shall bear the costs of pursuing the recovery on the FTDF Transferred Assets.

### c. FTDF General Unsecured Claim Subordination

Finally, FTDF will transfer its pro-rata share of recoveries from its interests as a beneficiary in the USACM Trust to DTDF until the allowed DTDF equity interests receive a recovery of 85% on their investment in DTDF from all sources of recovery allocated to the DTDF and Post-Effective Date DTDF (the "DTDF 85% Recovery"). After the DTDF 85% Recovery is reached, FTDF will retain its pro-rata share of recoveries from its interests as a beneficiary in the USACM Trust.

### 4. USA Realty/FTDF Settlement

FTDF and USA Realty have reached a settlement of intercompany claims under the Plan. FTDF has agreed to subordinate its claims against USA Realty to the claims of all other unsecured creditors. In exchange, USA Realty has waived management fees due from FTDF to USA Realty prepetition and has agreed to the repayment of postpetition management fees by USACM (who actually received those fees postpetition) to FTDF.

### 5. USA Realty/DTDF Settlement

DTDF and USA Realty have reached a settlement of intercompany claims under the Plan. DTDF has agreed to subordinate any allowed unsecured claim it has over $50 million to the claims of all other unsecured creditors. In exchange, USA Realty has waived management fees

asserting claims for re-characterization and substantive consolidation.

72

due from DTDF to USA Realty prepetition and has agreed to consent to any settlement reached between DTDF and USACM on the postpetition management fees which were actually received by USACM.

### 6. Remaining Disputes Between USACM and DTDF.

Despite substantial efforts among the USACM Committee and the DTDF Committee, these two Committees have been unable to reach agreement on a resolution of the disputes between USACM and DTDF. These parties will continue to attempt to settle the remaining disputes prior to the Confirmation Hearing. If any such settlements are reached, the details of such settlement(s) will be posted on the USACM website at usacapitalcorp.com. The Debtors will request that the Court approve such settlements at the confirmation hearing. The disputes between USACM and DTDF primarily consist of the following:

   a.   The allowed amount of the DTDF general unsecured claim against USACM.

   b.   The allocation of the USAIP $58 Million Promissory Note as between USACM and DTDF.

   c.   The assignment of priority (i.e., first priority liens or second priority liens) of the collateral pledged by USAIP for both the DTDF 10-90, Inc. Loan and the IP Security Agreement. (The IP Security Agreement is dated May 31, 2006 and was made by USAIP in favor of USACM, DTDF, FTDF, USA Securities and USA Realty as modified by the Order Approving the Agreement with Investment Partners entered by the Bankruptcy Court on July 24, 2006.)

   d.   USACM's right to recovery from DTDF of $4,641,402 in Prepaid Interest, given DTDF's claims against USACM, including for Diverted (or Unremitted) Principal, and the possibility of offsetting such claims.

   e.   DTDF's payment of the approximately $124,000 per month

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

management fee to USA Realty, which management fee is then paid over by USA Realty to USACM.

    f.  The refund of the 2% Holdback to DTDF and the payment by DTDF of a one percent (1%) servicing fee to USACM for both the prepetition and postpetition periods.

    g.  The amount and payment of DTDF's share of the professional fees and costs incurred by the Debtors' professionals in the USACM Estate commencing on the Petition Date. The USACM Committee and the DTDF Committee will continue to work to settle these disputes.  If these Committees are unable to resolve these disputes in whole or in part, the USACM Trust and the Post Effective Date DTDF will litigate these disputes after the Effective Date.

**F.  Release and Limitations of Liability**

  Under the Plan, certain releases are provided as follows:  (a) among the Direct Lenders, on the one hand, and USACM and FTDF (and their Estates), on the other hand; (b) FTDF and DTDF; (c) FTDF and USACM; and (d) FTDF and USA Realty.  In addition, the Plan provides for the limitations of liability for professionals, committees and certain other parties for services provided in the Chapter 11 Cases, including preparation of and confirmation of the Plan.

**G.  Post-Effective Date Entities**

**1.  FTDF, USA Realty, and USA Securities After the Effective Date**

  On and after the Effective Date, FTDF, USA Realty and USA Securities will have the authority to effect all transactions and take all actions required by the Plan.  In particular, FTDF and the FTDF Committee shall each have authority to prosecute (a) claim objections in the FTDF Estate, and (b) the non-assignable FTDF litigation claims on behalf of FTDF subject to the compromise with DTDF discussed above.  After the actions set forth in this paragraph are completed, FTDF, USA Realty, and USA Securities shall be dissolved in accordance with the

74

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Confirmation Order and applicable state law.

### 2. The USACM Trust

The USACM Trust will be created pursuant to a trust agreement, the form of which will be submitted to the Court at least ten (10) days prior to the commencement of the Confirmation Hearing. The USACM Trust will hold title to all assets of USACM not collected or not disposed of prior to the Effective Date including such things as accounts, notes or receivables of USACM (including USACM estate's share of the USAIP $58 million Promissory Note), all litigation claims including claims against non-debtor insiders belonging to or assertable by the USACM Estate, and all servicing and related fees to be retained by USACM as set forth in the Asset Purchase Agreement. The purpose of the USACM Trust is to realize assets that can be liquidated with net proceeds disbursed to its beneficiaries. The beneficiaries will include all unsecured claims against USACM that have been allowed, including allowed unremitted principal claims, and the unsecured claims of DTDF, FTDF and the Direct Lenders.

### 3. The Post-Effective Date DTDF

The post-Effective Date DTDF will be created by an amendment to the current DTDF operating agreement. This agreement will be amended to, among other things, reflect the appointment of an officer to manage the affairs of DTDF after the Effective Date, to provide for any oversight and replacement of such officer, and to reflect the fact that the charge of such officer will be to liquidate the assets of DTDF for the benefit of the equity holders of DTDF. The form of such amendment will be submitted to the Court at least ten (10) days prior to the commencement of the Confirmation Hearing. The post-Effective Date DTDF will hold title to all assets of DTDF not collected or not disposed of prior to the Effective Date including such things as the DTDF loans, certain assets transferred by FTDF to DTDF, all litigation claims including non-debtor and professional litigation held by or assertable by DTDF, and the DTDF estate's share of the USAIP $58 million Promissory Note. The purpose of DTDF after the Effective Date is to realize assets that can be liquidated with net proceeds disbursed to its beneficiaries, which include all of the equity interests in DTDF that have been allowed, and recoveries from litigation.

### 4. The Litigation Against Non-Debtor Insiders

75

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

The USACM, FTDF and DTDF bankruptcy estates have rights, claims and causes of action among their assets, defined in the Plan as "Litigation Claims." The FTDF estate transfers its non-assignable Litigation Claims to the DTDF estate under a settlement between them, and these FTDF causes of action and DTDF causes of action are transferred by the plan to DTDF after the Effective Date. The causes of action held by USA Realty including causes of action for breach of fiduciary duty, bankruptcy avoidance actions, and others against any non-debtor insiders are also transferred by the Plan to DTDF as part of a compromise between those entities. A subcategory of Litigation Claims is the non-debtor insider and litigation, which generally consists of all of the claims that exist against the insiders of the Debtors, including but not limited to those that can be asserted against Joseph D. Milanowski, Thomas A. Hantges, Paul S. Hamilton, USAIP, and all persons and entities related to or affiliated with those persons and entities who may have improperly received direct or indirect transfers of property of the Debtors, or aided and abetted such wrongdoing. The claims against these individuals and entities are extensive, and may include, but are not necessarily limited to, the following causes of action: (1) breach of contract, (2) breach of fiduciary duty, (3) usurpation or theft of business opportunities, (4) conversion; (5) negligence, (6) mismanagement, (7) an accounting, (8) fraud, (9) fraudulent inducement, (10) negligence misrepresentation, (11) fraudulent conveyance, (12) equitable contribution, (13) equitable indemnity, and (14) securities violations. The Unsecured Committee and DTDF Committee expect that the USACM Trust and DTDF will agree on terms of a joint prosecution agreement to pursue these causes of action. The Plan provides for such a joint effort, and that the net recoveries will be shared among the USACM Trust beneficiaries and DTDF investors, without further court approval.

**5. Post-Effective Date Administrators and Advisory Committees.**

The USACM Trust and DTDF will each be separately managed by an estate administrator and chief executive officer, respectively, and by an advisory committee, unless otherwise agreed to by the DTDF Committee and the unsecured creditors of USACM. The estate administrator for the USACM Trust will be also be its trustee, a person proposed by the Committee for the unsecured creditors of USACM (the "USACM Trustee"). The chief executive officer for DTDF will be a person proposed by the DTDF Committee (the "DTDF Administrator"). The retention of both of the estate administrators must be approved by the Court at the Confirmation Hearing.

The advisory committees for the USACM Trust will be will be comprised of five persons, who will be named in the Plan Supplement and available for review at least ten (10) days before the deadline for Plan objections. The Committees for DTDF and the Direct Lenders will each appoint one of the five, and the Committee for the unsecured creditors of USACM will appoint the other three. In the event of a vacancy, the resigning member will appoint a replacement. The advisory committee for DTDF will be named in a supplement to the Plan well.

In their capacity as estate administrators, the USACM Trustee and DTDF Administrator will assume responsibility for administrative expense and claims objections, Plan distributions, and other aspects of implementing the Plan for their respective bankruptcy estates. The USACM Trustee may assume such responsibility for those duties for the USA Realty and USA Securities estates, and certain of the foregoing responsibilities for FTDF, as well. They will also be responsible for liquidating the assets transferred to the USACM Trust and DTDF, which includes pursuing Litigation Claims, paying the costs of such litigation and administration of the USACM Trust and DTDF, respectively, and distributing net proceeds in accordance with the Plan. The USACM Trustee and DTDF Administrator may engage lawyers, accountants and other professionals, who may be professionals for existing Committees. The estate administrators and advisory committees will continue in their capacities until the assets of the USACM Trust and Post-Effective Date DTDF, respectively, have been liquidated and all distributions have been made in accordance with the Plan.

**H. USACM's Pension Plan**

USACM established and maintains a pension plan for certain of its employees known as the USA Commercial Mortgage Company Defined Benefit Pension Plan (the "Pension Plan").

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), (29 U.S.C. § 1301 et seq.). On October 20, 2006, the Court entered an order freezing the Pension Plan and approving the appointment of USACM as the successor trustee for the Pension Plan.

The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. The PBGC asserts that USACM and all members of its controlled group are obligated to contribute to the Pension Plan the amount necessary to satisfy ERISA's minimum funding standards under ERISA section 302 and Internal Revenue Code section 412, and that the Pension Plan may be terminated only if the statutory requirements of either ERISA section 4041, 29 U.S.C. section 1341, or ERISA section 4042, 29 U.S.C. section 1342, are met. The PBGC further asserts that if the Pension Plan terminates, USACM and all members of its controlled group will be jointly and severally liable for the unpaid minimum funding contributions, premiums, and unfunded benefit liabilities of the Pension Plan.

The PBGC has informed Debtors that it intends to file in the bankruptcy cases estimated claims for unfunded benefit liabilities, contingent on plan termination, and claims for unpaid minimum funding contributions and premiums under the Pension Plan. The PBGC also asserts that it is entitled to administrative priority for certain amounts of its claims under 11 U.S.C. sections 507(a)(2), 507(a)(5) and 507(a)(8). The Debtors currently do not know what amounts the PBGC will claim as an administrative priority, but the Debtors contend the right of the PBGC to an administrative priority claim is limited under applicable bankruptcy law. Further, the Debtors are evaluating whether the PBGC has any claims against the estates, and do not know whether the PBGC has valid claims.

The PBGC alleges that unless the Pension Plan has been terminated prior to the effective date of the plan of reorganization, Debtors' liability to the Plan under ERISA, or their liability to the PBGC with respect to the Plan, will not be affected in any way by this reorganization proceeding, confirmation of the Plan of Reorganization, or discharge in bankruptcy. USACM does not necessarily agree with the PBGC's assertion.

**I.      Binding Nature of the Plan and Injunction Included in Plan**

As provided in section 1141(a) of the Bankruptcy Code, upon entry of the Confirmation

Order, the Plan shall bind the Debtors, all entities that are to acquire any property either directly or indirectly under the Plan, and all holders of claims and interests, including the Direct Lenders, whether or not their claims and/or interests are impaired under the Plan and whether or not they have accepted the Plan.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 cases under section 105 or 362 of the Bankruptcy Code or that are otherwise existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date of the Plan.

While under section 1141(d) of the Bankruptcy Code one or more of the Debtors may not qualify for a discharge, all parties (including all holders of claims and/or interests) bound by the Plan pursuant to section 1141(a) of the Bankruptcy Code will be permanently enjoined, on and after the Effective Date of the Plan, from:

(i)     commencing or continuing in any manner any action or other proceeding of any kind;

(ii)    enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order;

(iii)   creating, perfecting, or enforcing any encumbrance of any kind;

(iv)    asserting any right of setoff, subrogation, or recoupment of any kind against the Debtors, their estates, the USACM Trust and DTDF or their assets or their estate representatives, with respect to or on account of any such claim or interest; and

(v)     taking any action that would interfere with the consummation of the Plan.

## X.     ALTERNATIVES TO THE PLAN AND LIQUIDATION ANALYSIS

### A.     Alternatives to the Plan

The Debtors have carefully considered all reasonable alternatives to the organized liquidation that was selected and is set forth in the Plan.  During the first several months of these cases, the Debtors diligently sought to obtain post-petition financing that might have allowed USACM to reorganize and remain in business as a loan originator and loan servicer.  However, after the Debtors' unsuccessful attempts to obtain Court approval for two different term sheets for

79

1   post-petition financing from two reputable lenders, the Debtors were unable to obtain further

2   reasonable proposals from potential lenders for such financing. The Debtors then diligently

3   marketed the significant assets available for sale to various potential acquirers, and the result of

4   those intensive efforts is the Asset Purchase Agreement with Silver Point, and the final auction

5   process that will bring forth the highest and best offer to acquire the assets of USACM and FTDF

6   identified for sale pursuant to the Plan. Further, extensive negotiations with the different

7   Committees resulted in the proposed structure for the organized liquidation of remaining assets

8   and the potential recovery of other assets that is also carried out through the Plan.

9       The Debtors believe that if the Plan is not confirmed, a reasonably likely alternative is that

10  the cases will be converted to liquidation cases under Chapter 7 of the Bankruptcy Code. As

11  discussed below, the Debtors believe that the Chapter 7 alternative is not in the best interest of any

12  of the creditors, equity interest holders, or other parties in interest in these cases.

13          **B.      Liquidation Analysis and Best Interest of Creditors Test**

14      Pursuant to section 1129(a)(7) of the Bankruptcy Code, for the Plan to be confirmed it

15  must provide that creditors and holders of equity interests will receive at least as much under the

16  Plan as they would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code

17  (the "Best Interest Test"). The Best Interest Test with respect to each impaired class requires that

18  each holder of a claim or equity interest of such class either (a) accepts the plan or (b) receives or

19  retains under the Plan property of a value, as of the Effective Date, that is not less than the value

20  such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the

21  Bankruptcy Code. The Court will determine whether the value received under the Plan by the

22  holders of claims in each class of creditors or equity interests equals or exceeds the value that

23  would be allocated to such holders in liquidation under Chapter 7 of the Bankruptcy Code. The

24  Debtors believe that the Plan meets the Best Interest Test and provides value that is significantly

25  greater than that which would be recovered by each such holder in a proceeding under Chapter 7

26  of the Bankruptcy Code.

27      The chart attached hereto as *Exhibit 4* provides a preliminary liquidation analysis

28  ("Liquidation Analysis") for each of the five Debtors and, based on certain assumptions discussed

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

80

below, supports the conclusion that a hypothetical liquidation under Chapter 7 of the Bankruptcy

Code would return less value to each holder of a claim or equity interest in each class under the

Plan than would the proposed distributions to be made under the Plan.  Further analysis, including

calculation of recovery values under the Plan versus the Chapter 7 liquidation alternative, will be

provided after all proofs of claim filed by the November 13, 2006, bar date are reviewed.

**C.    General Assumptions for the Liquidation Analysis**

The following general assumptions were made in preparing the Liquidation Analysis for

each of the five Debtors.

1.    The Liquidation Analysis was prepared in accordance with section

1129(a)(7)(A)(ii) of the Bankruptcy Code to determine whether the Plan is in the interests of the

Debtors' estates and creditors.

2.    The Liquidation Analysis is based upon a number of estimates and assumptions

that, although considered reasonable by the Debtors, are subject to economic, business,

governmental regulation and contingencies beyond the control of the Debtors.  Accordingly, no

assurances can be made.  The Liquidation Analysis is subject to change.  Nothing contained herein

shall be used as an admission against the Debtors or any other person.

3.    The Liquidation Analysis utilizes the Debtors' unaudited financial statements as of

July 31, 2006, and other figures estimated by the Debtors as a basis for determining liquidation

values.

4.    The Liquidation Analysis assumes a conversion to Chapter 7 on November 15,

2006.

5.    The Liquidation Analysis does not quantify potential legal causes of action, which

may include, without limitation, proceeds of avoidance actions as well as claims of the Debtors

against third parties.

81

1

**D.    Notes to the Liquidation Analysis**

2    The following notes apply to the Liquidation Analysis for each of the five Debtors that is

3    attached hereto as *Exhibit 4.*  The notes below relate to specific asset categories identified in the

4    Liquidation Analysis and correspond to the "Note Reference" column in that analysis.

5    A.  Cash and Cash Equivalents: Estimated recovery of Cash and Cash Equivalents on
     hand is assumed to be 100%.  The Liquidation Analysis assumes that the Debtors will
6    be entitled to any applicable servicing and interest revenue earned until 11/15/06.

7    B.  Investments in Loans: Estimated recoveries for Investments in Loans are based
     upon a loan by loan recovery analysis and current management estimates.  These
8    recoveries are allocated in accordance with the loan documents.

9    C.  Principal in Collection Account:  Estimated recovery of Principal in Collection
10   Account is assumed to be 100%.

11   D.  Accounts Receivable: Estimated recoveries for Accounts Receivable are based
     upon current management estimates.
12
     E.  Prepaid Interest: The Liquidation Analysis assumes that the Court will allow
13   USACM to retain Prepaid Interest (both the uncollected amounts and the funds in
     collection account).
14

15   F.  Notes Receivable: Estimated recoveries for Notes Receivable are based upon
     current management estimates.
16
     G.  Prepaid Expenses: The Liquidation Analysis assumes no recovery for Prepaid
17   Expenses.

18   H.  Property, Plant & Equipment: Estimated recoveries for Property, Plant &
     Equipment are based on appraisals and current management estimates.
19

20   I.   Other Assets:  Estimated recoveries for Other Assets are based upon current
     management estimates.
21
     J.  Administrative Claims:  Estimated based on management's current estimates of
22   operating costs, Chapter 7 trustee and professional fees, and Chapter 11 professional
     fees.
23

24   K.  Secured Claims: Based on scheduled claims (none scheduled)

25   L.  Priority Claims: Based on 105% of scheduled claims

26   M.  Unsecured Claims: Based on scheduled claims plus estimated deficiency claims

27   N.  Equity Interests: Based on total equity as reported on the July 31, 2006 balance
     sheet, net of restructuring charges and reserves

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

82

1    **XI.    PLAN FEASIBILITY**

2    The Bankruptcy Code requires that in order to confirm the Plan, the Court must find that

3    confirmation of the Plan is not likely to be followed by a further liquidation or need for further

4    financial reorganization of the Debtors (the "Feasibility Test").  For the Plan to meet the

5    Feasibility Test, the Court must find that the Debtors will possess the resources and working

6    capital necessary to meet their obligations under the Plan.

7    The Debtors believe that the structure set forth in the Plan, as discussed above, provides a

8    feasible framework for the recovery of certain claims and assets held by the Debtors and an

9    orderly, phased liquidation of the Debtors and their assets, and that confirmation of the Plan is not

10   likely to be followed by any further liquidation or reorganization of the Debtors.

11   **XII.   POTENTIAL MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

12

13   PROVIDED BELOW IS A SUMMARY DESCRIPTION OF CERTAIN UNITED

14   STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS

     AND TO CERTAIN HOLDERS OF ALLOWED CLAIMS OR INTERESTS.  THIS
15
     DESCRIPTION IS FOR INFORMATIONAL PURPOSES ONLY AND, DUE TO A LACK OF
16
     DEFINITIVE JUDICIAL OR ADMINISTRATIVE AUTHORITY OR INTERPRETATION,
17
     SUBSTANTIAL UNCERTAINTIES EXIST WITH RESPECT TO VARIOUS TAX
18
     CONSEQUENCES OF THE PLAN AS DISCUSSED HEREIN.  ONLY CERTAIN
19
     CONSEQUENCES OF THE PLAN FOR THE DEBTORS AND FOR HOLDERS OF
20
     ALLOWED CLAIMS OR INTERESTS ARE DESCRIBED BELOW.  NO OPINION OF
21
     COUNSEL HAS BEEN SOUGHT OR OBTAINED WITH RESPECT TO ANY TAX
22
     CONSEQUENCES OF THE PLAN.  NO RULINGS OR DETERMINATIONS OF THE IRS OR
23
     ANY OTHER TAX AUTHORITIES HAVE BEEN SOUGHT OR OBTAINED WITH RESPECT
24
     TO THE TAX CONSEQUENCES OF THE PLAN, AND THE DISCUSSION BELOW IS NOT
25
     BINDING UPON THE IRS OR SUCH OTHER AUTHORITIES.  THE DEBTORS ARE
26
     MAKING NO REPRESENTATIONS REGARDING THE PARTICULAR TAX
27
     CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS
28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   TO ANY CLAIM OR EQUITY INTEREST HOLDER, AND NO PERSON IS RENDERING

2   ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.  NO ASSURANCE

3   CAN BE GIVEN THAT THE IRS WOULD NOT ASSERT, OR THAT A COURT WOULD

4   NOT SUSTAIN, A POSITION DIFFERENT FROM ANY DISCUSSED HEREIN.

5          THE DISCUSSION OF UNITED STATES FEDERAL INCOME TAX

6   CONSEQUENCES BELOW IS BASED ON THE INTERNAL REVENUE CODE, TREASURY

7   REGULATIONS, JUDICIAL AUTHORITIES, PUBLISHED POSITIONS OF THE IRS AND

8   OTHER APPLICABLE AUTHORITIES, ALL AS IN EFFECT ON THE DATE OF THIS

9   DISCLOSURE STATEMENT, AND ALL OF WHICH ARE SUBJECT TO CHANGE OR

10  DIFFERING INTERPRETATIONS (POSSIBLY WITH RETROACTIVE EFFECT).

11         THE FOLLOWING DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR

12  LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS

13  THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO

14  SPECIAL CLASSES OF TAXPAYERS SUBJECT TO SPECIAL TAX RULES (E.G., BANKS

15  AND CERTAIN OTHER FINANCIAL INSTITUTIONS, INSURANCE COMPANIES, TAX-

16  EXEMPT ORGANIZATIONS, PERSONS WHOSE FUNCTIONAL CURRENCY IS NOT THE

17  UNITED STATES DOLLAR, DEALERS IN SECURITIES OR FOREIGN CURRENCY,

18  PERSONS WHO RECEIVED THEIR ALLOWED CLAIMS OR INTERESTS PURSUANT TO

19  THE EXERCISE OF AN EMPLOYEE STOCK OPTION OR OTHERWISE AS

20  COMPENSATION AND PERSONS HOLDING ALLOWED CLAIMS OR INTERESTS AS A

21  HEDGE AGAINST, OR THAT ARE HEDGED AGAINST, CURRENCY RISK OR THAT ARE

22  PART OF A STRADDLE, CONSTRUCTIVE SALE OR CONVERSION TRANSACTION).

23  FURTHERMORE, THE FOLLOWING DISCUSSION DOES NOT ADDRESS UNITED

24  STATES FEDERAL TAXES OTHER THAN INCOME TAXES.

25         EACH CLAIM OR INTEREST HOLDER IS STRONGLY URGED TO CONSULT HIS,

26  HER, OR ITS OWN TAX ADVISOR REGARDING THE UNITED STATES FEDERAL,

27  STATE, LOCAL AND ANY FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS

28  DESCRIBED HEREIN AND IN THE PLAN.

## A. General Tax Administration and Reporting

The USACM Trust shall be treated as a grantor trust, for federal income tax purposes, within the meaning of sections 671 through 677 of the Internal Revenue Code. Pursuant to and in accordance with the Plan, the USACM Trustee shall be responsible for all tax matters of the USACM Trust, including, but not limited to, the filing of all tax returns and other filings with governmental authorities on behalf of the USACM Trust for time periods ending on or before the last day of the last tax reporting year of the USACM Trust, including the filing of tax returns for the applicable USACM Trust as a grantor trust pursuant to section 1.671-4(a) of the United States Income Tax Regulations, the filing of determination requests under section 505 of the Bankruptcy Code (if deemed necessary), and responding to any tax audits of the USACM Trust. The USACM Administrator shall provide such information to the beneficiaries of the USACM Trust as will enable them to properly file their separate tax returns and shall withhold and pay over any amounts required by tax law. The USACM Administrator is authorized to act as agent for the USACM Trust in withholding or paying over any amounts required by law (including tax law) to be withheld or paid by the USACM Trust in connection with the transfer and assignment of the assets of the estate to the USACM Trust pursuant to the Plan.

No liquidating trust will be created for any other Debtors' estate. Each other Debtor is a limited liability company which is treated as a partnership for federal tax purposes. Of the four limited liability companies which are Debtors, only DTDF will undergo a transfer of its assets to a DTDF Administrator. The DTDF Administrator will have similar duties with respect to the filing of tax returns and governmental reports and the provisions of tax information to creditors and to members of the Debtor as are described above with respect to the USACM Trustee of the USACM Trust.

### 1. Allocation of Reportable Tax Items.

Except as otherwise set forth in the Plan or a USACM Trust Agreement, and as more fully set forth in B through D below, items of income, deduction, credit, or loss of the USACM Trust shall be allocated for federal income tax purposes among the beneficiaries of the applicable USACM Trust pro rata on the basis of their beneficial interests; provided, however, that to the extent any item of income cannot be allocated in the taxable year in which it arises, the USACM Trust shall pay the federal, state and local taxes attributable to such income (net of related

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

deductions) and the amount of such taxes shall be treated as having been received by, and paid on behalf of the Beneficiaries when such allocations are made. Similarly such tax items determined with respect to DTDF will be reported by the estate administrator to governmental authorities and to the creditors and members of DTDF. The estate administrator shall be entitled to deduct any federal or state withholding taxes from any payments made with respect to allowed claims or interests, as appropriate, and shall otherwise comply with section 346 of the Bankruptcy Code.

### 2.    Valuations.

The USACM Trustee shall provide for consistent valuations of assets transferred to the USACM Trust as of the Effective Date and as of the date of any other taxable event and shall use such valuations for all federal tax purposes.

### B.    Consequences to the Debtors

### 1.    Sale of Acquired Assets

If the anticipated sales of the assets of USACM and FTDF to Silver Point, or a higher and better bidder approved by the Court, close as contemplated by the Plan, the sales will result in realization of a gain to the Debtor that sells such assets in an amount equal to the excess of the proceeds received over the basis of the acquired asset in the hands of the Debtor. The sales will result in a loss to the Debtor that sells such assets in an amount equal to the shortfall between such basis and the proceeds received. Gains and losses realized by the respective Debtors will be passed through to their shareholders or members on Schedules K-1 and the latter will pay any resulting tax as further explained in paragraph B.2. below.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## 2.    Partial Satisfaction of Indebtedness

USACM's transfer of its property to the USACM Trust will be treated as a deemed two-step transfer to the shareholders of the Debtor, followed by deemed transfers to the beneficiaries of those trusts.  This will be in satisfaction of the Debtor's obligations to the creditor beneficiaries in amounts up to the fair market value of the transferred property on the Effective Date as determined and reported by the USACM Trustee of the USACM Trust.  USACM will recognize gain or loss on this transfer in an amount up to the difference between that fair market value and the Debtor's basis in the transferred property.

Any gain or loss realized by USACM (which is an S corporation Debtor) from those transfers will pass through to the shareholders on Schedule K-1.  A shareholder who recognizes taxable income or gain from those transfers or from any other source will pay any resulting tax.

USA Realty, USA Securities, FTDF and DTDF are limited liability companies classified directly or indirectly as partnerships.  A partnership is not taxed on its income but passes it through on Schedules K-1 to its partners.  Losses are similarly passed through to the partners.

S corporations and partnership entities do not have unused losses or carry-forwards, but the shareholders and partners may be unable to use losses from the corporation or partnerships for any of several reasons, such as lack of basis, not being "at risk" on the investment in the corporation or partnership, etc.

## 3.    Cancellation of Indebtedness Income

Confirmation of the Plan can be expected to give rise to cancellation of indebtedness income ("COD").  Under the Plan, each Debtor will generally realize COD in an amount equal to the excess of the adjusted issue price of any of its indebtedness exchanged or canceled (including any accrued but unpaid interest) over the fair market value of any property transferred to the USACM Trust or DTDF or to the creditors of any of the Debtors on the Effective Date, as determined and reported by the USACM Trustee, DTDF Administrator, or FTDF, USA Realty or USA Securities, respectively.  Because the COD will arise in the course of a proceeding pursuant to Chapter 11 or 7, respectively, of the Bankruptcy Code, USACM may not be required to include such COD in distributable income on Schedules K-1 to shareholders.  Instead, certain shareholders

87

may be required to reduce certain of their beneficial tax attributes by the amount of COD excluded from taxable income by reason of the bankruptcy. Such attribute reduction would first be applied to reduce the shareholders' net operating losses, next to reduce certain other tax attributes (such as capital loss carryforwards and the tax basis of certain property), and finally to reduce some subsidiary attributes, if applicable. If the amount of COD excluded from taxable income by reason of the bankruptcy exceeds available tax attributes, the excess would permanently escape taxation.

However, tax treatment of COD for members of limited liability companies treated as partnerships is different from the treatment of S corporation shareholders. COD realized from discharge of partnership debt is partnership income allocated to the partners on Schedule K-1 pursuant to Internal Revenue Code section 702(a). Each partner's basis in its membership interest is increased by the COD income allocation and the partner is deemed to have received cash in an equivalent amount. Only members who are themselves bankrupt will be entitled to exclude COD income under Internal Revenue Code section 108.

### 4.    Effects of Filing by Partnerships

When a limited liability company classified as a partnership files for bankruptcy, no new taxable entity is automatically created for federal income tax purposes, and the partnership is not terminated under Internal Revenue Code section 708. Therefore, each partnership is considered as continuing until it is terminated. Under section 708(b) (in the absence of special circumstances such as a merger or division), a partnership will terminate if no part of any business, financial operation or venture of the partnership continues to be carried on by any of its partners in a partnership. Until the partnership completely ceases all business activities and has no assets, it should be treated as continuing. The transfer of all assets of a partnership to an estate administrator for liquidation should not by itself terminate the partnership, because the partnership will still have financial operations and will be deemed to have assets after the transfer. Thus, the filing of a bankruptcy case alone does not result in recognition of income, gain or loss by the partnership, depreciation recapture or deemed disposition of the partnership's assets (so gain on any installment obligations held by the partnership is not thereby accelerated), but the later

88

1    transfer of all assets of a partnership to creditors will trigger all of the foregoing consequences.

2    Each Debtor that is a limited liability company will be deemed terminated upon the earlier of the

3    transfer of all of its assets to creditors, or its dissolution and termination under Nevada state law.

4        **C.    Tax Consequences to Creditors**

5        For United States federal income tax purposes, USACM's transfer of its property to the

6    USACM Trust will be treated as a deemed transfer to beneficiaries of a trust who are creditors in

7    satisfaction of the Debtor's obligations to those creditors, followed by deemed transfers by the

8    creditors to the USACM Trust.  The deemed transfers to the several respective classes of creditors

9    will be treated as taxable recognition events to those creditors, resulting in reportable gains or

10   losses equal to the fair market value of the creditors' interests in the transferred property on the

11   Effective Date, as determined and reported by the trustee, reduced by the creditors' bases in their

12   receivables from the Debtors.

13       The deemed transfers from the several respective classes of creditors to the USACM Trust

14   will be treated as creating a grantor trust, with the several respective classes of creditors treated as

15   grantors.  As grantors of such grantor trust, the several respective classes of creditors will report

16   their pro-rata shares of all items of taxable income, gains and losses of the creditors' trust on their

17   federal income tax returns, and pay any resulting tax liability.

18       The transfer of assets directly from the other Debtors, or from DTDF, to creditors will

19   similarly be taxable recognition events to those creditors, resulting in gains or losses equal to the

20   fair market values of the assets received reduced by the creditors' bases in their receivables from

21   the Debtors.  All of the several respective classes of creditors should consult their own tax

22   advisors for information that might be relevant to their particular situations and circumstances and

23   the particular tax consequences to them.

24       **D.    Tax Consequences to USACM Stockholders and Members of the Debtors**

25       For United States Federal income tax purposes, USACM's transfer of its property to the

26   USACM Trust will be treated as a deemed transfer to USACM shareholders, followed by deemed

27   transfers by its shareholders to creditors (and to the USACM Trust for the benefit of shareholders

28   to the extent the assets exceed the claims of creditors).  The deemed transfer to the shareholders of

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

89

1   USACM will be treated as exchanges in redemption of their shares of stock of USACM.  Any

2   excess of the value of assets received through the deemed distribution over a shareholder's basis in

3   those shares will generally be taxable as long or short term capital gain.  The transfer of money or

4   other property by Debtors organized as limited liability companies to their members generally will

5   result in the recognition of gain only to the extent that the money or other property by Debtors

6   organized as limited liability companies to their members generally will not result in the

7   recognition of gain or loss unless such distribution consists solely of money, unrealized

8   receivables (as defined in the Internal Revenue Code) and inventory (as defined in the Internal

9   Revenue Code).  In the event a loss is recognized, it will equal the amount by which the

10  distrubutee-member's pre-distribution basis in its membership interest exceeds the sum of (1) the

11  amount of money, and (2) the adjusted basis of such unrealized receivables and inventory

12  distributed to such member.  Generally, any such gain or loss recognized is treated as gain or loss

13  from the sale of a capital asset and therefore gives rise to short-term or long term capital gain or

14  capital loss.  In addition, each member of a Debtor (other than USACM) will be deemed to have

15  COD to the extent of that member's allocable share of the debt discharged in bankruptcy.  See the

16  discussion of COD income in B-3 above.  Shareholders and members should consult their own tax

17  advisors for further information.

18  [*Remainder of this page intentionally left blank.*]

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

90

# XIII.  CONCLUSION

The Debtors and the four Committees believe that the Plan offers a fair and comprehensive solution to the numerous complex and difficult issues presented in these bankruptcy cases, fairly addresses the rights of all creditors, equity holders, and other parties in interest, and provides a significant recovery for creditors and Fund Members that is greater than other reasonably likely alternatives.  The Debtors and the four Committees therefore urge that you vote to accept the Plan. Dated this 14th day of November, 2006.

THE DEBTORS:

USA Commercial Mortgage Company
USA Securities, LLC
USA Capital Realty Advisors, LLC
USA Capital Diversified Trust Deed Fund, LLC
USA First Trust Deed Fund, LLC

By: _____
        Thomas J. Allison
        Chief Restructuring Officer

Respectfully submitted,

_____
Lenard E. Schwartzer, Nevada Bar No. 0399
Jeanette E. McPherson, Nevada Bar No. 5423
SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146

and

Annette W. Jarvis, Utah Bar No. 1649
Steven C. Strong, Utah Bar No. 6340
RAY QUINNEY & NEBEKER P.C.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Annette W. Jarvis, Utah Bar No. 1649
    RAY QUINNEY & NEBEKER P.C.
2   36 South State Street, Suite 1400          **E-FILED ON NOVEMBER 15, 2006**
    P.O. Box 45385
3   Salt Lake City, Utah 84145-0385
4   Telephone: (801) 532-1500
    Facsimile: (801) 532-7543
5   Email: ajarvis@rqn.com
        and
6   Lenard E. Schwartzer, Nevada Bar No. 0399
7   Jeanette E. McPherson, Nevada Bar No. 5423
    SCHWARTZER & MCPHERSON LAW FIRM
8   2850 South Jones Boulevard, Suite 1
    Las Vegas, Nevada  89146-5308
9   Telephone:  (702) 228-7590
    Facsimile:  (702) 892-0122
10  E-Mail:  bkfilings@s-mlaw.com

11  Attorneys for Debtors and Debtors-in-Possession

12                  **UNITED STATES BANKRUPTCY COURT**
13                          **DISTRICT OF NEVADA**

14  | In re: | Case No. BK-S-06-10725 LBR |
15  | USA COMMERCIAL MORTGAGE COMPANY, | Case No. BK-S-06-10726 LBR |
    | Debtor. | Case No. BK-S-06-10727 LBR |
16  | In re: | Case No. BK-S-06-10728 LBR |
17  | USA CAPITAL REALTY ADVISORS, LLC, | Case No. BK-S-06-10729 LBR |
    | Debtor. | |
18  | In re: | Chapter 11 |
19  | USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, | Jointly Administered Under Case No. BK-S-06-10725 LBR |
20  | Debtor. | |
21  | In re: | |
    | USA CAPITAL FIRST TRUST DEED FUND, LLC, | **DEBTORS' THIRD AMENDED** |
22  | Debtor. | **JOINT CHAPTER 11 PLAN OF** |
23  | In re: | **REORGANIZATION** |
    | USA SECURITIES, LLC, | |
24  | Debtor. | |
    | Affects: | |
25  | ☒ All Debtors | Confirmation Hearing |
    | ☐ USA Commercial Mortgage Company | December 19, 2006 |
26  | ☐ USA Securities, LLC | 10:00 a.m. |
27  | ☐ USA Capital Realty Advisors, LLC | |
    | ☐ USA Capital Diversified Trust Deed Fund, LLC | |
28  | ☐ USA First Trust Deed Fund, LLC | |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

i

# **TABLE OF CONTENTS**

I. DEFINITIONS AND RULES OF CONSTRUCTION ...................................................2
   A.  DEFINED TERMS. ..........................................................................................2
   B.  OTHER TERMS. ...........................................................................................21
   C.  PLAN DOCUMENTS SUPPLEMENT. ..........................................................21
   D.  SCHEDULE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ......22
   E.  DIRECT LENDER SUPPLEMENT. ...............................................................22
   F.  EXHIBITS. ...................................................................................................23

II. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ...........23
   A.  SUMMARY. .................................................................................................23
   B.  UNCLASSIFIED CLAIMS. ...........................................................................29
      1.  Administrative Expense Claims For Each Debtor. ..............................29
      2.  Priority Tax Claims. ............................................................................31
   C.  CLASSIFIED CLAIMS AND EQUITY INTERESTS. .......................................32
      1.  USACM – (Classes A-1 Through A-8). ................................................32
      2.  FTDF – (Classes B-1 Through B-5). ....................................................35
      3.  DTDF – (Classes C-1 Through C-5). ...................................................37
      4.  USA Realty – (Classes D-1 Through D-5). ..........................................39
      5.  USA Securities – (Classes E-1 Through E-5). ......................................41

III. ACCEPTANCE OR REJECTION OF THE PLAN ...................................................43
   A.  VOTING CLASSES. .....................................................................................43
   B.  VOTING RIGHTS OF HOLDERS OF DISPUTED CLAIMS AND DISPUTED EQUITY INTERESTS. ..43
   C.  ACCEPTANCE BY IMPAIRED CLASSES. ...................................................43
   D.  NONCONSENSUAL CONFIRMATION. ........................................................44

IV. IMPLEMENTATION OF THE PLAN ...................................................................45
   A.  GENERAL MEANS OF IMPLEMENTATION. ...............................................45
   B.  NO SUBSTANTIVE CONSOLIDATION OR RECHARACTERIZATION OF LOANS. .......46
   C.  ASSET SALE TRANSACTION. ....................................................................46
   D.  POST-EFFECTIVE DATE ENTITIES. ..........................................................47
      1.  The USACM Trust. .............................................................................47
      2.  Post-Effective Date DTDF. .................................................................50
   E.  INTERCOMPANY COMPROMISES. ............................................................51
      1.  The USACM/Direct Lender Compromise. ..........................................51
      2.  The USACM/FTDF Compromise. .......................................................53
      3.  The FTDF/DTDF Compromise. ...........................................................56
      4.  The FTDF/USA Realty Compromise. ..................................................56
      5.  The DTDF/USA Realty Compromise. ..................................................57
   F.  LOAN DISTRIBUTIONS AND LOAN SERVICING AGREEMENTS. ...............57
   G.  PRESERVATION OF RIGHTS OF ACTION AND DEFENSES. ........................58
   H.  NONDISCHARGE OF DEBTORS AND INJUNCTION. ...................................59

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

V. EXECUTORY CONTRACTS AND UNEXPIRED LEASES................................................60
   A.   ASSUMPTION.................................................................................................60
   B.   REJECTION.................................................................................................62
      1.   General...............................................................................................62
      2.   USACM Management And/Or Operating Agreements......................62
      3.   Claims Bar Date.................................................................................63

VI. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE .................63
   A.   CONDITIONS TO CONFIRMATION. ...........................................................63
   B.   CONDITIONS TO EFFECTIVE DATE. ........................................................64
   C.   WAIVER OF CONDITIONS. ......................................................................64
   D.   FAILURE TO SATISFY CONDITIONS. ........................................................64

VII. DISTRIBUTION OF CONSIDERATION ..................................................................65
   A.   OBJECTIONS TO CLAIMS. .......................................................................65
      1.   Deadlines. ..........................................................................................65
      2.   Authority............................................................................................65
   B.   DISPUTED CLAIMS AND EQUITY INTERESTS—CASH RESERVES. ...........66
      1.   General...............................................................................................66
      2.   Establishment Of Cash Reserves. .....................................................66
      3.   Estimation..........................................................................................67
      4.   Distribution Upon Allowance. ...........................................................67
      5.   Release Of Cash Reserves. ................................................................67
   C.   UNDELIVERABLE OR RETURNED DISTRIBUTIONS. ...................................68
   D.   DE MINIMIS DISTRIBUTIONS. .................................................................68
   E.   DISBURSING AGENT.................................................................................69
      1.   Disbursing Agent For FTDF, USA Realty And USA Securities Estates. ....................69
      2.   Disbursing Agent USACM And DTDF Estates. ...............................69
      3.   Bond...................................................................................................70
      4.   Compensation. ...................................................................................70
   F.   MANNER OF PAYMENT UNDER THE PLAN.................................................70
   G.   DELIVERY OF DISTRIBUTIONS. ................................................................70
   H.   COMPLIANCE WITH TAX REQUIREMENTS. ..............................................71
   I.   OLD INSTRUMENTS AND SECURITIES; LIENS. ........................................71
      1.   Rights Of Persons Holding Instruments And Securities. ...................71
      2.   Cancellation Of Liens. ......................................................................71
   J.   DATES OF DISTRIBUTION........................................................................71

VIII. MISCELLANEOUS PROVISIONS .........................................................................72
   A.   LIMITATION OF LIABILITY AND RELEASES...............................................72
      1.   Limitation Of Liability. .....................................................................72
      2.   DTDF/FTDF Releases. ......................................................................72
      3.   FTDF/USACM Releases. ...................................................................74
      4.   Debtor Releasors/Direct Lenders Releases.......................................75
      5.   FTDF/USA Realty Releases................................................................76
   C.   NOTICE OF EFFECTIVE DATE. .................................................................78
   D.   RETENTION OF JURISDICTION. .................................................................78

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

E. Binding Effect. ..................................................................................81
F. Amendment, Modification And Severability. ...............................81
G. Exhibits. ...............................................................................................81
H. No Admission. .....................................................................................82
I. 1146(c) Exemption. ............................................................................82
J. General Authority. ...........................................................................82
K. Dissolution Of Committees. ..........................................................82
    1. USACM. ............................................................................................83
    2. DTDF. .............................................................................................83
    3. FTDF, USA Realty And USA Securities. ...............................83
M. Binding Effect. ....................................................................................83
N. Governing Law. ..................................................................................84
O. Payment Dates. ...................................................................................84
P. Headings. ...............................................................................................84
Q. No Waiver. ............................................................................................84
R. Other Documents And Actions. ....................................................84
S. Severability Of Plan Provisions. ..................................................84
T. Post-Confirmation Status Report. .............................................85
U. Final Decree. .......................................................................................85
V. Revocation, Withdrawal, Cram-Down Or Non-Consummation. ..85
W. Notice To Certain Parties. .............................................................86

IX. REQUEST FOR CONFIRMATION ............................................................88

Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

iv

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**DEBTORS' THIRD AMENDED JOINT
CHAPTER 11 PLAN OF REORGANIZATION**

USA Commercial Mortgage Company, USA Securities, LLC, USA Capital Realty Advisors, LLC, USA Capital Diversified Trust Deed Fund, LLC, and USA Capital First Trust Deed Fund, LLC, the Debtors and Debtors in Possession in these jointly administered Chapter 11 Cases, propose the following joint chapter 11 Plan of reorganization pursuant to section 1121(a) of title 11 of the United States Code.

On April 13, 2006, the Debtors commenced their Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code. Sent to you in the same envelope as this document is the Disclosure Statement that has been approved by the Court and that is provided to help you understand the Plan. All Direct Lenders and holders of Allowed Claims and Equity Interests are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. The Disclosure Statement for the Plan contains a summary of the Plan and discusses the Debtors' history, businesses, and assets. Reading the summary of the Plan contained in the Disclosure Statement, however, is not a substitute for reading the Plan. As the provisions of the Plan control, all Direct Lenders and holders of Allowed Claims and Equity Interests are encouraged to carefully read the Plan. No solicitation materials, other than the Disclosure Statement, the Exhibits attached hereto or thereto or referenced herein or therein, and the related materials transmitted herewith and therewith, have been approved by the Court for use in soliciting acceptances or rejections of the Plan.

1

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# I.

## DEFINITIONS AND RULES OF CONSTRUCTION

**A.     Defined Terms.**

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires (such meanings to be equally applicable to both the singular and plural, and masculine and feminine, forms of the terms defined):

1.     **"2% Holdback"** means sums withheld under Paragraph 1.2 of the Modified Order Authorizing Distributions and Holdbacks entered on October 2, 2006 [Docket No. 1424].

2.     **"Acquired Assets"** means the FTDF Assets and the USACM Assets, described as "Assets" in the Asset Purchase Agreement.

3.     **"Adjusted FTDF Base Recovery Percentage"** means the percent recovery that DTDF or the Post-Effective Date DTDF must reach after the adjustment for an annual increase, made on each anniversary of the Effective Date, of an additional $5 million to DTDF's Investment in order to obtain the FTDF Base Recovery Percentage.

4.     **"Administrative Expense Claim"** means any Claim against a Debtor constituting a cost of expense of administration of and in these Chapter 11 Cases incurred on or after the Petition Date of the kind described in section 503(b) of the Bankruptcy Code, including, without limitation, (A) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of a Chapter 11 Case; (B) Taxes described in section 503(b)(1)(B) of the Bankruptcy Code; (C) any fees or expenses of Debtors' Professionals or Committee Professionals allowable under sections 330(a) or 331 of the Bankruptcy Code; (D) all Statutory Fees; and (E) Cure Payments.

5.     **"Administrative Expense Claim Bar Date"** means the date(s) as set forth in section B.1.c.i of Art. II of the Plan.

6. **"Affiliate"** has the meaning ascribed to that term in section 101(2) of the Bankruptcy Code.

7. **"Allocated Net Sale Proceeds"** means the net sale proceeds generated from the Asset Sale Transaction as allocated between USACM and FTDF in accordance with the Asset Purchase Agreement as may be modified or supplemented by the provisions of section E.2.i of Art. IV of the Plan.

8. **"Allowed Administrative Expense Claim"** means all or that portion of an Administrative Expense Claim which has been Allowed pursuant to a Final Order.

9. **"Allowed Claim" or "Allowed . . . Claim"** means any Claim against a Debtor (A) as listed in the Schedules Filed in such Debtor's Chapter 11 Case, provided that the Claim is not listed therein as disputed, contingent or unliquidated; (B) as stated in a proof of Claim which is Filed before the Bar Date applicable to such Claim and as to which no objection to the allowance thereof or a motion to estimate Claim pursuant to section 502(c) of the Bankruptcy Code has been interposed on or before the dates set forth in section A of Art. VII of the Plan; or (C) as allowed by Final Order. An "Allowed . . . Claim"(i) is the total amount of the Claim less any distribution or payments made by a Debtor to the Holder of the Allowed . . . Claim after the Petition Date pursuant to any order of the Court, including without limitation, the Interim Distribution Orders, and (ii) unless otherwise specified herein or by Final Order of the Court, an Allowed . . . Claim shall not include interest on such Claim accruing after the Petition Date; provided, however, that holders of Allowed Class B-4 General Unsecured Claims and Allowed Class C-4 General Unsecured Claims shall receive Postpetition Interest on such Allowed Claims as provided in Art. II of the Plan.

10. **"Allowed Equity Interest"** means an Equity Interest in a Debtor (A) as designated in List of Equity Security Holders Filed in such Debtor's Chapter 11 Case, including the Lists designated in the "Stipulated Order re Proofs of Interest" entered by the Court in the First Trust Case and the Diversified Case on September 15, 2006 [Docket No. 1293], provided that such Equity Interest is not listed as disputed or contingent; (B) as stated in a proof of Equity Interest which is Filed before the expiration of the General Bar Date and to which no objection to the

3

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

allowance thereof has been interposed on or before the date set forth in section A of Art. VII of the Plan. An "Allowed Equity Interest" is the total amount of the Equity Interest less any distribution or payments made by a Debtor to the holder of the Allowed Equity Interest after the Petition Date, pursuant to any order of the Court, including without limitation, the Interim Distribution Orders.

11. **"Allowed Class . . . Claim" or "Allowed Class . . . Equity Interest"** means an Allowed Claim or Allowed Equity Interest, respectively, classified in the specified Class.

12. **"Alternative Dispute Resolution Agreement"** means the joint agreement by the Direct Lender Committee and the USACM Committee, which shall set forth the process by which objections to Direct Lender Unsecured Claims may be resolved. This agreement will be Filed as part of the Direct Lender Supplement and served on all Direct Lenders as set forth in section D of Art. I of the Plan.

13. **"Asset Purchaser"** means SPCP Group, Inc., or a Third Party Bidder who is selected as the successful bidder as a result of the Auction and who acquires the Acquired Assets pursuant to the Bid Procedures Order and the Plan.

14. **"Asset Purchase Agreement"** means (A) the Revised First Amended And Restated Asset Purchase Agreement between USACM and FTDF, as sellers, DTDF, USA Securities and USA Realty, as acknowledging parties, and SPCP Group, LLC, as purchaser, Filed on November 7, 2006 [Docket No. 1750], and attached hereto as Exhibit A, as the same may be further amended pursuant to the terms of the Agreement, or (B) any substantially similar agreement executed with a Third Party Bidder, if a Third Party Bidder is the Asset Purchaser.

15. **"Asset Sale Transaction"** means the sale of the Acquired Assets to the Asset Purchaser as set forth in the Asset Purchase Agreement.

16. **"Auction"** means the auction that will be held pursuant to the Bid Procedures Order and conducted on December 7, 2006, as the same may be continued or rescheduled by the Court, in connection with the Asset Sale Transaction.

17. **"Avoidance Actions"** means all of the Debtors' and the Estates' rights and Claims under Bankruptcy Code sections 541 through 558, inclusive, whether or not an action is initiated on, before or after the Effective Date.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

18.     **"Bankruptcy Code"** means title 11, United States Code (11 U.S.C. § 101 *et seq.*), as in effect on the Petition Date and as amended and effective after the Petition Date and during the Chapter 11 Cases.

19.     **"Bankruptcy Rules"** means, collectively, (A) the Federal Rules of Bankruptcy Procedure, as amended from time to time, and (B) the Local Bankruptcy Rules applicable to cases pending before the Court, as now in effect or hereafter amended.

20.     **"Bar Date"** means (A) with respect to Administrative Expense Claims, other than Ordinary Course Administrative Expense Claims, the dates set forth in section B.1.c. of Art. II of the Plan; (B) with respect to Claims for damages resulting from the rejection of an executory contract or unexpired lease pursuant to section B of Art. V of the Plan, the date stated in section B.3 of Art. V of the Plan; and (C) with respect to all other Claims against and Equity Interests in a Debtor, the General Bar Date.

21.     **"Bid Procedures Order"** means the "Order (A) Scheduling an Auction for the Sale of Certain Assets; (B) Approving SPCP Group, LLC as Lead Bidder; and (C) Approving Bid Procedures and Protections," entered by the Court on November 8, 2006 [Docket No. 1761].

22.     **"Borrower"** means the Borrower under any applicable Loan.

23.     **"Business Day"** means any day which is not a Saturday, a Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

24.     **"Bysynergy Loan"** means FTDF's interest in the Loan, dated as of February 3, 2006, made and delivered by BySynergy, LLC, a Delaware limited liability company.

25.     **"Cash"** means legal tender of the United States of America, or cash equivalents, including currency and checks or wire transfers of immediately available funds.

26.     **"Chapter 11 Cases"** means the above-captioned cases under chapter 11 of the Bankruptcy Code, commenced by the Debtors on the Petition Date, and jointly administered under Case No. 06-10725.

27.     **"Claim"** has the meaning ascribed to it in section 101 of the Bankruptcy Code.

28.     **"Class"** means a group of Claims or Equity Interests classified together in a class designated in Art. II of the Plan.

29.     **"Closing"** means the closing of the Asset Sale Transaction as provided in the Asset Purchase Agreement.

30.     **"Closing Date"** means the Effective Date.

31.     **"Committees"** means collectively the USACM Committee, the DTDF Committee, the FTDF Committee, and the Direct Lender Committee, as appointed by the U.S. Trustee pursuant to Bankruptcy Code section 1102 to serve in these Chapter 11 Cases.

32.     **"Committee Professionals"** means all Professionals employed by the Committees in these Chapter 11 Cases.

33.     **"Confirmation"** means entry of a Confirmation Order by the Court in accordance with section 1129 of the Bankruptcy Code.

34.     **"Confirmation Date"** means the date on which the Clerk of the Court enters the Confirmation Order on the Court's docket.

35.     **"Confirmation Hearing"** means the hearing before the Court to consider the confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

36.     **"Confirmation Order"** means the order entered by the Court confirming the Plan in accordance with the Bankruptcy Code.

37.     **"Court"** means the United States District Court for the District of Nevada, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court pursuant to section 151 of title 28 of the United States Code; or, in the event such court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or unit thereof that exercises jurisdiction over the Chapter 11 Cases in lieu thereof.

38.     **"Cure Payment"** means the amount, if any, that the Debtors must tender on the Effective Date in order to provide compensation in accordance with sections 365(b)(1)(A) and (B) of the Bankruptcy Code to assume an unexpired lease or an executory contract as described in further detail in section A of Art. V of the Plan.

39.     **"Debtors"** means, collectively, USACM, USA Securities, USA Realty, DTDF, and FTDF.

6

40.     **"Debtors in Possession"** means any or all of the Debtors when acting in the capacity of representatives of their respective Estates in the Chapter 11 Cases.

41.     **"Debtors' Professionals"** means all Professionals employed by the Debtors in these Chapter 11 Cases, including those professionals employed as ordinary course professionals.

42.     **"Direct Lender"** means each Entity who is a beneficiary under a Loan, excluding USACM and the Funds to the extent of their beneficial interests in a Loan.

43.     **"Direct Lender Committee"** means the Official Committee of Holders of Executory Contract Rights through USA Commercial Mortgage Company as appointed by the U.S. Trustee pursuant to Bankruptcy Code section 1102 to serve in these Chapter 11 Cases.

44.     **"Direct Lender Loans"** means Loans in which the Direct Lenders have an ownership interest.

45.     **"Direct Lender Supplement"** means the Loan Servicing Fee Schedule and the Alternative Dispute Resolution Agreement, referred to in section E of Art. I of the Plan, as amended from time to time, and which shall be Filed and served as soon as practicable after Court approval of the Disclosure Statement.

46.     **"Direct Lender Unremitted Principal Claims"** means all General Unsecured Claims or other Claims of Direct Lenders against USACM for Loan payments received prior to the Petition Date by USACM but not paid over to the Direct Lenders in the applicable Loan.

47.     **"Direct Lender Unsecured Claims"** means all General Unsecured Claims (whether under contract, tort or other legal theory against USACM) of Direct Lenders against USACM, excluding Direct Lender Unremitted Principal Claims.

48.     **"Disbursing Agent"** means the Entity or Entities appointed pursuant to section E of Art. VII of the Plan to act in making distributions authorized under the Plan for each of the respective Estates on and after the Effective Date.

49.     **"Disclosure Statement"** means the Disclosure Statement, including any Exhibits attached thereto, Filed by the Debtors in the Chapter 11 Cases on September 15, 2006, as the same is amended, supplemented, or otherwise modified from time to time by any duly authorized amendment or modification.

7

50.     **"Disputed . . . Claim"** means any Claim against a Debtor which is not an Allowed

Claim, including, without limitation, any Claim (A) designated as disputed, contingent,

unliquidated or unknown in the Schedules Filed in such Debtor's Chapter 11 Case, (B) to which

an objection to the allowance thereof or motion to estimate Claim under section 502(c) of the

Bankruptcy Code has been interposed on or before the date set forth in section A of Art. VII of the

Plan; (C) which is the subject of one or more causes of action pending against the holder of such

Claim; or (D) which is disallowed pursuant to section 502(d) of the Bankruptcy Code or by Final

Order.

51.     **"Disputed Equity Interest"** means any Equity Interest in a Debtor which is not an

Allowed Equity Interest, including, without limitation, any Equity Interest (A) designated as

disputed or contingent in the List of Equity Security Holders Filed in a Debtor's Chapter 11 Case,

including the Lists designated in the "Stipulated Order Re Proofs of Interest" entered by the Court

in the First Trust Case and the Diversified Case on September 15, 2006 [Docket No. 1293]; (B) to

which an objection to allowance thereof has been interposed on or before the date set forth in

section A of Art. VII of the Plan; or (C) which is disallowed by Final Order.

52.     **"DTDF"** means USA Capital Diversified Trust Deed Fund, LLC.

53.     **"DTDF 85% Recovery"** means a recovery from all sources for DTDF and Post-

Effective Date DTDF for all Allowed Class C-5 Equity Interests equal to 85% of the DTDF

Investment, net of expenses.

54.     **"DTDF Administrator"** means the chief executive officer of Post-Effective Date

DTDF, which has the powers and responsibilities set forth in the Plan and the DTDF Amended

Operating Agreement, or any successor officer appointed pursuant to the DTDF Amended

Operating Agreement.

55.     **"DTDF Amended Operating Agreement"** means the DTDF Operating

Agreement, as amended, to provide for the wind down, liquidation and dissolution of

DTDF pursuant to the implementation of the Plan that will be Filed as part of the Plan Documents

Supplement.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

56.   **"DTDF Chapter 11 Case"** means the Chapter 11 Case of DTDF, Case No. BK-S-06-10727 LBR.

57.   **"DTDF Committee"** means the Official Committee of Equity Security Holders of USA Capital Diversified Trust Deed Fund, LLC, as appointed by the U.S. Trustee pursuant to Bankruptcy Code section 1102 to serve in these Chapter 11 Cases.

58.   **"DTDF Investment"** means the amount that represents the equity investment in DTDF as may be agreed to by the USACM Committee and the DTDF Committee by the date of the Confirmation Hearing, or if no agreement is reached by such date, the amount determined by the Court after an evidentiary hearing between such Committees; provided however, that the USACM Committee and DTDF Committee or, after the Effective Date, the Post-Effective Date Entities, may agree at any time as to the amount that represents the equity investment in DTDF without further Court order by Filing a notice of such agreement with the Court; and provided further, however, that prior to the Effective Date, the USACM Committee and the DTDF Committee shall consult with the FTDF Committee and the Direct Lender Committee regarding the amount that represents the equity investment in DTDF.

59.   **"DTDF Loans"** means Loans in which DTDF has an ownership interest.

60.   **"DTDF Operating Agreement"** means the "Operating Agreement of USA Capital Diversified Trust Deed Fund, LLC" made and entered into effective as of February 10, 2000.

61.   **"DTDF Post-Effective Date Committee"** means the oversight committee for Post-Effective Date DTDF.

62.   **"DTDF Unremitted Principal Claim"** means the General Unsecured Claim or other Claims of DTDF against USACM for Loan payments received by USACM but not paid to DTDF prior to the Petition Date.

63.   **"DTDF Unsecured Claim"** means the General Unsecured Claim of DTDF against USACM, excluding the DTDF Unremitted Principal Claim, allowed in the amount as may be agreed to by the USACM Committee and the DTDF Committee by the date of the commencement of the Confirmation Hearing, or if no agreement is reached by such date, the amount determined by the Court after an evidentiary hearing between such Committees; provided, however, that the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USACM Committee and the DTDF Committee or, after the Effective Date, the Post-Effective Date Entities, may agree at any time as to the amount that represents the DTDF Unsecured Claim without further Court order by filing a notice of such agreement with the Court; and provided further, however, that prior to the Effective Date, the USACM Committee and the DTDF Committee shall consult with the FTDF Committee and the Direct Lender Committee regarding the issue.

64.   **"Effective Date"** means the first Business Day (A) on which no stay of the Confirmation Order is and remains in effect, and (B) that is at least one (1) Business Day after the date on which the conditions specified in section B of Art. VI of the Plan have been satisfied or waived.

65.   **"Entity"** has the meaning ascribed to this term in section 101(15) of the Bankruptcy Code.

66.   **"Equity Interest"** means the rights of owners of the issued and outstanding shares of any class of stock, membership or other ownership interest in any of the Debtors.

67.   **"Estate"** or **"Estates"** means the bankruptcy estate created for each Debtor in these Chapter 11 Cases pursuant to Bankruptcy Code section 541, or, collectively, the bankruptcy estates created for each of the Debtors, in these Chapter 11 Cases pursuant to Bankruptcy Code section 541.

68.   **"Excluded DTDF Loans"** means DTDF Loans whose Loan Servicing Agreements are not being transferred to the Asset Purchaser as part of the Asset Sale Transaction.

69.   **"File," "Filed," "Files,"** or **"Filing"** means properly and timely filed with the Court in the Chapter 11 Cases, as reflected on the official docket of the Court for the Chapter 11 Cases, and served on Entities, as such filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or order of the Court.

70.   **"Final Decree"** means a Final Order of the Court closing the Chapter 11 Cases; provided, however, if a Final Decree is separately entered in one or more of the Debtors' Chapter 11 Cases, the "Final Decree" means a Final Order of the Court closing a particular Chapter 11 Case.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

71.     **"Final Order"** means an order or judgment of the Court or other applicable court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors and the Committees or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

72.     **"FTDF"** means USA Capital First Trust Deed Fund, LLC.

73.     **"FTDF Base Recovery Percentage"** means the Pro Rata recovery by holders of Allowed Equity Interests in FTDF based on the ratio of (x) the net recovery to FTDF as calculated by adding (i) all post-Petition Date collections that FTDF received on account of the FTDF Loans prior to the Closing to (ii) the sale proceeds that FTDF receives from the Asset Sale Transaction (including amounts received for any overbid) minus all payments made on account of (i) all Allowed classified and unclassified Claims against the FTDF Estate, (ii) all Allowed Administrative Expense Claims allocated to FTDF, (iii) all post-Effective Date costs and expenses incurred on behalf of either (a) FTDF or (b) the holders of Allowed Equity Interests in FTDF, (iv) any expense reimbursement or break-up fee paid pursuant to the Bid Procedures Order (unless reimbursed pursuant to the overbid process), and (v) the FTDF Payment to DTDF to (y) the FTDF Investment.

74.     **"FTDF Chapter 11 Case"** means the Chapter 11 Case of FTDF, Case No. BK-S-06-10728 LBR.

75.     **"FTDF Committee"** means the Official Committee of Equity Security Holders of USA Capital First Trust Deed Fund, LLC, as appointed by the U.S. Trustee pursuant to Bankruptcy Code section 1102 to serve in these Chapter 11 Cases.

76.     **"FTDF Investment"** means the amount of $65,179,522.

11

77.     **"FTDF Litigation Claims"** means the Litigation Claims in which FTDF has an interest, including without limitation all Non-Debtor Insider Litigation in which FTDF has an interest.

78.     **"FTDF Loans"** means Loans in which FTDF has an ownership interest.

79.     **"FTDF Payment"** means the payment made by FTDF to DTDF on the Effective Date in the amount of (A) $500,000, and (B) an additional amount of up to $500,000 from 50% of any overbid increment actually paid and allocated to FTDF as part of the Closing of the Asset Sale Transaction, after taking into consideration any break-up fee (including any expense reimbursement) paid by FTDF.

80.     **"FTDF Transferred Assets"** means the assets transferred by FTDF to DTDF consisting of the FTDF Payment, the Bysynergy Loan, the FTDF Unremitted Principal Claim, and the proceeds of any non-assignable FTDF Litigation Claims.

81.     **"FTDF Unremitted Principal Claim"** means the General Unsecured Claim or other Claims of FTDF against USACM for Loan payments received by USACM but not paid over to FTDF prior to the Petition Date.

82.     **"FTDF Unsecured Claim"** means the General Unsecured Claim of FTDF against USACM, excluding the FTDF Unremitted Principal Claim, in the amount as may be agreed to by the FTDF Committee and the USACM Committee by the date of the commencement of the Confirmation Hearing, or if no agreement is reached by such date, the amount determined by the Court after an evidentiary hearing between such Committees; provided however that the USACM Committee and the FTDF Committee or, after the Effective Date, the USACM Trust and FTDF may agree at any time as to the amount that represents the FTDF Unsecured Claim without further Court order by Filing a notice of such agreement with the Court; and provided further, however, that prior to the Effective Date, the USACM Committee and the FTDF Committee shall consult with the DTDF Committee and the Direct Lender Committee regarding the issue.

83.     **"FTDF's Debtors' Professionals' Fee/Cost Allocation"** means the allocation to FTDF for the professional fees and costs incurred by the Debtors' Professionals in the Chapter 11

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Cases of $125,000 per month commencing on the Petition Date and ending on the earlier of: (A)

2   the Effective Date, or (B) January 31, 2007.

3       84.     **"Funds"** means FTDF and DTDF.

4       85.     **"General Bar Date"** means, except as to the Claims of Direct Lenders and

5   Intercompany Claims, November 13, 2006, which is the date established by the "Order Setting

6   Deadline to File Proofs of Claim and Proofs of Interest" entered by the Court in the Chapter 11

7   Cases on September 14, 2006 [Docket No. 1280]. With respect to the Claims of Direct Lenders,

8   "General Bar Date" means January 13, 2007, which is the date established by the "Stipulation and

9   Order to Extend Proof of Claim Bar Date for Direct Lenders Only" entered by the Court in the

10  Chapter 11 Cases on November 6, 2006 [Docket No.1729]. With respect to Intercompany Claims

11  no bar date has been set as the Court has granted the "Debtors' Motion to Exclude Intercompany

12  Claims from the General Bar Date" [Docket No. 1469].

13      86.     **"General Unsecured Claim"** means a Claim against a Debtor arising on or before

14  the Petition Date that is not an Administrative Expense Claim, Priority Tax Claim, Priority

15  Unsecured Claim, Secured Claim, Secured Tax Claim or Subordinated Claim.

16      87.     **"Higher and Better Offer"** means a bona fide offer made in accordance with the

17  Bid Procedures Order.

18      88.     **"Insider"** has the meaning ascribed to this term in section 101(31) of the

19  Bankruptcy Code. For purposes of this definition, the term "affiliate" in section 101(31)(E) has

20  the meaning ascribed to that term in the Plan, and to the extent not included in the definition of

21  "Affiliate" under the Plan, shall include any and all Persons whose business is owned or controlled

22  by the Debtors or any of Insiders of the Debtors (as defined herein), or in which the Debtors or

23  Insiders of the Debtors (as defined herein) have any ownership, participation, profit sharing or any

24  other kind of interest whatsoever.

25      89.     **"Instruments of Transfer"** means any mortgages, deeds of trust, leasehold

26  mortgages, leases (whether recorded or unrecorded) and/or the various instruments and documents

27  of transfer as specified in or contemplated by the Plan including the documents related to the Asset

28  Sale Transaction.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

90. **"Interim Distribution Orders"** mean (A) "Order (a) Granting (i) Debtors' Motion to Distribute Funds; (ii) Debtors' Hold Funds Motion and (iii) the Compel Motion, and (b) Denying (i) the Lift Stay Motion and (ii) McKnight Motion" entered by the Court on August 24, 2006 [Docket No. 1184]; and (B) "Modified Order Authorizing Interim Distribution and Holdbacks" entered by the Court on October 2, 2006 [Docket No. 1424].

91. **"IP"** means USA Investment Partners, LLC.

92. **"IP Parties"** means Joseph Milanowski, Thomas Hantges, Paul Hamilton and IP.

93. **"IP $58 Million Promissory Note"** means that certain promissory note dated as of May 31, 2006, in the original principal amount of $58,374,918.81 made by IP in favor of USACM (as modified by the "Order Approving Agreement with Investment Partners" entered by the Court on July 24, 2006 [Docket No. 946]).

94. **"Lenders"** means Direct Lenders, USACM and the Funds.

95. **"Litigation Claims"** means any and all rights, causes of action, Claims, obligations, suits, debts, promises, agreements, judgments and demands of whatever kind or nature, whether known or unknown, suspected or unsuspected, whether at law or in equity, including, without limitation all Avoidance Actions, Non-Debtor Insider Litigation, and causes of action listed in the Schedules and the Statements of Financial Affairs Filed in each of the Debtor's Chapter 11 Cases, recoupment, set off and equitable subordination, whether or not brought as of the Effective Date, which are the property of or may be asserted by any of the Debtors and their respective Estates, or the Post-Effective Date Entities, and which have not been settled or otherwise resolved by Final Order as of the Effective Date.

96. **"Loans"** means the loans originated by and serviced by USACM on behalf of the Lenders. This definition of "Loans" is applicable solely to the Plan and does not apply to, nor supersede the definition of "Loans" in the Asset Purchase Agreement, which contains a different definition for "Loans."

97. **"Loan Servicing Agreement"** means agreements entered into by USACM with Lenders relating to USACM's servicing of the Loans in effect at any time during the Chapter 11 Cases.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

98.     **"Loan Servicing Fee Schedule"** means a schedule setting forth the amount of the servicing fees payable under each of the Loan Servicing Agreements, which will be transferred to the Asset Purchaser at Closing as part of the Asset Sale Transaction.

99.     **"Non-Debtor Insider"** means an Insider that is not a Debtor, expressly including, without limitation, the IP Parties, any Affiliate of the Debtors and the IP Parties, Insiders of the IP Parties, professionals of such Insiders or of the Debtors, and/or any Entity which has conspired with or aided and abetted an Insider that is not a Debtor.

100.     **"Non-Debtor Insider Litigation"** means all Litigation Claims against Non-Debtor Insiders and recoveries therefrom.  Solely to the extent necessary to pursue this Non-Debtor Insider Litigation, this definition shall also include Litigation Claims by Debtors against Debtors who are Insiders, which Litigation Claims by Debtors against Debtors, notwithstanding anything to the contrary in this Plan and solely to the extent necessary to pursue Litigation Claims against Non-Debtor Insiders, shall survive the Confirmation of the Plan and the Effective Date and shall not be extinguished; provided that to the extent there are inter-Debtor releases in this Plan, the prior sentence shall have no operative effect on such releases, which releases will bar any recoveries by applicable Debtors against Debtors as provided for therein.

101.     **"Ordinary Course Administrative Expense Claim"** means an Administrative Expense Claim incurred in the ordinary course of the Debtors' businesses prior to the Effective Date; provided, however, Ordinary Course Administrative Expense Claims expressly do not include: (A) any postpetition obligations of a Debtor which are past due; (B) Cure Payments; (C) any fees or expenses, compensation or reimbursement for which is requested pursuant to subsections 503(b)(2), (3), (4) or (5) of the Bankruptcy Code; (D) any Taxes (including without limitation, income, sales, use, property or other Taxes); and (E) any Claims against a Debtor for breach of contract, tort, or other actionable conduct.

102.     **"Other Secured Claim"** means any Secured Claim other than a Secured Tax Claim.

15

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

103.     **"Overbid Allocation"** means the allocation agreed to between USACM and FTDF for the overbid, breakup fee, and expense reimbursement (as those terms are used in the Bid Procedures Order) as described in section E.2. of Art. IV of the Plan.

104.     **"Penalty Claim"** means a Claim against a Debtor for a fine, penalty, forfeiture, or for multiple, exemplary or punitive damages, arising before or after the Petition Date, to the extent that such fine, penalty, forfeiture or damages are not compensation for actual pecuniary loss suffered by the holder of such Claim or is asserted by a governmental unit.

105.     **"Pending Litigation"** means all actions Filed against USACM as of the Effective Date, including *USA Commercial Mortg. Co. v. Standard Property Dev., LLC* [Adversary Proceeding No. 06-1179]; *USA Commercial Mortg. Co. v. Robert J. Kehl, et. al* [Adv. Pro. No. 06-1167]; *USA Commercial Mortg. Co. v. Gateway Stone Assocs., LLC* [Adv. Pro. No. 06-1201], and any other actions Filed against USACM prior to the Effective Date.

106.     **"Person"** has the meaning ascribed to this term in section 101(41) of the Bankruptcy Code.  To the extent not provided for in section 101(41), the term "Person" as used herein includes limited partnerships, limited liability companies, associations, joint stock companies, joint ventures, and the Committees.

107.     **"Petition Date"** means April 13, 2006, the date on which the Debtors Filed their voluntary petitions commencing the Chapter 11 Cases.

108.     **"Plan"** means this Third Amended Joint Chapter 11 Plan of Reorganization, including any and all Exhibits annexed hereto, any and all documents incorporated herein by reference, and any and all documents incorporated by reference to the Plan Documents Supplement, or the Direct Lender Supplement either in their present form or as they may be altered, amended, or modified at any time prior to or as part of the Confirmation Hearing.

109.     **"Plan Documents Supplement"** means the compilation of the forms of certain documents as specified in and required to be Filed in accordance with section C of Art. I of the Plan.

110.     **"Post-Effective Date DTDF"** means DTDF after the Effective Date.

1    111.   **"Post-Effective Date Entities"** means the USACM Trust and Post-Effective Date

2    DTDF, and prior to dissolution, FTDF, USA Realty and USA Securities.

3    112.   **"Postpetition Interest"** means all contractual or statutory interest to which holders

4    of Allowed Class B-4 General Unsecured Claims and Allowed Class C-4 General Unsecured

5    Claims have a legal right enforceable outside of the Chapter 11 Cases.  In the absence of any legal

6    right to interest on any particular Allowed Claim in Class B-4 or Class C-4, "Postpetition Interest"

7    shall mean 4.85%, the federal judgment rate in effect as of the Petition Date.

8    113.   **"Prepaid Interest"** means (a) all causes of action to recover principal or interest

9    payments USACM paid in advance to the applicable Lender(s) before the Petition Date; (b) all

10   principal and interest payments USACM has collected (will continue to collect) postpetition from

11   Borrowers for such advanced principal or interest payments; and (c) all payments USACM has

12   collected (and will continue to collect) postpetition on any Loan that would otherwise be payable

13   to a Lender that received an advanced principal or interest payment from USACM prior to the

14   Petition Date, but only to the extent of such advanced principal or interest payments.

15   114.   **"Priority Tax Claim"** means a Claim against a Debtor entitled to priority under

16   section 507(a)(8) of the Bankruptcy Code.

17   115.   **"Priority Unsecured Claim"** means a Claim against a Debtor that is entitled to

18   priority under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims,

19   Administrative Expense Claims, and Ordinary Course Administrative Expense Claims.

20   116.   **"Professionals"** means those Entities or firms who have been employed by the

21   Debtors or the Committees pursuant to Bankruptcy Code sections 327, 1103, and/or 1106.

22   117.   **"Professionals Administrative Expense Claim Bar Date"** has the meaning

23   ascribed to this term in section B.1.c.ii of Art. II of the Plan.

24   118.   **"Pro Rata," "Pro Rata Share,"** and **"Pro Rata Basis"** mean proportionately so

25   that the ratio of (A) the amount of consideration (such as Cash) distributed on account of a

26   particular Allowed Claim or Allowed Equity Interest, as applicable, to (B) the amount of such

27   Allowed Claim or Allowed Equity Interest, as applicable, is the same as the ratio of (x) the amount

28   of consideration distributed on account of all Allowed Claims or Allowed Equity Interests, as

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

17

applicable, of the Class or group of Classes in which the Allowed Claim or Allowed Equity

Interest is classified to (y) the amount of all Allowed Claims or Allowed Equity Interests, as

applicable, of that Class or group of Classes.

The Pro Rata ratio or formula is illustrated as follows:

| (a) Amount of consideration distributed to holder of Allowed Claim or Allowed Equity Interest, as applicable | = | (x) Total consideration available for distribution to holders of Allowed Claims or Allowed Equity Interests, as applicable, of that Class or group of Classes |
|---|---|---|
| (b) Amount of such Allowed Claim or Allowed Equity Interest, as applicable | | (y) Amount of all Allowed Claims of Allowed Equity Interest, as applicable, in that Class or group of Classes |

For purposes of the application of this definition, the amount of any Disputed Claim shall be the

stated "face amount" of such Claim, unless such Claim is estimated by Final Order, in which case,

the amount of such Disputed Claim shall be the estimated amount.

119. **"Schedule of Executory Contracts and Unexpired Leases"** means the schedule

which is defined in section D of Art. I of the Plan and referred to under Article V of the Plan.

120. **"Schedules"** means the Schedules Filed by each of the Debtors pursuant to

Bankruptcy Code section 521(a)(1)(B)(i), Bankruptcy Rules 1007(a)(3) and (b)(1), and Official

Bankruptcy Form No. 6, as amended from time to time.

121. **"Secured Claim"** means a Claim against the Debtors to the extent of the value of

any interest in property of the Estates securing such Claim, as determined by the Court pursuant to

Bankruptcy Code sections 506(a) and 1111(b).

122. **"Secured Tax Claim"** means a Claim of a governmental unit against the Debtors

to the extent of the value of any interest in property of the Estates securing such Claim, as

determined by the Court pursuant to Bankruptcy Code section 506(a).

123. **"Servicer Advances"** means advances by the servicing agent for legal fees,

foreclosure costs and other expenses that may be recovered from a Lender under Paragraph 4 or

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  any other similar Paragraph of the applicable Loan Servicing Agreement in the event that such

2  amounts are not paid by the applicable Borrower.

3      124.   **"SPCP Group, LLC"** means the Entity described as the "Purchaser" in the Asset

4  Purchase Agreement.

5      125.   **"Statutory Fees"** means those fees payable in the Chapter 11 Cases under 28

6  U.S.C. § 1930.

7      126.   **"Subordinated Claim"** means any and all Claims of Non-Debtor Insiders against

8  USACM.

9      127.   **"Taxes"** means all taxes, charges, fees, imposts, levies or other assessments,

10  including, without limitation, all net income, gross receipts, sales, use, ad valorem, value added,

11  transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment,

12  social security, unemployment, excise, severance, stamp, occupation, and property taxes, customs

13  duties, fees, assessments and charges of any kind whatsoever, together with any interest and

14  penalties, additions to tax or additional amounts imposed by any taxing authority (domestic or

15  foreign) and any interest and penalties imposed with respect to the filing, obligation to file or

16  failure to file any tax return, and shall include any transferee liability in respect to Taxes.

17      128.   **"Third Party Bidder"** means an Entity, other than SPCP Group, LLC, who makes

18  a Higher and Better Offer for the Acquired Assets pursuant to and in accordance with the terms of

19  the Bid Procedures Order.

20      129.   **"Undistributed Cash"** means $2.6 million in Cash that had been collected prior to

21  the Petition Date but had not been distributed on or since the Petition Date.

22      130.   **"Unremitted Principal Claims"** means General Unsecured Claims against

23  USACM for Loan payments received by USACM, but not paid over to applicable Lenders prior to

24  the Petition Date, including without limitation, the FTDF Unremitted Principal Claim, the Direct

25  Lender Unremitted Principal Claims, and the DTDF Unremitted Principal Claim.

26      131.   **"Unremitted Principal Direct Lenders"** means Direct Lenders holding

27  Unremitted Principal Claims.

28      132.   **"USA Realty"** means USA Capital Realty Advisors, LLC.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

133.    **"USA Securities"** means USA Securities, LLC.

134.    **"USACM"** means USA Commercial Mortgage Company.

135.    **"USACM Accounts"** means all accounts, notes or receivables of USACM, including USACM's share of the IP $58 Million Promissory Note.

136.    **"USACM Committee"** means the Official Unsecured Creditors' Committee for USA Commercial Mortgage Company, as appointed by the U.S. Trustee pursuant to Bankruptcy Code section 1102 to serve in these Chapter 11 Cases.

137.    **"USACM Loans"** mean the Loans in which USACM has an ownership interest.

138.    **"USACM Trust"** means the trust created under the Plan and pursuant to the USACM Trust Agreement for the benefit of holders of Allowed USACM Unsecured Claims.

139.    **"USACM Trust Agreement"** means the trust agreement that will establish (along with the Plan) and govern the USACM Trust which will be Filed as part of the Plan Documents Supplement.

140.    **"USACM Trust Assets"** means those assets to be transferred or assigned to the USACM Trust, respectively, on the Effective Date of the Plan, free and clear of any liens or Claims that might otherwise have existed in favor of any party minus any Cash needed to make the payments required to be made on the Effective Date pursuant to the Plan or needed to fund the reserves required to be established on the Effective Date.

141.    **"USACM Trust Committee"** means the oversight committee for the USACM Trust established pursuant to the Plan and the USACM Trust Agreement.

142.    **"USACM Trustee"** means the trustee of the USACM Trust, which has the powers and responsibilities set forth in the Plan and the USACM Trust Agreement, or any successor trustee appointed pursuant to the USACM Trust Agreement.

143.    **"USACM Unsecured Claims"** means all Allowed General Unsecured Claims against USACM, including Unremitted Principal Claims, the DTDF Unsecured Claim, the FTDF Unsecured Claim, and the Direct Lender Unsecured Claims.

144.    **"U.S. Trustee"** means the Office of the United States Trustee for the District of Nevada.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**B.      Other Terms.**

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or Bankruptcy Rules and shall be construed in accordance with the rules of construction thereunder.

**C.      Plan Documents Supplement.**

The forms of the following documents are or will be contained in a separate Plan Documents Supplement that will be Filed as provided herein and incorporated in the Plan by reference:

1.      the USACM Trust Agreement; and

2.      the DTDF Amended Operating Agreement.

In the event of a conflict between the terms of any of the documents contained in the Plan Documents Supplement and the Plan, the terms of the Plan shall govern.

The USACM Trust Agreement will be Filed by the USACM Committee and served on counsel for the Debtors and the other Committees and the U.S. Trustee, at least ten (10) days prior to the commencement of the Confirmation Hearing. The USACM Trust Agreement will identify the identity and affiliations of the USACM Trustee and the USACM Trust Committee as required by section 1129(a)(5) of the Bankruptcy Code and will include all other information required to comply with section 1129(a)(4) of the Bankruptcy Code.

The DTDF Amended Operating Agreement will be Filed by the DTDF Committee and served on counsel for the Debtors and the other Committees and the U.S. Trustee, at least ten (10) days prior to the commencement of the Confirmation Hearing. The DTDF Amended Operating Agreement will identify the identity and affiliations of the DTDF Administrator and the DTDF Post-Effective Date Committee as required by section 1129(a)(5) of the Bankruptcy Code and will include all other information required to comply with section 1129(a)(4) of the Bankruptcy Code.

Once Filed, the Plan Documents Supplement may be inspected in the Office of the Clerk of the Court during normal court hours. The holders of Claims or Equity Interests may obtain a

copy of the Plan Documents Supplement, or excerpts therefrom, by accessing the BMC Group website for the Debtors at http://www.bmccorp.net; contacting the BMC Group by phone at 888-909-0100; or by accessing the Debtors' website at www.usacapitalcorp.com.

**D.    Schedule of Executory Contracts and Unexpired Leases.**

The Debtors will File a Schedule of Executory Contracts and Unexpired Leases that conforms to section A of Art. V of the Plan, and serve it on the Committees, the U.S. Trustee, all non-Debtor Entities who are parties to any executory contracts or unexpired leases listed thereon and the limited service list as soon as practicable after the Court approves the Disclosure Statement, but in no event later than twenty (20) days prior to the commencement of the Confirmation Hearing.

Once Filed, the Schedule of Executory Contracts and Unexpired Leases may be inspected in the Office of the Clerk of the Court during normal court hours.  The holders of Claims or Equity Interests may obtain a copy of the Schedule of Executory Contracts and Unexpired Leases, or excerpts therefrom, by accessing the BMC Group website for the Debtors at http://www.bmccorp.net; contacting the BMC Group by phone at 888-909-0100; or by accessing the Debtors' website at www.usacapitalcorp.com.

**E.    Direct Lender Supplement.**

The forms of the following documents are or will be contained in a separate Direct Lender Supplement that will be Filed as provided herein and incorporated in the Plan by reference:

1.    the Loan Servicing Fee Schedule; and

2.    the Alternative Dispute Resolution Agreement.

The Direct Lender Supplement will be Filed and served on the Committees, the U.S. Trustee and all Direct Lenders as soon as practicable after the Court approves the Disclosure Statement, but in no event later than twenty (20) days prior to the commencement of the Confirmation Hearing.

Once Filed, the Direct Lender Supplement may be inspected in the Office of the Clerk of the Court during normal court hours.  The holders of Claims or Equity Interests may obtain a copy of the Direct Lender Supplement, or excerpts therefrom, by accessing the BMC Group website for

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

the Debtors at http://www.bmccorp.net; contacting the BMC Group by phone at 888-909-0100; or by accessing the Debtors' website at www.usacapitalcorp.com.

**F.      Exhibits.**

All Exhibits to the Plan and all documents contained in the Plan Documents Supplement and the Direct Lender Supplement are incorporated into and are a part of the Plan as if set forth in full herein.

<div align="center">

**II.**

**CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

</div>

**A.      Summary.**

As discussed in section B of Art. IV of the Plan below, the Estates will not be substantively consolidated. Accordingly, holders of Allowed Claims or Allowed Equity Interests against a particular Estate shall have their Claims or Equity Interests allowed and treated in such respective Estate. Further, within an Estate, an Allowed Claim or Allowed Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class. However, an Allowed Claim or Allowed Equity Interest may be apportioned and classified in more than one Class to the extent that portions of the Claim or Equity Interest fall within the description of several different Classes. An Allowed Claim or Allowed Equity Interest is classified in a particular Class only to the extent that it has not already been paid, released or otherwise satisfied before the Effective Date. The following is a chart summarizing the classification and treatment of unclassified Claims, classified Claims and Equity Interests in each Estate:

| Claims | Treatment |
|---|---|
| **USACM** | |
| **Unclassified Claims** | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| Priority Tax | Holders of Allowed Priority Tax Claims shall be paid in full on the |

<div align="left">SCHWARTZER & McPHERSON LAW FIRM<br>2850 South Jones Boulevard, Suite 1<br>Las Vegas, Nevada 89146-5308<br>Tel: (702) 228-7590 · Fax: (702) 892-0122</div>

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims | Treatment |
|---|---|
| Claims | Effective Date, unless the holder of the Claim agrees otherwise. |
| | **Classified Claims** |
| A-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. |
| A-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USACM: **Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or **Option B:** USACM shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USACM shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. |
| A-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| A-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims, including the Unremitted Principal Claims, Allowed FTDF Unsecured Claims, the Allowed Direct Lender Unsecured Claims and the Allowed DTDF Unsecured Claim, shall receive a beneficial interest in the USACM Trust, and on account of their Allowed Claim may receive a Pro Rata Share of the assets of the USACM Trust after satisfaction of all Allowed unclassified Claims, Allowed Class A-1, A-2 and A-3 Claims, and all post-Effective Date fees, costs, and expenses of implementation of the USACM Plan for USACM and the USACM Trust. |
| A-5: Direct Lender Compromise Claims | The Direct Lenders will be released by USACM, FTDF, USA Realty and USA Securities from all Claims including but not limited to surcharge, recharacterization of Direct Lender Loans, and the collection of prepetition accrued but unpaid as of the Effective Date annual loan servicing fees due under Loan Servicing Agreements, but excluding causes of action to recover principal or interest payments USACM paid in advance to the applicable Lender(s) before the Petition Date. In |

| Claims | Treatment |
|---|---|
| | exchange (and as a compromise), Direct Lenders acknowledge and agree that the Prepaid Interest constitutes an asset of the USACM Estate or to transfer their ownership rights, if any, in Prepaid Interest to the USACM Estate, that USACM retains the maximum amount for servicing fees allowed and that $605,000 of the 2% Holdback can and will be used to reimburse USACM for the Allowed Administrative Expense Claims attributed to the fees and costs of the Professionals of the Direct Lender Committee. If the Plan is confirmed, the Direct Lenders will be bound to the Class A-5 treatment regardless of whether they vote to accept or reject the Plan, or Class A-5 votes to accept or reject the Plan; all such objections must be made by objecting to Plan confirmation. |
| A-6: Allowed Penalty Claims | Holders of Allowed Penalty Claims shall be subordinated in payment to the payment in full of all Allowed General Unsecured Claims, plus interest, and shall receive no distribution under the Plan. |
| A-7: Allowed Subordinated Claims | Holders of Subordinated Claims shall be subordinated in payment to the payment in full of all Allowed Penalty Claims, plus interest, and shall receive no distribution under the Plan. |
| A-8: Equity Interests | All Equity Interests in USACM, regardless of form, shall be cancelled and the holders of Equity Interests in USACM shall receive no distribution under the Plan. |
| **FTDF** | |
| **Unclassified Claims** | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| **Classified Claims** | |
| B-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. |
| B-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of FTDF:<br>**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or<br>**Option B:** FTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims | Treatment |
|---|---|
| | reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, FTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. |
| B-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| B-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims shall be paid in full on the Effective Date, plus Postpetition Interest. |
| B-5: Equity Interests | After the FTDF Payment has been made, holders of Allowed Equity Interests shall retain all distributions received after the Petition Date and receive the remaining Allocated Net Sale Proceeds after satisfaction of all Allowed unclassified Claims, Allowed Class B-1, B-2, B-3 and B-4 Claims, and post-Effective Date fees, costs, and expenses of implementation of the Plan for FTDF. Allowed Equity Interests shall receive a Pro Rata Share of the USACM Trust recoveries on account of the Allowed FTDF Unsecured Claim. |
| **DTDF** | |
| **Unclassified Claims** | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| **Classified Claims** | |
| C-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. |
| C-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of Post-Effective Date DTDF:<br>**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or |

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims | Treatment |
|---|---|
| | **Option B:** Post-Effective Date DTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, Post-Effective Date DTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. |
| C-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| C-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims shall be paid in full on the Effective Date, plus Postpetition Interest. |
| C-5: Equity Interests | Holders of Allowed Equity Interests shall retain their Equity Interests in DTDF and distributions received from the Petition Date, and after satisfaction of all Allowed unclassified Claims, Allowed Class C-1, C-2, C-3 and C-4 Claims, and all post-Effective Date fees, costs and expenses of implementation of Plan for DTDF, shall receive shall receive a Pro Rata Share of the assets of Post-Effective Date DTDF and the USACM Trust recoveries on account of the Allowed DTDF Unsecured Claim. |
| **USA Realty** | |
| **Unclassified Claims** | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| **Classified Claims** | |
| D-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. |
| D-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USA Realty: **Option A:** Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) |

| Claims | Treatment |
|---|---|
| | fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or **Option B:** USA Realty shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA Realty shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. |
| D-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| D-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims shall be paid a Pro Rata Share of assets of the Estate available after payment in full of Allowed unclassified Claims and Allowed Class D-1, D-2 and D-3 Claims. |
| D-5: Equity Interests | All Equity Interests in USA Realty, regardless of form, shall be cancelled and the holders of Equity Interests in USA Realty shall receive no distribution under the Plan. |
| **USA Securities** | |
| **Unclassified Claims** | |
| Administrative Expense Claims | Holders of Allowed Administrative Expense Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| Priority Tax Claims | Holders of Allowed Priority Tax Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| **Classified Claims** | |
| E-1: Secured Tax Claims | Holders of Allowed Secured Tax Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim. |
| E-2: Other Secured Claims | Holders of Allowed Other Secured Claims are to be treated pursuant to Option A or Option B below, at the discretion of USA Securities: **Option A:** Allowed Other Secured Claims shall be paid in full on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or **Option B:** USA Securities shall surrender the property securing the Allowed Other USA Securities Claim to the holder of such Claim by |

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

| Claims | Treatment |
|--------|-----------|
| | making the property reasonably available to such holder on or before the later of (i) sixty (60) days after the Effective Date, or (ii) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA Securities shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B. |
| E-3: Priority Unsecured Claims | Holders of Allowed Priority Unsecured Claims shall be paid in full on the Effective Date, unless the holder of the Claim agrees otherwise. |
| E-4: General Unsecured Claims | Holders of Allowed General Unsecured Claims shall be paid a Pro Rata Share of assets of the Estate available after payment in full of Allowed unclassified Claims and Allowed Class E-1, E-2 and E-3 Claims. |
| E-5: Equity Interests | All Equity Interests in USA Securities, regardless of form, shall be cancelled and the holders of Equity Interests in USA Securities shall receive no distribution under the Plan. |

**B.      Unclassified Claims.**

Certain types of Claims are not placed into Classes that are entitled to vote to accept or reject this Plan; instead, such Claims are unclassified. Such Claims do not vote on the Plan because they are entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a Class. The respective treatments for these Claims are provided below.

**1.      Administrative Expense Claims For Each Debtor.**

**a.      General.**

Each holder of an Allowed Administrative Expense Claim in a particular Estate shall be paid in full, in Cash of such Estate, on the later of: (i) the Effective Date, or (ii) the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in either case, as soon thereafter as is practicable, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment. The fees and costs of the counsel to the Direct Lender Committee, to the extent Allowed, will be treated as an Administrative Expense

1  Claim against USACM, except to the extent covered by a surcharge on Direct Lenders authorized

2  by the Court and collected by USACM prior to the Effective Date.

3         **b.    Payment of Statutory Fees.**

4         On or before the Effective Date, Statutory Fees for each Estate shall be paid in Cash, in full

5  when due.  To the extent there is any dispute as to the amount or payment of these Statutory Fees,

6  such dispute will be resolved by the Court at the Confirmation Hearing.

7         **c.    Bar Dates Applicable to Administrative Expense Claims.**

8             **i.    General Administrative Expense Claims.**

9         Except as provided in subsections ii and iii below, requests for payment of Administrative

10  Expense Claims must be Filed and served on the Debtors and the Post-Effective Date Entities, the

11  Committees (to the extent such Committees are not dissolved) and the U.S. Trustee by no later

12  than thirty (30) days after the Effective Date, which shall be the "Administrative Expense Claim

13  Bar Date."  Any holder of an Administrative Expense Claim who fails to File a request seeking to

14  have its Claim Allowed on or before the Administrative Expense Claim Bar Date shall be forever

15  barred from seeking the allowance of its Administrative Expense Claim, and the Debtors and their

16  Estates, including any Post-Effective Date Entities, if applicable, shall be discharged of any

17  obligation on such Claim or any other Claim related to the Administrative Expense Claim.

18            **ii.    Professionals.**

19         All Professionals or other Entities requesting compensation or reimbursement of expenses

20  under sections 327, 328, 330, 331, 503(b) and/or 1103 of the Bankruptcy Code for services

21  rendered before the Effective Date (including any compensation requested by any professional or

22  any other Entity for making a substantial contribution in the Chapter 11 Cases under section

23  503(b)(3)(D) of the Bankruptcy Code) shall File and serve on the Debtors, the Post-Effective Date

24  Entities, the Committees (to the extent such Committees are not yet dissolved) and the U.S.

25  Trustee an application for final allowance of compensation and reimbursement of expenses no

26  later than forty-five (45) days after the Effective Date, which shall be the "Professionals

27  Administrative Expense Claim Bar Date."  Any objections to such applications must be Filed and

28  served in accordance with applicable law, including Nevada District Court Local Rule 9014.  Any

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Professional who fails to File an application requesting payment on or prior to the Professionals

2  Administrative Expense Claim Bar Date shall be forever barred from seeking the allowance of its

3  Administrative Expense Claim or any other Claim, and the Debtors, their Estates and any Post-

4  Effective Date Entities, if applicable, shall be discharged of any obligation on such Claim or any

5  other Claim related to the Professional's Claim.

6  <div align="center">**iii.     Ordinary Course Administrative Expense Claims.**</div>

7  Holders of Ordinary Course Administrative Expense Claims shall not be required to File

8  any request for payment of such Claims by the Administrative Expense Claim Bar Date.  Each

9  Ordinary Course Administrative Expense Claim shall be assumed and paid by the obligated Estate

10  under the terms and conditions of the particular transaction giving rise to that Ordinary Course

11  Administrative Expense Claim, without any further action by the holder of such Ordinary Course

12  Administrative Expense Claim.

13  <div align="center">**iv.     Effect of Claim Bar Dates.**</div>

14  All holders of Administrative Expense Claims (including without limitation, Professionals

15  requesting compensation or reimbursement of expenses), except holders of Ordinary Course

16  Administrative Expense Claims, are required to File a request for payment of such Claims in

17  accordance with the Plan.  Failure to File a request for payment of an Administrative Expense

18  Claim prior to the Administrative Expense Claim Bar Date or the Professionals Administrative

19  Expense Claim Bar Date, as applicable, shall  forever bar the holder from asserting such Claims

20  against the Debtors, the Estates, the Post-Effective Date Entities and any other Entity or any of

21  their respective property, and the Debtors, the Estates and the Post-Effective Date Entities, to the

22  extent applicable, shall be discharged of any obligation on such Claim or any other Claim related

23  to the Administrative Expense Claim.

24  **2.     Priority Tax Claims.**

25  Each holder of an Allowed Priority Tax Claim in a particular Estate shall be paid in full, in

26  Cash from such Estate, on the later of: (A) the Effective Date, or (B) the date such Priority Tax

27  Claim becomes an Allowed Priority Tax Claim, or, in either case as applicable, as soon thereafter

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

as is practicable, except to the extent that the holder of an Allowed Priority Tax Claim agrees to a different treatment.

**C.      Classified Claims And Equity Interests.**

      **1.      USACM – (Classes A-1 Through A-8).**

          **a.      Class A-1: Secured Tax Claims.**

              i.      *Classification*:  Class A-1 consists of all Allowed Secured Tax Claims against USACM.

              ii.      *Treatment*:  Each holder of an Allowed Secured Tax Claim shall be paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim.  Class A-1 is unimpaired, and the holders of Allowed Class A-1 Claims are presumed to vote in favor of the Plan.

          **b.      Class A-2: Other Secured Claims.**

              i.      *Classification*:  Class A-2 consists of all Allowed Other Secured Claims against USACM.

              ii.      *Treatment*:  Each holder of an Allowed Other Secured Claim shall be treated pursuant to Option A or Option B below, at the discretion of USACM.

      **Option A:**  Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or

      **Option B:**  USACM shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; provided, however, that if the property securing an Allowed Other Secured Claim has been lost or destroyed, USACM shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Class A-2 is unimpaired, and the holders of Allowed Class A-2 Claims are

2   presumed to vote in favor of the Plan.

3    c.    **Class A-3: Priority Unsecured Claims.**

4    i.    *Classification*:  Class A-3 consists of all Allowed Priority Unsecured

5   Claims against USACM.

6    ii.    *Treatment*:  Each holder of an Allowed Priority Unsecured Claim

7   shall be paid in full on the Effective Date, unless such holder agrees otherwise.  Class A-3 is

8   unimpaired, and the holders of Allowed Class A-3 Claims are presumed to vote in favor of the

9   Plan.

10    d.    **Class A-4: General Unsecured Claims.**

11    i.    *Classification*:  Class A-4 consists of all Allowed General

12   Unsecured Claims against USACM, including the Allowed Unremitted Principal Claims, the

13   Allowed Direct Lender Unsecured Claims, the Allowed FTDF Unsecured Claims, and the

14   Allowed DTDF Unsecured Claims.

15    ii.    *Treatment*:  Each holder of an Allowed General Unsecured Claim

16   shall receive a beneficial interest in the USACM Trust, and on account of the Allowed Claim may

17   receive a Pro Rata Share of the assets of the USACM Trust after satisfaction of all Allowed

18   unclassified Claims, Allowed Class A-1, A-2 and A-3 Claims, and all post-Effective Date fees,

19   costs, and expenses of implementation of the USACM Plan and USACM Trust.  Class A-4 is

20   impaired, and the holders of Allowed Class A-4 Claims are entitled to vote to accept or reject the

21   Plan.

22    e.    **Class A-5: Direct Lender Compromise Claims.**

23    i.    *Classification*:  Class A-5 Consists of all Direct Lenders.

24    ii.    *Treatment*:  In exchange (and as a compromise) for the release by

25   USACM, FTDF, USA Realty, USA Securities of Claims against the Direct Lenders under the

26   Plan, including Claims relating to surcharge, recharacterization of Direct Lender Loans, and the

27   collection of prepetition accrued as of the Effective Date but unpaid annual loan servicing fees due

28   under Loan Servicing Agreements, but excluding all other causes of action to recover principal or

interest payments USACM paid in advance to applicable Direct Lenders before the Petition Date, the Direct Lenders (a) acknowledge that the Prepaid Interest constitutes an asset of the USACM Estate (or will otherwise transfer their ownership rights, if any, in the Prepaid Interest to the USACM Estate); (b) agree that up to $605,000 of the 2% Holdback (on a Pro Rata basis based on unpaid principal Loan balances of those Direct Lenders with funds in the 2% Holdback) will be used to reimburse USACM for the Allowed Administrative Expense Claims of Professionals employed by the Direct Lender Committee; and (c) agree that, with respect to servicing fees paid prior to the Effective Date, USACM will retain its contractual servicing fee due under the Loan Servicing Agreements and, with respect to Loan Servicing Agreements which provide that USACM may collect "up to" a maximum amount for such servicing fees, USACM will retain the maximum amount for such servicing fees as provided under the Loan Servicing Agreement. Class A-5 is impaired, and the holders of Allowed Class A-5 Claims are entitled to vote to accept or reject the Plan. If the Plan is confirmed, the Direct Lenders will be bound to the Class A-5 treatment regardless of whether they vote to accept or reject the Plan, or Class A-5 votes to accept or reject the Plan; all such objections must be made by objecting to Plan confirmation.

      **f.**      **Class A-6: Allowed Penalty Claims.**

      i.      *Classification:*  Class A-6 consists of all Allowed Penalty Claims against USACM.

      ii.      *Treatment:*  Payment to holders of Allowed Penalty Claims shall be subordinated to the payment in full, plus interest, of all Allowed General Unsecured Claims.  It is anticipated that holders of Allowed Penalty Claims shall receive no distribution under the Plan.  In the unlikely event that Cash exists after all Allowed General Unsecured Claims are paid in full, plus interest, the Plan shall be deemed to be amended to provide that such Cash be distributed Pro Rata to the holders of Allowed Penalty Claims, plus interest. Class A-6 is impaired, and the holders of Class A-6 Claims are deemed to reject the Plan.

      **g.**      **Class A-7: Subordinated Claims.**

      i.      *Classification*:  Class A-7 consists of all Subordinated Claims against USACM.

34

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1             ii.    *Treatment:*  Payment to holders of Allowed Subordinated Claims

2    shall be subordinated to the payment in full, plus interest, of all Allowed Penalty Claims.  It is

3    anticipated that holders Allowed Subordinated Claims shall receive no distribution under the Plan.

4    In the unlikely event that Cash exists after all Allowed Penalty Claims are paid in full, plus

5    interest, the Plan shall be deemed to be amended to provide that such Cash be distributed Pro Rata

6    to the holders of Allowed Subordinated Claims, plus interest. Class A-7 is impaired, and the

7    holders of Class A-7 Claims are deemed to reject the Plan

8             **h.**    **Class A-8: Equity Interests.**

9             i.    *Classification*:  Class A-8 consists of all Equity Interests in

10   USACM.

11            ii.    *Treatment*:  Any and all Equity Interests in USACM, regardless of

12   form, are cancelled as of the Effective Date, and the holders of such Equity Interests will receive

13   no distribution under the Plan.  Class A-87 is impaired, and the holders of Class A-8 Equity

14   Interests are deemed to reject the Plan.

15        **2.**    **FTDF – (Classes B-1 Through B-5).**

16            **a.**    **Class B-1: Secured Tax Claims.**

17            i.    *Classification*:  Class B-1 consists of all Allowed Secured Tax

18   Claims against FTDF.

19            ii.    *Treatment*:  Each holder of an Allowed Secured Tax Claim shall be

20   paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15)

21   Business Days after the date the Secured Tax Claim becomes an Allowed Claim.  Class B-1 is

22   unimpaired, and the holders of Allowed Class B-1 Claims are presumed to vote in favor of the

23   Plan.

24            **b.**    **Class B-2: Other Secured Claims.**

25            i.    *Classification*:  Class B-2 consists of all Allowed Other Secured

26   Claims against FTDF.

27            ii.    *Treatment*:  Each holder of an Allowed Other Secured Claim shall

28   be treated pursuant to Option A or Option B below, at the discretion of FTDF.

**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or

**Option B:** FTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; provided, however, that if the property securing an Allowed Other Secured Claim has been lost or destroyed, FTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B.

Class B-2 is unimpaired, and the holders of Allowed Class B-2 Claims are presumed to vote in favor of the Plan.

  **c.**  **Class B-3: Priority Unsecured Claims.**

    i.  *Classification*: Class B-3 consists of all Allowed Priority Unsecured Claims against FTDF.

    ii.  *Treatment*: Each holder of an Allowed Priority Unsecured Claim shall be paid in full on the Effective Date, unless such holder agrees otherwise. Class B-3 is unimpaired, and the holders of Allowed Class B-3 Claims are presumed to vote in favor of the Plan.

  **d.**  **Class B-4: General Unsecured Claims.**

    i.  *Classification*: Class B-4 consists of all Allowed General Unsecured Claims against FTDF.

    ii.  *Treatment*: Each holder of an Allowed General Unsecured Claim shall be paid in full on the Effective Date, plus Postpetition Interest. Class B-4 is unimpaired, and the holders of Allowed Class B-4 Claims are presumed to vote in favor of the Plan.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

    **e.**  **Class B-5: Equity Interests.**

      i.  *Classification*:  Class B-5 consists of all Allowed Equity Interests in FTDF.

      ii.  *Treatment*:  All holders of Allowed Equity Interests in FTDF shall (a) retain their Pro Rata Share of all distributions received after the Petition Date and, after payment of the FTDF Payment, (b) receive a Pro Rata Share of Allocated Net Sale Proceeds after satisfaction of all Allowed unclassified Claims, all Allowed Class B-1, B-2, B-3 and B-4 Claims, and any and all post-Effective Date fees, costs and expenses of implementation of the Plan for FTDF, and (c) receive a Pro Rata Share of the USACM Trust recoveries (subject to the compromise with DTDF) on account of the Allowed FTDF Unsecured Claim.  Class B-5 is impaired, and the holders of Allowed Class B-5 Equity Interests are entitled to vote to accept or reject the Plan.

    **3.**  **DTDF – (Classes C-1 Through C-5).**

    **a.**  **Class C-1: Secured Tax Claims.**

      i.  *Classification*:  Class C-1 consists of all Allowed Secured Tax Claims against DTDF.

      ii.  *Treatment*:  Each holder of an Allowed Secured Tax Claim shall be paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Secured Tax Claim becomes an Allowed Claim.  Class C-1 is unimpaired, and the holders of Allowed Class C-1 Claims are presumed to vote in favor of the Plan.

    **b.**  **Class C-2: Other Secured Claims.**

      i.  *Classification*:  Class C-2 consists of all Allowed Other Secured Claims against DTDF.

      ii.  *Treatment*:  Each holder of an Allowed Other Secured Claim against DTDF shall be treated pursuant to Option A or Option B below, at the discretion of Post-Effective Date DTDF.

**Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; or

**Option B:** Post-Effective Date DTDF shall surrender the property securing the Allowed Other Secured Claim to the holder of such Claim by making the property reasonably available to such holder before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days after the date the Other Secured Claim becomes an Allowed Claim; provided, however, that if the property securing an Allowed Other Secured Claim has been lost or destroyed, Post-Effective Date DTDF shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of which notice shall constitute "surrender" of the property securing the Allowed Other Secured Claim for purposes of this Option B.

Class C-2 is unimpaired, and the holders of Allowed Class C-2 Claims are presumed to vote in favor of the Plan.

c.  **Class C-3: Priority Unsecured Claims.**

i.  *Classification*:  Class C-3 consists of all Allowed Priority Unsecured Claims against DTDF.

ii.  *Treatment*:  Each holder of an Allowed Priority Unsecured Claim shall be paid in full on the Effective Date, unless such holder agrees otherwise.  Class C-3 is unimpaired, and the holders of Allowed Class C-3 Claims are presumed to vote in favor of the Plan.

d.  **Class C-4: General Unsecured Claims.**

i.  *Classification*:  Class C-4 consists of all Allowed General Unsecured Claims against DTDF.

ii.  *Treatment*:  Each holder of an Allowed General Unsecured Claim shall be paid in full on the Effective Date, plus Postpetition Interest.  Class C-4 is unimpaired, and the holders of Allowed Class C-4 Claims are presumed to vote in favor of the Plan.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    **e.      Class C-5: Equity Interests.**

2    i.      *Classification*:  Class C-5 consists of all Allowed Equity Interests in

3    DTDF.

4    ii.      *Treatment*:  All holders of  Allowed Equity Interests shall (a) retain

5    their interests in DTDF and any distributions received from the Petition Date, and, after

6    satisfaction of all Allowed unclassified Claims, Allowed Class C-1, C-2, C-3 C-4 Claims and the

7    post-Effective Date costs, fees and expenses for implementation of the Plan for DTDF, including

8    without limitation costs, fees, and expenses incurred by Post-Effective Date DTDF under the

9    DTDF Amended Operating Agreement, (b) receive a Pro Rata Share of the assets of Post-

10   Effective Date DTDF, and (c) receive a Pro Rata Share in the USACM Trust recoveries on

11   account of the Allowed DTDF Unsecured Claim.  Class C-5 is impaired, and the holders of

12   Allowed Class C-5 Equity Interests are entitled to vote to accept or reject the Plan.

13        **4.      USA Realty – (Classes D-1 Through D-5).**

14        **a.      Class D-1: Secured Tax Claims.**

15   i.      *Classification*:  Class D-1 consists of all Allowed Secured Tax

16   Claims against USA Realty.

17   ii.      *Treatment*:  Each holder of an Allowed Secured Tax Claim shall be

18   paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15)

19   Business Days after the date the Secured Tax Claim becomes an Allowed Claim.  Class D-1 is

20   unimpaired, and the holders of Allowed Class D-1 Claims are presumed to vote in favor of the

21   Plan.

22        **b.      Class D-2: Other Secured Claims.**

23   i.      *Classification*:  Class D-2 consists of all Allowed Other Secured

24   Claims against USA Realty.

25   ii.      *Treatment*:  Each holder of an Allowed Other Secured Claim against

26   USA Realty shall be treated pursuant to Option A or Option B below, at the discretion of USA

27   Realty.

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    **Option A:**  Holders of Allowed Other Secured Claims shall be paid in full on or

2 before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days

3 after the date the Other Secured Claim becomes an Allowed Claim; or

4    **Option B:**  USA Realty shall surrender the property securing the Allowed Other

5 Secured Claim to the holder of such Claim by making the property reasonably available to such

6 holder before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business

7 Days after the date the Other Secured Claim becomes an Allowed Claim; provided, however, that

8 if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA Realty

9 shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the delivery of

10 which notice shall constitute "surrender" of the property securing the Allowed Other Secured

11 Claim for purposes of this Option B.

12    Class D-2 is unimpaired, and the holders of Allowed Class D-2 Claims are

13 presumed to vote in favor of the Plan.

14    **c.    Class D-3: Priority Unsecured Claims.**

15    i.    *Classification*:  Class D-3 consists of all Allowed Priority Unsecured

16 Claims against USA Realty.

17    ii.    *Treatment*:  Each holder of an Allowed Priority Unsecured Claim

18 shall be paid in full on the Effective Date, unless such holder agrees otherwise.  Class D-3 is

19 unimpaired, and the holders of Allowed Class D-3 Claims are presumed to vote in favor of the

20 Plan.

21    **d.    Class D-4: General Unsecured Claims.**

22    i.    *Classification*:  Class D-4 consists of all Allowed General

23 Unsecured Claims against USA Realty.

24    ii.    *Treatment*:  Each holder of an Allowed General Unsecured Claim

25 against USA Realty shall receive a Pro Rata Share of assets of the Estate of USA Realty after

26 payment in full of all Allowed unclassified Claims, and all Allowed Class D-1, D-2 and D-3

27 Claims.  Class D-4 is impaired, and the holders of Allowed Class D-4 Claims are entitled to vote

28 to accept or reject the Plan.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1             **e.**      **Class D-5: Equity Interests.**

2                  i.      *Classification*: Class D-5 consists of all Allowed Equity Interests in

3 USA Realty.

4                  ii.      *Treatment*: Any and all Equity Interests in USA Realty, regardless

5 of form, are cancelled as of the Effective Date, and the holders of such Equity Interests will

6 receive no distribution under the Plan. Class D-5 is impaired, and the holders of Allowed Class D-

7 5 Equity Interests are deemed to reject the Plan.

8      **5.**      **USA Securities – (Classes E-1 Through E-5).**

9             **a.**      **Class E-1: Secured Tax Claims.**

10                  i.      *Classification*: Class E-1 consists of all Allowed Secured Tax

11 Claims against USA Securities.

12                  ii.      *Treatment*: Each holder of an Allowed Secured Tax Claim shall be

13 paid in full on or before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15)

14 Business Days after the date the Secured Tax Claim becomes an Allowed Claim. Class E-1 is

15 unimpaired, and the holders of Allowed Class E-1 Claims are presumed to vote in favor of the

16 Plan.

17             **b.**      **Class E-2: Other Secured Claims.**

18                  i.      *Classification*: Class E-2 consists of all Allowed Other Secured

19 Claims against USA Securities.

20                  ii.      *Treatment*: Each holder of an Allowed Other Secured Claim against

21 USA Securities shall be treated pursuant to Option A or Option B below, at the discretion of USA

22 Securities.

23          **Option A:** Holders of Allowed Other Secured Claims shall be paid in full on or

24 before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business Days

25 after the date the Other Secured Claim becomes an Allowed Claim; or

26          **Option B:** USA Securities shall surrender the property securing the Allowed Other

27 Secured Claim to the holder of such Claim by making the property reasonably available to such

28 holder before the later of (a) sixty (60) days after the Effective Date, or (b) fifteen (15) Business

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Days after the date the Other Secured Claim becomes an Allowed Claim; provided, however, that

2    if the property securing an Allowed Other Secured Claim has been lost or destroyed, USA

3    Securities shall provide notice of such fact to the holder of the Allowed Other Secured Claim, the

4    delivery of which notice shall constitute "surrender" of the property securing the Allowed Other

5    Secured Claim for purposes of this Option B.

6              Class E-2 is unimpaired, and the holders of Allowed Class E-2 Claims are

7    presumed to vote in favor of the Plan.

8              **c.        Class E-3: Priority Unsecured Claims.**

9                        i.        *Classification*:  Class E-3 consists of all Allowed Priority Unsecured

10   Claims against USA Securities.

11                       ii.       *Treatment*:  Each holder of an Allowed Priority Unsecured Claim

12   shall be paid in full on the Effective Date, unless such holder agrees otherwise.  Class E-3 is

13   unimpaired, and the holders of Allowed Class E-3 Claims are presumed to vote in favor of the

14   Plan.

15             **d.        Class E-4: General Unsecured Claims.**

16                       i.        *Classification*:  Class E-4 consists of all Allowed General Unsecured

17   Claims against USA Securities.

18                       ii.       *Treatment*:  Each holder of an Allowed General Unsecured Claim

19   against USA Securities shall receive a Pro Rata Share of the assets of the Estate of USA Securities

20   after payment in full of all Allowed unclassified Claims, and all Allowed Class E-1, E-2 and E-3

21   Claims.  Class E-4 is impaired, and the holders of Allowed Class E-4 Claims are entitled to vote to

22   accept or reject the Plan.

23             **e.        Class E-5: Equity Interests.**

24                       i.        *Classification*:  Class E-5 consists of all Allowed Equity Interests in

25   USA Securities.

26                       ii.       *Treatment:* Any and all Equity Interests in USA Securities,

27   regardless of form, are cancelled as of the Effective Date, and the holders of such Equity Interests

28

42

will receive no distribution under the Plan.  Class E-5 is impaired, and the holders of Allowed

Class E-5 Equity Interests are deemed to reject the Plan.

### III.

### ACCEPTANCE OR REJECTION OF THE PLAN

**A.    Voting Classes.**

Holders of Allowed Class A-4, A-5,  D-4 and E-4 Claims are entitled to vote to accept or

reject the Plan.  Holders of Allowed Class B-5 and C-5 Equity Interests are entitled to vote to

accept or reject the Plan.  Holders of Allowed Class A-1, A-2, A-3, B-1, B-2, B-3, B-4, C-1, C-2,

C-3, C-4, D-1, D-2, D-3, E-1, E-2, E-3 Claims are deemed to accept the Plan.  Holders of Allowed

Class A-6, A-7, A-8, D-5 and E-5 Equity Interests are deemed to have rejected the Plan.  An

Entity holding an Allowed Claim or Equity Interest in more than one Class is entitled to vote in

each Class.

**B.    Voting Rights Of Holders Of Disputed Claims And Disputed Equity Interests.**

Pursuant to Bankruptcy Rule 3018(a), a Disputed Claim or Disputed Equity Interest will

not be counted for purposes of voting on the Plan to the extent it is Disputed, unless the Court

enters an order temporarily allowing the Disputed Claim or Disputed Equity Interest for voting

purposes under Bankruptcy Rule 3018(a).  Such disallowance for voting purposes is without

prejudice to the holder of the Disputed Claim or Disputed Equity Interest's right to seek to have its

Disputed Claim or Disputed Equity Interest, as the case may be, Allowed for purposes of

distribution under the Plan.

**C.    Acceptance By Impaired Classes.**

An impaired Class of Claims shall have accepted the Plan if (1) the holders (other than any

holder designated under Bankruptcy Code section 1126(e)) of at least two-thirds in dollar amount

of the Allowed Claims actually voting in such class have voted to accept the Plan, and (2) more

than one-half in number of the holders (other than any holder designated under Bankruptcy Code

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  section 1126(e)) of such Allowed Claims actually voting in such Class have voted to accept the

2  Plan.

3          An impaired Class of Equity Interests shall have accepted the Plan if the holders (other

4  than any holder designated under Bankruptcy Code section 1126(e)) of at least two-thirds in

5  amount of the Allowed Equity Interests actually voting in such Class, or subclass, have voted to

6  accept the Plan.

7  **D.          Nonconsensual Confirmation.**

8          In the event that the Classes entitled to vote to accept or reject this Plan fail to accept the

9  Plan in accordance with Bankruptcy Code section 1129(a)(8), the Debtors, with the agreement of

10 the Committees, reserve the right to (i) request that the Court confirm the Plan in accordance with

11 Bankruptcy Code section 1129(b) and/or (ii) modify the Plan in accordance with Bankruptcy Code

12 section 1127(a) and request confirmation of the modified Plan.  Further, as the Plan contains a

13 Plan for each of the five separate Debtors, the Debtors, with the agreement of the Committees,

14 reserve the right to request confirmation of the Plan for one or more, but less than all Debtors

15 under section 1129(b) of the Bankruptcy Code.  In accordance with section 1127 of the

16 Bankruptcy Code, the Debtors, with the agreement of the Committees, reserve the right to alter,

17 amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule, including documents

18 in the Plan Documents Supplement and the Direct Lender Supplement, for one or more or all of

19 the Debtors, including to amend or modify the Plan to satisfy the requirements of section 1129(b)

20 of the Bankruptcy Code for one or more of the Debtors covered by the Plan.  In the event the

21 Debtors, with the agreement of all of the Committees, modify the Plan by withdrawing the Plan

22 for less than all of the Debtors, the Plan, as modified, will remain intact and unchanged for all

23 non-withdrawing Debtors.

24

25

26

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**IV.**

**IMPLEMENTATION OF THE PLAN**

**A.    General Means Of Implementation.**

The Plan will be implemented and consummated through the means contemplated by sections 1123(a)(5)(A), (B) and (D), 1123(b)(2), 1123(b)(3)(A) and (B), and 1123(b)(4) of the Bankruptcy Code, including by:

1.    the transfer of certain Loan Servicing Agreements pursuant to the Asset Purchase Agreement;

2.    the sale of the Acquired Assets as set forth in section C of Art. IV of the Plan and disbursement of the Allocated Net Sale Proceeds and certain other Cash of the Estates in accordance with the Plan;

3.    the transfer of certain assets of USACM to the USACM Trust pursuant to section D.1 of Art. IV of the Plan, the liquidation of those assets by the USACM Trust, the disbursement of Cash to holders of Allowed USACM Unsecured Claims as USACM Trust beneficiaries in accordance with the Plan and the USACM Trust Agreement, and the dissolution of USACM;

4.    the transfer of the FTDF Transferred Claims and the making of the FTDF Payment;

5    the retention by Post-Effective Date DTDF of assets of DTDF pursuant to section D.2 of Art. IV of the Plan, the liquidation of those assets by the Post-Effective Date DTDF, the disbursement of Cash to holders of Allowed Equity Interests in DTDF in accordance with the Plan, and the dissolution of DTDF;

6.    the distribution of FTDF's share of the Allocated Net Sale Proceeds in accordance with the Plan, and the dissolution of FTDF; and

7.    the liquidation of any assets of the USA Realty Estate and the USA Securities Estate, distribution of Cash to holders of Allowed Claims against USA Realty and USA Securities, respectively, in accordance with the Plan, and the dissolution of USA Realty and USA Securities.

**B.     No Substantive Consolidation Or Recharacterization Of Loans.**

On the Effective Date, all of the assets of each Debtor shall be sold, transferred, distributed or retained by each of such Debtor's respective Estates, or the Post-Effective Date Entities created for each such Debtor and its Estate under the Plan, with all proceeds of sold, transferred, or liquidated assets of each Debtor being retained by the respective Debtor's Estate, or the Post-Effective Date Entities created for each such Debtor and its Estate under the Plan.  All Claims against and Equity Interests in the Debtors and their respective Estates shall be retained by the holders of Allowed Claims and Allowed Equity Interests against and in the respective Estates, except as otherwise provided for under the Plan.  The allowance, voting, treatment and distributions on account of Allowed Claims and Allowed Equity Interests shall be as set forth in the Plan on an individual Estate basis.  Notwithstanding any inference to the contrary in this section, Equity Interests in USACM, USA Realty and USA Securities shall be retained only until the Effective Date, at which date, those Equity Interests shall be cancelled on an individual Estate basis under the Plan.

Notwithstanding any provision of this Plan, nothing in this Plan shall constitute or effect a recharacterization of any Loan or any interest in a Loan as giving rise to a Claim against or Equity Interest in any of the Debtors.  If any Entity believes that all or a portion of the Loans should be so recharacterized, it must expressly raise this issue by Filing an objection to the Confirmation of the Plan on this basis.  Any Entity who fails to File such an objection to Confirmation of the Plan shall be forever barred and estopped from arguing, asserting or claiming in any way that its Loan or its interest in a Loan should be recharacterized as an Allowed Claim against or Allowed Equity Interest in a Debtor.

**C.     Asset Sale Transaction.**

The Plan will be implemented in part by the Asset Sale Transaction.  In implementation of the Asset Sale Transaction, USACM and FTDF, as sellers, DTDF, USA Securities and USA Realty, as acknowledging parties, and SPCP Group, LLC, as purchaser, have entered into the Asset Purchase Agreement.  The Asset Purchase Agreement and the Bid Procedures Order provide that the Acquired Assets are sold to SPCP Group, LLC or, as part of the Auction, to a Third Party

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Bidder making a Higher and Better Offer. Pursuant to the Asset Sale Transaction, the Asset

Purchaser (either SPCP Group, LLC or a Third Party Bidder as determined by the Auction) will

purchase the following Acquired Assets:

1.    FTDF's proportional interest in 44 different Loans for Cash consideration of $46

million, subject to certain adjustments; and

2.    USACM's post-Closing rights to service Loans pursuant to the Loan Servicing

Agreements for the Loans and related personal property for Cash consideration based on the future

(A) collection of servicing fees, (B) collection of default rate interest, and (C) other payments and

obligations set forth in the Asset Purchase Agreement.

Except as expressly agreed to otherwise by the Debtors and the Asset Purchaser, the

Acquired Assets will be sold free and clear of all liens, Claims, encumbrances, rights of third

parties and interests. The Confirmation Order shall constitute an Order pursuant to section 363(b)

and (f) of the Bankruptcy Code authorizing the sale of the Estates' interests in the Acquired Assets

to the Asset Purchaser. The Confirmation Order shall provide that the Asset Purchaser is a good

faith purchaser of assets within the meaning of section 363(m) of the Bankruptcy Code and has

paid fair consideration and reasonable equivalent value of the Acquired Assets that are purchased.

Except as set forth in the Asset Purchase Agreement and the Plan, the Asset Purchaser shall have

no liability for Claims or Equity Interests against the Debtors (whether or not currently known)

based on its purchase of Acquired Assets.

After the Auction, the Asset Sale Transaction shall be approved in connection with

Confirmation of the Plan. The Allocated Net Sale Proceeds from the Asset Sale Transaction shall

be distributed to FTDF and USACM Trust, respectively, on the Effective Date of the Plan.

**D.    Post-Effective Date Entities.**

**1.    The USACM Trust.**

The USACM Trust shall be governed and created pursuant to the Plan and the USACM

Trust Agreement. A copy of the proposed USACM Trust Agreement shall be included in the Plan

Documents Supplement. The USACM Trust shall have the discretion, subject to review by the

USACM Trust Committee appointed in accordance with the USACM Trust Agreement, to retain

1   and compensate professionals, compensate the USACM Trustee, compensate the Debtors'

2   Professionals for any assistance of information requested of them by the USACM Trust, employ

3   staff or agents, object to Claims, realize assets, whether by suit, compromise, release or otherwise,

4   and take all actions reasonable to maximize the recovery to beneficiaries of the USACM Trust.

5   The USACM Trust Agreement shall provide for all expense reserves necessary for the USACM

6   Trust.

7          The USACM Committee will propose the Person to serve as the USACM Trustee, after

8   soliciting advice from and obtaining the consent of USACM and the other Committees, and will

9   provide all disclosures required respecting the Person pursuant to sections 1129(a)(4) and (a)(5) of

10  the Bankruptcy Code, not less than ten (10) days before the Confirmation Hearing. The USACM

11  Trustee shall be approved by the Court at the Confirmation Hearing.

12         The USACM Trust shall be funded with all assets of the USACM Estate not collected or

13  disposed of prior to the Effective Date, including Cash and noncash proceeds.  Assets of the

14  USACM Estate shall include the USACM Loans, the Prepaid Interest (including Prepaid Interest

15  collected by the Asset Purchaser post-Effective Date and including the DTDF Prepaid Interest,

16  subject to the objection of the DTDF Committee, which shall be determined by the Court if not

17  settled), the USACM Accounts (including USACM Estate's share of the IP $58 Million

18  Promissory Note), all USACM Litigation Claims, including without limitation the Non-Debtor

19  Insider Litigation, belonging to or assertable by the USACM Estate, the FTDF Litigation Claims

20  transferred to USACM pursuant to section E.2.j of Art. IV of the Plan, and all servicing and

21  related fees to be retained by USACM as set forth in the Asset Purchase Agreement and which

22  will be included in the Asset Sale Transaction to the Asset Purchaser.  The USACM Trust shall

23  receive its share of the Non-Debtor Insider Litigation of the USACM Estate and may, without

24  further order of the Court, enter into a joint prosecution or sharing agreement with Post-Effective

25  Date DTDF.  Pending Litigation shall be prosecuted or defended by the Asset Purchaser, as

26  appropriate, if the Asset Acquirer, in its sole discretion, agrees to do so in writing within ten (10)

27  Business Days of the Effective Date of the Plan.  If Asset Purchaser does not agree to prosecute or

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    defend the Pending Litigation, the Pending Litigation shall automatically transfer to the USACM

2    Trust, and USACM may, in its discretion, prosecute or defend the Pending Litigation.

3          On and after the Effective Date, pursuant to the Asset Purchase Agreement and the Plan,

4    the USACM Trust shall have or, if it does not have, be granted access to all databases, software,

5    documents, records and office equipment currently owned by, or currently in the possession or

6    control of, any of the Debtors, which, in the discretion of the USACM Trust, are deemed to be

7    necessary.  The foregoing shall include, but not be limited to, electronic copies (in a form that will

8    enable the USACM Trust to use and manipulate the data), all software and systems, all hardware,

9    all documents, all records (including reconstructed Loan ledgers and other documents created

10   during the Chapter 11 Cases), and all office equipment and all computers that are necessary or

11   make it convenient for the USACM Trust to administer or service any Loans, to object to Claims

12   against and Equity Interests in USACM, to prosecute or defend any litigation to which USACM,

13   the USACM Estate or the USACM Trust is a party, to administer and/or manage the USACM

14   Trust, and to make distributions to the beneficiaries of the USACM Trust.   Notwithstanding the

15   foregoing, as agreed in the Asset Purchase Agreement, the USACM Trust shall retain the original

16   relevant databases and servicing and reporting software.

17         The beneficiaries of the USACM Trust will be the holders of Allowed USACM Unsecured

18   Claims, including the Allowed Unremitted Principal Claims, the DTDF Unsecured Claim, the

19   Direct Lender Unsecured Claims, and the FTDF Unsecured Claim.  Distributions from the

20   USACM Trust shall be made directly to the holders of Allowed USACM Unsecured Claims,

21   including holders of Unremitted Principal Claims, holders of Allowed Direct Lender Unsecured

22   Claims and holders of Allowed Equity Interests in FTDF, except that distributions on account of

23   the Allowed DTDF Unsecured Claim shall be made to the Post-Effective Date DTDF, Pro Rata

24   based upon the Allowed amount of such Claims; provided, however, that distributions on account

25   of the Allowed FTDF Unsecured Claim shall be transferred to Post-Effective Date DTDF until

26   Post-Effective Date DTDF obtains the DTDF 85% Recovery and thereafter, distributions on

27   account of the FTDF Unsecured Claim shall be made directly to holders of Allowed Equity

28   Interests in FTDF.  There shall be no separate trusts or Post-Effective Date Entities for FTDF or

1    the holders of Allowed Direct Lender General Unsecured Claims. All costs of distribution

2    allocable to a particular group of beneficiaries shall be paid from such respective distributions in

3    accordance with the USACM Trust Agreement.

4          **2.      Post-Effective Date DTDF.**

5          Post-Effective Date DTDF shall be governed pursuant to the Plan and the DTDF Amended

6    Operating Agreement. A copy of the DTDF Amended Operating Agreement shall be included in

7    the Plan Documents Supplement. Allowed Equity Interests in DTDF shall survive the Effective

8    Date, and be the sole beneficiaries of Post-Effective Date DTDF.

9          The DTDF Amended Operating Agreement will modify the DTDF Operating Agreement

10    to include, but not be limited to, the elimination of the management provisions and fees relating to

11    USA Realty. The DTDF Amended Operating Agreement will also include all disclosures required

12    under sections 1129(a)(4) and (a)(5) of the Bankruptcy Code. Post-Effective Date DTDF, through

13    the DTDF Administrator, shall have the discretion, subject to review by the DTDF Post-Effective

14    Date Committee in accordance with the DTDF Amended Operating Agreement, to realize assets,

15    whether by suit, compromise, release or otherwise. The DTDF Amended Operating Agreement

16    shall provide for all expense reserves necessary for Post-Effective Date DTDF.

17          The DTDF Committee will propose the Person to serve as the DTDF Administrator, after

18    advice and consent of DTDF, and will provide all disclosures required respecting the Person

19    pursuant to sections 1129(a)(4) and (a)(5) of the Bankruptcy Code, not less than ten (10) days

20    before the Confirmation Hearing. The DTDF Administrator shall be appointed by the Court at the

21    Confirmation Hearing.

22          Post-Effective Date DTDF shall retain the DTDF Estate and shall be funded by and consist

23    of all assets of the DTDF Estate not collected or disposed of prior to the Effective Date, including

24    all Cash and noncash proceeds. The assets of the DTDF Estate retained by Post-Effective Date

25    DTDF include the DTDF Loans (including but not limited to rights associated with the former

26    Epic and Sheraton Loans and the Loan Servicing Agreements for the Excluded DTDF Loans), the

27    FTDF Transferred Assets, all DTDF Litigation Claims, including without limitation the Non-

28    Debtor Insider Litigation, belonging to or assertable by the DTDF Estate, and the DTDF Estate's

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   share of the IP $58 Million Promissory Note. Post-Effective Date DTDF shall retain its share of

2   the Non-Debtor Insider Litigation and may, without further order of the Court, enter into a joint

3   prosecution or sharing agreement with the USACM Trust. Post-Effective Date DTDF shall also

4   be funded with Pro Rata distributions from the USACM Trust on account of the Allowed DTDF

5   Unsecured Claim.

6       On and after the Effective Date, pursuant to the Asset Purchase Agreement and the Plan,

7   Post-Effective Date DTDF shall have or, if it does not have, be granted access to all databases,

8   software, documents, records and office equipment currently owned by, or currently in the

9   possession or control of, any of the Debtors, which, in the discretion of Post-Effective Date

10  DTDF, are deemed to be necessary. The foregoing shall include, but not be limited to, electronic

11  copies (in a form that will enable Post-Effective Date DTDF to use and manipulate the data), all

12  databases, all software and systems, all hardware, all documents and all records (including the

13  reconstructed Loan ledgers and other documents created during the Chapter 11 Cases), and all

14  office equipment and all computers that are necessary or make it convenient for Post-Effective

15  Date DTDF to collect upon and otherwise administer its retained Loans, to object to Claims

16  against and Equity Interests in DTDF and Post-Effective Date DTDF, to prosecute or defend any

17  litigation to which DTDF, the DTDF Estate or the Post-Effective Date DTDF is a party, to

18  administer and/or manage Post-Effective Date DTDF, and to make distributions to the holders of

19  Allowed Claims against and Equity Interests in DTDF and Post-Effective Date DTDF.

20  **E.      Intercompany Compromises.**

21      The Plan will effect the following intercompany compromises:

22      **1.      The USACM/Direct Lender Compromise.**

23          If the Plan is confirmed, all Direct Lenders will be bound to the compromise

24  provisions set forth herein, regardless of whether they vote to accept or reject the Plan, or Class A-

25  5 votes to accept or reject the Plan; all such objections must be made by objecting to Plan

26  confirmation.

27          **a.      _Release_**: USACM releases all Claims against Direct Lenders, including but

28  not limited to surcharge, recharacterization of Direct Lender Loans, and the collection of

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

prepetition accrued annual loan servicing fees due under the Loan Servicing Agreements but unpaid as of the Effective Date, but excluding all causes of action to recover principal or interest payments USACM paid in advance to the applicable Direct Lender(s) before the Petition Date.

      **b.**    ***Loan Servicing Agreements***:  All rights of USACM as servicer under the Loan Servicing Agreements transferred without modification pursuant to the Plan and the Asset Purchase Agreement shall be free and clear of all liens, Claims, interests, obligations and encumbrances whatsoever under sections 363 and 1123 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code.

      **c.**    ***Tax Reporting***:  USACM shall prepare and timely transmit all required Forms 1098 and 1099 for calendar year 2006 in respect of the Acquired Assets.

      **d.**    ***Prepaid Interest***:  Claims for Prepaid Interest, offsets, or holdbacks from Direct Lenders under the Plan (whether collected from the Borrowers or the Direct Lenders) shall be property of the USACM Estate free and clear of all liens, Claims and interests, except as otherwise provided in the Plan.

      i.    Pre-Effective Date Prepaid Interest – Claims for Prepaid Interest, offsets, or holdbacks from Direct Lenders collected through the Effective Date are retained by USACM, and will be used to satisfy Allowed unclassified Claims and Allowed Class A-1, A-2 and A-3 Claims in accordance with the Plan, with any excess being contributed to the USACM Trust.

      ii.    Post-Effective Date Prepaid Interest – The Prepaid Interest shall be collected post-Effective Date through an assignment of Prepaid Interest to the USACM Trust, which shall survive the Effective Date, so that the Asset Purchaser or any substitute or subsequent servicer will continue to net Prepaid Interest sums due from Direct Lenders in accordance with the Plan and will collect Prepaid Interest from Borrowers, and remit those amounts to the USACM Trust, except as otherwise provided herein.

      iii.    Post-Effective Date Causes of Action – The statute of limitations for recovery of the Prepaid Interest as a fraudulent transfer shall be tolled for two (2)

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

years.  Recovery of Prepaid Interest by USACM or the USACM Trust as a result of the payment of Prepaid Interest under the Plan via a pre-Effective Date or post-Effective Date netting shall be a complete defense to all Claims for recovery of Prepaid Interest, and such Claims may be brought in enforcement of the Plan settlement agreement, binding all Direct Lenders upon Plan Confirmation.

**e.**     ***2% Holdback***:  From the 2% Holdback, Direct Lenders shall reimburse USACM (on a Pro Rata basis based upon unpaid principal Loan balance of those Direct Lenders with funds in the 2% Holdback) for Allowed Administrative Expense Claims of Professionals employed by the Direct Lenders Committee up to a maximum amount cap of $605,000.  In addition to the foregoing, USACM will also retain its contractual servicing fees due under the Loan Servicing Agreements.

**f.**     ***Post-Effective Date Offsets***: The Direct Lenders may not offset sums due post-Effective Date to the servicing agent, *i.e.,* the Asset Purchaser, for Claims of Direct Lenders against USACM.

**g.**     ***Pre-Effective Date Offsets***: The Direct Lenders may not offset pre-Effective Date accrued and unpaid servicing fees and sums under Paragraph 4 of the Loan Servicing Agreements (or any comparable paragraph that may be differently numbered) due to USACM against the Direct Lenders' Claims against USACM.

**h.**     ***Alternative Dispute Resolution***: There will be an Alternative Dispute Resolution option for objections to Direct Lender Unsecured Claims, objections to the Loan Servicing Fee Schedule, and any other litigation between Post-Effective Date DTDF and the USACM Trust.  The Alternative Dispute Resolution Agreement shall be Filed as part of the Direct Lender Supplement pursuant to section E of Art. I of the Plan.

**2.**     **The USACM/FTDF Compromise.**

**a.**     ***FTDF Unremitted Principal Claim***: The FTDF Unremitted Principal Claim shall be an Allowed General Unsecured Claim against USACM in the amount of $347,775 plus prepetition interest, if any.

**b**      *FTDF Unsecured Claim*: The FTDF Unsecured Claim against USACM is the General Unsecured Claim of FTDF against USACM, excluding the FTDF Unremitted Principal Claim, in the amount as may be agreed to by the FTDF Committee and the USACM Committee by no later than the date of the Confirmation Hearing, or if no agreement is reached by such date, the amount determined by the Court after an evidentiary hearing between such Committees; provided, however, that the USACM Committee and the FTDF Committee or, after the Effective Date, the USACM Trust and the FTDF Committee, may agree at any time as to the amount that represents the FTDF Unsecured Claim without further Court order by filing a notice of such agreement with the Court; and provided further, however, that prior to the Effective Date, the USACM Committee and the FTDF Committee shall consult with the DTDF Committee and the Direct Lender Committee regarding the issue.

**c.**      *FTDF Prepaid Interest*: The FTDF Prepaid Interest is $2,557,307 and has been netted against the post-Petition Date FTDF collections.  The FTDF Prepaid Interest is being held in the USACM collection account and, upon the Effective Date of the Plan, USACM shall be permitted to retain the FTDF Prepaid Interest as an unencumbered asset of the USACM Estate.

**d.**      *FTDF Management Fee*: The FTDF management fee payable to USA Realty, and then payable to USACM, of approximately $78,000 per month shall be waived in full for both prepetition and postpetition periods, through the earlier of January 31, 2007, or the Effective Date.  Any management fees paid by FTDF to USA Realty or USACM since the Petition Date shall be applied to reduce any obligations of FTDF to USACM under the Plan, and any remaining management fees shall be repaid by USACM to FTDF on the Effective Date.  Management fees from July 2006 until the Effective Date shall be deposited in the USA Realty account and transferred to FTDF on the Effective Date.

**e.**      *FTDF Servicing Fee*: The FTDF Loan Servicing Agreement provides for an "up to 3%" annual servicing fee.  FTDF shall be charged a 1% annual servicing fee for the period of the Petition Date through June 30, 2006.  Commencing on July 1, 2006 and ending on the earlier of (i) the Effective Date or (ii) January 31, 2007, FTDF shall be charged a 2.5% annual

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

loan servicing fee.  To the extent any prepetition servicing fees are outstanding, such prepetition

servicing fees are waived in full by USACM.

f. **FTDF's Servicer Advances:**  FTDF shall pay its proportionate share of all

Servicer Advances incurred by USACM prior to the Closing of the Asset Sale Transaction;

provided, however, that if FTDF pays the FTDF Debtors' Professionals' Fee/Cost Allocation,

FTDF shall not be responsible for reimbursing Servicer Advances incurred by the Debtors'

Professionals, except, solely for Servicer Advances incurred by firms other than Ray Quinney &

Nebeker P.C., Mesirow Interim Financial Management, LLC or Schwartzer & McPherson.  If

USACM receives payment from any source for Servicer Advances that have been previously paid

by FTDF (including proceeds from the sale of the respective secured real property), then USACM

shall reimburse FTDF for such Servicer Advances paid by FTDF pursuant to this subsection.

g. **FTDF's Debtors' Professionals' Fee/Cost Allocation:**  FTDF's obligation

for the Allowed Administrative Expense Claims of the Debtors' Professionals shall be limited to

the FTDF's Debtors' Professionals' Fee/Cost Allocation through the earlier of (i) the Effective

Date or (ii) January 31, 2007.

h. **January 31, 2007:**  In the event the Effective Date does not occur by

January 31, 2007, the parties' settlement regarding FTDF's payment of servicing fees, Servicer

Advances, the FTDF Management Fee, or the FTDF's Debtors' Professionals' Fees/Cost

Allocation, as set forth in this Plan, shall no longer be enforceable as of February 1, 2007, and

USACM and FTDF shall have reserved all of their rights with respect thereto for all periods after

January 31, 2007, including the right of USACM to seek a Court order to compel FTDF's payment

of such fees for all time periods after January 31, 2007.

i. **Overbid/Break-up Fee/Expense Reimbursement Allocation:** The Overbid

Allocation shall be 85% to FTDF and 15% to USACM for any overbid consideration, and any

incurred break-up fee or expense reimbursement obligation (as those terms are used in the Asset

Purchase Agreement) shall be allocated in the same percentages, except as otherwise provided in

the Stipulation memorializing the agreement between USACM and FTDF on the Overbid

Allocation filed by the USACM Committee and the FTDF Committee with the Court, under seal,

55

and served on the Debtors as confidential information, no later than ten (10) days prior to the Auction.

       **j.**     ***Claims Transfer:*** On the Effective Date, FTDF will transfer all of the FTDF Litigation Claims, except the non-assignable FTDF Litigation Claims, to the USACM Trust. The USACM Trust (and not FTDF) shall bear the costs of pursuing a recovery on FTDF Litigation Claims transferred to the USACM Trust pursuant to this provision.

       **3.**     **The FTDF/DTDF Compromise.**

       **a.**     ***FTDF Payment:*** On the Effective Date, FTDF shall pay the FTDF Payment to DTDF.

       **b.**     ***DTDF Repayment of FTDF Payment***: Upon achieving the FTDF Base Recovery Percentage (not as adjusted below), Post-Effective Date DTDF shall repay $500,000 of the FTDF Payment. On each anniversary of the Effective Date, a further calculation shall be performed by increasing the dollar amount of the recovery that Post-Effective Date DTDF must obtain in order for Post-Effective Date DTDF to achieve the Adjusted FTDF Base Recovery Percentage. Only upon achieving the Adjusted FTDF Base Recovery Percentage shall Post-Effective Date DTDF repay the balance of the FTDF Payment.

       **c.**     ***Asset and Claims Transfer***: On the Effective Date, FTDF will transfer the FTDF Transferred Assets to Post-Effective Date DTDF. Post-Effective Date DTDF (and not FTDF) shall bear the costs of pursuing a recovery on FTDF Transferred Assets.

       **d.**     ***FTDF Unsecured Claim Subordination***: FTDF will transfer its Pro Rata Share of the USACM Trust on account of the FTDF Unsecured Claim to DTDF until the Allowed Equity Interests in DTDF receive the DTDF 85% Recovery. After the DTDF 85% Recovery is obtained, FTDF will retain its Pro Rata Share of the USACM Trust on account of the FTDF Unsecured Claim.

       **4.**     **The FTDF/USA Realty Compromise.**

       **a.**     ***Management Fee:*** USA Realty releases FTDF from all management fees accrued, but unpaid, as of the Petition Date and agrees (i) to the waiver of postpetition management fees paid by FTDF to USA Realty and/or USACM, and (ii) to the repayment or

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 | release of those waived postpetition management fees paid by FTDF, or held back from

2 | distributions to FTDF by USACM, for all periods after the Petition Date.

3 |        **b.**    ***Subordinated Claim:*** FTDF shall subordinate its Claim against USA

4 | Realty to the payment of all other Allowed Claims against USA Realty, except for the

5 | subordinated part of the Allowed Claim of DTDF, which shall be paid pari passu with the

6 | Subordinated Claim of FTDF.

7 |        **5.**    **The DTDF/USA Realty Compromise.**

8 |        **a.**    ***Subordinated Claim:*** DTDF shall subordinate any Allowed Claim it has

9 | against USA Realty to the payment of all other Allowed Claims against USA Realty except the

10 | subordinated Claim of FTDF against USA Realty to the extent that, and in the amount that, the

11 | Allowed Claim of DTDF against USA Realty exceeds $50 million. Such Subordinated Claim of

12 | DTDF against USA Realty shall be paid pari passu with the Subordinated Claim of FTDF against

13 | the USA Realty Estate.

14 |        **b.**    ***Litigation Claims:*** In exchange for the partial subordination of the DTDF

15 | Claim, Litigation Claims held by USA Realty, including without limitation, the Avoidance

16 | Actions and the Non-Debtor Litigation, shall be preserved and transferred to Post-Effective Date

17 | DTDF, which may be pursued at the discretion of, and at the sole cost of, the Post-Effective Date

18 | DTDF.

19 |        **c.**    ***Management Fees***: USA Realty releases DTDF from all management fees

20 | accrued, but unpaid, as of the Petition Date. With respect to management fees paid postpetition to

21 | USACM through USA Realty, or collected and held by USACM postpetition, the payment,

22 | waiver, refund or other treatment of those management fees shall be as mutually agreed upon by

23 | the USACM Committee and the DTDF Committee or, in the absence of agreement, will be

24 | determined by the Court after evidence submitted by both Committees.

25 | **F.**    **Loan Distributions And Loan Servicing Agreements.**

26 |        After the Effective Date, the Direct Lenders and Post-Effective Date DTDF shall be

27 | entitled to distributions from the Direct Lender Loans in accordance with the related Loan

28 | Servicing Agreements and applicable Nevada law, by the Asset Purchaser, as the third party

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  servicer.  After the Effective Date, the Direct Lenders are obligated to comply with the terms of

2  the applicable Loan Servicing Agreements including the payment of fees as set forth on the Loan

3  Servicing Fee Schedule included in the Direct Lender Supplement subject to the resolution of any

4  disputes regarding the same under the Alternative Dispute Resolution option.

5  **G.    Preservation Of Rights Of Action And Defenses.**

6          Except to the extent such rights, Claims, causes of action, defenses, and counterclaims are

7  expressly and specifically released in connection with the Plan or in any settlement agreement

8  approved during the Chapter 11 Cases, (1) any and all rights, Claims, causes of action, defenses,

9  and counterclaims accruing to or assertable by the Debtors or their Estates, including without

10  limitation any and all Litigation Claims, the Non-Debtor Insider Litigation, Claims related to the

11  Undistributed Cash and Claims for Prepaid Interest shall remain assets of such Estates and be

12  assertable by the Debtors or such Estates, and to the extent applicable, be transferred to and

13  assertable by any respective Post-Effective Date Entity, whether or not litigation relating thereto is

14  pending on the Effective Date, and whether or not any such rights, Claims, causes of action,

15  defenses, and counterclaims have been Scheduled or otherwise listed or referred to in the Plan or

16  Disclosure Statement, or any other document Filed with the Court, and (2) neither the Debtors nor

17  the Post-Effective Date Entities waive, relinquish, or abandon (nor shall they be estopped or

18  otherwise precluded from asserting) any right, Claim, cause of action, defense, or counterclaim

19  that constitutes property of such Debtor's Estate or is assertable by such Estate: (A) whether or not

20  such right, Claim, cause of action, defense, or counterclaim has been listed or referred to in the

21  Schedules, the Plan, the Disclosure Statement, or any other document Filed with the Court,

22  (B) whether or not such right, Claim, cause of action, defense, or counterclaim is currently known

23  to the Debtors, and (C) whether or not a defendant in any litigation relating to such right, Claim,

24  cause of action, defense, or counterclaim filed a proof of Claim in the Chapter 11 Cases, filed a

25  notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against

26  the Plan, or received or retained any consideration under the Plan.  Without in any manner limiting

27  the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity,

28  including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a

2    right, Claim, cause of action, defense, or counterclaim, or potential right, Claim, cause of action,

3    defense, or counterclaim, in the Schedules, the Plan, the Disclosure Statement, or any other

4    document Filed with the Court shall in no manner waive, eliminate, modify, release, or alter the

5    Debtors or the Post-Effective Date Entities' rights to commence, prosecute, defend against, settle,

6    and realize upon any rights, Claims, causes of action, defenses, or counterclaims that any of the

7    Debtors or the Estates has or may have as of the Confirmation Date.  The Debtors or the Post-

8    Effective Date Entities may commence, prosecute, defend against, recover on account of, and

9    settle all rights, Claims, causes of action, defenses, and counterclaims in their sole discretion in

10   accordance with what is in the best interests, and for the benefit, of the Debtors or the Post-

11   Effective Date Entities.

12   **H.     Nondischarge Of Debtors And Injunction.**

13          **This Plan provides for an injunction of certain actions against the Debtors.  Holders**

14   **of Claims against and Equity Interest in the Debtors may not pursue (1) property of the**

15   **Estates other than through the Claims and Equity Interests allowance process; or (2) the**

16   **Debtors or their agents.**

17          **Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order shall**

18   **not discharge Claims against or Equity Interests in the Debtors.  However, no holder of a**

19   **Claim or Equity Interest may receive any payment from or seek recourse against any assets**

20   **that are distributed or to be distributed under the Plan, except for those assets required to**

21   **be distributed to such holder as expressly provided for in the Plan.  As of the Effective Date,**

22   **all Entities are precluded from asserting against any assets that are distributed or to be**

23   **distributed under the Plan any Claims, rights, causes of action, liabilities or interests based**

24   **upon any act or omission, transaction or other activity of any kind or nature that occurred**

25   **prior to the Effective Date, other than as expressly provided in the Plan or Confirmation**

26   **Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or**

27   **Equity Interest and regardless of whether such an Entity has voted to accept the Plan.**

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date all Entities that have held, currently hold or may hold a debt, Claim, other liability or Equity Interest against or in the Debtors that would be discharged upon confirmation of the Plan on the Effective Date but for the provisions of section 1141(d)(3) of the Bankruptcy Code shall be permanently enjoined from taking any of the following actions on account of such debt, Claim, liability, Equity Interest or right: (A) commencing or continuing in any manner any action or other proceeding on account of such debt, Claim, liability, Equity Interest or right against assets or proceeds thereof that are to be distributed under the Plan, other than to enforce any right to a distribution with respect to such assets or the proceeds thereof as provided under the Plan; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any assets to be distributed to creditors under the Plan, other than as permitted under subparagraph (A) above; and (C) creating, perfecting or enforcing any lien or encumbrance against any assets to be distributed under the Plan, other than as permitted by the Plan, provided that nothing contained herein shall limit the rights of any distributee under the Plan from taking any actions in respect of property distributed or to be distributed to it under the Plan.**

## V.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption.**

In the Schedule of Executory Contracts and Unexpired Leases Filed and served in accordance with section D of Art. I of the Plan, the Debtors that shall set forth the executory contracts and unexpired leases that are to be assumed or assumed and assigned effective upon the Effective Date, and shall specify the Cure Payment, if any, that the Debtors believe must be tendered on the Effective Date, in order to provide compensation in accordance with section 365(b)(1)(A) and (B) of the Bankruptcy Code.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Objections to the assumption or the assumption and assignment of any executory contracts

2  or unexpired leases listed in the Schedule of Executory Contracts and Unexpired Leases or to any

3  proposed Cure Payment amounts set forth in that Schedule must be Filed and served on the

4  Debtors and the Committees on or before the date for filing objections to the Plan, and no other

5  objections to the assumption and/or assumption and assignment of such executory contracts or

6  unexpired leases or to such Cure Payment amounts shall be timely.  All objections Filed and

7  served in accordance with this provision must be supported by a declaration specifying the

8  objection to the assumption and/or assignment and/or to the amounts allegedly owing under

9  sections 365(b)(1)(A) and (B) of the Bankruptcy Code.  Failure to File and serve an objection in

10  accordance with this subsection shall result in the determination that the assumption or assumption

11  and assignment is proper and that the tender of the Cure Payment, as specified in the Schedule of

12  Executory Contracts and Unexpired Leases shall provide, on the Effective Date, cure and

13  compensation for any and all defaults and unpaid obligations under such assumed executory

14  contracts or unexpired leases.  The Debtors reserve the right to respond to and contest any

15  objection filed by any party to an executory contract or unexpired lease and, as part of the

16  Confirmation Hearing, to request a determination from the Court as to the right of the Debtors to

17  assume or assume and assign such executory contract or unexpired lease and/or the amount of the

18  Cure Payment.  If a party to any executory contract or unexpired lease establishes that the Cure

19  Payment is greater than the amount listed on the Schedule of Executory Contracts and Unexpired

20  Leases, the Debtors reserve the right under section 365(b) of the Bankruptcy Code to reject such

21  executory contract or unexpired lease, or to assume such executory contract or unexpired lease, at

22  the Debtors' option.

23    Up to and until one (1) day prior to the Confirmation Hearing, Entry of the Confirmation

24  Order shall constitute approval of the Debtors may delete any executory contract or unexpired

25  lease from the Schedule of Executory Contracts and Unexpired Leases by Filing an amended

26  Schedule of Executory Contracts and Unexpired Leases and serving that amended Schedule on the

27  affected non-Debtor party to the executory contract or unexpired lease.

28

1    Entry of the Confirmation Order by the Court any assumptions and/or any assumptions and

2    assignments made hereunder pursuant to sections 365(a) and 365(f) of the Bankruptcy Code.  All

3    Cure Payments which may be required by Bankruptcy Code section 365(b)(1) shall be made on

4    the Effective Date, or as soon thereafter as is practicable, or as may otherwise be agreed by the

5    parties to any particular executory contract or unexpired lease.

6    **B.    Rejection.**

7         **1.    General.**

8    Effective upon the Effective Date, the Debtors hereby reject all executory contracts and

9    unexpired leases that exist between the Debtors and any other Entities which have not previously

10   been rejected, except the Debtors do not reject those executory contracts and unexpired leases

11   (a) which are listed in the Schedule of Executory Contracts and Unexpired Leases referred to in

12   section A above and assumed or assumed and assigned on the Effective Date, or (b) which are or

13   have been specifically assumed, or assumed and assigned, by the Debtors with the approval of the

14   Court by separate proceeding in the Chapter 11 Cases.

15   All Allowed Claims arising from the rejection of executory contracts or unexpired leases,

16   whether under the Plan or by separate proceeding, shall be treated as General Unsecured Claims in

17   Class A-4 (USACM), Class B-4 (FTDF), Class C-4 (DTDF), Class D-4 (USA Realty) and

18   Class E-4 (USA Securities), respectively.

19        **2.    USACM Management And/Or Operating Agreements.**

20   USACM is a party to various management and/or operating agreements with non-Debtor

21   Entities.  Except as to the management and/or operating agreements with FTDF and DTDF which

22   are dealt with separately under this Plan, as part of the Schedule of Executory Contracts and

23   Unexpired Leases referred to in section A above, USACM shall designate all such management

24   and/or operating agreements that are to be rejected, assumed or assumed and assigned under the

25   Plan.  Notwithstanding the rejection of any such management and/or operating agreement,

26   USACM reserves the right to claim all fees or other amounts owing USACM from the period prior

27   to the date of the rejection.  All Allowed Claims arising from USACM's rejection of such

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    executory contracts are General Unsecured Claims of USACM, and shall be treated under

2    Class A-4 of the Plan.

3         **3.    Claims Bar Date.**

4         All holders of Claims arising from the rejection of executory contracts or unexpired leases,

5    whether rejected under the Plan or by separate proceeding, must File a request for payment in

6    accordance with the Plan to have their Claims treated as Allowed Claims hereunder. A request for

7    payment of any and all Claims allegedly arising from a Debtor's rejection of executory contracts

8    or unexpired leases, whether rejected under the Plan or by separate proceeding, must be Filed on

9    or before such date as the Court has fixed or may fix by express order; provided, however, that if

10   the Court has not entered an order fixing such a date prior to the Confirmation Hearing, all such

11   requests for payment must be made on or before the first Business Day which is thirty (30)

12   calendar days after the date of service of notice of entry of the Confirmation Order.  Failure to File

13   such a request for payment prior to the time set forth herein shall be forever barred from asserting

14   such Claims against the Debtors, the Estates, the Post-Effective Date Entities and/or any other

15   Entity or any of their respective property, and the Debtors, the Estates, and the Post-Effective Date

16   Entities, to the extent applicable, shall be discharged of any obligation on such Claim or any other

17   Claim related such Claim.

18

19                                   **VI.**

20   **CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE**

21

22   **A.    Conditions To Confirmation.**

23         Confirmation of the Plan shall not occur unless and until each of the conditions set forth

24   below has been satisfied or duly waived by the Debtors.

25         1.    The USACM Trust Agreement and DTDF Amended Operating Agreement have

26   been Filed in form and substance acceptable to the Court, USACM and DTDF, respectively.

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    2.    The Plan is consistent with the terms of the Asset Purchase Agreement, except as

2  may be otherwise agreed to by the Asset Purchaser.

3    3.    The Confirmation Order is in a form and substance acceptable to the Debtors and

4  the Asset Purchaser.

5    4.    The Court shall have entered the Confirmation Order.

6  **B.    Conditions To Effective Date.**

7    The Effective Date of the Plan shall not occur unless and until each of the conditions set

8  forth below has been satisfied or duly waived by the Debtors.

9    1.    The Confirmation Order has been entered by the Court in a form and substance

10  reasonably satisfactory to the Debtors, and the same is a Final Order.

11    2.    All conditions precedent to the Closing of the Asset Sale Transaction have been

12  satisfied or waived by the appropriate party and Asset Purchaser is prepared to, and does, close the

13  Asset Sale Transaction on the Effective Date.

14    3.    The USACM Trust Agreement and the DTDF Amended Operating Agreement

15  have been executed and approved by the Court, and there is sufficient Cash available to fund the

16  Post-Effective Date Entities in accordance with the Plan in the amount necessary to pay all Claims

17  that must be paid on the Effective Date.

18  **C.    Waiver Of Conditions.**

19    Except to the extent that a waiver would constitute a breach under the Asset Purchase

20  Agreement or any substantially similar agreement with the Asset Purchaser, the Debtors may

21  waive any of the above conditions to the Effective Date, in whole or in part and in their sole and

22  absolute discretion, by Filing a written waiver.  The failure to satisfy or waive any condition may

23  be asserted by the Debtors regardless of the circumstances giving rise thereto.  The failure of the

24  Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights,

25  and each such right shall be deemed an ongoing right that may be asserted at any time.

26  **D.    Failure To Satisfy Conditions.**

27    The Effective Date must occur on or before the later of: (1) February 16, 2007, or (2) such

28  other date as may be agreed to between the Asset Purchaser and the Debtors or which is

1 established by the Debtors, with the approval of the Court, after notice and a hearing. If the

2 Effective Date does not timely occur, the Confirmation Order shall automatically be vacated. If

3 the Confirmation Order is vacated, the Plan and the Confirmation Order shall be deemed null and

4 void, of no force or effect and shall not be used by any party for any purpose and nothing in the

5 Plan or the Confirmation Order shall prejudice or constitute a waiver or release of any right, Claim

6 or remedy by or against the Debtors or any other party.

7

8 **VII.**

9 **DISTRIBUTION OF CONSIDERATION**

10

11 **A.    Objections To Claims.**

12    **1.    Deadlines.**

13        Unless otherwise extended by the Court, objections to the allowance of Claims and Equity

14 Interests shall be Filed and served upon the Entities asserting such Claims or Equity Interests as

15 follows: (A) for any and all Claims and Equity Interests to which the General Bar Date applies,

16 ninety (90) days after the Effective Date; (B) for any and all Claims to which the Administrative

17 Claims Bar Date or the Professionals Administrative Bar Date applies, thirty (30) days after the

18 expiration of the respective Bar Date; and (C) for any and all Claims to which the Bar Date

19 applicable under section B.3 of Art. V of the Plan applies, thirty (30) days after the expiration of

20 that Bar Date.

21    **2.    Authority.**

22        The Post-Effective Date Entities, (or, if there are no Post-Effective Date Entities for the

23 USACM and DTDF Estates, USACM and DTDF)the FTDF Committee (to the extent it is still in

24 existence) or FTDF (for the benefit of and on behalf of the FTDF Estate), USA Realty on behalf of

25 the USA Realty Estate and USA Securities on behalf of the USA Securities Estate, shall be

26 responsible for Filing objections to any and all Claims and Equity Interests that are Disputed

27 Claims or Disputed Equity Interests asserted against its Estate. The Post-Effective Date Entities

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   (of, if there are not Post-Effective Date Entities for the USACM and DTDF Estates, USACM and

2   DTDF), the FTDF Committee (to the extent it is still in existence) or FTDF (for the benefit of and

3   on behalf of the FTDF Estate), USA Realty on behalf of the USA Realty Estate and USA

4   Securities on behalf of the USA Securities Estate have the authority to settle and compromise any

5   objection to a Disputed Claim or Disputed Equity Interest, if appropriate, without further order of

6   the Court, and they may assert any and all Claims, rights of action, causes of action, counterclaims

7   and defenses held by their respective Estates.  The Estates, including the Post-Effective Date

8   Entities, may, but shall not be required to, set off or recoup against any Claim or Equity Interest

9   and the distributions to made pursuant to the Plan in respect of such Claim or Equity Interest, any

10   counterclaims, setoffs, or recoupment of any nature whatsoever that the Estates may have against

11   the holder of the Claim or Equity Interest, but neither the failure to do so nor the allowance of any

12   Claim or Equity Interest shall constitute a waiver or release by the Estates or the Post-Effective

13   Date Entities of any such Claim, cause of action, setoff or recoupment.

14   **B.**    **Disputed Claims And Equity Interests—Cash Reserves.**

15        **1.**    **General.**

16        On the Effective Date, no distributions shall be made unless a Claim or Equity Interest is

17   an Allowed Claim or Allowed Equity Interest on the Effective Date. Except as may otherwise be

18   agreed with respect to any Disputed Claim or Disputed Equity Interest, no payment or distribution

19   will thereafter be made with respect to all or any portion of a Disputed Claim or Equity Interest

20   until such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest.  Payments

21   and distributions to each holder of a Disputed Claim or Equity Interest (to the extent that such

22   Claim or Equity Interest, or any portion thereof, ultimately becomes an Allowed Claim or

23   Allowed Equity Interest) must be made in accordance with the Plan.

24        **2.**    **Establishment Of Cash Reserves.**

25        Prior to making any distribution on Allowed Claims and Equity Interests, the Post-

26   Effective Date Entities (or, if there are no Post-Effective Date Entities for the USACM and DTDF

27   Estates, USACM and DTDF), the FTDF Committee (to the extent it is still in existence) or FTDF

28   (for the benefit of and on behalf of the FTDF Estate), USA Realty on behalf of the USA Realty

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Estate and USA Securities on behalf of the USA Securities Estate shall establish a Cash reserve

2  for each Disputed Claim and Equity Interest, including unclassified Claims.  Except as provided

3  below, the Cash reserve for a Disputed Claim or Equity Interest shall be equal the amount set forth

4  in the proof of Claim or Equity Interest, or if no proof of Claim or Equity Interest has been Filed,

5  the amount set forth for the Claim or Equity Interest on the Schedules.

6          The Debtors (to the extent applicable), the Post-Effective Date Entities, and the FTDF

7  Committee (to the extent not dissolved) are authorized to File a motion seeking an Order setting a

8  Cash reserve in an amount different than as provided in a proof of Claim or Equity Interest, or in

9  the Schedules.  So long as such motion is Filed prior to the making of a distribution, no Cash

10  reserve need be made for the Claims or Equity Interests that are the subject of such motion, until

11  the movant receives a Final Order on the motion, unless otherwise ordered by the Court.

12          **3.      Estimation.**

13          As to any Disputed Claim, the Post-Effective Date Entities, or the Debtors, to the extent

14  applicable, may request in their sole discretion that the Court estimate such Claim  pursuant to

15  section 502(c) of the Bankruptcy Code, and set a Cash reserve based on that estimation.

16          **4.      Distribution Upon Allowance.**

17          Within five (5) Business Days of a Disputed Claim or Disputed Equity Interest becoming

18  an Allowed Claim or Equity Interest, the holder of such Claim or Interest shall be paid in

19  accordance with the Plan from the Cash reserve.  The amount of Cash released from Cash reserve

20  to make such a distribution shall be calculated on a Pro Rata basis, so that the holder of the newly

21  Allowed Claim or Equity Interest receives a distribution equal to the total percentage distributions

22  made prior to the date that its Claim or Equity Interest was Allowed to the holders of other

23  Allowed Claims or Allowed Equity Interests in the same Class.

24          **5.      Release Of Cash Reserves.**

25          If a Disputed Claim or Disputed Equity Interest, or any portion thereof, is disallowed, the

26  Cash reserve shall be released for distribution to holders of Allowed Claims and Allowed Equity

27  Interests in accordance with the Plan.  If a Disputed Claim or Disputed Equity Interest, or any

28  portion thereof becomes an Allowed Claim or an Allowed Equity Interest in an amount that is less

67

1    than the Cash reserve for such Claim or Equity Interest, the excess Cash reserve related to such

2    Claim or Equity Interest shall be released for distribution to holders of Allowed Claims and

3    Allowed Equity Interests in accordance with the Plan.

4    **C.**     **Undeliverable Or Returned Distributions.**

5        If (1) the Post-Effective Date Entities shall be unable, at the time that a distribution to

6    holders of Allowed Claims or Allowed Equity Interests is to be made under this Plan, to deliver

7    the portion of such distribution due a holder of an Allowed Claim or Allowed Equity Interest, (2)

8    any amount paid to the holder of an Allowed Claim or Allowed Equity Interest is returned as

9    undeliverable and the Post-Effective Date Entity is unable, with reasonable effort, to ascertain a

10   correct address for the holder entitled thereto within six (6) months of its return, or (3) any check

11   distributed in payment of an Allowed Claim or Allowed Equity Interest is neither returned nor

12   negotiated within six (6) months of the date distributed, then, in every such case, the Allowed

13   Claim or Allowed Equity Interest shall be deemed reduced to zero in amount and the holder

14   thereof shall have no further right to payment against or distribution from the Debtors, the Estates

15   or any Post-Effective Date Entities. The Cash that, but for this section, would have been payable

16   to the holders of such Allowed Claims or Allowed Equity Interests shall, to the extent applicable,

17   revert to the Post-Effective Date Entities, and will be available for application or distribution in

18   accordance with the terms of the Plan.

19        For purposes of this subsection, any undeliverable or returned distributions made by

20   FTDF, USA Realty and USA Securities, which Estates will have no Post-Effective Date Entities

21   to act on their behalf, shall be handled on behalf of those Debtors and their respective Estates by

22   the USACM Trust.

23   **D.**     **De Minimis Distributions.**

24        No Cash payment of less than five (5) dollars shall be made by the Disbursing Agent for

25   each Estate. Any Cash payment of less than five (5) dollars shall be held by the Disbursing Agent

26   of the relevant Estate, until a subsequent distribution, if any, results in an aggregate Cash payment

27   of over five (5) dollars. To the extent that a final distribution would require a distribution of less

28   than five (5) dollars to a holder of an Allowed Claim against or Allowed Equity Interest in a

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Debtor, such amount shall be deemed forfeited, and shall be redistributed to holders of Allowed

2    Claims against or Allowed Equity Interests in the Debtor who are to receive a final distribution in

3    excess of five (5) dollars on account of their Allowed Claim or Allowed Equity Interest.  If, in the

4    sole discretion of the Disbursing Agent, excess Cash exists at the time of a final distribution that is

5    so de minimis in amount that cannot be reasonably redistributed to the holders of Allowed Claims

6    and Allowed Equity Interests, the Disbursing Agent deposit such Cash in the unclaimed funds

7    account of the Court.

8    **E.      Disbursing Agent.**

9             **1.      Disbursing Agent For FTDF, USA Realty And USA Securities Estates.**

10            In the Chapter 11 Cases of FTDF, USA Securities and USA Realty, the Debtors shall act

11   as Disbursing Agents under the Plan for their respective Estates and shall make all distributions

12   required under the Plan.  At any time after thirty (30) days following the Effective Date, such

13   Debtors may request, upon agreement between the Debtors and the USACM Trust, that all future

14   distributions of their respective Estates be handled by the Disbursing Agent for the USACM Trust.

15            **2.      Disbursing Agent USACM And DTDF Estates.**

16            In the case of USACM and DTDF, the Asset Purchase Agreement and this Plan, FTDF,

17   USA Securities and USA Realty shall have copies of or access to all databases, software,

18   documents and records of, or in the possession or control of, any of the Debtors, as may be

19   necessary or appropriate in the wind down and dissolution of FTDF, USA Securities and USA

20   Realty, including as necessary or appropriate, all databases, software, documents and records

21   necessary to object to and make distributions to Claims and Equity Interest, as Allowed, against

22   FTDF, USA Securities and USA Realty.  The Post-Effective Date Entities shall act as Disbursing

23   Agents under the Plan for the Estates of USACM and DTDF, and shall make all distributions

24   required under the Plan.  Any Disbursing Agent may employ or contract with other Entities to

25   assist in or perform any distribution of property.

26

27

28

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3.      **Bond.**

Each Disbursing Agent shall serve without the posting of a bond, unless otherwise required by the Court, or determined by FTDF, USA Securities, USA Realty or the Post-Effective Date Entities to be necessary.

4.      **Compensation.**

Whether the Disbursing Agents make distributions under the Plan themselves or they employ a third-party Entity to act on their behalf, the Disbursing Agents shall receive, without the need for Court approval, reasonable compensation for services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the relevant Estate or Post-Effective Date Entities on terms agreed to with the Post-Effective Date Entities (or, if there are no Post-Effective Date Entities for the USACM and DTDF Estates, USACM and DTDF), the FTDF Committee (to the extent it is still in existence) or FTDF (for the benefit of and on behalf of the FTDF Estate), USA Realty on behalf of the USA Realty Estate and USA Securities on behalf of the USA Securities Estate.

**F.      Manner Of Payment Under The Plan.**

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the applicable Disbursing Agent or by wire transfer from a domestic bank, at the option of such Disbursing Agent.

**G.      Delivery Of Distributions.**

Except as provided in section C above for holders of unclaimed distributions, distributions to holders of Allowed Claims and Allowed Equity Interests shall be made by mail as follows: (1) at the addresses set forth on the respective proofs of Claim or Equity Interest by such holders; (2) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related proof of Claim or Equity Interest; or (3) at the address reflected on the Schedules if no proof of Claim or Equity Interest is Filed and the Disbursing Agent has not received a written notice of a change of address.

**H.  Compliance With Tax Requirements.**

In connection with the Plan, to the extent applicable, the Disbursing Agent shall comply with all withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

**I.  Old Instruments And Securities; Liens.**

**1.  Rights Of Persons Holding Instruments And Securities.**

Except as otherwise provided herein, as of the Effective Date, and whether or not surrendered by the holder thereof, all existing instruments and securities evidencing any Claims against or Equity Interests in the Debtors shall be deemed automatically cancelled and deemed void and of no further force or effect, without any further action on the part of any Person, and any Claims or Equity Interests under or evidenced by any instruments or securities shall be deemed discharged.  Notwithstanding the foregoing, the Equity Interests in DTDF shall survive the Effective Date and shall not be cancelled or discharged until the completion of the dissolution of DTDF as provided for in the Plan and the DTDF Amended Operating Agreement.

**2.  Cancellation Of Liens.**

Except as otherwise provided in the Plan or as necessary to evidence or secure the Loans, any lien securing any Secured Claim, shall be deemed released and discharged, and the Person holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors held by such Person and to take such actions as may be requested by the Debtors or the Post-Effective Date Entities to evidence the release of such lien, including, without limitation, the execution, delivery and filing or recording of such releases as may be requested by the respective Debtors or Post-Effective Date Entities at the sole expense of such Post-Effective Date Entities or Estates.

**J.  Dates Of Distribution.**

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after the Effective Date and, in any event, within thirty (30) days after the Effective Date.  Unless otherwise agreed by the applicable parties, any distribution required to be made upon a Disputed Claim or Disputed Equity Interest that becomes an Allowed Claim or

1   Allowed Equity Interest shall be deemed timely made if made within five (5) Business Days of the

2   Disputed Claim or Disputed Equity Interest or any portion thereof becoming an Allowed Claim or

3   Allowed Equity Interest.

4

5                                            **VIII.**

6                               **MISCELLANEOUS PROVISIONS**

7

8   **A.      Limitation Of Liability And Releases.**

9           **1.      Limitation Of Liability.**

10          Except as otherwise expressly provided in the Plan, on and after the Effective Date, none

11  of the Debtors, the Debtors in Possession, the Committees, the members of the Committees, nor

12  any of their employees, officers, directors, agents, or representatives, nor any Professionals

13  employed by any of them, shall have or incur any liability to any Entity for any authorized act

14  taken or authorized omission made in good faith in connection with or related to the Chapter 11

15  Cases or the Estates, including objections to or estimations of Claims, disposition of assets, or

16  formulating, determining not to solicit acceptances or rejections to, or confirming the Plan, or any

17  contract, instrument, release, or other agreement or document created in connection with the Plan.

18          Consistent with section 1125(e) of the Bankruptcy Code, the Entities that have solicited

19  acceptances or rejections of the Plan and/or that have participated in the offer, issuance, sale, or

20  purchase of securities offered or sold under the Plan, in good faith and in compliance with the

21  applicable provisions of the Bankruptcy Code, are not liable, on account of such solicitation or

22  participation, for violation of any applicable law, rule, or regulation governing the solicitation of

23  acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

24          **2.      DTDF/FTDF Releases.**

25          As of the Effective Date, in consideration for the obligations, subordination, modifications

26  of rights and accommodations of FTDF, and the FTDF Estate, and except as otherwise expressly

27  provided under the Plan, DTDF, the DTDF Estate and Post-Effective Date DTDF, on their own

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

behal, shall be deemed to forever release, waive and discharge any and all Claims, demands, debts, liabilities, obligations, actions, causes of action, suits, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises and rights whatsoever, whenever arising, whether known or unknown, suspected or unsuspected, contingent or fixed, liquidated or unliquidated, matured or unmatured, in law, equity, bankruptcy or otherwise, based upon, arising out of, relating to, by reason of, or in connection with, in whole or in part, any act or omission, transaction, occurrence, fact or matter from the beginning of time to the Effective Date, including, without limitation, in any way relating to FTDF, the FTDF Estate, the FTDF Chapter 11 Case, including any recharacterization, or substantive consolidation causes of action, or any other matter which DTDF, the DTDF Estate, or Post-Effective Date DTDF or any Person or Entity claiming by, from, through, or under any of DTDF, the DTDF Estate, or Post-Effective Date DTDF ever had, now has, or hereafter can, shall, or may have against FTDF or the FTDF Estate.

As of the Effective Date, in consideration for the obligations, subordination, modifications of rights and accommodations of DTDF and the DTDF Estate, and except as otherwise expressly provided under the Plan, FTDF and the FTDF Estate, on their own behalf, shall be deemed to forever release, waive and discharge any and all Claims, demands, debts, liabilities, obligations, actions, causes of action, suits, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises and rights whatsoever, whenever arising, whether known or unknown, suspected or unsuspected, contingent or fixed, liquidated or unliquidated, matured or unmatured, in law, equity, bankruptcy or otherwise, based upon, arising out of, relating to, by reason of, or in connection with, in whole or in part, any act or omission, transaction, occurrence, fact or matter from the beginning of time to the Effective Date, including, without limitation, in any way relating to DTDF, the DTDF Estate, the DTDF Chapter 11 Case, including any recharacterization, or substantive consolidation causes of action, or any other matter which FTDF, the FTDF Estate, or any Person or Entity claiming by, from, through, or under any of FTDF or the FTDF Estate ever had, now has, or hereafter can, shall, or may have against DTDF or the DTDF Estate.

### 3. FTDF/USACM Releases.

As of the Effective Date, in consideration for the obligations, modifications of rights and accommodations of FTDF and the FTDF Estate, and except as otherwise provided under the Plan and, in particular the compromise between the FTDF and the FTDF Estate, on the one hand, and USACM, USACM Estate and the USACM Trust, on the other hand, USACM, the USACM Estate, and the USACM Trust, on their own behalf, shall be deemed to forever release, waive and discharge any and all Claims, demands, debts, liabilities, obligations, actions, causes of action, suits, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises and rights whatsoever, whenever arising, whether known or unknown, suspected or unsuspected, contingent or fixed, liquidated or unliquidated, matured or unmatured, in law, equity, bankruptcy or otherwise, based upon, arising out of, relating to, by reason of, or in connection with, in whole or in part, any act or omission, transaction, occurrence, fact or matter from the beginning of time to the Effective Date, including, without limitation, in any way relating to FTDF, the FTDF Estate, the FTDF Chapter 11 Case, or any other matter which USACM, the USACM Estate, or the USACM Trust or any Person or Entity claiming by, from, through, or under any of USACM, the USACM Estate, or the USACM Trust ever had, now has, or hereafter can, shall, or may have against FTDF or the FTDF Estate.

As of the Effective Date, in consideration for the obligations, modifications of rights and accommodations of USACM and the USACM Estate and except as otherwise expressly provided in the Plan, in particular the compromise between USACM, the USACM Estate and the USACM Trust, on the one hand, and FTDF and the FTDF Estate, on the other hand, FTDF and the FTDF Estate, on their own behalf, shall be deemed to forever release, waive and discharge any and all Claims, demands, debts, liabilities, obligations, actions, causes of action, suits, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises and rights

74

1    whatsoever, whenever arising, whether known or unknown, suspected or unsuspected, contingent

2    or fixed, liquidated or unliquidated, matured or unmatured, in law, equity, bankruptcy or

3    otherwise, based upon, arising out of, relating to, by reason of, or in connection with, in whole or

4    in part, any act or omission, transaction, occurrence, fact or matter from the beginning of time to

5    the Effective Date, including, without limitation, in any way relating to USACM, the USACM

6    Estate, the USACM Chapter 11 Case, or any other matter which FTDF, the FTDF Estate, or any

7    Person or Entity claiming by, from, through, or under any of FTDF or the FTDF Estate ever had,

8    now has, or hereafter can, shall, or may have against USACM or the USACM Estate.

9

10        **4.**    **Debtor Releasors/Direct Lenders Releases.**

11        As of the Effective Date, except for the objections to the allowance of the Direct Lender

12    Unsecured Claims and as otherwise expressly provided in the Plan, in consideration for the

13    obligations, subordination, modifications of rights and accommodations of the Direct Lenders

14    pursuant to the settlements embodied in the Plan, USACM, FTDF, their Estates and the USACM

15    Trust, on their own behalf (collectively, the "Debtor Releasors"), shall be deemed to forever

16    release, waive and discharge any and all Claims, demands, debts, liabilities, obligations, actions,

17    causes of action, suits, sums of money, accounts, reckonings, covenants, contracts, controversies,

18    agreements, promises and rights whatsoever, whenever arising, whether known or unknown,

19    suspected or unsuspected, contingent or fixed, liquidated or unliquidated, matured or unmatured,

20    in law, equity, bankruptcy or otherwise, based upon, arising out of, relating to, by reason of, or in

21    connection with, in whole or in part, any act or omission, transaction, occurrence, fact or matter

22    from the beginning of time to the Effective Date, including, without limitation, in any way relating

23    to the Direct Lenders, including any surcharge, recharacterization, or substantive consolidation

24    causes of action, or any other matter which any of the Debtor Releasors or any Person or Entity

25    claiming by, from, through, or under any of the Debtor Releasors ever had, now has, or hereafter

26    can, shall, or may have against the Direct Lenders.  Notwithstanding the foregoing, nothing herein

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1     shall constitute a release of any obligations under any Loan Servicing Agreement as to which

2     USACM's servicing rights are being transferred to the Asset Purchaser.

3         As of the Effective Date, in consideration for the obligations, subordination, modifications

4     of rights and accommodations of the Debtor Releasors and except as otherwise expressly provided

5     under the Plan, the Direct Lenders, pursuant to the settlements embodied in the Plan, on their own

6     behalf  (the "Direct Lender Releasors"), shall be deemed to forever release, waive and discharge

7     any and all Claims, demands, debts, liabilities, obligations, actions, causes of action, suits, sums of

8     money, accounts, reckonings, covenants, contracts, controversies, agreements, promises and rights

9     whatsoever, whenever arising, whether known or unknown, suspected or unsuspected, contingent

10     or fixed, liquidated or unliquidated, matured or unmatured, in law, equity, bankruptcy or

11     otherwise, based upon, arising out of, relating to, by reason of, or in connection with, in whole or

12     in part, any act or omission, transaction, occurrence, fact or matter from the beginning of time to

13     the Effective Date, including, without limitation, in any way relating to the Debtor Releasors, the

14     Debtor Releasors' Estates, the USACM and FTDF Chapter 11 Cases, including any causes of

15     action, or any other matter which any of the Direct Lender Releasors or any Person or Entity

16     claiming by, from, through, or under any of the Direct Lender Releasors ever had, now has, or

17     hereafter can, shall, or may have against the Debtor Releasors.

18       **5.      FTDF/USA Realty Releases.**

19         Except as otherwise expressly provided in the Plan, as of the Effective Date, in

20     consideration for the obligations, subordination, modifications of rights and

21     accommodations of FTDF and the FTDF Estate, USA Realty and the USA Realty Estate,

22     on their own behalf, shall be deemed to forever release, waive and discharge any and all

23     Claims, demands, debts, liabilities, obligations, actions, causes of action, suits, sums of

24     money, accounts, reckonings, covenants, contracts, controversies, agreements, promises

25     and rights whatsoever, whenever arising, whether known or unknown, suspected or

26     unsuspected, contingent or fixed, liquidated or unliquidated, matured or unmatured, in law,

27     equity, bankruptcy or otherwise, based upon, arising out of, relating to, by reason of, or in

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   connection with, in whole or in part, any act or omission, transaction, occurrence, fact or

2   matter from the beginning of time to the Effective Date, including, without limitation, in

3   any way relating to FTDF, the FTDF Estate, the FTDF Chapter 11 Case, including all

4   management fees accrued, but unpaid, as of the Petition Date, all postpetition management

5   fees, or any other matter which USA Realty, the USA Realty Estate, or any Person or

6   Entity claiming by, from, through, or under any of USA Realty or USA Realty Estate ever

7   had, now has, or hereafter can, shall, or may have against FTDF or the FTDF Estate.

8           Except as otherwise expressly provided in the Plan, as of the Effective Date, in

9   consideration for the obligations, subordination, modifications of rights and

10  accommodations of USA Realty and the USA Realty Estate, FTDF and the FTDF Estate

11  on their own behalf, shall be deemed to forever release, waive and discharge any and all

12  Claims, demands, debts, liabilities, obligations, actions, causes of action, suits, sums of

13  money, accounts, reckonings, covenants, contracts, controversies, agreements, promises

14  and rights whatsoever, whenever arising, whether known or unknown, suspected or

15  unsuspected, contingent or fixed, liquidated or unliquidated, matured or unmatured, in law,

16  equity, bankruptcy or otherwise, based upon, arising out of, relating to, by reason of, or in

17  connection with, in whole or in part, any act or omission, transaction, occurrence, fact or

18  matter from the beginning of time to the Effective Date, including, without limitation, in

19  any way relating to USA Realty, the USA Realty Estate, the USA Realty Chapter 11 Case,

20  including any other matter which FTDF, the FTDF Estate, or any Person or Entity

21  claiming by, from, through, or under any of FTDF or the FTDF Estate ever had, now has,

22  or hereafter can, shall, or may have against USA Realty or the USA Realty Estate;

23  provided, however, that nothing in this paragraph shall be deemed to release any Claims that

24  FTDF has against Non-Debtor Insiders.

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**B.     Execution Of Documents And Corporate Action.**

The Debtors and Debtors in Possession, without any action by Equity Interests whatsoever, shall execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

**C.     Notice Of Effective Date.**

As soon as practicable after the occurrence of the Effective Date, but no later than ten (10) days thereafter, the USACM Trustee shall File and serve on each holder of a Claim or Equity Interest a written notice of the occurrence of Effective Date.

**D.     Retention Of Jurisdiction.**

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Cases, the assets and liabilities of the Estates and the Trust Estates, and the Plan to the fullest extent permitted by law, including, but not limited to:

1.     Allowing, disallowing, determining, liquidating, classifying, estimating or establishing the priority or secured or unsecured status of any Claim or Equity Interest not otherwise allowed under the Plan, including resolving any request for payment of any Administrative Expense Claim and resolving any objections to the allowance or priority of Claims or Equity Interests;

2.     Hearing and determining any and all Claims, Causes of Action or rights that may be asserted or commenced by the Debtors or a post-Effective Date Entity against Persons, Entities or governmental units;

3.     Hearing and determining all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the Post-Effective Date Entities shall be made in the ordinary course of business and shall not be subject to approval of the Bankruptcy Court;

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

4. Hearing and determining the reasonableness and allowability of any principal Claim, attorney fee Claim, interest Claim or the charges asserted by a Secured Creditor against the Debtors, the Estates, or the Post-Effective Date Entities;

5. Hearing and determining all matters related to any executory contracts and unexpired leases to which a Debtor is a party or with respect to which a Debtor may be liable;

6. Hearing and determining all matters related to the transfer of the Acquired Assets to the Asset Purchaser;

7. Hearing and determining all matters related to Loan Servicing Agreements;

8. Effectuating performance of and payments under the provisions of the Plan;

9. Hearing and determining any and all adversary proceedings, motions, applications, requests for disgorgement and contested or litigated matters arising out of, arising under or related to the Chapter 11 Cases, including with out limitation the Litigation Claims and the Non-Debtor Insider Litigation;

10. Entering such Orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including USACM Trust Agreement and the DTDF Amended Operating Agreement;

11. Hearing and determining disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan, such as the USACM Trust Agreement, the DTDF Amended Operating Agreement, and the Asset Purchase Agreement;

12. Modifying the Plan, the USACM Trust Agreement or the DTDF Amended Operating Agreement at the request of the Debtors, the USACM Trustee or the DTDF Administrator and as provided by applicable law, including to cure any defect or omission, or to reconcile any inconsistencies in any order of the Court and the Plan, the USACM Trust Agreement or the DTDF Amended Operating Agreement;

13.     Issuing injunctions, entering and implementing other orders, or taking such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, consummation, or enforcement of the Plan, the Asset Purchase Agreement, or the Confirmation Order;

14.     Entering and implementing such Orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

15.     Hearing and determining any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the USACM Trust Agreement, the DTDF Amended Operating Agreement, the Asset Purchase Agreement or any other asset purchase agreement entered into by the Debtors and a Third-Party Bidder;

16.     Enforcing all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

17.     Except as otherwise limited herein, recovering all assets of the Debtors and property of the Estates wherever located;

18.     Hearing and determining matters concerning state, local, and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

19.     Hearing and determining all questions and disputes regarding title to the assets to be administered pursuant to the Plan, and the validity and/or priority of any liens or Secured Claims against those assets;

20.     Hearing and determining all questions and disputes as to whether the payment of any Claim under the Plan should be subordinated to the payment of other Claims;

21.     Approving compromises and settlements under Rule 9019 of the Bankruptcy Rules to the extent required under or included in the Plan;

22.     Hearing and determining such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

23. Hearing and determining any matter relating the administration of the Estates by the Post-Effective Date Entities; and

24. Entering Final Decrees closing each of the Chapter 11 Cases.

**E. Binding Effect.**

The rights, benefits and obligations of any Entity or Person named or referred to in the Plan are binding on, and will inure to the benefit of, any permitted heirs, executors, administrators, successors or assigns of such Entity or Person.

**F. Amendment, Modification And Severability.**

1. The Plan may be amended or modified before the Effective Date by the Debtors, with consent of the Committees, to the extent provided by section 1127 of the Bankruptcy Code.

2. The Debtors reserve the right to modify or amend the Plan upon a determination by the Court that the Plan, as it is currently drafted, is not confirmable pursuant to section 1129 of the Bankruptcy Code. To the extent such a modification or amendment is permissible under section 1127 of the Bankruptcy Code, the Debtors reserve the right to sever any provisions of the Plan that the Court finds objectionable.

3. Any modification of the USACM Trust by the beneficiaries thereof in accordance with the provisions of the USACM Trust Agreement shall not constitute a modification of the Plan under section 1127 of the Bankruptcy Code.

4. Any modification to the Estate of the Post-Effective Date DTDF in accordance with the DTDF Amended Operating Agreement shall not constitute a modification of the Plan under section 1127 of the Bankruptcy Code.

**G. Exhibits.**

Any Exhibits to the Plan not Filed herewith will be Filed no later than ten (10) days prior to the commencement of the Confirmation Hearing. The Exhibits will not be served with the Plan, but rather copies of all such Exhibits will be available upon written request to the Debtors' counsel.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**H.    No Admission.**

Except as specifically provided in the Plan, nothing contained in the Plan shall be deemed or construed in any way as an admission by the Debtors or the Estates with respect to any matter set forth in the Plan, including the amount or allowability of any Claim, or the value of any property of the Estates.

**I.    1146(c) Exemption.**

In accordance with section 1146(c) of the Bankruptcy Code, the making delivery, filing or recording of any mortgages, deeds of trust, leasehold mortgages, leases (whether recorded or unrecorded) and/or the various instruments and documents of transfer as specified in or contemplated by the Plan, including the documents related to the Asset Sale Transaction and/or the exhibits thereto, are hereby exempt from taxation under any law imposing a recording tax, stamp tax, transfer tax, or any similar tax.  The appropriate state or local government officers are hereby directed to accept for filing or recording all Instruments of Transfer or other documents of transfer to be filed and recorded in accordance with the Plan and the exhibits thereto, without payment of any such tax or government assessment, and without the presentation of any affidavits, instruments, or returns otherwise required for recording other than the Confirmation Order.  The Court retains jurisdiction to enforce the foregoing direction by contempt proceedings or otherwise.

**J.    General Authority.**

The Debtors, the Committees, and the Post-Effective Date Entities shall execute such documents, and take such other actions, as are necessary to effectuate the transactions provided for in the Plan.

**K.    Dissolution Of Committees.**

On the Effective Date, except as provided below, the Committees shall be disbanded and their members shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.  The USACM Committee and the DTDF Committee will not dissolve unless and until the USACM Trustee and the DTDF Administrator are appointed and are authorized to act.  The FTDF Committee will dissolve on the Effective Date, unless the FTDF Committee is charged with prosecuting objections to Claims or any of the non-assignable FTDF

1    Litigation Claims on behalf of the FTDF Estate as provided pursuant to the compromise between

2    DTDF and FTDF.

3    **L.      Post-Effective Date Debtors.**

4            **1.      USACM.**

5            USACM shall have authority to take actions on behalf of USACM and the USACM Estate

6    on and after the Effective Date until the date that the USACM Trustee is appointed for the

7    USACM Trust.  After the USACM Trust Assets are transferred to the USACM Trust and the

8    USACM Trust becomes effective in accordance with this Plan and the USACM Trust Agreement,

9    USACM shall be dissolved in accordance with the Confirmation Order and applicable state law.

10           **2.      DTDF.**

11           On the Effective Date, Post-Effective Date DTDF shall have the exclusive authority to act

12   on behalf of DTDF and the DTDF Estate.  When the Plan has been fully implemented by Post-

13   Effective Date DTDF and all assets of the DTDF Estate and Post-Effective Date DTDF have been

14   fully liquidated and distributed and the DTDF Estate and Post-Effective Date DTDF fully

15   administered, DTDF shall be dissolved in accordance with the Confirmation Order, the DTDF

16   Amended Operating Agreement and applicable state law.

17           **3.      FTDF, USA Realty And USA Securities.**

18           FTDF, USA Realty, and USA Securities shall have the authority to effect all transactions

19   and take all actions required by the Plan on and after the Effective Date.  FTDF and the FTDF

20   Committee shall each have authority to prosecute (a) claim objections in the FTDF Estate, and (b)

21   the non assignable FTDF Litigation Claims on behalf of FTDF subject to the compromise with

22   DTDF set forth herein.  After the actions set forth in this paragraph are completed, FTDF, USA

23   Realty, and USA Securities shall be dissolved in accordance with the Confirmation Order and

24   applicable state law.

25   **M.      Binding Effect.**

26           The Plan and all rights, duties and obligations thereunder shall be binding upon and inure

27   to the benefit of the Debtors, the Committees, the Post-Effective Date Entities, Direct Lenders,

28   holders of Claims, holders of Equity Interests, and their respective successors and assigns.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**N.    Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or by an express choice of law provision in any agreement, contract, document, or instrument provided for or executed in connection with the Plan, the rights and obligations arising under the Plan and any agreement, contract, document, or instrument provided for or executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the laws of the State of Nevada, without giving effect to the principles of conflict of laws thereof.

**O.    Payment Dates.**

Whenever any action, including any payment, distribution, or Filing of any objection, motion, or proof of Claim or Equity Interest is required to be made under the Plan on a day other than a Business Day, such payment, distribution, or filing shall instead be made, without interest, on the immediately following Business Day.

**P.    Headings.**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**Q.    No Waiver.**

The failure of the Debtors or any other Entity to object to any Claim or Equity Interest for purposes of voting shall not be deemed a waiver of the Debtors' or the Post-Effective Date Entities' right to object to or examine such Claim or Equity Interest, in whole or in part.

**R.    Other Documents And Actions.**

The Post-Effective Date Entities may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under this Plan.

**S.    Severability Of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of this Plan is held by the Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of this Plan, the Court shall, with the consent of the Debtors and the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Committees, have the power to interpret, modify or delete such term or provision (or portions

2  thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the

3  original purpose of the term or provision held to be invalid, void or unenforceable, and such term

4  or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding any such

5  interpretation, modification or deletion, the remainder of the terms and provisions of this Plan

6  shall in no way be affected, impaired or invalidated by such interpretation, modification or

7  deletion.

8  **T.    Post-Confirmation Status Report.**

9          Within ninety (90) days of the Effective Date, the Debtors or a post-Effective Date Entity

10  or the FTDF Committee, to the extent applicable, shall File a status report for each of the relevant

11  Debtors setting forth what progress has been made toward the consummation of the confirmed

12  Plan.  The status report shall be served on the U.S. Trustee, the Debtors, prior to dissolution or

13  transition to the Post-Effective Date Entities, the Post-Effective Date Entities, and any Entities

14  who have Filed a request for such reports with the Court**.**  Unless otherwise ordered, further status

15  reports shall be Filed every ninety (90) days and served on the same Entities.  On or after the

16  Effective Date, no monthly operating reports need to be filed with the U.S. Trustee.

17  **U.    Final Decree.**

18          Once each Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the

19  Post-Effective Date Entities, the Debtors, or another party, as the Court shall designate in the

20  Confirmation Order, shall File a final report and account of all receipts and disbursements, and

21  serve that report on the U.S. Trustee, and any other Entities entitled to service under any

22  applicable law.  Any such final report shall include a request that the Court enter a Final Decree in

23  the Chapter 11 Case of the applicable Debtor.

24  **V.    Revocation, Withdrawal, Cram-Down Or Non-Consummation.**

25          The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the

26  Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or

27  withdraw the Plan, or if Confirmation or consummation does not occur, then (1) the Plan shall be

28  null and void in all respects, (2) any settlement or compromise embodied in the Plan (including the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity

2  Interests), rejection or assumption of any executory contracts or unexpired leases affected by the

3  Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void,

4  and (3) nothing contained in the Plan, and no acts taken in preparation for consummation of the

5  Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or

6  against, or any Equity Interests in, any Debtor or any other Entity, (B) prejudice in any manner the

7  rights of the Debtors or any Entity in any further proceedings involving the Debtors, or (C)

8  constitute an admission of any sort by the Debtors or any other Entity.

9       The Debtors reserve any and all rights they may have under section 1129(b) of the

10 Bankruptcy Code, notwithstanding any rejection of the Plan by any Class of Claims or Equity

11 Interests.  Additionally, the Debtors reserve their right to seek Confirmation of the Plan in fewer

12 than all of these Chapter 11 Cases.  In other words, if the Bankruptcy Court determines that a

13 cram-down of the Plan pursuant to section 1129(b) of the Bankruptcy Code is legally

14 impermissible in regard to a particular Debtor and its Estate, then the Debtors will withdraw the

15 Plan in regard to that particular Debtor, its Estate and its Chapter 11 Case and the Debtors may

16 then proceed to seek Confirmation of the Plan in those Chapter 11 Cases herein in which the cram-

17 down provisions of section 1129(b) of the Bankruptcy Code may validly be exercised.

18 **W.     Notice To Certain Parties.**

19      All notices and documents to be effective for the following parties shall be in writing

20 (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be

21 deemed to have been duly given or made when actually delivered or, in the case of notice by

22 facsimile transmission, when received and telephonically confirmed, addressed as follows:

23      1.      <u>The Debtors:</u>
              Annette W. Jarvis, Esq.
24            Steven C. Strong, Esq.
              Ray Quinney & Nebeker P.C.
25            36 South State Street, Suite 1400
              P.O. Box 45385
26            Salt Lake City, Utah  84145-0385
              Facsimile:  (801) 532-7543
27            Email: <u>ajarvis@rqn.com</u>
28

86

Email: sstrong@rqn.com
and
Lenard E. Schwartzer, Esq.
Jeanette E. McPherson, Esq.
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

2.   SPCP Group, LLC
     Michael Gatto
     Silver Point Capital
     Two Greenwich Plaza, 1st Floor
     Greenwich, CT 06830
     Facsimile: (203) 542-4100
     and
     James C. McCarroll, Esq.
     Reed Smith, LLP
     New York, NY 10022
     Facsimile: (212) 521-5450

3.   Direct Lender Committee
     Gerald M. Gordon, Esq.
     Gregory E. Garman, Esq.
     Gordon & Silver, Ltd.
     3960 Howard Hughes Pkwy., Ninth Floor
     Las Vegas, NV 89169
     Facsimile: (702) 369-2666
     Email: gmg@gordonsilver.com
     Email: geg@gordonsilver.com

4.   DTDF Committee
     Marc A. Levinson, Esq.
     Orrick Herrington & Sutcliffe LLP
     400 Capital Mall, Suite 3000
     Sacramento, CA 95814-4497
     Facsimile: (916) 329-4900
     Email: malevinson@orrick.com

5.   FTDF Committee
     Frank A. Merola, Esq.
     Eve H. Karasik, Esq.
     Stutman, Treister & Glatt, P.C.
     1901 Avenue of the Stars, 12th Floor
     Los Angeles, CA 90067
     Facsimile: (310) 228-5788
     Email: fmerola@stutman.com

87

1    Email:  ekarasik@stutman.com

2    6.    USACM Committee
         Rob Charles, Esq.
3         Lewis and Roca, LLP
         3993 Howard Hughes Pkwy., Suite 600
4         Las Vegas, NV 89169
         Facsimile:  (702) 949-8321
5         Email:  rcharles@lrlaw.com

6

7                          **IX.**

8              **REQUEST FOR CONFIRMATION**

9         The Debtors hereby request that the Court confirm the Plan pursuant to Bankruptcy Code

10   section 1129(a), or, if necessary, pursuant to Bankruptcy Code section 1129(b).

11                          Dated: November 15, 2006.

12                          **THE DEBTORS:**
                          USA Commercial Mortgage Company
13                          USA Securities, LLC
                          USA Capital Realty Advisors, LLC
14                          USA Capital Diversified Trust Deed Fund, LLC
                          USA First Trust Deed Fund, LLC
15

16

17                          By: _____
                              Thomas J. Allison
18                              Chief Restructuring Officer

19   Respectfully submitted this 15th day of November, 2006.

20

21                              /s/  Jeanette E. McPherson
                          Lenard E. Schwartzer, Nevada Bar No. 0399
22                          Jeanette E. McPherson, Nevada Bar No. 5423
                          SCHWARTZER & MCPHERSON LAW FIRM
23                          2850 South Jones Boulevard, Suite 1
                          Las Vegas, Nevada 89146
24                          and
                          Annette W. Jarvis, Utah Bar No. 1649
25                          RAY QUINNEY & NEBEKER P.C.
26                          36 South State Street, Suite 1400
                          P.O. Box 45385
27                          Salt Lake City, Utah 84145-0385

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

# EXHIBIT "A"

**REVISED FIRST AMENDED AND RESTATED
ASSET PURCHASE AGREEMENT**

dated as of

November 7, 2006

to the

ASSET PURCHASE AGREEMENT

dated

October 19, 2006

by and among

USA COMMERCIAL MORTGAGE COMPANY,
and
USA CAPITAL FIRST TRUST DEED FUND, LLC
("Sellers")
and
USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,
USA CAPITAL REALTY ADVISORS, LLC,
and
USA SECURITIES, LLC
("Acknowledging Parties")

and

SPCP GROUP, LLC
("Purchaser")

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ..................................................................................5
    Section 1.1    Definitions...........................................................................5
    Section 1.2    Other Definitional and Interpretive Matters. ...........................11
Article II PURCHASE AND SALE OF LOANS AND SERVICING AGREEMENTS..............12
    Section 2.1    Purchase and Sale of Loans ......................................12
    Section 2.2    Purchase Price..........................................................12
    Section 2.3    Adjustments to Purchase Price.................................13
    Section 2.4    Payment of Purchase Price.......................................14
    Section 2.5    Deposit........................................................................14
    Section 2.6    Closing Escrow ..........................................................15
    Section 2.7    Due Diligence ............................................................16
Article III STATEMENTS OF USACM ....................................................16
    Section 3.1    Due Incorporation .....................................................16
    Section 3.2    Authority and Capacity .............................................16
    Section 3.3    Litigation....................................................................17
    Section 3.4    Statements Regarding the Assets .............................17
Article IIIA STATEMENTS OF FTDF......................................................18
    Section 3A.1.  Due Incorporation .....................................................18
    Section 3A.2.  Authority and Capacity .............................................18
    Section 3A.3.  Litigation....................................................................18
    Section 3A.4.  Statements Regarding the First Trust Deed Fund Assets...........18
Article IV STATEMENTS OF PURCHASER ...........................................19
    Section 4.1    Due Incorporation and Good Standing ....................19
    Section 4.2    Enforceability.............................................................19
    Section 4.3    Authority and Capacity .............................................19
    Section 4.4    No Conflict..................................................................19
Article V BANKRUPTCY COURT APPROVAL.......................................19
    Section 5.1    Bidding Procedures ...................................................19
    Section 5.2    Sale Approval Order ..................................................20
    Section 5.3    Plan of Reorganization..............................................20
Article VI COVENANTS OF SELLERS ...................................................21
    Section 6.1    Delivery of Documents .............................................21
    Section 6.2    No Modification..........................................................21
    Section 6.3    Conduct of Business .................................................21
    Section 6.4    Other Bankruptcy Covenants....................................21
    Section 6.5    Taxes ..........................................................................21
    Section 6.6    Tax Reporting ............................................................22
    Section 6.7    Reports/Notices.........................................................22
Article VII COVENANTS OF PURCHASER.............................................22
    Section 7.1    Fees Payable to Sellers.............................................22
    Section 7.2    Distribution of Collected Money ...............................23
    Section 7.3    Causes of Action Against Insiders............................23
    Section 7.4    Causes of Action Against Debtors............................24
    Section 7.5    Servicing Agreements ...............................................24
    Section 7.6    Delivery of Assignments...........................................24

Article VIII REMEDIES ................................................................................................25
    Section 8.1    Remedies for Breach by Purchaser ......................................25
    Section 8.2    Remedies for Breach by Sellers ...........................................25
Article IX CONDITIONS TO CLOSING ......................................................................25
    Section 9.1    Conditions Precedent to Obligations of Purchaser ...................25
    Section 9.2    Conditions Precedent to Obligations of Sellers .....................28
Article X TERMINATION .............................................................................................29
    Section 10.1    Termination ...........................................................................29
Article X MISCELLANEOUS .......................................................................................29
    Section 11.1    Compromises With Borrowers ...............................................29
    Section 11.2    Survival .................................................................................30
    Section 11.3    Amendment ...........................................................................30
    Section 11.4    Counterparts .........................................................................30
    Section 11.5    Entire Agreement ..................................................................30
    Section 11.6    Closing ..................................................................................30
    Section 11.7    Additional Collection Actions ..............................................30
    Section 11.8    Access to Documents ............................................................30
    Section 11.9    Waivers .................................................................................30
    Section 11.10    Notices ................................................................................31
    Section 11.11    Acknowledging Parties .......................................................32
    Section 11.12    Governing Law / Venue ......................................................32
    Section 11.13    Severability .........................................................................32
    Section 11.14    Binding Effect; Third Party Beneficiaries; Successors and Assigns .........32
    Section 11.15    Relationship of Parties ........................................................33

# LIST OF EXHIBITS AND SCHEDULES

**EXHIBITS**

EXHIBIT A      FORM OF BILL OF SALE

EXHIBIT B      FORM OF BID PROCEDURES MOTION

**SCHEDULES**

SCHEDULE 1      LOAN SCHEDULE

SCHEDULE 2      SERVICED LOAN SCHEDULE

SCHEDULE 2.3(f)      PRICE ADJUSTMENT METHODOLOGY SCHEDULE

SCHEDULE 3.3      USACM ASSET LITIGATION SCHEDULE

SCHEDULE 3.4(f)      USACM LOAN LITIGATION SCHEDULE

SCHEDULE 3.4(g)      FTDF ASSETS LOAN SCHEDULE

SCHEDULE 3.A3      FTDF LITIGATION SCHEDULE

SCHEDULE 4      95% LIST

SCHEDULE 5      85% LIST

SCHEDULE 6      80% LIST

SCHEDULE 7      65% LIST

# FIRST AMENDED AND RESTATED
## ASSET PURCHASE AGREEMENT

THIS REVISED FIRST AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (the "Agreement") dated and effective as of this 7th day of November, 2006 to the ASSET PURCHASE AGREEMENT dated October 19, 2006 by and between USA COMMERCIAL MORTGAGE COMPANY ("USACM") and USA CAPITAL FIRST TRUST DEED FUND, LLC ("FTDF" and collectively with USACM, the "Sellers") and USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC, USA CAPITAL REALTY ADVISORS, LLC and USA SECURITIES, LLC (the "Acknowledging Parties") and SPCP GROUP, LLC and its affiliates and designees (collectively, the "Purchaser").

## WITNESSETH:

WHEREAS, Sellers and certain non-seller affiliates and subsidiaries have filed voluntary petitions for reorganization pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), jointly administered as Case No. BK-S-06-10725 LBR (the "Bankruptcy Case"), and shall seek the entry of an order by the Bankruptcy Court authorizing and approving this Agreement and its consummation as provided in the Plan (as defined herein).

WHEREAS, FTDF desires to sell, and Purchaser desires to purchase, pursuant to the terms hereof, FTDF's interest in certain commercial loans as set forth herein and detailed on the schedules attached hereto.

WHEREAS, USACM desires to sell, and Purchaser desires to purchase, pursuant to the terms hereof, USACM's interest in certain servicing agreements and related contracts for all of the serviced loans as detailed on the schedules attached hereto.

NOW, THEREFORE, in consideration of the mutual covenants made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1** **Definitions**. As used in this Agreement, the following terms shall have the meanings specified below.

"**Accrued Servicing Fees**" means all servicing fees and servicer advances accrued, but unpaid, as of the Closing Date.

"**Assets**" means, collectively, all First Trust Deed Fund Assets listed on Schedule 1 and the Commercial Mortgage Assets listed on Schedule 2, together with the Personal Property.

"**Auction**" means the auction scheduled by the Bankruptcy Court in connection with the Bid Procedures Motion.

"**Bankruptcy Code**" means Title I of the Bankruptcy Reform Act of 1978, as amended, set forth in sections 101 et seq. of title 11 of the United States Code.

"**Bid Procedures Motion**" means a motion filed by the Debtors on or about September 22, 2006, seeking Bankruptcy Court approval of certain bidding procedures on terms that are acceptable to Purchaser.

"**Borrower**" means any obligor under a Loan.

"**Break-Up Fee**" means an amount equal to $ 1,500,000.00, less the amount of any Expense Reimbursement actually paid to Purchaser.

"**Break-Up Fee Order**" means the order entered by the Bankruptcy Court granting the Bid Procedures Motion and approving the Break-Up Fee and the Expense Reimbursement, in form and substance acceptable to Purchaser and Sellers.

"**Business Day**" means a day other than Saturday, Sunday or any day on which banks located in the State of Nevada are authorized or obligated to close.

"**Closing**" means the closing of the purchase and sale of the Assets on the Closing Date pursuant to the Sale Approval Order, and transfer of each of the Assets to Purchaser consistent with the terms hereof.

"**Closing Date**" means that date on which the Sale Approval Order becomes a Final Order, and each of the Assets actually is transferred to Purchaser consistent with the terms hereof, provided that in no event shall the Closing Date be later than the Outside Approval Date.

"**Commercial Mortgage**" means USA Commercial Mortgage Company.

"**Commercial Mortgage Assets**" means all Servicing Agreements and Personal Property for all of the Serviced Loans set forth in the Serviced Loan Schedule.  Commercial Mortgage Assets excludes any other assets not specifically identified herein, including, (i) USACM's rights (including indemnification, insurance rights and claims and avoidance actions), claims and recoveries against third parties arising out of, or relating to, events prior to the Closing Date with respect to Commercial Mortgage Assets or arising at any time with respect to assets which are not Commercial Mortgage Assets, (ii) all cash, accounts receivable, interests in promissory notes which are not Notes, tax refunds and other similar assets and (iii) tangible or intangible assets of USACM.

"**Commercial Mortgage Price**" shall have the meaning ascribed to it in Section 2.2(b) hereof.

"**Committees**" means, collectively, all of the official committees of creditors or interest holders appointed to serve in the Bankruptcy Case.

"**Cut-off Date**" means July 31, 2006.

- 6 -

"**Debtors**" means the Sellers and the Acknowledging Parties that have filed for chapter 11 bankruptcy relief in the Bankruptcy Case.

"**Debtors' Agreed Allocation**" means the allocation of the Total Asset Purchase Price into components, as more fully described in Section 2.2 hereof, such being provided at Sellers' request, without Purchaser expressing any opinion with regard to its accuracy, propriety or reasonableness.

"**Deposit**" means the $2,325,000 deposit submitted by the Purchaser pursuant to Section 2.5 hereof.

"**Due Diligence Completion Date**" means October 19, 2006, the date that Purchaser completed its final due diligence pursuant to Section 2.7 hereof and executed the Asset Purchase Agreement.

"**Expense Reimbursement**" means an amount up to $500,000 on account of amounts incurred by Purchaser as actual, documented, out-of-pocket expenses in connection with the negotiation, preparation, execution, delivery and attempted performance of this Agreement and the matters contemplated hereby.

"**Final Order**" means an order or a judgment entered by a court of competent jurisdiction (x) that has not been reversed, stayed, modified or amended, (y) as to which no appeal or petition for review or motion for rehearing or reargument has been taken or has been made, and (z) as to which the time for filing a notice of appeal, a petition for review or a motion for reargument or rehearing has expired.

"**First Trust Deed Fund**" means USA Capital First Trust Deed Fund, LLC.

"**First Trust Deed Fund Assets**" means that portion of the Loans owned by First Trust Deed Fund that are set forth in the Loan Schedule, together with FTDF's interest in the Loan Documents, and proceeds of the Loans that would otherwise be payable to FTDF except as otherwise expressly stated herein. First Trust Deed Fund Assets exclude any other assets not specifically identified herein as First Trust Deed Fund Assets, including, without limitation, (i) FTDF's rights (including indemnification, insurance rights and claims and avoidance actions), claims and recoveries against third parties arising out of, or relating to, events prior to the Closing Date with respect to any First Trust Deed Fund Asset (other than rights in connection with enforcement of any Mortgage or Servicing Agreement) or arising at any time with respect to assets which are not First Trust Deed Fund Assets, (ii) all books and records related to assets other than First Trust Deed Fund Assets, (iii) all cash, accounts receivable, tax refunds and other similar assets and (iv) tangible or intangible assets of FTDF.

"**First Trust Deed Fund Price**" shall have the meaning ascribed to it in Section 2.2(a) hereof.

"**FTDF Principal Balance**" shall mean the amount designated as "CFT Ownership Principal Balance" set forth on Schedule 1, which represents that amount of the principal balance of the Loan that First Trust Deed Fund owns.

- 7 -

"**Debtors**" means the Sellers and the Acknowledging Parties that have filed for chapter 11 bankruptcy relief in the Bankruptcy Case.

"**Debtors' Agreed Allocation**" means the allocation of the Total Asset Purchase Price into components, as more fully described in Section 2.2 hereof, such being provided at Sellers' request, without Purchaser expressing any opinion with regard to its accuracy, propriety or reasonableness.

"**Deposit**" means the $2,325,000 deposit submitted by the Purchaser pursuant to Section 2.5 hereof.

"**Due Diligence Completion Date**" means October 19, 2006, the date that Purchaser completed its final due diligence pursuant to Section 2.7 hereof and executed the Asset Purchase Agreement.

"**Expense Reimbursement**" means an amount up to $500,000 on account of amounts incurred by Purchaser as actual, documented, out-of-pocket expenses in connection with the negotiation, preparation, execution, delivery and attempted performance of this Agreement and the matters contemplated hereby.

"**Final Order**" means an order or a judgment entered by a court of competent jurisdiction (x) that has not been reversed, stayed, modified or amended, (y) as to which no appeal or petition for review or motion for rehearing or reargument has been taken or has been made, and (z) as to which the time for filing a notice of appeal, a petition for review or a motion for reargument or rehearing has expired.

"**First Trust Deed Fund**" means USA Capital First Trust Deed Fund, LLC.

"**First Trust Deed Fund Assets**" means that portion of the Loans owned by First Trust Deed Fund that are set forth in the Loan Schedule, together with FTDF's interest in the Loan Documents, and proceeds of the Loans that would otherwise be payable to FTDF except as otherwise expressly stated herein. First Trust Deed Fund Assets exclude any other assets not specifically identified herein as First Trust Deed Fund Assets, including, without limitation, (i) FTDF's rights (including indemnification, insurance rights and claims and avoidance actions), claims and recoveries against third parties arising out of, or relating to, events prior to the Closing Date with respect to any First Trust Deed Fund Asset (other than rights in connection with enforcement of any Mortgage or Servicing Agreement) or arising at any time with respect to assets which are not First Trust Deed Fund Assets, (ii) all books and records related to assets other than First Trust Deed Fund Assets, (iii) all cash, accounts receivable, tax refunds and other similar assets and (iv) tangible or intangible assets of FTDF.

"**First Trust Deed Fund Price**" shall have the meaning ascribed to it in Section 2.2(a) hereof.

"**FTDF Principal Balance**" shall mean the amount designated as "CFT Ownership Principal Balance" set forth on Schedule 1, which represents that amount of the principal balance of the Loan that First Trust Deed Fund owns.

- 7 -

**"FTDF Principal Balance Deficiency"** shall mean the amount that the FTDF Principal Balance as of the Cut-Off Date is less than the amount indicated in Schedule 1, as determined pursuant to section 9.1(c) on or before the Closing Date.

**"FTDF Principal Balance Surplus"** shall mean the amount that the FTDF Principal Balance as of the Cut-Off Date is more than the amount indicated in Schedule 1, as determined pursuant to section 9.1(c) on or before the Closing Date.

**"General Asset MAC"** shall have the meaning ascribed to it in Section 9.1(h).

**"General Service Agreement MAC"** shall have the meaning ascribed to it in Section 9.1(h).

**"Individual Asset MAC"** shall have the meaning ascribed to it in Section 9.1(i).

**"Insider"** shall have the meaning set forth in section 101(31) of the Bankruptcy Code, plus, to the extent not already covered by section 101(31), shall also include Joseph Milanowski, Thomas Hantges, Paul Hamilton, and USA Investment Partners, LLC (collectively the "USAIP Parties") and any "affiliate" of the Debtors or the USAIP Parties.  The term "affiliate" as referenced in section 101(31) and as used in this definition shall have the meaning set forth in section 101(2) of the Bankruptcy Code, plus, to the extent not already covered by section 101(2), shall also include any and all closely held private entities owned in whole or in part or controlled by the Debtors or any of the Debtors' Insiders.  Notwithstanding anything to the contrary herein, no borrower shall be deemed to be an Insider for purposes of Purchaser's enforcement of any of the Serviced Loans or the Loans.

**"Late Charges"** means all late charges and default interest due, but unpaid, from Borrowers as of the Closing Date.

**"Lenders"** means those certain direct investors holding the unpaid principal balances and accrued interest balances, as confirmed pursuant to the terms hereof and the Plan, in the Loans.

**"Liabilities"** means claims, liabilities and obligations of every nature or kind, whether accrued, absolute, contingent or otherwise and whether asserted or unasserted, known or unknown and whether due or to become due.

**"Lien"** means any lien, claim, mortgage, security interest, pledge, charge, easement, servitude or other encumbrance of any kind, including any of the foregoing, arising under any conditional sales or other title retention agreement.

**"Litigation"** means a court action, an administrative or regulatory action or an arbitration proceeding involving USACM or FTDF, as applicable, excluding actions related to enforcement of the Loans and bankruptcy actions.

**"Loan"** means all of FTDF's interests in the commercial loans listed in the Loan Schedule.

"**Loan Documents**" means FTDF's or USACM's interests in all agreements and documents evidencing or securing the Loans including, but not limited to, the Mortgages and Mortgage Notes.

"**Loan Schedule**" means the schedule of Loans attached hereto as Schedule 1.

"**Minimum Incremental Overbid**" has the meaning ascribed to it in the Bid Procedures Motion.

"**Mortgage**" means the mortgage, deed of trust, deed to secure debt or similar instrument creating a lien on the related Mortgaged Property as security for the Loans.

"**Mortgage Note**" means, with respect to the Loans, FTDF's interest in any promissory note or notes evidencing any Loan transferred by FTDF hereunder.

"**Mortgaged Property**" means, with respect to each Loan, the real property and personal property that is subject to the lien of the related Mortgage.

"**Net Adjustment 5**" the product of (i) the Net FTDF Principal Balance Surplus if any of Schedule 4 Loans and (ii) the quotient of (a) the Net FTDF Principal Balance Deficiency of Schedule 5 Loans and (b) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of the Schedule 5, 6 and 7 Loans.

"**Net Adjustment 6**" the product of (i) the Net FTDF Principal Balance Surplus if any of Schedule 4 Loans and (ii) the quotient of (a) the Net FTDF Principal Balance Deficiency of Schedule 6 Loans and (b) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of Schedule 5, 6 and 7 Loans plus the product of (i) the Net FTDF Principal Balance Surplus if any of Schedule 5 Loans and (ii) the quotient of the (c) Net FTDF Principal Balance Deficiency of Schedule 6 Loans and (d) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of Schedule 6 and 7 Loans.

"**Net Adjustment 7**" the product of (i) the Net FTDF Principal Balance Surplus if any of the Schedule 4 Loans and (ii) the quotient of (a) the Net FTDF Principal Balance Deficiency of the Schedule 7 Loans and (b) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of the Schedule 5, 6 and 7 Loans plus the product of (ii) the Net FTDF Principal Balance Surplus if any of Schedule 5 Loans and (iii) the quotient of (c) the Net FTDF Principal Balance Deficiency of the Schedule 7 Loans and (d) the sum of each of the Net FTDF Principal Balance Deficiencies (if any) of Schedule 6 and 7 Loans plus the Net FTDF Principal Balance Surplus if any of Schedule 6 Loans.

"**Net FTDF Principal Balance Deficiency**" means the aggregate difference between the FTDF Principal Balance Surplus of a set of Loans and the FTDF Principal Balance Deficiency of the same set of Loans if such difference is negative.

"**Net FTDF Principal Balance Surplus**" means the aggregate difference between the FTDF Principal Balance Surplus of a set of Loans and the FTDF Principal Balance Deficiency of the same set of Loans if such difference is positive.

"**Offer Letter**" means the letter of intent between the Sellers and the Purchaser dated September 11, 2006.

"**Offer Letter Acceptance Date**" means September 12, 2006.

"**Outside Approval Date**" means the date that is 120 days after the Due Diligence Completion Date.

"**Person**" means an individual, corporation, partnership, joint venture, trust or unincorporated organization or a federal, state, city, municipal or foreign government or an agency or political subdivision thereof.

"**Personal Property**" means those personal property assets of USACM necessary for enforcement of the Servicing Agreements, including, without limitation, all books and records of USACM related to the Loans, all servicing and investor records, databases, servicing and reporting software, and such reasonable assistance with operating and maximizing the efficiency of management of the foregoing as may be requested by the Purchaser, mutually agreed upon with the USACM before the Closing Date; provided, however, that only working copies of the relevant databases, and servicing and reporting software, will be delivered to Purchaser, with the originals being retained by USACM.

"**Plan**" means the Debtors' Second Amended Joint Plan of Reorganization, which is deemed to be mutually acceptable to the Debtors and Purchaser, provided that it is, and remains through confirmation thereof, consistent in all respects with the provisions of this Agreement, as such may be modified through further negotiations between the parties hereto.

"**Sale Approval Order**" means an order entered by the Bankruptcy Court approving the sale of the Assets pursuant to Section 363 of the Bankruptcy Code, which is presently contemplated to be the Order confirming the Plan.

"**Schedule 4 Loans**" means those Loans listed on Schedule 4.

"**Schedule 5 Loans**" means those Loans listed on Schedule 5.

"**Schedule 6 Loans**" means those Loans listed on Schedule 6.

"**Schedule 7 Loans**" means those Loans listed on Schedule 7.

"**Schedule Value 4**" means for a Loan listed on Schedule 4, 95%.

"**Schedule Value 5**" means for a Loan listed on Schedule 5, 85%.

"**Schedule Value 6**" means for a Loan listed on schedule 6, 80%.

"**Schedule Value 7**" means for a Loan listed on Schedule 7, 65%.

"**Servicing Agreement**" means those servicing agreements for all of the Serviced Loans, including, without limitation, the Loans.

"**Serviced Loan**" means any loan that is the subject of a Servicing Agreement.

"**Serviced Loan Schedule**" means the schedule of Serviced Loans that are the subject of Servicing Agreements attached hereto as Schedule 2 and including the Loans.

"**Success Fee**" means all exit fees, extension fees, deferred origination fees and other fees due to Commercial Mortgage pursuant to and as defined in the current documentation and agreements relating to each of the Serviced Loans whether accrued before or accruing after the Closing Date.

"**Total Asset Purchase Price**" means the sum of the First Trust Deed Fund Price and the Commercial Mortgage Price, subject to any applicable adjustments pursuant to Sections 2.3 and 9.1(i) hereto, and as the same may be finally determined as a result of the Auction.

### Section 1.2      Other Definitional and Interpretive Matters.

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

**Calculation of Time Period**.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

**Dollars**.  Any reference in this Agreement to $ shall mean U.S. dollars.

**Exhibits/Schedules**.   The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.  The Exhibits and/or Schedules shall not be amended following the Due Diligence Completion Date, except pursuant to the terms hereof.

**Gender and Number**.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

**Headings**.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections, and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

**Herein**. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

**Including**. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b) The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity, question of intent, or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

**Knowledge**. With respect to references to the knowledge, including the qualification of any statement in this Agreement by the word known (as used in any statement in Article III or Article IIIA) or the phrase "to the knowledge of the Sellers" "to Sellers' knowledge," or by any other variant thereof, the Sellers shall be deemed to have knowledge of a matter if the Chief Restructuring Officer, Mr. Thomas Allison, in his capacity as President and Chief Restructuring Officer, or Mesirow Financial Interim Management, LLC., solely in its capacity as the restructuring consultant, has actual knowledge of the matter or was in possession of documentation indicative of any such matter. Notwithstanding anything contrary in this Agreement, neither the Thomas Allison, in his capacity as President and Chief Restructuring Officer of the Debtors, Thomas Allison, in his personal capacity, nor Mesirow Financial, Mesirow Financial Interim Management, LLC, Mesirow Financial Consulting, LLC or their respective affiliates, officers, directors, members, shareholders, employees, representatives or agents shall have any liability, personal or otherwise, relating to or arising from this Agreement, including, without limitation, any obligations of the Debtors under the Agreement, any statements in the Agreement, the statements in Articles III and IIIA of the Agreement, the Expense Reimbursement or the Break-Up Fee. Any and all such liabilities relating to or arising from the Agreement shall be liabilities of the Debtors' bankruptcy estates and shall be solely the responsibility of the Debtors' bankruptcy estates.

## ARTICLE II
## PURCHASE AND SALE OF LOANS AND SERVICING AGREEMENTS

**Section 2.1    Purchase and Sale of Loans**. Pursuant to this Agreement, Sellers hereby agree to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser hereby agrees to purchase from Sellers, all of Sellers' right, title and interest in and to the Assets.

**Section 2.2    Purchase Price**. The Total Asset Purchase Price for the sale or transfer of the Assets shall be allocated according to the Debtors' Agreed Allocation as follows:

(a)     First Trust Deed Fund Assets.   The First Trust Deed Fund Assets for the cash consideration of $46,000,000, as adjusted pursuant to Section 2.3 (the "First Trust Deed Fund Price"); plus

(b)     Commercial Mortgage Assets.   The Commercial Mortgage Assets, for the consideration of the sum of (i) following reimbursement to Purchaser of all amounts due under Section 7.2(a) hereof, 50% of the first $1,000,000 collected by Purchaser as provided in Section 7.2(b) hereof (with such amount to be reduced by the ratio of the outstanding principal balance at closing of all Serviced Loans for which Servicing Agreements are excluded from this transfer by agreement among Purchaser and the Sellers, over the outstanding principal balance of all Serviced Loans for which Servicing Agreements are actually transferred); (ii) 50% of the first $100,000 collected of default rate interest accrued on the First Trust Deed Fund Assets as of the Closing Date, plus (iii) the other payments and obligations set forth herein (collectively, the "Commercial Mortgage Price").  The Servicing Agreements shall be transferred to Purchaser (or its affiliate) in a manner mutually agreed upon between USACM and the Purchaser.

The Total Asset Purchase Price shall be valid only with regard to all Assets, as a whole, and is not separable to any extent.  The foregoing allocations of the Total Asset Purchase Price may be adjusted at Sellers', or Purchaser's, discretion solely for Purchaser's purposes, provided that any adjustment will have no effect on the Total Asset Purchase Price or on the Debtors' Agreed Allocation, unless otherwise agreed to by the Debtors and each of the Committees.

### Section 2.3     Adjustments to Purchase Price.

(a)     The First Trust Deed Fund Price shall be further reduced by all payments of principal received by FTDF or any of the Sellers after the Cut-Off Date to the extent any such principal payments are related to the First Trust Deed Fund Assets in accordance with the following schedule:

(i)     For a Loan listed on Schedule 4, 95% of any principal payments received by FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date;

(ii)     For a Loan listed on Schedule 5, 85% of any principal payments received by FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date;

(iii)     For a Loan listed on Schedule 6, 80% of any principal payments received by FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date; and

(iv)     For a Loan listed on Schedule 7, 65% of any principal payments received by FTDF or any of the Sellers as to First Trust Deed Fund Assets after the Cut-Off Date.

(b)     At the Closing Date, if the aggregate FTDF Principal Balance Deficiency for Schedule 4 Loans is greater than the aggregate FTDF Principal Balance Surplus for Schedule

4 Loans, then the First Trust Deed Fund Price shall be further reduced in an amount equal to the amount of such positive difference multiplied by the Schedule Value 4.

(c)     If there is a Net FTDF Principal Balance Deficiency of the Schedule 5 Loans, and if the sum of the Net FTDF Principal Deficiency of Schedule 5 Loans and Net Adjustment 5 is negative then the Purchase Price shall be reduced by such amount times Schedule Value 5.

(d)     If there is a Net FTDF Principal Balance Deficiency of the Schedule 6 Loans, and if the sum of the Net FTDF Principal Deficiency of Schedule 6 Loans and Net Adjustment 6 is negative then the Purchase Price shall be reduced by such amount times Schedule Value 6.

(e)     If there is a Net FTDF Principal Balance Deficiency of the Schedule 7 Loans, and if the sum of the Net FTDF Principal Deficiency of Schedule 7 Loans and Net Adjustment 7 is negative then the Purchase Price shall be reduced by such amount times Schedule Value 7.

(f)     For the avoidance of doubt, the methodology of the calculations set forth in items in (d) - (e) is set forth in Schedule 2.3(f).

(g)     The First Trust Deed Fund Price shall not be adjusted on account of, and Purchaser shall have no interest, in any payments collected before the Closing Date that are proceeds of the First Trust Deed Assets for interest that has accrued prior to the Closing Date. Purchaser shall receive and retain all accrued interest collected after the Closing Date that are proceeds of the First Trust Deed Assets including, without limitation, First Trust Deed Fund's accrued default rate interest.

(h)     On or before the Closing Date, if Sellers deliver to Purchaser an endorsement from the existing title company for the Loan referred to as Gramercy Court Ltd. certifying that amounts advanced or to be advanced thereunder are prior and superior in interest to any and all other non-tax lienholders or claimants, including, but not limited to, Mountain West Mortgage LLC's Deed of Trust and Assignment of Leases and Rents recorded on March 11, 2004, then the First Trust Deed Fund Price shall be increased in the amount of $250,000.00 ("Additional Price Adjustment").

**Section 2.4     Payment of Purchase Price.**  Subject to the terms and provisions hereof, payment of the Total Asset Purchase Price is subject to the adjustments and/or credits set forth in this Agreement and shall be paid by Purchaser to Sellers on the Closing Date, by wire transfer, in immediately available funds.

**Section 2.5     Deposit.**  Within one (1) business day of entry of the Break-Up Fee Order, Purchaser shall submit the Deposit to the Sellers pursuant to the Bid Procedures Motion.  The Deposit shall be held by Sellers in a segregated interest bearing escrow account from the date of its submission to the Sellers with all interest payable to the Purchaser, provided,

however, if the Break Up Fee Order is reversed, or modified in any way, without Purchaser's consent, the Sellers shall immediately return the Deposit to the Purchaser.

<div align="center">

**Section 2.6**      **Closing Escrow.**

</div>

(a)      Sellers shall have deposited with a mutually acceptable escrow agent all documents and Personal Property required under this Agreement, including, without limitation, the following:

      (i)      any Personal Property in their possession, including, without limitation, copies of all loan servicing and/or investor reporting software and databases, including written documentation, programming code and business rules associated with each Loan and/or Lender;

      (ii)      all original Mortgage Notes, together with an allonge to such Mortgage Notes, endorsed to Purchaser or, if such originals are not available, appropriate affidavit(s) of loss with respect thereto;

      (iii)      the original recorded Mortgages with recording information endorsed thereon (or a copy certified by the appropriate public recording office);

      (iv)      original assignments to Purchaser of all right, title and interest of Seller in and to the Mortgages, Mortgage Notes, and all other Assets;

      (v)      all other original Loan Documents and if such originals are not available, at the request of Purchaser, appropriate affidavit(s) of lost original Loan Documents;

      (vi)      original assignments of the UCC financing statements from Sellers to Purchaser;

      (vii)      all appraisals, surveys, title reports, title insurance policies, commitments to issue title insurance policies, documents, correspondence, credit records, payment histories, insurance policies or certificates in Sellers' possession that pertains to the Assets;

      (viii)      all original Servicing Agreements and original powers of attorney executed by the Lenders in our possession; and

      (ix)      on or before the date of notices are to be transmitted pursuant to Section 9.1(c) hereof, a schedule of servicing fees due on each Serviced Loan, together with a detailed explanation regarding how such fees are calculated.

(b)      Prior to the Auction Date, Sellers shall have deposited with a mutually acceptable escrow agent all Mortgages, Mortgage Notes (including allonges to such Mortgage Notes, endorsed to Purchaser) Loan Documents and Personal Property to be transferred under this Agreement. To the extent original Loan Documents are unavailable, Sellers shall execute appropriate affidavit(s) of lost original Loan Documents.

<div align="center">

- 15 -

</div>

**Section 2.7    Due Diligence.** The Sellers shall provide Purchaser with reasonable access to Debtors' books, records and personnel. Purchaser will complete final due diligence no later than the date of the initial hearing on the Bid Procedures Motion (the "Due Diligence Completion Date"). All of Purchaser's obligations pursuant to this Agreement shall be subject to Purchaser's satisfaction with the results of such final due diligence. Final due diligence will include for each of the Assets, but will not be limited to: (i) confirmation of the performance and payment status of each Serviced Loan, and the performance and payment status of each Service Agreement, including non-Debtor contracting parties agreement; (ii) tax, title and UCC searches on all collateral; (iii) confirmation that the collateral appraised by Hilco Financial Services continues to be collateral with regard to each loan specified, in the same priority indicated in the Sellers' loan files, and that no liens have been released following the dates of applicable appraisals and title reports, except for loans paid in full before the Closing Date; and (iv) an environmental report with regard to each piece of real property that is in all respects satisfactory to Purchaser. The cost of such due diligence shall be borne by Purchaser, except to the extent that Purchaser is entitled to Expense Reimbursement, pursuant to the terms hereof. If at any time prior to the Due Diligence Completion Date, Purchaser determines that any Asset does not fully satisfy the foregoing criteria, Purchaser shall, at its option, either (a) proceed with the transaction at the then-existing Total Asset Purchase Price, or (b) rescind the Offer Letter, and be released from any further obligation to perform pursuant to this Agreement or the Plan, except as otherwise provided herein. This Agreement shall be executed upon the Due Diligence Completion Date, and if not executed, Purchaser will be deemed to have rescinded the Offer Letter. Execution of this Agreement by Purchaser on or before the Due Diligence Completion Date constitutes Purchaser's acknowledgement of the completion of final due diligence.

## ARTICLE III
## STATEMENTS OF USACM

USACM, severally and not jointly, hereby makes the following closing condition statements to the Purchaser as follows:

**Section 3.1    Due Incorporation.** USACM is duly organized, and validly existing under the laws of its state of formation. USACM has a provisional, limited license to conduct all activities performed with respect to the servicing of the Serviced Loans.

**Section 3.2    Authority and Capacity.** Subject to obtaining Bankruptcy Court approval pursuant to the Sale Approval Order and/or confirmed Plan, USACM has all requisite corporate power, authority and capacity to enter into this Agreement and to perform the obligations hereunder. Without limiting the generality of the foregoing, subject to obtaining the Sale Approval Order, the execution and delivery of this Agreement, and any related agreements or instruments, and the consummation of the transactions contemplated hereby and thereby, each has been duly and validly authorized by all necessary action, and this Agreement and any related agreements or instruments each constitute a valid and legally binding agreement of USACM enforceable in accordance with its or their terms.

**Section 3.3     Litigation**.  Except for adversary proceedings and other matters pending in the Bankruptcy Court and as set forth on Schedule 3.3, to the knowledge of USACM, there is no Litigation pending or threatened, nor is there any order, injunction or decree outstanding against or relating to USACM, which could have a material adverse effect upon any of the Assets or materially impair the ability of USACM to perform their obligations hereunder, nor does USACM know of any material basis for any such litigation, proceeding, claim or demand or governmental investigation.  To USACM's knowledge, USACM is not in default in any material respect with regard to any order of any court, governmental authority or arbitration board or tribunal to which USACM is a party or is subject, and USACM is not in violation of any laws, ordinances, governmental rules or regulations to which it is subject, which such default or violation might materially and adversely affect any of the Loans.

**Section 3.4     Statements Regarding the Assets.**  With respect to the Commercial Mortgage Assets, USACM hereby makes the following closing condition statements to the Purchaser as follows:

(a)     Subject to Bankruptcy Court approval pursuant to the Sale Approval Order and/or confirmed Plan, USACM has the legal right and authority to sell, convey and transfer the Commercial Mortgage Assets to the Purchaser.

(b)     The outstanding principal balance with regard to each of the Loans, as set forth in Schedule 1 attached hereto, is each borrower's outstanding balance as of the Cut-Off Date.

(c)     The assignment of the Mortgages to Purchaser has been or will be on or before the Closing Date duly authorized, executed and delivered by USACM.

(d)     Sellers have taken no action that would render the Mortgage Notes or Mortgages or any of the other Loan Documents invalid or unenforceable.  All Mortgage Notes and Mortgages and the other Loan Documents are legal, valid and binding obligations of the maker thereof.

(e)     Except as provided in Sections 6.2 and 9.1(g) hereof with respect to the Loan Documents, USACM has not since the Cut-Off Date, modified the Mortgages or Mortgage Notes in any respect, or satisfied, canceled or subordinated any Mortgage or Mortgage Note in whole or in part or released all or any portion of any Mortgaged Property from the lien of any Mortgage, or executed any instrument of release, cancellation or satisfaction affecting the Mortgages or Mortgage Notes.

(f)     Except as set forth on Schedule 3.4(f), there is no litigation, proceeding or governmental investigation or any judicial order, injunction or decree pending, or to USACM's knowledge, threatened with respect to the Loans, which could have a material adverse effect upon the Loans.

(g)     No written notice has been received by USACM to the effect that (A) the maintenance, operation, occupancy or use of any Mortgaged Property violates any zoning or building code or regulation, any restrictive covenant, or any other federal, state or municipal law, ordinance or regulation applicable to any Mortgaged Property, or (B) any material licenses,

permits, inspections, authorizations, certifications or approvals required by any governmental authority having jurisdiction over the operation of any Mortgaged Property has not been performed or issued and paid for, or is not in full force and effect.

(h)     There is no pending or known threatened condemnation or similar proceeding affecting any Mortgaged Property or any part thereof, and all Mortgaged Property complies with all zoning, environmental and hazardous substance laws.

(i)     The First Trust Deed Fund Assets are term loans and have been fully advanced by FTDF and the other lenders parties thereto and there are no further obligations of FTDF or any other lender to fund or make any advances under the Loans.  Notwithstanding the foregoing, the loans listed on Schedule 3.4(g) that are part of the First Trust Deed Fund Assets have the option, but not the obligation, to fund certain unfunded construction budget requirements as set forth in that Schedule.

## ARTICLE IIIA
## STATEMENTS OF FTDF

FTDF, severally and not jointly, hereby makes the following closing condition statements to the Purchaser as follows:

Section 3A.1.   Due Incorporation.   FTDF is and shall continue to be, duly organized and validly existing under the laws of the State of Nevada.

Section 3A.2.   Authority and Capacity.   Subject to obtaining the Sale Approval Order, FTDF has all requisite corporate power, authority and capacity to enter into this Agreement and to perform the obligations hereunder.  Without limiting the generality of the foregoing, subject to obtaining the Sale Approval Order, the execution and delivery of this Agreement, and any related agreements or instruments, and the consummation of the transactions contemplated hereby and thereby, has been duly and validly authorized and this Agreement constitutes a valid and legally binding agreement of FTDF enforceable in accordance with its terms.

Section 3A.3.   Litigation.   Except for adversary proceedings and other matters pending in the Bankruptcy Court and as set forth on Schedule 3.A3, to the knowledge of FTDF, there is no Litigation pending or threatened, nor is there any order, injunction or decree outstanding against or relating to FTDF, which could have a material adverse effect upon any of the Assets or materially impair the ability of FTDF to perform their obligations hereunder.  To FTDF's knowledge (i) FTDF is not in default in any material respect with regard to any order of any court, governmental authority or arbitration board or tribunal to which FTDF is a party or is subject, and (ii) FTDF is not in violation of any laws, ordinances, governmental rules or regulations to which it is subject, either of which such default or violation might materially and adversely affect any of the Loans.

Section 3A.4.   Statements Regarding the First Trust Deed Fund Assets.  With respect to the First Trust Deed Fund Assets, FTDF hereby states to Purchaser as of

- 18 -

the Closing Date, subject to obtaining Bankruptcy Court approval pursuant to the Sale Approval Order and/or confirmed Plan, as follows:

        (a)    FTDF has the legal right and authority to sell, convey and transfer the First Trust Deed Fund Assets to the Purchaser.

        (b)    The assignment by FTDF of the related Mortgages to Purchaser has been or will be on or before the Closing Date duly authorized, executed and delivered by FTDF.

### ARTICLE IV
### STATEMENTS OF PURCHASER

Purchaser hereby makes the following closing condition statements to the Sellers as follows:

        **Section 4.1**    **Due Incorporation and Good Standing.**  Purchaser is and shall continue to be duly organized, validly existing and in good standing under the laws of its state of formation.

        **Section 4.2**    **Enforceability.**  This Agreement and any related agreements or instruments each constitutes a valid and legally binding agreement of Purchaser enforceable in accordance with its terms.

        **Section 4.3**    **Authority and Capacity.**  Purchaser has all requisite corporate power, authority and capacity to enter into this Agreement and to perform the obligations hereunder.  Without limiting the generality of the foregoing, the execution and delivery of this Agreement, and any related agreements or instruments, and the consummation of the transactions contemplated hereby and thereby, has been duly and validly authorized.  This Agreement has been duly and validly executed and delivered by Purchaser.

        **Section 4.4**    **No Conflict.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby, nor compliance with its terms and conditions, shall: (a) violate, conflict with, result in the breach of, or constitute a default under, be prohibited by, or require any additional approval under any of the terms, conditions or provisions of Purchaser's Articles of Organization or Operating Agreement, or of any mortgage, indenture, deed of trust, loan or credit agreement or instrument to which Purchaser is now a party or by which it is bound, or of any order, judgment or decree of any court or governmental authority applicable to Purchaser, or (b) result in the creation or imposition of any lien, charge or encumbrance of any material nature upon any of the properties or assets of Purchaser.

### ARTICLE V
### BANKRUPTCY COURT APPROVAL

        **Section 5.1**    **Bidding Procedures**.  The Bid Procedures Motion attached hereto as Exhibit B has been filed with the Bankruptcy Court and is acceptable to Purchaser. The Break-Up Fee Order shall be in form and substance acceptable to Purchaser and Sellers.

**Section 5.2     Sale Approval Order**.  The Sale Approval Order shall be reasonably acceptable in form and substance to Purchaser and shall include provisions, among others (i) providing that Purchaser shall not incur any liability as a successor to the Sellers unless such liability is expressly assumed, (ii) approving the sale of the Assets to Purchaser on the terms and conditions set forth in this Agreement, or such higher and better terms and conditions offered at the Auction, and authorizing Sellers to proceed with this transaction, (iii) stating that any objections timely filed with respect to the sale of the Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Total Asset Purchase Price represents fair value for the Assets, (v) finding that sale is in the best interests of the Debtors' estates and creditors, (vi) finding that Purchaser is a good faith purchaser of the Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(m) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Assets to Purchaser shall be free and clear of all liens, claims, interests, obligations and encumbrances whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Assets to Purchaser and protecting Purchaser against any liens, claims, interests, obligations and encumbrances against Sellers or the Assets, (ix) finding that there are no brokers involved in consummating the sale and no brokers' commissions are due, (x) authorizing and directing Sellers to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, and (xi) determining that Purchaser is not a successor to Sellers or otherwise liable for any liabilities not expressly assumed and to the extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or encumbrance against Purchaser or the Assets related thereto, and (xiii) finding that, pursuant to Section 1146(c) of the Bankruptcy Code, the within transaction is "in contemplation of a plan or plans of reorganization to be confirmed in the Bankruptcy Cases," and as such shall be free and clear of any and all transfer tax, stamp tax, or similar taxes; provided, however, that Purchaser's obligations hereunder shall not be conditioned on the findings set forth in this clause (xiii). Sellers shall use commercially reasonable efforts to obtain entry of the Sale Approval Order in the form described hereto.  Purchaser's obligations to consummate the transactions contemplated herein shall be conditioned upon the Bankruptcy Court's entry of the Sale Approval Order in form and substance satisfactory to Purchaser.  To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

**Section 5.3     Plan of Reorganization.**  Subject to the terms hereof, the Sellers shall transfer the Assets to the successful bidder at the Auction pursuant to a confirmed Plan that is in all material respects consistent with the terms of this Agreement.    The    Debtors shall promptly schedule a hearing to seek approval of the Disclosure Statement by the Bankruptcy Court under Section 1125 of the Bankruptcy Code, which hearing shall be held approximately seventy (70) days following the Offer Letter Acceptance Date. Upon approval of the Disclosure Statement by the Bankruptcy Court under Section 1125 of the Bankruptcy Code, the Debtors shall promptly solicit acceptances and proceed to confirmation of the Plan.  The

hearing on the confirmation of the Plan shall be scheduled for no earlier than seven (7) days following the Auction.

## ARTICLE VI
## COVENANTS OF SELLERS

**Section 6.1 Delivery of Documents**. At any time and from time to time at and after the Closing, upon request of Purchaser, the Sellers shall do, execute, and acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, confirmations and assurances as Purchaser may reasonably request to more effectively convey, assign and transfer to and vest in the Purchaser full legal right, title and interest in and actual possession of the Assets and to generally carry out the purposes and intent of this Agreement. The Sellers shall also furnish Purchaser and Acknowledging Parties with such information and documents in its possession or under their control, or which the Sellers can execute or cause to be executed, as will enable Purchaser to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Assets. USCAM shall also provide Purchaser with all reasonable assistance that Purchaser may request in operating, and maximizing the operating efficiency of, all items of Personal Property prior to the Closing Date.

**Section 6.2 No Modification**. Except in the ordinary course of business or pursuant to Court order, as of the Offer Letter Acceptance Date, Sellers have not materially modified, altered, hypothecated, settled or compromised, all or any portion of the First Trust Deed Fund Assets or Servicing Agreements or obligations of any party thereunder in respect of any First Trust Deed Fund Assets or Servicing Agreements, and will not do so at any time through the Closing Date without the prior consent of the Purchaser.

**Section 6.3 Conduct of Business**. Following the execution hereof and prior to the Closing Date, USCAM shall use its commercially reasonable efforts to preserve the Assets, and shall consult with Purchaser prior to implementing any material decisions affecting any of the Assets.

**Section 6.4 Other Bankruptcy Covenants.** Sellers shall promptly make all filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Assets consistent with the terms herein. In the event that an appeal is taken, or a stay pending appeal is requested, from any order relating to the Plan or to the Assets, generally, Sellers shall promptly notify Purchaser of such appeal or stay request and, upon Purchaser's request, shall provide to Purchaser within two (2) Business Days after Sellers' receipt thereof, a copy of the related notice of appeal or order of stay. Sellers shall also provide Purchaser with written notice of any motion, application, brief or other pleading filed in connection with any appeal relating to the transactions contemplated hereunder.

**Section 6.5 Taxes**. Sellers shall pay all income taxes with respect to the Assets that accrued prior to the Closing Date and Purchaser shall have no liability for income

taxes accruing prior to the Closing Date. Purchaser hereby acknowledges and agrees that Purchaser shall be responsible for any transfer taxes, if any, in connection with the purchase and sale of the Assets and Sellers are not responsible for and shall not be required to pay any real property taxes outstanding with respect to the Assets.

Section 6.6    **Tax Reporting**. Sellers shall prepare and timely transmit all required Forms 1098 and 1099 for calendar year 2006 in respect of the Assets.

Section 6.7    **Reports/Notices.** USCAM timely shall have:

(a)    provided to Purchaser each week prior to Closing weekly collections statements showing principal and interest stated individually with respect to each Loan;

(b)    provided to Purchaser each month prior to Closing monthly statements showing principal and interest stated individually with respect to each Loan; and,

(c)    informed Purchaser, in each case within two Business Days of occurrence, of any:

(i)    payoff offer received with regard to any Loan, or any discussions relating to payoff of any Loan;

(ii)    negotiations engaged in by the Sellers with regard to any resolution of any Loan other than by payoff;

(iii)    communications with Sellers' attorneys regarding any pending litigation; and

(iv)    discussions with any Borrower regarding re-financing or potential re-financing of any Loan.

## ARTICLE VII
## COVENANTS OF PURCHASER

Section 7.1    **Fees Payable to Sellers.** After the Closing Date, any of the following amounts collected by Purchaser shall be paid over to Sellers (or their successor or assignee under the Plan), in accordance with the disbursement priorities stated in Section 7.2 hereof:

(a)    all Accrued Servicing Fees;

(b)    all Late Charges; provided however, that Purchaser shall retain any and all proportionate default interest in respect of and to the extent of Purchaser's interest in the First Trust Deed Fund Assets acquired by the Purchaser;

(c)    all Success Fees; and

(d)     all proceeds of all Serviced Loans and Serviced Loan participations and related receivables owed to Commercial Mortgage, to the extent of Commercial Mortgage's interest therein, as set forth in the Serviced Loan Schedule.

Section 7.2     **Distribution of Collected Money.**     With respect to all servicing fees and other fees and sums due the loan servicer under any of the Servicing Agreements, including, without limitation, the fees described in Section 7.1 above, received by Purchaser on and after the Closing Date, such fees and sums shall be distributed in the following order, calculated on a loan by loan basis:

(a)     First, Purchaser shall be reimbursed for sums advanced by Purchaser in respect of legal proceedings under the applicable Service Agreement(s);

(b)     Second, Purchaser shall retain fees for annual servicing fees (pro-rated on a monthly basis) under the applicable Service Agreement(s) that relate to any period of time on and after the Closing Date;

(c)     Third, all other sums due for late charges under the applicable Service Agreement(s) shall be paid, to Purchaser if accrued on or after the Closing Date, or to Sellers (or their successor or assignee under the Plan) if accrued prior to the Closing Date;

(d)     Fourth, all other sums due for default interest under the applicable Service Agreement(s) shall be paid, to Purchaser if accrued on or after the Closing Date, or to Sellers (or their successor or assignee under the Plan) if accrued prior to the Closing Date; provided however, that, subject to Section 2.2(b)(ii) hereof, all such sums payable at any time in respect of the First Trust Deed Fund Assets shall be paid to and retained by Purchaser; and

(e)     Fifth, all fees for annual servicing fees under the applicable Service Agreement(s) for pre-Closing Date months and all sums advanced or deemed advanced in respect of legal proceedings under any other provision of the applicable Service Agreement(s) before the Closing Date shall be paid to Sellers (or their successor or assignee under the Plan).

Purchaser shall hold all sums collected and due to Sellers in accordance with this Section 7.2 in trust until paid. To the extent Purchaser has been paid any sums from Borrowers or Lenders following its reimbursement of those sums pursuant to subsection (a) above, Purchaser shall distribute any such funds in accordance with the priorities set forth in subsections (b) – (e) above.

Section 7.3     **Causes of Action Against Insiders.**     As to the Assets purchased, other than the right to pursue personal guaranties of any of the Serviced Loans guaranteed by an Insider of the Debtors, Purchaser is not through the transactions described herein acquiring any other claim or cause of action against an Insider of any of the Debtors or against another Debtor. Further, if Purchaser obtains a judgment in respect of any personal guaranty of any Serviced Loan by an Insider of the Debtors, Purchaser will negotiate in good faith in an effort to reach an equitable agreement to do so in conjunction with any litigation by Sellers (or their successor or assignee under a Plan) in a manner that will not impair Purchaser's ultimate economic realization in respect of its Assets purchased pursuant to the terms hereof or otherwise or its obligations under the Servicing Agreements, but also will not impair any

- 23 -

recovery or litigation efforts undertaken by any of the Debtors (or their successors or assigns under a Plan) in respect of other liability claims or causes of action that they are then prosecuting or may in the future prosecute against such Insider.

> **Section 7.4** **Causes of Action Against Debtors.** Purchaser agrees that it will not prosecute any action against any of the Debtors arising out of or relating to the acquired Assets and arising out of any event occurring before the Closing Date. For the avoidance of doubt, the foregoing agreement shall not apply to any asset acquired by Purchaser other than pursuant to this Agreement. Purchaser further agrees to be bound by any applicable provisions contained in a confirmed Plan, and by any applicable orders entered by the Bankruptcy Court following the Closing Date.

> **Section 7.5** **Servicing Agreements.** Nothing contained in this Agreement shall modify the obligations owed to the Lenders by the loan servicer or rights of the Lenders against the loan servicer (or the rights of the loan servicer against the Lenders) under the applicable Servicing Agreements and otherwise applicable law. Purchaser shall distribute any sums due to Lenders under any of the Servicing Agreements in accordance with the Servicing Agreements, as the same may be modified with consent of the applicable Lenders, and with otherwise applicable law. Further, notwithstanding the foregoing, to the extent the Bankruptcy Court has entered an order, including, but not limited to, an order confirming a Plan, which interprets or enforces provisions of the Servicing Agreements or directs the distribution of payments under the Servicing Agreements or payments collected from Borrowers, Purchaser shall abide by the terms of such order(s). If, as between the provisions of the Servicing Agreements and the order(s) of the Bankruptcy Court, it is not clear to Purchaser how the sums collected shall be distributed, then Purchaser shall hold the sums payable to the Lender until Purchaser either receives joint direction from the Lender and the Sellers (or their successor or assignee under the Plan) regarding disbursement of interest, or is directed by an order from a court of competent jurisdiction. Nothing contained herein is intended to waive any defenses of the Lenders or of the Sellers (or their successors or assignees) under the Servicing Agreements. For the avoidance of doubt, under no circumstance shall any pre-Closing Date liability assertable by any party attach to Purchaser, or to any Asset acquired by Purchaser, pursuant to this Agreement, and the order entered by the Bankruptcy Court transferring the Assets to Purchaser shall clearly so state. Furthermore, for the avoidance of doubt, notwithstanding any other provision herein, or any order which may in the future be entered by the Bankruptcy Court, all servicing fees due pursuant to the terms stated in the Servicing Agreements, and all interest due on the First Trust Deed Fund Assets, shall continue to be due and payable, and Purchaser shall collect such servicing fees and interest for its sole benefit on and after the Closing Date.

> **Section 7.6** **Delivery of Assignment.** In the event that, upon Closing there is no Additional Price Adjustment, then upon Closing, Purchaser shall assign to FTDF, on terms and conditions reasonably acceptable to FTDF, all of its right, title and interest in and to the claims under the title policy described in Section 2.3 in connection with the occurrence of the Additional Price Adjustment.

## ARTICLE VIII
## REMEDIES

**Section 8.1     Remedies for Breach by Purchaser.**  In the event that Purchaser breaches any material statement or covenant required of Purchaser hereunder, and such breach prevents the Sellers from concluding the Closing and in fact the Sellers do not conclude the Closing; or if Purchaser is required to conclude the Closing pursuant to the terms hereof and fails to conclude the Closing for any reason other than failure of a condition precedent as set forth in Section 9.1, then Sellers shall be entitled to terminate this Agreement and, as their sole remedy, to make a claim against the Deposit for the amount of any actual damages suffered by Sellers.

**Section 8.2     Remedies for Breach by Sellers.**  In the event that Sellers breach any material statement or covenant required of Sellers hereunder other than a breach of Sections 9.1(h), 9.1(i) or 9(l), for which Purchaser's remedy is set forth therein (and which, with respect to Sections 9.1(h) and 9.1(i), shall apply if the Court does not enter an order confirming USACM's records of disbursements and payments of principal as to any of the Loans), and other than a breach of Section 3.4(b), for which Purchaser's remedy is the price adjustment set forth in Section 2.3, then Purchaser shall be entitled, in its sole discretion, and as its sole remedy, (a) to proceed to Closing, (b) to sue Sellers for specific performance, provided, however, that if a breach hereunder prevents or prohibits Sellers from concluding the Closing, then such breach shall be deemed to be a General Asset MAC, or (c) by giving written notice to the Sellers on or before the Closing Date, to rescind or terminate this Agreement and be released from any further obligation to perform pursuant to this Agreement or the Plan.  If Purchaser elects to rescind or terminate this Agreement pursuant to the terms hereof, Purchaser shall be entitled, as its sole remedy, to a refund of its Deposit.  Notwithstanding anything herein, if the Purchaser would be entitled to payment of the Break-Up Fee or the Expense Reimbursement pursuant to any other Section of this Agreement, then Purchaser may, at its sole option, elect to proceed under this Section, or to proceed under such other Section.

## ARTICLE IX
## CONDITIONS TO CLOSING

**Section 9.1     Conditions Precedent to Obligations of Purchaser.**  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):Between the Due Diligence Completion Date and the Closing Date, Purchaser shall not have discovered any taxes, liens, or encumbrances in respect of the Assets that may have a higher priority than Sellers in the Assets other than those identified by Purchaser in connection herewith;

(b)     Sellers shall have performed and complied in all material respects with all obligations and conditions required in this Agreement to be performed or complied with them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the forgoing effect;

(c)     The Debtors shall solicit votes on the Plan, which contemplates the sale of the Assets to the Purchaser in accordance with this Agreement and shall set forth the validity and amount of the servicing fees payable under the Servicing Agreements that are a part thereof, from all counter-parties to the Servicing Agreements.  The Sale Approval Order, which shall approve the sale of the Assets pursuant to Section 363(m) of the Bankruptcy Code and is presently contemplated to be the order confirming the Plan, shall be binding on all such counter-parties.  Furthermore, to ensure that there are no post-Closing disputes with regard to the unpaid balance, and any other amounts due in connection with each of the Loans, the Sellers shall transmit to each Borrower under each of the Loans a notice, in form acceptable in all respects to the Purchaser, confirming each such amount due in connection with each of the Loans, and the Court shall enter orders with respect thereto.

(d)     The loans included in the First Trust Deed Funds Assets that have not been paid in full before the Closing Date are in full force and effect and no condition exists nor has any event occurred that by notice, the passage of time, or otherwise, could give rise to an impediment to the enforcement of such loans;

(e)     The Plan and order confirming the Plan or the Sale Approval Order or similar order shall be consistent with the terms found in Article V hereof, and the Servicing Agreements shall not be materially modified, by order or otherwise, expect as expressly agreed to by Purchaser, provided, however, that this does not affect the rights of the Lenders to consent to modify under a Plan any rights not conveyed to Purchaser pursuant to the terms hereof, so long as any such modification shall not adversely affect Purchaser in any way;

(f)     The Plan and order confirming the Plan and/or Sale Approval Order shall provide for the transfer of the Servicing Agreements in a manner which does not create related claims under Section 503(b) of the Bankruptcy Code, provided that the Sellers may waive this condition in their sole discretion, so long as it does not otherwise affect any provision herein;

(g)     Sellers have not released or otherwise terminated their security interest in all or any portion of the Assets from the Cut-Off Date through the Closing Date except as to (i) Serviced Loans that have been paid in full before the Closing Date, or (ii) partial releases and related reconveyances made by the Sellers pursuant to Court orders entered prior to the date of this Agreement.

(h)     Between the Due Diligence Completion Date and the Closing Date, or at any time with respect to statements set forth in Articles III and IIIA (with the exception of Section 3.4(b)), there will be no adverse change that, through no fault of Purchaser, impairs the value of the First Trust Deed Fund Assets by an amount greater than $1,250,000 (a "General Asset MAC"); provided however, that, the calculation of any impairment in such value shall exclude any payments of principal received by the Debtors after the Cut-Off Date to the extent such principal payments are related to the First Trust Deed Fund Assets.  Additionally, no

adverse change will have occurred that, through no fault of Purchaser, impairs Purchaser's ability to enforce rights under the Servicing Agreements with regard to (i) 2% or more of the unpaid principal balance of the First Trust Deed Fund Assets outstanding as of the Closing Date, or (ii) 10% or more of the unpaid principal balance as of the Due Diligence Completion Date of Assets that are not First Trust Deed Fund Assets (a "General Service Agreement MAC"). If a General Asset MAC or a General Service Agreement MAC occurs, then Purchaser may, in its sole discretion, by giving written notice to the Debtors on or before the Closing Date, rescind or terminate this Agreement and be released from any further obligation to perform pursuant to this Agreement or the Plan. In the event Purchaser rescinds or terminates this Agreement pursuant to the terms of this paragraph, Purchaser shall be paid the Expense Reimbursement, pursuant to the terms of this Agreement;

(i) Additionally, between the Due Diligence Completion Date and the Closing Date, or at any time with respect to the statements set forth in Articles III and IIIA (with the exception of Section 3.4(b)), there will be no adverse change that, through no fault of Purchaser, impairs the value of any one or more First Trust Deed Fund Assets by an amount that is material but does not exceed $1,250,000, provided however, that, the calculation of any impairment in such value shall exclude any payments of principal received by the Debtors after the Cut-Off Date to the extent such principal payments are related to the First Trust Deed Fund Assets (an "Individual Asset MAC"). If an Individual Asset MAC occurs, then Purchaser may, in its sole discretion, proceed to close the transaction, excluding or including the Asset or Assets with regard to which an Individual Asset MAC has occurred, at the previously agreed Total Asset Purchase Price minus the lesser of (a) 0.75% of the cash otherwise payable as part of the Total Asset Purchase Price or (b) the actual value of the Individual Asset MAC; provided however, that the Total Asset Purchase Price shall only be adjusted once pursuant to this provision; and

(j) The Break-Up Fee Order in form and substance satisfactory to Purchaser must be entered by the Bankruptcy Court by no later than November 8, 2006, and no appeal of the Break-Up Fee Order shall thereafter have been filed. For the avoidance of doubt, notwithstanding any waiver of this condition by Purchaser, if at any time after entry the Break-Up Fee Order is reversed or modified, without the express consent of Purchaser, then Purchaser shall be released from all obligations to perform hereunder or under the terms of a Plan.

(k) Purchaser shall have actually obtained an exemption, satisfactory to Purchaser in all reasonable respects by no later than November 27, 2006, from any and all applicable Nevada laws or regulations that would require any licensing of Purchaser and affiliate of Purchaser identified by Purchaser by the State of Nevada in connection with or as a result of consummation of this transaction. Sellers shall provide reasonable cooperation and support to Purchaser in connection with its effort to obtain such exemption. The condition to the timing of the obtaining of this regulatory exemption may be extended by the Sellers at their sole discretion.

(l) The Plan has been confirmed by a Final Order of the Bankruptcy Court by the Outside Approval Date. If the Plan has not been confirmed by a Final Order of the Bankruptcy Court by the Outside Approval Date, and, as long as Purchaser is not in breach of the Agreement at the Outside Approval Date, Purchaser shall be entitled solely to the Expense Reimbursement for actual and reasonable expenses incurred by Purchaser in connection with this

Agreement, provided, however, that if the Outside Approval Date passes, the Sellers will nonetheless be required to pay the full Break-Up Fee to Purchaser, reduced only by the amount paid to Purchaser in respect of the Expense Reimbursement, if within nine (9) months following the Outside Approval Date any portion of the Assets is transferred to any party for a payment equal to or greater than the Total Asset Purchase Price.  In the event that the Outside Approval Date passes and Purchaser has not waived compliance therewith, but it nonetheless thereafter acquires the Assets, then any Expense Reimbursement paid to Purchaser as a result of passage of the Outside Approval Date shall be repaid to the Sellers by Purchaser.

(m)    There is no Litigation pending or threatened, nor any order, injunction or decree outstanding against or relating to the Sellers, which materially impairs the value of the Assets or the ability of the Sellers to perform their obligations hereunder.

(n)    No notice has been issued by any governmental authority or any party entitled to enforce a restrictive covenant affecting any Mortgaged Property to the effect that (A) the maintenance, operation, occupancy or use of any Mortgaged Property violates any zoning or building code or regulation, any restrictive covenant, or any other federal, state or municipal law, ordinance or regulation applicable to any Mortgaged Property, or (B) any material licenses, permits, inspections, authorizations, certifications or approvals required by any governmental authority having jurisdiction over the operation of any Mortgaged Property has not been performed or issued and paid for, or is not in full force and effect.

(o)    Purchaser shall, at Purchaser's expense, if any, receive an endorsement of the existing title policy from the existing title company for each Loan and, if not, such failure to receive any endorsement or all endorsements, individually or collectively, does not materially impair the value of the Assets or the ability of the Sellers to perform their obligations hereunder. Sellers shall use their best commercially reasonable efforts to cause each endorsement to be received by Purchaser hereunder.

(p)    No pending or threatened condemnation or similar proceeding exists affecting any Mortgaged Property or any part thereof, and all Mortgaged Property complies with all zoning, environmental and hazardous substance laws.

**Section 9.2    Conditions Precedent to Obligations of Sellers**.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable law):

(a)    Bankruptcy Court approval; by Final Order of the Bankruptcy Court;

(b)    The statements of Purchaser set forth in Article IV of this Agreement shall be true and correct in all material respects, at and as of the Closing Date; and:

(c)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the forgoing effect.

(d)    By no later than November 27, 2006 (<u>unless extended by Sellers</u>), Purchaser shall have obtained the exemption described in Section 9.1(k) hereof.

## ARTICLE X
## TERMINATION

**Section 10.1  Termination.**  Notwithstanding anything to the contrary contained herein, this Agreement may be terminated at any time before the Closing (a) by mutual consent of the Sellers and the Purchaser, (b) by the Seller, upon a breach by Purchaser pursuant to Section 8.1 hereof, or (c) by the Purchaser upon a breach by Seller pursuant to Sections 8.2 or 9.1h hereof. In the event of termination pursuant to this Section, the Agreement shall become null and void and have no effect, with no liability on the part of the Sellers, or Purchasers with respect to this Agreement, except for liability for breach of this Agreement as set forth herein.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.1.  Compromises With Borrowers.**   On and after the Closing Date, Purchaser shall have full authority to take any actions it deems appropriate as allowed under the applicable Servicing Agreement(s) and to enforce its rights in respect of the Assets, except as otherwise provided in this Section 11.1.  Subject to the provisions of any Servicing Agreement, Purchaser may forgive the payment of Success Fees, in whole or in part:

(a)    notwithstanding any other provision herein, at its sole discretion for loans in which it owns a majority interest acquired as part of the First Trust Deed Fund Assets;

(b)    notwithstanding any other provision herein, at its sole discretion, after not less than ten (10) days' prior written notice to Sellers (or their successor or assignee under the Plan), if, either after realization of the collateral securing a Serviced Loan, whether through foreclosure, deed in lieu, or otherwise, and exhaustion of such other remedies against the Borrower or any guarantor of the Serviced Loan that Purchaser in its reasonable discretion determines are viable and economically prudent, there remains an unsecured deficiency in respect of such Serviced loan or, after realization of the collateral securing a Serviced Loan, whether through foreclosure, deed in lieu, or otherwise, Purchaser determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees;

(c)    except pursuant to paragraphs (a) and (b) of this Section 11.1, to which this clause expressly shall not apply, if it receives any amounts payable for default interest under a Service Agreement, with the prior written consent of the Sellers (or their successor or assign under the Plan), which consent shall not be unreasonably withheld (the failure to reply to a request by Purchaser for such consent within ten (10) days of the date of such request shall be deemed to be a consent); or

(d)    if Purchaser does not receive any amounts due for default interest under a Service Agreement, then, in its discretion, after no less than ten (10) days' prior written notice to Sellers (or their successor or assignee under the Plan), Purchaser may forgive or reduce the payment of any Success Fees in the following circumstances:

(i)     where a Borrower (and any guarantor) is otherwise ready and able to fully pay off a Serviced Loan except for amounts due or default interest under a Service Agreement and Purchaser determines the Borrower (and any guarantor) lacks the reasonable ability to pay all or part of such Success Fees; or

(ii)     where a Borrower is otherwise ready and able only to pay off a Serviced Loan at a discount from its then principal balance, or at a discount of accrued and unpaid interest, and the Lenders have agreed to such compromise payment to satisfy the Borrowers' obligation, and Purchaser determines the Borrower (and any guarantor) lacks the reasonably ability to pay all or part of such Success Fees.

**Section 11.2     Survival.** Sellers' statements, covenants and agreements contained in this Agreement shall not survive the Closing Date.

**Section 11.3     Amendment.** This Agreement shall not be amended without the express written consent of the parties hereto.

**Section 11.4     Counterparts.** This Agreement may be executed in two or more counterparts, each of which, when so executed and delivered, will be deemed to be an original, but all of which counterparts, taken together, will constitute one and the same instrument.

**Section 11.5     Entire Agreement.** This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating to the subject matter hereof, including the Offer Letter. There are no written or oral agreements, understandings, statements between the parties other than those set forth herein.

**Section 11.6     Closing.** For the avoidance of doubt, the transfers of Assets described herein shall be deemed to have closed solely upon the Sale Approval Order becoming a Final Order, and each of the Assets actually being transferred to Purchaser being so transferred consistent with the terms hereof. Upon Closing, Purchaser, to the extent it acquires the Assets, shall be deemed released from any confidentiality obligations to which it had previously agreed, or pursuant to which is was otherwise bound.

**Section 11.7     Additional Collection Actions.** Prior to the Closing Date, Sellers may assign to Purchaser, on terms mutually acceptable to Sellers and Purchaser, for purposes of collection, certain accounts receivable and notes receivable.

**Section 11.8     Access to Documents.** Prior to the Closing Date, Debtors shall provide Purchaser with access to information pursuant to Section 2.6 hereof. After the Closing Date, Purchaser shall allow any of the Sellers (or their successors or assignees under a confirmed Plan) reasonable access to the Personal Property, including original documents and files, for all purposes as needed.

**Section 11.9     Waivers.** The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in

writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

      **Section 11.10    Notices.** All notices and other communications hereunder shall be in writing (including a writing delivered by facsimile transmission) and shall be deemed to have been duly given: (a) when delivered, if sent by registered or certified mail (return receipt requested); (b) when delivered, if delivered personally or by telecopy, or (c) on the first following business day, if sent by United States Express Mail or overnight courier, in each case to the parties at the following addresses (or at such other addresses as shall be specified by like notice);

      If to Sellers and Acknowledging Parties:

> USA Commercial Mortgage Company
> 4484 Pecos Avenue
> Las Vegas, Nevada 89121
> Facsimile: (702) 456-2057
> Attn: Mr. Thomas J. Allison
> - and -
>
> Ray Quinney & Nebeker P.C.
> 36 South State Street, Suite 1400
> Salt Lake City, Utah 84111
> Facsimile: (801) 532-7543
> Attn: Annette W. Jarvis, Esq.

and, with respect to notices of default under Article VII, notice shall also be given to

> Stutman, Treister & Glatt, P.C.
> 1901 Ave. of the Stars, 12th Floor
> Los Angeles, CA 90067
> Facsimile: (310) 228-5788
> Attn: Frank A. Merola, Esq.
>
> and
>
> Lewis & Roca, LLP
> 3993 Howard Hughes Pkwy., Suite 600
> Las Vegas, Nevada 89169
> Facsimile: (702) 949-8321
> Attn: Robert Charles, Esq.

If to Purchaser:

>Silver Point Capital
>Two Greenwich Plaza, 1st Floor
>Greenwich, CT  06830
>Facsimile:  (203) 542-4100
>Attn:  Salman Khan
>           Vick Sandhu, Esq.
>
>- and -
>
>REED SMITH LLP
>599 Lexington Avenue
>New York, NY  10022
>Facsimile: (212) 521-5450
>Attn:  James C. McCarroll, Esq.

**Section 11.11    Acknowledging Parties.**  Sellers and Purchaser agree that the Acknowledging Parties are entitled to information produced or shared pursuant to this Agreement and to participate fully in the process of obtaining Bankruptcy Court approval for this Agreement and Sale Approval Order and/or Plan.  Notwithstanding anything herein to the contrary, the Acknowledging Parties agree to Article 5 hereof and this Section 11.11.

**Section 11.12    Governing Law/Venue.**   This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Nevada, without regard to conflicts of law principles thereof.  The United States Bankruptcy Court for the District of Nevada shall be the exclusive forum for the enforcement of the terms of this Agreement.

**Section 11.13    Severability.**  In the case any provision in this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be construed and enforced as if it had been more narrowly drawn so as not to be invalid, illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

**Section 11.14    Binding Effect; Third Party Beneficiaries; Successors and Assigns.**  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by, the parties hereto and their respective legal representatives, successors and assigns.  Except as expressly set forth herein, nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity other than the parties to this Agreement, or their respective legal representatives, successors and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.  A reference to any of the Debtors, including the Sellers, is also a reference to any successor or assign of such Debtors under the Plan or pursuant to an order of the Bankruptcy Court.  Purchaser may assign its rights under this Agreement to any of its subsidiaries or affiliates, and may assign the Assets to any of its subsidiaries or affiliates.

**Section 11.15    Relationship of Parties.**    The relationship between the parties is an arms-length, non-affiliated relationship, and Sellers are not, and shall not represent to third parties, that they are acting as agents for or on behalf of Purchaser.

[SIGNATURE PAGE TO FOLLOW]

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com

Lenard E. Schwartzer, NV Bar No. 0399
Jeanette E. McPherson, NV Bar No. 0399
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com

Attorneys for Debtors and Debtors-in-Possession

**Entered on Docket**
**January 08, 2007**

_____
**Hon. Linda B. Riegle**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br>Debtor. | **[PROPOSED] ORDER<br>CONFIRMING THE "DEBTORS'** |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | **THIRD AMENDED JOINT<br>CHAPTER 11 PLAN OF<br>REORGANIZATION," AS<br>MODIFIED HEREIN** |

Affects:
- ☒ All Debtors
- ☐ USA Commercial Mortgage Company
- ☐ USA Securities, LLC
- ☐ USA Capital Realty Advisors, LLC
- ☐ USA Capital Diversified Trust Deed Fund, LLC
- ☐ USA First Trust Deed Fund, LLC

**Confirmation Hearing**
Date: December 19, 2006
Time: 10:00 a.m.

USA Capital_ Proposed Confirmation Order 010807

Commencing on December 19, 2006 at 10:00 a.m., the Court held a hearing (the "Confirmation Hearing") on the confirmation of the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" (the "Third Amended Plan") proposed by USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF") and USA Capital First Trust Deed Fund, LLC ("FTDF"), debtors and debtors in possession in the above-captioned chapter 11 cases (the "Debtors"). Appearances were made as indicated in the recorded transcript of the Confirmation Hearing.

The Court, having entered the "Findings of Fact and Conclusions of Law in Support of Order Confirming the 'Third Amended Joint Chapter 11 Plan of Reorganization, as Modified Herein'" (the "Findings"), which are hereby incorporated into this Confirmation Order, and good cause appearing,

**IT HEREBY IS ORDERED THAT**:

1.    The Third Amended Plan, as amended or modified by this Confirmation Order, (the Third Amended Plan, as so modified, being referred to herein as the "Plan"[1]) is approved and confirmed under Bankruptcy Code section 1129.

2.    All Objections to the confirmation of the Plan, including objections to the Asset Sale Transaction, that have not been stricken from the record, withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan or the consummation of the Asset Sale Transaction included therein or otherwise made in any pleading, correspondence, written or oral statement, or other communication to the Bankruptcy Court, the Debtors, the United States Trustee, the Committees, or other parties in interest are overruled on the merits.

3.    The Cangelosi Declaration and Loob Declaration are hereby stricken from the record.

4.    The Sierra Liquidity Objection and H&M Objection are overruled and stricken

---

[1]    Terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

USA Capital_ Proposed Confirmation Order 010807

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 from the record.

2     5.     The arguments raised orally at the Confirmation Hearing by The Lender Protection

3 Group regarding the classification of Class A-5 were not timely raised and are not properly before

4 the Court and, notwithstanding the foregoing, are overruled.

5     6.     The failure to reference or discuss any particular provision of the Plan in this

6 Confirmation Order or the Findings shall have no effect on this Court's approval and authorization

7 of, or the validity, binding effect, and enforceability of, such provision; and each provision of the

8 Plan is authorized and approved and shall have the same validity, binding effect, and

9 enforceability as every other provision of the Plan, whether or not mentioned in this Confirmation

10 Order or the Findings.

11     7.     The amounts, priorities, secured status, and classifications of Claims and Equity

12 Interests for purposes of the distributions to be made under the Plan shall be governed solely by

13 the terms of the Plan.  The amounts, priorities, secured status, and classifications set forth on the

14 Ballots tendered to or returned by holders of Claims and Equity Interests in connection with voting

15 on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the

16 Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise

17 affect, the actual amount, priority, secured status, or classification of such Claims and Equity

18 Interests under the Plan for distribution purposes, and (c) shall not be binding on, or used as

19 evidence against the Debtors or the Post-Effective Date Entities for any purpose other than with

20 respect to voting on the Plan.

21 **<u>Binding Effect</u>**

22     8.     The provisions of the Plan and this Confirmation Order shall bind (a) the Debtors

23 and their respective Estates, (b) the Post-Effective Date Entities, (c) the USACM Trust

24 Committee,  USACM Trustee, the DTDF Administrator, and the DTDF Post-Effective Date

25 Committee (d) Compass Partners LLC, who is the Asset Purchaser under the Plan ("Compass"),

26 (e) all creditors of the Debtors; (f) all Direct Lenders; (g) all parties in interest; and (h) and any

27 holder of an Administrative Expense Claim or Claim against or Equity Interest in any of the

28 Debtors, including all federal, state, and local governmental entities and fiscal intermediaries

SCHWARTZER & McPHERSON LAW FIRM<br>2850 South Jones Boulevard, Suite 1<br>Las Vegas, Nevada 89146-5308<br>Tel: (702) 228-7590 · Fax: (702) 892-0122

1  thereof, whether or not (i) the Administrative Expense Claim, Claim, or Equity Interest of such

2  holder is impaired under the Plan, (ii) such holder or entity has voted to accept or reject the Plan,

3  and (iii) such holder or entity has filed or is deemed to have filed proof of Claim or Equity

4  Interest, made a demand for payment of an Administrative Expense Claim, or has made

5  appearance has been made in these Chapter 11 Cases.

6  **No Substantive Consolidation / Recharacterization**

7       9.      In consideration of the compromises set forth in the Plan, the DTDF Committee in

8  open court waived any right to seek substantive consolidation of the Debtors' Estates and waived

9  any right to seek recharacterization of (i) the notes and deeds of trust in which the Direct Lenders

10 hold interests as property of the Debtors' Estates or (ii) the Direct Lenders' interests in such notes

11 and deeds of trust as unsecured claims against the Debtors' Estates.

12      10.     On the Effective Date, all of the assets of each Debtor shall be sold, transferred,

13 distributed or retained by each of such Debtor's respective Estates, or the Post-Effective Date

14 Entities created for each such Debtor and its Estate under the Plan, with all proceeds of sold,

15 transferred, or liquidated assets of each Debtor being retained by the respective Debtor's Estate, or

16 the Post-Effective Date Entities created for each such Debtor and its Estate under the Plan.  All

17 Claims against and Equity Interests in the Debtors and their respective Estates shall be retained by

18 the holders of Allowed Claims and Allowed Equity Interests against and in the respective Estates,

19 except as otherwise provided for under the Plan.  The allowance, voting, treatment and

20 distributions on account of Allowed Claims and Allowed Equity Interests shall be as set forth in

21 the Plan on an individual Estate basis.

22      11.     Nothing in the Plan or this Confirmation Order shall be deemed to recharacterize

23 either (i) the notes and deeds of trust in which the Direct Lenders hold interests as property of the

24 Debtors' Estates or (ii) the Direct Lenders' interests in such notes and deeds of trust as unsecured

25 claims against the Debtors' Estates.

26 **Asset Sale Transaction**

27      12.     The Asset Purchase Agreement, dated and effective as of December 8, 2006

28 [Docket No. 2164] (the "Asset Purchase Agreement"), made by and between USACM and FTDF

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA Capital_ Proposed Confirmation Order 010807

1   (together with USACM, the "Sellers") and DTDF, USA Realty and USA Securities, as

2   acknowledging parties, and Compass is hereby approved.

3          13.    The Debtors and Compass, as may be mutually agreed by such parties, are hereby

4   authorized to consummate the Asset Purchase Agreement at any time following ten (10) days after

5   entry of this Confirmation Order, which may occur prior to the Effective Date of the Plan.

6          14.    Except as expressly permitted or otherwise specifically provided for in the Asset

7   Purchase Agreement or this Confirmation Order, pursuant to sections 105(a), 1123, and 363(f) of

8   the Bankruptcy Code, the Acquired Assets shall be transferred to the Asset Purchaser on the terms

9   and conditions set forth in the Asset Purchase Agreement, and upon Closing shall be, free and

10  clear of all liens, claims, interests, obligations and encumbrances whatsoever, including, but not

11  limited to, (A) all monetary and non-monetary defaults and rights that purport to give to any party

12  a right or option to effect any forfeiture, modification, right of first refusal, or termination of the

13  Sellers' or the Asset Purchaser's interest in, or rights in or under, the Acquired Assets, or any

14  similar rights, based in any way on any action taken (or failed to be taken) by any of the Debtors

15  or any other matter or occurrence relating to the period prior to the Closing (other than any right

16  that existed and was matured and exercisable, as of the Petition Date, to effect a substitution of

17  USACM as loan servicer under Section 3 of any Loan Servicing Agreement, as well as any

18  defenses of the loan servicer thereto (a "Surviving Section 3 Right")); (B) taxes arising under or

19  out of, in connection with, or in any way relating to the existence, ownership, management or

20  servicing of the Acquired Assets prior to the Closing; and (C) (i) all mortgages, deeds of trust,

21  security interests, conditional sale or other title retention agreements, pledges, liens, judgments,

22  demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, including,

23  but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of

24  any attributes of ownership and (ii) all debts arising in any way in connection with any

25  agreements, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors or

26  affiliates; all claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, rights

27  of recoupment or setoff, demands, guaranties, options, rights, restrictions, interest and matters of

28  any kind and nature in any way relating to the existence, ownership, management or servicing of

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

the Acquired Assets prior to Closing, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these cases pursuant to chapter 11 of the Bankruptcy Code, and whether imposed by agreement, understanding, law, equity or otherwise, including but not limited to claims otherwise arising under doctrines of successor liability (collectively, "Interests"); provided, however, that, in connection with any attempted post-Closing exercise of a Surviving Section 3 Right: (a) the Direct Lenders must provide Compass at least thirty (30) days prior written notice of the intended exercise of such right in accordance with section 8 of the Loan Servicing Agreement, (b) Compass shall have the right to challenge the exercise of such Surviving Section 3 Right by filing a motion with this Court prior to the expiration of such thirty (30) day period to determine whether such Surviving Section 3 Right has been properly and validly exercised (the "Compass Motion") and the Court shall retain jurisdiction to adjudicate any such disputes, (c) in the event Compass timely files such Compass Motion, the effectiveness of the attempted exercise of such Surviving Section 3 Right shall be stayed pending this Court's entry of an order in respect of the Compass Motion, and (d) the post-Closing survival of such Surviving Section 3 Right shall not impair in any respect any rights or interests of Compass under the Loan Servicing Agreements, including, without limitation, its rights under Section 2(c)(iii) of the Loan Servicing Agreement. In the event of a proper exercise of remedies under Section 3 of the Loan Servicing Agreement, (i) neither the Direct Lenders nor any replacement servicer selected by such Direct Lender shall have the right or ability to compromise, subordinate, or impair, in any respect, any rights, claims or interests purchased by Compass from the Estates for default interest, accrued servicing fees, late charges, success fees, or other amounts under the Loan Servicing Agreement, and (ii) this Confirmation Order shall be binding upon such replacement servicer regardless of whether such replacement servicer actually received such copy of the Confirmation Order.

15. Any and all such Interests whatsoever shall attach to the net proceeds of the Asset Sale Transaction in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, subject to any claims and defenses that the Sellers may possess with respect thereto.

USA Capital_ Proposed Confirmation Order 010807

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

16.     Upon the Closing of the Asset Sale Transaction, the Sellers are hereby authorized to pay SPCP, LLC the Break-Up Fee from the proceeds of the Asset Sale Transaction.

17.     The transfer of the Acquired Assets to the Asset Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets, and shall vest the Asset Purchaser with all right, title, and interest of the Sellers in and to the Acquired Assets free and clear of all Claims and Interests of any kind or nature whatsoever.

18.     If any Person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests in the Acquired Assets shall not have delivered to the Sellers prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the Person or entity has with respect the Acquired Assets or otherwise, then (a) the Sellers are authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the Person or entity with respect to the Acquired Assets and (b) the Asset Purchaser is authorized to file, register, or otherwise record a certified copy of this Confirmation Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests in the Acquired Assets of any kind or nature whatsoever.

19.     The consideration provided by the Asset Purchaser for the Acquired Assets under the Asset Purchase Agreement is, and shall be deemed, to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any State (including Nevada), territory, possession, or the District of Columbia.

20.     This Confirmation Order (a) shall be effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing have been unconditionally released, discharged and terminated (other than any obligations expressly assumed by the Asset Purchaser under the Asset Purchase Agreement), and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

1   administrative agencies, governmental departments, secretaries of state, federal, state, and local

2   officials, and all other persons and entities who may be required by operation of law, the duties of

3   their office, or contract, to accept, file, register or otherwise record or release any documents or

4   instruments, or who may be required to report or insure any title or state of title in or to any of the

5   Acquired Assets.

6        21.    Each and every federal, state, and local governmental agency or department is

7   directed to accept any and all documents and instruments necessary and appropriate to

8   consummate the transactions contemplated by the Asset Purchase Agreement.

9        22.    All entities who are presently, or on the Closing may be, in possession of any or all

10  of the Acquired Assets are directed to surrender possession of the Acquired Assets to the Asset

11  Purchaser on the Closing; provided, however, that, pursuant to the Asset Purchase Agreement,

12  only working copies of the relevant databases and servicing and reporting software, will be

13  delivered to the Asset Purchaser, with the originals being retained by USACM and transferred to

14  the USACM Trust.

15       23.    This Court retains jurisdiction as set forth in Section VIII.D. of the Plan, including

16  the jurisdiction to enforce and implement the terms and provisions of this Confirmation Order and

17  the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, in

18  all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the

19  Acquired Assets to the Asset Purchaser pursuant to the terms of this Confirmation Order and the

20  Asset Purchase Agreement; and (b) to protect the Asset Purchaser against any Interests against the

21  Sellers or the Acquired Assets.

22       24.    Except for any liabilities expressly assumed by the Asset Purchaser pursuant to the

23  Asset Purchase Agreement (the "Assumed Liabilities"), the sale of the Acquired Assets shall be

24  free and clear of, and the Asset Purchaser shall have no liability or responsibility for, any Interests

25  Without limiting the generality of the foregoing, and except as otherwise specifically provided in

26  the Asset Purchase Agreement and this Confirmation Order, to the extent allowed by law, the

27  Asset Purchaser shall not be liable for any Claims or Interests against the Sellers or any of their

28  predecessors or affiliates or the Acquired Assets, and the Asset Purchaser shall have no successor

1    or vicarious liabilities of any kind or character including, but not limited to, any such liability that

2    may be imposed by statute (e.g., under so-called "bulk sale" laws) or any theory of antitrust,

3    environmental, successor or transferee liability, labor law, de facto merger, or substantial

4    continuity, whether known or unknown as of the Closing, now existing or hereafter arising,

5    whether matured, unmatured, fixed or contingent, with respect to the Sellers or any obligations of

6    the Sellers or the Acquired Assets arising prior to the Closing, including, but not limited to,

7    liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with,

8    or in any way relating to the existence, ownership, management or servicing of the Acquired

9    Assets prior to the Closing.

10         25.    Under no circumstances shall the Asset Purchaser be deemed a successor of or to

11   the Sellers for any Interest against or in the Sellers or the Acquired Assets of any kind or nature

12   whatsoever. The sale, transfer, assignment and delivery of the Acquired Assets shall not be

13   subject to any Interests, and Interests of any kind or nature whatsoever shall remain with, and

14   continue to be obligations of, the Sellers. All Persons holding Interests against or in the Sellers or

15   the Acquired Assets of any kind or nature whatsoever (including but not limited to, the Sellers

16   and/or their respective successors, including any trustee's thereof, creditors, lenders to any of the

17   Sellers, Direct Lenders, borrowers, employees, unions, former employees and shareholders,

18   administrative agencies, governmental units, secretaries of state, federal, state and local officials,

19   maintaining any authority relating to any environmental, health and safety laws, and their

20   respective successors or assigns) shall be, and are, forever barred, estopped, and permanently

21   enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature

22   whatsoever against the Asset Purchaser, its property, its successors and assigns, or the Acquired

23   Assets, as an alleged successor or otherwise, with respect to any Interest of any kind or nature

24   whatsoever such Person or entity had, has, or may have against or in the Sellers, their estates,

25   officers, directors, shareholders, or the Acquired Assets. Following the Closing, no holder of an

26   Interest in the Sellers shall interfere with the Asset Purchaser's title to or use and enjoyment of the

27   Acquired Assets based on or related to such Interest, or any actions that the Sellers may take in

28   their Chapter 11 Cases.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

26.     The transactions contemplated by the Asset Purchase Agreement are undertaken by the Asset Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Asset Sale Transaction shall not affect the validity of the Asset Sale Transaction or any rights or protections accorded Asset Purchaser under the Asset Purchase Agreement or this Confirmation Order, unless such authorization is duly stayed pending such appeal.  The Asset Purchaser is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

27.     The transfer of the Acquired Assets pursuant to the Asset Sale Transaction is a transfer pursuant to section 1146(c) of the Bankruptcy Code, and accordingly, the transfer of the Acquired Assets (including without limitation both real and personal property) to Asset Purchaser does not and will not subject the Sellers or Asset Purchaser, their affiliates or designees to any liability for any law imposing a mortgage or recording tax, transfer tax, stamp tax, sales tax, use or similar tax or any so-called "bulk-sale", to the fullest extent permitted by Section 1146(c) of the Bankruptcy Code.  Each and every federal, state and local government agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transfer of any of the Acquired Assets, all without imposition or payment of any stamp tax, transfer tax, or similar tax.

**Post-Effective Date Entities**

28.     Pursuant to Article IV, Section D.1. of the Plan, on the Effective Date, all assets of the USACM Estate not collected or disposed of on or prior to the Effective Date, including (a) Cash and noncash proceeds, (b) loans made to Placer Vineyards, Marquis Hotel, Colt Gateway LLC, and Colt Second TD and all related fees and default interest on the Placer Vineyards, Marquis Hotel, Colt Gateway LLC, and Colt Second TD loans, including the Loan Servicing Agreements related to the Placer Vineyards, Marquis Hotel, Colt Gateway LLC, and Colt Second TD loans, all other Notes Receivable (including the Investment Partners Note) and all Accounts Receivable, computers and software, (c) the Prepaid Interest (including Prepaid Interest collected by the Asset Purchaser post-Closing and including the DTDF Prepaid Interest, subject to the

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 objection of the DTDF Committee, which shall be determined by the Court if not settled), (d) the

2 USACM Accounts (including USACM Estate's share of the IP $58 Million Promissory Note), (e)

3 all USACM Litigation Claims, including without limitation the Non-Debtor Insider Litigation,

4 belonging to or assertable by the USACM Estate, and (f) the FTDF Litigation Claims  transferred

5 to USACM pursuant to Article IV, Section E.2.j of the Plan (collectively, the "USACM Trust

6 Assets"), minus any Cash needed to make the payments required to be made on the Effective Date

7 pursuant to the Plan or needed to fund the reserves required to be established on the Effective

8 Date, shall vest in the USACM Trust, pursuant to the Plan and shall be transferred to the USACM

9 Trust as soon as practicable thereafter.

10       29.    As of the Effective Date and pursuant to Article IV, Section D.2. of the Plan, all

11 assets of the DTDF Estate not collected or disposed of prior to the Effective Date, including (a)

12 Cash and noncash proceeds, (b) the DTDF Loans (including but not limited to rights associated

13 with the former Epic and Sheraton Loans and the Loan Servicing Agreements for the Excluded

14 DTDF Loans), (c) the FTDF Transferred Assets, (d) all DTDF Litigation Claims, including

15 without limitation the Non-Debtor Insider Litigation, belonging to or assertable by the DTDF

16 Estate, and (e) the DTDF Estate's share of the IP $58 Million Promissory Note (collectively, the

17 "DTDF Assets") shall remain the property of DTDF after the Effective Date.  Post-Effective Date

18 DTDF shall also be funded with Pro Rata distributions from the USACM Trust on account of the

19 Allowed DTDF Unsecured Claim.

20       30.    The Liquidating Trust Agreement as filed with the Court is approved, and Geoffrey

21 L. Berman is approved as the USACM Trustee.  On and after the Effective Date, the USACM

22 Trust and the USACM Trustee shall have all powers and duties set forth in the Plan and in the

23 USACM Trust.

24       31.    The DTDF Amended Operating Agreement as filed with the Court is approved, and

25 Michael Tucker is approved as the DTDF Administrator.  On and after the Effective Date, the

26 Post-Effective Date DTDF and DTDF Administrator shall have all powers and duties set forth in

27 the Plan and in the DTDF Amended Operating Agreement.

28       32.    As of the Effective Date, the USACM Trust Committee shall have the rights,

powers, privileges, responsibilities, and authority as set forth in the Plan and in the USACM Trust.

33.     As of the Effective Date, the DTDF Post-Effective Date Trust Committee shall have the rights, powers, privileges, responsibilities, and authority as set forth in the Plan and in the DTDF Amended Operating Agreement.

34.     As of the Effective Date, USACM shall irrevocably assign, transfer and convey to the USACM Trust, all right, title and interest in and to the USACM Trust Assets, including, but not limited to, all USACM Litigation Claims and the FTDF Litigation Claims. All USACM Litigation Claims and the FTDF Litigation Claims accruing to USACM or FTDF, respectively, or their respective Estates shall remain assets of and vest in the USACM Trust, whether or not litigation relating thereto is pending on the Effective Date. Neither USACM, FTDF, their respective Estates nor the USACM Trust waives, relinquishes, or abandons any USACM Litigation Claim or FTDF Litigation Claim which constitutes property of their respective Estates, regardless of whether or not litigation relating thereto is pending on the Effective Date and whether or not any such right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or any schedule, exhibit or other document filed in connection therewith.

35.     The USACM Trust shall have full power and authority to prosecute, compromise or otherwise resolve any and all such USACM Litigation Claims and FTDF Litigation Claims, with all recoveries derived therefrom to be distributed under the Plan. The USACM Trust and the Estates shall not be barred by res judicata, collateral estoppel, judicial estoppel, issue preclusion or otherwise after Confirmation from prosecuting the USACM Litigation Claims or FTDF Litigation Claims. To the full extent permitted by law, USACM will be deemed to irrevocably transfer to the USACM Trustee, as its legal successor, all rights of USACM and the USACM Estate (including the USACM Estate after the Confirmation Date) to exercise or waive any attorney-client privilege, accountant-client privilege, work-product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) as set forth in the Liquidating Trust Agreement, and USACM and the USACM Trustee are authorized to take all necessary actions to effectuate the transfer of the Privileges.

36.     On and after the Effective Date, pursuant to the Asset Purchase Agreement and the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA Capital_ Proposed Confirmation Order 010807

Plan, the USACM Trust shall have or, if it does not have, be granted access to all databases, software, documents, records and original computers and related hardware currently owned by, or currently in the possession or control of, any of the Debtors, which, in the discretion of the USACM Trust, are deemed to be necessary. The foregoing shall include, but not be limited to, electronic copies (in a form that will enable the USACM Trust to use and manipulate the data), all software and systems, all hardware, all documents, all records (including reconstructed Loan ledgers and other documents created during the Chapter 11 Cases), and all original computers and related hardware that are necessary for the USACM Trust to administer or service any Loans, to object to Claims against and Equity Interests in USACM, to prosecute or defend any litigation to which USACM, the USACM Estate or the USACM Trust is a party, to administer and/or manage the USACM Trust, and to make distributions to the beneficiaries of the USACM Trust. Notwithstanding anything to the contrary herein, as agreed in the Asset Purchase Agreement, the USACM Trust shall retain the original relevant databases and servicing and reporting software.

37. All DTDF Litigation Claims accruing to DTDF or its Estate shall remain assets of the Post-Effective Date DTDF, whether or not litigation relating thereto is pending on the Effective Date. Neither DTDF, its Estate nor Post-Effective Date DTDF waives, relinquishes, or abandons any DTDF Litigation Claim which constitutes property of its Estate, regardless of whether or not litigation relating thereto is pending on the Effective Date and whether or not any such right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or any schedule, exhibit or other document filed in connection therewith.

38. Post-Effective Date DTDF shall have full power and authority to prosecute, compromise or otherwise resolve any and all such DTDF Litigation Claims, with all recoveries derived therefrom to be distributed under the Plan. The Post-Effective Date DTDF and the DTDF Estate shall not be barred by res judicata, collateral estoppel, judicial estoppel, issue preclusion or otherwise after Confirmation from prosecuting the DTDF Litigation Claims.

39. On and after the Effective Date, pursuant to the Asset Purchase Agreement and the Plan, Post-Effective Date DTDF shall have or, if it does not have, be granted access to all databases, software, documents, records and original computers and related hardware currently

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   owned by, or currently in the possession or control of, any of the Debtors, which, in the discretion

2   of Post-Effective Date DTDF, are deemed to be necessary.  The foregoing shall include, but not be

3   limited to, electronic copies (in a form that will enable Post-Effective Date DTDF to use and

4   manipulate the data), all databases, all software and systems, all hardware, all documents and all

5   records (including the reconstructed Loan ledgers and other documents created during the Chapter

6   11 Cases), and all original computers and related hardware that are necessary for Post-Effective

7   Date DTDF to collect upon and otherwise administer its retained Loans, to object to Claims

8   against and Equity Interests in DTDF and Post-Effective Date DTDF, to prosecute or defend any

9   litigation to which DTDF, the DTDF Estate or the Post-Effective Date DTDF is a party, to

10  administer and/or manage Post-Effective Date DTDF, and to make distributions to the holders of

11  Allowed Claims against and Equity Interests in DTDF and Post-Effective Date DTDF.

12          40.     USACM Trust and Post-Effective Date DTDF shall retain their respective share of

13  the Non-Debtor Insider Litigation and may, without further order of this Court, enter into a joint

14  prosecution or sharing agreement with each other.

15          41.     The Debtors, the Debtors' officers, the USACM Trustee, and the DTDF

16  Administrator are authorized to take all actions necessary to implement the Plan and the

17  transactions contemplated therein in accordance with the terms of the Plan, and are authorized to

18  execute, deliver, file, or record such contracts, instruments, releases, and other agreements or

19  documents and to take such other actions as they may determine to be necessary or appropriate to

20  effectuate, implement, and further evidence the terms and conditions of the this Confirmation

21  Order, the Plan, the Plan Documents Supplement, the Direct Lender Supplement, or the exhibits

22  and schedules to any of the foregoing, <u>and any or all such documents shall be accepted by each of</u>

23  <u>the respective local or state filing offices and recorded in accordance with applicable state law and</u>

24  <u>shall become effective in accordance with their terms and the provisions of state law.</u>

25  **Intercompany Compromises.**

26          42.     As set forth in Article IV, Section E.1. of the Plan, the compromise between

27  USACM and the Direct Lenders is hereby approved.

28          43.     As set forth in Article IV, Section E.2. of Art. IV of the Plan, the compromise

1    between USACM and FTDF is hereby approved.

2          44.    As set forth in Article IV, Section E.3. of Art. IV of the Plan, the compromise

3    between FTDF and DTDF is hereby approved.

4          45.    As set forth in Article IV, Section E.4. of Art. IV of the Plan, the compromise

5    between FTDF and USA Realty is hereby approved.

6          46.    As set forth in Article IV, Section E.5. of Art. IV of the Plan, the compromise

7    between DTDF and USA Realty is hereby approved.

8    **Loan Distributions, Loan Servicing Agreements, Loans And Deeds of Trust**

9          47.    After the Effective Date, and except as otherwise provided in the Plan, the Direct

10   Lenders and Post-Effective Date DTDF shall be entitled to distributions from the Direct Lender

11   Loans in accordance with the related Loan Servicing Agreements, the applicable loan and security

12   documents, and applicable Nevada law, by the Asset Purchaser, as the third party servicer.  In

13   accordance with Article IV, Section E.1.d.ii of the Plan, Section 7.3 of the Asset Purchase

14   Agreement and any other orders of this Court, the Asset Purchaser is authorized and directed to

15   net Prepaid Interest sums due from Direct Lenders and collect Prepaid Interest from Borrowers,

16   and remit those amounts to USACM or the USACM Trust, as applicable.  After the Closing, the

17   Direct Lenders are obligated to comply with the terms of the applicable Loan Servicing

18   Agreements including the obligation to pay the fees at the rate expressed as a percentage specified

19   in Section 5 thereof, without regard to any inconsistent offering circular or other document;

20   provided, however, that solely as to the timely filed objections by (i) Erna D. Grundman and

21   Joanne M. Grundman, jointly, (ii) Joanne M. Grundman, and (iii) Gregory Walch and Shauna

22   Walch to the Loan Servicing Fee Schedule: (i) such objections concerning pre-Closing servicing

23   fees shall be resolved as between USACM and the objecting Direct Lenders under the Alternative

24   Dispute Resolution Agreement; and (ii) entry of the Confirmation Order shall not resolve such

25   objections concerning post-Closing servicing fees as between the Asset Purchaser and the

26   objecting Direct Lender.

27         48.    Nothing in the Plan or this Confirmation Order shall be deemed to modify, in any

28   respect, the Direct Lenders' notes or the deeds of trust securing such notes.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**Preservation of Rights of Action and Defenses.**

49.     Except to the extent such rights, Claims, causes of action, defenses, and counterclaims are expressly and specifically released in connection with the Plan or in any settlement agreement approved during the Chapter 11 Cases, (1) any and all rights, Claims, causes of action, defenses, and counterclaims accruing to or assertable by the Debtors or their Estates, including without limitation any and all Litigation Claims, the Non-Debtor Insider Litigation, Claims related to the Undistributed Cash and Claims for Prepaid Interest shall remain assets of such Estates and be assertable by the Debtors or such Estates, and to the extent applicable, be transferred to and assertable by any respective Post-Effective Date Entity, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, Claims, causes of action, defenses, and counterclaims have been Scheduled or otherwise listed or referred to in the Plan or Disclosure Statement, or any other document Filed with the Court, and (2) neither the Debtors nor the Post-Effective Date Entities is hereby deemed to waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, cause of action, defense, or counterclaim that constitutes property of such Debtor's Estate or is assertable by such Estate: (A) whether or not such right, Claim, cause of action, defense, or counterclaim has been listed or referred to in the Schedules, the Plan, the Disclosure Statement, or any other document Filed with the Court, (B) whether or not such right, Claim, cause of action, defense, or counterclaim is currently known to the Debtors, and (C) whether or not a defendant in any litigation relating to such right, Claim, cause of action, defense, or counterclaim filed a proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan.  Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, cause of action, defense, or counterclaim, or potential right, Claim, cause of action, defense, or counterclaim, in the Schedules, the Plan, the Disclosure Statement, or any other document Filed with the Court shall in no manner

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  waive, eliminate, modify, release, or alter the Debtors or the Post-Effective Date Entities' rights to

2  commence, prosecute, defend against, settle, and realize upon any rights, Claims, causes of action,

3  defenses, or counterclaims that any of the Debtors or the Estates has or may have as of the

4  Confirmation Date.  The Debtors or the Post-Effective Date Entities may commence, prosecute,

5  defend against, recover on account of, and settle all rights, Claims, causes of action, defenses, and

6  counterclaims in their sole discretion in accordance with what is in the best interests, and for the

7  benefit, of the Debtors or the Post-Effective Date Entities.

8  **Nondischarge of Debtors and Injunction.**

9         **50.**    **Pursuant to Article IV, Section H. of the Plan and section 1141(d)(3) of the**

10  **Bankruptcy Code, the Confirmation Order shall not discharge Claims against or Equity**

11  **Interests in the Debtors.  However, no holder of a Claim or Equity Interest may receive any**

12  **payment from or seek recourse against any assets that are distributed or to be distributed**

13  **under the Plan, except for those assets required to be distributed to such holder as expressly**

14  **provided for in the Plan.  As of the Effective Date, all Entities are precluded from asserting**

15  **against any assets that are distributed or to be distributed under the Plan any Claims, rights,**

16  **causes of action, liabilities or interests based upon any act or omission, transaction or other**

17  **activity of any kind or nature that occurred prior to the Effective Date, other than as**

18  **expressly provided in the Plan or Confirmation Order, regardless of the filing, lack of filing,**

19  **allowance or disallowance of such a Claim or Equity Interest and regardless of whether such**

20  **an Entity has voted to accept the Plan.**

21         **51.**    **Except as otherwise provided in the Plan or this Confirmation Order, on and**

22  **after the Effective Date all Entities that have held, currently hold or may hold a debt, Claim,**

23  **other liability or Equity Interest against or in the Debtors that would be discharged upon**

24  **confirmation of the Plan on the Effective Date but for the provisions of section 1141(d)(3) of**

25  **the Bankruptcy Code shall be permanently enjoined from taking any of the following actions**

26  **on account of such debt, Claim, liability, Equity Interest or right: (A) commencing or**

27  **continuing in any manner any action or other proceeding on account of such debt, Claim,**

28  **liability, Equity Interest or right against assets or proceeds thereof that are to be distributed**

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

USA Capital_ Proposed Confirmation Order 010807

**under the Plan, other than to enforce any right to a distribution with respect to such assets or the proceeds thereof as provided under the Plan; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against any assets to be distributed to creditors under the Plan, other than as permitted under subparagraph (A) above; and (C) creating, perfecting or enforcing any lien or encumbrance against any assets to be distributed under the Plan, other than as permitted by the Plan, provided that nothing contained herein shall limit the rights of any distributee under the Plan from taking any actions in respect of property distributed or to be distributed to it under the Plan.**

**Executory Contracts and Unexpired Leases**

52. Pursuant to the Debtors' Revised Schedule of Executory Contracts And Unexpired Leases In Connection With Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization, filed on December 18, 2006 (docket no. 2162), all executory contracts and unexpired Leases of the Debtors are hereby rejected, effective as of the Effective Date.

53. Pursuant to Article V, Section B.3. of the Plan, if the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Article V, Section B.1. of the Plan results in damages to the other party or parties to such contract or lease, a request for payment of any and all Claims allegedly arising from a Debtor's rejection of executory contracts or unexpired leases, whether rejected under the Plan or by separate proceeding, must be Filed on or before the first Business Day which is thirty (30) calendar days after the date of service of notice of entry of the Confirmation Order. Failure to File such a request for payment prior to the time set forth herein shall be forever barred from asserting such Claims against the Debtors, the Estates, the Post-Effective Date Entities and/or any other Entity or any of their respective property, and the Debtors, the Estates, and the Post-Effective Date Entities, to the extent applicable, shall be discharged of any obligation on such Claim or any other Claim related such Claim.

**Administrative Expense Claims and Objections to Claims**

54. Pursuant to Article II, Section B.1.c.i. of the Plan, except as provided in Article II, Sections B.1.c.ii. and B.1.c.iii. of Art. II of the Plan, requests for payment of Administrative Expense Claims must be Filed and served on the Debtors and the Post-Effective Date Entities, the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Committees (to the extent such Committees are not dissolved) and the U.S. Trustee by no later than thirty (30) days after the Effective Date (the "Administrative Expense Claim Bar Date")  Any holder of an Administrative Expense Claim who fails to File a request seeking to have its Claim Allowed on or before the Administrative Expense Claim Bar Date shall be forever barred from seeking the allowance of its Administrative Expense Claim, and the Debtors and their Estates, including any Post-Effective Date Entities, if applicable, shall be discharged of any obligation on such Claim or any other Claim related to the Administrative Expense Claim.

55.     Pursuant to Article II, Section B.1.c.ii. of the Plan,  all Professionals or other Entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 503(b) and/or 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional or any other Entity for making a substantial contribution in the Chapter 11 Cases under section 503(b)(3)(D) of the Bankruptcy Code) shall File and serve on the Debtors, the Post-Effective Date Entities, the Committees (to the extent such Committees are not yet dissolved) and the U.S. Trustee an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date (the "Professionals Administrative Expense Claim Bar Date").  Any objections to such applications must be Filed and served in accordance with applicable law, including Nevada District Court Local Rule 9014.  Any Professional who fails to File an application requesting payment on or prior to the Professionals Administrative Expense Claim Bar Date shall be forever barred from seeking the allowance of its Administrative Expense Claim or any other Claim, and the Debtors, their Estates and any Post-Effective Date Entities, if applicable, shall be discharged of any obligation on such Claim or any other Claim related to the Professional's Claim.

56.     Pursuant to Article II, Section B.1.c.iii. of the Plan,  holders of Ordinary Course Administrative Expense Claims shall not be required to File any request for payment of such Claims by the Administrative Expense Claim Bar Date.  Each Ordinary Course Administrative Expense Claim shall be assumed and paid by the obligated Estate under the terms and conditions of the particular transaction giving rise to that Ordinary Course Administrative Expense Claim, without any further action by the holder of such Ordinary Course Administrative Expense Claim

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

57.     Pursuant to Article II, Section B.1.c.iv. of the Plan, all holders of Administrative Expense Claims (including without limitation, Professionals requesting compensation or reimbursement of expenses), except holders of Ordinary Course Administrative Expense Claims, are required to File a request for payment of such Claims in accordance with the Plan.  Failure to File a request for payment of an Administrative Expense Claim prior to the Administrative Expense Claim Bar Date or the Professionals Administrative Expense Claim Bar Date, as applicable, shall forever bar the holder from asserting such Claims against the Debtors, the Estates, the Post-Effective Date Entities and any other Entity or any of their respective property, and the Debtors, the Estates and the Post-Effective Date Entities, to the extent applicable, shall be discharged of any obligation on such Claim or any other Claim related to the Administrative Expense Claim.

58.     The Post-Effective Date Entities, the FTDF Committee (to the extent it is still in existence) or FTDF (for the benefit of and on behalf of the FTDF Estate), USA Realty on behalf of the USA Realty Estate and USA Securities on behalf of the USA Securities Estate, shall be responsible for Filing objections to any and all Claims and Equity Interests that are Disputed Claims or Disputed Equity Interests asserted against its respective Estate.  The Post-Effective Date Entities, the FTDF Committee (to the extent it is still in existence) or FTDF (for the benefit of and on behalf of the FTDF Estate), USA Realty on behalf of the USA Realty Estate and USA Securities on behalf of the USA Securities Estate have the authority to settle and compromise any objection to a Disputed Claim or Disputed Equity Interest, if appropriate, without further order of the Court, and they may assert any and all Claims, rights of action, causes of action, counterclaims and defenses held by their respective Estates.  The Estates, including the Post-Effective Date Entities, may, but shall not be required to, set off or recoup against any Claim or Equity Interest and the distributions to be made pursuant to the Plan in respect of such Claim or Equity Interest, any counterclaims, setoffs, or recoupment of any nature whatsoever that the Estates may have against the holder of the Claim or Equity Interest, but neither the failure to do so nor the allowance of any Claim or Equity Interest shall constitute a waiver or release by the Estates or the Post-Effective Date Entities of any such Claim, cause of action, setoff or recoupment.

USA Capital_ Proposed Confirmation Order 010807

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

59. Unless otherwise extended by order of this Court, objections to the allowance of Claims and Equity Interests shall be Filed and served upon the Entities asserting such Claims or Equity Interests as follows: (A) for any and all Claims and Equity Interests to which the General Bar Date applies, ninety (90) days after the Effective Date; (B) for any and all Claims to which the Administrative Claims Bar Date or the Professionals Administrative Bar Date applies, thirty (30) days after the expiration of the respective Bar Date; and (C) for any and all Claims to which the Bar Date applicable under section B.3 of Art. V of the Plan applies, thirty (30) days after the expiration of that Bar Date.

**Chief Restructuring Officer / Disbursing Agent**

60. After the Effective Date, Tom Allison shall remain Chief Restructuring Officer of FTDF, USA Realty and USA Securities.

61. In the Chapter 11 Cases of FTDF, USA Securities and USA Realty, the Debtors shall act as Disbursing Agents under the Plan for their respective Estates and shall make all distributions required under the Plan. At any time after thirty (30) days following the Effective Date, such Debtors may request that all future distributions of their respective Estates be handled by a Disbursing Agent, which may be Development Specialists, Inc. ("DSI"), including through Geoffrey L. Berman, acting in its own right and not as USACM Trustee, as Disbursing Agent. In the Chapter 11 Case of FTDF, after FTDF has made all initial distributions required under the Plan, DSI shall act as Disbursing Agent pursuant to a Disbursing Agent Agreement substantially in the form filed with the Court by the Debtors, as such agreement may be modified by such parties.

62. Pursuant to the Asset Purchase Agreement and the Plan, FTDF, USA Securities and USA Realty shall have copies of or access to all databases, software, documents and records of, or in the possession or control of, any of the Debtors, as may be necessary or appropriate in the wind down and dissolution of FTDF, USA Securities and USA Realty, including as necessary or appropriate, all databases, software, documents and records necessary to object to and make distributions to Claims and Equity Interest, as Allowed, against FTDF, USA Securities and USA Realty.

USA Capital_ Proposed Confirmation Order 010807

63.     In the USACM Chapter 11 Case, the USACM Trustee shall act as Disbursing Agent under the Plan for distributions to USACM Trust Beneficiaries, and DSI shall act as Disbursing Agent under the Plan with respect to disbursements under the Plan after the Effective Date to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, and Allowed Claims in Classes A-1, A-2, and A-3 and Disputed Claims pursuant to a Disbursing Agent Agreement substantially in the form filed by the Debtors.  In the DTDF Chapter 11 Case, Post-Effective Date DTDF shall act as Disbursing Agent under the Plan for the DTDF Estate, and shall make all distributions required under the Plan, and may employ or contract with other Entities to assist in or perform any distribution of property.

**Miscellaneous.**

64.     As set forth in Article VIII, Section A. of the Plan, the limitation of liability and release provisions shall be effective and binding upon all applicable Persons and entities to the fullest extent provided in the Plan.

65.     The Debtors and Debtors in Possession, without any action by Equity Interests whatsoever, are hereby authorized to execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

66.     As set forth in Article II, Section B.1.b. of the Plan, on or before the Effective Date, Statutory Fees for each Estate shall be paid in Cash, in full when due.

67.     As soon as practicable after the occurrence of the Effective Date, but no later than ten (10) days thereafter, the USACM Trustee shall File and serve on each holder of a Claim or Equity Interest a written notice of the occurrence of Effective Date.  Each Committee shall post notice of the occurrence of the Effective Date on its respective website.

68.     In accordance with section 1146(c) of the Bankruptcy Code, the making delivery, filing or recording of any mortgages, deeds of trust, leasehold mortgages, leases (whether recorded or unrecorded) and/or the various instruments and documents of transfer as specified in or contemplated by the Plan, including the documents related to the Asset Sale Transaction and/or the exhibits thereto, are hereby exempt from taxation under any law imposing a mortgage or

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    recording tax, stamp tax, sales tax, transfer tax, use tax or any similar tax.  The appropriate federal,

2    state or local government officers are hereby directed to accept for filing or recording all

3    Instruments of Transfer or other documents of transfer to be filed and recorded in accordance with

4    the Plan and the exhibits thereto, without payment of any such tax or government assessment, and

5    without the presentation of any affidavits, instruments, or returns otherwise required for recording

6    other than the Confirmation Order.  The Court retains jurisdiction to enforce the foregoing

7    direction by contempt proceedings or otherwise.

8          69.    USACM shall have authority to take actions on behalf of USACM and the USACM

9    Estate until and including the Effective Date, when the appointment of the USACM Trustee

10   becomes effective and the USACM Trust Assets are transferred to the USACM Trust and the

11   USACM Trust becomes effective in accordance with this Plan and the USACM Trust Agreement.

12   As soon as practicable thereafter, USACM shall be dissolved in accordance with the Confirmation

13   Order and applicable state law.

14         70.    DTDF shall have authority to take actions on behalf of DTDF and the DTDF Estate

15   until and including the Effective Date and, thereafter, the Post-Effective Date DTDF shall have the

16   exclusive authority to act on behalf of DTDF and the DTDF Estate.  When the Plan has been fully

17   implemented by Post-Effective Date DTDF and all assets of the DTDF Estate and Post-Effective

18   Date DTDF have been fully liquidated and distributed and the DTDF Estate and Post-Effective

19   Date DTDF fully administered, DTDF shall be dissolved in accordance with the Confirmation

20   Order, the DTDF Amended Operating Agreement and applicable state law.

21         71.    FTDF, USA Realty, and USA Securities shall have the authority to effect

22         all transactions and take all actions, including, without limitation, filing applicable tax

23   returns, required by the Plan on and after the Effective Date.  FTDF and the FTDF Committee

24   shall each have authority to prosecute (a) claim objections in the FTDF Estate, and (b) the non

25   assignable

26         FTDF Litigation Claims on behalf of FTDF subject to the compromise with DTDF set

27   forth herein.  After the actions set forth in this paragraph are completed, FTDF, USA Realty, and

28   USA Securities shall be dissolved in accordance with the Confirmation Order and applicable state

1  law, and FTDF, USA Realty, and USA Securities, or their respective appointed Disbursing Agent,

2  which may be DSI, shall file a final report and close their respective Chapter 11 Cases in

3  accordance with Bankruptcy Code section 350.

4  72. The Post-Effective Date Entities may execute such other documents and take such

5  other actions as may be necessary or appropriate to effectuate the transactions contemplated under

6  this Plan.

7  73. The reversal or modification of this Confirmation Order or Findings on appeal shall

8  not affect the validity of the Plan, or any agreement or action authorized by this Confirmation

9  Order or under the Plan, including the Asset Purchaser Agreement, with respect to any entity

10 acting in good faith, whether or not that entity knows of the appeal, unless this Confirmation

11 Order is stayed pending appeal.

12 74. Within ninety (90) days of the Effective Date, the Debtors or a Post-Effective Date

13 Entity or the FTDF Committee, to the extent applicable, shall File a status report for each of the

14 respective Debtors setting forth what progress has been made toward the consummation of the

15 confirmed Plan. The status report shall be served on the U.S. Trustee, the Debtors, prior to

16 dissolution or transition to the Post-Effective Date Entities, the Post-Effective Date Entities, and

17 any Entities who have Filed a request for such reports with the Court. Unless otherwise ordered,

18 further status reports shall be Filed every ninety (90) days and served on the same Entities. On or

19 after the Effective Date, no monthly operating reports need to be filed with the U.S. Trustee.

20 75. Once each Estate has been fully administered, as referred to in Bankruptcy

21 Rule 3022, the Post-Effective Date Entities, the Debtors, or another party as the Court may

22 designate, shall File a final report and account of all receipts and disbursements, and serve that

23 report on the U.S. Trustee, and any other Entities entitled to service under any applicable law.

24 Any such final report shall include a request that the Court enter a Final Decree in the Chapter 11

25 Case of the applicable Debtor.

26 76. Nothing in this Confirmation Order or the Plan shall be construed or interpreted to

27 release, discharge, enjoin or otherwise adversely impact any claim or claims of PBGC or any

28 pension plan, currently or formerly sponsored by the Debtors against any person arising under 29

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  U.S.C. Sections 1104-1109 with respect to the pension plans.

2  77.  Nothing in this Confirmation Order or the Plan, including without limitation the

3  injunction provided in Section IV.H. of the Plan: (i) shall alter, affect or supersede the Bankruptcy

4  Court's Order Approving Agreement With Investment Partners entered on July 24, 2006 (Docket

5  No. 946); or (ii) shall enjoin, prejudice, limit, preclude or otherwise impair the rights and remedies

6  that (a) the Debtors and their respective Estates, (b) the Post-Effective Date Entities, (c) the Direct

7  Lenders, or (d) creditors of the Debtors or parties in interest, including Liberty Bank, as or may

8  have against any non-debtor third parties, including without limitation HMA Sales, LLC ("HMA")

9  and USA Investment Partners, LLC ("USAIP"), under the Receivables Loan Agreement between

10 Liberty Bank and HMA dated as of November 15, 2004, as amended, and the loan documents

11 securing and/or relating thereto, including without limitation the Guaranty Agreement executed by

12 USAIP and the Subordination Agreement among USAIP, HMA and Liberty Bank, each dated as

13 of November 15, 2004.

14 78.  Nothing in this Confirmation Order or the Plan shall be construed or interpreted to

15 release, discharge, enjoin or otherwise adversely impact the assertion of any setoff, recoupment,

16 counterclaim or defense that Standard Property Development, LCC ("Standard"), Binford Medical

17 Developers, LLC ("Binford"), or Copper Sage Commerce Center, LLC ("Copper Sage") may

18 assert against any lender, other than FTDF, USACM, or Compass as the assignee or transferee of

19 the assets of FTDF and USACM, to the attempted enforcement, collection and/or foreclosure of

20 the applicable Loan(s) to such borrower; as for FTDF or USACM or Compass as the assignee or

21 transferee of the assets of FTDF and USACM, nothing in this Confirmation Order or the Plan shall

22 be construed or interpreted to preclude Standard, Binford, or Copper Sage from asserting any

23 defense (including the defense of recoupment) to the enforcement, collection and/or foreclosure

24 of FTDF's or USACM's undivided interest in the Standard, Binford, or Copper Sage Loan(s) to

25 such borrower.

26 79.  Each term and provision of the Plan is hereby deemed to be valid and enforceable

27 pursuant to its terms.

28 80.  If and to the extent that there is any direct conflict between the terms of the Plan,

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  the Findings and the terms of this Confirmation Order, this Confirmation Order shall control.

2         81.     Notwithstanding the fact that Joseph Milanowski, Thomas Hantges, Paul Hamilton,

3  Victoria Loob, USA Investment Partners, LLC, USA Commercial Real Estate Group, Cynthia

4  Milanowski, or Salvatore Reale, their insiders or affiliates may have acted or served in some

5  capacity with the Debtors after the Petition Date or may have some other connection with the

6  Debtors or the Debtors' Estates, and notwithstanding anything in the Plan to the contrary or which

7  could be construed to the contrary, nothing in the Plan nor this Confirmation Order shall be

8  construed as providing a release of any claims or causes of action against Joseph Milanowski,

9  Thomas Hantges, Paul Hamilton, Victoria Loob, USA Investment Partners, LLC, USA

10  Commercial Real Estate Group, Cynthia Milanowski, or Salvatore Reale, their insiders or

11  affiliates (other than the Debtors themselves in accordance with the provisions of the Plan).

12         82.     Nothing contained in the Asset Purchase Agreement shall modify the obligations

13  owed to the Lenders by Compass as the loan servicer or rights of the Lenders against Compass as

14  the loan servicer (or the rights of Compass as the loan servicer against the Lenders) under the

15  applicable Loan Servicing Agreements and otherwise applicable law. Compass shall distribute

16  any sums due to Lenders under any of the Loan Servicing Agreements in accordance with the

17  Loan Servicing Agreements, as the same may be modified with consent of the applicable Lenders,

18  and with otherwise applicable law. Compass shall apply all payments and proceeds from Serviced

19  Loans (as such term is defined in the Asset Purchase Agreement), however collected, whether

20  through liquidation of collateral, payments from the Borrower or otherwise, in accordance with the

21  provisions of the notes and/or loan agreements. Further, notwithstanding the foregoing, to the

22  extent the Bankruptcy Court has entered an order, including, but not limited to, this Confirmation

23  Order, which interprets or enforces provisions of the Loan Servicing Agreements or directs the

24  distribution of payments under the Loan Servicing Agreements or payments collected from

25  Borrowers, Compass, the Lenders, and all other affected parties shall abide by the terms of such

26  order(s). If, as between the provisions of the Loan Servicing Agreements and the order(s) of the

27  Bankruptcy Court, it is not clear to Compass how the sums collected shall be distributed, then

28  Compass shall hold the sums payable to the Lender until Compass either receives direction from

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   the Lender and, as to items not constituting Commercial Mortgage Assets (as such term is defined

2   in the Asset Purchase Agreement), the Sellers (or their successor or assignee under the Plan)

3   regarding disbursement of interest, or is directed by an order from a court of competent

4   jurisdiction.  Nothing contained herein is intended to waive any defenses of the Lenders or, as to

5   items not constituting Commercial Mortgage Assets (as such term is defined in the Asset Purchase

6   Agreement), the Sellers (or their successors or assignees) under the Loan Servicing Agreements.

7   For the avoidance of doubt, under no circumstance shall any pre-Closing Date liability assertable

8   by any party attach to Compass, or to any asset acquired by Compass, pursuant to the Asset

9   Purchase Agreement.  Furthermore, for the avoidance of doubt, notwithstanding any other

10  provision in the Asset Purchase Agreement, this Confirmation Order, or any order which may in

11  the future be entered by the Bankruptcy Court, all servicing fees due pursuant to the terms stated

12  in the Loan Servicing Agreements, and all interest due on the First Trust Deed Fund Assets (as

13  such term is defined in the Asset Purchase Agreement), shall continue to be due and payable, and

14  Compass shall collect such servicing fees and interest for its sole benefit on and after the Closing

15  Date.

16  Submitted by:                                  Approved / Disapproved by:

17  RAY QUINNEY & NEBEKER P.C.                      OFFICE OF THE U.S. TRUSTEE
    and SCHWARTZER & MCPHERSON LAW

18  FIRM

19  By: /s/ Lenard E. Schwartzer                   By: _____
    LENARD E. SCHWARTZER, ESQ.                          August B. Landis

20  JEANETTE E. MCPHERSON, ESQ.
    ANNETTE W. JARVIS, ESQ.

21  STEVEN STRONG, ESQ.
    *Counsel for Debtors*

22

23  **Approved**/Disapproved by:                   **Approved**/Disapproved by:
    LEWIS AND ROCA, LLP                            GORDON & SILVER, LTD.

24

25  By:   /s/  Rob Charles                         By:   /s/  Gregory Garman
          SUSAN M. FREEMAN, ESQ.                         GERALD M. GORDON, ESQ.

26        ROB CHARLES, ESQ.                              GREGORY E. GARMAN, ESQ.
          *Counsel for the Official Committee of*        *Counsel for the Official Committee of*

27        *Unsecured Creditors of USA Commercial*        *Holders of Executory Contract Rights of*
          *Mortgage Company*                             *USA Commercial Mortgage Company*

28

USA Capital_ Proposed Confirmation Order 010807

**[PROPOSED] ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION," AS MODIFIED HEREIN**

**Approved**/Disapproved by:
ORRICK, HERRINGTON & SUTCLIFFE LLP
and BECKLEY SINGLETON, CHTD.

By: ___/s/ Marc A. Levinson_____
    MARC A. LEVINSON, ESQ.
    JEFFERY HERMANN ESQ.
    BOB L. OLSON, ESQ.
    ANNE M. LORADITCH, ESQ.
    *Counsel for the Official Committee of*
    *Equity Security Holders of USA Capital*
    *Diversified Trust Deed Fund, LLC*

**Approved**/Disapproved by:
STUTMAN TREISTER & GLATT, P.C. and
SHEA & CARLYON, LTD.

By: ___/s/ Christine Pajak_____
    FRANK A. MEROLA, ESQ.
    EVE KARASIK, ESQ.
    CHRISTINE PAJAK, ESQ.
    CANDACE C. CARLYON, ESQ.
    *Counsel for the Official Committee of*
    *Equity Security Holders of USA Capital*
    *First Trust Deed Fund LLC*

Approved/**Disapproved** by:

By: ___/s/ Kevin Darby for_____
    ALAN SMITH, ESQ.
    *Counsel for Lenders Protection Group*

Approved/**Disapproved** by:

By: ___/s/ Dean Kirby_____
    DEAN KIRBY, ESQ.
    *Counsel for Debt Acquisition*
    *Company of America*

**Approved**/Disapproved by:

By: ___/s/ Jim Eggeman_____
    ERIC FIELD, ESQ.
    *Counsel for Pension Benefit Guarantee*
    *Corporation*

Approved/**Disapproved** by:

By: ___/s/ Robert LePome_____
    NANCY ALLF, ESQ.
    ROBERT LEPOME, ESQ.
    *Counsel for The Alexander Group*

Approved/Disapproved by:

By: _____
    MICHAEL SCHMAHL, ESQ.
    *Counsel for Dr. Gary Kantor, Mrs. Kantor*
    *and Kantor Nephrology 401K plan*

Approved/**Disapproved** by:

By: ___/s/ Janet Chubb_____
    JANET CHUBB, ESQ.
    *Counsel for Jones Vargas Direct Lenders*

**Approved**/Disapproved by:

By: ___/s/ George Davis_____
    GEORGE DAVIS ESQ.
    *Counsel for Compass Partners*

Approved/Disapproved by:

By: _____
    DAVID COHEN, ESQ.
    *Counsel for Sierra Liquidity Fund*

USA Capital_ Proposed Confirmation Order 010807

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**[PROPOSED] ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION," AS MODIFIED HEREIN**

Approved/Disapproved by:

Approved/Disapproved by:

By: _____
    GREGORY J. WALCH ESQ.
    *Counsel for Gregory J. Walch and Shauna*
*M. Walch, Trustees of the Gregory J. and*
*Shauna M. Walch Family Trust*

By: _____
    JEFFREY SYLVESTER, ESQ.
    *Counsel for USA Commercial Real Estate*
*Group*

Approved/Disapproved by:

Approved/Disapproved by:

By: _____
    RUSSELL WALKER, ESQ.
    *Counsel for USA Investment Partners, LLC,*
*Joseph Milanowski and Thomas Hantges*

By: _____
    SUSAN SCANN, ESQ.
    *Counsel for Copper Sage Commercial*
*Center and Binford Medical Developers, LLC*

**Approved**/Disapproved by:

Approved/Disapproved by:

By:  _/s/  Andrew Brumby_____
    ANDREW BRUMBY, ESQ.
    R. VAUGHN GOURLEY, ESQ.
    *Counsel for Standard Property Development*

By: _____
    WADE GOCHNOUR, ESQ.
    ARYN M. FITZWATER, ESQ.
    *Counsel for Liberty Bank*

In accordance with LR 9021, counsel submitting this document certifies as follows (check one):

\_\_\_ The court has waived the requirement of approval under LR 9021.

\_\_\_ No parties appeared or filed written objections, and there is no trustee appointed in the case.

_X_ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and any trustee appointed in this case, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

**Failed to respond:**

WADE GOCHNOUR, ESQ.
SUSAN SCANN, ESQ.
RUSSELL WALKER, ESQ.
JEFFREY SYLVESTER, ESQ.
GREGORY J. WALCH ESQ.
DAVID COHEN, ESQ.
MICHAEL SCHMAHL, ESQ.
AUGUST B. LANDIS, ESQ.

# # #

USA Capital_ Proposed Confirmation Order 010807

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   ALAN R. SMITH, ESQ.
    Nevada Bar No. 1449
2   KEVIN A. DARBY, ESQ.
    Nevada Bar No. 7670
3   Law Offices of Alan R. Smith
    505 Ridge Street
4   Reno, Nevada  89501
    Telephone (775) 786-4579
5   Facsimile (775) 786-3066
    **E-mail: mail@asmithlaw.com**
6
    Attorneys for Plaintiffs
7

8                UNITED STATES DISTRICT COURT

9                    DISTRICT OF NEVADA

10                        —ooOoo—

11  3685 SAN FERNANDO LENDERS,              Case No.
    LLC, a Nevada limited liability company,
12  5055 COLLWOOD LENDERS, LLC, a
    Nevada limited liability company, 6425
13  GESS LENDERS, LLC, a Nevada limited     **COMPLAINT FOR DECLARATORY**
    liability company, 60th STREET           **RELIEF AND DAMAGES**
14  VENTURES LENDERS, LLC, a Nevada
    limited liability company, AMESBURY
15  HATTERS PT LENDERS, LLC, a Nevada
    limited liability company, ANCHOR B
16  LENDERS, LLC, a Nevada limited
    liability company, BAR-USA LENDERS,
17  LLC, a Nevada limited liability company,
    BAY POMPANO LENDERS, LLC, a
18  Nevada limited liability company,
    BINFORD LENDERS, LLC, a Nevada
19  limited liability company, BROOKMERE
    LENDERS, LLC, a Nevada limited
20  liability company, BUNDY CANYON 2.5
    LENDERS, LLC, a Nevada limited
21  liability company, BUNDY CANYON 5.0
    LENDERS, LLC, a Nevada limited
22  liability company, BUNDY CANYON
    5.725 LENDERS, LLC, a Nevada limited
23  liability company, BUNDY CANYON 7.5
    LENDERS, LLC, a Nevada limited
24  liability company, CABERNET
    LENDERS, LLC, a Nevada limited
25  liability company, CASTAIC II
    LENDERS, LLC, a Nevada limited
26  liability company, CASTAIC III
    LENDERS, LLC, a Nevada limited
27  liability company, CHARLEVOIX
    LENDERS, LLC, a Nevada limited
28

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd

1 | liability company, CLEAR CREEK PLANTATION LENDERS, LLC, a
2 | Nevada limited liability company, COM VEST LENDERS, LLC, a Nevada limited
3 | liability company, COPPER SAGE II LENDERS, LLC, a Nevada limited
4 | liability company, CORNMAN TOLTEC LENDERS, LLC, a Nevada limited
5 | liability company, DEVALLE LIVINGSTON LENDERS, LLC, a
6 | Nevada limited liability company, EAGLE MEADOWS LENDERS, LLC, a Nevada
7 | limited liability company, FIESTA MURIETTA LENDERS, LLC, a Nevada
8 | limited liability company, FIESTA USA STONERIDGE LENDERS, LLC, a
9 | Nevada limited liability company, FOXHILLS 216 LENDERS, LLC, a
10 | Nevada limited liability company, GRAMERCY COURT LENDERS, LLC,
11 | a Nevada limited liability company, HARBOR GEORGETOWN LENDERS,
12 | LLC, a Nevada limited liability company, HESPERIA LENDERS, LLC, a Nevada
13 | limited liability company, HFA CLEARLAKE I LENDERS, LLC, a
14 | Nevada limited liability company, HFA CLEARLAKE II LENDERS, LLC, a
15 | Nevada limited liability company, HUNTSVILLE LENDERS, LLC, a
16 | Nevada limited liability company, LA HACIDENDA LENDERS, LLC, a
17 | Nevada limited liability company, LAKE HELEN PARTNERS LENDERS, LLC, a
18 | Nevada limited liability company, LERIN HILLS LENDERS, LLC, a Nevada limited
19 | liability company, MARGARITA ANNEX LENDERS, LLC, a Nevada limited
20 | liability company, MARLTON SQUARE I LENDERS, LLC, a Nevada limited
21 | liability company, MARLTON SQUARE II LENDERS, LLC, a Nevada limited
22 | liability company, MOUNTAIN HOUSE-PEGS LENDERS, LLC, a Nevada limited
23 | liability company, OAK SHORES II, LENDERS, LLC, a Nevada limited
24 | liability company, OCEAN ATLANTIC 2.75 LENDERS, LLC, a Nevada limited
25 | liability company, OCEAN ATLANTIC 9.425 LENDERS, LLC, a Nevada limited
26 | liability company,

27

28

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 2 -

1   PALM HARBOR I LENDERS, LLC, a
    Nevada limited liability company,
2   SHAMROCK TOWER LENDERS, LLC,
    a Nevada limited liability company, SO
3   CAL LAND LENDERS, LLC, a Nevada
    limited liability company, SVRB 2.325
4   LENDERS, LLC, a Nevada limited
    liability company, SVRB 4.5 LENDERS,
5   LLC, a Nevada limited liability company,
    TAPIA RANCH LENDERS, LLC, a
6   Nevada limited liability company, TEN-
    NINETY 4.15 LENDERS, LLC, a Nevada
7   limited liability company, THE
    GARDENS 2.425 LENDERS, LLC, a
8   Nevada limited liability company, THE
    GARDENS LLC TSHR LENDERS, LLC,
9   a Nevada limited liability company,

10                    Plaintiffs,

11  v.

12  COMPASS USA SPE, LLC, a Delaware
    limited liability company, COMPASS
13  PARTNERS, LLC, a Delaware limited
    liability company, DAVID BLATT, an
14  individual, and BORIS PISKUN, an
    individual, SILAR ADVISORS, LP, a
15  Delaware limited partnership, SILAR
    SPECIAL OPPORTUNITIES FUND, LP,
16  a Delaware limited partnership,

17                    Defendants.

18  _____

19       Plaintiffs, 3685 SAN FERNANDO LENDERS, LLC, a Nevada limited liability

20  company, 5055 COLLWOOD LENDERS, LLC, a Nevada limited liability company, 6425

21  GESS LENDERS, LLC, a Nevada limited liability company, 60th STREET VENTURES

22  LENDERS, LLC, a Nevada limited liability company, AMESBURY HATTERS PT

23  LENDERS, LLC, a Nevada limited liability company, ANCHOR B LENDERS, LLC, a

24  Nevada limited liability company, BAR-USA LENDERS, LLC, a Nevada limited liability

25  company, BAY POMPANO LENDERS, LLC, a Nevada limited liability company,

26  BINFORD LENDERS, LLC, a Nevada limited liability company,   BROOKMERE

27  LENDERS, LLC, a Nevada limited liability company, BUNDY CANYON 2.5 LENDERS,

28  LLC, a Nevada limited liability company, BUNDY CANYON 5.0 LENDERS, LLC, a

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd   - 3 -

Nevada limited liability company, BUNDY CANYON 5.725 LENDERS, LLC, a Nevada limited liability company, BUNDY CANYON 7.5 LENDERS, LLC, a Nevada limited liability company, CABERNET LENDERS, LLC, a Nevada limited liability company, CASTAIC II LENDERS, LLC, a Nevada limited liability company, CASTAIC III LENDERS, LLC, a Nevada limited liability company, CHARLEVOIX LENDERS, LLC, a Nevada limited liability company, CLEAR CREEK PLANTATION LENDERS, LLC, a Nevada limited liability company, COM VEST LENDERS, LLC, a Nevada limited liability company, COPPER SAGE II LENDERS, LLC, a Nevada limited liability company, CORNMAN TOLTEC LENDERS, LLC, a Nevada limited liability company, DEVALLE LIVINGSTON LENDERS, LLC, a Nevada limited liability company, EAGLE MEADOWS LENDERS, LLC, a Nevada limited liability company, FIESTA MURIETTA LENDERS, LLC, a Nevada limited liability company, FIESTA USA STONERIDGE LENDERS, LLC, a Nevada limited liability company, FOXHILLS 216 LENDERS, LLC, a Nevada limited liability company, GRAMERCY COURT LENDERS, LLC, a Nevada limited liability company, HARBOR GEORGETOWN LENDERS, LLC, a Nevada limited liability company, HESPERIA LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE I LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE II LENDERS, LLC, a Nevada limited liability company, HUNTSVILLE LENDERS, LLC, a Nevada limited liability company, LA HACIDENDA LENDERS, LLC, a Nevada limited liability company, LAKE HELEN PARTNERS LENDERS, LLC, a Nevada limited liability company, LERIN HILLS LENDERS, LLC, a Nevada limited liability company, MARGARITA ANNEX LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE I LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE II LENDERS, LLC, a Nevada limited liability company, MOUNTAIN HOUSE-PEGS LENDERS, LLC, a Nevada limited liability company, OAK SHORES II, LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 2.75 LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 9.425 LENDERS, LLC, a Nevada limited liability company, PALM HARBOR I LENDERS, LLC, a Nevada limited liability company,

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 4 -

SHAMROCK TOWER LENDERS, LLC, a Nevada limited liability company, SO CAL LAND LENDERS, LLC, a Nevada limited liability company, SVRB 2.325 LENDERS, LLC, a Nevada limited liability company, SVRB 4.5 LENDERS, LLC, a Nevada limited liability company, TAPIA RANCH LENDERS, LLC, a Nevada limited liability company, TEN-NINETY 4.15 LENDERS, LLC, a Nevada limited liability company, THE GARDENS 2.425 LENDERS, LLC, a Nevada limited liability company, THE GARDENS LLC TSHR LENDERS, LLC, a Nevada limited liability company, (collectively the "Plaintiffs"), through their counsel, The Law Offices of Alan R. Smith, hereby avers and seeks relief as set forth below:

## GENERAL AVERMENTS

**A.** **Jurisdiction and Venue**.

1.      The United States District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

2.      Pursuant to 28 U.S.C. § 2201, et seq. (the Federal Declaratory Judgment Act), this Court has jurisdiction to declare the rights and legal obligations of the interested parties.

3.      Venue for this case in this district is property pursuant to 28 U.S.C. § 1391.

**B.** **The Parties.**

4.      Plaintiffs are all Nevada limited liability companies and are all direct lenders/investors in certain investments made through USA Commercial Mortgage Company ("USACM). These investments were in the nature of direct loans to third-party borrowers secured by real property and sometimes improvements, which loans were brokered by USACM. The members of the Plaintiff limited liability companies are all direct lender/investors who originally invested with USACM, but assigned their interest in the loans brokered by USACM to, among numerous other reasons, to consolidate and unite to protect themselves and their investments from the actions of Defendants alleged herein. Plaintiffs, or their predecessor in interest, are named as fractional interest beneficiaries on each promissory note and deed of trust evidencing and perfecting the secured loans. Each Plaintiff limited liability company is a direct lender/investor in a separate and distinct loan.

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 5 -

5. Compass USA SPE, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. Compass USA SPE, LLC does not maintain an office in Nevada.

6. Compass Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. Compass Partners, LLC does not maintain an office in Nevada (Compass USA SPE, LLC and Compass Partners, LLC shall collectively be referred to herein as "Compass")

7. David Blatt ("Blatt") is a resident of the State of New York and is member and manager of Compass.

8. Boris Piskun is a resident of the State of New York and is a member and a manager of Compass ("Piskun").

9. Compass is not registered, qualified or authorized to do business in the State of Nevada.

10. Compass is not licensed as a Mortgage Broker or Mortgage Agent in the State of Nevada and does not have an application pending to become a licensed Mortgage Broker or Mortgage Agent in Nevada.

11. Silar Advisors, LP, is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York. Silar Advisors, LP does not maintain an office in Nevada.

12. Silar Special Opportunities Fund, LP is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York Silar Special Opportunities Fund, LP does not maintain an office in Nevada (hereafter, Silar Advisors, LP, and Silar Special Opportunities Fund, LP shall collectively be referred to as "Silar").

**C.    General Background.**

13. USA Commercial Mortgage Company, defined above as USACM, which sometimes did business under the name "USA Capital", was formed as a Nevada corporation in 1989, and was in the business of underwriting, originating, brokering, funding and

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 6 -

servicing short term (typically one year or less) commercial loans primarily secured by residential and commercial developments, on behalf of private investors/direct lenders.

14. On January 11, 1990, USACM obtained a license to act as a mortgage broker/agent in the State of Nevada under Nevada Revised Statutes (NRS) Chapter 645B and Nevada Administrative Code Chapter 645B (NAC).

15. USACM routinely advertised and promoted, through sales and marketing literature, high-yielding secured investments, with no fees ever charged to investors, and represented that no investors had ever lost money in their investments with USACM.

16. At the time USACM brokered direct loans on behalf of Plaintiffs, or their predecessors in interest, USACM was operating in the State of Nevada as a licensed mortgage broker/agent under NRS 645B and NAC 645B.

17. On April 13, 2006, USACM filed a Chapter 11 Petition for bankruptcy in the Bankruptcy Court for the District of Nevada, Las Vegas, together with four other entities related to USACM (hereinafter collectively referred to as "USA Bankruptcy Cases").

18. At the time USACM filed its bankruptcy petition, approximately 3,600 investors were "lenders" in one or more loan originated and serviced by USACM. These 3,600 investors are commonly referred to as "direct lenders."

19. The loans brokered by USACM on behalf of Plaintiffs are each evidenced by a Promissory Note Secured By A Deed Of Trust (respectively the "Note"), which were executed by third-party borrowers in favor of the Plaintiff (or their predecessor in interest) and other direct lenders in each loan. All loan documents, including the Notes, expressly provide that they are governed by Nevada law.

20. At the time USACM brokered direct loans each lender/investor and USACM entered into various Loan Servicing Agreements pursuant to which USACM would service the loans it brokered on behalf of Plaintiffs ("Loan Servicing Agreements"). Each Plaintiff entered into a single Loan Servicing Agreement, which covered every investment made by each Plaintiff with USACM. All Loan Servicing Agreements are in the same form. All Loan Servicing Agreements expressly provide that they are governed by Nevada law.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 7 -

21.    At the time USACM filed its bankruptcy petition, the loan portfolio it was servicing pursuant to the Loan Servicing Agreements consisted of approximately 115 loans having a combined outstanding principal balance of approximately $960 million.  Most of the original direct lenders invested in  more than one of the serviced loans, with the being approximately 3 to 4 loans for each direct lender.

22.    On May 1, 2006, the State of Nevada, Department of Business and Industry, Division of Mortgage Lending, entered a *Order Conditioning Mortgage Broker's License and Notice of Right To Request A Hearing*, which became a *Final Order Conditioning Mortgage Broker's License* on June 9, 2006, a copy of which is attached hereto as Exhibit A, pursuant to which USACM was prohibited from making any further loans based upon various violations of Nevada law.

23.    The Commissioner for the Nevada Mortgage Lending Division, Scott Bice, has described USACM as "a calculated, self serving deceptive scheme that was enacted to allow the Principals to potentially profit with no risk, while astronomical risk inured to the unsuspecting lenders.

24.    During the course of its Bankruptcy Case, USACM admitted that it breached the Loan Servicing Agreements, breached its fiduciary duties, and violated Nevada state law, prior to filing its Bankruptcy Petition, which included, but are not limited to:

a.    USACM received full principal payoffs from multiple borrowers, but failed to disburse those funds to the appropriate Direct Lenders (the "Converted Principal").  The total amount of Converted Principal is approximately $50,000,000.

b.    USACM failed to make any attempt to obtain real estate collateral to secure multiple loans, while at the same time representing to Direct Lenders that their loans were fully secured by valuable real estate.

c.    USACM made monthly interest payments to Direct Lenders on occasions when the borrowers of particular loans in which the Lenders had an interest were not paying USACM (the "Prepaid Interest").  The

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 8 -

1   total amount of Prepaid Interest is approximately $49,000,000. The

2   payment of Prepaid Interest led Direct Lenders to believe that their

3   loans were properly performing.

4       d.    USACM made loans to borrowers who were affiliated or otherwise

5   related to USACM's pre-petition management, such that the borrower

6   entities were partially owned by the owners and officers of USACM

7   through one or more of their various entities. Many of these loans

8   became non-performing loans in that the underlying borrower had not

9   paid the interest due.

10       e.    Plaintiffs, or their predecessors in interest, as existing Lenders, and new

11   lenders dating back to January 2005, were fraudulently induced into

12   making new investments and entering into agreements with USACM

13   based on USACM's false misrepresentations regarding the performance

14   of their investments.

15       25.    As a result of USACM's fraudulent misrepresentations and conduct, 100% of

16   the portfolio of loans it brokered are in default, while the default rate of commercial loans

17   in default for all commercial banks nationally is approximately 1.5%. Industry averages for

18   principal recovery on defaulted loans is approximately 65%.

19       26.    On or about September 22, 2006, USACM filed a *Motion For Order*

20   *Scheduling An Auction For The Sale Of Certain Assets, Appointing SPCP Group , LLC, As*

21   *Lead Bidder, and Approving  Bid Procedures And Protections* in its Bankruptcy Case, in

22   which it sought to establish the parameters for the sale of certain assets in the USA

23   Bankruptcy Cases, primarily consisting of valuable assets of a related debtor, the First Trust

24   Deed Fund. The Bankruptcy Court entered and *Order: (A) Scheduling An Auction For The*

25   *Sale Of Certain Assets; (B) Appointing SPCP Group, LLC, As Lead Bidder; And ©*

26   *Approving Bid Procedures And Protections, Approving Bidding Procedures* on November

27   8, 2006. The stalking horse bidder agreed to take on the obligations of USACM under the

28   Loan Servicing Agreements as part of the sale, but did not attribute any of its initial bid price

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579
H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 9 -

1   to the Agreements.

2       27.   After the Order Scheduling Auction was entered, but prior to the auction being

3   conducted, Mesirow Financial Interim Management ("MFIM"), the Bankruptcy Court

4   appointed management for USACM, prepared calculations of the default interest to be

5   charged to third-party borrowers on monthly invoices or at the time of payoff.   MFIM

6   determined that default interest could be charged for substantially all of the loans, and as a

7   result, prepared default interest calculations.

8       28.   After the Order Scheduling Auction was entered, but prior to the auction being

9   conducted, Compass submitted a revised Asset Purchase Agreement, which included the sale

10  of additional assets that were not included in the original asset purchase agreement submitted

11  by the stalking horse bidder, specifically, the sale of loan servicing rights, the default rate

12  interest calculated by MFIM, accrued servicing fees, late charges, success fees and other fees

13  due to the loan servicer under the Loan Servicing Agreements.

14      29.   The Bankruptcy Court conducted an auction of various assets of the USA

15  Bankruptcy Cases on December 7, 2006.   The sale was expressly conditioned upon

16  confirmation of the USACM's Chapter 11 Plan of Reorganization, which was confirmed by

17  an order of the Bankruptcy Court entered on January 8, 2007.

18      30.   Compass was the successful bidder at auction and, on February 16, 2007 (the

19  "Closing Date"), acquired substantially all of the assets of USACM and related debtor, the

20  First Trust Deed Fund ("FTDF") in exchange for at $67 Million.   The Compass bid was

21  broken down by an initial bid of $48 million fo the FTDF assets and $8 million for the loan

22  servicing rights and fees under the Loan Servicing Agreements ("Purchased Assets").   The

23  remaining amounts were to be allocated by an over-bid agreement between FTFD and

24  USCM, which was filed under seal, and a break-up fee of $1.5 million to the stalking horse

25  bidder.   The sale was expressly conditioned upon confirmation of the USACM's Chapter

26  11 Plan of Reorganization, which was confirmed by an order of the Bankruptcy Court

27  entered on January 8, 2007.

28      31.   Other than certain conditions, the Loan Servicing Agreements were transferred

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 10 -

1   to Compass without any other modification whatsoever.

2        32.    Compass has represented in a declaration by Blatt that it is a national firm with

3   over 200 employees which acquires over $100 million in loan interests every year.

4        33.    Silar, which together with its principals have a substantial background in the

5   lending industry in numerous asset classes, including consumer, residential and commercial,

6   provided financing to Compass for the Purchased Assets, and conducted due diligence in

7   connection with the financing.

8        34.    On February 16, 2007, Compass issued a press release in which it stated that

9   the actual value of the assets purchased from USACM and FTDF was more than $150

10  million.  Based on the full note value of $62,652,742 for the FTDF assets, not talking into

11  account any borrower defaults, it can be deducted that Compass claims over $87 million in

12  profit to be realized from the loan servicing rights.

13       35.    Compass has put into action a strategy to extract value from the collateral

14  pledged by third-party borrowers to Plaintiffs and other direct lenders, by attempting to

15  deduct unpaid default interest and late fees from the collateral proceeds before remitting

16  amounts due to Plaintiffs and other direct lenders, which is in direct conflict with the loan

17  documentation (Notes, deeds of trust and loan agreements), the Loan Servicing Agreements,

18  the intent of the parties to the loans and various related agreements, the historical practices

19  of USACM and long established lending industry standards and practices.

20       36.    Compass' strategy and approach for servicing the Loans has created a conflict

21  of interest between Compass and direct lenders, including Plaintiffs, to whom Compass owes

22  fiduciary duties.

23       37.    Compass is attempting to further the scheme started by USACM, to profit with

24  no risk, while astronomical risk inures to Plaintiffs and other direct lenders.

25       38.    As a purported loan servicer, Compass plays a crucial role in the Loans and its

26  capabilities and experience directly affects the underlying performance of the Loans.

27       39.    As a purported loan servicer, Compass acts as an agent to Plaintiffs and other

28  direct lenders and, therefore, Compass assumes fiduciary responsibilities to Plaintiffs and

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd  - 11 -

other direct lenders.

40.     The State of Nevada and its Division of Mortgage Lending, recognizing the responsibilities assumed by a loan servicer to direct lenders, regulates and monitors loan servicing activities pursuant to NRS 645B and NAC 645B.

41.     Pursuant to NRS 645B.185, each investor in USACM was required to receive and sign a Mortgage Investment Disclosure Form, approved by the Nevada Mortgage Lending Division, a copy of which approved form is attached as Exhibit B.

42.     As detailed in the Mortgage Investment Disclosure Form, a mortgage broker/agent operating in Nevada is required to inform investors that:

   a.     "Before you invest in a promissory note by an interest in real property, you should know… the knowledge, experience and integrity of the mortgage broker with whom you are dealing."

   b.     "You are entitled to receive information regarding the mortgage broker you are dealing with" more specifically the most recent financial statements.

   c.     "You have a right to ascertain from the Division of Mortgage Lending the results of any investigation against the mortgage broker"

   d.     "In many cases, including those cases where the investments consist of "fractionalized" interests, the loan requires servicing by an authorized agent... The mortgage broker with whom you are dealing is authorized by Nevada law to act as the servicing agent."

   e.     "A Mortgage Broker performing loan servicing has an obligation to account to the borrower and every investor for money collected and disbursed in the exercise of that function".

   f.     When the borrower on a mortgage loan fails to make required payments, the actions and investor can take, or that a servicing agent can take on behalf of an investor, are determined by provisions of Nevada Law and the documents and instruments evidencing the

1     mortgage loan.

2          43.     Plaintiffs and other direct lenders did not get the benefit of the Mortgage

3     Investment Disclosure Form as it relates to Compass, nor have they received the required

4     disclosures from Compass, including, but not limited to:

5                    a.     Compass has refused to disclose any compensation they are receiving;

6                    b.     Plaintiffs and other direct lenders did not have a chance to know

7                           anything about Compass prior to Compass being forced upon them as

8                           a loan servicer, nor have direct lenders been provided any information

9                           regarding Compass since Compass began servicing the Loans;

10                   c.     Plaintiffs and other direct lenders have not been able to obtain any

11                          financial information concerning Compass, yet Compass is being

12                          entrusted with nearly $750 million dollars of direct lenders money,

13                   d.     Compass has stated that they have no plans to get licensed in Nevada,

14                          and have relocated their operations to the State of New York and, as

15                          such, plaintiffs and direct lenders are being deprived of all the rights

16                          afforded them in connection with making a private investment.

17

18

19

20         44.     Nevada Administrative Code section 645B.073(1) provides:

21                 Except as otherwise provided in subsection 3, if a mortgage

22                 broker acts on behalf of investors on a matter related to a

23                 mortgage loan, and if the beneficial interest in the loan belongs

24                 to more than one natural person, the documentation of the matter

25                 must include provisions to allow the holders of 51 percent or a

26                 greater specified percentage of the beneficial interests of record

27                 to act on behalf of all the holders of the beneficial interests of

28                 record in the event of a default or foreclosure for matters that

require the direction or approval of the holders of the beneficial
interests in the loan, including, without limitation:

    (a) The designation of the mortgage broker, servicing
agent or other person to act on the behalf of the holders
of the beneficial interests in the loan; and

    (b) The sale, encumbrance or lease of real property
owned by the holders resulting from a foreclosure or the
receipt of a deed in lieu of a foreclosure.

45.    Compass is aware of NAC 645B.073 and has attempted to take advantage of its provisions by acquiring 51% of the beneficial interests in certain loans to prevent Plaintiffs and other direct lenders from removing Compass as loan servicer.

46.    The Loan Servicing Agreements provide for a power of attorney to be granted by Plaintiffs and other direct lenders to USACM, to empower USACM act on behalf of direct lenders in certain matters, thereby creating additional fiduciary duties owed to Plaintiffs and other direct lenders.

46.    Pursuant to NRS 645B.330, a mortgage broker/agent must act on behalf of direct lenders pursuant to a valid power of attorney, approved by the State of Nevada.  In this regard, Plaintiff executed a power of attorney in favor of USACM when making investments/loans.  Those powers of attorney expressly expire on the maturity date of each related loan.

47.    NRS 645B.330 requires that the power of attorney "Expressly provide that the power of attorney is effective only for the term of the specific loan unless the mortgage broker obtains written approval from the private investor to extend the term of the power of attorney..."    and "a power of attorney which designates a mortgage broker or mortgage agent as the attorney-in-fact or the agent of a private investor and which violates the provisions of this section is void and must not be given effect with regard to any act or transaction that occurs on or after October 1, 1999, whether or not the power of attorney is or has been executed by the private investor before, on or after October 1, 1999."

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 14 -

48.     The Powers of Attorney granted by Plaintiffs and other direct lenders to USACM expire as the term of each loan expires, and are now in default.  No written extension of any of Plaintiffs' Powers of Attorney have been executed as required by NRS 645B.330.

49.     At the time the Loan Servicing Agreements were transferred to Compass, many of the loans in the USACM loan portfolio were in term default, and others have since gone into term default.

50.     As a result of the term default of various loans in the USACM portfolio, Compass no longer has a valid power of attorney to act on behalf of direct lenders and, as such. the powers of attorney required under NRS 645B.330 have expired.

51.     Despite the fact no valid power of attorney exists that authorizes Compass to act on behalf of Plaintiffs and other direct lenders, Compass continues to hold itself out as a representative/agent of Plaintiffs (and other direct lenders)  to borrowers, title companies and others.  Without the power to do so, Compass has negotiated payoffs, filed lawsuits and executed satisfactions on behalf of Plaintiffs and other direct lenders.

52.     Compass was not able to obtain a license from the State of Nevada, Mortgage Lending Division, as required by the Asset Purchase Agreement.  As a result, in February 2007, Compass entered into a sub-servicing agreement with USACM.  The sub-servicing agreement, among other things, provided for USACM to provide administrative functions, while negotiations with borrowers, foreclosures, or other legal proceeding were left to Compass.

53.     In May, 2007, the State of Nevada, Department of Business and Industry, Division of Mortgage Lending entered a formal *Order Revoking Mortgage Broker License And Notice of Right To Request Hearing*, pursuant to which USACM license to act as a mortgage broker/agent in Nevada was revoked and in which the State described USACM as "a calculated, self-serving deceptive scheme that was enacted to allow the Principals to potentially profit with no risk, while astronomical risk inured to the unsuspecting lenders." A copy of the *Order Revoking Mortgage Broker License And Notice of Right To Request*

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 15 -

*Hearing,* is attached hereto as Exhibit C.

54. On May 9, 2007, entered a formal *Order Imposing Fine And Order To Cease And Desist And Notice of Right To Request Hearing,* pursuant to which Compass was ordered to cease and desist all mortgage lending/agent activities in Nevada, a copy of which is attached hereto as Exhibit D.

55. Compass as enacted policies regarding the allocation of loan proceeds collected at their sole discretion, whether the source of proceeds are from payments made by borrowers or proceeds gained through a sale of the collateral upon foreclosure, which are contrary to the terms of the underlying Notes, deeds of trust and Loan Servicing Agreements, and are unprecedented in the industry.

56. Pursuant to Section 5 of the Loan Servicing Agreement, the loan servicer had the right to retain, as compensation for servicing loans, (a) a servicing fee varying between 1-3% per annum; (2) any late charges collected from the borrower; and (c) any default interest collected from the borrower pursuant to the terms of the note.

57. The loan servicer under the Loan Servicing Agreements is only authorized to retain default interest for itself if the direct lenders exercise their option to charge default interest, and only if default interest is actually collected from the borrower.

58. While purportedly acting as Plaintiff's loan servicer under the Loan Servicing Agreements, Compass has effectuated a strategy and approach to sit on collateral for an unknown period of time, in order to allow the accumulation and accrual of default interest, which it can take off the top of any foreclosure proceeds, which leaves Plaintiffs' and other direct lenders' cash investments significantly diminished in value, if not virtually worthless, depending upon how long the delinquent loans are allowed to continue to accrue default interest and late fees without the initiation of foreclosure proceedings.

59. The unpaid principal balance on the loans in which Plaintiffs are direct lenders total in excess of $485 million. The servicing fee and default interest fees that Compass claims it is entitled to accrue in excess of 10% per annum or over $4 million per month that they choose to do nothing to collect on the loans, to the detriment of Plaintiffs and other

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

direct lenders.

60.     Compass completed extensive due diligence on the loans in order to formulate their bid for the FTDF assets.  Silar was aware of the results of such due diligence.

61.     In the three months have passed since Compass closed on the asset purchase transaction, Compass has failed to failed to provide monthly reports as required by Nevada law and has only generated a total of seven (7) loan status reports

62.     Since taking over as loan servicer, Compass has failed to communicate to Direct Lenders certain offers made by borrowers to repay their debt to the Direct Lenders in violation of Nevada law and their fiduciary duties, in order to continue accruing default interest and other fees for its own benefit.

63.     Since taking over as loan servicer, Compass has negotiated with borrowers for its own benefit, and to the detriment of Direct Lenders, in violation of Nevada law and its fiduciary duties.

64.     Since taking over as loan servicer, Compass has misrepresented the status of loans to Direct Lenders for the purpose of coercing the direct lenders to agree to modifications to loan documents, resulting in additional undisclosed fees to Compass, which is violation of its fiduciary duties and Nevada law.

65.     Since taking over as loan servicer, Compass has taken the position that it is entitled to be paid default interest and other fees, prior to Direct Lenders being paid principal and interest.

66.     Since taking over as loan servicer, Compass has applied principal and interest payments made by borrowers to pay itself so-called loan origination fees.

67.     Since taking over as loan servicer, Compass has failed to produce, keep and maintain records and reports required by Nevada Revised Statutes, Chapter 645B.

68.     Since taking over as loan servicer, Compass has struck secret deals with borrowers, pursuant to which Compass received payments from borrowers, when the Plaintiffs and other direct lenders were not receiving full principal and interest payments from the borrower.

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 17 -

69.     Since taking over as loan servicer, Compass has misrepresented to third parties, including borrowers, title companies and others, that they have the authority to act on behalf of Plaintiffs and other direct lenders.

70.     Since taking over as loan servicer, Compass has purported to make advances on behalf of Plaintiffs and other direct lenders, which it was not authorized to make.

71.     Since taking over as loan servicer, Compass has subjected Plaintiffs and other direct lenders to foreclosure and other expenses without the express authorization of Plaintiffs and other direct lenders.

72.     Since taking over as loan servicer, Compass has engaged in reckless conduct, which has subjected Plaintiffs and other direct lenders to an increased exposure to lender liability lawsuits.

73.     Since taking over as a loan servicer, Compass has engaged in actions that place direct lenders principal investments/loans at substantial risk, without permission of the direct lender.

74.     Since taking over as loan servicer, Compass has breached its fiduciary duty to act in the best interest of Plaintiffs and other direct lenders.

75.     Since taking over as loan servicer, Compass has refused to process direct lender/borrower settlement agreements.

76.     Since taking over as loan servicer, Compass has used to its benefit, and to the determent of Plaintiffs and other direct lenders, a three (3) day deadline to respond to loan resolution offers, even when substantially more time was feasible, in violation of its fiduciary duties.

77.     Since taking over as loan servicer, Compass has had the time and ability to circulate offers to purchase Plaintiffs' and other direct lenders' interests, at substantial discounts, but has not provided sufficient loan status reports for Plaintiffs and other lenders to make informed decisions.

78.     Since taking over as loan servicer, Compass has advised direct lenders that they do not need an attorney, when an independent attorney is advisable, in violation of its

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd  - 18 -

fiduciary duties.

79.    Based on the various acts on Compass, and Compass alone, and NAC 645B.073, Direct Lenders constituting over 51% of the beneficial interests in various loans serviced by Compass have executed written elections pursuant to Section 3 of the Loan Servicing Agreement and NAC 645B.073 to: (1) terminate any rights that Compass may have to service their various Loan; and (2) to appoint an alternate servicing agent for loans.

### D.    The Standard Property Loan.

80.    Each Note executed by borrowers in favor of Plaintiffs and other direct lenders, expressly provides that the lender shall have the option of determining the priority in which payments on each loan are applied.  Each Note further provides that the lender shall have the option to charge a default rate of interest in the event of default by the borrower.

81.    Certain Plaintiffs, and other direct lenders, through USACM, made a direct loan to STANDARD PROPERTY DEVELOPMENT, LLC ("Standard Property"), which loan is commonly known as the Standard Property Loan (hereinafter the "Standard Property Loan").  In connection with the Standard Property Loan, Plaintiffs executed a Power of Attorney, pursuant to which they appointed USACM as their servicer for the Standard Property Loan, governed by the terms of the Loan Servicing Agreement.  As of March 15, 2007, the total principal balance the Standard Property Loan was $9,640,000 ("Standard Property Principal Balance").

82.    On February 27, 2006, Standard Property executed a Promissory Note Secured By Mortgage in favor of certain Plaintiffs and other direct lenders (the "Standard Property Note"), which provides for an interest rate of twelve and one-half percent (12.5%) per annum.  Pursuant to Section 4 of the Standard Property Note all payments on the Note were to first be applied toward the payment of accrued interest.

83.    USACM's right to service the Standard Property Loan on behalf Plaintiffs was transferred to Compass on February 16, 2007.

84.    Pursuant to Section 3(c)(I) of the Loan Servicing Agreement, the loan servicer

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 19 -

is required to proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties principal, interest, late charges, insurance and other specified funds.  Pursuant to Section 5 of the Loan Servicing Agreement, USACM as servicer had the right to retain, as compensation for servicing loans, (a) a servicing fee varying between 1-3% per annum; (2) any late charges collected from the borrower; and (c)  any default interest collected from the borrower pursuant to the terms of the note.

85.    On March 7, 2007, Compass, through Mark L. Olson, Director of Investors Relations for Compass, sent a letter certain Plaintiffs and all other direct lenders in the Standard Property Loan, in which it sought the approval of 100% of the direct lenders in the Standard Property Loan of an agreement Compass reached with Standard Property to pay off the Standard Property Loan.  According to that letter, the terms of the payoff included:

a.    The Direct Lenders in the loan receive 100% of their unpaid Standard Property Principal Balance;

b.    The Direct Lenders do not receive any accrued interest; and

c.    Compass shall release the security interest against Standard Property's real property.

86.    In reliance on the representations of Compass in the March 7, 2007, letter, certain Plaintiffs and other direct lenders constituting 100% of the beneficial interest in the Standard Property Loan approved the payoff in accordance with the specific terms of the March 7, 2007, letter.

87.    On or about March 13, 2007, USACM, through Mark L. Olson, COO,  issued a Payoff Statement to Standard Property (the "Standard Property Payoff Statement"), which required Standard Property to make a payoff, as of March 15, 2007, in the amount of $10,499,068 with a per diem interest accrual of $2,205.74 for every day after March 15, 2007.  The $10,499,068.15 payoff consisted of:

a.    Standard Property Principal Balance:    $    9,640,000.00

b.    Late Fees:    $    47,694.43

c.    Other Fees:    $    267,164.11

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd  - 20 -

1    d.    Default Interest    $    544,509.60

2    88.    The Standard Property Payoff Statement revealed that Compass had a secret

3    agreement with Standard Property, undisclosed to the Standard Property Loan Direct

4    Lenders, whereby Compass received Late Fees, Other Fees and Default Interest from

5    Standard Property, without collecting accrued contractual interest owed to the Direct

6    Lenders.

7    89.    On or about March 15, 2007, Standard Property paid off the Standard Property

8    Loan pursuant to the terms of the Standard Property Payoff Statement.  At the time the

9    Standard Loan was paid off, Compass did not pay the Standard Property Loan direct lenders

10    any of the accrued interest they were owed, but took the available funds pay themselves

11    default interest, late fees and other fees totaling $859,368.14.

12    90.    At the time the Standard Loan was paid off, Compass and Silar directed the

13    escrow company to wire $859,068.14 of Plaintiffs and other direct lenders principal loan

14    proceeds directly to Silar.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Declaratory Relief)

18    91.    Plaintiffs  reallege and incorporate by reference each and every allegation

19    contained in paragraphs 1 through 90 as though fully set forth herein.

20    92.    An actual, ripe, and justiciable controversy has arisen and now exists between

21    the Plaintiffs and Compass as follows:

22    a)    Plaintiffs contend that pursuant to NAC 645B.073, Plaintiffs and other

23        direct lenders have an absolute right to replace Compass as loan

24        servicer in any loan provided 51% of the beneficial interests of the

25        Loan have made the decision to do so.  Compass contends that it cannot

26        be terminated as loan servicer based solely on NAC 645B.073.

27    b)    Plaintiffs contend that payments made by borrowers are first to be

28        applied to accrued non-default rate interest and then to principal, and

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 21 -

1    then to default interest and late fees, which priority may only be altered

2    by the direct lenders in each loan.  Compass contends that all payments

3    by borrowers are first applied to pay Compass default interest and late

4    fees.

5    c)    Plaintiffs contend that a lender in a loan secured by real property has an

6          absolute right to modify the terms of their promissory note and deed of

7          trust to maximize their recovery, irrespective of the rights of any third-

8          party loan servicer.  Compass contends that Plaintiffs have no right to

9          modify the terms of their note and deed of trust with the third-party

10         borrower.

11   d)    Plaintiffs contend that as a result of the maturity of various loans in the

12         USACM portfolio, Compass no longer has a valid power of attorney to

13         act on behalf of Plaintiffs on such Loans, as is required by NRS

14         645B.330.  Compass maintains that it still has the power and authority

15         to act on Plaintiff's behalf.

16   e)    Plaintiffs contend that pursuant to the Notes executed by third-party

17         borrowers in favor of Plaintiffs and other direct lenders, the direct

18         lenders have the right to determine the priority of allocating payments

19         made by the third-party borrower.  Compass maintains that it, as the

20         loan servicer, has the right to determine the priority of allocating

21         payments.

22   f)    Plaintiffs contend that, based upon Compass' breaches of the Loan

23         Servicing Agreements, upon termination of the Loan Servicing

24         Agreement Compass is not entitled to any compensation provided for

25         in section 5 of the Loan Servicing Agreements.  Plaintiff are informed

26         and believe that Compass contends that it has an absolute right to

27         collect default interest.

28   g)    Plaintiffs contend that they are entitled to terminate their Loan

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 22 -

Servicing Agreements with Compass by virtue of Compass' actions in connection with certain loans, as detailed above. Plaintiffs are informed and believe that Compass contends that Plaintiffs are not entitled to terminate the Loan Servicing Agreements.

93. A determination of the disputes set forth in paragraph 92, above, is necessary and appropriate at this time in order to resolve the adverse interests of Plaintiffs and Compass.

WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

### SECOND CLAIM FOR RELIEF

### (Breach of Contract)

94. Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 93 as though fully set forth herein.

95. Plaintiffs have performed all of her obligations under the Loan Servicing Agreement.

96. Compass breached the Loan Servicing Agreement by:

a. failing to pay accrued contractual interest to Plaintiffs;

b. failing to communicate to Plaintiffs certain offers made by borrowers to repay their debt to the Direct Lenders;

c. negotiating with borrowers for its own benefit, and to the detriment of Plaintiffs;

d. misrepresenting the status of loans to Plaintiffs;

e. taking funds that were available to pay accrued interest to Plaintiffs to pay itself Default Interest, Late Fees and Other Fees;

f. applying principal and interest payments made by borrowers to pay itself so-called loan origination fees;

g. failing to produce, keep and maintain appropriate accounting records on each loan as required by section 2(b) of the Loan Servicing Agreements;

h. striking secret deals with borrowers, pursuant to which Compass

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 23 -

1  received payments from borrowers, when the Plaintiffs and other direct lenders were not

2  receiving full principal and interest payments from the borrower; and

3             i.       failing to promptly pay Plaintiffs principal and interest as

4  required by section 2(c)(I) of the Loan Servicing Agreements.

5          97.     Compass breached the Loan Servicing Agreements, which are expressly

6  governed by Nevada law, because Compass is not licensed as a mortgage broker/agent in

7  Nevada.

8          98.     Compass breached the Loan Servicing Agreements, which are expressly

9  governed by Nevada law, because Compass has been ordered by the State of Nevada cease

10  and desist the performance of its obligations under the Loan Servicing Agreements and,

11  therefore, Compass is unable to lawfully perform its required services under the Loan

12  Servicing Agreement.

13          99.     As a result of Compass' breaches of the Loan Servicing Agreement, Plaintiffs

14  suffered damages in an amount to be proven at trial.

15  WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

16  **THIRD CLAIM FOR RELIEF**

17  **(Breach of Fiduciary Duty)**

18        100.     Plaintiffs reallege and incorporate by reference each and every allegation

19  contained in paragraphs 1 through 99 as though fully set forth herein.

20        101.     Compass owed a fiduciary duty to Plaintiffs as a loan servicer under the Loan

21  Servicing Agreements.

22        102.     Compass breached its fiduciary duty to Plaintiffs by:

23            a.       failing to pay accrued contractual interest to Plaintiffs;

24            b.       failing to communicate to Plaintiffs certain offers made by

25  borrowers to repay their debt to the Direct Lenders;

26            c.       negotiating with borrowers for its own benefit, and to the

27  detriment of Plaintiffs;

28            d.       misrepresenting the status of loans to Plaintiffs;

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579
H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 24 -

1           e.     taking funds that were available to pay accrued interest to

2  Plaintiffs to pay itself Default Interest, Late Fees and Other Fees;

3           f.     applying principal and interest payments made by borrowers to

4  pay itself so-called loan origination fees;

5           g.    by striking secret deals with borrowers, pursuant to which

6  Compass received payments from borrowers, when the Plaintiffs and other direct lenders

7  were not receiving full principal and interest payments from the borrower; and

8           h.    by collecting Default Interest, Late Fees and Other Fees on its

9  own behalf, without collecting accrued non-default interest on behalf of Plaintiffs.

10       103.   As a result of Compass breaching its fiduciary duty to Plaintiffs, Plaintiffs has

11  suffered damages in an amount to be proven at trial in this matter.

12  WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

13  ///

14  ///

15                 **FOURTH CLAIM FOR RELIEF**

16      **(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)**

17       104.   Plaintiffs reallege and incorporate by reference each and every allegation

18  contained in paragraphs 1 through 103 as though fully set forth herein.

19       105.   Compass owed Plaintiffs a duty of good faith and fair dealing arising from the

20  Loan Servicing Agreement.

21       106.   Plaintiffs imposed a special element of reliance in Compass as their loan

22  servicer, who stands in a superior and entrusted position in connection with Compass'

23  negotiation of the payoff of the Standard Property Loan and in performing all other services

24  under the Loan Servicing Agreement.

25       107.   Compass breached the duty of good faith and fair dealing it owed to Plaintiffs

26  by:

27           a.    failing to pay accrued contractual interest to Plaintiffs;

28           b.    failing to communicate to Plaintiffs certain offers made by

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 25 -

borrowers to repay their debt to the Direct Lenders;

            c.     negotiating with borrowers for its own benefit, and to the detriment of Plaintiffs;

            d.     misrepresenting the status of loans to Plaintiffs;

            e.     taking funds that were available to pay accrued interest to Plaintiffs to pay itself Default Interest, Late Fees and Other Fees;

            f.     applying principal and interest payments made by borrowers to pay itself so-called loan origination fees;

            g.     by striking secret deals with borrowers, pursuant to which Compass received payments from borrowers, when the Plaintiffs and other direct lenders were not receiving full principal and interest payments from the borrower; and

            h.     by collecting Default Interest, Late Fees and Other Fees on its own behalf, without collecting accrued non-default interest on behalf of Plaintiffs.

    108.    Plaintiffs suffered damages in an amount to be proven at trial as a result of Compass breaching the duty of good faith and fair dealing it owed to her.

WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Constructive Fraud)

    109.    Plaintiffs realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 108 as though fully set forth herein.

    110.    Compass owed Plaintiffs legal and equitable duties arising from their fiduciary and confidential relationship.

    111.    Compass breached its duties to Plaintiffs by misrepresenting the actual negotiated terms of loan payoffs.

    112.    Compass breached its duties to Plaintiffs by concealing material terms of the loan payoffs.

    113.    Compass breached its duties to Plaintiffs by misrepresenting the terms of payoff compromise offers made by borrowers.

Law Offices of
**ALAN R. SMITH**
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 26 -

114.    Compass breached its duties to Plaintiffs by concealing the terms of payoff compromise offers made by borrowers.

115.    Plaintiffs suffered damages in an amount to be proven at trial as a result of Compass' constructive fraud.

WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

## SIXTH CLAIM FOR RELIEF

## (Fraudulent Misrepresentation)

116.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 115 as though fully set forth herein.

117.    Compass made false representations to Plaintiffs regarding the negotiated terms of the Standard Loan payoff.

118.    Compass knew or believed that is representations regarding the Standard Loan payoff were false.

119.    Compass intended to induce Plaintiffs to act upon its misrepresentation by approving the Standard Loan payoff.

120.    Plaintiffs justifiably relied on Compass' misrepresentations and approved the Standard Loan payoff.

121.    As a result of Compass' fraudulent misrepresentation, Plaintiffs suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

## SEVENTH CLAIM FOR RELIEF

## (Conversion)

### (Compass)

122.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 121 as though fully set forth herein.

123.    Compass has wrongfully exerted domain and control over principal loan proceeds from third-party borrowers, which proceeds belong to Plaintiffs and other direct lenders.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 27 -

124.   Compass' taking of Plaintiffs' principal loan proceeds is inconsistent with Plaintiffs' right, title and interest in those proceeds.

125.   Compass' taking of Plaintiff's loan proceeds is in derogation, exclusion and defiance of Plaintiffs' right, title and interest in those proceeds.

WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

## EIGHTH CLAIM FOR RELIEF

### (Conversion)

(Silar)

126.   Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 125 as though fully set forth herein.

127.   Silar has wrongfully exerted domain and control over principal loan proceeds from the Standard Loan Payoff belonging to Plaintiffs and other direct lenders.

128.   Silar's taking of Plaintiffs' Standard Loan proceeds is inconsistent with Plaintiffs' right, title and interest in those proceeds.

129.   Silar's taking of Plaintiff's Standard Loan proceeds is in derogation, exclusion and defiance of Plaintiffs' right, title and interest in those proceeds.

WHEREFORE, Plaintiffs respectfully request judgment as set forth below.

## NINTH CLAIM FOR RELIEF

### (Civil Conspiracy)

(All Defendants)

130.   Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 129 as though fully set forth herein.

131.   Silar had knowledge of Compass business plan when it financed the purchase of the Loan Servicing Agreements.

132.   Silar had knowledge of Plaintiffs and other direct lenders' rights when it took proceeds from the Standard Loan Payoff.

133.   Piskun and Blatt, the principals and beneficiaries of Compass, formed and operate Compass for the purpose of conducting activities prohibited by Nevada law.

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada 89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd - 28 -

1   134.   Compass, Piskun, Blatt and Silar, by acting in concert, intended to accomplish

2   an unlawful objective for the purpose of harming Plaintiffs and other direct lenders, as

3   detailed above and incorporated herein.

4   135.   Plaintiffs have suffered damages resulting from the concerted acts of Compass,

5   Piskun, Blatt and Silar,

6   WHEREFORE, Plaintiffs respectfully request judgment as follows:

7       a.   For a declaration by this Court that Plaintiffs, together with other direct

8            lenders making up 51% of the beneficial interests of any loan, have the

9            absolute right under NAC 645B.073 to terminate Compass as loan

10           servicer for each loan and to designate a new loan servicer;

11      b.   For a declaration of this Court that Compass' actions related to the

12           Standard Property Loan entitles Plaintiffs to terminate the Loan

13           Servicing Agreement as it applies to all loans in which Plaintiffs are

14           direct lenders;

15      c.   For a declaration of this Court that Plaintiffs and other direct lenders

16           have an absolute right to modify the terms of their promissory note and

17           deed of trust with the third-party borrower to maximize their recovery;

18      d.   For a declaration of this Court that as a result of the maturity of various

19           loans in the USACM portfolio, Compass has never had a valid power

20           of attorney to act on behalf of Plaintiffs on such Loans, as is required

21           by NRS 645B.330.

22      e.   For a declaration that Plaintiffs and other direct lenders have the right

23           to determine the priority of allocating payments made by any third-party

24           borrower, and that Compass has no such right.

25      f.   For a declaration by this Court that Compass is not entitled to any

26           compensation under section 5 of the Loan Servicing Agreements;

27      g.   For a declaration that Plaintiffs are entitled to terminate Compass as

28           servicer on any loan based upon breaches of the Loan Servicing

Law Offices of
ALAN R. SMITH
505 Ridge Street
Reno, Nevada  89501
(775) 786-4579

H:\USA Lenders\v Compass Partners\Complaint v Compass FINAL.wpd  - 29 -

1    Agreement by Compass;

2    h.    For a declaration that payments made by borrowers on loans shall first

3          be applied to accrued non-default rate interest, then to principal, and

4          then to accrued default interest and late fees, subject only to the rights

5          of direct lenders on a specific loan to designate a different sequence of

6          payment;

7    i.    For an award of damages against Compass in an amount in excess of

8          $75,000, to be proven at trial in this matter;

9    j.    For an award of damages against Silar in an amount excess of $75,000,

10         to be proven at trial in this matter;

11   k.    For an award of damages against Blatt in an amount excess of $75,000,

12         to be proven at trial in this matter;

13   l.    For an award of damages against Piskun in an amount excess of

14         $75,000, to be proven at trial in this matter;

15   m.    For an award of punitive damages;

16   n.    For an award of reasonable attorneys' fees;

17   o.    For costs of suit incurred herein; and

18   p.    For such other and further relief as this Court deems just and proper.

19   **DATED** this 21st day of May, 2007.

20         LAW OFFICES OF ALAN R. SMITH

21         By:_____*/s/ Kevin A. Darby, Esq.*_____

22         ALAN R. SMITH, ESQ.
           KEVIN A. DARBY, ESQ.
           Attorney for Plaintiffs

23

24

25

26

27

28

Exhibit "A"

**STATE OF NEVADA**
**DEPARTMENT OF BUSINESS AND INDUSTRY**
**DIVISION OF MORTGAGE LENDING**

In Re:                                    )
                                          )
USA COMMERCIAL MORTGAGE        )        **FINAL ORDER CONDITIONING**
COMPANY,                                   )        **MORTGAGE BROKER'S LICENSE**
d/b/a USA CAPITAL,                       )
                                          )
                Respondent.           )

The STATE OF NEVADA, DEPARTMENT OF BUSINESS AND INDUSTRY, DIVISION OF MORTGAGE LENDING ("Division"), having served USA Commercial Mortgage Company, d/b/a USA Capital ("Respondent"), on May 1, 2006, with an **Order Conditioning Mortgage Broker's License**, attached hereto as Exhibit 1, and incorporated herein by this reference, notifying Respondent that a final order would be entered unless, within 20 days after entry and receipt of the order, Respondent requested in writing a hearing to contest the charges, and the Respondent having failed to request a hearing in this matter, and good cause appearing;

IT IS HEREBY ORDERED that Respondent's license is conditioned upon the Respondent not making any loans secured by liens on real property funded by private, non-institutional investors; Respondent may only make loans secured by liens on real property funded by institutional investors.

///
///
///

-1-

EXHIBIT " A "

1    The Division is currently conducting an investigation into USA's past activities and does

2    not represent that the Factual Allegations in the attached Exhibit 1 are complete, or that the

3    entry of the Final Order conditioning of Respondent's license will be the only action that the

4    Division intends to take against Respondent.

7    DATED this 9th day of June 30, 2006.

8    

9                          DIVISION OF MORTGAGE LENDING

10

11   By: _____
     SCOTT BICE, COMMISSIONER

12

-2-

**AFFIDAVIT OF SERVICE**

STATE OF NEVADA        )
                       )
COUNTY OF CLARK        )

I HEREBY CERTIFY that on the 12th day of June 2006, I served the foregoing Final Order Conditioning Mortgage Broker's License upon USA Commercial Mortgage Company dba USA Capital at 4484 S. Pecos Road, Las Vegas, State of Nevada, by:

1.      Personally delivering a copy to the following person at: 4484 S. Pecos Road, Las Vegas, State of Nevada

_____
Person Receiving Service

_____
Person Making Service

SUBSCRIBED AND SWORN to me

This 12 day of June 2006.
By:

_____
NOTARY PUBLIC in and for said
County and State

AMANDA STEVENS
NOTARY PUBLIC
STATE OF NEVADA
Date Appointment Exp: 01-16-2010
Certificate No: 02-72937-1

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY
DIVISION OF MORTGAGE LENDING

In re:

USA COMMERCIAL MORTGAGE
COMPANY, d/b/a USA CAPITAL,

               Respondent.

_____

<u>ORDER CONDITIONING MORTGAGE BROKER'S LICENSE</u>

<u>NOTICE OF RIGHT TO REQUEST HEARING</u>

      The licensing and regulation of mortgage brokers in the State of Nevada is governed by chapter 645B of the Nevada Revised Statutes ("NRS") and chapter 645B of the Nevada Administrative Code ("NAC"). The State of Nevada, Department of Business and Industry, Mortgage Lending Division ("Division") has the general duty to exercise supervision and control over mortgage brokers and mortgage brokering activity. NRS 645B.060(1), NRS 645B.690 (1)(a) and NRS 645B.670. Pursuant to that authority, the Division makes the following Findings of Fact, Conclusions of Law, and Order as follows:

<u>FACTUAL ALLEGATIONS</u>

      1.     USA Commercial Mortgage Company, dba USA Capital ("USA") is a licensed mortgage broker operating within the State of Nevada. USA Capital was issued a mortgage broker's license pursuant to NRS 645B on January 11, 1990.

      2.     On Thursday, April 13, 2006, USA filed a voluntary petition for reorganization under Chapter 11 in the U.S. Bankruptcy Court of the Southern District of Nevada.

      3.     On or after April 13, 2006, USA stated to the Division that a significant number of borrowers were currently, and should have previously been considered delinquent on the payment of loans secured by liens on real property. USA also indicated that it continued to pay investors the stated amount of interest on loans which should have been considered delinquent.

4.     Thomas Allison retained by USA as Chief Restructuring Officer, stated to the Division that USA had continued to pay investors on loans which had defaulted from other loans which had partial or complete payments of principal.

5.     USA controlled and directed the activity of the individual trust accounts to which monies were collected from borrowers for complete or partial repayment of principal and interest payments on loans secured by liens on real property.

6.     USA failed to reveal on its required monthly activity reports to the Commissioner that it had borrowers/ debtors with loans secured by liens on real property who had failed to make two or more consecutive payments in accordance with the terms of their loans.  USA also failed to notify investors/lenders that borrowers had failed to make two or more consecutive payments in accordance with the terms of their loans secured by liens on real property.

## ALLEGED VIOLATIONS OF LAW

The licensing and regulation of mortgage brokers and mortgage agents in the State of Nevada is governed by NRS chapter 645B and NAC chapter 645B.  The Division has the duty to exercise supervision and control over mortgage brokers.  NRS 645B.060(1).  In addition, the Division has the responsibility to take disciplinary action for certain violations of NRS chapter 645B or NAC chapter 645B.

NRS 645B.670 provides in relevant part:

> 2.  For each violation committed by a mortgage broker, the Commissioner may impose upon the mortgage broker an administrative fine of not more than $10,000, may suspend, revoke or place conditions upon his license, or may do both, if the mortgage broker, whether or not acting as such:
> (c) Does not conduct his business in accordance with law or has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner;

1.     USA controlled and directed the activity of individual trust accounts where money paid by borrowers for complete or partial repayment of principal and interest on their loans secured by liens on real property was to be kept.  NRS 645B.175(4) requirements of

mortgage brokers when mortgage brokers maintain/service accounts where money paid by borrowers for complete or partial repayment on loans secured by liens on real property is kept. In relevant part, NRS 645B.175 states:

4. Except as otherwise provided in this section, all money paid to a mortgage broker and his mortgage agents by a person in full or in partial payment of a loan secured by a lien on real property, must:
(a) Be deposited in:
(1) An insured depository financial institution; or
(2) An escrow account which is controlled by a person who is subject to instructions regarding the account which are approved by the parties.
(b) Be kept separate from money:
(1) Belonging to the mortgage broker in an account appropriately named to indicate that it does not belong to the mortgage broker.
(2) Received pursuant to subsection 1.
5. Except as otherwise provided in this section, the amount held in trust pursuant to subsection 4:
(a) Must be released, upon the deduction and payment of any fee or service charge due the mortgage broker, to each investor who owns a beneficial interest in the loan in exact proportion to the beneficial interest that he owns in the loan; and
(b) Must not be released, in any proportion, to an investor who owns a beneficial interest in the loan, unless the amount described in paragraph (a) is also released to every other investor who owns a beneficial interest in the loan.
6. An investor may waive, in writing, the right to receive one or more payments, or portions thereof, that are released to other investors in the manner set forth in subsection 5. A mortgage broker or mortgage agent shall not act as the attorney-in-fact or the agent of an investor with respect to the giving of a written waiver pursuant to this subsection. Any such written waiver applies only to the payment or payments, or portions thereof, that are included in the written waiver and does not affect the right of the investor to:
(a) Receive the waived payment or payments, or portions thereof, at a later date; or
(b) Receive all other payments in full and in accordance with the provisions of subsection 5.
. . .
9. If a mortgage broker or a mortgage agent receives any money pursuant to this section, the mortgage broker or mortgage agent, after the deduction and payment of any fee or service charge due the mortgage broker, shall not release the money to:
(a) Any person who does not have a contractual or legal right to

(b) Any person who has a contractual right to receive the money if the mortgage broker or mortgage agent knows or, in light of all the surrounding facts and circumstances, reasonably should know that the person's contractual right to receive the money violates any provision of this chapter or a regulation adopted pursuant to this chapter.

(a)     USA violated NRS 645B.175 (4)(a) because it did not deposit money received from borrowers for complete or partial repayment of principal and interest payments on loans secured by liens on real property in an insured depository financial institution or in an escrow account controlled by a person subject to instructions regarding the account that were approved by the parties.  Rather, USA took borrower money it received in full or partial repayment of borrower loans secured by liens on real property and used this money to pay investors of loans that were in default.

(b)     USA violated NRS 645B.175(5)(a) because it did not release, after payment of any fee or service charge due to the mortgage broker, money received for complete or partial repayment of principal and interest on loans secured by liens on real property to each investor who owned a beneficial interest in the exact proportion to the interest that the investor owned in the loan;  rather, USA took the money it received in complete or partial repayment of principal and interest on loans secured by liens on real property and used this money to pay investors of loans that were in default.

(c)     USA violated NRS 645B.175(9)(a) because it released money to investors of loans secured by liens on real property that were in default who did not have a contractual or legal right to receive the money.  Rather USA took the money it received in full or partial repayment of principal and interest on loans secured by liens on real property and used this money to pay the investors of loans that had defaulted.

2.     USA violated NRS 645B.250, which states:

Except pursuant to a contract for the collection or servicing of a loan which is governed by the requirements established by the Government National Mortgage Association, Federal Home Loan Mortgage Corporation or Federal National Mortgage Association, a mortgage broker or mortgage agent shall not advance payments to

an investor on behalf of a person who has obtained a loan secured by a lien on real property and who has defaulted in his payments.

(a)     Mr. Allison admitted to the Division that USA was advancing payments to investors on behalf of borrowers who had defaulted on loan secured by liens on real property.

3.     USA    violated NRS 645B.260, which states:

> 1.  If a mortgage broker maintains any accounts described in subsection 4 of NRS 645B.175 in which the mortgage broker deposits payments from a debtor on a loan secured by a lien on real property and, on the last day of any month, the debtor has failed to make two or more consecutive payments in accordance with the terms of the loan, the mortgage broker shall:
> (a) Include in the report that the mortgage broker submits to the Commissioner pursuant to subsection 2 of NRS 645B.080 the information relating to delinquencies in payments and defaults that is required by the regulations adopted pursuant to subsection 2;
> (b) Not later than 15 days after the last day of each such month, mail to the last known address of each investor who owns a beneficial interest in the loan a notice containing the information relating to delinquencies in payments and defaults that is required by the regulations adopted pursuant to subsection 2; and
> (c) Comply with the provisions of this section each month on a continuing basis until:
> (1) The debtor or his designee remedies the delinquency in payments and any default; or
> (2) The lien securing the loan is extinguished.
> 2.  The Commissioner:
> (a) Shall adopt regulations prescribing the information relating to delinquencies in payments and defaults that a mortgage broker must include in his report to the commissioner and in the notice mailed to investors pursuant to subsection 1. Such regulations may provide for variations between the information that a mortgage broker must include in his report to the Commissioner and the information that a mortgage broker must include in the notice mailed to investors.
> (b) May adopt any other regulations that are necessary to carry out the provisions of this section.

With regard to notice obligations owed to investors, NAC 645B.070 further defines the obligations of a mortgage broker.  NAC 645B.070 states in relevant part, that:

> 2.  If, on the last day of any month, a debtor has failed to make two or more consecutive payments in accordance with the terms of the loan, a mortgage broker who is performing loan

servicing and maintains any accounts described in subsection 4 of NRS 645B.175 shall:

    (a) Include in his report to the Commissioner:

       (1) The name, address and telephone number of the debtor;

       (2) The total number and amount of any payments made on the current delinquency;

       (3) The outstanding balance of the loan and any accrued interest on the last day of the month for which the report is submitted;

       (4) A statement of whether the loan has been declared to be in default and, if so, the nature of any actions that have been taken because of the default; and

       (5) The date on which the mortgage broker sent the notice to investors required pursuant to paragraph (b) of this subsection and paragraph (b) of subsection 1 of NRS 645B.260.

    (b) Mail a notice containing the following information to the last known address of each investor who owns a beneficial interest in the loan not later than 15 days after the last day of each such month:

       (1) The name, address and telephone number of the debtor;

       (2) The total number of months and days that the debtor has failed to make a payment;

       (3) The outstanding balance of the loan and any accrued interest on the last day of the month for which the notice is submitted; and

       (4) A statement of whether the loan has been declared to be in default and, if so, the nature of any actions that have been taken because of the default.

    3. If the mortgage broker is not servicing any loans in which a debtor has failed to make two or more consecutive payments in accordance with the terms of the loan, the monthly report required pursuant to subsection 1 must state that fact.

    4. The mortgage broker must comply with the provisions of subsection 2 each month until:

    (a) The debtor or his designee remedies the delinquency in payments and any default; or

    (b) The lien securing the loan is extinguished.

    5. The Commissioner may refuse to renew the license of a mortgage broker who has not submitted a monthly report required by subsection 1 for 1 or more of the preceding 12 months.

    (a)    USA violated NRS645B.280(1)(a) because it failed to report the Division on it monthly activity reports that it had any delinquent loans secured by liens on real property, ye after USA filed bankruptcy Allison informed the Division that USA had delinquent loans.

1    (b)    USA violated NRS645B.280(1)(b) because it did not, no later than 15 days after

2    the last day of the month, when it was aware that debtors had failed to make two or more

3    consecutive payments in accordance with the terms of the loan, mail to investors who owned

4    beneficial interests in the defaulting loans, the debtors name, address and telephone number,

5    nor did USA ever mail to investors and of the information required in NRS 645B.070(5), nor

6    did it indicate in any way to investors that their loans were in default when, in some cases,

7    borrowers had not paid on their loans secured by liens on real property.

8

9    5.    USA violated NRS 645B.670. NRS 645B.670 states:

10

11   Except as otherwise provided in NRS 645B.690:
      1. For each violation committed by an applicant for a license
12    issued pursuant to this chapter, whether or not he is issued a
      license, the Commissioner may impose upon the applicant an
13    administrative fine of not more than $10,000, if the applicant:
      (a) Has knowingly made or caused to be made to the
14    Commissioner any false representation of material fact;
      (b) Has suppressed or withheld from the Commissioner any
15    information which the applicant possesses and which, if submitted
      by him, would have rendered the applicant ineligible to be licensed
16    pursuant to the provisions of this chapter; or
      (c) Has violated any provision of this chapter, a regulation
17    adopted pursuant to this chapter or an order of the Commissioner
      in completing and filing his application for a license or during the
18    course of the investigation of his application for a license.
      2. For each violation committed by a mortgage broker, the
19    Commissioner may impose upon the mortgage broker an
      administrative fine of not more than $10,000, may suspend,
20    revoke or place conditions upon his license, or may do both, if the
      mortgage broker, whether or not acting as such:
21    (a) Is insolvent;
      (b) Is grossly negligent or incompetent in performing any act
22    for which he is required to be licensed pursuant to the provisions
      of this chapter;
23    (c) Does not conduct his business in accordance with law or
      has violated any provision of this chapter, a regulation adopted
24    pursuant to this chapter or an order of the Commissioner;
      (d) Is in such financial condition that he cannot continue in
25    business with safety to his customers;
      (e) Has made a material misrepresentation in connection with
26    any transaction governed by this chapter;

27

28

(f) Has suppressed or withheld from a client any material facts, data or other information relating to any transaction governed by the provisions of this chapter which the mortgage broker knew or, by the exercise of reasonable diligence, should have known;

(g) Has knowingly made or caused to be made to the Commissioner any false representation of material fact or has suppressed or withheld from the Commissioner any information which the mortgage broker possesses and which, if submitted by him, would have rendered the mortgage broker ineligible to be licensed pursuant to the provisions of this chapter;

(h) Has failed to account to persons interested for all money received for a trust account;

(i) Has refused to permit an examination by the Commissioner of his books and affairs or has refused or failed, within a reasonable time, to furnish any information or make any report that may be required by the Commissioner pursuant to the provisions of this chapter or a regulation adopted pursuant to this chapter;

(j) Has been convicted of, or entered a plea of nolo contendere to, a felony relating to the practice of mortgage brokers or any crime involving fraud, misrepresentation or moral turpitude;

(k) Has refused or failed to pay, within a reasonable time, any fees, assessments, costs or expenses that the mortgage broker is required to pay pursuant to this chapter or a regulation adopted pursuant to this chapter;

(l) Has failed to satisfy a claim made by a client which has been reduced to judgment;

(m) Has failed to account for or to remit any money of a client within a reasonable time after a request for an accounting or remittal;

(n) Has commingled the money or other property of a client with his own or has converted the money or property of others to his own use;

(o) Has engaged in any other conduct constituting a deceitful, fraudulent or dishonest business practice;

(p) Has repeatedly violated the policies and procedures of the mortgage broker;

(q) Has failed to exercise reasonable supervision over the activities of a mortgage agent as required by NRS 645B.460;

(r) Has instructed a mortgage agent to commit an act that would be cause for the revocation of the license of the mortgage broker, whether or not the mortgage agent commits the act;

(s) Has employed a person as a mortgage agent or authorized a person to be associated with the mortgage broker as a mortgage agent at a time when the mortgage broker knew or, in light of all the surrounding facts and circumstances, reasonably should have known that the person:

(1) Had been convicted of, or entered a plea of nolo contendere to, a felony relating to the practice of mortgage agents or any crime involving fraud, misrepresentation or moral turpitude; or

(2) Had a financial services license or registration suspended or revoked within the immediately preceding 10 years;

(t) Has failed to pay a tax as required pursuant to the provisions of chapter 363A of NRS; or

(u) Has not conducted verifiable business as a mortgage broker for 12 consecutive months, except in the case of a new applicant. The Commissioner shall determine whether a mortgage broker is conducting business by examining the monthly reports of activity submitted by the mortgage broker or by conducting an examination of the mortgage broker.

(a)    USA violated NRS 645B.670(1)(a) because it knowingly made to the Division a false representation of material fact, To Wit: USA did not indicate on its monthly activity reports to the Division that it had any loans in default, and therefore represented that all of its loans were being paid by borrowers in accordance with terms of the loan.

(b)    USA violated NRS 645B.670(c) because it has violated NRS 645B.175, NRS 645B.280, ad NAC 645B.070, as referenced above.

(c)    USA violated NRS 645B.670(f) because it suppressed or withheld from investors the fact that many of the investors' loans secured by liens on real property were no being paid in accordance with the terms of the loan agreements, but were in fact in default.

(d)    USA violated NRS 645B.670(o) because it engaged in a deceitful, fraudulent o dishonest business practice, To Wit: USA took money from accounts containing money from borrowers who had paid off their loans and used that money to pay investors whose loan were in default.

6.    The Division is still conducting an investigation into USA's past activities an does not represent that the findings listed in this Order Conditioning Mortgage Broker' License are complete, or that the action it seeks to take against USA in this Order will be th only action that the Division intends to take against USA.

7.    NRS 645B.670(2) allows the Commissioner to suspend, revoke or plac conditions upon a mortgage broker's license if the broker violates NRS 645B.670. Th Division alleges that USA has violated provisions of NRS 645B.670. Therefore, th Commissioner may suspend, revoke or condition USA's mortgage broker license. Th Commissioner therefore imposes certain conditions USA's mortgage broker's license. Thes

1 conditions are: USA will not make any loans secured by liens on real property funded by
2 private, non-institutional investors; USA may only make loans secured by liens on real
3 property funded by institutional investors.

4 <u>ORDER</u>

5 **NOW, THEREFORE, IT IS HEREBY ORDERED** that USA mortgage broker's license is
6 conditioned upon USA not making any loans secured by liens on real property funded by
7 private, non-institutional investors; USA may only make loans secured by liens on real
8 property funded by institutional investors.

9 **IT IS FURTHER ORDERED** that, pursuant to NRS 645B.750, upon written application
10 to the Division, that USA entitled to a hearing with regard to this Order. Should USA not
11 request a hearing within **twenty (20) days** of the receipt of this Order, the Division will enter a
12 Final Order in this matter as required by NRS 645B.750(2).

13 DATED this _____st day of May 2006.

14                   STATE OF NEVADA
                    DEPARTMENT OF BUSINESS AND INDUSTRY
15                  DIVISION of MORTGAGE LENDING
16
17 By: _____
18                   Scott Bice, Commissioner
19
20
21
22
23
24
25
26
27
28

Exhibit "B"

# MORTGAGE INVESTMENT DISCLOSURE FORM

**IMPORTANT:** Pursuant to NRS 645B.185, each investor must sign and date a disclosure form before a mortgage broker or mortgage agent accepts money for the investment. This form must be executed for each separate loan in which the investor invests money. A mortgage broker or mortgage agent may not act as the investor's attorney in fact or agent in the signing or dating of this form and may not by agreement alter or waive these disclosure requirements.

Description of loan:_____

## BEFORE YOU INVEST IN A PROMISSORY NOTE SECURED BY AN INTEREST IN REAL PROPERTY, YOU SHOULD KNOW . . .

The funding of a loan or purchase of a promissory note that is secured by a lien on real property (mortgage loan) is an investment that involves some risk.

An investment in a promissory note secured by a lien on real property, usually through a deed of trust (mortgage loan or mortgage loan investment), like most investments involves the risk that the investment will not perform as expected. The mortgage broker with whom you are dealing is not a depository institution, and a deed of trust investment is not secured by any depository insurance or insured or guaranteed by any agency of the State of Nevada or the Federal Government. Nevada law prohibits the mortgage broker with whom you are dealing from representing or even implying to you that he will ensure or guarantee that the investment will perform as expected. The borrower on the loan may default in required payments, and you may lose all or part of the principal amount you invested and/or the interest you expected to earn from the investment.

Some of the most significant factors that affect your risk in a mortgage loan investment include: (1) the knowledge, experience and integrity of the mortgage broker with whom you are dealing; (2) the market value and equity of the property that will secure the promissory note; (3) the borrower's financial standing and creditworthiness; (4) the escrow process involving the funding of the loan or purchase of the note; (5) the documents and instruments describing, evidencing and securing the loan; (6) the provisions regarding the collection and servicing of the loan; and (7) the provisions for enforcement of the deed of trust.

## You are entitled to information about the mortgage broker with whom you are investing.

You are entitled to receive information regarding the mortgage broker with whom you are dealing from the Division of Mortgage Lending, which may be contacted at either one of the following locations:

Division of Mortgage Lending
400 W. King Street, Suite 101
Carson City, Nevada 89703
(775) 684-7060

Division of Mortgage Lending
3075 E. Flamingo, Suite 100
Las Vegas, Nevada 89121
(702) 486-0780

You have the right to request the mortgage broker with whom you are dealing to authorize the Division of Mortgage Lending to release to you the most recent financial statement of the mortgage broker on file with the Division. ☐ YES, I would like to review a financial statement. ☐ NO, I would not like to review a financial statement.

Investor Disclosure Page 1

EXHIBIT " B "

Disclosures required by subparagraphs (3) and (4) of paragraph (b) of subsection 6 of NRS 645B.185:

Has any disciplinary action been taken by the commissioner against the mortgage broker or any general partner, officer or director of the mortgage broker within the preceding 12 months? ☐YES ☐NO. If yes, describe below:

_____

_____

Has the mortgage broker or any general partner, officer or director of the mortgage broker been convicted within the preceding 12 months for violating any law, ordinance or regulation that involves fraud, misrepresentation or a deceitful, fraudulent or dishonest business practice? ☐YES ☐NO. If yes, describe below:

_____

_____

You also have the right, pursuant to subsection 3 of NRS 645B.090, to ascertain from the Division of Mortgage Lending:
- Whether the Division of Mortgage Lending has disciplined the mortgage broker during the immediately preceding 5 years.
- The findings and results of any investigation against the mortgage broker pursuant to the provisions of chapter 645B of NRS which was completed during the immediately preceding 5 years and which resulted in a finding by the commissioner that the mortgage broker committed a violation of a provision of this chapter or chapter 645B of NRS or an order of the commissioner.

## You are entitled to have a written appraisal of the property that is to secure your deed of trust investment as well as other information relating to the property.

The law requires the mortgage broker with whom you are dealing to obtain and make available for your inspection a written appraisal of the real property which is to secure the mortgage loan investment unless you specifically waive in writing your right to have the appraisal performed. An appraiser who is licensed or certified to perform real estate appraisals in this state must perform the appraisal if the property is located in this state. The mortgage broker with whom you are dealing is prohibited from performing the appraisal or providing any estimate or opinion of the value of the property that is to secure the mortgage loan investment, unless the mortgage broker is certified or licensed to perform the appraisal pursuant to chapter 645C of NRS. You are entitled to a copy of the appraisal upon request.

☐ I waive my right to an appraisal for this loan. Investor: _____

☐ I wish to review an appraisal for this loan. Date: _____

In addition to a written appraisal, you are entitled to know whether the real property that will secure the loan is encumbered by any other liens and, if so, the priority of each such lien, the amount of debt secured by each such lien and the current status of that debt, including, without limitation, whether the debt is being paid or is in default.

The real property that will secure this loan ☐ is ☐ is not encumbered by any other liens. If other liens exist, describe, for each lien:

Investor Disclosure Page 2

Description: _____

Amount encumbered: _____

Priority: _____

Current status: _____

## You are entitled to review information relating to the financial standing and creditworthiness of the borrower and documentation relating to the mortgage loan. Pursuant to NAC 645B.080, you will be asked to complete a form in which you acknowledge that you had the opportunity to receive and review that information and documentation.

## You are entitled to review documentation relating to how the mortgage loan is funded and serviced.

Nevada law requires the mortgage broker to fund the entire amount of the loan either out of his trust account directly to the borrower or through a third-party escrow agent. In most cases, the loan will be funded through a third-party escrow agent. An escrow is opened when money, documents, instruments and written instructions regarding the transaction (escrow instructions) are conditionally delivered by the principals to a third party (escrow agent). The escrow instructions set forth the conditions that must be satisfied or waived before the escrow agent may disburse your money to the borrower or the note holder. You have the right to review the escrow instructions. The escrow instructions should be consistent with your understanding of the loan transaction and should identity a specific promissory note and deed of trust (or interest therein). Escrow "closes" when all the conditions of the escrow instructions have been waived or satisfied, the instruments have been recorded and the money was disbursed. You have the right to review a closing statement relating to the escrow describing to whom and how the money was disbursed.

In many cases, including those cases where the investments consist of "fractionalized" interests, i.e., ownership of less than 100% of the mortgage investment, the loan requires servicing by an authorized agent. Loan servicing includes collecting payments from borrowers, disbursing payments to investors or note holders, mailing of appropriate notices, monitoring the status of senior liens and encumbrances, maintaining adequate insurance coverage and coordinating foreclosure proceedings. The mortgage broker with whom you are dealing is authorized by Nevada law to act as the servicing agent for the mortgage loan he originates. It is recommended that all persons investing in a mortgage loan which will be serviced by a servicing agent execute a written servicing agreement that clearly specifies the authority granted to the servicing agent. The servicing agreement should address issues such as: (1) the fees for servicing and how they are to be paid; (2) the person who has the authority to instruct the trustee under the deed of trust to commence foreclosure proceedings in the event of a default; (3) how, in the case of a "fractionalized" note and deed of trust with multiple parties owning beneficial interests, the parties are to determine and direct the actions to be taken in the event of default or with respect to other matters that involve the enforcement of terms of the promissory note and/or deed of trust (Nevada law requires that the documentation pertaining to a note and deed of trust owned initially by more than one natural person include a provision by which record holders of 51% or a greater specified percentage of the beneficial interests in the mortgage loan may direct certain actions that require direction or approval of the holders of beneficial interests); (4) the identity of the person responsible for holding the original promissory note and deed of trust; (5) how the loan servicing agreement may be terminated by the investors in the mortgage loan; (6) the right to obtain the names, addresses and phone numbers of other persons with beneficial interests in the loan; and (7) the monitoring of any senior liens.

Investor Disclosure Page 3

A mortgage broker performing loan servicing has an obligation to account to the borrower and every investor for money collected and disbursed in the exercise of that function.

## You have the right to know whether the mortgage broker with whom you are dealing, or any relative of the mortgage broker, is acting in any capacity, or has any other interest, other than as a mortgage broker.

Nevada law requires the mortgage broker with whom you are dealing to disclose to you whether he, or any relative of his, has any personal interest in the mortgage loan other than as a mortgage broker. For example, if the mortgage broker owns a 50% interest in the builder applying for a construction loan, the mortgage broker is required to disclose that interest to you. In addition, if a mortgage broker or a relative of the mortgage broker is licensed as, conducts business as or holds a controlling interest or position in (1) a construction control company, (2) an escrow agency, or (3) a title agent, a title insurer or an escrow officer of a title agent or title insurer, the mortgage broker must fully disclose that relationship to every investor, and may not require, as a condition to the acquisition or purchase of an interest in a mortgage loan, that the investor transact business with or use the services of the other business.

The mortgage broker, or a relative of the mortgage broker, has an interest in this loan in a capacity other than as a mortgage broker. ☐ YES ☐ NO. If yes, explain below:

_____

_____

## Collection of a promissory note and enforcement of a deed of trust involves some risk.

When the borrower on a mortgage loan fails to make required payments, the actions an investor can take, or that a servicing agent can take on behalf of an investor, are determined by provisions of Nevada law and the documents and instruments evidencing the mortgage loan. Frequently, the borrower who is delinquent on your loan is also delinquent on senior liens. Even though your loan may be current, the borrower may fail to maintain the payments on senior liens, such as taxes, insurance premiums or deeds of trust. A breach of or default in connection with a senior lien by the borrower most likely constitutes an event of default under your deed of trust. It is therefore important that the status of all senior liens be monitored. Before investing in a junior deed of trust, you should determine the amount of debt service (payments) required to maintain the senior lien(s). To protect your investment during any senior lien (loan) foreclosure, it may be necessary for you to maintain the payments (with your own money) on all senior liens. You may lose your interest in the property securing the loan if a senior lien forecloses on the property.

There will be other costs associated with enforcing a mortgage loan, such as attorney's fees and processing fees, and there will likely be a delay of some months before the foreclosure process is complete. Issues such as whether to commence a judicial or nonjudicial foreclosure, deficiency judgments, rents and profits if the property is income-producing, and bankruptcy may also need to be addressed.

## If you have questions.

If you have any questions regarding any of the issues discussed in this disclosure form, discuss them with your mortgage broker, lawyer or financial advisor or a trusted friend or family member. No one can guarantee that a particular investment will be risk free, but with information about the specific risks involved, you can take steps to minimize your risk.

Loan:

_____

Investor signature required:

_____

Title (if investor is a corporation, partnership or limited-liability company):

_____

Dated:

Exhibit "C"

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STATE OF NEVADA**

**DEPARTMENT OF BUSINESS AND INDUSTRY**

**DIVISION OF MORTGAGE LENDING**

\* \* \*

In re:

USA COMMERCIAL
MORTGAGE COMPANY,
a licensed mortgage broker,

      Respondent.

<u>ORDER REVOKING MORTGAGE BROKER LICENSE</u>
<u>AND NOTICE OF RIGHT TO REQUEST HEARING</u>

     The licensing and regulation of mortgage brokers and mortgage agents in the State of Nevada is governed by Chapter 645B of the Nevada Revised Statutes (hereinafter, "NRS") and Chapter 645B of the Nevada Administrative Code (hereinafter, "NAC"). The State of Nevada, Department of Business and Industry, Mortgage Lending Division (hereinafter, the "DIVISION") has the general duty to exercise supervision and control over mortgage brokers and mortgage brokering activity. <u>See</u>, NRS 645B.060(1), NRS 645B.690 and NRS 645B.670. Pursuant to that authority, the DIVISION makes the following Findings of Fact, Conclusions of Law, and Order as follows:

**FACTUAL ALLEGATIONS**

    1.    USA COMMERCIAL MORTGAGE COMPANY (hereinafter, "RESPONDENT") is a licensed mortgage broker operating within the State of Nevada. RESPONDENT was issued a mortgage broker's license pursuant to Chapter 645B of the Nevada Revised Statutes on January 11, 1990. The DIVISION currently classifies RESPONDENT'S license as active.

////

EXHIBIT " *C* "

-1-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

2.    On April 13, 2006, RESPONDENT filed for protection pursuant to Chapter 11 of the United States Bankruptcy Code.   RESPONDENT was accompanied into bankruptcy by several of its related entities (hereinafter, the "USA ENTITIES").    Said bankruptcy was commenced in the United States Bankruptcy Court for the District of Nevada, Las Vegas Division and is being administered, on behalf of RESPONDENT and the USA ENTITIES as Case No. 06-10725-LBR.

3.    On December 8, 2006, RESPONDENT and the USA ENTITIES entered into an "Asset Purchase Agreement" with COMPASS PARTNERS, LLC and its affiliated entities (hereinafter, "COMPASS") wherein RESPONDENT and the USA ENTITIES agreed to sell, and COMPASS agreed to purchase the entirety of RESPONDENT'S and the USA ENTITIES' respective interests in their portfolio of commercial loans.

4.    Pursuant to said agreement, COMPASS also agreed to purchase RESPONDENT'S and the USA ENTITIES' respective interests in the servicing agreements and related contracts attached to each commercial loan within said portfolio.

5.    Said agreement further specified that RESPONDENT, the USA ENTITIES and COMPASS were to close this transaction on or before February 16, 2007.

6.    Said agreement further recognized that COMPASS' contemplated purchase of the loans and the servicing rights for said loans would then necessarily cause it to engage in licensable activity as regulated by the DIVISION under either Chapter 645A or 645B of the Nevada Revised Statutes.   For this reason, the "Asset Purchase Agreement" between the parties also required that COMPASS make application with the DIVISION for an appropriate license.

7.    As called for under said agreement, COMPASS did, in fact, make application with the DIVISION.  However, as February 16, 2007 approached (i.e., the designated closing date for the COMPASS purchase to be consummated), it became clear that it was logistically

impossible for COMPASS to complete the approval process with the DIVISION and acquire its license before said date.

8.     Because both COMPASS, RESPONDENT and the USA ENTITIES recognized this fact, the respective parties entered into a "Subservicing Agreement" in mid-February 2007, wherein COMPASS would essentially "subcontract" its servicing duties (for which a license was required) to RESPONDENT (which still maintained the appropriate license).  Said arrangement allowed the planned purchase to continue, albeit with an extended closing date.

9.     Thus, because of the "Subservicing Agreement" referenced above, it has been incumbent upon RESPONDENT to maintain its current licensure under Chapter 645B of the Nevada Revised Statutes.

10.     Pursuant to NRS 645B.060, the DIVISION is charged with conducting "...such investigations as may be necessary to determine whether any person has violated any provision of this chapter, a regulation adopted pursuant to this chapter or an order of the Commissioner." *See*, NRS 645B.060(2)(b).

11.     Pursuant to NRS 645B.060, the DIVISION is further charged with conducting "...such other examinations, periodic or special audits, investigations and hearings as may be necessary and proper for the efficient administration of the laws of this State regarding mortgage brokers and mortgage agents..." *See*, NRS 645B.060(2)(d).

12.     On March 15 through March 29, 2007, the DIVISION conducted an investigation of RESPONDENT'S loan servicing operations.

////

////

////

////

////

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-3-

13.     Said investigation revealed the following violations:

**a.     RESPONDENT'S Failure To Submit Financials And Audits Required For Its Trust Accounts**

Because RESPONDENT possesses a license under NRS Chapter 645B and maintains trust accounts for client funds, RESPONDENT is obligated to submit audited financial statements and audits for these accounts, to the DIVISION on an annual basis. *See*, NRS 645B.085(3). RESPONDENT has failed to do this and has, thereby, violated NRS 645B.085.

**b.     RESPONDENT'S Commingling, Mishandling And Misuse Of Client Funds**

NRS 645B.175(4) requires that all monies paid to a mortgage broker in the State of Nevada, either in full or in partial payment of a loan secured by a lien on real property must be kept separate from (i.e., not commingled with) monies belonging to the mortgage broker, and maintained in an account named so as to indicate that its contents are not the property of said mortgage broker. *See*, NRS 645B.175(4).

The DIVISION'S investigation revealed that RESPONDENT maintains a bank account where all monies received as loan payments and loan payoffs from borrowers are deposited. Said account is titled, "Debtor In Possession BK-S-06-10725 Operating Account / Collection" (hereinafter, the "ACCOUNT"). The DIVISION'S investigation further revealed that the ACCOUNT is not, in fact, a trust account and inappropriately titled under the above-referenced statute.

The DIVISION'S investigation further revealed that monies received from borrowers are periodically "swept" from the ACCOUNT into a money market account titled, "Debtor In Possession BK-S-06-10725 Operating Account". This was done in order to generate interest on these monies, as they awaited distribution to investors. The DIVISION'S investigation further revealed that this second account was not, in fact, a trust account and was also inappropriately

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-4-

titled. The DIVISION'S investigation further revealed that this second account has generated THREE HUNDRED EIGHTEEN THOUSAND, THREE HUNDRED NINETY-NINE DOLLARS ($318,399) in interest income, for the month of January 2007 and further revealed that this second account generated ONE MILLION TWO HUNDRED THOUSAND DOLLARS ($1,200,000) for all of calendar year 2006. RESPONDENT has improperly converted this interest income for its own use, despite the fact that the monies used to generate said interest income were never its property.

The DIVISION'S investigation further revealed that default interest collected on loans from borrowers is deposited directly into RESPONDENT'S operating account and not into either of the collection accounts referenced herein. It is the DIVISION'S position that RESPONDENT was obligated to deposit said default interest into the collection accounts referenced herein, and then divide the funds as called for under the applicable Loan Servicing Agreements. RESPONDENT'S direct depositing of these funds into its own accounts constitutes impermissible commingling. *See*, NRS 645B.175(4).

   c.   **RESPONDENT'S Impermissible Change Of Principal Location And Branch Office(s)**

NAC 645B.057 states that a mortgage broker in the State of Nevada may not change the location of their principal office or any branch office until the DIVISION approves the location change. This provision further states that a mortgage broker in the State of Nevada may not close their principal office or any branch office until said broker returns their license to the DIVISION and the DIVISION approves the closure. *See*, NAC 645B.057(1)(c), (3).

The DIVISION'S investigation revealed that within the previous six (6) months, RESPONDENT has changed locations on two (2) occasions and failed to return its license upon doing so. The DIVISION'S investigation further revealed that RESPONDENT closed its main location without prior DIVISION approval.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-5-

**d.  RESPONDENT'S Impermissible Payment Of Interest To Investors On Defaulted Loans**

NRS 645B.250 prohibits the advancement of payments to investors on behalf of a person who has obtained a loan secured by a lien on real property and who has defaulted on the payments related to said property.  *See*, NRS 645B.250.  The DIVISION'S investigation revealed that prior to its filing for bankruptcy protection, RESPONDENT paid interest to investors on defaulted loans it serviced.

**e.  RESPONDENT'S Failure To Report On The True Performance Status Of Its Outstanding Loans**

NRS 645B.260 and NAC 645B.070 require monthly reporting by all licensees under Chapter 645B regarding delinquencies and/or defaults in connection with any loans serviced by any such licensees.  These provisions further detail the contents of the mandatory reporting in question and indicate that the DIVISION may refuse to renew the licensure of any mortgage broker who has failed to submit the required reports for any of the previous twelve (12) months.  *See*, NRS 645B.260 and NAC 645B.070.

The DIVISION'S investigation revealed that RESPONDENT failed to provide a single report to the DIVISION and/or the beneficial owners of the loans it serviced, as to the true performance status, whether prior to or after RESPONDENT'S filing for Chapter 11 bankruptcy protection.

**f.  RESPONDENT'S Failure To Post Its License As Required**

NRS 645B.025 requires that mortgage brokers in the State of Nevada must post their licenses in a "…conspicuous place in the office to which it pertains…"  *See*, NRS 645B.025.  The DIVISION'S investigation revealed that RESPONDENT'S license was not posted as required by statute.

////

-6-

### g.  RESPONDENT'S Other Servicing "Irregularities"

NRS 645B.670 subjects Chapter 645B licensees to discipline for engaging in "material misrepresentation in connection with any transaction governed by this chapter…or [engaging] in any other conduct constituting a deceitful, fraudulent or dishonest business practice…": See, NRS 645B.670(3)(b), (h).

As demonstrated through the following excerpts from the Investigative Report created in this matter, the DIVISION'S investigation revealed the following additional irregularities in the RESPONDENT'S loan servicing practices:

**Interest and fees calculations:**

In summary, the Division found minor errors, in some instances, in the calculation of interest earned by investors, and fees earned by the licensee. The dollar amounts of the errors made were small, as shown by the examples below. In addition, the errors appear to have been in the investors' favor, i.e., they were paid more than they should have.

For investors Phillip E. McMullin & Rosemarie L. McMullin Trustees, who had a $50,000 investment in the Goss Road loan ($1,000,000), the interest earned for the period 1/1/07 to 1/02/07 as calculated by the licensee was $46.42, whereas the Division's calculations indicated that it should actually have been $42.14. So, in this instance, the investor was <u>overpaid</u> by $4.28 (The Goss Road loan paid off on 01-02-07, hence there was only two day's interest).

For the same investor for the same loan above, the loan service fee calculated by the licensee was $3.74, whereas it should have been $2.78.

<u>No interest</u> was calculated for investor Joyce E. Smith, Trustee of the Joyce E. Smith Trust. This investor had a $50,000 investment in the Goss Road loan, and hence would have earned $41.67 in interest for January. The licensee's Controller, LeAnn Weese, stated that Joyce Smith was indeed paid the interest after they discovered the error. This was verified by the investigators.

Investor Byrne E. Falke Trustee of the Byrne Falke Living Trust, who had a $62,500 investment in the Goss Road loan, was paid $58.02 in interest for the period 1/1/07 – 1/2/07. Division calculations indicate that the interest for the 2-day period should

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-7-

have been $53.35. Hence, in this case, the investor was overpaid by $4.67. In addition, this investor was charged $4.67 in loan servicing fee for Jan '07; Division calculations indicate that it should have been $3.36.

These errors were shown to the licensee's Controller, LeAnn Weese. Ms. Weese reviewed the Division's calculations and acknowledged that errors appeared to have been made. She also stated that some of the differences between our figures and the figures calculated by the licensee's computer system could have been due to rounding: apparently, the licensee's computer carried out calculations to 10 decimal places. However, the Division believes that the dollar amounts, although small, were greater than just due to rounding alone.

Although the error for *each* investor was small, the cumulative effect of the combined errors could total a significant amount.

The Division sampled the calculations for interest and fees for the Goss Road for December, and found those to be correct. Hence, the errors appear to have been made in January 2007. Controller LeAnn Weese stated that a change to the computer system's calculations was made in January, and that probably caused the errors.

The transactions on two other loans that paid off in January '07 were also reviewed: the Fiesta Development McNaughton loan, which paid off on 01-12-07, and the Elizabeth May Real Estate loan, which paid off on 01-18-07.

The Fiesta Development McNaughton loan had only one investor: the USA Capital First Trust Deed Fund. The interest paid to the investor and the loan servicing fee charged calculated by the licensee's system agreed with Division calculations.

The Division reviewed a sample of investors in the Elizabeth May Real Estate loan, and tested the interest paid and the loan servicing fees charged. This loan paid off on Jan 18, '07. The Division found that the borrower had been charged interest for 19 days, and not 18 days. The extra days' interest was distributed to investors. However, the servicing fee appears to have been calculated for 17 days, and not 18 days; hence the investors were <u>undercharged</u> the servicing fee in Jan '07 for this loan.

The Division additionally sampled some loans that were <u>not</u> payoffs and tested the interest and servicing fees, for Jan '07. The Division found small errors in this instance, too. But again, they were in the investor's favor.

Prior to Jan '07, our testing indicates that interest and loan servicing fees appear to have been calculated correctly.

**"Netting" of interest:**

Prior to the bankruptcy filing, USA Capital was paying interest to investors on defaulted loans. The bankruptcy court has allowed the new management of USA Capital (debtor in possession) to "net" the interest paid on defaulted loans against interest collected *after* the bankruptcy. For example, assume that an investor was paid $2,000 on a defaulted loan prior to the bankruptcy. After the bankruptcy, for example if USA Capital collected $3,000 in interest that has to be distributed to this investor. The investor would only receive the "net" amount, which is $1,000.

The Division did not have sufficient time to verify if the "netting" calculations were correct, because it is based on the interest received by the investor on defaulted loans, going back several years. It should also be noted that NRS 645B and NAC 645B does not specifically allow for the concept of netting as it is a violation of State law to commingle funds which was the basis for netting.

**Servicing Fees**

The Loan Servicing Agreements signed by investors had varying amounts for the servicing fee, from 0% to 3%, with one investor at 4%. The breakdown is as follows:

| Servicing Fee % | % of investors |
|---|---|
| 0% | 2.1% |
| 0.25% | 0.2% |
| 0.50% | 1.2% |
| 1.00% | 72.1% |
| 1.50% | 0.2% |
| 2.00% | 0% |
| 3.00% | 24.2% |
| 4.00% | One investor - Steven Frankel |

The Loan Servicing Agreement (LSA) could not be located for 15% of the investors.

The bankruptcy court allowed USA Capital to charge a 1% servicing fee *and hold back an additional 2%* until the licensee could accurately determine, for each investor, what servicing fee should be charged, per their LSA.

The total of this "hold back" amount is around $605,000.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-9-

This amount will be distributed back to those investors whose LSA does indicate that their servicing fee is less than 3%. The distribution was made in March 2007, towards the end of the investigation, so there was insufficient time to test it to see if it was correct.

**Appraisal Fees and Assignment Fees**

After the bankruptcy, the new management of USA Capital ordered an appraisal on all loans, in order to determine what the value was in each of the underlying properties. These appraisal fees were charged back to investors, on a pro-rata basis. We were able to verify only a few of the appraisal fees charged, but did not have sufficient time to verify a good sample.

Assignment fees were also charged back to investors. This is in cases where an investor was able to get another investor to take his place in a loan.

**Interest charged to borrowers**

Interest charged to the borrower is compounded interest, not simple interest. In other words, if a borrower does not make his interest payment one month, the interest owed the next month is based on interest on the outstanding principal balance plus interest on the interest owed the previous month. For example:

| | | | |
|---|---|---|---|
| Month 1: | $100,000 @ 13% | 1,083.33 | interest owed |
| Month 2 | $101,083.33 @ 13% | 1,095.07 | interest owed |

This is very unusual. The Division has not come across any other 'hard money' brokers who charge compound interest.

The Division reviewed a sample of promissory notes and found that, in each instance, the borrower has signed the note agreeing to pay compound interest.

**Default interest and late fees**

Per the sample of Loan Servicing Agreements reviewed, the licensee is allowed to retain default interest and late fees.

This appears to have been a considerable amount. For example, in Jan 2007, a total of $734,693 was collected in default interest, and $48,009 in late fees. These funds go directly into the licensee's operating account. The borrower's history report does not show the default interest collected. It does show the late fees;

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

1
2
3

however, the Division was informed by the Controller LeAnne Weese that the late fees should not be on the borrower's history report, either. Based upon this information it is doubtful whether USA Capital has ever properly reported interest, etc to the IRS either pre or post bankruptcy.

4
5
6
7
8

The Division's position, once again, is that all funds received as a payment or a payoff on a loan is to be deposited in the Collection trust account and then transferred to the appropriate recipient. By circumventing this step it is doubtful whether any audit of the financial statements of USA Capital have ever been validated or valid. It should be noted that the majority of other 'hard money' brokers pass on the default interest to borrowers.

9

### Exit Fees

10
11
12
13
14
15
16
17
18
19

There is no specific reference in the notes or loan servicing agreements with regards to exit fees. A review of the files and financial records indicate that as of July 2006 the exit fees could total well in excess of $6,000,000. These exit fees would be construed as either profit participation(s) or a pre-payment penalty. There was one instance found where the exit fee was contained in an addendum to the note; however, never treated as a pre-payment penalty and never distributed to the direct lenders. The division could find only one investor out of 3,600 who was given the opportunity to participate in the exit fee. This underscores the true nature of the risk and reward on the loans originated by USA Capital. A calculated, self serving deceptive scheme that was enacted to allow the principals to potentially profit with no risk while astronomical risk inured to the unsuspecting lenders. An exit fee is not typical of the mortgage brokerage industry nor is it appropriate compensation for a loan servicing company the monies should be distributed to the lenders who bore **ALL** of the risk although unbeknownst to them.

20
21
22
23
24

Taken together, these irregularities in the nature of RESPONDENT'S servicing activities constitute numerous instances of material misrepresentation in connection with a transaction governed by NRS Chapter 645B, and further constitute deceitful, fraudulent or dishonest business practices, in violation of NRS 645B.670. _See_, NRS 645B.670(3)(b), (h).

25

////

26

////

27

////

28

////

14.    Pursuant to NRS 645B.670, "…for each violation committed by a mortgage broker, the Commissioner may impose upon the mortgage broker an administrative fine of not more than $10,000, may suspend, revoke or place conditions upon his license, or may do both, if the mortgage broker, whether or not acting as such… [h]as made a material misrepresentation in connection with any transaction governed by this chapter…or [h]as engaged in any other conduct constituting a deceitful, fraudulent or dishonest business practice…": _See_, NRS 645B.670(3)(b), (h).

## **VIOLATIONS OF LAW**

1.    The DIVISION has determined that, through the above-described conduct, RESPONDENT has violated provisions of the following statutes and regulations:

        a.    NRS 645B.085(3)

        b.    NRS 645B.175(4)

        c.    NAC 645B.057(1)(c)

        d.    NAC 645B.057(3)

        e.    NRS 645B.250

        f.    NRS 645B.260

        g.    NAC 645B.070

        h.    NRS 645B.025

        i.    NRS 645B.670(3)(b)

        j.    NRS 645B.670(3)(h).

## **ORDER**

**NOW, THEREFORE,** the **COMMISSIONER** of the **DIVISION HEREBY ORDERS** that, pursuant to NRS 645B.720 and NRS 645B.750, the mortgage broker license of RESPONDENT be **REVOKED**.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-12-

**IT IS FURTHER ORDERED** that, pursuant to NRS 645B.750, upon written application to the DIVISION, RESPONDENT shall be entitled to a hearing with regard to the contents of the instant Order. Should RESPONDENT not request a hearing within **twenty (20) days** of the receipt of the instant Order, the DIVISION will enter a Final Order in this matter, as required by NRS 645B.750(2).

Dated this <u>2nd</u> day of May, 2007.

STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY
DIVISION OF MORTGAGE LENDING


By: _____
     SCOTT BICE, COMMISSIONER

# Exhibit "D"

**STATE OF NEVADA**

**DEPARTMENT OF BUSINESS AND INDUSTRY**

**DIVISION OF MORTGAGE LENDING**

* * *

In re:

COMPASS FINANCIAL PARTNERS,
LLC, a Nevada limited liability company,

     Respondent.

<u>ORDER IMPOSING FINE AND</u>
<u>ORDER TO CEASE AND DESIST AND</u>
<u>NOTICE OF RIGHT TO REQUEST HEARING</u>

    The licensing and regulation of escrow agencies and agents in the State of Nevada is governed by Chapter 645A of the Nevada Revised Statutes (hereinafter, "NRS") and Chapter 645A of the Nevada Administrative Code (hereinafter, "NAC"). The State of Nevada, Department of Business and Industry, Mortgage Lending DIVISION (hereinafter, the "DIVISION") has the general duty to exercise supervision and control over escrow agencies and agents. <u>See</u>, NRS 645A.050, NRS 645A.090 and NRS 645A.110. Pursuant to that authority, the DIVISION makes the following Findings of Fact, Conclusions of Law, and Order as follows:

**FACTUAL ALLEGATIONS**

    1.    Upon information and belief, COMPASS FINANCIAL PARTNERS, LLC (hereinafter, "COMPASS") is a Nevada limited liability company.

    2.    COMPASS had previously sought, but subsequently withdrew an application for licensure with the DIVISION as a mortgage broker / agent pursuant to Chapter 645B of the Nevada Revised Statutes.

////

EXHIBIT " D "

-1-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

3.      At no time has COMPASS made application for licensure with the DIVISION as an escrow agency pursuant to Chapter 645A of the Nevada Revised Statutes.

4.      COMPASS remains unlicensed by the DIVISION under either Chapter 645A and 645B of the Nevada Revised Statutes at this time.

5.      On April 13, 2006, USA Commercial Mortgage Company (hereinafter, "USA"), a licensed mortgage broker in the State of Nevada pursuant to Chapter 645B of the Nevada Revised Statutes, filed for protection pursuant to Chapter 11 of the United States Bankruptcy Code.  USA was accompanied into bankruptcy by several of its related entities.

6.      Said bankruptcy was commenced in the United States Bankruptcy Court for the District of Nevada, Las Vegas Division and is being administered, on behalf of USA and its related entities as Case No. 06-10725-LBR.

7.      On December 8, 2006, USA and its related entities entered into an "Asset Purchase Agreement" with COMPASS (hereinafter, "COMPASS") wherein USA and its specified related entities agreed to sell, and COMPASS agreed to purchase the entirety of USA's and its related entities' interests in their portfolio of commercial loans.

8.      Pursuant to said agreement, COMPASS also agreed to purchase USA's and its related entities' respective interests in the servicing agreements and related contracts attached to each commercial loan within said portfolio.

9.      Said agreement further specified that USA, its related entities and COMPASS were to close this transaction on or before February 16, 2007.

10.     Said agreement further recognized that COMPASS' contemplated purchase of the loans and the servicing rights for said loans would then necessarily cause it to engage in activity as regulated by the DIVISION under the appropariate Nevada Revised Statutes.  For this reason, the "Asset Purchase Agreement" between the parties also required that COMPASS make application with the DIVISION for an appropriate license.

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

11. Specifically, Article IX of the "Asset Purchase Agreement" between COMPASS, USA and its related entities, stated as follows:

### Article IX    Conditions to Closing

**Section 9.1  Conditions Precedent to Obligations of Purchaser.** The obligation of the Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

* * * * * * * * * * * * * * * * * * * * * * *

**(j)** Purchaser shall have actually obtained an interim license to operate in the State of Nevada or an exemption, satisfactory to Purchaser in all reasonable respects by no later than the Closing Date, from any and all applicable Nevada laws or regulations that would require any licensing of Purchaser and affiliate of Purchaser identified by Purchaser by the State of Nevada in connection with or as a result of consummation of this transaction.  Sellers shall provide reasonable cooperation and support to Purchaser in connection with its effort to obtain such interim license or exemption.  The condition to the timing of the obtaining of this interim license or regulatory exemption may be extended by the Sellers at their sole discretion.

12. As called for under said agreement, COMPASS did, in fact, make application with the DIVISION.  However, as February 16, 2007 approached (i.e., the designated closing date for the COMPASS purchase to be consummated), it became clear that it was logistically impossible for COMPASS to complete its application with the DIVISION and acquire its license before said date.

13. Because both COMPASS, USA and its related entities recognized this fact, the respective parties entered into a "Subservicing Agreement" on February 16, 2007, wherein COMPASS would essentially "subcontract" its servicing duties (for which a license was required) to USA (which still maintained the appropriate license).  Said arrangement allowed the planned purchase to continue, albeit with an extended closing date.

///

-3-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

14.     Thus, because of the "Subservicing Agreement" referenced above, from February 16, 2007 forward, the responsibility for the servicing of the commercial loans COMPASS had purchased, fell to USA, as a matter of law.  For this reason, COMPASS was obligated to utilize the services of USA to engage in any servicing activity as to the loans in question, or risk violating Chapter 645A of the Nevada Revised Statutes in behaving otherwise.

15.     Despite its contractual arrangement with USA and its legal obligation to rely upon USA in servicing the loans in question, COMPASS has, since February 16, 2007, disregarded this arrangement and represented to borrowers that *it is, in fact*, the servicer of the loans in question.

16.     Proof of COMPASS' decision to engage in servicing activity, notwithstanding its legal arrangement with USA is as follows:

a.     On March 9, 2007, COMPASS' Director of Investor Relations, Mark L. Olson (hereinafter, "OLSON") wrote to all lenders involved in the USA bankruptcy to advise them of the following:   "…We are pleased to announce that as of February 16, 2007, [COMPASS] became the servicer of most of the loan portfolio formerly serviced by [USA]…"

b.     On March 23, 2007, OLSON wrote to one "Larry L. Rieger" and "Larry L. Rieger and Patsy R. Rieger" as "Trustees of the Larry L. Rieger & Patsy R. Rieger Revocable Trust" and represented that "COMPASS has officially taken over as the servicer of the USA Commercial Mortgage portfolio and has been working diligently to resolve all the loans in this distressed portfolio…"  OLSON'S letter further sought to open a dialogue with these lenders so as to effect the sale of  their interest in a property commonly known as "Shamrock Tower, L.P.", in exchange for a yet-to-be negotiated cash sum.

c.     On March 23, 2007, OLSON, on COMPASS' behalf, commenced similar discussions with a "Donald H. Pinsker", with reference to a property commonly known as "Clear Creek Plantation".

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

-4-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

d.    On April 8, 2007, COMPASS generated a "Loan Status Report" regarding a loan commonly known as "Palm Harbor One, LLC". This "Loan Status Report" makes the following representation: "[COMPASS] has been working hard to collect the maximum value possible from each loan it now services from the USA Capital portfolio. [COMPASS] will provide information to the Direct Lenders about the status of their loans and the actions being taken by the Borrowers and [COMPASS] to get the loans repaid…"

e.    On April 12, 2007, COMPASS generated a "Loan Status Report" regarding a loan commonly known as "5055 Collwood, LLC", which contained identical prefatory language concerning COMPASS' role in servicing the loan referenced therein. COMPASS apparently accompanied this "Loan Status Report" with a written solicitation requesting that the lender in question "Consent to Extend 5055 Collwood, LLC Loan for Six Months", and then provided the terms of the offer to extend.

f.    On April 20, 2007, COMPASS generated two (2) additional "Loan Status Report(s)" regarding loans commonly known as "Eagle Meadows Development" and "Fox Hills 216, LLC", both of which also contained identical prefatory language concerning COMPASS' role in servicing the loans referenced therein.

17.    On April 20, 2007, the DIVISION received word that COMPASS had chosen to terminate the "Subservicing Agreement" between itself and USA since USA had experienced difficulties in its own right, in conforming to the DIVISION'S requirements to maintain its licensure with the DIVISION. Thus, from April 20, 2007 forward, COMPASS' affiliation with USA had ended, thereby leaving COMPASS with no licensed entity to service the loans in question.

18.    On May 3, 2007, the DIVISION issued an "Order Revoking Mortgage Broker License and Notice of Right to Request Hearing", because of certain irregularities and improper activities uncovered in USA'S loan servicing system(s).

////

19.     Pursuant to NRS 645A.010, the concept of "escrow" activity is defined as follows:

'Escrow' means any transaction where one person, for the purpose of effecting the sale, transfer, encumbering or leasing of real or personal property to another person, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person until the happening of a specified event or the performance of a prescribed condition, when it is then to be delivered by such third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor or any agent or employee of any of the latter. ***The term includes the collection of payments and the performance of related services by a third person in connection with a loan secured by a lien on real property.***

*See*, NRS 645A.010(3)(emphasis added).

20.     Pursuant to NRS 645A.050, the DIVISION is charged with conducting "...such investigations as may be necessary to determine whether any person has violated any provision of this chapter..." *See*, NRS 645A.050(2)(c).

21.     Pursuant to NRS 645A.110, the DIVISION is further charged with conducting an investigation "...if it appears that an escrow agent or agency is conducting business in an unsafe and injurious manner or in violation of this chapter if it appears that any person is engaging in the escrow business without being licensed pursuant to the provisions of this chapter." *See*, NRS 645A.110(1).

22.     As specified above, the documentary evidence brought to the DIVISION'S attention, indicates that COMPASS has engaged in escrow activity in the State of Nevada (as defined in NRS 645A.010(3)) on multiple occasions, despite its lack of licensure to do so.

23.     Pursuant to NRS 645A.020, "...a person who wishes to be licensed as an escrow agent or agency must file a written application in the Office of the Commissioner..." Further, said application must "...be verified [and] be accompanied by the appropriate fee prescribed in NRS 645A.040..." *See*, NRS 645B.020(1), (2).

-6-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

24.     Pursuant to NRS 645A.210, "…it is unlawful for any person, unless exempted under NRS 645A.015, to engage in or carry on, or hold himself out as engaging in or carrying on, the escrow business or act in the capacity of an escrow agent or agency without first obtaining a license as an escrow agent or agency…" *See*, NRS 645A.210.

25.     Pursuant to NRS 645A.090, "…the Commissioner may refuse to license any escrow agent or agency or may suspend or revoke any license or impose a fine of not more than $500.00 for each violation by entering an order to that effect, with his findings in respect thereto, if upon a hearing, it is determined that the applicant or licensee… has violated any provision of this chapter or any regulation adopted pursuant thereto or has aided and abetted another to do so [OR] …has intentionally or knowingly made any misrepresentation or false statement to, or concealed any essential or material fact from, any principal or designated agent of a principal in the course of the escrow business…" *See*, NRS 645A.090(1)(b), (e).

26.     Pursuant to NRS 645A.110(2), "…if, upon investigation it appears that the agent or agency is so conducting business or an unlicensed person is engaged in the escrow business, the Commissioner may… order the person to discontinue business in an injurious manner or in violation of this chapter…" *See*, NRS 645A.110(2)(a).

## VIOLATIONS OF LAW

1.     Having investigated COMPASS' activities, as described hereinabove, it has been determined that COMPASS has engaged in at a minimum seven (7) distinct instances of escrow agency activity in the State of Nevada without a license to do so, thereby violating NRS 645A.020 and NRS 645A.210.

## ORDER

**NOW, THEREFORE,** pursuant to NRS 622.080 and NRS 645A.110(2), the **COMMISSIONER** of the **DIVISION HEREBY ORDERS** that COMPASS **CEASE AND DESIST** from conducting any and all unlicensed escrow agency activity in the State of Nevada.

-7-

Attorney General's Office
555 E. Washington, Suite 3900
Las Vegas, NV 89101

**IT IS HEREBY FURTHER ORDERED** that, pursuant to NRS 645A.090, COMPASS will be subject to an administrative fine in the amount of THREE THOUSAND FIVE HUNDRED DOLLARS ($3,500.00), representing a FIVE HUNDRED DOLLAR ($500.00) fine for each of the seven (7) documented instances of unlicensed escrow agency activity in this matter;

**IT IS FURTHER ORDERED** that the sum of said administrative fine be paid in full within **thirty (30) days** of entry of the instant Order;

**IT IS FURTHER ORDERED** that, pursuant to NRS 645A.110(2)(a), upon submission of a verified petition to the DIVISION, COMPASS shall be entitled to a hearing with regard to the contents of the instant Order. Should COMPASS not request a hearing within **thirty (30) days** of the receipt of the instant Order, the DIVISION will enter a Final Order in this matter.

Dated this 9TH day of May, 2007.

STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY
DIVISION OF MORTGAGE LENDING

By: _____
      SCOTT BICE, COMMISSIONER

**Entered on Docket**
**July 02, 2007**

_____
**Hon. Linda B. Riegle**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

**\* \* \* \* \* \* \***

| | | |
|---|---|---|
| In re: | ) | Case No. BK-S-06-10725-LBR |
| | ) | Case No. BK-S-06-10726-LBR |
| USA COMMERCIAL MORTGAGE | ) | Case No. BK-S-06-10727-LBR |
| COMPANY, | ) | Case No. BK-S-06-10728-LBR |
| Debtor. | ) | Case No. BK-S-06-10729-LBR |
| _____ | ) | |
| In re: | ) | |
| | ) | |
| USA CAPITAL REALTY ADVISORS, LLC | ) | Chapter 11 |
| Debtor | ) | |
| _____ | ) | |
| In re: | ) | Jointly Administered Under |
| | ) | Case No. BK-S-06-10725 |
| USA CAPITAL DIVERSIFIED TRUST | ) | |
| DEED FUND, LLC | ) | |
| Debtor | ) | |
| _____ | ) | |
| In re: | ) | Date:   June 20, 2007 |
| | ) | Time:   10:30 a.m. |
| USA CAPITAL FIRST TRUST DEED | ) | |
| FUND, LLC | ) | |
| Debtor | ) | |
| _____ | ) | |
| In re: | ) | |
| | ) | |
| USA SECURITIES, LLC | ) | |
| | ) | |
| Debtor | ) | |
| _____ | ) | |

Affects: All Debtors

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ORDER ON EMERGENCY MOTION TO ENFORCE CONFIRMATION
AND FOR SANCTIONS AND ORDER ON
SUBJECT MATTER JURISDICTION**

Compass Partners (and its affiliates and designees) was the purchaser of loan servicing rights from the debtor under an asset purchase agreement pursuant to a confirmed plan of reorganization. On May 25, 2007, Compass USA SPE LLC, and Compass Financial Partners LLC (together "Compass") filed an emergency motion for this court to enforce its confirmation order and for contempt ("Motion to Enforce Confirmation," Docket # 3773). In its Motion, Compass states that Ms. Donna Cangelosi and others (collectively referred to as the "Lenders Protection Group")[1] seek to wrongfully terminate Compass as the loan servicer and take for themselves the servicing rights and fees. The Motion to Enforce Confirmation alleges that the Lenders Protection Group mailed at least fifty letters to borrowers of loans stating that Compass was not authorized to act on behalf of the lenders and that "all payments made to Compass would be made at your own peril." The letters directed borrowers to make all payments to "Lender 2 Lender, LLC," a Nevada limited liability company established by Ms. Cangelosi. Compass argued in its Motion to Enforce Confirmation that these acts were a direct violation of the asset purchase agreement with the debtor and the confirmed plan, as well as a collateral attack on the provisions of this court's orders. The "debtor" filed a joinder to the motion. (Docket 3999.)

The motion was opposed (Docket 3853) on the stated grounds that the members of the Lenders Protection Group had terminated Compass as the servicer on each of the loans in accordance with the loan servicing agreements and that it had the right to do so without notice and without cause. Alternatively, the Lenders Protection Group contended that if the loan servicing agreements required cause to terminate Compass as servicer, then they had the cause to

---

[1]Ms. Cangelosi established what she called the "Lender Protection Group." This group was never recognized as a formal committee, and is apparently a collection of individuals represented by Mr. Smith.

2

1    do so. The Lenders Protection Group also argued that this court did not have subject matter

2    jurisdiction.

3            This court entered an order preserving the status quo as of the day before the

4    termination letters were sent. The court further ordered supplemental briefing on the issue of

5    subject matter jurisdiction, and it continued the matter to June 20, 2007.

6            For the reasons set out herein, this court finds that it has subject matter jurisdiction

7    pursuant to 28 U.S.C. § 1334 as to a number of the issues raised, and supplemental jurisdiction

8    with respect to the remaining issues. However, because the resolution of these issues will involve

9    the determination both core and non-core matters under 28 U.S.C. § 157, this court recommends

10   that the reference be withdrawn.[2]

11                                   **FACTS**

12   *A. The Business of USCAM and the Loan Servicing Agreements.*

13            One of the debtors, USACM Capital Mortgage ("USACM") was in the business

14   of underwriting, originating, brokering, funding, and servicing mortgage loans. It solicited

15   individuals and entities to invest in fractional interests in loans, and also originated and serviced

16   those loans. As of the date of the filing of the bankruptcy petition, USACM was servicing 115

17   loans involving 3,600 investors. ("Debtors' First Amended Disclosure Statement," Docket

18   # 1798,  pp. 22-24.) Two separate debtors, USACM Capital Diversified Trust Deed Fund, LLC,

19   ("DTDF")  and USACM First Trust Deed Fund ("FTDF") were also investors in the

20   fractionalized loans brokered by USACM.  These funds were comprised of a number of

21   members who invested in the funds, with the funds then investing in loans. As of the date of the

22   petition, DTDF had approximately 1,350 members and FTDF had 950 members. ("Debtors' First

23   Amended Disclosure Statement, Docket # 1798, pp. 25-26.)

24            As noted, USACM entered into loan servicing agreements with those entities for whom it

25

26        [2]At the request of the court, counsel for Ms. Cangelosi has prepared a recommendation for

27   withdrawal of the reference. It will be separately entered.

28                                          3

had brokered loans. Under paragraph 2(e) of the loan servicing agreements, the lender authorized

and empowered USACM on it's behalf to, among other things, execute and deliver payoff

demands and beneficiary statements, consent to modifications of the loans if the effect would not

materially or adversely affect the security provided by the real or personal property, institute

foreclosure proceedings, engage in settlement discussions, and enter into forbearance and other

settlement-related agreements. USACM, however, could not permit any modification to any loan

that would change the interest rate, forgive the payment of any principal or interest (expressly

excluding late charges or the difference between default and non-default interest), change the

outstanding principal amount, or extend the maturity date, without the lender's prior consent. If

the lender failed to grant or deny consent within 3 business days after notice, consent was

deemed to have been conclusively been given. ("Motion to Enforce Confirmation, Docket #

3773, "Exhibit A.")[3]

       Under paragraph 5 of the loan servicing agreements, USACM was entitled to retain

monthly, in connection with those services, a service fee, any late charges collected from the

borrower, and default interest collected from the borrower pursuant to the terms of the note.

(Motion to Enforce Confirmation, Docket # 3773, "Exhibit A.")

       The loan servicing agreements contained two provisions relating to termination.

Paragraph 9 provided that the lender:

> [M]ay, by 30 days written notice to USACM, terminate this
> agreement, and the power of attorney granted, if one is granted,
> under Section 9 of this Agreement, if USACM fails to perform its
> obligations hereunder.[4]

---

[3]A sample loan service agreement was attached as "Exhibit A" to the declaration of David
Blatt, which was filed as "Exhibit A" in support of the Motion to Enforce Confirmation. (Docket
# 3773.)

[4]Section 9 of the Agreement supplied to the court has nothing to do with a power of attorney.
Rather, Section 9 merely provides that the lender's name is the exact form for registration.
Paragraph 11 deals with a "Limited Power of Attorney."  A different version on file with this
Court in connection with a separate matter refers to Paragraph 11.  (Docket 847,  p.19.)

4

1    (Motion to Enforce Confirmation, Docket # 3773, "Exhibit A.")

2        Paragraph 3 provided that:

3            Pursuant to NAC 645B.073, in the event of default, foreclosure, or
             other matters that require action, if for any reason USA fails to act
4            on Lender's behalf . . . then Lender may, with approval of fifty-one
             percent (51%) or more of all the holders of the beneficial interest
5            of record in the Loan, act on behalf of all such holders of
             beneficial interest of record.
6
7        The actions included the designation of the servicing agent or other person to act on

8    behalf of the holders of the beneficial interests in the loan. (Motion to Enforce Confirmation,

     Docket # 3773, "Exhibit A.")
9

10

11       **B. Bankruptcy and the Situation Prior to Filing.**

12           USACM and its related affiliates filed a chapter 11 petition on April 13, 2006.

13   USACM's management was replaced with a chief restructuring officer and crisis manager,

     Thomas Allison and Mesirow Financial Interim Management, LLC. (Docket # 26.)[5] Hence none
14
     of the former insiders had a role in administering the case or in the plan negotiations. Indeed,
15
     former management appealed the order confirmation the plan. (Docket # 2481.)
16
         The United States Trustee appointed committees for the direct lenders,[6] for creditors of
17
     the two separate debtors USACM Capital Diversified Trust Deed Fund, LLC[7] and USACM First
18

19

20   _____

21       [5]While this order was designated as an interim order, the court extended those orders
     throughout the case.
22
         [6]The United States Trustee denominated this committee the "Official Committee of Holders
23   of Executory Contract Rights"of USACM. (Docket # 202.)  The court, believing that this
     designation created a legal distinction without a finding that the contracts were executory
24   contracts, denominated these individuals and entities who held  fractionalized interest in unpaid
     loans as "direct lenders." Under the plan, "direct lenders" are defined as each entity, except
25   USCAM and the Funds, who is a beneficiary under a loan originated and serviced by USACM
     on behalf of lenders. (Docket # 1799, (1)(A)(42).
26

27       [7]Docket #203.

28                                              5

1   Trust Deed Fund,[8] and for the unsecured creditors.[9] Each of those committees retained counsel

2   and were actively involved in the case.

3          During the case, it became apparent (and the court ultimately found) that the borrowers

4   on many of the underlying loans were in default and had either not made any payments, or had

5   not made payments in accordance with their notes and deeds of trust. Despite the fact that

6   lenders were only to receive payments in accordance with their contracts and the underlying

7   notes and deeds of trust, the lenders continued to receive payments on their notes as if payments

8   were being made. Obviously, these funds came from sources other than the borrowers and were

9   made from monies that were due to USACM as servicing or other fees, loans which had been

10  paid (but the principal not repaid to the lenders), and money borrowed from third parties.

11  ("Debtors' First Amended Disclosure Statement, Docket # 1798, pp. 28-29; Declaration of

12  Thomas Allison in Support of Confirmation, Docket # 2147, p. 31.)[10] These payments were

13  described in the plan as "pre-paid interest." However, that was only a term of convenience, as

14  the lenders had no right to receive funds that were not paid by the borrower.[11]

15         As noted above, FTDF owned interests in a number of loans. Some of these loans were

16  performing and many others were in default. These loans were also serviced by USACM.

17  DTDF had also invested in loans brokered and serviced by USACM.

18         During negotiations with the debtor (through Mesirow Financial) and the four

19  committees, it was determined that in light of the costs of attempting to service the loans,

20  including commencing foreclosure or otherwise realizing on the collateral of loans in default,

21

22     [8]Docket #204.

23     [9]Docket #201.

24
25     [10]This court made certain oral findings of fact on the record in accordance with FED. R.
       BANKR P. 7052, which included the adoption of the facts set forth by Mr. Allison.

26     [11]See N.R.S. § 645B.250, which provides that a mortgage broker is prohibited from advancing
27  payments to an investor on behalf of a person who has obtained a loan and is in default.

28                                                6

and given that there was no ability to continue as a mortgage broker, the only way in which

creditors could receive payment was through an asset purchase agreement and plan. (*See*

*generally*, "Debtors' First Amended Disclosure Statement, Docket # 1798, pp. 79-80.)

### C. The Asset Purchase Agreement, the Plan, and the Confirmation Order.

#### 1. Asset Purchase Agreement.

The debtors, with the concurrence of the committees, filed a motion to sell

the servicing rights, including the fees to which USACM was entitled as servicer, and the loan

portfolio of FTDF at auction with SPCP Group, LLC ("Silver Point") as the stalking horse

bidder. (Docket # 1352.) Other bidders qualified, but ultimately Compass was the successful

bidder.[12]

The closing of the sale to Compass was conditioned upon confirmation of a plan with

provisions consistent with the terms of the asset purchase agreement. ("Asset Purchase

Agreement," § 5.3, filed as "Exhibit A" to Docket # 2164.)

Under the Asset Purchase Agreement, Compass purchased the First Trust Deed Fund

Assets and the Commercial Mortgage Assets. The "Commercial Mortgage Assets" were defined

as:

> [A]ll Servicing Agreements . . . for all of the Serviced Loans . . .
> including, without limitation, Default Rate Interest, Accrued
> Servicing Fees, Late Charges, Success Fees, other fees and sums
> due the loan servicer under any of the Servicing Agreements" [and
> USCAM's rights in the loans].[13]

"Default Rate Interest" was defined as the "amount of interest payable upon default under

each Serviced Loan at any time." "Accrued Servicing Fees" was defined, with certain

exceptions as "all servicing fees and servicer advances accrued, but unpaid, as of the of the

Closing

---

[12]See Docket # 2147, Allison Declaration in Support Confirmation, pp. 25-28, for a
description of the sale process.

[13]USACM held a fractionalized interest in some loans.

7

Date. . . . ." "Late Charges" was defined as the amount of late charges payable upon default under each Serviced Loan at any time." ("Asset Purchase Agreement," § 1.1, filed as "Exhibit A" to Docket # 2164.) The asset purchase agreement, at Section 5.2, also required the Sale Approval Order to contain certain provisions. In further provided the following:

> Sec. 7.3. Servicing Agreements. Nothing contained in the Agreement shall modify the obligations owed to the Lenders by the loan servicer or rights of the Lenders against the loan servicer (or the rights of the loan servicer against the Lenders) under the applicable Servicing Agreements and otherwise applicable law . . . . [U]nder no circumstance shall any pre-Closing Date liability assertable by any party attach to Purchase, or to any Asset acquired by purchaser . . . . [N]otwithstanding any other provision herein, or any order which may in the future be entered by the Bankruptcy Court, all servicing fees due pursuant to the terms stated in the Servicing Agreements, and all interest due on the First Trust Deed Fund Assets, shall continue to be due and payable, and Purchaser shall collect such servicing fees and interest for its sole benefit on and after the Closing Date.

### 2. The Plan.

The plan provided for the compromise of Direct Lender claims in that claims for the recharacterization[14] of loans as property of the estate were released. While rights to recover principal or interest paid in advance were preserved, lenders would continue to receive monies paid on the loan after the pre-paid amounts were netted. (Debtor's Third Amended Plan, Docket # 1799, Section II (C)(1)(e).) In connection with this provision, the liquidating trust would receive the amounts netted on account of the pre-paid interest, and the asset purchaser and any subsequent purchaser were required to continue to net these sums. (Section IV(E)(1).)

Because the plan affected the direct lenders by virtue of the compromise discussed above,

---

[14]While under 11 U.S.C. § 541(d), property in which the debtor holds only equitable title is not property of the estate, the commingling of funds received from all sources and payments on loans in default may result in the characterization of such loans as property of the estate. *See, e.g; In re Lemons & Assoc.,* 67 B.R. 198 (Bankr. D. Nev. 1986).

8

1 the direct lenders voted on the plan. The direct lenders, along with all other classes entitled to

2 vote, voted by majority and amount to accept the plan. An order confirming the plan was entered

3 on January 8, 2007. (Docket #2376.) Findings of fact and conclusions of law were also entered

4 on January 8, 2007, as modified herein. (Docket # 2377.)[15]

5       At the time of confirmation, the issue arose as to the meaning of the acquisition of the

6 loan serving agreements free and clear of claims and the rights of a lender to terminate on

7 account of pre-petition defaults by USACM. Compass agreed that a lender had the right to effect

8 a substitution of USACM as a loan servicer under Section 3 of any loan servicing agreement

9 (and Compass had the right to any defenses) to the extent that such right was matured and

10 exercisable as of the petition date. Such rights were denominated as "Surviving Section 3 Right."

11 Such rights were, however, only exercisable in accordance with certain procedures which

12 included a 30 day notice of an intent to exercise such right, the right of Compass to challenge the

13 exercise by filing a motion within thirty days, and that this court should retain jurisdiction to

14 adjudicate any such disputes. (Findings of Fact, Docket # 2377 at ¶ KK,; Confirmation Order,

15 Docket # 2376, at ¶ 14.)[16]

16       Other relevant provisions of the Findings of Fact include the following, at ¶ KK:

17

18       The transfer of the Acquired Assets . . . will be a legal, valid, and
      effective transfer of the Acquired Assets, and will vest the Asset

19       Purchaser with all right, title, and interest of the Sellers to the
      Acquired Assets free and clear of all liens, claims, interest,

20       obligations and encumbrances whatsoever, including, but not
      limited to, (A) all monetary and non-monetary defaults and rights

21       that purport to give to any party a right or option to effect any
      forfeiture, modification, right of first refusal, or termination of the

22       Sellers' or the Asset Purchasers's interest in, or rights in or under,

23

24     [15]Despite the failure to cross out the parenthetical "proposed" designation, the court adopted

25 the findings and conclusions (Docket # 2377) and the confirmation order (Docket #2376) and
entered them as the court's orders.

26     [16]The Lenders Protection Group asserts that it is not claiming any rights to terminate based

27 upon defaults by USACM.

28                 9

the Acquired Assets, or any similar rights, based in any way on any action taken (or failed to be taken) by any of the Debtors or any other matter or occurrence relating to the period prior to the Closing [other than the surviving section 3 rights] . . . © . . . (ii) all debts arising in any way in connection with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers' predecessors or affiliates; all claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, rights of recoupment or setoff, demands, guaranties, options, rights, restrictions, interest and matters of any kind and nature in any way relating to the existence, ownership, management or servicing of the Acquired Assets prior to Closing, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these cases . . . and whether imposed by agreement, understanding, law, equity, or otherwise . . . .

Paragraph KK also provided that:

In the event of a proper exercise of remedies under Section 3 of the Loan Servicing Agreement, (I) neither the Direct Lenders nor any replacement servicer selected by such Direct Lender shall have the right or ability to compromise, subordinate, or impair, in any respect, any claims purchased by Compass from the Estates for default interest, accrued servicing fees, late charges, success fees, or other amounts under the Loan Servicing Agreement, and (ii) the Confirmation Order shall be binding upon such replacement servicer. . . [17]

### 3. Confirmation Order.

The confirmation order contained the following additional potentially relevant provisions:[18]

The provisions of the Plan and this Confirmation Order shall bind . . . (f) all Direct Lenders. (¶ 8.)

– – – –

[17]These provisions were also contained in paragraph 14 of the Confirmation Order except that the last sentence includes the phrase "rights, claims or interests purchased by Compass."

[18]The court makes no determination as to the interpretation of any of these provisions as it relates to the issue presently before the court.

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11

The transfer . . . constitutes a legal, valid and effective transfer of the Acquired Assets, and shall vest the Asset Purchaser with all right, title, and interest of the Sellers . . . free and clear of all Claims and Interests of any kind or nature whatsoever. (¶ 17.)

– – – –

This court retains jurisdiction as set forth in Section VIII. D of the Plan, including the jurisdiction to enforce and implement the terms and provisions of this Confirmation Order and the Asset Purchase Agreement . . . including, but not limited to, retaining jurisdiction . . . (b) to protect the Asset Purchaser against any Interests against the Sellers or the Acquired Assets. (¶ 23.)

– – – –

All Persons holding Interests against or in the Sellers or the Acquired Assets of any kind or nature whatsoever (including but not limited to . . . Direct Lenders . . . shall be, and are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against the Asset Purchaser . . . or the Acquired Assets . . . with respect to any Interest of any kind or nature whatsoever such Person or entity had, has, or may have against or in the . . . Acquired Assets. Following the Closing, no holder of an Interest in the Sellers shall interfere with the Asset Purchaser's title to or use and enjoyment of the Acquired Assets based on or related to such Interest, or any actions that the Sellers may take in their Chapter 11 Cases. (¶ 25.)

– – – –

After the effective date . . . the Direct Lenders . . . shall be entitled to distributions from the Direct Lender Loans in accordance with the related Loan Servicing Agreements, the applicable loan and security documents, and applicable Nevada law, by the Asset Purchaser, as the third party servicer. . . . . [T]he Asset Purchaser is authorized and directed to net Prepaid Interest sums due from the Direct Lenders and Collect Prepaid Interest from Borrowers, and remit those amounts to . . . the USACM Trust. . . . After the Closing, the Direct Lenders are obligated to comply with the terms of the applicable Loan Servicing Agreements including the obligation to pay the fees at the rate expressed as a percentage specified in Section 5 thereof[.] (¶ 47.)

– – – –

Nothing in the Plan or this Confirmation Order shall be deemed to modify, in any respect, the Direct Lenders' notes or the deeds of trust securing such notes. (¶ 48.)

– – – –

12

Nothing contained in the Asset Purchase Agreement shall modify the obligations owed to the Lenders by Compass as the loan servicer or rights of the Lenders against Compass as the loan servicer (or the rights of Compass as the loan servicer against the Lenders) under the applicable Loan Servicing Agreements and otherwise applicable law. Compass shall distribute any sums due to Lenders under any of the Loan Servicing Agreements in accordance with the Loan Servicing Agreements, as the same may be modified with consent of the applicable Lenders, and with otherwise applicable law. Compass shall apply all payments and proceeds from Serviced Loans . . . however collected . . . in accordance with the provisions of the notes and/or loan agreements. Further, notwithstanding the foregoing, to the extent the Bankruptcy Court has entered an order, including, but not limited to, this Confirmation Order, which interprets or enforces provisions of the Loan Servicing Agreements or directs the distribution of payments under the Loan Servicing Agreements or payments collected from Borrowers, Compass, the Lenders, and all other affected parties shall abide by the terms of such order(s). If, as between the provisions of the Loan Servicing Agreements and the order(s) of the Bankruptcy Court, it is not clear to Compass how the sums collected shall be distributed, then Compass shall hold the sums payable to the Lender until Compass either receives direction from the Lender . . . regarding disbursement of interest, or is directed by an order from a court of competent jurisdiction. Nothing contained here is intended to waive any defenses of the Lenders . . . under the Loan Servicing Agreements. For the avoidance of doubt, under no circumstance shall any pre-Closing Date liability assertable by any party attach to Compass, or to any asset acquired by Compass, pursuant to the Asset Purchase Agreement. Furthermore, for the avoidance of doubt, notwithstanding any other provision in the Asset Purchase Agreement, this Confirmation Order, or any order which may be in the future be entered by the Bankruptcy Court, all servicing fees due pursuant to the terms stated in the Loan Servicing Agreements, and all interest due on the First Trust Deed Fund Assets . . . shall continue to be due and payable, and Compass shall collect such servicing fees and interest for its sole benefit on and after the Closing Date. (¶ 82.)

### D. Post-Confirmation Events.

Donna Cangelosi and the Lenders Protection Group opposed the confirmation of the plan.[19] Their objections were overruled. The Lenders Protection Group appealed and, rather than seeking a stay on appeal pursuant to the Federal Rules of Bankruptcy Procedure, sought and

---

[19]As noted, this Group was an ad hoc group and although the Court required the filing of statements under Rule 2019, these statements were not always kept up-to-date.

13

1   received an ex-parte stay on appeal from the Bankruptcy Appellate Panel. That stay was quashed

2   by the District Court after the case was returned to the District Court when the debtors failed to

3   consent to jurisdiction before the BAP. Rather than seeking a stay in this court, the Lenders

4   Protection Group abandoned that effort prior to the closing.

5       The closing occurred and Compass paid approximately $67 million for the assets. In its

6   Motion to Enforce Confirmation, Compass contends that Ms. Cangelosi and the Lenders

7   Protection Group have been engaged in a concerted effort, both before and after confirmation of

8   the plan, to derail the reorganization and to deter Compass, and that the letters to borrowers and

9   the termination letters were a part of this scheme as opposed to the exercise of any legitimate

10  rights of the direct lenders to terminate Compass as a servicing agent. (See Docket # 3773,

11  "Exhibit B," Declaration of Boris Piskun.)

12      Apparently, Ms. Cangelosi and others have caused the formation of limited liability

13  companies, which are described as being comprised of direct lenders who have allegedly

14  assigned their rights to the LLC in exchange for membership interests. A different LLC was

15  formed for each loan. It also appears that the LLC's contemplate that default interest will be paid

16  to them (and shared by the manager and the members) and not to Compass. ("Exhibit F" to

17  Docket # 3830; Docket #3873, "Exhibit A.")

18      One of the "members" of the LPG, Todd Hansen, has allegedly contacted a borrower and

19  represented that only he has the right to speak on behalf of lenders in that loan.  (Docket 3773,

20  Blatt Declaration.)

21      On May 18, 2007, Compass filed an action in state court against Ms. Cangelosi and

22  others for intentional interference with contractual relations and prospective economic

23  advantage, defamation, and breach of the covenant of good faith and fair dealing. ("Exhibit F" to

24  Docket # 3854.)  On May 23, 2007, Compass dismissed the lawsuit without prejudice.

25  ("Declaration of Donna Cangelosi, "Docket # 3854.)

26

27

28                                    14

On or about May 18, 2007, Ms. Cangelosi caused to be sent to each borrower a letter stating that Compass had been terminated and that payments should be made to the "Lender 2 Lender, LLC," an entity apparently managed by Ms. Cangelosi.  (Docket 3854, ¶ 13; Docket #3773, "Exhibit B" to Blatt Declaration.) Simultaneously, Ms. Cangelosi, on behalf of the particular LLC, sent a letter terminating Compass's servicing rights. The letters stated that the agreements were terminated based upon Nevada Adm Code 645B.073 as well as various actions and inactions of Compass Partners. (See "Exhibit C "to Docket # 3830.)

The Lenders Protection Group filed an action based upon diversity jurisdiction in Federal District Court (#07-CV-000241-ECR-VPC) for declaratory relief as well as for damages on or about May 21, 2007.[20] (Docket # 3854, "Exhibit H".)  The plaintiffs request judgment for declarations that:

> 1. Under the Nevada Administrative Code plaintiffs, together with other direct lenders making up 51% of the beneficial interests of any loan, have the absolute right to terminate Compass as loan servicer and designate a new loan servicer.

> 2. Payments made by borrowers are first to be applied to accrued non-default rate interest and then to principal, and then to default interest and late fees, which priority may only be altered by the direct lenders in each loan.

> 3. That the plaintiffs and other direct lenders have the absolute right to modify the terms of their promissory note and deed of trust with the third-party borrower to maximize their recovery.

> 4. That as a result of the maturity of various loans in the USACM portfolio, Compass has never had a valid power of attorney to act on behalf of plaintiffs on the loans.

> 5. Plaintiffs and other direct lenders have the right to determine the priority of allocating payments made by any third-party borrower, and Compass has no such right.

> 6. Plaintiffs are entitled to terminate Compass as servicer on any loan based upon Compass's breaches of the loan servicing agreements.

> 7. Compass is not entitled to any compensation provided for in Section 5 of the loan servicing agreements.

---

[20]The named plaintiffs are each of the newly formed LLC's.

15

*E. Proceedings in this Court.*

Compass removed the action to this court. While a motion to strike fugitive pleading and remand has been filed, it has not yet been set for hearing. Compass brought this Motion to Enforce Confirmation to enforce the terms of the confirmation order and for contempt. In its Motion, Compass seeks the following orders against Cangelosi, Hansen, LPG, L2L and parties acting in court:

> 1. An order directing them to comply with the terms of the Confirmation Order and the loan servicing agreement.

> 2. An order directing them and others to issue letters to the borrowers that the prior letters shall have no force and effect and that Compass will continue to service until further order of the court.

> 3. An order enjoining them from communicating with borrowers under the loans, and sanctioning them.

> 4. Sanctioning them for civil contempt.

The court, as well as the Lenders Protection Group, raised the issue of subject matter jurisdiction and asked for additional briefing. Pending this hearing, the court ordered that the status quo be maintained as of the day prior to the purported termination letters. However, the Lenders Protection Group could take steps to terminate in accordance with the contracts and if valid, would be recognized.

## LEGAL DISCUSSION

The court finds that it has subject matter jurisdiction to adjudicate Compass's motion and has supplemental jurisdiction to adjudicate those issues for which it may not directly have subject matter jurisdiction. For those issues for which the court has only supplemental jurisdiction, such issues are, however, "non-core" and subject to either withdrawal to the District Court (absent consent) or this court's making of findings and recommendations to the District Court. Because of the need for expeditious and unified hearings, the court recommends that the reference be withdrawn.

16

1    As the court noted at the prior hearing, the mere fact that a court reserves jurisdiction in

2    it's orders to adjudicate further disputes does not end the question of whether or not the court has

3    subject matter jurisdiction. Rather, subject matter jurisdiction is not given by consent but by

4    statute. A court retains jurisdiction to determine if it has jurisdiction. *In re Harleston*, 275 B.R.

5    546, 549 (B.A.P. 9ᵗʰ Cir. 2002), *aff'd*, 331 F.3d 699 )(9ᵗʰ Cir. 2003).

6    Pursuant to 28 U.S.C. § 1334(b), the district courts (and by referral, the bankruptcy

7    courts) have original but not exclusive jurisdiction of all civil proceedings arising under title 11,

8    or arising in or related to cases under title 11. Bankruptcy Courts may hear and determine all

9    cases under title 11 and all core proceedings arising under title 11, or arising in a case under title

10   11.  11 U.S.C. § 157(b)(1). Core proceedings include matters concerning the administration of

11   the estate, allowance or disallowance of claims against the estate, confirmations of plans, orders

12   approving the sale of property and other proceedings affecting the liquidation of the assets of the

13   estate. 11 U.S.C. § 157(b)(2). The bankruptcy judge may hear a proceeding that is not a core

14   proceeding but that is otherwise related to a case under title 11. In such case, the court may not,

15   without consent, enter a final order, but must submit proposed findings of fact and conclusions of

16   law to the district court that enters the final order. 11 U.S.C. § 157©. Finally, a district court may

17   withdraw, in whole or in part, any case or proceeding referred to the bankruptcy court. 11 U.S.C.

18   § 157(d).

19   Clearly, a court retains jurisdiction to interpret and enforce its own orders. *In re*

20   *Franklin*, 802 F.2d 324, 326 (9ᵗʰ Cir. 1986). "Related to" jurisdiction is a grant of some breadth

21   and includes suits between third parties which have an effect on the bankruptcy estate. *Celotex*

22   *Corp. v. Edwards*, 514 U.S. 300, 308 n. 5 (1995).  *Stratosphere Litigation L.L.C. v. Grand*

23   *Casinos*, 298 F.3d 1137, 1142 (9ᵗʰ Cir. 2002).  The test for pre-confirmation jurisdiction has been

24   broadly formulated such that if the outcome of the proceeding could conceivably have any effect

25   on the estate being administered in bankruptcy, whether or not it be against the debtor or against

26   the debtor's property, then the court has jurisdiction. *In re Fietz*, 852 F.2d 455, 457(9ᵗʰ Cir.1988).

27

28   17

1        In the Ninth Circuit, while post-confirmation jurisdiction is more limited than pre-

2   confirmation jurisdiction, the bankruptcy court still retains jurisdiction for matters which have a

3   "close nexus" to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court

4   jurisdiction over the matter. *In re Pegasus Gold Corp.*, 394 F.3d 1189 (9th Cir. 2005). As the

5   Ninth Circuit held, adopting the Third Circuit's test in *In re Resorts Int'l, Inc.,* 372 F.3d 154 (3d

6   Cir. 2004):[21]  Matters affecting "the interpretation, implementation, consummation, execution, or

7   administration of the confirmed plan will typically have the requisite close nexus." *In re Pegasus*

8   *Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005)(quoting *In re Resorts Int'l, Inc.,* 372 F.3d 154,

9   166-67 (3d Cir. 2004).

10        The Ninth Circuit in *Pegasus* also recognized that bankruptcy courts may properly

11   exercise supplemental jurisdiction over claims which have a more tangential relationship to the

12   underlying bankruptcy court. Hence if the remaining claims involve a "common nucleus of

13   operative fact" and would ordinarily be expected to be resolved in one judicial proceeding, the

14   bankruptcy court has supplemental jurisdiction over the remaining claims. *Pegasus*, 394 F.3d

15   1189, 1195 (9th Cir. 2005).

16        Before addressing the application of the law governing subject matter jurisdiction for

17   post-confirmation issues, it is important to note what this motion is not about. It is, despite the

18   protestations of the Lenders Protection Group, not merely about the determination of whether or

19   not Compass has committed breaches of the Loan Servicing Agreement. Nor is it merely about

20   the interpretation of the contract or the order of the application of the proceeds received from a

21   particular borrower. This Court agrees that if the Lenders Protection Group had sent letters of

22   termination which specified the manner in which Compass had failed to perform in accordance

23

24   _____

25   [21]The Lender Protection Group states in its opposition that the Ninth Circuit test is the same
     as the Seventh. (Docket #3853.)  This is incorrect.   The Seventh  Circuit test is more limited.

26   *See, e.g.*, *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995); *In re Fietz*, 852 F2d. 455, 457 (9th Cir.
     1988)(pre-confirmation jurisdiction); *In re Fedpak Sys, Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996),

27   *In re Commercial Loan Corp*., 363 B.R. 559 (Bankr. N.D. Ill. 2007).

28                                          18

1    with the loan servicing agreements and had sought only (or Compass sought) a declaration that

2    the contracts had been validly terminated, then this Court would not have subject matter

3    jurisdiction over the dispute.

4           Rather, the Lenders Protection Group seeks to do a number of additional things. It seeks

5    to void a provision of the loan servicing agreement by declaring that cause is not required to

6    terminate the contract despite the plain language of the agreement.[22]  Additionally, the Group

7    seeks to void the rights of Compass to collect and service based upon a pre-petition claim (at

8    least as to some loans) that the power of attorney expired upon maturity of the loans. It seeks to

9    modify the loans so as to prevent Compass from collecting amounts due it under the loan

10   servicing agreements  and the Asset Purchase Agreement. The Group seeks to deprive Compass

11   of fees purchased under the Asset Purchase Agreement. Finally, it has been suggested that the

12   Lenders Protection Group, and the LLC's and it's manager, Ms. Cangelosi, intend to take the

13   fees that Compass purchased. (Brief of Richard McKnight and attached exhibit, Docket # 3973.)

14          Subject matter jurisdiction is implicated in a number of ways. First, the Lenders

15   Protection Group seeks to void one provision of the contract by a declaration that despite the

16   language of the agreement, the contracts may be terminated even if Compass has not failed to

17   perform any of its duties. Any right to defeat a provision of the contract, by way of damages or

18   equitable relief, would appear to implicate the provisions concerning the Court's powers to

19   adjudicate claims. 11 U.S.C. § 101(5). Similarly, the declaration that the power of attorney was

20   invalid as of the maturation of each note also implicates the claim process.

21          Each of these issues also implicates the sale process. In essence, despite the sale order,

22   the Lenders Protection Group contends that certain assets - either loan servicing rights, or rights

23   to certain fees - were not conveyed. Clearly, this is within the court's jurisdiction. The court has

24   no doubt that it has the power to determine whether or not certain assets were included in it's

25   _____

26      [22]At oral argument, counsel for the Lenders Protection Group indicated that it would waive
     seeking a declaration as to this issue but only if the Court otherwise found no subject matter
27   jurisdiction.   Hence the Court does not view this claim as abandoned.

28                                              19

sale order.

The most dramatic impact on the sale order was the letter sent to borrowers advising them not to pay Compass. The Lenders Protection Group also seeks to modify the underlying loans to apparently direct that interest to be allocated in a certain manner and to declare that Compass has no rights to the fees it purchased. This directly impacts the sale order and asset purchase agreement because Compass purchased the rights to the loan servicing agreements as well as the fees due to USACM. Even if validly replaced as a servicer, it had the rights to the accrued fees.   Finally, Compass argues that these issues could lead to an action for recission.

Furthermore, Compass and any replacement servicer were required to net pre-paid interest and pay it over to the Liquidating Trust. The termination letter sent to borrowers directly impacts the estate, because if the borrowers fail to pay, there is no pre-paid interest to be remitted. While counsel for the Lenders Protection Group indicated they would abide by such provision if they were allowed to proceed, the estates' rights to receive these fees is implicated by a change in servicer. In particular, would the Lenders Protection Group take the position  that it was not required to remit pre-paid interest pending a resolution of it's appeal notwithstanding that it failed to seek a stay?

The Lenders Protection Group also argues that it has the right to terminate for cause and the court has no jurisdiction to so determine. It is clear from the various hearings and orders that Compass acquired the loan servicing agreements as written. It gained no greater rights than held by USACM nor any lesser rights. Conversely, the direct lenders each retain their rights, including the right to terminate the contracts in accordance with the terms of the agreement. As noted, if this case were simply about that, the court would decline jurisdiction. However, there is a non-frivolous claim that the alleged terminations were subterfuge for an attempt to interfere with Compass's rights. For example, rather than individual lenders determining whether or not Compass had failed to act, the Lenders Protection Group provided form letters which did not specify any cause, has engaged in a series of communications seeking to stop Compass, and has

20

1   formed LLC's to acquire all servicing rights. ("Motion to Enforce Confirmation, Docket # 3773,

2   "Exhibit A.") This court believes that where such subterfuge is alleged, it has jurisdiction to

3   determine whether or not the lenders are in good faith exercising their rights under the contract

4   or are attempting to avoid the effect of this court's orders. *See In re Petrie Retail Inc*, 304 F.3d

5   223 (2d Cir. 2002)(court has post-confirmation jurisdiction.) However, even if the court does not

6   have core or related to jurisdiction with respect to this particular dispute, the court has

7   supplemental jurisdiction over this common nucleus of facts.

8               **WITHDRAWAL OF THE REFERENCE**

9       While this court has found that it has subject matter jurisdiction to determine the issues

10  raised by Compass's motion, that does not end the question of the nature and extent of this

11  court's jurisdiction.

12      As stated above, unless the parties consent, this court cannot enter final orders with

13  respect to non-core matters. The issues implicated in this include matters over which this court

14  has only supplemental jurisdiction as well as matters which are within the court's jurisdiction

15  under § 1334, but are non-core under § 157. Hence, the court would be in the position of making

16  only findings and recommendations as to some matters. The issues here are inextricably

17  intertwined, and to attempt to delineate the matters and/or bifurcate hearings would constitute a

18  waste of judicial resources.

19      The court cannot enforce the provisions of the plan without determining whether or not

20  the contracts were validly terminated. Furthermore, this court cannot enforce the provisions of

21  the plan without determining whether Compass is applying the monies received in accordance

22  with the provisions of the notes and deeds of trust and loan servicing agreements.

23      Accordingly, this court believes that the most expeditious way of proceeding is for the

24  District Court to withdraw the reference.

1

**INTERIM RELIEF**

2          Until the reference is withdrawn, this court retains jurisdiction to enter all orders.

3    FED. R. BANK. P. 5011. It is apparent that interim relief is required so that borrowers will not use

4    this dispute as an excuse not to remit payments and so that funds collected can be distributed to

5    the direct lenders and especially those direct lenders who are not involved in this dispute.

6    However, the rights of the Lenders Protection Group must be preserved such that if it some or all

7    of its members have validly terminated the loan servicing agreements, they can proceed in the

8    manner they wish to proceed.[23] At the prior hearing on June 22, 2007 the parties and the court

9    determined how this should be accomplished. Compass is directed to prepare the order, with the

10   Lender Protection Group to approve or disapprove such order pursuant to the provisions of Local

11   Bankruptcy Rule 9021.

12          **IT IS SO ORDERED.**

13

14   Copies noticed through ECF to:
15          LENARD E. SCHWARTZER     bkfilings@s-mlaw.com
             RICHARD MCKNIGHT     mcknightlaw@cox.net, gkopang@lawlasvegas.com
16          ALAN R SMITH     mail@asmithlaw.com,
                  turk@asmithlaw.com;marsh@asmithlaw.com;darby@asmithlaw.com
17          ROB CHARLES     rcharles@lrlaw.com, cjordan@lrlaw.com

18   Copies noticed through BNC to:
             ORRICK HERRINGTON & SUTCLIFFE LLP
19          400 CAPITOL MALL #3000
             SACRAMENTO, CA 95814-4497

20

21

22

23

24

25   _____

26   [23]Despite the fact the loan servicer has the right to foreclose on loans in default (and perhaps
     the duty to do so), the Lenders Protection Group apparently does not want Compass to cause
27   foreclosure of some or all of the defaulted loans.

28                                          22

**Entered on Docket**
**August 01, 2007**

_____
**Hon. Linda B. Riegle**
**United States Bankruptcy Judge**

| | |
|---|---|
| Robert J. Moore | Peter C. Bernhard (Nevada Bar No. 0734) |
| Tyson M. Lomazow | Georganne W. Bradley (Nevada Bar No. 1105) |
| MILBANK, TWEED, HADLEY & McCLOY, LLP | BULLIVANT HOUSER BAILEY PC |
| 1 Chase Manhattan Plaza | 3980 Howard Hughes Pkwy., Ste. 550 |
| New York, NY 10005 | Las Vegas, NV 89169 |
| Telephone No.: (212) 530-5367 | Telephone No.: (702) 650-6565 |
| Facsimile No.: (212) 822-5367 | Facsimile No.: (702) 650-2995 |
| | E-Mail: peter.bernhard@bullivant.com |

**Counsel for Compass Financial Partners LLC**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br>Debtor. | Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br>Debtor. | Chapter 11<br><br>Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND,<br>LLC,<br>Debtor. | **SUPPLEMENTAL ORDER RE:**<br>**EMERGENCY MOTION OF COMPASS**<br>**FINANCIAL PARTNERS LLC FOR** |
| In re:<br>USA SECURITIES, LLC,<br>Debtor. | **ORDER PURSUANT TO 11 U.S.C. §§**<br>**105 AND 1141 ENFORCING**<br>**CONFIRMATION ORDER AND FOR** |
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund,<br>LLC<br>☐ USA First Trust Deed Fund, LLC | **CIVIL CONTEMPT SANCTIONS**<br><br>Date: June 20, 2007<br>Time: 10:30 p.m. |

On June 20, 2007, this Court (the "Court") conducted a continued hearing to determine

whether it had subject matter jurisdiction to consider the Motion of Compass Financial Partners

LLC and Compass USA SPE LLC (together, "Compass") for Order Pursuant to 11 U.S.C. §§

– 1 –

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

1   105 and 1141 Enforcing Confirmation Order and for Civil Contempt Sanctions (the "Motion"),

2   which was filed by Compass on May 25, 2007, and the Complaint for Declaratory Relief and

3   Damages filed on May 21, 2007 in the United States District Court for the District of Nevada

4   entitled *3685 San Fernando Lenders, LLC, et al. vs. Compass USA SPE, LLC, et al.*, Case No.

5   07-CV-0224-ECR-VAC (the "Complaint"), which was removed by Compass to, and is currently

6   pending before, this Court in Adv. Proc. No. 07-01076 (the "Adversary Proceeding").

7   Appearances of counsel were noted on the record at the hearing.  Capitalized terms not

8   otherwise defined herein shall have the meanings ascribed to them in the Motion.

9       The Court having heard oral argument of counsel and other interested persons, having

10  read and considered all pleadings and papers filed in support of and in opposition to the Motion,

11  and having read and considered all statements made, and all pleadings and papers on file herein,

12  that are, in the opinion of this Court, relevant to the issues currently before the Court, and

13  having entered a Recommendation For Withdrawal of the Reference as it applies to the Motion

14  and the Adversary Proceeding, and it appearing that interim relief is required so that borrowers

15  will not use the dispute between Compass and the plaintiffs in the above-referenced Complaint

16  and their respective assignors (collectively, the "Plaintiff Lenders") as an excuse not to remit

17  payments and so that funds collected can be distributed to all Direct Lenders, especially those

18  not involved in this dispute, but it further appearing that the rights of the Plaintiff Lenders must

19  be preserved such that if a Plaintiff Lender or Plaintiff Lenders validly have terminated

20  Compass, such Plaintiff Lender or Plaintiff Lenders will be in a position to take further action in

21  accordance with their contractual rights and otherwise applicable law; and for good cause

22  appearing,

23      IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Court has subject

24  matter jurisdiction over the Motion and the Adversary Proceeding, but finds that withdrawal of

25  the reference is appropriate in this case, for the reasons stated in this Court's memorandum

26  decision dated July 2, 2007, and as stated in this Court's Order Recommending Withdrawal of

27  the Reference; and

28

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

1    IT IS FURTHER ORDERED that jurisdiction shall remain with this Court to consider

2    the Motion and the Adversary Proceeding unless and until the United Stated District Court for

3    the District of Nevada (the "District Court") orders that the reference be withdrawn in whole or

4    in part and all matters regarding whether the reference shall be withdrawn shall proceed in the

5    District Court; provided, however, that notwithstanding the above, the Court shall retain

6    jurisdiction as set forth below until further order of the Court or the District Court; and

7    IT IS FURTHER ORDERED that, pending further order of the Court, the status quo as

8    of May 15, 2007 is and shall be preserved such that Compass shall be and remain the loan

9    servicer with respect to all loans for which it acquired servicing rights pursuant to that certain

10    Asset Purchase Agreement dated December 8, 2006, approved by Order of this Court entered

11    January 8, 2007 (each a "Loan," and collectively, the "Loans"); and

12    IT IS FURTHER ORDERED that pending further order of the Court, no Direct Lender

13    shall initiate contact with the borrower in any Loan which (i) undermines Compass' exclusive

14    authority to act on behalf of the Direct Lenders as loan servicer, or (ii) purports that an entity

15    other than Compass is authorized to negotiate with the borrower on behalf of the Direct Lenders

16    in such Loan; and

17    IT IS FURTHER ORDERED that within three (3) business days of the date of entry of

18    this Order, the Law Offices of Alan R. Smith shall cause the Plaintiff Lenders to mail

19    correspondence (previously reviewed and approved by Compass) to the borrower on each Loan

20    for which the Plaintiff Lenders attempted to terminate Compass as servicer on May 18, 2007,

21    enclosing a copy of this Order, and providing that (i) the Plaintiff Lenders' May 18, 2007

22    correspondence to each such borrower was ineffectual, (ii) Compass remains the exclusive

23    entity authorized to act on behalf of the Direct Lenders in such Loan, and (iii) all payments on

24    the Loan should continue to be made directly to Compass, pending further order of the Court;

25    and

26    IT IS FURTHER ORDERED that, pending further order of the Court, all amounts due

27    and owing under or in connection with the Loans (the "Payments") shall continue to be paid

28    directly to Compass and that all Direct Lenders shall be enjoined, prevented and restrained from

1    any communication with borrowers that would otherwise direct the borrowers to make

2    payments to an individual or entity other than Compass; and

3         IT IS FURTHER ORDERED that, pending further order of the Court, Compass shall be

4    entitled to deduct and retain from Payments received the amount of its accrued and unpaid

5    servicing fees then due to Compass, provided, however, that any amounts relating to default

6    interest, late charges, or non-servicing fees shall be held in the Direct Lender remittance account

7    established and maintained by Compass, and provided, further, that notwithstanding the above,

8    in the event Compass receives Payments from a borrower in respect of a Loan (i) in which

9    Compass holds one hundred percent (100%) of the beneficial interests of record, or (ii) which

10   satisfy in full all current obligations due and owing under the governing loan documents

11   (including default interest, late charges, and non-servicing fees), then Compass shall be

12   permitted to deduct and retain from such Payments received any amounts relating to default

13   interest, late charges, and non-servicing fees; and

14        IT IS FURTHER ORDERED that in the event the Plaintiff Lenders hold one hundred

15   percent (100%) of the beneficial interests of record in a Loan, they shall have the right to direct

16   Compass not to take any further action to pursue recovery from borrowers of outstanding

17   amounts due with respect to such Loan; provided, however, that Compass shall remain loan

18   servicer of such Loan, pending further order of the Court; and

19        IT IS FURTHER ORDERED that pending further order of the Court, effective May 15,

20   2007, all Direct Lenders shall be enjoined, prevented and restrained from terminating Compass,

21   or effectuating any change or replacement of Compass as their loan servicer; and

22        IT IS FURTHER ORDERED that pending further order of the Court, Direct Lenders

23   shall be enjoined, prevented and restrained from sending out any notice to Compass, or to any

24   third-party borrowers on loans made by the Direct Lenders, purporting to terminate or replace

25   Compass as their loan servicer; and

26        IT IS FURTHER ORDERED that this Court shall hold a status conference with respect

27   to the Motion and the Adversary Proceeding on August 17, 2007 at 10:30 a.m.; and

28

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

– 4 –

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

1      IT IS FURTHER ORDERED that prior to August 17, 2007, Compass shall not complete

2  a foreclosure sale of any real property collateral for any Loan (the "Collateral") absent further

3  order of the Court or the approval of the holders of fifty-one-percent (51%) or more of the

4  beneficial interests of record in the particular Loan; provided that (i) Compass remains

5  authorized to continue to initiate and pursue foreclosure sales with respect to Collateral up until

6  the point of completing such sales, and (ii) subject to this Court's calendar, Compass shall be

7  permitted to schedule a hearing with respect to a request for Court approval to complete a

8  foreclosure sale upon at least seven (7) days notice to the Law Offices of Alan R. Smith.

9      IT IS FURTHER ORDERED that the Court shall deem and treat the Motion as an

10  adversary proceeding to permit the parties to commence discovery on the issues raised in the

11  Motion in compliance with a discovery plan approved by this Court, and that the rules set forth

12  in Rule 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

13  including all provisions of Bankruptcy Rule 7026, are applicable to the matters raised by the

14  Motion; provided that, notwithstanding Rule 7026 of the Local Rules of Bankruptcy Procedure,

15  the parties shall meet and confer within five (5) days and shall submit a discovery plan within

16  seven (7) days of the date this Order is entered.

17

| Submitted by: | Approved/Disapproved by: |
|---|---|
| MILBANK, TWEED, HADLEY & McCLOY, LLP -and- BULLIVANT HOUSER BAILEY PC<br><br>By: _____<br>    Georganne W. Bradley, Esq.<br><br>*Attorneys for Compass Financial Partners* | LAW OFFICES OF ALAN R. SMITH<br><br>By: _____<br>    Alan R. Smith, Esq.<br><br>*Attorneys for Lenders Protection Group* |
| | **Approved/Disapproved by:**<br><br>OFFICE OF THE U.S. TRUSTEE<br><br>By: _____<br>    August B. Landis, Esq. |

1   IT IS FURTHER ORDERED that prior to August 17, 2007, Compass shall not complete

2   a foreclosure sale of any real property collateral for any Loan (the "Collateral") absent further

3   order of the Court or the approval of the holders of fifty-one-percent (51%) or more of the

4   beneficial interests of record in the particular Loan; provided that (i) Compass remains

5   authorized to continue to initiate and pursue foreclosure sales with respect to Collateral up until

6   the point of completing such sales, and (ii) subject to this Court's calendar, Compass shall be

7   permitted to schedule a hearing with respect to a request for Court approval to complete a

8   foreclosure sale upon at least seven (7) days notice to the Law Offices of Alan R. Smith.

9   IT IS FURTHER ORDERED that the Court shall deem and treat the Motion as an

10   adversary proceeding to permit the parties to commence discovery on the issues raised in the

11   Motion in compliance with a discovery plan approved by this Court, and that the rules set forth

12   in Rule 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

13   including all provisions of Bankruptcy Rule 7026, are applicable to the matters raised by the

14   Motion; provided that, notwithstanding Rule 7026 of the Local Rules of Bankruptcy Procedure,

15   the parties shall meet and confer within five (5) days and shall submit a discovery plan within

16   seven (7) days of the date this Order is entered.

17

| 18 | **Submitted by:** | **Approved/Disapproved by:** |
|---|---|---|
| 19 | MILBANK, TWEED, HADLEY & McCLOY, LLP | LAW OFFICES OF ALAN R. SMITH |
| 20 | -and-<br>BULLIVANT HOUSER BAILEY PC | By: _____ |
| 21 | | Alan R. Smith, Esq. |
| 22 | By _____ | *Attorneys for Lenders Protection Group* |
| 23 | Georganne W. Bradley, Esq. | |
| 24 | *Attorneys for Compass Financial Partners* | |
| 25 | | **Approved/Disapproved by:** |
| 26 | | OFFICE OF THE U.S. TRUSTEE |
| 27 | | By: _____ |
| 28 | | August B. Landis, Esq. |

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

1     IT IS FURTHER ORDERED that prior to August 17, 2007, Compass shall not complete

2  a foreclosure sale of any real property collateral for any Loan (the "Collateral") absent further

3  order of the Court or the approval of the holders of fifty-one-percent (51%) or more of the

4  beneficial interests of record in the particular Loan; provided that (i) Compass remains

5  authorized to continue to initiate and pursue foreclosure sales with respect to Collateral up until

6  the point of completing such sales, and (ii) subject to this Court's calendar, Compass shall be

7  permitted to schedule a hearing with respect to a request for Court approval to complete a

8  foreclosure sale upon at least seven (7) days notice to the Law Offices of Alan R. Smith.

9     IT IS FURTHER ORDERED that the Court shall deem and treat the Motion as an

10  adversary proceeding to permit the parties to commence discovery on the issues raised in the

11  Motion in compliance with a discovery plan approved by this Court, and that the rules set forth

12  in Rule 9014(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

13  including all provisions of Bankruptcy Rule 7026, are applicable to the matters raised by the

14  Motion; provided that, notwithstanding Rule 7026 of the Local Rules of Bankruptcy Procedure,

15  the parties shall meet and confer within five (5) days and shall submit a discovery plan within

16  seven (7) days of the date this Order is entered.

17

| 18 | **Submitted by:** | **Approved/Disapproved by:** |
|---|---|---|
| 19 | MILBANK, TWEED, HADLEY & McCLOY, LLP | LAW OFFICES OF ALAN R. SMITH |
| 20 | -and-<br>BULLIVANT HOUSER BAILEY PC | |
| 21 | | By: _____<br>     Alan R. Smith, Esq. |
| 22 | By: _____<br>     Georganne W. Bradley, Esq. | *Attorneys for Lenders Protection Group* |
| 23 | | |
| 24 | *Attorneys for Compass Financial Partners* | |
| 25 | | **Approved/Disapproved by:** |
| 26 | | OFFICE OF THE U.S. TRUSTEE |
| 27 | | |
| 28 | | By: _____<br>     August B. Landis, Esq. |

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

– 5 –

In accordance with Local Rule 9021, the undersigned certifies:

_____ The court waived the requirements of LR 9021.

_____ No parties appeared or filed written objections, and there is no trustee appointed in the case.

___✓___ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and any trustee appointed in this case, and each has approved or disapproved the order, or failed to respond, as indicated below:

Alan R. Smith, Esq. : *Approved 7/31/07*

Office of U.S. Trustee: *Approved 8/1/07*

BULLIVANT HOUSER BAILEY P.C.

By: *Georganne W. Bradley*
    Georganne W. Bradley, Esq.

Bullivant|Houser|Bailey PC
3980 Howard Hughes Pkwy., Suite. 550
Las Vegas, NV 89169
Telephone: (702) 650-6565
Facsimile: (702) 650-2995

# EXHIBIT J

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3                    LAS VEGAS, NEVADA

4    3685 SAN FERNANDO LENDERS, LLC,  )
     et al.,                          )
5                                     )
               Plaintiffs,            )
6                                     )
         vs.                          )  Case No.
7                                     )  3:07-CV-241-RCJ-VPC
     COMPASS USA SPE, LLC, et al.,    )
8                                     )
               Defendants.            )
9    _____ )
     In re:  USA COMMERCIAL MORTGAGE  )
10   COMPANY.                         )  Case No.
     _____ )  2:07-CV-892-RCJ-GWF
11

12            PARTIAL TRANSCRIPT OF PROCEEDINGS
                           OF
13            HEARING RE: BANKRUPTCY ORDER
                        VOLUME 1
14        BEFORE THE HONORABLE ROBERT C. JONES
               UNITED STATES DISTRICT JUDGE
15
                  Monday, August 6, 2007
16

17

18

19

20

21

22

23

24   Court Recorder:       Araceli Catu

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

2

```
 1   APPEARANCES:

 2   For Silar Advisors,    LOUIS A. CURIO, ESQ.
     LP:                    Thacher, Proffitt & Wood, LLP
 3                          2 World Financial Center
                            New York, New York 10281
 4                          (Telephonic)

 5   For Castaic Partners,  KATHERINE M. WINDLER, ESQ.
     LLC, Castaic Partners  Bryan Cave, LLP
 6   II, LLC, Castaic       120 Broadway
     Partners III, LLC,     Suite 300
 7   Varusa, and            Santa Monica, California 90401
     Bill Barkett:          (Telephonic)

 8
     For the Rita P.        JANET L. CHUBB, ESQ.
 9   Anderson Trust,        Jones Vargas
     Kehl Family Members,   100 West Liberty
10   and Mohave Canyon,     Twelfth Floor
     Inc.:                  Reno, Nevada 89501
11                          (Telephonic)

12   For Compass Financial  LINDA DAKIN-GRIMM, ESQ.
     Partners, LLC:         DANIEL M. PERRY, ESQ.
13                          Milbank, Tweed, Hadley & McCloy, LLP
                            601 South Figueroa Street
14                          Los Angeles, California 90017

15                          TYSON M. LOMAZOW, ESQ.
                            Milbank, Tweed, Hadley & McCloy, LLP
16                          1 Chase Manhattan Plaza
                            New York, New York 10005
17
                            GEORGANNE W. BRADLEY, ESQ.
18                          Bullivant Houser Bailey, P.C.
                            3980 Howard Hughes Parkway
19                          Suite 550
                            Las Vegas, Nevada 89109
20
     For the Lenders        ALAN R. SMITH, ESQ.
21   Protection Group:      KEVIN A. DARBY, ESQ.
                            Law Offices of Alan R. Smith
22                          505 Ridge Street
                            Reno, Nevada 89501
23
     For 6425 Gess, LP,     EDGAR C. SMITH, ESQ.
24   Anchor B, LP, and      Smith Law Offices
     619 Main, LP:          850 East Bonneville Avenue
25                          Las Vegas, Nevada 89101
```

```
1   APPEARANCES (Cont.):

2   Also Present:          BORIS PISKUN
                           Managing Partner
3                          Compass Financial Partners, LLC

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    and I object to these statements because there's no

2    declaration.  There's no supporting evidence whatsoever.

3            THE COURT:  Overruled.

4            MS. DAKIN-GRIMM:  Your Honor, the transcript of the

5    July 27th hearing is attached to our papers.  Again, it's

6    attached to Mr. Lomazow's declaration as Exhibit F, and a CD

7    recording of that hearing just a week and a half ago also

8    exists, and we would ask that the Court read that transcript.

9    I wasn't present.  My bankruptcy court -- my bankruptcy partner

10   was present.

11           THE COURT:  Why should I read it at this juncture?

12   What I've said is the order's entered until withdrawal of

13   reference are the orders.

14           MS. DAKIN-GRIMM:  Okay.

15           THE COURT:  And I'm not going to consider today

16   limiting or delimiting the order.

17           MS. DAKIN-GRIMM:  That order still has not been

18   complied with, your Honor, and that is my problem.  We are more

19   than three --

20           THE COURT:  But that's not on our calendar, either,

21   right?

22           MS. DAKIN-GRIMM:  It is not on our calendar, other

23   than Mr. Smith asked you to dissolve the order, and I guess

24   what I'm hearing is if he doesn't comply with it, we'll come

25   back and bring it to your attention --

```
 1              THE COURT:  Right.

 2              MS. DAKIN-GRIMM:  -- and then I'll tell you the

 3    history of the two months of noncompliance.

 4              THE COURT:  Right.

 5              MS. DAKIN-GRIMM:  Okay.  I accept that, and I will

 6    move on.

 7         I'm not sure that there's any need at this point,

 8    your Honor, to address the agency argument that Mr. Smith

 9    raised in his papers given your ruling.

10         But in short, the very cases that Mr. Smith cited to you

11    establish that in the bankruptcy court in the confirmation of

12    the order, Compass acquired a right accompanied with an

13    interest.

14         And Mr. Smith did not provide you any case law on that.

15    But under that agency case law, it is not possible to

16    terminate --

17              THE COURT:  Okay.

18              MS. DAKIN-GRIMM:  -- an agent --

19              THE COURT:  All right.

20              MS. DAKIN-GRIMM:  -- without cause.

21              THE COURT:  Now, I understand you need to make a

22    record, but I want to make a -- and I'll let you do that if you

23    feel it appropriate, but I'm going to withdraw the reference.

24    Both sides want me to.

25         So I'm going to -- I already have the Northern District
```

1  case that's 241, and the case number that's been assigned to

2  the adversary proceeding proposed to be withdrawn from

3  Judge Riegle is 892.

4      And I'll grant the motion, and I'll ask Mr. Smith to

5  prepare on order agreed to by the other side that withdraws the

6  reference to --

7          MR. A. SMITH:  Go ahead and stand up (indiscernible).

8      (Colloquy not on the record.)

9          THE COURT:  -- with respect to 892.  And just for the

10  record, the order should make clear that it's withdrawing

11  reference to the adversary proceeding and the motions

12  identified by a docket number that Judge Riegle made a part of

13  that adversary proceeding.

14          MS. DAKIN-GRIMM:  Your Honor, may I ask that you also

15  have the order specifically state given the relief that

16  Mr. Smith requested today that all existent orders of

17  Judge Riegle remain in effect --

18          THE COURT:  No.

19          MS. DAKIN-GRIMM:  -- until this Court --

20          THE COURT:  But that's clearly the law.

21          MS. DAKIN-GRIMM:  Thank you.

22          THE COURT:  That's clearly the law.  Anything, any

23  order issued previously by a senior judge, district judge, or

24  by Judge Riegle, it's on the docket.  It's an order --

25          MS. DAKIN-GRIMM:  And that --

```
 1              THE COURT:  -- in the case.
 2              MS. DAKIN-GRIMM:  That is contained in the order that
 3    we just handed up to you, your Honor.  It says that expressly,
 4    but I just wanted to make sure.  It still hasn't been complied
 5    with, and we'd like to see it complied with.
 6         Our fear, your Honor, is there hasn't been in the past in
 7    this case clear communication with the thousands of lenders out
 8    there.
 9         I bet they don't even know about this order, even though
10    it's been in existence for two months, and we'd like to have
11    that happen because I don't think it's going to be possible --
12              THE COURT:  Have what happen?
13              MS. DAKIN-GRIMM:  Have communication of the Court's
14    order communicated to the parties in the case.
15              THE COURT:  Would you file a motion to make that
16    request, please.
17              MS. DAKIN-GRIMM:  That is part of Judge Riegle's
18    order, your Honor.  That's what she ordered.  She ordered that
19    they send the letter to the borrowers saying that --
20              THE COURT:  Okay.
21              MS. DAKIN-GRIMM:  -- our prior letter --
22              THE COURT:  You want me --
23              MS. DAKIN-GRIMM:  -- and that they copy it --
24              THE COURT:  -- to enforce the order --
25              MS. DAKIN-GRIMM:  -- to the lenders.
```

1        I certify that the foregoing is a correct transcript.

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Michele Phelps                      08/08/07

7    Michele Phelps, Transcriptionist            Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Linda Dakin-Grimm (admitted *pro hac vice*)
    Daniel M. Perry (admitted *pro hac vice*)
2   MILBANK, TWEED, HADLEY & McCLOY, LLP
    601 S. Figueroa Street, 30th Floor
3   Los Angeles, CA 90035
    Telephone No.:  (213) 892-4000
4   Facsimile No.:  (213) 629-5063

5   Peter C. Bernhard (Nevada Bar No. 0734)
    Georganne W. Bradley (Nevada Bar No. 1105)
6   Joseph P. Hardy (Nevada Bar No. 7370)
    BULLIVANT HOUSER BAILEY PC
7   3883 Howard Hughes Pkwy., Ste. 550
    Las Vegas, NV 89169
8   Facsimile No.:  (702) 650-2995
    E-Mail:  peter.bernhard@bullivant.com;
9           georganne.bradley@bullivant.com

10  **Counsel for Compass Financial Partners LLC
    and Compass USA SPE LLC**

11

12              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
13

| 14 | In re:<br>USA COMMERCIAL MORTGAGE<br>COMPANY,<br><br>                    Debtor. | **Case No. 2:07-CV-00892-RCJ-GWF**<br><br>Bankruptcy Case No. BK-S-06-10725 LBR<br>[Chapter 11] |
|---|---|---|
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |

22  ***ERRATA* RE: PRELIMINARY INJUNCTION AND ORDER PURSUANT TO 11 U.S.C.
23      §§ 105 AND 1141 AND FED. R. CIV. P. 65 ENFORCING CONFIRMATION ORDER**

24              Compass hereby files this *Errata* to the Preliminary Injunction and Order Pursuant

25  to 11 U.S.C. §§ 105 and 1141 and Fed. R. Civ. P. 65 Enforcing Confirmation Order.  Exhibits A

26  and B to the Order were inadvertently omitted from the filing with this Court.  In addition,

27  Compass has made a nonmaterial change to the defined term "Compass" in the Order, at page 1,

28

line 20.  The Order has been changed to include in its defined term of Compass a "licensed subservicer" of Compass.

 Attached is a new version of the Order in which Exhibits A and B are now included, and the definition of Compass has been updated.  No other changes whatsoever have been made to this document.

Dated:  October 31, 2007

Linda Dakin-Grimm (admitted *pro hac vice*)
Daniel M. Perry (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY, LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90035
Telephone No.:  (213) 892-4000
Facsimile No.:   (213) 629-5063

-and-

Peter Bernhard (State Bar No. 734)
Georganne W. Bradley (State Bar No. 1105)
Bullivant Houser Bailey PC
3883 Howard Hughes Pkwy., Ste. 550
Las Vegas, NV 89169
peter.bernhard@bullivant.com
Telephone No.: (702) 650-6565
Facsimile No.:  (702) 650-2995

Counsel for Compass Financial Partners LLC and
Compass USA SPE LLC

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br>Debtor. | Case No. 2:07-CV-00892-RCJ-GWF<br><br>Bankruptcy Case No. BK-S-06-10725 LBR [Chapter 11] |
|---|---|
| Affects:<br>☐ All Debtors<br>☒ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | **Preliminary Injunction and Order Pursuant to 11 U.S.C. §§ 105 and 1141 and Fed. R. Civ. P. 65 Enforcing Confirmation Order**<br><br>**Hearing Date:   September 10, 2007**<br>**Hearing Time:   3:00 p.m.** |

On August 1, 2007, following hearings held on June 20, 2007 and July 27, 2007, the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") entered its Supplemental Order Re: Emergency Motion for Order Pursuant to 11 U.S.C. §§ 105 and 1141 Enforcing Confirmation Order and for Civil Contempt Sanctions (the "Bankruptcy Court Injunction Order") in the chapter 11 bankruptcy cases of USA Commercial Mortgage Company ("USACM") and certain of its affiliates (collectively, the "Debtors"), jointly administered under Case Number BK-S-06-10725-LBR (the "Bankruptcy Case"), with respect to the Emergency Motion of Compass Financial Partners LLC and Compass USA SPE LLC (together, with any parent, affiliate, subsidiary, or licensed subservicer thereof, "Compass") for Order Pursuant to 11 U.S.C. §§ 105 and 1141 Enforcing Confirmation Order and for Civil Contempt Sanctions (the "Sanctions Motion").  On August 6, this United States District Court for the District of Nevada (the "Court") withdrew the reference to the Bankruptcy Court with respect to the disputes set forth in the Sanctions Motion, which had been designated an adversary proceeding by the Bankruptcy Court.

On August 27, 2007, the Court held a preliminary hearing on a Motion to Dissolve Bankruptcy Court's Temporary Status Quo Order (the "Plaintiff Lenders Motion") filed by the plaintiffs in Cause No. 3:07-CV.00241: Donna M. Cangelosi ("Cangelosi"); fifty-two (52)

Limited Liability Company entities (each an "LLC," and collectively the "LLCs") purportedly holding beneficial interests in the fifty-two (52) separate loans originated by USACM identified in Exhibit A hereto (each a "Loan," and collectively the "Loans"); and an entity calling itself the "Lenders Protection Group" consisting of individuals holding beneficial interests in certain of the loans originated by the Debtors (the "LPG;" and together with Cangelosi and the LLCs, the "Plaintiff Lenders").  The Court ruled at that hearing that the Bankruptcy Court Injunction Order should remain in full force and effect pending a hearing on the Court's order to show cause why the Bankruptcy Court Injunction Order should not be entered by the Court as a preliminary injunction pursuant to Fed. R. Civ. P. 65 (the "Order to Show Cause").  A hearing on the Order to Show Cause was held before this Court on Monday, September 10, 2007, at which time the Court made preliminary findings of law and ordered interim relief, as supplemented by further rulings at hearings on related matters held on October 1, 2007 and October 2, 2007.

This Court, having heard oral argument of counsel and other interested persons whose appearances were as noted on the record of the September 10, 2007, October 1, 2007 and October 2, 2007 hearings, having read and considered all pleadings and papers filed in support of and in opposition to the Order to Show Cause, and having read and considered the Sanctions Motion, the Plaintiff Lenders Motion, and all Declarations and other pleadings and papers on file herein that are, in the opinion of the Court, relevant to the issues before it; and it appearing that interim relief is required so that borrowers will not use the dispute between Compass and the Plaintiff Lenders as an excuse not to timely remit payments to Compass and so that funds collected by Compass can be distributed to the beneficial holders of interests in the Loans (collectively, and not limited only to those holders that purported to assign such beneficial interests to an LLC, the "Direct Lenders"), including those Direct Lenders not directly or indirectly a party to the dispute, but it further appearing that the rights of the Plaintiff Lenders must be preserved so that such Plaintiff Lenders will have an opportunity to take further action in accordance with their contractual rights and this Preliminary Injunction Order to seek to terminate Compass as servicer with respect to a Loan; and for good cause otherwise appearing:

1    IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

2    1.    <u>Compass as Servicer</u>. Pending further order of this Court, Compass is and shall

3 remain the loan servicer with respect to all Loans for which Cangelosi, on behalf of FDH

4 Management Company LLC as managing member of each of the LLCs, purported to terminate

5 Compass as loan servicer on May 18, 2007, and Compass shall retain and be authorized to

6 exercise its authority as servicer to (i) negotiate with borrowers under the Loans the settlement

7 of any defaulted or non-performing Loan, and (ii) initiate and pursue foreclosure proceedings in

8 its own name on behalf of the holders of the Bid Interests (as defined in paragraph 7 herein)

9 with respect to any Loan in accordance with the terms of this Preliminary Injunction Order and

10 the applicable Loan Servicing Agreements between USACM and Direct Lenders under a Loan,

11 the rights of USACM under which were purchased by and assigned to Compass pursuant to an

12 Order entered in the Bankruptcy Case (the "<u>LSAs</u>").

13    2.    <u>Borrower Payments</u>. Pending further order of this Court, all amounts due and

14 owing by borrowers under or in connection with the Loans shall continue to be paid directly to

15 Compass (the "<u>Payments</u>"), and all Direct Lenders are enjoined, prevented and restrained from

16 initiating or engaging in any contact with a borrower in any Loan in which such a Direct

17 Lender: (i) undermines the exclusive authority of Compass (and its Subservicer, as defined in

18 paragraph 3 herein) to act directly on behalf of the Direct Lenders as servicer; (ii) purports to

19 have the authority to negotiate on behalf of Direct Lenders in such Loan; or (iii) otherwise

20 directs a borrower to make Payments to an individual or entity other than Compass.

21    3.    <u>Subservicer</u>. Compass is authorized, required and directed to engage a

22 subservicer that holds a valid Nevada mortgage lender license to assist in servicing the Loans

23 (the "<u>Subservicer</u>"), which Subservicer shall remain under the Court's supervision, to, among

24 other things:  (i) provide and distribute status updates to Direct Lenders on the Loans consistent

25 with the terms of the LSAs; (ii) field and timely reply to Direct Lender inquiries regarding Loan

26 status, account status, and related questions regarding the Loans; (iii) review and reply to Direct

27 Lender inquiries regarding Compass's activities related to resolution of a defaulted or non-

28 performing Loan; (iv) review and monitor distributions made by Compass to Direct Lenders in

accordance with the applicable LSAs, applicable law and this Preliminary Injunction Order
upon Compass's recovery on account of a Loan; (v) contact, advise, and make appropriate
disclosure on behalf of Compass and the Subservicer to Direct Lenders with respect to proposed
Loan resolutions negotiated with the defaulted borrowers; (vi) gather necessary Direct Lender
consents to discounted borrower Loan payoffs in accordance with the terms of this Preliminary
Injunction Order and the applicable LSAs; (vii) review and monitor Compass's accountings of
distributions to Direct Lenders, payment of applicable Compass Fees (as defined in paragraph 4
herein), and deposits into the Direct Lender remittance account pursuant to this Preliminary
Injunction Order; and (viii) comply with the requirements of applicable regulatory bodies and
under applicable mortgage licensing statutes, and provide guidance to Compass with respect
thereto.

4.     Payment in Full.  In the event Compass receives a Payment from a borrower on a
Loan or cash from the sale of the collateral securing a Loan which satisfies in full ("Payment in
Full") all then outstanding principal and accrued interest owed to the Direct Lenders with
respect to such Loan (including, but not limited to, Compass to the extent that it is a Direct
Lender under such Loan) ("Principal and Interest") and all then outstanding and accrued default
interest, late charges, origination fees, extension fees, exit fees, success fees, and servicing fees
under the terms of the applicable Loan documents and LSAs (the "Compass Fees"), then: (a)
Compass shall be permitted to deduct and retain from such Payment in Full the Compass Fees;
and (b) Compass shall distribute the balance of the Payment in Full to such Direct Lenders
(including, but not limited to, Compass to the extent that it is a Direct Lender under such Loan)
in accordance with applicable law and the applicable LSAs.

5.     Consensual Discounted Payoff.  In the event that Compass receives a Payment
from a borrower on a Loan or cash from the sale of the collateral securing a Loan that is less
than Payment in Full (a "Discounted Payment"), but, after full disclosure and a line-by-line
itemization to the Direct Lenders in such Loan of the Principal and Interest and the specific
Compass Fees related to the Loan ("Disclosure"), Compass has received the unconditional
consent of all Direct Lenders under such Loan in accordance with the applicable LSAs

1 (including, but not limited to, Compass to the extent that it is a Direct Lender under such Loan)

2 as to the amount of such Discounted Payment that shall be distributed to Direct Lenders with

3 respect to Principal and Interest on the Loan, and Compass has consented to the amount of such

4 Discounted Payment that shall be distributed to it with respect to the Compass Fees, then: (a)

5 Compass shall be entitled to deduct and retain from such Discounted Payment and release from

6 the remittance account for the Loan, if any, for its own account such amount of Compass Fees

7 as have been so consented to; and (b) Compass shall distribute to the Direct Lenders (including,

8 but not limited to, Compass to the extent that it is a Direct Lender on a Loan) from such

9 Discounted Payment such amounts of Principal and Interest as have been so consented to.

10 Notwithstanding anything contained in this Preliminary Injunction Order to the contrary, under

11 no circumstance shall Compass be obligated to accept a Discounted Payment from a borrower

12 absent the unconditional consent of Compass and all of the Direct Lenders (including, but not

13 limited to, Compass to the extent that it is a Direct Lender on a Loan) on such Loan.

14       6.     <u>Non-Consensual Discounted Payment</u>. In the event that Compass receives a

15 Discounted Payment on a Loan, but, after Disclosure, Compass has not received the consent of

16 all Direct Lenders under such Loan as to the amount of such Discounted Payment that Compass

17 has proposed shall be distributed to Direct Lenders (including, but not limited to, Compass to

18 the extent that it is a Direct Lender under such Loan) on account of Principal and Interest (the

19 "<u>Direct Lender Allocation</u>"), then: (a) Compass shall be permitted to deduct and retain from

20 such Discounted Payment its servicing fees that accrued on and after February 16, 2007 under

21 the terms of the applicable LSAs ("<u>Post-Closing Servicing Fees</u>") and servicer advances made

22 with respect to such Loan under the terms of the applicable Loan documents and in accordance

23 with the LSAs ("<u>Advances</u>"); (b) if the amount of the Discounted Payment (after the deduction

24 of Post-Closing Servicing Fees and Advances) exceeds the total amount of Principal and Interest

25 due and owing to the Direct Lenders on such Loan (including, but not limited to, Compass to the

26 extent that it is a Direct Lender under such Loan), Compass is authorized to retain and apply

27 such difference to Compass Fees; (c) Compass shall distribute to Direct Lenders (including, but

28 not limited to, Compass to the extent that it is a Direct Lender under such Loan) from such

Discounted Payment the Direct Lender Allocation; (d) Compass is authorized to deduct and retain from such Discounted Payment an amount equal to the Compass Fees (including any funds relating to such Loan currently held in the Direct Lender remittance account pursuant to prior order of the Bankruptcy Court) less the Post-Closing Servicing Fees and Advances (the "Compass Allocation") in respect of those Direct Lenders that have consented to the Discounted Payoff, the Direct Lender Allocation and the Compass Allocation; and (e) Compass shall deposit the balance of such Discounted Payment in an interest-bearing Direct Lender remittance account. The funds deposited in such remittance account shall be distributed to Compass and to those Direct Lenders that have consented to the Discounted Payoff but have not consented to the Direct Lender Allocation and the Compass Allocation only upon and pursuant to: (i) the subsequent consent of Compass and all such non-consenting Direct Lenders; or (ii) further order of this Court obtained upon a motion brought by a party in interest after appropriate notice.

7. Foreclosure. In the event that Compass commences and pursues a foreclosure sale with respect to a Loan in accordance with the applicable LSAs: (a) Compass or a single purpose entity designated by Compass (the "Bidding Entity") is authorized to make a credit bid at the foreclosure sale (which shall not be in an amount greater than Payment in Full) on behalf of Compass and the Direct Lenders (including, but not limited to, Compass to the extent that it is a Direct Lender under such Loan) with respect to Compass's and the Direct Lenders' respective rights as beneficiaries under any applicable deed of trust, mortgage or security interest on account of obligations arising under the applicable Loan documents that are secured by the collateral (the "Bid Interests"); (b) if the Bidding Entity makes such a credit bid and there is a cash overbid, then either (i) if the cash overbid is in an amount equal to or greater than Payment in Full, then the Bidding Entity shall have no further obligation to bid at the foreclosure sale and upon receipt of proceeds of the sale in an amount equal to or greater than Payment in Full, the Bidding Entity shall proceed in accordance with paragraph 4 above, (ii) if the cash overbid is in an amount less than Payment in Full and Compass and all Direct Lenders under such Loan (including, but not limited to, Compass to the extent that it is a Direct Lender under such Loan) have not consented to the acceptance of a cash overbid in such amount, then

the Bidding Entity must increase its credit bid to at least the next highest incremental bid

amount in excess of the cash overbid permitted at the foreclosure sale, or (iii) if the cash overbid

is in an amount less than Payment in Full but Compass and all Direct Lenders under such Loan

(including, but not limited to, Compass to the extent that it is a Direct Lender under such Loan)

have consented (in accordance with the applicable LSAs), after Disclosure, to the acceptance of

a cash overbid in such amount, then (A) the Bidding Entity must accept (or direct the

foreclosure trustee or other entity conducting the foreclosure sale to accept) such cash overbid,

and (B) the Bidding Entity shall distribute such proceeds in accordance with paragraph 5 above.

Under no circumstance shall the Bidding Entity be obligated to make a bid in an amount greater

than Payment in Full.

       In the event that the Bidding Entity purchases the collateral at the foreclosure sale

pursuant to a successful credit bid made on behalf of the holders of the Bid Interests or receives

a deed in lieu of foreclosure, then the Bidding Entity is authorized to hold title to the purchased

collateral in the name of such Bidding Entity on behalf of the holders of the Bid Interests, and to

preserve, maintain, manage, market, sell and (in accordance with the applicable section of the

LSA which provides for the conveyance of title upon the approval of fifty-one percent (51%) of

the Direct Lenders in a Loan) convey title to the purchased collateral in the name of the Bidding

Entity on behalf of the holders of the Bid Interests, with all costs and advances associated

therewith to be deducted and paid to the Bidding Entity in accordance with the terms of the

applicable LSAs, after Disclosure, as a first priority from the proceeds realized in a subsequent

disposition of the collateral, prior to distribution of the balance in a manner consistent with

paragraphs 4, 5, or 6 above.

       8.    <u>Motion to Terminate Compass</u>.  Fifty-one percent (51%) or more of the Direct

Lenders in a Loan, whether acting directly or acting through a person or entity holding a power

of attorney of such Direct Lender granted after such Direct Lender's receipt of this Preliminary

Injunction Order and the Contempt Order re Donna M. Cangelosi entered concurrently herewith

and reiterating such Direct Lender's desire to terminate Compass ("<u>Majority Lenders</u>"), may file

a motion seeking an order authorizing the termination of Compass as servicer with respect to

1   such Loan (as well as any Subservicer engaged by Compass).[1]  Such motion will be heard by

2   this Court upon no less than ten (10) days notice to Compass (without regard to any thirty (30)

3   day or other prior notice provision in the applicable LSA).  The foregoing notwithstanding,

4   Compass shall be terminated as servicer of the Loans identified on Exhibit B hereto effective as

5   of the date of this Preliminary Injunction Order, without a showing of cause or further order of

6   the Court, and the Majority Lenders may take such actions with respect to such Loans as

7   otherwise may be permitted in the absence of a servicer under the applicable LSAs and

8   applicable law.  The inclusion of any Loan on Exhibit B hereto shall not constitute an admission

9   of wrongdoing on the part of Compass and, in accordance with paragraph 14 of the

10  Confirmation Order entered in the Bankruptcy Case and this Preliminary Injunction Order, no

11  entity other than Compass shall have the right or ability to compromise, subordinate, or impair,

12  in any respect, any of the Compass Fees having accrued on such Loan through the date of this

13  Preliminary Injunction Order (subject to further order of this Court).

14          9.      Compass Accountings.  Compass shall file with the Court as soon as is

15  practicable, but in no event later than November 15, 2007, a detailed line-item accounting as of

16  October 2, 2007 (which may reasonably be amended) with respect to each Loan of the

17  following: (a) the Loan account status as of February 16, 2007; (b) all Payments received by

18  Compass or by Silar Advisors. L.P. or Silar Special Opportunities Fund, Ltd. from the borrower

19  or through foreclosure sales or other dispositions of collateral; (c) all Compass Fees on an

20  itemized basis, purportedly owed on such Loan as of October 2, 2007; (d) all Compass Fees

21  deducted from a Payment received by Compass or otherwise paid to Compass by a borrower; (e)

22  all disbursements made by Compass; (f) all written requests for payment on a Loan made by

23  Compass to a borrower; and (g) all written Loan payoff proposals received by Compass from a

24  borrower.

25

26

---

27  [1] The LLCs may file and pursue this motion on behalf of Direct Lenders requesting termination
    upon obtaining a power of attorney from each such Direct Lender following their receipt of this
28  Preliminary Injunction Order and the Contempt Order re Donna M. Cangelosi..

10.    LLC Accountings.  Each LLC shall file with the Court as soon as is practicable, but in no event later than November 15, 2007, an accounting as of October 2, 2007 with respect to each LLC from and after its inception of the following: (a) the total dollar amount of beneficial interests held by the LLC with respect to the applicable Loan; (b) the Direct Lenders who heretofore assigned to the LLC their beneficial interests under the deed of trust or mortgage securing the obligations under the Loan documents ("Beneficial Interests"); (c) any voluntary rescission to a Direct Lender of a Beneficial Interest heretofore assigned to an LLC and the accompanying LLC membership interest transferred to such Direct Lender; (d) all payments on account of such Loan received by the LLC from Compass, the borrower or otherwise; (e) all sales, assignments, transfers, hypothecations or encumbrances of Beneficial Interests by the LLC; (f) all funds received by the LLC on account of such sales, assignments, transfers, hypothecations or encumbrances; (g) all reasonably known requests for payment on a Loan made by an LLC or any of its members to a borrower; and (h) all reasonably known Loan payoff proposals received by an LLC or any of its members from a borrower.

11.    Prohibition on Compass Transfers.  With the exceptions of sales, assignments, transfers, hypothecations or encumbrances of Compass Fees made by Compass to Silar Advisors. L.P. or Silar Special Opportunities Fund, Ltd., or to a licensed subservicer, Compass shall not sell, assign, transfer, hypothecate or encumber the Compass Fees and/or Compass's interests as a Direct Lender in any Loan in which it is currently the servicer without further order of this Court obtained upon motion by Compass noticed to the Plaintiff Lenders.

12.    Prohibition on LLC Transfers.  With the exception of any voluntary rescission to a Direct Lender of a Beneficial Interest transferred to an LLC and the accompanying LLC membership interest transferred to such Direct Lender, and subject to paragraph 13 below, no LLC shall sell, assign, transfer, hypothecate or encumber any Beneficial Interests held or owned by such LLC without further order of this Court obtained upon motion by such LLC noticed to Compass and the affected Direct Lenders. Compass shall be provided with notice of any such rescission, sale, assignment, transfer, hypothecation or encumbrance of a Beneficial Interest

within ten (10) days after such rescission, sale, assignment, transfer, hypothecation or encumbrance becomes effective.

13.   <u>LLC Encumbrance of Beneficial Interests</u>.  The LLCs are permitted to encumber any Beneficial Interests held or owned by the LLCs for the purpose of obtaining litigation financing and property related carrying costs financing only upon entry of an order of this Court authorizing such encumbrance following the filing of a motion (after appropriate notice to Compass and all members of the LLCs).

14.   <u>Communication of Order to Borrowers and Direct Lenders</u>.  Within three (3) business days of the date of entry of this Preliminary Injunction Order, Compass shall serve by mail upon the borrowers and Direct Lenders on each Loan: (a) copies of this Preliminary Injunction Order and the Contempt Order re Donna M. Cangelosi entered concurrently herewith; and (b) with respect to each Loan, notification that (i) the May 18, 2007 correspondence of Cangelosi to the borrower purporting to terminate Compass as servicer was ineffectual, (ii) Compass remains the exclusive entity authorized to act on behalf of the Direct Lenders in such Loan; and (iii) all Payments on such Loan should continue to be made directly to Compass.  If a Direct Lender who is not a Plaintiff Lender (and who did not otherwise receive notice of the October 1-2, 2007 hearing) wishes to object to the relief granted in this Preliminary Injunction Order, such Direct Lender must file a written objection with this Court stating the specific basis for such objection within fifteen (15) days of the date hereof, or such Direct Lender shall otherwise be bound by the terms hereof and forever barred from asserting a claim against any collateral conveyed in accordance with paragraph 7 hereof or against the foreclosure trustee or other entity conducting the foreclosure sale.

15.   <u>Jurisdiction</u>.  This Court has and shall retain in personam jurisdiction over the Plaintiff Lenders and Compass and in rem jurisdiction over the Loans and LSAs relating thereto, and the conveyance of title of collateral acquired in connection therewith.

16.   <u>Effect of Preliminary Injunction Order</u>.  This Preliminary Injunction Order supersedes the Bankruptcy Court Injunction Order, <u>provided</u>, <u>however</u>, funds held in any Direct Lender remittance account pursuant to prior order of the Bankruptcy Court shall remain in such

account and be distributed pursuant to paragraph 6 of this Preliminary Injunction Order.

Nothing herein shall be construed as a waiver of any party's right to assert that any obligation

arising under a Loan document is not secured by the collateral.

**IT IS SO ORDERED.**

Dated:  November 6, 2007

**HONORABLE ROBERT C. JONES**
**UNITED STATES DISTRICT COURT JUDGE**

# Exhibit A

# Exhibit A

Exhibit "A" Loans

1.  3685 San Fernando
2.  5505 Collwood
3.  6425 Gess
4.  60th Street Venture
5.  Amesbury Hatters Point
6.  Anchor B
7.  BarUSA
8.  Bay Pompano
9.  Binford
10. Brookmere
11. Bundy Canyon $2.5 MM
12. Bundy Canyon $5.0 MM
13. Bundy Canyon $5.725 MM
14. Bundy Canyon $7.5 MM
15. Cabernet
16. Castaic II
17. Castaic III
18. Charlevoix
19. Clear Creek Plantation
20. Comvest
21. Copper Sage II
22. Cornman Toltec
23. Del Valle Livingston
24. Eagle Meadows
25. Fiesta Murrieta
26. Fiesta Stoneridge
27. Foxhills 216
28. Gramercy Court
29. Harbor Georgetown
30. Hesperia
31. HFA Clearlake I
32. HFA Clearlake II
33. Huntsville
34. La Hacienda
35. Lake Helen Partners
36. Lerin Hills
37. Margarita Annex
38. Marlton Square I
39. Marlton Square II
40. Mountain House-Pegs
41. Oak Shores II
42. Ocean Atlantic $2.75 MM
43. Ocean Atlantic $9.425 MM

44. Palm Harbor I
45. Shamrock Tower
46. SoCal Land Development
47. SVRB $2.325 MM
48. SVRB $4.5 MM
49. Tapia Ranch (Castaic I)
50. Ten-Ninety $4.15 MM
51. The Gardens $2.425 MM
52. The Gardens Timeshare

# Exhibit B

# Exhibit B

Exhibit "B" Loans

1. Brookmere
2. Hesperia
3. HFA Clearlake II
4. Lerin Hills
5. Marlton Square II
6. Ocean Atlantic $2.75 MM
7. SoCal Land Development

RE: COMPASS FINANCIAL PARTNERS LLC

### AFFIDAVIT OF MAILING

STATE OF NEW YORK      )
                                            )    ss.:
COUNTY OF NEW YORK  )

HUGO SUAREZ, being duly sworn, deposes and says:

1.      I am employed as Case Manager by Epiq Bankruptcy Solutions, LLC (f/k/a Bankruptcy Services LLC), located at 757 Third Avenue, New York, New York 10017. I am over the age of eighteen years and am not a party to the above-captioned action.

2.      On November 7, 2007, I supervised the mailing for the following:

   a)   "Letter" to all direct lenders regarding the Preliminary Injunction Order and Contempt Order re Donna M. Cangelosi, (the "Letter"),

   b)   "Preliminary Injunction and Order Pursuant to 11 U.S.C. §§ 105 and 1141 and Fed. R. Civ. P. 65 Enforcing Confirmation Order," dated November 6, 2007, (the "Preliminary Injunction Order"), and

   c)   "Contempt Order Re Donna M. Cangelosi," dated November 6, 2007, (the "Contempt Order"),

by causing true and correct copies of the Letter, Preliminary Injunction Order and Contempt Order, enclosed securely in separate postage pre-paid envelopes, to be delivered by first class mail to those parties listed on the annexed Exhibit "A".

_____
Hugo Suarez

Sworn to before me this

29th day of November, 2007

_____
Notary Public

ROSS MATRAY
Notary Public, State of New York
No. 01MA614899
Qualified in New York County
Commission Expires July 3, 2010

| Claim Name | Address Information |
|---|---|
| CAROLE JAFFE IN TRUST FOR KEN M. JAFFE & AMY | JAFFE-ROSEN,C/O CAROLE JAFFE IN TRUST,3675 N COUNTRY CLUB DR APT 2102, AVENTURA, FL 33180-1709 |
| CAROLINE M. GERWIN TRUSTEE OF THE CAROLINE GERWIN, | FAMILY TRUST DATED 11/2/95,1450 IDLEWILD DRIVE, #318, RENO, NV 89509 |
| CAROLYN RAND SAMUELSON TRUSTEE OF THE CAROLYN RAND | SAMUELSON REVOCABLE TRUST DATED 11/2/95,3933 OCEAN DR, OXNARD, CA 93035-3937 |
| CARTER L. GRENZ, A DIVORCED MAN | 925 MARION COUNTY 7002,, FLIPPIN, AR 72634-9559 |
| CARY TUCH & CAROL TUCH, HUSBAND & WIFE, AS JOINT, | TENANTS WITH RIGHT OF SURVIVORSHIP,11445 GERALD AVE, GRANADA HILLS, CA 91344-3623 |
| CASPAR H. ESCHER, JR., AN UNMARRIED MAN | 1800 WHITEHALL LN,, SAINT HELENA, CA 94574-9786 |
| CASSANDRA J. ROBBINS, AN UNMARRIED WOMAN | 57 TOPPLER DR,, CASTLE ROCK, CO 80108-8208 |
| CATHERINE B. STRETMATER TRUSTEE OF THE CATHERINE, | B. STRETMATER REVOCABLE TRUST DATED 6/5/89,DATED 6/5/89,C/O CATHERINE B STRETMATER TRUSTEE,12000 N 90TH ST UNIT 2006, SCOTTSDALE, AZ 85260-8631 |
| CATHERINE D. OPPIO TRUSTEE OF THE CATHERINE D. | OPPIO TRUST DATED 2/11/04,TRUST DATED 2/11/04,C/O CATHERINE D OPPIO TRUSTEE,PO BOX 15, CRYSTAL BAY, NV 89402-0015 |
| CATHERINE GARLAND, AN UNMARRIED WOMAN | 318 MCSKIMMING RD,, ASPEN, CO 81611-2217 |
| CATHERINE PERRONE, AN UNMARRIED WOMAN | 923 CROTON RD,, CELEBRATION, FL 34747-4843 |
| CCM PATHFINDER POMPANO BAY LLC | C/O CONTRARIAN CAPTIAL MANAGEMENT LLC,411 WEST PUTNAM AVE, #225, GREENWICH, CT 06830 |
| CCM PATHFINDER POMPANO BAY LLC | C/O CONTRARIAN CAPITAL MANAGEMENT,ATTN: REAL ESTATE GROUP,411 WEST PUTNAM AVE, #225, GREENWICH, CT 06830 |
| CCM PATHFINDER POMPANO BAY, LLC | C/O CONTRARIAN CAPITAL MANAGEMENT, LLC,ATTN: REAL ESTATE GROUP,411 WEST PUTNAM AVE, #225, GREENWICH, CT 06830 |
| CCM PATHFINDER POMPANO BAY, LLC | C/O CONTRARIAN CAPITAL MANAGEMENT CCL,ATTN: REAL ESTATE GROUP,411 WEST PUTNAM AVE, #225, GREENWICH, CT 06830 |
| CCM PATHFINDER POMPANO BAY, LLC | C/O CONTRRIAN CAPITAL MANAGEMENT LLC,ATTN:  REAL ESTATE GROUP,411 WEST PUTNAM AVE., #225, GREENWICH, CT 06830 |
| CCM PATHFINDER POMPANO BAY, LLC | C/O CONTRARIAN CAPITAL MANAGEMENT, LLC,ATTN:  REAL ESTATE GROUP,411 WEST PUTNAM AVE., #225, GREENWICH, CT 06830-6263 |
| CELSO ACOSTA, AN UNMARRIED MAN | 9061 BLACK ELK AVE,, LAS VEGAS, NV 89143-1180 |
| CHAD R. SANDHAS, AN UNMARRIED MAN | 3312 RAINTREE CIRCLE,, CULVER CITY, CA 90230 |
| CHAI MILLER LLC | ATTN: AVI BARASHI,P.O. BOX 81191, LAS VEGAS, NV 89180 |
| CHARLES A. SPENCER, A SINGLE MAN | 4850 CANYON RUN DR,, SPARKS, NV 89436-4627 |
| CHARLES B. ANDERSON TRUSTEE OF THE CHARLES B. | ANDERSON TRUST,C/O CHARLES B ANDERSON TRUSTEE,211 COPPER RIDGE CT, BOULDER CITY, NV 89005-1211 |
| CHARLES B. DUNN, IV TRUSTEE OF THE CHARLES B. | DUNN, IV TRUST DATED 8/12/05,TRUST DATED 8/12/05,C/O CHARLES B DUNN IV TRUSTEE,17042 NORLENE WAY, GRASS VALLEY, CA 95949-7161 |
| CHARLES B. PLUNKETT TRUSTEE OF THE CHARLES B. | PLUNKETT REVOCABLE TRUST DTD 10-25-94,DTD 10-25-94,C/O CHARLES B PLUNKETT TRUSTEE,142 CODYERIN DR, HENDERSON, NV 89074-0148 |
| CHARLES BOMBARD TRUSTEE OF THE CHARLES BOMBARD | 1999 TRUST DATED 12/3/99,TRUST DATED 12/3/99,C/O CHARLES BOMBARD TRUSTEE,1076 MULLEN AVE, LAS VEGAS, NV 89044-9544 |
| CHARLES D. CUNNINGHAM & SUSAN M. CUNNINGHAM, | HUSBAND & WIFE, AS JOINT TENANTS WITH RIGHT OF,SURVIVORSHIP,1964 OLIVER SPRINGS ST, HENDERSON, NV 89052-8502 |
| CHARLES D. HOPSON TRUSTEE OF THE CHARLES D. HOPSON | LIVING TRUST DATED 2/20/96,TRUST DATED 2/20/96,C/O CHARLES D HOPSON TRUSTEE,3009 CRADLE MOUNTAIN DR, LAS VEGAS, NV 89134-7518 |
| CHARLES DUKE CUMMINS & APRIL M. CUMMINS, HUSBAND & | WIFE, AS JOINT TENANTS WITH THE RIGHT OF,SURVIVORSHIP,483 MARINA CV, BOULDER CITY, NV 89005-1047 |
| CHARLES E. BOROM & LANNA G. BOROM, HUSBAND & WIFE, | AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP,6106 SISTER ELSIE DR, TUJUNGA, CA 91042-2543 |
| CHARLES E. BROKOP, AN UNMARRIED MAN | 13835 N TATUM BLVD STE 9419,, PHOENIX, AZ 85032-5581 |
| CHARLES E. JOHNSON & JANET P. JOHNSON, HUSBAND &, | WIFE, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP,17 FRONT ST, PALM COAST, FL 32137-1453 |

# EXHIBIT E

# LOAN SERVICING AGREEMENT

This Loan Servicing Agreement ("Agreement") is made as of the ____ day of _____ between USA Commercial Mortgage Company ("USA") and _____ ("Lender").

## RECITALS

A.     USA is a mortgage broker and loan servicer in Clark County, Nevada.

B.     Lender lends, or wishes to lend, money to various borrowers (the term "Borrower" includes single and married persons, corporations, trusts, partnerships and all other legal entities) from time to time, which loans are arranged by USA and are secured by interests in real and/or personal property.

C.     Lender wishes to retain the services of USA in connection with making and servicing a loan or loans ("Loan" or "Loans" as the context requires), including all Loans heretofore or hereafter placed by Lender through USA, all upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     <u>Services in Connection with Arranging the Loans</u>.  USA will perform the following services in connection with arranging each Loan:

(a)     Obtain a promissory note or notes secured by the trust deed referred to in Section 1(b) below, executed by Borrower in a form customarily used by USA and approved by USA's counsel.

(b)     Obtain a deed of trust, assignment of rents and security agreement executed by Borrower in form customarily used by USA and approved by USA's counsel, and cause the same to be properly recorded.

(c)     Obtain one or more personal or corporate guaranties, if applicable and as determined by USA to be necessary, executed by such guarantors, as USA shall deem appropriate, in form customarily used by USA.

(d)     If USA deems it appropriate or necessary, obtain, at Borrower's expense, an appraisal of the property to be encumbered, prepared and executed by an appraiser reasonably satisfactory to USA.

(e)     Obtain from a reputable title insurance company, at Borrower's expense, a fully-paid ALTA lender's policy of title insurance, showing Lender as an insured, in an amount at least equal to the initial principal amount of the note and showing as exceptions only those items approved by USA and its counsel.

(f)     Cause the Borrower to obtain, where applicable, casualty insurance policies in amounts at least equal to the principal amount of the note or the full insurable value of the improvements on the

1

encumbered real property, whichever is less, containing a mortgage or loss payee clause naming Lender, or USA (as agent for Lender), as an additional insured or loss payee.

(g)    Obtain from the Borrower and each guarantor such recent financial statements and information as USA shall deem appropriate.

(h)    Obtain, with respect to any and all encumbrances of record to which Lender's deed of trust will be subject, documentation verifying the principal balance thereof within a reasonable time prior to the making of the Loan and specifying any then existing defaults thereunder.

(i)    Obtain such other documents in connection with the Loan, as USA may deem appropriate in order to protect the Lender's interest.

(j)    All documents which USA obtains from borrower in connection with arranging or servicing any Loan, so long as such Loan is outstanding, shall be kept on file in USA's corporate office and be available to Lender upon request.   Notwithstanding the foregoing, USA shall have no obligation or responsibility to obtain any original documents in connection with any Loan serviced by USA, but not arranged or originated by USA.

(k)    Prepare and deliver to escrow closing instructions to effectuate the Loan closing in accordance with the Loan Agreement and the Fee Agreement.

2.    <u>Services of USA in Connection with Servicing the Loans</u>.   Subject to and in accordance with the terms and conditions set forth in this Agreement, and all applicable laws, Lender instructs and authorizes USA to, and USA will perform the following services in connection with servicing each of the Loans:

(a)    Verify, where applicable, that the property encumbered by Lender's deed of trust is insured (at the Borrower's expense) by a sufficient casualty insurance policy and that Borrower has sufficient liability insurance coverage.  USA will hold for the Lender's account such policies and renewals thereof.

(b)    Keep appropriate accounting records on each note and the sums collected thereon, which records will reflect the amounts collected as to principal, interest and late charges, and, if applicable, insurance, taxes and other specified amounts. Those records will be available for review by the Lender during regular business hours at USA's corporate office.

(c)    Until the total amount due under each note is paid in full:

(i)    Proceed diligently to collect all payments due under the terms of the note and promptly pay the proper parties, when and if due, principal, interest, late charges,  insurance and other specified funds.

(ii)    In the event the Borrower fails to make any payment to USA as required by the  terms of the note, USA will take steps to collect the payment including but not limited to delivering default notices, commencing and pursuing foreclosure procedures, and obtaining representation for Lender in litigation and bankruptcy proceedings as deemed necessary or appropriate by USA in its business judgment to fully protect the interests of the Lender, and of all Lenders in the loan.

2

(iii)    In its sole discretion, USA may pay off any Lender at any time by paying the then outstanding balance of Lender's interest in the principal of the Loan, plus all accrued interest and any prepayment penalty or fee, if applicable. Any Lender so paid off shall concurrently execute and deliver therewith to USA an assignment, in a form acceptable to USA, of all of such Lender's right, title, and interest in the Loan (including all documents evidencing the Loan) and in the deed of trust securing the Loan.

(iv)    In its sole discretion, USA may waive late payment charges, assumption fees, charges for returned checks due to insufficient funds, or other fees which may be collected in the ordinary course of servicing the Loans.

(d)    Provide the Lender with regular statements regarding loan collections, but in no event less frequently than quarterly.

(e)    Without limiting the generality of anything contained herein, Lender hereby authorizes and empowers USA, on Lender's behalf, to: (1) execute and deliver demands for payoff and beneficiary's / lender's statements of condition and the like; (2) execute and deliver any and all instruments if satisfaction or cancellation, or of partial or full release, discharge, or reconveyance, or authorizations in connection therewith, with respect to any Loans paid in full and with respect to the related real or personal property securing such Loans; (3) execute and deliver any and all other documents with respect to any Loans that are customary and consistent with loan servicing practices pertaining to such loans; (4) consent to modifications of the Loans if the effect of any such modification will not materially or adversely affect the security provided by the real or personal property in connection therewith; (5) institute foreclosure proceedings (judicial or non-judicial), obtain a deed-in-lieu thereof, engage in settlement discussions, and enter into forbearance and other settlement-related agreements (which agreements may contain provisions that release or waive claims against a Borrower or Guarantor); and (6) take title in the name of Lender (in proportion to its interest in the Loan) to any real property upon a foreclosure or delivery of a deed-in-lieu thereof. Notwithstanding the foregoing or any other provision contained herein, USA may not permit any modification to any Loan that would change the interest rate, forgive the payment of any principal or interest (expressly excluding late charges or the difference between default and non-default interest), change the outstanding principal amount, or extend the maturity date, without Lender's prior consent; provided, however, if Lender fails to grant or deny its consent within three (3) business days after notice from USA, Lender shall be deemed to have conclusively given its consent.

3.    <u>Rights of Lender if USA Fails to Act</u>.    Pursuant to NAC 645B.073, in the event of default, foreclosure, or other matters that require action, if for any reason USA fails to act on Lender's behalf as authorized herein, then Lender may, with approval of fifty-one percent (51%) or more of all of the holders of the beneficial interest of record in the Loan, act on behalf of all such holders of beneficial interest of record. These actions may include, but are not limited to:

(a)    the designation of the mortgage broker, servicing agent or other person to act on behalf of the holders of the beneficial interests in the loan; and

(b)    the sale, encumbrance or lease of real property owned by the holders resulting from a foreclosure or the receipt of a deed in lieu of a foreclosure.

3

4.    <u>Legal Proceedings</u>.    USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. Where necessary, in USA's business judgment, USA may retain attorneys on Lender's behalf. Any legal proceeding instituted by USA pursuant to this Agreement may be pursued in USA's name only or as agent for Lender. Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs. In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees, including trustee's fees, attorney's fees, and costs of foreclosure; provided, however, that any fees advanced by USA shall be paid back from the proceeds of the foreclosure (whether by reinstatement or sale), or from any other monies collected with respect to such Loan, before any payments are made to Lender. In the event of any litigation concerning the Loan, Lender hereby appoints USA as its agent to accept service of any summons and complaint, naming Lender as a party.

5.    <u>Compensation to USA for Loan Servicing</u>.    Lender authorizes USA to retain monthly, as compensation for services performed hereunder, (a) one-twelfth (1/12th) of its annual servicing fee, which shall not exceed three percent (3%) per annum of the maximum principal amount of each of the Loans, (b) any late charges collected from the Borrower pursuant to the terms of the Note, and (c) and default interest collected from the Borrower pursuant to the terms of the Note. Notwithstanding the foregoing, it is agreed and acknowledged that USA derives the bulk of its revenues from charging loan fees ("points") to the Borrower. Certain Borrowers, however, may prefer to pay a higher rate of interest in exchange for a reduction in loan fees payable in advance to USA, the higher interest rate comprising a deferred loan fee. USA will notify Lender when such a case arises, and advise Lender of what portion of the interest is payable to USA as a deferred loan fee.

Should Lender desire to sell all or any part of its interest in the note and deed of trust, USA will assist Lender in finding potential buyers and completing the necessary documentation for the transaction. A fee of 5% of the remaining balance of Lender's undivided interest in the note amount will be deducted from the selling price and paid to USA on all such assignments for which USA locates the Assignee.

In the event an extension of a Loan is negotiated, USA shall be entitled to charge a fee therefor from the Borrower pursuant any separate fee agreement between USA and the Borrower.

6.    <u>USA's Right to Delegate</u>.    Notwithstanding anything contained herein, USA may in its sole discretion delegate specific loan arranging and servicing obligations to credit bureaus, real estate tax service companies, real estate brokers or agents, appraisers, attorneys, trustees, or others, provided that USA shall remain responsible for all action taken or not taken by such companies, agents, representatives, and others throughout the term of this Agreement.

7.    <u>No Legal Advice</u>.    Lender acknowledges that USA will not act as Lender's attorney or provide legal advice to Lender, and that Lender is encouraged to seek independent counsel in connection with any questions Lender may have concerning this agreement, any Loan, USA's form loan documents, or any other matter.

8.    <u>Termination</u>.    Lender may, by 30 days written notice to USA, terminate this agreement, and the power of attorney granted, if one is granted, under Section 11 of this Agreement, if USA fails to perform its obligations hereunder.

4

9.     Lender's Registration.  Lender(s) name as listed in the first paragraph of this Agreement is the exact form for registration of Lender's interest and for reference to Lender in the Loan Documents.

10.     Integration Clause.  This Agreement contains the entire agreement between the parties hereto and cannot be modified except by a written amendment signed by both parties.  The invalidity of any portion of this agreement shall in no way affect the balance thereof.  This Agreement shall remain in effect until Lender's interest in all notes and deeds of trust with respect to Loans arranged and/or serviced by USA is completely liquidated (unless sooner terminated in accordance with the terms hereof).

11.     Limited Power of Attorney.  With respect to each loan, Lender hereby agrees that USA shall have full power and authority, and Lender hereby appoints USA as its true and lawful attorney-in-fact to (a) hold the original note(s), and (b) to do all things and take all actions on behalf of Lender which are necessary or convenient to effectuate this Agreement and its intent and to protect Lender's interest under any note, deed of trust, guaranty, security agreement or other document pertaining to any Loan.  Upon USA's request, Lender hereby agrees to execute and deliver, in the presence of a notary public, a "Declaration of Agency and Limited Power of Attorney", in a form consistent with Chapter 645B of the Nevada Revised Statutes, pursuant to which Lender shall further evidence the appointment of USA as Lender's true and lawful attorney-in-fact to undertake the duties of USA hereunder.  No one shall be required to look beyond such Declaration of Agency and Limited Power of Attorney for evidence of USA's authority hereunder.  All Declarations of Agency and Limited Powers of Attorney may include the language: This document may be executed with counterpart signature pages, and the document with all counterpart signature pages shall constitute one and the same instrument.

12. Notices.  All notices, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) when personally delivered, or (ii) on receipt, when deposited with a recognized overnight courier service such as Federal Express or DHL, or (iii) three (3) business days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:

      If to USA:        USA Commercial Mortgage Company
                            4484 S. Pecos Road
                            Las Vegas, Nevada 89121-5030
                            Attention:

      If to Lender:


                Attention:

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

13.     Governing Law.  This Agreement shall be construed in accordance with the laws of the State of Nevada, without regard to the conflict of laws or rules thereof, and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws,

14.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

15.    Attorney's Fees. In the event any party hereto brings an action to enforce any of the provisions of this Agreement, the party against whom judgment is rendered in such action shall be liable to the other for reimbursement of its costs, expenses and attorneys' fees, including such costs, expenses and fees as may be incurred on appeal,

16.    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns.

17.    Headings.  Sections headings used in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

18.    Authority.  Each party represents and warrants to the other party that it is duly authorized to execute, deliver and perform this Agreement.

IN WITNESS WHEREOF, the parties hereto have signed, sealed, acknowledged and delivered this instrument the day and year first above written.

LENDER: Michael T. Bridges, Trustee of the Bridges Family Trust

By:
Name:
Title: _____

By:    _____
Name:  _____
Title: _____

USA COMMERCIAL MORTGAGE COMPANY

By: _____
    Joseph D. Milanowski, President

6

**Entered on Docket**
**January 08, 2007**

_____
**Hon. Linda B. Riegle**
**United States Bankruptcy Judge**

1

2

3

4

5    Annette W. Jarvis, Utah Bar No. 1649
     RAY QUINNEY & NEBEKER P.C.
6    36 South State Street, Suite 1400
     P.O. Box 45385
7    Salt Lake City, Utah 84145-0385
     Telephone: (801) 532-1500
8    Facsimile: (801) 532-7543
     Email: ajarvis@rqn.com
9    and

10

Lenard E. Schwartzer, NV Bar No. 0399
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Telephone: (702) 228-7590
Facsimile: (702) 892-0122
E-Mail: bkfilings@s-mlaw.com
Attorneys for Debtors and Debtors-in-Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>           Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>           Debtor. | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED<br>FUND, LLC,<br><br>           Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND,<br>LLC,<br><br>           Debtor. | **[PROPOSED] FINDINGS OF FACT<br>AND CONCLUSIONS OF LAW IN<br>SUPPORT OF THE "ORDER<br>CONFIRMING THE "DEBTORS'<br>THIRD AMENDED JOINT CHAPTER<br>11 PLAN OF REORGANIZATION, AS<br>MODIFIED HEREIN"** |
| In re:<br>USA SECURITIES, LLC,<br><br>           Debtor. | |
| Affects:<br>&#9746; All Debtors<br>&#9744; USA Commercial Mortgage Company<br>&#9744; USA Securities, LLC<br>&#9744; USA Capital Realty Advisors, LLC<br>&#9744; USA Capital Diversified Trust Deed Fund, LLC<br>&#9744; USA First Trust Deed Fund, LLC | **Confirmation Hearing**<br>Date: December 19, 2006<br>Time: 10:00 a.m. |

1

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

Commencing on December 19, 2006 at 10:00 a.m., the Court held a hearing (the "Confirmation Hearing") on the confirmation of the "Debtors' Third Amended Joint Chapter 11 Plan of Reorganization") (as modified by the Confirmation Order (as defined below), the "Plan"[1]) proposed by USA Commercial Mortgage Company ("USACM"), USA Securities, LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital Diversified Trust Deed Fund, LLC ("DTDF") and USA Capital First Trust Deed Fund, LLC ("FTDF"), debtors and debtors in possession in the above-captioned chapter 11 cases (the "Debtors").  Appearances were made as indicated on the record at the Confirmation Hearing.

The Court considered the pleadings and documents filed by the Debtors and other interested parties in connection with confirmation of the Plan, including the following:

(a)     the Plan and all accompanying exhibits, including, without limitation, the Plan Documents Supplement, the Revised Schedule of Executory Contracts and Unexpired Leases, the forms of Disbursing Agent Agreements for USACM and FTDF filed by the Debtors and the Direct Lender Supplement;

(b)     the "Debtors' First Amended Disclosure Statement to Debtors' Third Amended Joint Plan of Reorganization" (the "Disclosure Statement") previously approved by the Court;

(c)     the "Memorandum of Points and Authorities in Support of Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" (the "Confirmation Memorandum");

(d)     the Declaration of Thomas J. Allison filed in support of confirmation of the Plan (the "Allison Declaration");

(e)     the Affidavit of Balloting Agent Regarding Solicitation and Tabulation of Votes in Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization, regarding compliance with the "Solicitation Procedures" approved in the Disclosure Statement Order ("BMC Declaration");

---

[1]     All terms not otherwise defined in these Findings of Fact and Conclusions of Law (the "Findings") shall have the meanings assigned to them in the Plan.

2

1    (f)    the Declaration of David Blatt of Compass Partners LLC in Support of
2    Confirmation of Debtors' Third Amended Joint Plan of Reorganization ("Compass Declaration");

3    (g)    the "Affidavit of Balloting Agent Regarding Solicitation and Tabulation of
4    Votes in Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization"
5    and the Ballot Tabulation Report attached as Exhibit A thereto [Docket No. 2165] and
6    "Supplemental Affidavit of Balloting Agent Regarding Solicitation and Tabulation of Votes in
7    Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" and the
8    Revised Ballot Tabulation Report attached as Exhibit B thereto [Docket No. 2243], which detail
9    the tabulation of Ballots cast for or against the Plan;

10    (h)    the "Partial Opposition to Debtors' Third Amended Joint Plan of
11    Reorganization," filed by Erna D. Grundman and Joanne M. Grundman;

12    (i)    the "Partial Opposition to Debtors' Third Amended Joint Plan of
13    Reorganization," filed by Joanne M. Grundman;

14    (j)    the "Objection of The Pension Benefit Guaranty Corporation to Debtors'
15    Third Amended Joint Plan of Reorganization," filed by the Pension Benefit Guaranty Corporation
16    ("PBGC");

17    (k)    the "Objection to Confirmation of Debtors' Third Amended Joint
18    Chapter 11 Plan of Reorganization," filed by Edward Burgess;

19    (l)    "Liberty Bank's Limited Objection to Confirmation of Debtors' Third
20    Amended Joint Chapter 11 Plan of Reorganization," filed by Liberty Bank;

21    (m)    "Standard Property Company, LLC's Limited Objection to the Debtors'
22    Third Amended Joint Plan of Reorganization," filed by Standard Property, LLC;

23    (n)    "Joinder in Standard Property Company, LLC's Limited Objection to the
24    Debtors' Third Amended Joint Plan of Reorganization on Behalf of Copper Sage Commerce
25    Center LLC, " filed by Copper Sage Commercial Center;

26    (o)    "Joinder in Standard Property Company, LLC's Limited Objection to the
27    Debtors' Third Amended Joint Plan of Reorganization on Behalf of Binford Medical Developers,"
28    filed by Binford Medical Developers;

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

(p)     "Memorandum of Points and Authorities in Opposition to Confirmation of Debtor's Plan," filed by Debt Acquisition Company of America V and the Declaration of Howard Justus [Docket No. 2032] filed in support thereof;

(q)     "Limited Objection to Plan," filed by Gregory Walch and Shauna Walch, etc.;

(r)     the "Objection of USA Investment Partners, LLC, Joseph Milanowski and Thomas Hantges to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization," filed by Joseph Milanowski and Thomas Hantges (the "H&M Objection") and the Declaration of Victoria Loob filed in support thereof (the "Loob Declaration");

(s)     the "Objection to Confirmation of Debtors' Third Amended Joint Chapter 11 Plan of Reorganization as it Applies to Debtor USA Commercial Mortgage Company," filed by The Lenders Protection Group (the "LPG Objection");

(t)     the Declaration of Donna Cangelosi filed in support of the LPG Objection (the "Cangelosi Declaration");

(u)     Multiple joinders to objections to confirmation of the Plan filed by Objecting JV Creditors [Docket nos. 2040, 2099, 2179, 2180, 2182, 2184, and 2191];

(v)     "Limited Objection to Pecos Professional Park Limited Partnership and Haspinov, LLC, to Debtors' Proposed Plan of Reorganization," filed by USA Commercial Real Estate Group;

(w)     "Joinder in Limited Opposition to Plan," filed by Direct Lenders Alexander and others as shown in the Second Amended Statement of Robert C. LePome, Esq. and Nancy Allf, Esq. Pursuant to Rule 2019;

(x)     "Errata to Limited Objection to Plan," filed by Gregory J. Walch and Shauna M. Walch, Trustees of the Gregory J. and Shauna M. Walch Family Trust;

(y)     the "Opposition and Joinder of Sierra Liquidity Fund, L.L.C. in Oppositions [sic] to Confirmation of Debtors' Third Amended Joint Plan of Reorganization" ( the "Sierra Liquidity Objection" and, collectively with the objections to the Plan listed in (h)-(x) above, the "Objections");

4

(z)     the "Debtors' Combined Motion In Limine And Memorandum In Support Regarding The Objection Of USA Investment Partners, LLC, Joseph Milanowski And Thomas Hantges To The Confirmation Of The Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization," filed by the Debtors; and

(aa)     all other pleadings, affidavits and documents filed in connection with this matter.

The Court has heard the statements, arguments, representations and offers of proof of counsel regarding confirmation of the Plan at the Confirmation Hearing, and has considered the record of these Chapter 11 Cases and all testimony and evidence admitted at or before the Confirmation Hearing.

These findings of fact and conclusions of law are in support of the "Order Confirming the 'Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization,' As Modified Herein" (the "Confirmation Order"), entered concurrently herewith.

Based on the foregoing, the Court makes the following findings of fact and conclusions of law, as supplemented by the findings of fact and conclusions of law stated orally and reported in open court on the record at the Confirmation Hearing (which are incorporated herein) pursuant to Bankruptcy Rule 7052:[2]

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

A.     This matter is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334(a).  Venue of this proceeding is proper under 28 U.S.C. §§ 1408 and 1409.

B.     The Debtors provided notice of the Confirmation Hearing and of the time fixed for balloting and filing objections to confirmation of the Plan to all entities entitled to receive such notice, including all known holders of Claims and Equity Interests of the Debtors. The notice by the Debtors of such matters fully and adequately described the relief requested at the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

---

[2]     This document constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014.  Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, when appropriate.

5

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Confirmation Hearing and was reasonable, appropriate, and complied in all regards with due

2  process and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules (including

3  Bankruptcy Rules 2002, 3017, 3018, and 3019), and the Local Bankruptcy Rules and orders of the

4  Court, including this Court's "Order Approving: (A) Debtors' Disclosure Statement; (B) Proposed

5  Notice of Confirmation Hearing; (C) Proposed Solicitation and Notice Procedures; and (D)

6  Proposed Form of Ballots" (the "Disclosure Statement Order").

7          C.      Pursuant to the Disclosure Statement Order, all objections to confirmation

8  of the Plan, including all evidence in support thereof, were required to be filed by December 11,

9  2006 and, therefore, the Cangelosi Declaration filed on December 18, 2006 and the Sierra

10  Liquidity Objection filed on December 15, 2006 were not timely filed and were stricken from the

11  record and/or overruled.

12          D.      The only evidence submitted in support of the H&M Objection was the

13  Loob Declaration. On December 18, 2006, the Debtors undertook an examination of Ms. Loob

14  pursuant to Bankruptcy Rule 2004 where Ms. Loob asserted her rights under the Fifth Amendment

15  of the United States Constitution in connection with questions concerning the H&M Objection and

16  her declaration in support thereof. Additionally, USA Investment Partners ("USAIP") and Joseph

17  Milanowski each failed to appear at Court-ordered examinations to be conducted pursuant to Rule

18  2004 of the Federal Rules of Bankruptcy Procedure. Upon consideration of Ms. Loob's assertion

19  of her Fifth Amendment rights, the failure of USAIP and Mr. Milanowski to appear at their

20  respective Rule 2004 examinations, and the Motion in Limine, the H&M Objection and Loob

21  Declaration were stricken from the record.

22          E.      None of the Objections, including the LPG Objection, raised any objection

23  with respect to the classification of the Classes of Claims and/or Equity Interests as set forth in the

24  Plan or use of a Class to meet cramdown requirements. Further, Class A-5 consists of holders of

25  "claims" within the meaning of Bankruptcy Code section § 101(5).

26          F.      The Debtors conducted the solicitation of acceptances or rejections of the

27  Plan, and the related distribution and tabulation of ballots with respect thereto, in good faith and in

28  compliance with the Disclosure Statement Order, all applicable provisions of the Bankruptcy

1    Rules (including Bankruptcy Rules 3017 and 3018), all applicable provisions of the Bankruptcy

2    Code (including sections 1125 and 1126), and all other applicable laws, rules, and regulations.

3    Among other things, the Debtors transmitted the Plan, the Disclosure Statement, and the

4    applicable ballot to all known holders of Claims and Equity Interests of the Debtors that are

5    impaired under, and therefore entitled to vote on, the Plan.

6            G.      The Plan satisfies all of the requirements of Bankruptcy Code

7    section 1129(a) as follows:

8            1.      11 U.S.C. § 1129(a)(1):  the Plan complies with all of the applicable

9    provisions of the Bankruptcy Code, including Bankruptcy Code sections 1122 and 1123.

10           The classification structure is proper and in accordance with Section 1122 of the

11   Bankruptcy Code.  Each Class under the Plan differs in legal character or nature.  All Claims and

12   Equity Interests within each Class are substantially similar to the other Claims or Equity Interests

13   in that Class because they are similar in legal character to the other Claims against or Equity

14   Interests in Debtors in such class.

15           Article II Section C of the Plan designates Classes of Claims and Equity Interests

16   for each of the Debtors, other than those specified in Sections 507(a)(2), (a)(3) and (a)(8) of the

17   Bankruptcy Code, and states the treatment of each Class under the Plan in accordance with

18   Sections 1123(a)(1), (2) and (3).  The Plan also provides for the same treatment of each Claim and

19   Equity Interest within a particular Class in accordance with Section 1123(a)(4).

20           Article IV of the Plan provides adequate means for its implementation in a manner

21   that is consistent with Section 1123(a)(5) and (b).

22           2.      11 U.S.C. § 1129(a)(2):  the Debtors have complied with all of the

23   applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 1125.

24           3.      11 U.S.C. § 1129(a)(3):  the Debtors have proposed the Plan in good faith

25   and not by any means forbidden by law.  Moreover, the Plan itself, and the negotiated process

26   leading to its formulation, along with all four Committees, provide independent evidence of the

27   good faith of the Debtors.

28           4.      11 U.S.C. § 1129(a)(4): Article II Section B.1 and Article VII Section A of

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

7

the Plan, provides for the appropriate review and determination of the fees and expenses incurred through the Effective Date.

5. <u>11 U.S.C. § 1129(a)(5)</u>: the Plan, the Disclosure Statement, the exhibits to the Plan, the Confirmation Memorandum, the Plan Documents Supplement, the Direct Lender Supplement, and the disclosures at the Confirmation Hearing disclose the identity, qualifications, method of election, and/or compensation of the DTDF Administrator, the DTDF Post-Effective Date Committee, USACM Trustee, the USACM Trust Committee, the Disbursing Agents for FTDF, USA Realty and USA Securities, respectively. The appointment of such persons is consistent with the interests of creditors and shareholders and with public policy.

6. <u>11 U.S.C. §§1129(a)(6)</u>: the requirements of Bankruptcy Code section 1129(a)(6) are not applicable to the Plan.

7. <u>11 U.S.C. § 1129(a)(7)</u>: each holder of a Claim or Equity Interest in a Class that is impaired under the Plan will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

8. <u>11 U.S.C. § 1129(a)(8), (10)</u>: In the Chapter 11 Cases of FTDF, DTDF, USA Realty, and USA Securities, Classes, B-1 through B-4, C-1 through C-4, D-1 through D-3 and E-1 through E-3 are unimpaired, and Classes B-5, C-5, D-4 and E-4, though impaired, have accepted the Plan. The Plan, with respect to the Chapter 11 Cases of FTDF, DTDF, USA Realty, and USA Securities, thus satisfies the requirement of Bankruptcy Code section 1129(a)(8).

In the Chapter 11 case of USACM, Classes A-1 through A-3 are unimpaired, and classes A-4 through A-8 are impaired under the Plan. Classes A-6 through A-8 will receive no distribution under the Plan and are deemed to reject the Plan. Impaired Class A-5 has voted to accept the Plan, and based on the Revised Ballot Tabulation Report, impaired Class A-4 also has voted to accept the Plan. Accordingly, Section 1129 (a)(8) has been satisfied with respect to USACM's Chapter 11 Case. Based on the acceptance of the Plan by Class A-5, Section 1129(a)(10) has been met with regard to USACM's Chapter 11 Case even if Class A-4 had not accepted the Plan as a result of the Del Bunch Rule 3018 contested matter.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Section 1129(a)(10) does not apply to FTDF or DTDF because there is no impaired

2    class of Claims in their respective Chapter 11 Cases

3    In USA Realty's case, Classes D-4, the only voting impaired Class of Claims, has

4    voted to accept the Plan.  Section 1129(a)(10) is met in USA Realty's Chapter 11 Case.

5    In USA Securities' case, Class E-4, the only voting impaired Class of Claims, has

6    voted to accept the Plan.  Section 1129(a)(10) is met with regard to USA Securities' Chapter 11

7    Case.

8    9.    11 U.S.C. § 1129(a)(9):  the treatment of Allowed Administrative Expense

9    Claims, Allowed Priority Unsecured Claims, Allowed Priority Tax Claims and Allowed Secured

10   Tax Claims as set forth in Article II, Sections B. and C. of the Plan satisfies the requirements of

11   Bankruptcy Code section 1129(a)(9) in that holders of such Administrative Expense Claims,

12   Priority Unsecured Claims, Priority Tax Claims and Secured Tax Claims will be paid in full on the

13   Effective Date, or as soon as such expenses or claims become Allowed under the terms of the

14   Plan, except where the holder of such Claim agrees to a different treatment.

15   10.    11 U.S.C. § 1129(a)(11):  the Plan satisfies the requirements of Bankruptcy

16   Code section 1129(a)(11) as the evidence submitted by the Debtors shows that each of the Debtors

17   has sufficient funds on the Effective Date to make all of the distributions required to be made

18   under the Plan and that the Plan, including all of the documents incorporated therein, has adequate

19   provisions for the creation and management of the USACM Trust, the retention of assets by and

20   the management of Post-Effective Date DTDF, for making distributions to holders of Allowed

21   Claims or Equity Interests classified in Classes A-4 (Allowed General Unsecured Claims against

22   USACM), B-4 (Allowed General Unsecured Claims against FTDF), B-5 (Equity Interests in

23   FTDF), C-4 (Allowed General Unsecured Claims against DTDF), C-5 (Equity Interests in DTDF),

24   D-4 (Allowed General Unsecured Claims against USA Realty) and E-4 (Allowed General

25   Unsecured Claims against USA Securities), which are the only Classes that will receive a

26   distribution under the Plan, and to implement the provisions of the settlement with the holders of

27   Class A-5 (Direct Lender Compromise Claims).

28   11.    11 U.S.C. § 1129(a)(12): the Plan's provision for the payment of statutory

9

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    fees to the Office of the United States Trustee, satisfies the requirements of Bankruptcy Code

2    section 1129(a)(12).

3         12.    <u>11 U.S.C. § 1129(a)(13)</u>:  the Plan satisfies the requirements of Bankruptcy

4    Code section 1129(a)(13) because the Debtors are not subject to any retiree benefits as defined in

5    Bankruptcy Code section 1144.

6         13.    <u>11 U.S.C. § 1129(a)(14)</u>:  the requirements of Bankruptcy Code

7    section 1129(a)(14), which mandate the payment of domestic obligations, are inapplicable to these

8    business Debtors.

9         14.    <u>11 U.S.C. § 1129(a)(15)</u>:  the requirements of Bankruptcy Code

10   section 1129(a)(15), which only applies to cases where the debtor is an individual, are inapplicable

11   to these business Debtors.

12        15.    <u>11 U.S.C. § 1129(a)(16)</u>:  the requirements of Bankruptcy Code

13   section 1129(a)(16), which only applies to "the transfer of property by a corporation or trust that is

14   not a moneyed, business, or commercial corporation or trust", are inapplicable because each of the

15   Debtors is a moneyed business or commercial corporation.

16        16.    <u>11 U.S.C. § 1129(b)(1) and (2)</u>:  With respect to Classes A-6, A-7, A-8, D-5

17   and E-5, which have not accepted the Plan, and Class A-4, to the extent such Class has not

18   accepted the Plan, the Plan satisfies the requirements of Bankruptcy Code sections 1129(b)(1) and

19   1129(b)(2) because the Plan does not discriminate unfairly against, and provides fair and equitable

20   treatment with respect to, the Allowed Claims in Classes A-4, A-6 and A-7 and Allowed Equity

21   Interests in Classes A-8, D-5 and E-5 in that the Plan provides for no distribution to any junior

22   Class in a Debtor's Estate and does not discriminate unfairly among such Classes.

23        H.    The Plan satisfies the requirements of Bankruptcy Code section 1129(b) as

24   follows:

25        1.    All of the applicable requirements of Bankruptcy Code section 1129(a)

26   other than paragraph (8) are met with respect to the Plan.

27        2.    The Plan does not discriminate unfairly with respect to Classes A-4 (to the

28   extent such Class has not accepted the Plan), A-6, A-7, A-8, D-5 and E-5.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3.      The Plan is "fair and equitable" as to Classes A-4 (to the extent such Class has not accepted the Plan) and A-6 because holders of junior Claims or Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property.

4.      The only Classes of Claims and Equity Interests that are junior to Class A-4 Claims are Claims in Classes A-6 through A-8.  Holders of Class A-6 Claims will not receive or retain any property unless holders of Allowed Class A-4 Claims are paid in full, plus interest. Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim any property unless holders of Class A-4 and Class A-6 Claims are paid in full, plus interest. Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no distribution and retain no property under the Plan.

5.      The only Classes of Claims and Equity Interests that are junior to Class A-6 Claims are Claims in Classes A-7 through A-8.  Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim any property unless holders of Class A-6 Claims are paid in full, plus interest.  Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no distribution and retain no property under the Plan

6.      The Plan is "fair and equitable" as to Class A-7 because holders of junior Claims or Equity Interests will not receive or retain under the Plan on account of such junior Claim or Equity Interest any property.  The only Class that is junior to Class A-7 Claims is Class A-8, which is comprised as Equity Interests in USACM.  Holders of Equity Interests in USACM will receive no distribution or retain any property under the Plan.

7.      The Plan is "fair and equitable" within the meaning of section 1129(b)(2)(C)(ii) as to Class A-8, which is comprised of Equity Interests in USACM, Class D-5, which is comprised of Equity Interests in USA Realty, and Class E-5, which is comprised of Equity Interests in USA Securities because no holder of any interest that is junior to the Equity Interests treated in these Classes will receive or retain any property under the Plan.

I.      Article V of the Plan governing the assumption and rejection of executory contracts and unexpired leases satisfies the requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code.  As provided in the Debtors' Revised Schedule of Executory Contracts And

11

1 Unexpired Leases In Connection With Debtors' Third Amended Joint Chapter 11 Plan Of

2 Reorganization, filed on December 18, 2006 (docket no. 2162), the Debtors have elected to reject

3 all executory contracts and unexpired leases.

4     J.    The principal purpose of the Plan is not the avoidance of taxes or the

5 avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

6     K.    All modifications to the Plan filed or announced prior to the conclusion

7 of the Confirmation Hearing constitute technical changes and/or changes that have either been

8 consented to by affected constituents or which do not adversely affect or change the treatment

9 of any other Claims or Equity Interests. Accordingly, pursuant to Bankruptcy Rule 3019, these

10 modifications do not require additional disclosure under Bankruptcy Code section 1125 or

11 1127(a), or resolicitation of votes under Bankruptcy Code section 1126, nor do they require that

12 holders of Claims or Equity Interests be afforded an opportunity to change previously cast

13 acceptances or rejections of the Plan. The Plan as so modified meets the requirements of

14 Bankruptcy Code sections 1122 and 1123. Such modifications shall be deemed accepted by

15 each holder of a Claim or Equity Interest who has previously voted to accept the Plan.

16     L.    The form of documents in the Plan Documents Supplement, including

17 the USACM Liquidating Trust Agreement, the DTDF Amended Operating Agreement, the

18 Direct Lender Supplement, and the Disbursing Agent Agreements for USACM and FTDF

19 substantially in the form filed by the Debtors are appropriate.

20     M.    The appointment of Michael Tucker of FTI Consulting to serve as the

21 DTDF Administrator and to perform the duties specified under the Plan and the DTDF

22 Amended Operating Agreement is appropriate and consistent with the best interests of DTDF's

23 creditors, Equity Interest holders, and the interests of public policy.

24     N.    The appointment of Geoffrey L. Berman of Development Specialists,

25 Inc. to serve as the USACM Trustee and to perform the duties specified under the Plan and the

26 USACM Trust Agreement is appropriate and consistent with the best interests of USACM's

27 creditors and the interests of public policy.

28     O.    The parties identified to the Court to serve as members of the USACM

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

12

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Trust Committee and the DTDF Post-Effective Date Committee are appropriate to serve in such

2    roles.

3           P.      All of the conditions precedent to Confirmation of the Plan described in

4    Article VI Section A of the Plan have been satisfied.

5           Q.      The agreements, transactions and transfers authorized by the Confirmation

6    Order, including, without limitation, the USACM Trust Agreement and the DTDF Amended

7    Operating Agreement, are fair, equitable and reasonable, are entered into in good faith, are in the

8    best interests of the USACM and DTDF, their respective creditors and Estates (and with respect to

9    DTDF, its Equity Interest holders), and help provide adequate means for implementing the Plan.

10          R.      Pursuant to Bankruptcy Code section 1125(e), Persons, including the

11   Debtors, the Committees, and their respective attorneys, agents, directors, officers and

12   representatives, have acted in good faith with respect to the solicitation of votes on the Plan and

13   thus are entitled to all the protections of Bankruptcy Code section 1125(e).

14          S.      The injunctions, releases and limitations on liability contained in the Plan

15   are fair and equitable, are given for valuable consideration, were properly noticed to holders of

16   Claims and Equity Interests and other interested parties in accordance with the requirements of

17   due process and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, and are

18   in the best interests of the Debtors and their Estates.

19          T.      Each term and provision of the Plan is valid and enforceable pursuant to its

20   terms.

21          U.      The Plan satisfies the requirements for confirmation set forth in

22   section 1129 of the Bankruptcy Code.

23          V.      The Court's retention of jurisdiction as set forth in Article VIII Section D of

24   the Plan is appropriate and comports with the parameters contained in 28 U.S.C. § 157.

25          W.      The provisions of the Plan, these Findings and the Confirmation Order

26   shall bind the Debtors, their respective Estates, the Asset Purchaser, the USACM Trustee, the

27   DTDF Administrator, and all holders of Claims against, and Equity Interests in the Debtors,

28   whether or not the Claims or Equity Interests of such entities are Allowed under the Plan or

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   impaired under the Plan, whether or not such entities have voted to accept or reject the Plan,

2   and whether or not such entities have filed or are deemed to have filed proofs of Claim or

3   Equity Interests in these Chapter 11 Cases.

4              X.      The transfer of the Acquired Assets (including, without limitation, both

5   real and personal property) to the Asset Purchaser is a transfer in accordance with Bankruptcy

6   Code section 1146(c) and, therefore the making, delivery, filing or recording of any mortgages,

7   deeds of trust, leasehold mortgages, leases (whether recorded or unrecorded), and/or the various

8   instruments and documents of transfer as specified in or contemplated by the Asset Purchase

9   Agreement or the Plan (collectively, "Instruments of Transfer"), and/or the exhibits thereto are

10  hereby exempt from taxation under any law imposing a recording tax, stamp tax, sales tax,

11  transfer tax, use tax or any similar tax or any so-called "bulk-sale".  The appropriate federal,

12  state or local government filing and recording officers are hereby directed to accept for filing or

13  recording all Instruments of Transfer or other documents of transfer to be filed and recorded in

14  accordance with the Plan or the Asset Sale Transaction, without payment of any such tax or

15  government assessment, and without the presentation of any affidavits, instruments, or returns

16  otherwise required for recording, other than the Confirmation Order.  The Court retains

17  jurisdiction to enforce the foregoing direction, by contempt proceedings or otherwise.

18             Y.      All DTDF Litigation Claims and FTDF Transferred Assets accruing to

19  DTDF or FTDF, or their Estates, shall remain assets of the Post-Effective Date DTDF, whether

20  or not litigation relating thereto is pending on the Effective Date and whether or not any such

21  right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or

22  any schedule, exhibit or other document filed in connection therewith.

23             Z.      All USACM Litigation Claims and the FTDF Litigation Claims (transferred

24  to USACM pursuant to section E.2.j of Art. IV of the Plan) accruing to USACM or FTDF,

25  respectively, or their respective Estates shall remain assets of and vest in the USACM Trust,

26  whether or not litigation relating thereto is pending on the Effective Date and whether or not any

27  such right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or

28  any schedule, exhibit or other document filed in connection therewith.

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    AA.     As set forth in Article IV, Section E.1. of the Plan, the compromise between

2 USACM and the Direct Lenders is fair and reasonable and is in the best interests of the USACM

3 Estate and the Direct Lenders, respectively.

4    BB.     As set forth in Article IV, Section E.2. of the Plan, the compromise between

5 USACM and FTDF is fair and reasonable and is in the best interests of the USACM Estate and

6 FTDF Estate, respectively.

7    CC.     As set forth in Article IV, Section E.3. of the Plan, the compromise between

8 FTDF and DTDF is fair and reasonable and is in the best interests of the FTDF Estate and DTDF

9 Estate, respectively.

10    DD.     As set forth in Article IV, Section E.4. of the Plan, the compromise between

11 FTDF and USA Realty is fair and reasonable and is in the best interests of the FTDF Estate and

12 USA Realty Estate, respectively.

13    EE.     As set forth in Article IV, Section E.5. of the Plan, the compromise

14 between DTDF and USA Realty is fair and reasonable and is in the best interests of the DTDF

15 Estate and USA Realty Estate, respectively.

16    FF.     The Asset Purchase Agreement and the transactions contemplated by the

17 Asset Purchase Agreement were negotiated and have been and are undertaken by USACM and

18 FTDF (FTDF together with USACM, the "Sellers") and Asset Purchaser at arm's length,

19 without collusion or fraud, and in good faith within the meaning of section 363(m) of the

20 Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization

21 provided herein to consummate the Asset Sale Transaction shall not affect the validity of the

22 transfer of the Acquired Assets to the Asset Purchaser unless such authorization is duly stayed

23 pending such appeal.

24    GG.     The Auction conducted in accordance with the Bid Procedures Order on

25 December 7, 2006, at which Asset Purchaser was declared the highest and best bidder, was

26 conducted in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The

27 Asset Purchaser is a purchaser in good faith of the Acquired Assets.  As a result of the

28 foregoing, the Sellers and Asset Purchaser entitled to the protections of section 363(m) of the

1    Bankruptcy Code.

2            HH.    The Asset Purchase Agreement was negotiated, proposed and entered

3    into by the Debtors and the Asset Purchaser without collusion, in good faith, and from arm's-

4    length bargaining positions.

5            II.    There were no brokers involved in the Asset Sale Transaction, and no

6    brokers' commissions are due with respect to the Asset Sale Transaction.

7            JJ.    The Asset Purchaser is not an "insider" of any of the Debtors, as that

8    term is defined in section 101 of the Bankruptcy Code.

9            KK.    The transfer of the Acquired Assets to the Asset Purchaser will be a

10   legal, valid, and effective transfer of the Acquired Assets, and will vest the Asset Purchaser

11   with all right, title, and interest of the Sellers to the Acquired Assets free and clear of all liens,

12   claims, interests, obligations and encumbrances whatsoever, including, but not limited to, (A)

13   all monetary and non-monetary defaults and rights that purport to give to any party a right or

14   option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers'

15   or the Asset Purchaser's interest in, or rights in or under, the Acquired Assets, or any similar

16   rights, based in any way on any action taken (or failed to be taken) by any of the Debtors or any

17   other matter or occurrence relating to the period prior to the Closing (other than any right that

18   existed and was matured and exercisable, as of the Petition Date, to effect a substitution of

19   USACM as loan servicer under Section 3 of any Loan Servicing Agreement, as well as any

20   defenses of the loan servicer thereto (a "Surviving Section 3 Right")); (B) taxes arising under or

21   out of, in connection with, or in any way relating to the existence, ownership, management or

22   servicing of the Acquired Assets prior to the Closing; and (C) (i) all mortgages, deeds of trust,

23   security interests, conditional sale or other title retention agreements, pledges, liens, judgments,

24   demands, encumbrances, rights of first refusal or charges of any kind or nature, if any,

25   including, but not limited to, any restriction on the use, voting, transfer, receipt of income or

26   other exercise of any attributes of ownership and (ii) all debts arising in any way in connection

27   with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers'

28   predecessors or affiliates; all claims (as that term is defined in the Bankruptcy Code),

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

16

1 obligations, liabilities, rights of recoupment or setoff, demands, guaranties, options, rights,

2 restrictions, interest and matters of any kind and nature in any way relating to the existence,

3 ownership, management or servicing of the Acquired Assets prior to Closing, whether known

4 or unknown, contingent or otherwise, whether arising prior to or subsequent to the

5 commencement of these cases pursuant to chapter 11 of the Bankruptcy Code, and whether

6 imposed by agreement, understanding, law, equity or otherwise, including but not limited to

7 claims otherwise arising under doctrines of successor liability (collectively, "Interests");

8 provided, however, that, in connection with any attempted post-Closing exercise of a Surviving

9 Section 3 Right: (a) the Direct Lenders must provide Compass at least thirty (30) days prior

10 written notice of the intended exercise of such right in accordance with section 8 of the Loan

11 Servicing Agreement, (b) Compass shall have the right to challenge the exercise of such

12 Surviving Section 3 Right by filing a motion with this Court prior to the expiration of such

13 thirty (30) day period to determine whether such Surviving Section 3 Right has been properly

14 and validly exercised (the "Compass Motion") and the Court shall retain jurisdiction to

15 adjudicate any such disputes, (c) in the event Compass timely files such Compass Motion, the

16 effectiveness of the attempted exercise of such Surviving Section 3 Right shall be stayed

17 pending this Court's entry of an order in respect of the Compass Motion, and (d) the post-

18 Closing survival of such Surviving Section 3 Right shall not impair in any respect any rights or

19 interests of Compass under the Loan Servicing Agreements, including, without limitation, its

20 rights under Section 2(c)(iii) of the Loan Servicing Agreement. In the event of a proper

21 exercise of remedies under Section 3 of the Loan Servicing Agreement, (i) neither the Direct

22 Lenders nor any replacement servicer selected by such Direct Lender shall have the right or

23 ability to compromise, subordinate, or impair, in any respect, any claims purchased by Compass

24 from the Estates for default interest, accrued servicing fees, late charges, success fees, or other

25 amounts under the Loan Servicing Agreement, and (ii) the Confirmation Order shall be binding

26 upon such replacement servicer regardless of whether such replacement servicer actually

27 received such copy of the Confirmation Order.

28         LL.    The Loan Servicing Agreements are not executory contracts under

17

Bankruptcy Code section 365 and can be transferred to the Asset Purchaser under Bankruptcy Code sections 1123 and 363(b) without being assumed and assigned to the Asset Purchaser under Bankruptcy Code section 365.

MM. The Asset Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Sellers, their Estates, their creditors, and, with respect to FTDF, its Equity Interest holders, if the sale of the Acquired Assets to the Asset Purchaser was not free and clear of all Interests of any kind or nature whatsoever, or if the Asset Purchaser would, or in the future could, be liable for any of the Interests, including, without limitation, any liabilities not expressly assumed by the Asset Purchaser.

NN. The consideration provided by Asset Purchaser pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery to the Sellers' Estates than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any State (including Nevada), territory, possession, or the District of Columbia.

OO. Unless otherwise provided by law, the reversal or modification of the Confirmation Order and these Findings on appeal shall not affect the validity of the Plan, or any agreement or action authorized by the Confirmation Order or under the Plan with respect to any entity acting in good faith, whether or not that entity knows of the appeal, unless the Confirmation Order is stayed pending appeal.

PP. Based on the foregoing findings and conclusions, the Debtors are entitled to entry by this Court of the Confirmation Order.

Submitted by:
RAY QUINNEY & NEBEKER P.C.
and SCHWARTZER & MCPHERSON LAW FIRM

By: /s/ Jeanette E. McPherson
LENARD E. SCHWARTZER, ESQ.
JEANETTE E. MCPHERSON, ESQ.
ANNETTE W. JARVIS, ESQ.
STEVEN STRONG, ESQ.
*Counsel for Debtors*

Approved / Disapproved by:
OFFICE OF THE U.S. TRUSTEE

By: ______________________
August B. Landis

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  **[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
2  THE "ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER
   11 PLAN OF REORGANIZATION, AS MODIFIED HEREIN"**

3

4  **Approved**/Disapproved by:                    **Approved**/Disapproved by:
   LEWIS AND ROCA, LLP                             GORDON & SILVER, LTD.

5
                                                   By:  /s/ Gregory Garman
6  By: /s/ Rob Charles                                 GERALD M. GORDON, ESQ.
       SUSAN M. FREEMAN, ESQ.                          GREGORY E. GARMAN, ESQ.
7      ROB CHARLES, ESQ.                            *Counsel for the Official Committee of
       *Counsel for the Official Committee of*       Holders of Executory Contract Rights of
8      *Unsecured Creditors of USA Commercial*       USA Commercial Mortgage Company*
       *Mortgage Company*
9

10

11 **Approved**/Disapproved by:                    **Approved**/Disapproved by:
   ORRICK, HERRINGTON & SUTCLIFFE LLP              STUTMAN TREISTER & GLATT, P.C. and
12 and BECKLEY SINGLETON, CHTD.                    SHEA & CARLYON, LTD.

13

14 By: /s/ Marc A. Levinson                        By: /s/ Christine Pajak
       MARC A. LEVINSON, ESQ.                           FRANK A. MEROLA, ESQ.
15     JEFFERY HERMANN ESQ.                              EVE KARASIK, ESQ.
       BOB L. OLSON, ESQ.                                CHRISTINE PAJAK, ESQ.
16     ANNE M. LORADITCH, ESQ.                           CANDACE C. CARLYON, ESQ.
       *Counsel for the Official Committee of*          *Counsel for the Official Committee of*
17     *Equity Security Holders of USA Capital*          *Equity Security Holders of USA Capital*
       *Diversified Trust Deed Fund, LLC*                *First Trust Deed Fund LLC*
18

19

20 Approved/**Disapproved** by:                    Approved/Disapproved by:

21 By: /s/ Kevin Darby for                         By:
       ALAN SMITH, ESQ.                                 DEAN KIRBY, ESQ.
22     *Counsel for Lenders Protection Group*          *Counsel for Debt Acquisition*
                                                        *Company of America*
23

24 Approved/Disapproved by:                        Approved/Disapproved by:

25

26 By:                                             By:
       ERIC FIELD, ESQ.                                 NANCY ALLF, ESQ.
27     *Counsel for Pension Benefit Guarantee*          ROBERT LEPOME, ESQ.
       *Corporation*                                    *Counsel for The Alexander Group*

28

19

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  **[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE "ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, AS MODIFIED HEREIN"**

2

3

4  Approved/Disapproved by:                    Approved/**<u>Disapproved</u>** by:

5

6  By: _____        By: _/s/ Janet Chubb_____
       MICHAEL SCHMAHL, ESQ.                         JANET CHUBB, ESQ.
       *Counsel for Dr. Gary Kantor, Mrs. Kantor*    *Counsel for Jones Vargas Direct Lenders*
7      *and Kantor Nephrology 401K plan*

8  **<u>Approved</u>**/Disapproved by:           Approved/Disapproved by:

9

10  By: _/s/ George Davis_____        By: _____
        GEORGE DAVIS ESQ.                            DAVID COHEN, ESQ.
11      *Counsel for Compass Partners*               *Counsel for Sierra Liquidity Fund*

12

13  Approved/Disapproved by:                    Approved/Disapproved by:

14

15  By: _____        By: _____
        GREGORY J. WALCH ESQ.                        JEFFREY SYLVESTER, ESQ.
16      *Counsel for Gregory J. Walch and Shauna*    *Counsel for USA Commercial Real Estate*
    *M. Walch, Trustees of the Gregory J. and*       *Group*
17  *Shauna M. Walch Family Trust*

18

19  Approved/Disapproved by:                    Approved/Disapproved by:

20

21  By: _____        By: _____
        RUSSELL WALKER, ESQ.                         SUSAN SCANN, ESQ.
22      *Counsel for USA Investment Partners, LLC,*  *Counsel for Copper Sage Commercial*
    *Joseph Milanowski and Thomas Hantges*           *Center and Binford Medical Developers, LLC*

23

24  **<u>Approved</u>**/Disapproved by:          Approved/Disapproved by:

25  By: _/s/ Andrew Brumby_____       By: _____
        ANDREW BRUMBY, ESQ.                          WADE GOCHNOUR, ESQ.
26      R. VAUGHN GOURLEY, ESQ.                      ARYN M. FITZWATER, ESQ.
        *Counsel for Standard Property Development*  *Counsel for Liberty Bank*
27

28  / / /

20

1   In accordance with LR 9021, counsel submitting this document certifies as follows (check one):

2   ___ The court has waived the requirement of approval under LR 9021.

3   ___ No parties appeared or filed written objections, and there is no trustee appointed in the case.

4   _X_ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any
    unrepresented parties who appeared at the hearing, and any trustee appointed in this case, and each has
    approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the
5   party has approved, disapproved, or failed to respond to the document]:

6   **Failed to respond:**

7   WADE GOCHNOUR, ESQ.
    SUSAN SCANN, ESQ.
8   RUSSELL WALKER, ESQ.
    GREGORY J. WALCH ESQ.
9   JEFFREY SYLVESTER, ESQ.
    DAVID COHEN, ESQ.
10  MICHAEL SCHMAHL, ESQ.
    ROBERT LEPOME, ESQ.
11  ERIC FIELD, ESQ.
    DEAN KIRBY, ESQ.
12  August B. Landis, Esq.

13

14
                                            # # #
15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122